# EXHIBIT A

Keith Bradley, *pro hac vice*
ScheLeese Goudy, *pro hac vice*
SQUIRE PATTON BOGGS (US) LLP
717 17th Street, Suite 1825
Denver, Colorado 80202
(303) 830-1776
(303) 894-9239 (facsimile)
keith.bradley@squirepb.com
scheleese.goudy@squirepb.com

Jeffrey M. Walker, *pro hac vice*
Katherine E. Wenner, *pro hac vice*
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
(614) 365-2700
(614) 365-2499 (facsimile)
jeffrey.walker@squirepb.com
katherine.wenner@squirepb.com

Thomas P. Amodio
Kevin M. Boots
REEVES AMODIO, LLC
500 L Street, Suite 300
Anchorage, AK 99501
(907) 222-7100
(907) 222-7199 (facsimile)
tom@reevesamodio.com
kevin@reevesamodio.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTHERN DYNASTY MINERALS LTD. and PEBBLE LIMITED PARTNERSHIP, | Case No. 3:24-cv-00059 |
| Plaintiffs, | |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and UNITED STATES ARMY CORPS OF ENGINEERS | |
| Defendants. | |

## FIRST AMENDED AND SUPPLEMENTED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Northern Dynasty Minerals Ltd. ("Northern Dynasty") and Pebble Limited Partnership ("Pebble Partnership") (collectively "PLP") ask the Court to vacate, as invalid, the actions of defendants, the United States Environmental Protection Agency ("EPA") and the United States Army Corps of Engineers ("Army Corps"), to block mining of the Pebble Deposit by vetoing issuance of Clean Water Act discharge permits for such mining operations across a broad swath of southwest Alaska. In support of their request, plaintiffs state as follows:

## INTRODUCTION

1.      PLP seeks relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 501 *et seq*, from the EPA's unprecedented Final Determination to veto discharges and discharge permits, purportedly under section 404(c) of the Clean Water Act, 33 U.S.C. § 1344, essentially prohibiting mining activities across a remote area of more than 200,000 acres in southwestern Alaska (the "Final Determination"). 88 Fed. Reg. 7,441 (Feb. 3, 2023).

2.      PLP seeks relief under the APA from the Army Corps Final Agency Decision ("Permit Denial") to deny the permit application for the Pebble mine and its associated transportation infrastructure by relying on the Final Determination as "a controlling factor that cannot be changed." Department of the Army, Record of Decision, *Review of the Application by Pebble Limited Partnership (POA-2017-0271) in light of the prohibitions and restrictions imposed by the Final determination of the* [EPA], (Apr. 15, 2024).

2

3.      The Pebble Deposit is a rich deposit of copper and other valuable minerals in southwestern Alaska.  It is currently the largest known undeveloped copper resource in the world, containing at least 4% of current world reserves.  It also contains enormous amounts of other valuable minerals, such as ores of rhenium, molybdenum, silver, and gold.

4.      PLP holds the mineral rights, through claims from the State of Alaska, to the entirety of the known Pebble Deposit, located within the area of the EPA's veto.

5.      Since first acquiring mineral rights in the Pebble Deposit in 2001, PLP has invested over one billion dollars, over the course of decades of work, to develop the Pebble Deposit.  PLP has worked under close regulatory oversight from the State of Alaska.  PLP has also worked diligently with the Army Corps over several years to refine its mining plans to reduce environmental impacts, and to develop mitigation measures for any remaining impacts. PLP spent almost $200 million on environmental research to mitigate the impact of the proposed mine and give the company, regulators, and the community a comprehensive understanding of the impacts of developing the Pebble Deposit.

6.      The minerals in the Pebble Deposit are vital to the modern economy.  Copper is particularly important to electricity and other renewable energy production, distribution, and consumption, including the transportation industry's ongoing transition from internal combustion engines to electric motors and batteries.  The demand for copper has dramatically increased in recent years, and will more than double by 2035, as the United States and the rest of the world transition from oil and gas-based economies to more electricity-based economies.

7.      Despite PLP's significant investments in the Pebble Deposit and the importance of bringing these resources to market, the EPA took unprecedented action to

block any development or use of the Pebble Deposit. Ultimately, the EPA issued the Final Determination, which prohibits the issuance of Clean Water Act permits for discharges within a certain area based on one version of PLP's mining plan, for any project that would have any impact "comparable" to that plan; and prohibits discharges into the waters of the United States, within a vast expanse of 200,000 acres, for any project with an impact "comparable" to that plan. Such prohibitions, together or separately, would make it impossible to extract minerals from the Pebble Deposit Area. Then, in reliance on the Final Determination, the Army Corps issued a its Permit Denial.

8. With the stroke of a pen, the EPA destroyed what PLP and the State of Alaska worked so hard over decades to create, while also denying the country access to critical metals during a time when multiple ongoing national and global industrial revolutions depend upon them.

9. What is more, the Final Determination also deprives the State of Alaska and the local communities around the Pebble Deposit of essential revenue and opportunities for economic development. The record before the EPA showed the Pebble mine would create 5,000 to 10,000 jobs in Alaska—over 6,000 jobs during construction and 4,000 jobs during early operations. Many of these jobs would be located in a rural area of the state where economic opportunities are extremely limited for the indigenous people who live there. The mine would also create economic opportunities for Native Village Corporations in the vicinity. In addition, it would, according to the record, have generated between $37 million and $170 million in annual royalties for the State of Alaska, and approximately $25 million to $150 million in annual state corporate income tax revenue. PLP had also agreed to share profits

with residents of the local communities through a "Pebble Performance Dividend," which was estimated to provide residents $2,100 to $7,700 annually. None of these state and local opportunities are possible because of the EPA's section 404(c) veto.

10. As set forth below, the EPA's Final Determination is contrary to the Clean Water Act, and violates the statutes conferring the Pebble Deposit lands to the State of Alaska. The Final Determination is also arbitrary and capricious, an abuse of discretion, and contrary to the record that was before the EPA. Further, the Army Corps Permit Denial is arbitrary and capricious. PLP seeks all available relief under the APA to remedy the EPA and the Army Corps's unlawful and irrational action, and, in particular, PLP asks the Court to vacate and set aside the Final Determination and the Permit Denial.

## JURISDICTION AND VENUE

11. This action raises federal questions and arises under the APA, 5 U.S.C. §§ 701 *et seq.*, and the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

12. The United States has waived its sovereign immunity against this action, by operation of 5 U.S.C. § 702, because PLP seeks no money damages from this Court and alleges that the EPA purported to act under color of the Clean Water Act.

13. This Court is a proper venue for this action under 28 U.S.C. § 1391(e), which permits a civil action to be brought against any officer or employee of the United States or any agency thereof in the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred or in which the plaintiffs reside. The action involves the designation of a restricted area within this district, based purportedly on scientific

investigations conducted in this district, to block the issuance of a permit under review by an Army Corps office in this district.

14. In addition, plaintiff Pebble Partnership maintains its principal place of business in Anchorage, within this district.

## **PARTIES**

15. Plaintiff Northern Dynasty is a Canadian company that is publicly traded on the Toronto Stock Exchange and the NYSE American exchange and headquartered in Vancouver, British Columbia. Northern Dynasty indirectly owns 100% of the Pebble Partnership and holds through subsidiaries the entire private interest in mineral rights located in the Pebble Deposit Area. Northern Dynasty's operations are focused on designing, permitting, building and operating the Pebble Project.

16. Plaintiff Pebble Partnership is an Alaska limited partnership based in Anchorage, Alaska. It has overseen a robust program of activities related to the Pebble Project in the areas of mineral exploration, engineering design and mine planning, environmental/socioeconomic studies, stakeholder relations, and public affairs.

17. Defendant EPA is an executive department of the U.S. government headquartered in the District of Columbia, and is the federal agency that took unlawful and improper action (the "Final Determination") that is a target of this complaint.

18. Defendant Army Corps is a unit of the United States Army, under the Department of Defense, headquartered in the District of Columbia, and took unlawful and improper action (the Permit Denial) that is a target of this complaint.

6

## STATUTORY AND REGULATORY BACKGROUND

19.     Congress enacted the Clean Water Act, including section 404(c) in its current form, in 1972.  Pub. L. 92-500, 86 Stat. 884.  Section 404(c) has been amended only once, in 1977, to replace a reference to the Secretary of the Army with just "the Secretary," which the 1977 amendment defined to mean the Secretary of the Army.

20.     The Clean Water Act requires a person to obtain a permit, under section 404, before discharging any "pollutant" into the navigable waters.  33 U.S.C. § 1311(a).  "Pollutant" is defined to include, among other materials, "dredged spoil," "rock," and "solid waste."  *Id.* § 1362(6).

21.     The mining operation described for the Pebble Deposit removes the rock that contains valuable minerals as well as soil overlying the deposit and other rock ("waste rock") associated with the mineral-containing rock.  Then the mineral-containing rock is processed to extract the minerals, leaving behind tailings.  The waste rock and tailings are managed in a safe and secure manner.  The proposed project for the Pebble Deposit would utilize two tailings storage facilities, located behind a rock-filled tailings dams.  Mining at the Pebble Deposit will involve discharging of waste rock and tailings in areas that include streams.

22.     The Army Corps can issue permits allowing "discharge of dredged or fill material into the navigable waters at specified disposal sites," which are to be "specified for each such permit by the Secretary . . . through the application of guidelines developed by the Administrator, in conjunction with the Secretary."  *Id.* § 1344(a), (b).

23.     Ordinarily, an application for a section 404 permit results in an analysis, by the Army Corps, of economic considerations pertinent to the proposed activity and the potential

environmental impacts, pursuant to both the National Environmental Policy Act ("NEPA") and to the guidelines, issued by the EPA, under section 404(b).

24.     But under section 404(c) of the Clean Water Act, the EPA might veto a permit. The EPA can, in general "prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site," and "deny or restrict the use of any defined area for specification . . . as a disposal site," if the EPA "determines . . . that the discharge of such materials into such area will have an unacceptable adverse effect on" four specific types of resource: (1) "municipal water supplies"; (2) "shellfish beds and fishery areas (including spawning and breeding areas)"; (3) "wildlife"; or (4) "recreational areas." 33 U.S.C. § 1344(c).

25.     **FACTUAL BACKGROUND**

26.     The Pebble Deposit sits within a remote area about 200 miles southwest of Anchorage, Alaska. The closest communities are the villages of Iliamna, Newhalen, and Nondalton, each approximately 17 miles from the Pebble Deposit. The nearest village of Nondalton has roughly 130 inhabitants.

27.     The State of Alaska has designated the area around the Pebble Deposit for potential mineral development.

28.     Northern Dynasty began investing in the Pebble Deposit in 2001, by purchasing mineral rights from the company that had originally discovered the Deposit. Northern Dynasty then invested in further exploratory work to expand the Deposit, and filed additional mineral claims with the State of Alaska as it learned how large the Deposit truly is. These claims are subject to royalty requirements, to be paid to the State of Alaska when mining operations extract minerals from the Deposit.

29.     In 2004, Northern Dynasty commissioned multiple third-party studies of environmental conditions at and near the Pebble Deposit.  This work came to involve over 100 independent scientists, investigating topics such as the hydrology of the area, the vegetation, the aquatic life in streams running down from the area of the Deposit, the economies and cultures of the closest communities, and more.  The environmental studies themselves cost almost $200 million.  PLP provided the EPA the resulting reports in 2011 as a compilation it called the Environmental Baseline Document; and in early 2012 it publicly released a complete copy of the collection.

30.     Meanwhile, PLP met repeatedly with federal and state agencies, including the EPA, the U.S. Fish and Wildlife Service, the Army Corps, and the Alaska Department of Natural Resources, in a set of working groups to assess what information would be useful for evaluating potential mining plans and making regulatory decisions about them.  The working groups held multiple-day in-person meetings on a periodic basis from 2004 through 2008, and occasionally thereafter.

31.     Unknown to PLP at the time, the EPA was secretly considering, even then, to block the use of the Pebble Deposit (and destroy PLP's investment) by exercising a section 404(c) veto.  In parallel with the working group meetings, EPA staff had developed an internal view that the agency should use section 404(c) to prevent the issuance of the Clean Water Act permits that would be needed for the mine.  In 2010, the EPA's Region 10 (the regional office that covers Alaska) requested funding to carry out a section 404(c) veto.

32.     The EPA's internal view was directly shaped by extra-governmental opponents of the Pebble mine—through almost 800 separate email communications, in-person meetings,

and other coordination efforts—to develop a plan to veto the mine using section 404(c) without even seeing PLP's actual plans. The EPA kept its plans secret from PLP; for example, when EPA Administrator Lisa Jackson met with PLP in July 2010, she did not reveal that the agency had received a petition requesting a section 404(c) veto.

33. Having determined through premature internal conclusions that it should exercise its 404(c) veto, the EPA began its own environmental assessment. The EPA asserted that this project, called the Bristol Bay Watershed Assessment (the "Assessment"), would be a general assessment of the environment around Bristol Bay and the potential consequences of development of all kinds, not just of mining the Pebble Deposit.

34. The State of Alaska repeatedly objected to the development of the Assessment, on grounds that the process was not objective or fair and did not take reasonable account of the State's views. PLP also strongly objected on the grounds that it was premature to conduct the Assessment given that PLP had not submitted a mine plan or permit application through which the EPA could evaluate actual impacts and mitigation.

35. After commenters pointed out extensive deficiencies in the first draft of the Assessment, the EPA asked outside consultants to review the draft. These consultants generally criticized the draft for assessing hypothetical mines without reference to how an actual mine might be built and operated, and for failing to consider what measures an actual mining operator might take to reduce or mitigate environmental impacts.

36. The EPA prepared a second draft of the Assessment, but it permitted peer reviewers only to evaluate the agency's response to comments on the first draft, and not to evaluate the Assessment as a whole. Even with that restricted scope, multiple reviewers

complained that the EPA gave them too little time to review the draft; and concerns remained about the EPA's use of hypothetical, unrealistic mine scenarios.

37. The Assessment was not an objective exercise to conduct a fair assessment of the consequences of an actual Pebble mine. Indeed, when the EPA issued the final Assessment in January 2014, PLP was still developing its plans and had not provided details to the EPA or to the Army Corps. But the unfair conclusions of the Assessment were not simply a consequence of conducting the evaluation prematurely. The EPA hypothesized potential mining operations that were not just worst-case scenarios, but were actually worse than could reasonably be expected for any mine at the Pebble Deposit Area.

38. As just one example, the Assessment assumed that hazardous substances would leach out from the mine tailings and only 50% of them would be captured. Because of this leachate, the Assessment concluded that mining operations at Pebble would result in harmful levels of copper in the Bristol Bay watershed. Yet existing regulatory requirements from the State of Alaska would require far higher capture rates, and modern mining technology can capture 99% of such leachates. The EPA had no reasonable basis for its exaggerated assumptions about leachate.

39. In multiple other respects as well, the Assessment was based on demonstrably inaccurate assumptions about the characteristics of an eventual mining operation.

40. In July 2014, just a few months after issuing the Assessment, the EPA published a proposed determination to issue a veto under section 404(c). At this point the EPA still had no details about any actual Pebble mine, as PLP had not submitted a plan to any federal agency, nor applied for a Clean Water Act permit. Instead, the 2014 proposal hypothesized various

Case 3:24-cv-00059-SLG    Document 55-2    Filed 06/07/24    Page 12 of 51
Exhibit 2

theoretical mines, and the EPA described the environmental effects of the hypothetical mines based on its defective Assessment.

41.     The 2014 proposal took no account of any potential compensatory mitigation measures, even though such mitigation is commonplace for any Clean Water Act permit.  The proposal said only that mitigation techniques are unlikely to offset the impacts.

42.     PLP contested the 2014 proposal and the Assessment through actions in this district court, on grounds, *inter alia*, that they violated the APA, the Clean Water Act, and the Federal Advisory Committees Act.  Among other charges, PLP contended that the EPA had colluded with extra-governmental opponents of Pebble mining to develop a plan to veto the mine using section 404(c).  Indeed, the individual who led that effort within the EPA (Phil North) acknowledged the EPA's collusion with project opponents, including environmental non-government organizations, during his deposition in the case.  The district court issued a preliminary injunction barring the EPA from further action on the 2014 proposal pending the resolution of the litigation.

43.     PLP and the EPA settled that litigation.  Among the EPA's commitments under the settlement, it promised to initiate a process to withdraw the 2014 proposed determination.

44.     In December 2017, PLP submitted to the Army Corps its application for the Clean Water Act permits needed for the actual mine that PLP planned to operate.

45.     The project footprint for the actual mine that PLP submitted in its 2017 application to the Army Corps was smaller and more compact than prior conceptual plans, and certainly significantly smaller than what the EPA imagined in the Assessment.

46. While the Army Corps reviewed the application, PLP developed a compensatory mitigation plan.

47. Compensatory mitigation, to offset impacts from an authorized development by supporting, preserving, or enhancing environmental resources elsewhere nearby, is an integral part of environmental impact assessments. For decades, both the Army Corps and the EPA have acknowledged that compensatory mitigation must be applied with flexibility in Alaska because the state's unique characteristics can defeat ordinary mitigation efforts. A Memorandum of Agreement ("Alaska MOA") between the EPA and the Army Corps establishes guiding principles for compensatory mitigation specific to Alaska and calls for both agencies to flexibly apply the Clean Water Act section 404(b) guidelines to Alaska projects.

48. A particular obstacle to mitigation in Alaska is that, unlike in more densely populated States, Alaska has much less area of degraded environmental resources, particularly degraded wetlands, and thus less opportunity for a developer to achieve mitigation by restoring degraded areas. The Alaska MOA therefore allows mitigation measures such as preservation. The Army Corps and the EPA have regularly followed that approach in other projects.

49. PLP's proposed mitigation, as documented in a repeated series of mitigation plans submitted to the Army Corps, was extensive and consistent with the Alaska MOA.

50. On July 24, 2020, the Army Corps published the final environmental impact statement ("EIS"), a mammoth analysis required under NEPA. The EIS is thousands of pages long, and PLP dedicated significant expense to participating in the process. The Army Corps developed and drafted the EIS.

51. The Army Corps' EIS concluded that the Pebble mine, as proposed by PLP in its application, would have no "measurable impact on fish populations."

52. The Army Corps' EIS assessed the possibility that by reducing the diversity of spawning habitat, the Pebble mine might reduce salmon populations in Bristol Bay by means of a "portfolio effect." The EIS concluded that any such effects would not be noticeable.

53. The Army Corps' EIS concluded that given the details of PLP's proposal, a failure of the tailings dam was not reasonably foreseeable. This conclusion directly contradicted the EPA's 2014 proposed determination and the EPA's Assessment. Of course, both the 2014 proposal and the Assessment were based on implausible hypothetical mining operations, with little relationship to reality; whereas the EIS assessed the potential impacts of a much smaller and more compact actual mine, planned using modern technology and modern regulatory requirements.

54. The Army Corps' EIS concluded that because of the technology planned for the mine (and mandated by state regulations), water discharged from the Pebble mine would not impact off-site surface waters.

55. The Army Corps' EIS concluded that the Pebble mine would have beneficial effects on the human environment in the area, by causing increased job opportunities with regular employment and steady incomes, and lowering the cost of living.

56. The EIS also noted the positive economic effects that a Pebble mine would have for southwestern Alaska.

57. In the meantime, the U.S. Fish and Wildlife Service conducted an assessment under the Endangered Species Act, as usual for any project like the mine. That agency drafted

a formal opinion stating that the Pebble mine would not be likely to jeopardize endangered species in southwest Alaska.

58.     The EPA maintains a memorandum of agreement ("404(q) MOA") with the Army Corps about how to coordinate reviews of Clean Water Act permit applications. The 404(q) MOA is mandated by section 404(q) of the Clean Water Act, 33 U.S.C. § 1344(q), which directed the Army Corps to enter into such MOAs with other agencies to "assure that, to the maximum degree practicable, a decision with respect to an application for a permit . . . will be made" within 90 days of the application, and "to minimize . . . delays in the issuance of permits." *Id.* Under the 404(q) MOA, if the EPA believes a project will have unacceptable adverse effects that could warrant a section 404(c) veto (supported by the facts and findings in the EIS), the EPA must notify the Army Corps by letter. This letter is called a "3(b) letter," named after the pertinent provision in the 404(q) MOA.

59.     The EPA was fully aware of the application that PLP filed with the Army Corps, and it reviewed the application as it was pending. In fact, the EPA was a cooperating agency for the EIS and participated in the NEPA process from the very beginning. But the EPA decided not to send a 3(b) letter. The EPA communicated with the Army Corps that it would not be issuing a 3(b) letter as they were satisfied with the work that had been done by the relevant agencies in the completion of the EIS.

60.     At this point, and as reported in the national media, the Pebble mine appeared on a direct path to approval.

61.     Then, on August 4, 2020, Donald Trump Jr., the eldest son of then-President Trump shared Nick Ayers's tweet urging the President to order the EPA to block the Pebble

mine.  At the time, Mr. Ayers was the former Chief of Staff for then-Vice President Pence.  In

a briefing the following day, the President acknowledged the tweet during a briefing.

62.     Personnel within the Army Corps' Pacific Ocean Division, reacting to the press

conference, concluded that "we may begin seeing the administration's involvement."

63.     Two weeks after the tweet, on August 18, 2020, Colonel Damon Delarosa, the

Army Corps Commander and District Engineer of the Alaska District informed his superior,

Kirk E. Gibbs, Colonel and Commander of the Pacific Ocean Division that "a potential

situation" with the Pebble mine permit "has come up" and that Army Corps headquarters

"has gotten wind of the issue" and scheduled a call with Colonel Delarosa.

64.     Two days after the "potential situation" arose, PLP received a letter from the

Army Corps demanding in-kind compensatory mitigation, i.e. refusing to accept the kinds of

mitigation measures that had long been contemplated by the Alaska MOA.

65.     On August 24, 2020, the Secretary of the Army—the head of the executive

department superior to the Army Corps—unusually issued a press release stating that "the

Corps finds that the project, as currently proposed, cannot be permitted under section 404 of

the Clean Water Act."  Ordinarily the Secretary of the Army does not take such public

positions on pending applications.  This press release was issued before the regional office of

the Army Corps had supposedly even made a decision.  It was issued before (if that decision

were to be negative) PLP had any opportunity to file an appeal in the ordinary administrative

process established by Army Corps regulations—much less for the Army Corps to carry out

an impartial adjudication of such an appeal.  Indeed, this press release was issued before PLP

had a chance to respond to the agency's request for additional mitigation.

66. Nonetheless, in response to the in-kind compensatory mitigation letter, PLP undertook a major project to develop a distinctly different compensatory mitigation plan, focusing on preservation of a 122,445-acre area of the Koktuli River watershed. PLP developed this plan in extensive consultation with the Army Corps.

67. The Army Corps' district office conducted a review with PLP, termed the "fatal flaw" review meant to identify any last deficiencies with the revised mitigation plan. The office identified only two problems. One was a request for additional details on monitoring, maintenance, and financial assurance for the compensatory mitigation that PLP proposed. The other was an observation that for certain land areas to be secured for the mitigation, a lease was not a protective enough instrument. These observations could readily be addressed, and the district office identified no other problems.

68. PLP's final version of the mitigation plan did, indeed, address both those criticisms, by providing substantial further detail and by planning to implement the protections through a different and more protective instrument.

69. Yet on October 19, 2020, Colonel Delarosa secretly told Colonel Gibbs that the team had drafted an initial recommendation for a decision on the Pebble application, and that the recommendation identified "multiple fatal flaws." The Army Corps did not identify such fatal flaws to PLP.

70. PLP submitted its revised compensatory mitigation plan on November 16, 2020. The plan addressed the two non-fatal concerns mentioned by the Army Corps.

71. One day later Colonel Gibbs indicated in an internal email that the Army Corps was reviewing the Record of Decision and not the final compensatory mitigation plan.

72.     On November 20, 2020, a few days later, the Army Corps executed a Record of Decision denying the permit application. On November 25, 2020, it notified PLP of the Record of Decision deeming the mitigation plan insufficient. PLP had no opportunity to hear or address the issues presented in that Record of Decision before it was issued.

73.     The process at the Army Corps was different from what it used for any other large-scale project in Alaska, for no apparent reason. And the standard used in the Army Corps's decision was different from what it used for any other large-scale project. Indeed, the Army Corps applied an unprecedented, higher standard requiring that a project have no more than trivial environmental consequences.

74.     PLP filed an appeal from the Record of Decision.

75.     Meanwhile, in May 2022, the EPA published a revised proposal for a section 404(c) veto. This action was taken despite the fact that the Army Corps had, at that point, issued a negative decision and had not completed its review of PLP's appeal. The revised proposal supplemented the 2014 proposed determination. Despite the many issues with the 2014 proposed determination, the 2022 proposal largely rests upon it and the Assessment that had been preemptively prepared and was demonstrably flawed, and which the EPA had promised to withdraw as part of the settlement of litigation between PLP and the EPA. Indeed, the 2022 proposal states that the EPA "continued to believe" conclusions it reached in 2014. The EPA thus persisted in beliefs that were based, in 2014, on hypothetical, outlandish mining scenarios that were far worse than any reasonable mine—and nothing like what PLP actually proposed.

76. PLP submitted extensive comments in opposition to the 2022 proposed determination.

77. Nonetheless, in February 2023, the EPA issued the Final Determination, concluding that "discharges of dredged or fill material to construct and operate" the Pebble plan would have "unacceptable adverse effects." 88 Fed. Reg. at 7,443. To prevent these asserted "unacceptable adverse effects," the Final Determination prohibited the "specification of certain waters of the United States . . . as disposal sites for the discharge of dredged or fill material for the construction and routine operation" of the Pebble Project.

78. The Final Determination relied heavily on statements in the Army Corps's Record of Decision constituting the initial denial of PLP's permit application.

79. The Final Determination constitutes two vetoes under section 404(c). First (the "Prohibition"), the EPA prohibited the issuance of a permit for the mine plan described in the 2020 update of PLP's permit application, as well as any permit for any mine that would "result in the same or greater levels of loss or streamflow changes." Second (the "Restriction"), the EPA restricted any discharge into the waters of the United States across a 200,000-acre area, stretching far beyond the actual planned mining operation, for any operation to mine the Pebble Deposit if such operation would "result in adverse effects similar or greater in nature and magnitude" to those the EPA described in its Final Determination.

80. The Final Determination focused on the effects of the 2020 mine plan (though PLP had already refined it before the EPA's 2022 proposal) on streams in the area. The EPA asserted that the mine would block or damage certain sections of stream that are spawning habitat for salmon living in Bristol Bay. The Final Determination makes clear that a mining

operation is prohibited not just based on the aggregate effect of a potential mine, but rather if the operation damages any single stretch of stream in the manner that the Final Determination describes.

81. Two months after the EPA's veto, the Army Corps' Northwestern Division completed its decision on PLP's appeal of the Record of Decision. The Northwestern Division concluded that the Record of Decision was flawed, irrational, and erroneous in multiple and significant ways, and it remanded for the Army Corps Alaska District ("Alaska District," the local office that had carried out the initial decision) to reconsider its decision.

82. The Army Corps' Northwestern Division identified a number of flaws in the Record of Decision, including:

    a. The Alaska District used the wrong level of granularity ("HUC-12" level) to assess what streams would be affected by the proposed mine.

    b. The District failed to properly weigh and consider the extent and permanence of the economic benefits and detriments to the local population and economies, including the increased jobs, income, etc. resulting from the project.

    c. The District gave inappropriate weight to the potential for catastrophic failure as "likely" while also acknowledging that it is not reasonably foreseeable, as stated in the EIS.

    d. The District did not properly evaluate and discuss the alternative locations in the United States that it identified as meeting the regulatory requirement of "practicability of using reasonable alternative locations and methods."

e. The District cited damage to fisheries as a basis for concluding the mine's impacts would be too significant, yet the District had repeatedly acknowledged the EIS's finding that damages to fisheries are actually not anticipated.

f. A proper assessment of the permit application must take account of the economic value of extracting the minerals in the Pebble Deposit.

g. The District rejected Pebble's last compensatory mitigation plan without giving PLP an opportunity to respond to and address the purported deficiencies the District found in that plan.

These errors, identified by the Army Corps in its own District's reasoning, were prominent in the Final Determination as well.

83. On April 15, 2024, the Alaska District issued its Permit Denial. The District did not address any of the errors and deficiencies identified in the Northwestern Division's review of the case. Instead, the District relied on the vetoes in the EPA's Final Determination to justify the denial of both the mining permit and the permit for the associated transportation infrastructure. The decision stated that the vetoes prevented the Army Corps from issuing a permit covering any areas within the proposed area of the mine. While important portions of PLP's proposed transportation infrastructure fall outside of the areas covered by the Final Determination, the District said the infrastructure would "not have separate utility" without the mine "and would not meet the purpose and need of the project." Without explaining why the final compensatory mitigation plan PLP, EPA, and the Army Corps developed collaboratively is no longer acceptable, the Army Corps denied the permit application because

EPA's Final Determination "is a controlling factor that cannot be changed" by the Army Corps.

84.     The Permit Denial revealed the shell game that the government has undertaken. The initial denial was driven by politics, not by the facts. The Army Corps drafted a negative decision that was contrary to the Army Corps' own analyses, and without even considering the revised compensatory mitigation that the Army Corps itself had requested. EPA then relied heavily on the negative decision as support for EPA's vetoes. Then the Army Corps appeals process identified a long list of errors in the Army Corps's Record of Decision, showing that the reasoning in EPA's Final Determination is flawed in many of the same ways described in this Complaint. But the Army Corps now says, through its Permit Denial, that it need not fix those errors because of the Final Determination blocks the Army Corps from granting a permit. Yet EPA's Final Determination was itself based on the erroneous Record of Decision.

85.     Streams occur across the Pebble Deposit Area. It is not practicable to mine the Deposit without touching a single stream *at all*. The Final Determination was intended to block all mining of the Pebble Deposit, and the EPA understood when it issued the Final Determination that this would be the consequence of barring discharges in such a manner.

### THE CLAIMS: THE FINAL DETERMINATION AND PERMIT DENIAL MUST BE VACATED UNDER THE ADMINISTRATIVE PROCEDURE ACT

86.     The Final Determination represents the termination of the EPA's decision-making process to veto the discharges at issue, as shown by the title of the decision-making document, which says "Final Determination"; as shown by the EPA's process in which the

Regional Administrator recommended a decision and then the Assistant Administrator issued the Final Determination; and as shown by the content of the Final Determination which speaks in conclusive terms.

87. The Final Determination has binding legal effect, for at least the Army Corps and PLP. The Determination states a ban against the Army Corps issuing a section 404 permit within the scope of the Prohibition. The Determination also states a ban against PLP, or any other mine operator, discharging material into the navigable waters for any operation mining the Pebble Deposit that has any single impact on streams within the scope of the Restriction.

88. Consequently, the Final Determination is a final agency action under the APA.

89. The Permit Denial is also a final agency action. It presents itself as a final decision by the Army Corps. In addition, under Army Corps regulations, a District's decision to deny a permit, after an appeal and remand within the Army Corps, constitutes a final decision for purposes of judicial review.

90. PLP exhausted all available administrative remedies to object to the Final Determination. PLP commented on the 2014 proposed determination, on the 2022 proposed determination, and on the recommendation of the Regional Administrator to the Assistant Administrator. There is no further administrative appeal available within the EPA.

91. There is no other mechanism provided by statute for review of the Final Determination. The Clean Water Act specifies judicial review proceedings for certain types of decisions that the EPA Administrator might make under the statute, but section 404 permits and section 404(c) vetoes are not among them.

92.     There is no other remedy available at law to address the defective Final Determination, and the APA authorizes judicial review in this circumstance.

93.     PLP exhausted administrative remedies for the Permit Denial.  Under Army Corps regulations, an applicant has exhausted its remedies when it has carried out an appeal within the Army Corps and the pertinent District then, on remand, denies the permit.  PLP participated extensively in administrative processes before the Army Corps, and did appeal successfully pursuant to the Army Corps' procedural regulations.

94.     There is no other mechanism provided by statute for review of the Permit Denial.  There is no other remedy available at law to address the Permit Denial, and the APA authorizes judicial review of the Permit Denial.

95.     PLP has standing.  It has invested over one billion dollars in its efforts to develop and use the Pebble Deposit, and it holds all the mineral rights to the Deposit.  The EPA's veto, by preventing any conceivable mining operation at the Deposit, directly prohibits activities that PLP has a documented intention of undertaking.  The EPA's veto also orders the Army Corps not to issue the very permit that PLP has applied for and that PLP has invested considerable sums in seeking.  These injuries are directly caused by the Final Determination; and vacating the Final Determination will provide partial redress for the injuries.

96.     PLP is a person aggrieved by the Final Determination and by the Permit Denial, in that it is within the zone of interests for section 404(a), (b), and (c).  The interests at stake in any section 404 decision, including any section 404(c) veto, include the interests of the

proposed developer that applies for a permit and that seeks to discharge materials into the waters.

97. The EPA's Final Determination must be set aside and vacated, because it is contrary to law; it is arbitrary and capricious; it lacks substantial evidence; it is an abuse of discretion; and it was issued without observance of procedures required by law.

98. The Army Corps' Permit Denial must be set aside and vacated as well.

**A.**     **The Final Determination is unlawful.**

99. Before vetoing the Pebble mine, the EPA had issued only 13 section 404(c) vetoes over the history of the statute. None of them came close to the astounding geographical scale of the Final Determination, its sweeping scope, and its disregard for the facts and circumstances. And none of them had the intent and effect of destroying the primary use of land under statutes enacted by Congress. The Final Determination is unprecedented, and its novelty reveals its unlawfulness.

> **1.**     **The Final Determination violates the Alaska Statehood Act, the Cook Inlet Land Exchange, and the Alaska National Interest Lands Conservation Act.**

100. Before Alaska became a State, the United States owned virtually all the land in the Alaska territory. This was a severe impediment to Alaska's economic development and the development of a viable state government as, unlike other states, there was little non-federal land to drive private economic development and serve as a state tax base.

101. The Alaska Statehood Act addressed these problems by granting substantial amounts of land to the new State. Pub. L. 85-508, 72 Stat. 339 (Jul. 7, 1958). The express purpose of this conveyance was to "propel private industry and create a tax base." *Sturgeon v.*

*Frost*, 587 U.S. 28, 34 (2019). The Act granted Alaska the right to select for itself more than 103 million acres of "vacant, unappropriated, and unreserved" federal land. § 6(a), 72 Stat. at 340. The Act promised that these lands "shall include mineral deposits," and that the "[m]ineral deposits in such lands shall be subject to lease by the State as the State legislature may direct." *Id.* § 6(i). Indeed, these minerals were to be "'the foundation upon which Alaska'" could become a "'full and equal' State." *Trustees for Alaska v. State*, 736 P.2d 324, 336 (Alaska 1987) (quoting 104 Cong. Rec. 9361 (1958)).

102. The Statehood Act also explicitly gave Alaska, not the federal government, "regulatory authority over 'navigation, fishing, and other public uses'" on the navigable waters within the State. *Sturgeon*, 587 U.S. at 35.

103. In 1976, at the request of the United States and Cook Inlet Region, Inc. ("CIRI"), the native corporation, the State of Alaska agreed to exchange extensive portions of land, to enable the United States to create a new national park centered on Cook Inlet. Congress embodied the agreement in a statute entitled Terms and Conditions for Land Consolidation and Management in the Cook Inlet Area, Pub. L. 94-204, 89 Stat. 1145 (1976) (the "Cook Inlet Land Exchange").

104. In the Cook Inlet Land Exchange, Alaska relinquished its rights to nearly 700,000 acres of land. The United States used part of that land to create Lake Clark National Park and Preserve. CIRI received resource-rich lands, from which it has derived revenue for nearly five decades.

105. In return, Alaska received U.S.-owned lands that were thought to have significant mineral potential. These lands and their mineral rights were critical to the continued

26

Case 3:24-cv-00059-SLG    Document 56-2    Filed 06/07/24    Page 27 of 51

Exhibit 2
Page 27 of 51

well-being of Alaska and its citizens. Part of these lands are what the EPA's vetoes effectively convert into a conservation area where mining is barred.

106. The Cook Inlet Land Exchange stated that the State's new lands were to be treated "for all purposes as if conveyed to the State under and pursuant to section 6 of the Alaska Statehood Act." Pub. L. 94-204, §12(d)(1).

107. The area of the Pebble Deposit, and indeed the 200,000-acre area affected by the Restriction in the Final Determination, is subject to the Cook Inlet Land Exchange.

108. Per the Cook Inlet Land Exchange and the Alaska Statehood Act, the United States promised, and Congress mandated, that the "[m]ineral deposits in such lands shall be subject to lease by the State as the State legislature may direct," and that the State would regulate those lands. In addition, the Act reserved to Alaska the authority to regulate navigable waters within the State.

109. Congress further enacted the Alaska National Interest Lands Conservation Act ("ANILCA") in 1980, which set aside 104 million acres of national parks, refuges, monuments and scenic rivers in Alaska and modified the use of another 40 million acres of parks and refuges already located within the state. 16 U.S.C. §§ 3101 *et seq.* In total, ANILCA protected an area larger than the State of California and designated as wilderness a total area representing 61 percent of all formal wilderness in the United States at the time.

110. ANILCA provides that "the designation and disposition of the public lands in Alaska pursuant to this Act are found to represent a proper balance between the reservation of national conservation system units and those public lands necessary and appropriate for more intensive use and disposition." 16 U.S.C. § 3101(d). Accordingly, Congress declared

that "the need for future legislation designating new conservation system units, new national conservation areas, or new national recreation areas, has been obviated thereby." *Id.*

111. Given that conclusion, Congress explicitly prohibited the President and federal agencies from withdrawing more than five thousand acres of public lands within Alaska for conservation purposes without congressional approval. *Id.* § 3213(a).

112. At the signing ceremony for ANILCA, President Carter affirmed that ANILCA "strikes a balance between protecting areas of great beauty and value and allowing development of Alaska's vital oil and gas and mineral and timber resources." He stated that "95 percent of the potentially productive oil and mineral areas will be available for exploration or for drilling."

113. Neither the Pebble Deposit Area nor the 200,000-acre area affected by the Final Determination was set aside for conservation by ANILCA. To the contrary, these areas are among the oil and mineral areas that President Carter affirmed would be available, per ANILCA, for exploration and drilling.

114. The EPA's Final Determination violates these statutes by effectively preventing any mining of the Pebble Deposit, which constitutes the vast majority of known mineral resources within the lands traded to Alaska in the Cook Inlet Land Exchange. The Final Determination blocks more than the mining of the Deposit; it blocks any mining in a much larger area of 200,000 acres. Indeed, the EPA has unilaterally withdrawn for conservation purposes, without even seeking congressional approval, an area that is nearly 40 times the limit under ANILCA.

115.    Whatever authority the EPA may have under section 404(c), that general provision in the Clean Water Act cannot authorize the EPA to take action to issue a wholesale ban on the specific economic activity that was Congress's express purpose for granting these lands to the State of Alaska.  It cannot authorize the EPA to override the State's regulatory preferences for the lands, or the State's preference to allow modest use of some streams and wetlands in the vicinity of the Deposit to facilitate the extraction of the valuable minerals.

116.    The EPA discounted the Cook Inlet Land Exchange, the Statehood Act, and ANILCA entirely, giving them no weight whatsoever in its analysis for the Final Determination.

117.    The Final Determination is contrary to law because it violates explicit statutory mandates and limitations on federal regulation in the Pebble Deposit Area.

## 2.    The EPA did not have authority to establish the "defined area" covered by its section 404(c) vetoes.

118.    Section 404(c) allows the EPA to prohibit the specification of, or deny or restrict the use of, "any *defined* area" as a disposal site.  There was no defined area to which the EPA might apply its vetoes.  Instead, the EPA wrote its own, brand-new geographical scope. Section 404(c) does not empower the EPA to define its own area for a section 404(c) veto.

119.    The Final Determination prohibited "the specification of waters of the United States within the Defined Area for Prohibition (Figures ES-6, ES-7, and ES-8) as disposal sites for the discharge of dredged or fill material for the construction and routine operation of the 2020 Mine Plan," and it restricted "the use of waters of the United States within the Defined Area for Restriction (Figures ES-7 and ES-8) for specification as disposal sites for the discharge of dredged or fill material."

29

120. To develop the Defined Area for Prohibition, the EPA said it "outlin[ed] a contiguous area around the portions of the mine site footprint identified in" the 2020 version of PLP's mine plan. In other words, the EPA identified the various facilities associated with the 2020 plan, such as the area to be dug up; the tailings facilities; the processing facility; and others; and the EPA drew a line around them to form a "contiguous" area that would encompass them. A full-page dense geographic description at page 5-6 of the Final Determination describes the Defined Area for Prohibition by means of a convoluted boundary.

121. To develop the Defined Area for Restriction, the EPA said, it "outlin[ed] a contiguous area . . . that includes the areas that have the potential to be disposal sites" used in Pebble mining. Thus, again, the EPA assessed various areas that it thought might be used in a potential mining plan, and then it drew a line around them to form a "contiguous" area. The Defined Area for Restriction covers 200,000 acres, and it does not correspond to any pre-existing defined geography, parcel, or legal entitlement.

122. Nothing in section 404(c) or elsewhere in the Clean Water Act authorizes the EPA to define its own area for prohibition or restriction. The statute allows (in appropriate circumstances) a prohibition against discharges in an already-defined area. It does not instruct or allow the EPA to make up its own definition for an area to be blocked.

123. By issuing section 404(c) vetoes against areas that were not defined, for which the EPA developed its own brand-new geographic descriptions, the EPA exceeded its authority under section 404(c).

**3.    The EPA did not have authority to issue a veto divorced from a**

**permit or permit application.**

124.    Section 404(c) does not authorize the EPA to prohibit discharges directly; rather, it allows the EPA only to prohibit "specification" of a disposal site or "use of any defined area for specification." 33 U.S.C. § 1344(c).

125.    "Specification," as the EPA itself has explained the term, refers to a regulatory status of being identified in a regulatory document describing the planned discharge.

126.    Section 404(c) does not authorize a free-range rulemaking power to ban future permits of a given type. At most, it allows the EPA to consider, and veto if appropriate, an actual or proposed specification.

127.    This limitation in section 404(c) is important, among other reasons, for ensuring that the EPA evaluates a concrete set of discharges that are proposed or planned under a specification.

128.    The Final Determination exceeded that authority. For example, the EPA vetoed future discharges across a 200,000-acre area that far exceeds what has ever been proposed in any permit or application for mining in the Pebble Deposit Area. There is no specification at issue for that vast area, and no concrete discharge that the EPA assessed across that area.

**B.** **The EPA's Final Determination was Arbitrary and Capricious, Lacked Substantial Evidence, and Was an Abuse of Discretion.**

**1.** **The EPA refused to weigh the economic consequences of the Final Determination.**

129.    The EPA improperly disregarded clear benefits that the Pebble mine would produce, and the corresponding costs of the Section 404(c) veto, resulting in dire economic consequences.

130.    Mining the Pebble Deposit would generate obvious and massive economic benefits for the United States and for Alaska.  The transition to renewable energy sources is increasing demand for copper at a magnitude that cannot currently be met.  Copper is a necessity for electricity-based technologies, and consequently demand for copper has accelerated in recent decades.  Even as worldwide production has doubled in the past two decades, copper prices have more than tripled.

131.    As the United States and the world transition their economies to reducing carbon dioxide emission by both shifting emissions-intensive sectors toward electricity and shifting electricity generation towards low-emission sources, the demand for copper will only grow exponentially.

132.    The electric vehicle market is accelerating rapidly, and a projected 26.4 million electric vehicles are expected on the roads in the United States by 2030.  Electric vehicles require immense amounts of copper—roughly 10 times more than a conventional passenger car.  Charging infrastructure demands even more copper, for the charging stations themselves and for the electric lines to distribute power.  Over the coming decade, copper demand for

charging infrastructure is expected to grow from approximately 20 million tonnes to approximately 50 million tonnes, a 250% increase.

133. Meanwhile, renewable electricity generation requires two to five times more copper for a given amount of capacity than traditional power plants. Delivering energy from renewable sources will also require new transmission lines equivalent to at least one third of the total transmission lines currently in place; those transmission lines will also consume yet more copper.

134. Existing copper mines, even coupled with projects currently under construction, only have capacity to satisfy 80% of copper needs by 2030. The need for vast amounts of copper in the coming decades cannot be overstated.

135. With 34.3 million tonnes of recoverable copper, an amount equivalent to at least 4% of current world copper reserves, Pebble ranks as the world's largest undeveloped copper deposit. The Pebble mine is a critical resource that can responsibly supply copper to assist in meeting the enormous demand for copper in the years to come. The Army Corps' remand decision acknowledged that a rational evaluation of the Pebble mine must take account of this value.

136. The EPA's vetoes foreclose extraction and use of the vast quantities of copper contained in the Pebble Deposit. Consequently, the Final Determination causes significant economic costs to the United States and Alaska.

137. Beyond the straightforward and predictable impact of the Pebble resources on the use and pricing of copper, the mine would generate substantial employment in Alaska and substantial revenue for the State.

138.    The EPA was obligated to take account of these economic costs and weigh them against the environmental considerations that it said drove its decision.  Section 404(c) permitted the EPA to issue the vetoes only if the prohibited discharges would have an "unacceptable adverse effect" on certain environmental resources.  33 U.S.C. § 1344(c).

139.    Any assessment of what effects would be "unacceptable" would have to balance the effects against the potential benefits to be gained from the discharges.  Indeed, "reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions."  *Michigan v. EPA*, 576 U.S. 743, 753 (2015) (emphasis in original).  A congressional mandate to assess whether an adverse effect is "unacceptable" necessitates a consideration of what reasons there could be to accept the effect, and whether those reasons are sufficient.  In other words, one cannot rationally find an effect unacceptable while refusing to weigh the great benefits that would come from the discharge activity.

140.    Yet that is how the EPA insisted on making its decision.  In the EPA's initial 1979 regulations implementing Clean Water Act section 404(c), the EPA refused to consider economic costs in deciding whether the impacts of a discharge are "unacceptable."  44 Fed. Reg. 58,076, 58,078 (Oct. 9, 1979).  Imposing a blanket ban across 200,000 acres of territory far exceeds what the EPA contemplated when it first took that position; and in recent years, the United States Supreme Court has explained how unusual and unreasonable it is for an agency to refuse to consider the economic fallout from its actions.  *Michigan*, 576 U.S. at 753.  But, pointing to its 1979 rule, the EPA still insisted in its Final Determination that costs and consequences are irrelevant to section 404(c) decisions.

141. Although the EPA clearly stated that the economic consequences of its vetoes are irrelevant to the Final Determination, it prepared a purported economic analysis in which it downplayed the economic benefits of mining the Pebble Deposit. This assessment was itself arbitrary and capricious.

142. As one key example, the EPA said that the IHS Markit Report, an assessment of the contribution that the Pebble mine would make to the US national and state economies, overestimated downstream economic impacts from the mine. The EPA said that much of the copper concentrate from Pebble would be exported for refining. This statement is a *non sequitur* and ignores economic reality. Refining is just one stage in the supply chain from mining to use of copper in products, and a substantial plurality of world refining capacity is in China. This is largely a result of the EPA's own policies prohibiting the construction of domestic smelting and refining capabilities.

143. Even if much of the output from Pebble would go to China for refining, copper concentrate is a fungible commodity with a worldwide market. Yet it cannot be denied that in a market where demand is outstripping supply and U.S. users of copper are paying ever-higher prices, adding a major new supply to world copper supplies would ease the economic pain of those users.

144. Besides, it is quite possible for a producer of copper concentrate to arrange refining on terms that retain ownership of the copper, which would then return back to the United States. The EPA, with no expertise in copper markets, had no reasonable basis for forecasting any other approach for copper from Pebble.

145.    In addition, the IHS Markit Report had not assessed the jobs and revenue impacts for the State of Alaska based on an assumption that refining would take place in Alaska.  As with any other natural resource, there are jobs and revenue derived from the production of the resource even though there are other jobs and revenue further along the supply chain.  The EPA's explanation that the Report was mistaken because of where refining capacity is located amounted to ignoring the real economic benefits of production.

146.    As it happens, the United States has other resources that are sold on fungible world markets.  One notable example is natural gas, for which the country has become a net exporter.  The U.S. government has, in the past two decades, repeatedly allowed exports of natural gas—exactly the sort of activity that the EPA said would have no benefit with respect to copper—and has made, about those exports, the opposite analysis and opposite conclusion from the EPA's blinkered view of copper markets.  As another example, of salmon production from Bristol Bay, roughly 80% ends up being exported, primarily to East Asia and significantly to China.

147.    The EPA's record is replete with other examples of arbitrary and capricious analysis of the potential costs and benefits associated with the Final Determination, including:

a.    The EPA did not assess the degree of opportunity cost in the mining capital and labor markets if the mine is not constructed.  Yet the EPA claimed that the benefits from the mine, including expenditures, revenue, and employment may be overstated because they do not account for opportunity costs.

b.    PLP had promised to distribute a share of profits from the mine to local communities, and the record before the EPA estimated these payments could

amount to in the neighborhood of $200 million over the 24.5-year period of construction and operation. The EPA arbitrarily disregarded the impact its Final Determination would have on these payments by claiming that these hundreds of millions of dollars would come from anticipated profits, and that "there is significant uncertainty around the potential profits of the mine and therefore the ability of the mine to pay out more than the minimum annual payment in any given year."

c.  The EPA declined to evaluate market impacts on gold, molybdenum, silver, and rhenium "[d]ue to the relatively lower production levels." However, the IHS Markit Report estimates that these minerals account for nearly half of the average annual value of final production from the Pebble Deposit. The mass of these materials would be much smaller than the mass of copper produced, but these materials are much more valuable per kilogram than copper even at its ever-higher prices. Thus, the EPA arbitrarily ignored half of the impact of Pebble mining on metals markets, and thus arbitrarily ignored a major adverse consequence of the vetoes.

148.  EPA's refusal to weigh the massive economic consequences of its Final Determination was arbitrary and capricious, and its halfhearted assessment of the consequences was itself arbitrary and capricious.

## 2. The EPA relied on a flawed definition of Waters of the United States, thereby wildly overestimating the likely adverse impact on jurisdictional waters.

149.     The Final Determination, in February 2023, was based on a wild overestimate of what sites would be subject to Clean Water Act permitting and regulation.

150.     The Clean Water Act governs the "waters of the United States." The EPA has issued varying regulatory interpretations of that term over the years. In the Final Determination, the EPA assumed "waters of the United States" include not only traditional navigable waters, but also intrastate lakes and wetlands either "adjacent to" or having a "significant nexus" to other waters. These concepts were so capacious that almost all wetlands were regarded as subject to the EPA's authority under the Clean Water Act.

151.     Subsequently, the Supreme Court clarified that the Clean Water Act covers "only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic[al] features' that are described in ordinary parlance as 'streams, oceans, rivers, and lakes,'" and wetlands that are "indistinguishably part" of such other bodies of water. *Sackett v. EPA*, 598 U.S. 651, 671, 676 (2023). To be covered, a wetland must have "a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands." *Id.* at 678. The Court held that "significant nexus" is impermissible as an interpretation. Thus, *Sackett* significantly reduced the scope of what qualifies as waters of the United States under the Clean Water Act.

152.     The EPA's development of the Defined Areas, for Prohibition and for Restriction, in the Final Determination assumed that the EPA has authority to prohibit discharges into wetlands throughout both Defined Areas. Under the proper interpretation of

the Clean Water Act established by the Supreme Court, the EPA does not have such authority. While some wetlands may come within the EPA's authority under the statute to the extent they satisfy the standard set in *Sackett*, the vast majority of the wetlands within each Defined Area do not. EPA's understanding of what discharges are pertinent for section 404(c) was overstated by a factor of at least 10.

153. The EPA's analysis of the effect of the prohibited discharges aggregated the effects of all discharges, including discharges onto wetlands of all kinds. Thus, its assessment of impacts improperly counted discharges over which it has no authority under the Clean Water Act.

154. The EPA's reliance on its own incorrect interpretation of the law when assessing the magnitude of impact was arbitrary and capricious.

### 3. The EPA improperly disregarded the Army Corps's EIS findings.

155. The EPA's Final Determination is replete with examples of the EPA arbitrarily ignoring the findings in the EIS to reach its own, separate determination using baseless assumptions and analysis.

156. For example, the EPA ignored the EIS finding that the Pebble mine—the mine actually proposed, not the EPA's wild imaginings from 2014—will have no measurable impact on fish. Given that finding in the EIS, the EPA cannot rationally conclude the discharges in the operation of the mine will have an "unacceptable adverse effect" on "fishery areas" or "wildlife," 33 U.S.C. § 1344(c).

157. The EIS included thousands of pages of detailed analysis. The EIS concluded that the Pebble mine can be built and operated without "a measurable impact on fish

populations based on physical habitat characteristics and fish density estimates in the affected reaches." The Army Corps' remand decision noted it was irrational to conclude there would be damage to fisheries, given these findings in the EIS.

158. In complete contrast, the EPA's veto concluded that any discharge within an entire 200,000-acre area for any project with an impact "comparable" to the 2020 Mine Plan would have an unacceptable adverse effect on fishery areas. The EPA specifically said that the loss or reduction of any one bit of streamflow, across various streams, would be unacceptable, and on that basis prohibited discharges for mining purposes across an entire 200,000-acre area.

159. The EPA concluded that 22 linear miles of stream would be lost. But that represents a minuscule proportion of the total miles of spawning stream in the area where the EPA barred discharges; the total amount of stream available is at least 2,000 times more than the portion that the EPA said would be affected.

160. Given that the mine, in the form assessed in the EIS, would not have even *measurable* impacts on fish populations, it cannot also be the case that blocking a small portion of stream, anywhere in an area of 200,000 acres, will have an unacceptable impact *on fisheries*. The EPA's Determination is contrary to the record in front of the agency.

161. As another example, the EIS assessed impacts on recreation as insignificant: yet the EPA ignored this and listed various recreational impacts in the Final Determination. The EPA's determination directly contravenes the EIS findings that recreational use in the Pebble Deposit Area is low, the area is not popular for sport hunting, fishing, or other recreation uses, and any possible users would go to other state lands in the area with similar habitat.

162.    The EPA also discusses spills as a consideration in the Final Determination, including catastrophic tailings storage facility ("TSF") failure, but the EIS found no realistic possibility of this occurring.

163.    The Final Determination faulted the Army Corps for not completing a full breach analysis where the probability of a full breach occurring was very remote, stating the "EPA believes there could be uncertainty with this conclusion."  But the EIS reviewed estimates of the probability of tailings dam failures, which ranged from one every 714 dam-years to every 250,000 dam-years.  The EIS found the proposed Pebble design essentially eliminated the risk of these types of failures.  Further, the Alaska Dam Safety Program requires periodic technical review by qualified engineers throughout the dam's lifetime, and these types of tailings storage facilities are shown as most robust and resistant to failure.  Yet, the EIS found that the probability of a full dam breach was "very low," as in, it "would require a lengthy causal chain of unlikely events," exemplifying how the EPA's speculative statements throughout the determination are unsupported by the record.

### 4.    The EPA relied on factors Congress did not intend for it to consider for section 404(c) vetoes.

164.    The EPA's exercise of its section 404(c) authority is limited to circumstances where the EPA "determines . . . that the discharge of such materials . . . will have an unacceptable adverse effect on" four specific categories: "[1] municipal water supplies, [2] shellfish beds and fishery areas (including spawning and breeding areas), [3] wildlife, or [4] recreational areas."  33 USC § 1344(c).

165.    Flouting that limitation, the EPA considers a wide range of secondary adverse effects that it thought a Pebble mine might have.  These secondary effects, according to the

EPA, might not even result from the actual discharge of material, but are simply associated with the operation.

166. For example, the EPA assessed impacts on Native traditional diets; social networks; transmission of cultural values; racial or cultural "tension and discord"; and mental health. These asserted concerns—though PLP believes it has and will maintain positive relationships throughout the closest communities and elsewhere in Alaska—are not municipal water supplies, shellfish beds, fishery areas, wildlife, or recreational areas.

167. In addition, the EPA evaluated not only the consequences of the proposed discharges themselves, but also the consequences—including consequences not among those identified by Congress—arising from a broad range of related activities. It assessed impacts on caribou herds from noise during exploration work, well before discharge activities. It assessed the impact on cultural resources—which are, again, not among the effects that Congress authorized the EPA to consider—from construction activities, not just from the discharges.

168. This approach is arbitrary and capricious and contrary to the statute in at least two ways.

169. First, section 404(c) asks whether "the discharge of such materials . . . will have unacceptable adverse effects." To account for the asserted effects of other activities beside the discharge is contrary to the statutory instructions. Second, section 404(c) asks about five specific types of adverse effects. To account for other adverse effects beyond those that Congress identified is contrary to the statutory instructions.

> C.      **The Army Corps's Permit Denial was Arbitrary and Capricious.**

### 1. The Army Corps allowed political interference to inform the Record of Decision.

170. Prior to August 2020, the Army Corps communicated regularly with PLP to discuss any flaws in PLP's permit application. PLP was actively working to remedy the flaws identified in a satisfactory manner, and the Army Corps had not indicated that those flaws would bar a permit.

171. Following Donald Trump Jr.'s tweet on August 4, 2020, the Army Corps' stance toward the compensatory mitigation abruptly changed, yet there were no further flaws identified or other developments to the compensatory mitigation plan, permit application or EIS.

172. Internal communications between members of the Army Corps suggest that this capricious change in stance was due to political interference rather than an evaluation of the facts.

173. After the Army Corps demanded an unprecedented alteration to PLP's compensatory mitigation plan, PLP swiftly developed a revised plan in response. But the Army Corps did not even consider the revised plan. The Secretary of the Army announced the permit could not be granted, just days after the Army Corps had demanded a revised compensatory mitigation plan. Then, the Army Corps announced the initial denial of the permit just days after PLP submitted the revised plan and issued an extensive Record of Decision that it had already drafted beforehand.

174. The Army Corps' Northwest Division identified multiple serious flaws in the Record of Decision, including statements and rationales that the Northwest Division

considered contradictory or otherwise arbitrary and capricious. Among the serious flaws it found in the Record of Decision are those identified in paragraph 74.

175.    When the Alaska District determined the Pebble mine would have a significant impact in the watershed where most of the facilities would be located, that determination was contrary to law and arbitrary and capricious. The District invoked a standard for significance that is unprecedented in CWA 404 determinations and contrary to the Army Corps' own regulations, in that it treated an impact as significant if it was anything more than trivial. Even so, the conclusion, that there would be significant degradation, was contrary to the Army Corps' own findings that there would be no measurable impact on fisheries. The District hypothesized there would be impacts on recreation, but that suggestion was contrary to the Army Corps' own findings that the areas near the mine have little recreational use.

176.    When the District analyzed the impacts on watersheds, it used an improperly fine level of granularity, which had the effect of magnifying the number of affected units. The District's approach was contrary to the Army Corps' guidance and its precedents, and contrary to the Army Corps' own EIS for the Pebble mine. The Northwestern Division acknowledged the District's analysis on this point was arbitrary and capricious.

177.    The District concluded there would be significant degradation and used that conclusion to restrict what mitigation would be acceptable. This method was contrary to the District's extensive precedent of considering impacts after accounting for proposed mitigation, and only then determining whether the net effects would be significant. The District had no reasonable explanation for departing from its precedent.

178.    The District required in-kind compensatory mitigation, contrary to the Army Corps's stated policies regarding Alaska.  Those policies, developed in collaboration with the State, recognize that in-kind mitigation is particularly challenging in Alaska, yet the District demanded that form of mitigation for the Pebble mine contrary to the District's own precedents.

179.    The District's finding that PLP had not proposed mitigation to offset impacts from building a port facility was contrary to the documents presented to the District, which explicitly contained exactly the proposal that the District said was missing.

180.    The District irrationally required PLP to present a written waiver from the District to allow mitigation in the form of preserving threatened resources.  But the District's instruction in August 2020 to propose solely in-kind mitigation necessarily meant the mitigation would have to focus on preservation.  Moreover, the Army Corps's regulations do not require an applicant to present such a waiver as part of the application; it is part of the decision.  Thus, the District faulted PLP for not obtaining, in advance of the District's decision, a prior statement by the District about how it would decide, on an issue where the only rational decision was actually foreordained by the District's own instructions.  This Kafkaesque requirement was arbitrary and capricious.

181.    Moreover, the District rejected PLP's revised mitigation plan without first informing PLP of the District's new concerns and giving PLP an opportunity to respond or to revise the plan to address them.  The Northwest Division recognized this procedure was improper.

182.    The District rejected PLP's compensatory mitigation plan for failing to propose functionality-based standards for assessing the outcomes of the plan.  The Army Corps' regulations do not require such standards in every case, and the District's precedents include approvals of projects that measure outcomes simply on the basis of the area preserved, the same metric that PLP proposed.  The District's departure from its precedents, without explanation, was arbitrary and capricious.

183.    The District found inadequate PLP's planned instrument for securing protection for areas to be preserved as compensatory mitigation.  But the Army Corps's own guidance documents recognize the proposed instrument as suitable for such tasks, and the District has approved its use in other Alaska projects.  The District's departure from Army Corps policy and from District precedents was arbitrary and capricious.

184.    The District rejected PLP's mitigation on grounds that PLP had not yet carried out each of the steps it proposed.  That rationale was contrary to Army Corps regulations, which allow the mitigation to be carried out concurrent with the planned discharge, and do not require it to be initiated before the Army Corps has even granted a permit for the discharge.

185.    The District's finding that the public interest weighs against the mine was irrational.  The District ignored the Army Corps's own findings of substantial and certain economic benefits that would flow to the State and directly to the communities near the mine site, such as higher employment, improved transportation, and reduced winter heating costs.  By contrast, the District gave excessive weight to speculative harms, not quantified and not likely to occur.  The District also gave significant weight to hypotheses about the state of the

46

communities decades into the future after mine closure, yet the District did not quantify those speculative harms properly or apply the necessary time-weighting to balance the benefits in the near term against those hypothetical costs decades later. The District's biased assessment, with inconsistent treatment of costs and benefits, was arbitrary and capricious.

186. The District assumed that human error at the mine, of unspecified nature, would increase the harm to fisheries. This assumption was arbitrary and capricious, because the Army Corps' own findings had assessed the potential errors and concluded they would not lead to measurable impacts on fisheries.

187. Although the Northwest Division criticized the District's decision on many of these grounds, the District did not revise any of them. The Permit Denial, embodying the record of the District's decision on PLP's application, is contrary to law, is arbitrary and capricious, and abuses the District's discretion; and violates procedural requirements, for the reasons stated above and others that may be developed in this litigation.

> **2. The Army Corps improperly relied on the EPA's Final Determination as justification for denying the permit application and refusing to correct the errors in its Record of Decision.**

188. By the time the District issued its Permit Denial, the State of Alaska had attempted to file a complaint in the U.S. Supreme Court charging that the Final Determination is fundamentally unlawful. The Supreme Court denied that request, but PLP and the State of Alaska had both sued in this Court contending that the Final Determination is unlawful and void.

189.    The Final Determination committed multiple errors that are similar to errors that the Army Corps' own Northwest Division said required reconsideration of the District's Record of Decision.

190.    The District concluded that the Pebble mine cannot be built because the entire mine site falls within the areas covered by the Final Determination. Yet the District did not assess whether the Final Determination properly has that consequence, given the unlawfulness of the Final Determination and the control of the State of Alaska over the pertinent waters.

191.    The District's initial Record of Decision contradicted the Army Corps' own findings, and did so because of political interference rather than reasoned assessment of the record.  The Final Determination relied on the District's irrational and contradictory statements as important inputs to the EPA's arbitrary and capricious conclusions.  The Northwest Division reviewed the District's decision despite the issuance of the Final Determination, and the Division identified key errors, a number of which are summarized in paragraph 74.  The EPA had processed those errors into its Final Determination, yet the District treated the Final Determination as dispositive without further analysis.  Because the Final Determination relies so significantly on the initial Record of Decision, the Permit Denial continues to incorporate the initial Record of Decision, and is arbitrary and capricious.

192.    The State of Alaska, which has the regulatory authority over the non-navigable streams and wetlands into which PLP would make discharges, has repeatedly expressed its policy preferences to encourage and allow mining of the Pebble Deposit.  The Army Corps's action to block that by refusing to allow even the construction of port facilities, in reliance on an unlawful veto beyond the EPA's authority, was arbitrary and capricious.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs respectfully request that the Court enter judgment in their favor as follows:

(1)     declaring that the EPA's Final Determination under Section 404(c) of the Clean Water Act in February 2023, 88 Fed. Reg. 7,441 (Feb. 3, 2023), is contrary to law, in excess of authority, arbitrary and capricious, an abuse of discretion, and contrary to required procedures;

(2)     vacating the Final Determination;

(3)     declaring that the Army Corps' Permit Denial in April 2024 is contrary to law and arbitrary and capricious;

(4)     vacating the Permit Denial;

(5)     awarding Plaintiffs reasonable costs, including attorneys' fees, to the extent permitted by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), or other applicable law;

(6)     granting such other and further relief as the Court may deem just, proper, and necessary.


Dated June 6, 2024                    /s/ Keith Bradley
                                      Keith Bradley, *pro hac vice*
                                      ScheLeese Goudy, *pro hac vice*
                                      SQUIRE PATTON BOGGS (US) LLP
                                      717 17th Street, Suite 1825
                                      Denver, Colorado 80202
                                      (303) 830-1776
                                      (303) 894-9239 (facsimile)
                                      keith.bradley@squirepb.com
                                      scheleese.goudy@squirepb.com

                                      Jeffrey M. Walker, *pro hac vice*
                                      Katherine E. Wenner, *pro hac vice*
                                      SQUIRE PATTON BOGGS (US) LLP

2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
(614) 365-2700
(614) 365-2499 (facsimile)
jeffrey.walker@squirepb.com
katherine.wenner@squirepb.com

Thomas P. Amodio
Kevin M. Boots
REEVES AMODIO, LLC
500 L Street, Suite 300
Anchorage, AK 99501
(907) 222-7100
(907) 222-7199 (facsimile)
tom@reevesamodio.com
kevin@reevesamodio.com

*Attorneys for Plaintiffs Northern Dynasty Minerals Ltd
and Pebble Limited Partnership*