STEPHEN J. COX
ATTORNEY GENERAL
Ronald W. Opsahl (Alaska Bar No. 2108081)
Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: ron.opsahl@alaska.gov

J. Michael Connolly (*pro hac vice*)
Gilbert C. Dickey (*pro hac vice*)
Steven C. Begakis (*pro hac vice*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Telephone: (703) 243-9423
mike@consovoymccarthy.com
gilbert@consovoymccarthy.com
steven@consovoymccarthy.com

*Attorneys for the State of Alaska*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

|  |  |  |
|---|---|---|
| NORTHERN DYNASTY MINERALS LTD., *et al.*, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:24-cv-59-SLG |
| | ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | ) | CONSOLIDATED |
| Defendants, | ) | LEAD CASE |
| | ) | |
| and | ) | |
| | ) | |
| UNITED TRIBES OF BRISTOL BAY, *et al.*, | ) | |
| Intervenor-Defendants. | ) | |

STATE OF ALASKA,
   *Plaintiff,*

   v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,
   *Defendant,*

  and

TROUT UNLIMITED, *et al.,*
   *Intervenor-Defendants.*

   )
   Case No. 3:24-cv-84-SLG

   CONSOLIDATED

---

ILIAMNA NATIVES LTD., *et al.,*
   *Plaintiffs,*

   v.

ENVIRONMENTAL PROTECTION
AGENCY, *et al.,*
   *Defendants,*

  and

BRISTOL BAY ECONOMIC
DEVELOPMENT CORPORATION, *et al.,*
   *Intervenor-Defendants.*

   Case No. 3:24-cv-132-SLG

   CONSOLIDATED

---

**STATE OF ALASKA'S OPENING BRIEF**

**ORAL ARGUMENT REQUESTED**

*Northern Dynasty Minerals Ltd. v. EPA*    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief
Case 3:24-cv-00059-SLG  Document 167  Filed 10/03/25  Page 2 of 54

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 6

    A.    The Alaska Statehood Act ................................................................. 6

    B.    The Cook Inlet Land Exchange ......................................................... 7

    C.    The Bristol Bay Area Plan of 1984 ................................................. 10

    D.    The Pebble Deposit ......................................................................... 12

    E.    The EPA's Prohibition and Restriction ........................................... 15

LEGAL STANDARD ........................................................................................ 19

JURISDICTION ................................................................................................. 20

ARGUMENT ..................................................................................................... 21

    I.    The EPA has no statutory authority to issue the Veto. ..................... 21

        A.    The court cannot uphold the Veto without clear Congressional authorization. ................................................................................. 22

        B.    The Veto violates the Statehood Act and the Cook Inlet Land Exchange. ..... 24

        C.    The Veto exceeds the EPA's authority under the Clean Water Act. ............... 27

    II.    The EPA failed to properly analyze whether discharges into "waters of the United States" would have an unacceptable adverse effect. ....................................... 31

        A.    The EPA considered harms from the loss of waters and wetlands without ever determining whether these waters and wetlands were "waters of the United States." ................................................................................. 31

        B.    The EPA improperly considered whether other activities besides "discharges" would have an unacceptable adverse effect. .................................. 34

    III.    The EPA failed to properly assess the costs and benefits of the Veto. .................... 36

        A.    The EPA was required to perform a cost-benefit analysis. ............... 36

        B.    The EPA improperly assessed the costs of the Veto. ....................... 38

        C.    The EPA failed to adequately assess the costs of the Restriction. .................... 41

CONCLUSION .................................................................................................. 44

# TABLE OF AUTHORITIES

## Cases

*Ala. Ass'n of Realtors v. HHS,*
  594 U.S. 758 (2021) .................................................................................. 22, 23

*Alaska v. United States,*
  No. 24-cv-396 (Fed. Cl.) ................................................................................. 19

*Am. Tr. Co. v. Smyth,*
  247 F.2d 149 (9th Cir. 1957) ......................................................................... 27

*Ariz. Cattle Growers' Ass'n v. USFW,*
  273 F.3d 1229 (9th Cir. 2001) ....................................................................... 33

*ASARCO Inc. v. Kadish,*
  490 U.S. 605 (1989) ........................................................................................ 25

*Biden v. Nebraska,*
  600 U.S. 477 (2023) ........................................................................................ 23

*Brown-Hunter v. Colvin,*
  806 F.3d 487 (9th Cir. 2015) ......................................................................... 36

*Bus. Roundtable v. SEC,*
  647 F.3d 1144 (D.C. Cir. 2011) .......................................................... 41, 42, 43

*California v. FCC,*
  905 F.2d 1217 (9th Cir. 1990) ....................................................................... 42

*Chamber of Com. of SEC,*
  412 F.3d 133 (D.C. Cir. 2005) ................................................................. 42, 43

*Chicken Ranch Rancheria of Me-Wuk Indians v. California,*
  42 F.4th 1024 (9th Cir. 2022) ....................................................................... 33

*Clean Wis. v. EPA,*
  964 F.3d 1145 (D.C. Cir. 2020) ..................................................................... 20

*Competitive Enter. Inst. v. NHTSA,*
  956 F.2d 321 (D.C. Cir. 1992) ....................................................................... 40

*Corrosion Proof Fittings v. EPA,*
  947 F.2d 1201 (5th Cir. 1991) ....................................................................... 39

*Council of Parent Att'ys & Advocs., Inc. v. DeVos,*
  365 F. Supp. 3d 28 (D.D.C. 2019) ............................................................... 41

*Crawford Fitting Co. v. J.T. Gibbons, Inc.,*
  482 U.S. 437 (1987) ........................................................................................ 26

*Ctr. for Biological Diversity v. NHTSA,*
  538 F.3d 1172 (9th Cir. 2008) ................................................................. 41, 42

*Ctr. for Biological Diversity v. USFWS*,
  67 F.4th 1027 (9th Cir. 2023) ................................................................. 33

*Cty. of Maui, Haw. v. Haw. Wildlife Fund*,
  590 U.S. 165 (2020) ..................................................................... 29, 35

*FCC v. NextWave Pers. Commc'ns Inc.*,
  537 U.S. 293 (2003) .......................................................................... 24

*Free Enter. Fund v. PCAOB*,
  561 U.S. 477 (2010) .......................................................................... 26

*Henson v. Santander Consumer USA Inc.*,
  582 U.S. 79 (2017) ............................................................................ 27

*In re Binghamton Bridge*,
  3 Wall. 51 (1866) .............................................................................. 27

*Ky. Waterways All. v. Ky. Utilities Co.*,
  905 F.3d 925 (6th Cir. 2018) .............................................................. 29

*League of United Latin Am. Citizens v. Regan*,
  996 F.3d 673 (9th Cir. 2021) .............................................................. 34

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369, 400 (2024) ................................................................... 19

*Maine v. Norton*,
  257 F. Supp. 2d 357 (D. Me. 2003) ..................................................... 21

*Michigan v. EPA*,
  268 F.3d 1075 (D.C. Cir. 2001) .......................................................... 21

*Michigan v. EPA*,
  576 U.S. 743 (2015) .................................................................. 4, 36, 37

*Mingo Logan Coal Co. v. EPA*,
  714 F.3d 608 (D.C. Cir. 2013) ........................................................... 28

*Mingo Logan Coal Co. v. EPA*,
  829 F.3d 710 (D.C. Cir. 2016) ....................................................... 37, 41

*Morton v. Mancari*,
  417 U.S. 535 (1974) .......................................................................... 26

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..................................................................... 20, 40

*Murray Energy Corp. v. EPA*,
  936 F.3d 597 (D.C. Cir. 2019) ....................................................... 33, 35

*Nat'l Parks Conservation Ass'n v. EPA*,
  788 F.3d 1134 (9th Cir. 2015) ............................................................ 39

*NFIB v. OSHA*,
   595 U.S. 109 (2022)..............................................................................22, 23

*NRDC v. EPA*,
   31 F.4th 1203 (9th Cir. 2022) ............................................................... 33

*NRDC v. Regan*,
   67 F.4th 397 (D.C. Cir. 2023) ............................................................... 21

*Oklahoma v. New Mexico*,
   501 U.S. 221 (1991)................................................................................ 24

*Or. Nat. Desert Ass'n v. BLM*,
   625 F.3d 1092 (9th Cir. 2010) ............................................................... 36

*PLP v. EPA*,
   3:14-cv-97 (D. Alaska) ............................................................................ 9

*Rapanos v. United States*,
   547 U.S. 715 (2006)................................................................................ 27

*Sackett v. EPA*,
   598 U.S. 651 (2023)........................................................................*passim*

*Shoshone-Bannock Tribes of Fort Hall Rsrv. v. DOI*,
   --- F.4th ---, 2025 WL 2424422 (9th Cir. Aug. 22, 2025) ................... 26

*Sierra Club v. Bosworth*,
   510 F.3d 1016 (9th Cir. 2007) ............................................................... 33

*State v. Lewis*,
   559 P.2d 630 (Alaska 1977) .................................................................... 8

*Sturgeon v. Frost*,
   577 U.S. 424 (2016)........................................................................ 6, 7, 26

*Sturgeon v. Frost*,
   587 U.S. 28 (2019).................................................................................... 6

*Tabb Lakes, Ltd. v. United States*,
   10 F.3d 796 (Fed. Cir. 1993) ................................................................. 29

*Texas v. New Mexico*,
   482 U.S. 124 (1987)................................................................................ 24

*Trustees for Alaska v. State*,
   736 P.2d 324 (Alaska 1987) ............................................................ 6, 7, 10

*West v. State*,
   248 P.3d 689 (Alaska 2010) ................................................................... 11

*West Virginia v. EPA*,
   597 U.S. 697 (2022)..............................................................................22, 23

*Weyerhaeuser Co. v. USFWS*,
   586 U.S. 9 (2018) ..................................................................................... 20

*WildEarth Guardians v. EPA*,
   759 F.3d 1064 (9th Cir. 2014) ................................................................. 43

*Yellen v. Confederated Tribes of the Chehalis Rsrv.*,
   594 U.S. 338 (2021) ................................................................................. 26

## Statutes

16 U.S.C. §3213 ............................................................................................. 25

33 U.S.C. §1344 ....................................................................................... *passim*

33 U.S.C. §1362 ....................................................................................... *passim*

43 U.S.C. §1616 ......................................................................................... 7, 9

5 U.S.C. §702 ................................................................................................ 20

5 U.S.C. §704 ................................................................................................ 20

5 U.S.C. §706 ........................................................................................... 19, 21

Alaska Statehood Act, Pub. L. 85-508, 72 Stat. 339 (Jul. 7, 1958) ....................... *passim*

Pub. L. 94-204, 89 Stat. 1145 (Jan. 2, 1976) ............................................ *passim*

## Regulations

44 Fed. Reg. 58076 (Oct. 9, 1979) ............................................................... 38

50 Fed. Reg. 47267 (Nov. 15, 1985) ............................................................ 23

EPA, *Final Determination Concerning the Proposed Yazoo Backwater Area Pumps Project, Issaquena County, Mississippi* (Aug. 31, 2008), bit.ly/4nH79n2 ................... 30

EPA, *Final Determination Concerning the Spruce No. 1 Mine, Logan County, West Virginia* (Jan. 13, 2011), bit.ly/46xtcFO ........................................................ 30

EPA, *Final Determination on Remand Concerning the Proposed Ware Creek Water Supply Impoundment, James City County, Virginia* (Mar. 27, 1992), bit.ly/47Pe9tx ............. 31

## State Constitutional Provisions

Alaska Const. art. VIII, §2 ........................................................................ 9, 10

Alaska Const. art. VIII, §3 ............................................................................ 10

Alaska Const. art. VIII, §4 ............................................................................ 10

## Other Authorities

104 Cong. Rec. 9361 (1958) ........................................................................... 7

104 Cong. Rec. 9498 (1958) ........................................................................... 6

*Administrative Appeal Decision*, USACE, POA-2017-00271 (Apr. 24, 2023), bit.ly/3pT7ryO ........................................................................................... 19

BLM, *ANCSA Conveyances*, perma.cc/SY93-DRFJ ......................................... 7

*Celebrating 30 Years of the Cook Inlet Land Exchange*, CIRI (Oct. 2006), perma.cc/L8QR-368Q ...................................................................................... 9

Docket, *Sackett v. United States*, No. 21-454, perma.cc/LX4D-ZBZ2 ...................................... 29

EPA, *Biden-Harris Administration Announces Action to Help Protect Bristol Bay Salmon Fisheries* (Jan. 31, 2023), perma.cc/K263-77S3 ................................ 25

EPA, *Chronology of CWA Section 404(c) Actions*, perma.cc/F2JY-XSEE ................................ 28

House Rep. 104-643 (June 27, 1996), bit.ly/4nETs8c ..................................... 8

House Rep. 94-729 (Dec. 15, 1975) ............................................................... 8

Jonathan V. Hall *et al.*, *Status of Alaska Wetlands*, USFWS (1994), perma.cc/7DTS-5N39 ....... 9

Lucy Battersby, *BlackRock Head Says $70 Trillion in Cash Sitting Idle as Opportunities Dry Up*, The Age (Sept. 9, 2019), bit.ly/46zZb8m ....................................... 41

*Nationwide Permit 15, U.S. Coast Guard Approved Bridges*, USACE (Feb. 25, 2022), bit.ly/46PQoAr ................................................................................. 27

*Notification of Appeal Remand Decision for Pebble Limited Partnership's Application*, USACE, POA-2017-00271 (Apr. 15, 2024) bit.ly/486z3nZ ............................... 19

Restatement (Second) of Contracts §203 (1981) ........................................... 26

The Alaska Const. Convention, Proposed Const. for the State of Alaska: A Report to the People of Alaska (1956) .................................................................. 11

*The Future of Copper*, IHS Markit (July 2022), bit.ly/42XLpJy ..................... 14

*The Pebble Deposit 30 Years Later*, Pebble Watch (Oct. 17, 2018), perma.cc/AAC5-E4TX ...... 12

True Tamplin, *Dry Powder | Definition, Reasons, Sources, and Strategies*, Nasdaq (Jan. 30, 2024), bit.ly/4gzl0JM ........................................................... 41

## INTRODUCTION

This case is about who decides one of the most important issues facing Alaska today. About 200 miles southwest of Anchorage are State-owned lands that are stunningly rich in precious minerals. Known as the Pebble Deposit, these lands contain more than 57 *billion* pounds of copper, in addition to enormous quantities of gold, silver, and rare earth minerals. Mining the Pebble Deposit would generate billions of dollars in revenue for the State and thousands of jobs for Alaskans, many of whom are rural residents with limited economic opportunities. And it would produce essential mineral resources for the emerging energy market, positioning Alaska as a leader in the coming renewable energy transition.

At the same time, the mine would be about 100 miles from Bristol Bay, a place that is renowned as the most bountiful sockeye salmon fishery in the world. The State of Alaska has a solemn obligation to ensure that these waters remain pristine for future generations. If a Pebble mine and the Bristol Bay cannot coexist, then the mine cannot happen. Full stop.

But who is responsible for deciding this delicate issue? The Constitution and federal law provide the answer: the State of Alaska, not the federal government. "Regulation of land and water use lies at the core of traditional state authority."[1] This division of powers is especially clear when it comes to the Pebble Deposit and the surrounding lands. When the State received these lands from the federal government, it was promised that the lands "shall include mineral deposits" and the "[m]ineral deposits in such lands shall be subject to lease by the State as the State legislature may direct."[2]

---

[1] *Sackett v. EPA*, 598 U.S. 651, 679 (2023).
[2] Alaska Statehood Act, Pub. L. 85-508, §6(i), 72 Stat. 339 (Jul. 7, 1958); *see* Pub. L. 94-204, §12(d)(1), 89 Stat. 1145 (Jan. 2, 1976).

Yet the EPA disregarded the State's rights and responsibilities. Relying on a rarely used power under Section 404(c) of the Clean Water Act, the EPA issued a "veto" that effectively prohibits any mining from occurring on these lands. The Veto includes a "Prohibition" over the Pebble Deposit (about 24.7 square miles) and a "Restriction" over the surrounding lands (about 309 square miles). To put that in perspective, the Prohibition covers an area of land the size of the entire island of Manhattan, and the Restriction covers an area the size of all five New York City boroughs combined. The EPA issued this veto even though no one had authorized the mine to move forward yet—neither the State through its permitting process nor the U.S. Army Corps of Engineers, which had actually *denied* a permit when the Veto was issued. The result of the EPA's unprecedented power grab is that Alaska's lands have been converted into yet another federal preserve—despite no clear authority from Congress.

The Veto must be set aside for multiple reasons. *First*, the EPA lacks statutory authority. The State of Alaska owns the lands within the Prohibition and Restriction areas. It received these lands from the United States through the Cook Inlet Land Exchange and the Statehood Act, both of which are federal laws. Under these laws, the State's lands "shall include mineral deposits" and the "[m]ineral deposits in such lands shall be subject to lease by the State as the State legislature may direct."[3] That means that Alaska has the right to recover these minerals, and the EPA cannot use a general law like the CWA to override the specific federal guarantees that Alaska received long ago.

---

[3] *Id.*

Even if the CWA applies, the EPA overstepped its authority by regulating a "defined area" that includes lands, not "waters of the United States." Section 404(c) of the CWA gives the EPA limited power to prohibit or restrict discharges into "navigable waters" (also known as "waters of the United States").[4] Under Section 404(c), the EPA cannot veto a "defined area as a disposal site" for discharges unless that area is a water over which it has jurisdiction. But the EPA didn't limit the "defined area" to these waters. Perhaps recognizing that its regulatory definition of "waters of the United States" would soon be abrogated in *Sackett v. EPA*, the EPA never made an official jurisdictional determination for the waters covered by the Veto. The EPA thus didn't know which streams, lakes, ponds, and wetlands were (and were not) "waters of the United States." So the EPA simply drew circles around huge plots of *land* and declared that any "waters of the United States" within those areas (whatever those waters may be) were off limits. The CWA doesn't authorize this blunderbuss approach.

*Second*, the EPA failed to properly assess whether the discharges would have an "unacceptable adverse effect" on fisheries. Again, the EPA's Section 404(c) power is limited to "waters of the United States." The EPA can issue a veto only when "the discharge of [dredge or fill] materials *into such area*"—meaning into "waters of the United States"—will have an unacceptable adverse effect on fishery areas.[5] But the EPA didn't base the Veto only on discharges into "waters of the United States." The EPA issued its veto based on discharges into "streams, wetlands, lakes, and ponds" in the Prohibition and Restriction areas without ever determining whether these waters and wetlands are actually "waters of the United

---

[4] 33 U.S.C. §1344(a)-(c).

[5] *Id.*

States."[6] But *Sackett v. EPA*—which was issued *after* the Veto and significantly narrows the definition of "waters of the United States"—makes clear that not all streams, wetlands, lakes, and ponds are "waters of the United States."[7] It was arbitrary and capricious for the EPA to issue a veto based on harms to waters over which it may have had no authority.

The EPA's errors continued. Section 404(c) applies only when the "*discharge* of [dredged or fill] materials *into*" waters of the United States will have an unacceptable adverse effect.[8] But the EPA didn't limit its analysis to purported harms from discharges. Instead, it expanded its analysis to so-called "secondary effects" from the mine itself, such as dust and groundwater pumping. The regulation of such activities is for *the State*, not the federal government.

*Finally*, the EPA improperly assessed the costs and benefits. Although the EPA claimed that it didn't need to weigh costs and benefits, that argument has no merit after *Michigan v. EPA*.[9] That is likely why the EPA's cost-benefit analysis (which it begrudgingly performed in a separate document) was so slipshod. The costs of the Veto are enormous. Prohibiting development of one of the largest copper deposits in the world eliminates jobs for Alaskans, revenue to the State, precious metals for the United States, and more. To minimize the costs of its veto, the EPA engaged in "heads I win, tails you lose" reasoning. The EPA claimed numerous benefits from preventing a mine, but it downplayed the costs as "speculative," reasoning that the mine might never happen because the Pebble Limited Partnership (the company holding the mining claim) might not receive the necessary permits or the mine may

---

[6] EPA_AR_0082954, 0083614.
[7] 598 U.S. at 666, 671, 678.
[8] 33 U.S.C. §1344(c) (emphasis added).
[9] 576 U.S. 743 (2015).

be too expensive to operate. But this reasoning makes no sense: If a mine is not built or operated, the EPA cannot claim any of the benefits, which occur only by *stopping* the mine. The EPA cannot have it both ways.

The EPA also improperly speculated that the harms to Alaska and the wider economy would be minimized because PLP (a mining company) could simply shift its capital to other enterprises that would benefit the State, such as "construct[ing] housing and apartments" in Anchorage.[10] That reasoning has no basis in the record and fundamentally misunderstands what happens to capital when a once-in-a-lifetime investment opportunity disappears.

Last, the EPA failed to analyze the costs of the Restriction (as opposed to the Prohibition). The costs imposed by the Restriction will be exponentially greater than those of the Prohibition. Yet the EPA casually extended its veto to hundreds of square miles of additional mineral deposits, apparently believing that the benefits justified any costs, no matter what they may be. The EPA acted arbitrarily by wholly ignoring this key aspect of its decision.

\*    \*    \*

The myriad decisions associated with the Pebble Mine—whether it should operate and, if so, how it should be operated—were for the State to decide, not the federal government. The State is fully equipped to make these important decisions. Yet the EPA, in its eagerness to have a say in these matters, grossly overstepped its authority. Indeed, the Veto reads like an order from a state regulatory body—not a limited federal assessment of "discharges" into "navigable waters." Because the Veto is unlawful, it should be vacated and set aside.

---

[10] EPA_AR_0141305.

*Northern Dynasty Minerals Ltd. v. EPA*                                  Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                                         5

# BACKGROUND

## A.    The Alaska Statehood Act

The United States purchased Alaska from Russia in 1867. It thereby acquired "in a single stroke 365 million acres of land—an area more than twice the size of Texas."[11] For the next 90 years, the Federal Government owned all of Alaska.[12] But Alaska's distant location and few inhabitants led to an "'era of total neglect.'"[13] It was not until the 1950s, after "[o]pportunities to mine, trap, and fish attracted tens of thousands more settlers," that Congress seriously considered admitting Alaska as a State.[14] But there was a problem: 98 percent of the land was still owned by the Federal Government.[15] As a result, "absent a land grant from the Federal Government to the State, there would be little land available to drive private economic activity and contribute to the state tax base."[16] Indeed, one of the principal objections to statehood was that Alaska would not survive unless it was "'heavily subsidized by the other 48 States of the Union.'"[17]

A solution was struck. In 1958, Congress passed—and the people of Alaska ratified—the Alaska Statehood Act, making Alaska the 49th state in the Union. To "propel private industry and create a tax base," Congress made an enormous land grant to the new State.[18]

---

[11] *Sturgeon v. Frost*, 587 U.S. 28, 33 (2019) (*Sturgeon II*) (cleaned up).
[12] *Id.*
[13] *Id.*
[14] *Id.* at 34
[15] *Sturgeon v. Frost*, 577 U.S. 424, 429 (2016) (*Sturgeon I*).
[16] *Id.*
[17] *Trustees for Alaska v. State*, 736 P.2d 324, 335 (Alaska 1987) (quoting 104 Cong. Rec. 9498 (1958)).
[18] *Sturgeon II*, 587 U.S. at 34.

*Northern Dynasty Minerals Ltd. v. EPA*                      Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                                    6
Case 3:24-cv-00059-SLG     Document 167     Filed 10/03/25     Page 14 of 54

Over the next 35 years, Alaska could select for itself more than 103 million acres of "vacant, unappropriated, and unreserved" federal land, about a quarter of all land in Alaska.[19]

Importantly, the Statehood Act promised that the land grants to Alaska "shall include mineral deposits," and that the "[m]ineral deposits in such lands shall be subject to lease by the State as the State legislature may direct."[20] These mineral rights were essential because only a fraction of the land in Alaska was suitable for agriculture, and "the federal government had already reserved the most valuable land" for itself.[21] Given the severe challenges facing the new State, these mineral rights were seen as "'the foundation upon which Alaska'" could become a "'full and equal' State."[22]

## B.    The Cook Inlet Land Exchange

The Statehood Act did not determine the rights of the Alaska Natives, who asserted aboriginal title to much of the same land now claimed by the State.[23] To address these issues, Congress in 1971 passed the Alaska Native Claims Settlement Act (ANCSA), which settled aboriginal land claims but also allowed corporations organized by Alaska Natives to select more than 40 million acres of federal land.[24] ANCSA further directed the Secretary of Interior to withdraw up to 80 million acres of land from selection by the State to set aside for conservation purposes.[25]

---

[19] Statehood Act §6(a)-(b).
[20] §6(i).
[21] *Trustees for Alaska*, 736 P.2d at 336 n.23.
[22] *Id.* at 336 (quoting 104 Cong. Rec. 9361 (1958)).
[23] *Sturgeon I*, 577 U.S. at 429.
[24] *Id.* at 429-30; *see* BLM, *ANCSA Conveyances*, perma.cc/SY93-DRFJ.
[25] 43 U.S.C. §1616(d)(2).

*Northern Dynasty Minerals Ltd. v. EPA*                                    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                                  7
Case 3:24-cv-00059-SLG     Document 167     Filed 10/03/25     Page 15 of 54

Although the law worked well throughout much of the State, "severe difficulties arose" in the Cook Inlet region of southcentral Alaska.[26] Much of the land desired by the new Alaska Native corporation (Cook Inlet Region, Inc. or CIRI) had already been selected by the State or set aside by the Federal Government for public purposes.[27] The land available to CIRI under ANCSA thus was "largely comprised of mountains and glaciers, hardly the settlement contemplated by Congress."[28]

To resolve these issues, there was a "series of intense discussions" among the United States, Alaska, CIRI, and "various other interested groups," including "mining interests."[29] The United States, the State of Alaska, and CIRI ultimately signed a contract agreeing to "the largest land exchange in American history."[30] Titled the "Terms and Conditions for Land Consolidation and Management in the Cook Inlet Area," it was enacted by Congress as Public Law 94-204, an amendment to ANCSA, and subsequently approved by the Alaska legislature.[31] The three-way agreement is now commonly known as the Cook Inlet Land Exchange.

All parties stood to benefit from the exchange. For the United States, the "centerpiece" of the land exchange was the creation of the Lake Clark National Park and Preserve.[32] To create a contiguous park, both the State and CIRI gave their land rights to the United States and "contractually bound themselves to support [the] creation of the [park]."[33] For CIRI, the

---

[26] *State v. Lewis*, 559 P.2d 630, 633 (Alaska 1977).
[27] *See* House Rep. 104-643, at 3-4 (June 27, 1996), bit.ly/4nETs8c.
[28] *Id.* at 4.
[29] House Rep. 94-729, at 30 (Dec. 15, 1975).
[30] House Rep. 104-643, at 4.
[31] *Id.*; *see* Pub. L. 94-204.
[32] House Rep. 104-643, at 4.
[33] *Id.*

Land Exchange was a "profound" success that "formed the basis of CIRI's future."[34] CIRI obtained "resource-rich lands in the region" that "laid the foundation for [CIRI's] unprecedented financial success, especially as [it secured] rights to oil and gas royalties."[35]

For the State of Alaska, it gained access to approximately 525,000 acres in the Lake Iliamna area and the Nushagak River and Koksetna River drainages of Bristol Bay.[36] These lands had previously been withdrawn from selection by the State under ANCSA.[37] Like much of Alaska, the lands that the State received in the Exchange were known to contain extensive wetlands and streams.[38] Although most of these lands had previously been set aside by the federal government for conservation purposes, the United States opened these lands to Alaska with the full knowledge that the State would "utiliz[e]" and "develo[p]" the land "for the maximum benefit of its people."[39] In fact, the parties knew that the lands "had significant mineral development potential," and the State wanted "to explore them and ultimately to obtain economic benefit from them."[40] These lands contain what would later be known as the

---

[34] *Celebrating 30 Years of the Cook Inlet Land Exchange* at 1, CIRI (Oct. 2006), perma.cc/L8QR-368Q.

[35] *Id.*

[36] Ex. 2 at 6 ¶17 (Dkt. 25, *PLP v. EPA*, 3:14-cv-97 (D. Alaska)) (Smith Decl.); *see also* EPA_AR_0015357.

[37] *Id.*; *see* 43 U.S.C. §1616(d)(2); Pub. L. 94-204, §12(d)(1); Ex. 1 at 3, ¶¶15, 17 (Hess Decl.); *see also* EPA_AR_0015368.

[38] *See, e.g.*, Jonathan V. Hall *et al.*, *Status of Alaska Wetlands* at 3, USFWS (1994), perma.cc/7DTS-5N39 (wetlands cover "43.3 percent of Alaska's surface area," compared to just "5.2 percent of the surface area" for the lower 48 States).

[39] Alaska Const. art. VIII, §2.

[40] Ex. 2 at 8 ¶22; *see* EPA_AR_0015369 ("Alaska's benefit of the bargain was acquiring mineral-rich lands specifically for their mineral potential."), 0015391, 0015410.

"Pebble Deposit" and comprise the lands that are subject to the Prohibition and Restriction at issue here.[41]

The State insisted that the Land Exchange explicitly recognize its mineral rights. The new lands the State obtained were thus designated "for all purposes as if conveyed to the State under and pursuant to Section 6 of the Alaska Statehood Act."[42] That meant the State would, among other things, own the new lands' "mineral deposits" and have the right to "lease [them] as the State legislature may direct."[43] These mineral-rich lands thus would help the young State—which was still the least populated in the union despite its vast size—receive "the income that [it] needed to meet the costs of statehood."[44]

## C.     The Bristol Bay Area Plan of 1984

After the Land Exchange, the State immediately put in place a land management plan to ensure responsible stewardship of its newly acquired land. Unlike most States, Alaska is constitutionally required to protect its natural resources. The State must provide for the "conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people."[45] Fish, wildlife, and waters are "reserved to the people for common use."[46] And all replenishable resources belonging to the State "shall be utilized, developed, and maintained on the sustained yield principle,"[47] which requires "'maximum use

------

[41] Ex. 1 at 3-4, ¶¶15-21; Ex. 2 at 7, ¶20; *see* EPA_AR_0015368.
[42] Pub. L. 94-204, §12(d)(1).
[43] Statehood Act §6(i).
[44] *Trustees for Alaska*, 736 P.2d at 336.
[45] Alaska Const. art. VIII, §2.
[46] *Id.* §3.
[47] *Id.* §4.

of natural resources with their continued availability to future generations.'"[48] In addition, the Alaska Department of Natural Resources ensures that any use of water is in the public interest, and the Alaska Department of Fish and Game carries out Alaska's constitutional duty to maintain a sustained yield of fish and wildlife resources for future generations.

To fulfill its constitutional obligations, the State spent years after the Land Exchange developing the Bristol Bay Area Plan, a comprehensive land-use plan designating each area of land in the Bristol Bay region to its best uses, including mining, hunting, fishing, conservation, and others.[49] The State developed the plan to "preserv[e] … fish and wildlife resources" on the State's new lands while also "allowing for the exploration and development of other resources such as oil[,] gas, [and] minerals."[50]

To accomplish its dual environmental and economic goals, the State created a strict environmental and regulatory regime governing all mining on the new lands.[51] For example, to "protect the fisheries and recreational resources" in the region, the State closed dozens of streams and rivers to any use in potential mining.[52] In addition, the State prohibited "dredging … , filling, or shoreline alteration in fish habitat[s]" unless the State "determined that the proposed activity will not have a significant adverse impact on fish or fish habitat or that no feasible and prudent alternative site exists to meet the public need."[53] And no mining could

---

[48] *West v. State*, 248 P.3d 689, 696 (Alaska 2010) (quoting The Alaska Const. Convention, Proposed Const. for the State of Alaska: A Report to the People of Alaska (1956)).

[49] *See* EPA_AR_0475620-867; *see also* EPA_AR_0015369-71 (discussing the Bristol Bay Area Plan).

[50] EPA_AR_0475630.

[51] EPA_AR_0475656-66.

[52] EPA_AR_0475657-61.

[53] EPA_AR_0475664.

occur without an "approved mining plan of operation," which requires compliance with a strict set of environmental controls.[54] By designating this land for mineral exploration, the State sought to both "develop the region's mineral and material resources" while also "protect[ing] the fisheries and recreational resources, as well as water quality."[55]

## D. The Pebble Deposit

In 1987, an Alaskan geologist, Phil St. George, was piloting an airplane in a remote area of the Bristol Bay region when he made "the biggest discovery of his career."[56] Seeing rust-colored earth (an indication of gold), St. George identified the land as worthy of mineral exploration. After initial tests indicated that the land contained gold and copper, St. George named the area after Pebble Beach, the famous golf course, because his discovery felt "like getting a hole in one."[57]

Despite its potential, the Pebble Deposit remained largely unexplored due to low metal prices and the large costs involved in any mining operation.[58] But in 2001, after a different company acquired the mineral claim for the Pebble Deposit, significant resources were devoted to exploring the Pebble Deposit.[59] After years of exploration and analysis, the world began to understand the Pebble Deposit's enormous potential.

Located about 200 miles southwest of Anchorage—17 miles from the closest villages of Iliamna, Newhalen, and Nondalton, and accessible only by helicopter or snowmobile—the

---

[54] EPA_AR_0475664-65.

[55] EPA_AR_0475657-58, 0475663.

[56] *The Pebble Deposit 30 Years Later*, Pebble Watch (Oct. 17, 2018), perma.cc/AAC5-E4TX.

[57] *Id.*

[58] EPA_AR_0082977.

[59] *Id.*

Pebble Deposit is now recognized as one of the largest undeveloped copper deposits in the world.[60] The Pebble Deposit contains an astounding 57 billion pounds of copper.[61] Mining the Pebble Deposit "could meet between 6.3% and 11.1% of US copper demand, translating to annual contributions between $350 million and $610 million in downstream copper sales."[62] The Deposit also contains copious other mineral riches, including 71 million ounces of gold, 3.4 billion pounds of molybdenum, 345 million ounces of silver, and 2.6 million kilograms of rhenium.[63] According to one estimate, mining the Pebble Deposit will produce $31.73 *billion* in "total revenue," as well as thousands of jobs, hundreds of millions of dollars in wages, and billions of dollars in State and local tax revenue.[64]

The importance of these minerals to the United States cannot be overstated. They are "critical to the transition to renewable energy sources, updating electrical grids, electric vehicles, and solar and wind energy production."[65] Because of the worldwide push to transition to renewable energy, copper demand is expected to soar in the coming years.[66] "[D]emand for copper for power lines alone will double by 2040, and overall copper demand during that time will grow by 40%."[67] But "currently operating or under-construction copper mines will only meet 80% of copper demand by 2030."[68] And this has national security implications because

---

[60] EPA_AR_0015362, 0087327.
[61] EPA_AR_0015362.
[62] EPA_AR_0078422.
[63] EPA_AR_0015362.
[64] EPA_AR_0141360-63.
[65] EPA_AR_0078425.
[66] *Id.*
[67] *Id.*
[68] *Id.*

China holds the "preeminent position" in copper resources and is a leading producer of rare earths.[69] "If the Pebble [Deposit] is not developed, the US will have to rely on increased production overseas," and by 2035, it "'will be importing between 57% and 67% … of its copper needs.'"[70]

As the owner of the Pebble Deposit, Alaska stands to benefit enormously. Mining these lands would generate between $2.8 and $5.4 billion in tax and royalty revenue for the State and $23.8 million in local tax revenue.[71] It also would be a lifeline for rural residents and Alaska Natives, creating "millions of dollars of contracting opportunities [for] Alaska Native Corporations" and high-paying jobs—"almost 40% higher than the US annual average wage"—in a remote part of Alaska where economic development is limited.[72] Building a mine at the Deposit, just in the initial capital phase, would create more than 12,000 jobs.[73] Increased economic activity and local tax revenue would benefit everyone in nearby rural communities through improved local infrastructure, schools, and health care facilities.[74] Simply put, mining the Pebble Deposit would do exactly what was intended by the Land Exchange and the Statehood Act: It would "provide the revenues necessary to support state and local governments and to sustain Alaska's economy, culture, and way of life."[75]

---

[69] *The Future of Copper* at 12-13, IHS Markit (July 2022), bit.ly/42XLpJy.
[70] EPA_AR_0078425.
[71] EPA_AR_0015393.
[72] EPA_AR_0078417-19, 0078422, 0078428.
[73] EPA_AR_0141362.
[74] EPA_AR_0078417-19.
[75] EPA_AR_0015362.

## E. The EPA's Prohibition and Restriction

In June 2020, the Pebble Limited Partnership submitted a permit application with the U.S. Army Corps to develop the Pebble Deposit.[76] Consistent with the public interest, PLP committed to take "numerous measures to avoid and minimize impacts to wetlands and other [waters], air quality, wildlife and aquatic habitat, areas of cultural significance, and areas of known subsistence use."[77] In July 2020, the Army Corps published its Final Environmental Impact Statement. The FEIS concluded, among other things, that the Pebble mine project would have no "measurable impact on fish populations" and would not "affect Cook Inlet commercial fisheries"[78]; that losses to anadromous fish would "fall within the range of natural variability"[79] with no "discernible" loss of genetic diversity in Bristol Bay fisheries[80]; that "changes in surface water flows" might actually "*increase* suitable habitat" for anadromous fish[81]; and that any harms to downstream spawning areas—which are a "considerabl[e]" distance from the deposit[82]—would be limited[83] and capable of mitigation.[84] The FEIS also noted the positive economic effects that a Pebble mine would have for southwestern Alaska.[85] Yet despite these findings, the Corps surprisingly did an about-face and denied PLP's

---

[76] *See* EPA_AR_0087313-391. For additional discussion of the regulatory history of the Pebble Deposit, *see* EPA_AR_0082977-92.

[77] EPA_AR_0087356-73.

[78] EPA_AR_0095259, 0095946; *see* EPA_AR_0095264.

[79] EPA_AR_0095991.

[80] EPA_AR_0095992; *see also* EPA AR 0078390-91.

[81] EPA_AR_0095959 (emphasis added).

[82] EPA_AR_0094991.

[83] EPA_AR_0095965-66.

[84] EPA_AR_0095973; *see generally* EPA_AR_0096330-76.

[85] *See* EPA_AR_0094519-31.

*Northern Dynasty Minerals Ltd. v. EPA*                    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                    15
Case 3:24-cv-00059-SLG     Document 167     Filed 10/03/25     Page 23 of 54

application four months later.[86] PLP appealed the denial to the Corps' Division Engineer in January 2021.[87]

Even though PLP's permit application had been denied, the EPA pushed forward. In May 2022, the EPA announced its intention to issue a Section 404(c) veto to prohibit and restrict mining in the Pebble Deposit and in the surrounding areas.[88] Section 404(c) is a rarely used provision that authorizes the EPA to "prohibit the specification … of any defined area as a disposal site" and "restrict the use of any defined area for specification … as a disposal site" when the EPA determines that "the discharge of such materials into such area will have an unacceptable adverse effect on," among other things, "fishery areas."[89] Because the EPA's jurisdiction is limited to "navigable waters" (which the CWA defines as "waters of the United States"), the EPA's power under Section 404(c) is limited to "prohibit[ing]" and "restrict[ing]" the discharge of dredged and fill materials into "waters of the United States."[90]

In its proposed Veto, the EPA said that it would issue both a "Prohibition" and a "Restriction" over the "use of certain waters in the Bristol Bay watershed as a disposal site for the discharge of dredged or fill material associated with mining at the Pebble deposit."[91] The Prohibition would cover 24.7 square miles,[92] and the Restriction would cover 309 square miles, more than 12 times the size of the Prohibition.[93] The EPA claimed that its veto was necessary

---

[86] EPA_AR_0129294.
[87] EPA_AR_0129359-417.
[88] *See* EPA_AR_0082179-517.
[89] 33 U.S.C. §1344(c).
[90] §§1344(a), (c), 1362(7).
[91] EPA_AR_0082194, 0082205-08.
[92] EPA_AR_0082370, 0083168.
[93] EPA_AR_0082371.

*Northern Dynasty Minerals Ltd. v. EPA*                    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                        16
Case 3:24-cv-00059-SLG    Document 167    Filed 10/03/25    Page 24 of 54

because discharges in these areas would eliminate streams and wetlands, which, in turn, could have downstream adverse effects on fishery areas in the Bristol Bay.[94]

Notably, when the EPA proposed its veto, neither the Corps nor the EPA had issued an official "jurisdictional determination" that established which waters within the Prohibition and Restriction were "waters of the United States."[95] The EPA thus proposed to base the veto on the harms of discharges into "streams," "wetlands," "lakes," and "ponds" in the areas without knowing whether these waters and wetlands were actually "waters of the United States."[96] The EPA also based its proposed veto on so-called "[s]econdary effects" from mining the Pebble Deposit, such as "[f]ugitive dust" and "dewatering."[97] Although the EPA claimed that it didn't need to perform a cost-benefit analysis, it included one for the Prohibition.[98] The EPA did not separately quantify and assess the costs of the Restriction.[99]

Commenters raised numerous objections to the EPA's proposal. The proposed veto violated the Statehood Act and the Land Exchange, which gave Alaska the right to lease the Pebble Deposit's minerals "'as the State legislature may direct.'"[100] The EPA was exceeding its authority under the CWA by regulating waters that the EPA had not found to be "waters of the United States."[101] The EPA was relying on factors that Congress had not authorized the EPA to consider—such as discharges into non-navigable waters and the "'secondary' …

---

[94] EPA_AR_0082369-70.
[95] EPA_AR_0083614.
[96] EPA_AR_0082203.
[97] EPA_AR_0082298.
[98] EPA_AR_0082397, 0141164, 0141160-215.
[99] *See generally* EPA_AR_0141160-215.
[100] EPA_AR_0015366-69, 0078427-28.
[101] EPA_AR_0015401-04.

*Northern Dynasty Minerals Ltd. v. EPA*                    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                      17
Case 3:24-cv-00059-SLG     Document 167     Filed 10/03/25     Page 25 of 54

effects of fugitive dust and other … nondischarge activities."[102] And the proposed veto's cost-benefit analysis was "fundamentally flawed" because it improperly discounted the costs of the mine as speculative and failed to separately quantify and assess the enormous costs of the Restriction.[103]

On January 30, 2023, the EPA issued its final veto over the Pebble Deposit, largely following the outlines of its proposed veto.[104] In the Prohibition, the EPA "prohibit[ed] the specification of waters of the United States within the Defined Area for Prohibition … as disposal sites for the discharge of dredged or fill material for the construction and routine operation of the 2020 Mine Plan."[105] The Defined Area for Prohibition was not limited to specific "waters of the United States," but was instead an area of land of approximately 24.7 square miles.[106] In the Restriction, the EPA "restrict[ed] the use of waters of the United States within the Defined Area for Restriction … for specification as disposal sites for the discharge of dredged or fill material associated with future proposals to construct and operate a mine to develop the Pebble Deposit that would either individually or cumulatively result in adverse effects similar or greater in nature and magnitude to those described" for the Prohibition.[107] The Defined Area for Restriction also was not limited to specific "waters of the United States," but was instead an area of land of approximately 309 square miles.[108]

---

[102] EPA_AR_0015398, 0015401-04.
[103] EPA_AR_0015391-95, 0078415-17.
[104] *See* EPA_AR_0082927-3361; *see also* EPA_AR_0082924-26.
[105] EPA_AR_0082957.
[106] EPA_AR_0083168-71.
[107] EPA_AR_0082958.
[108] EPA_AR_0083172-76.

*Northern Dynasty Minerals Ltd. v. EPA*                    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                          18
Case 3:24-cv-00059-SLG     Document 167     Filed 10/03/25     Page 26 of 54

After the EPA issued its veto, the Corps' initial denial of PLP's permit was reversed on an intra-agency appeal because the initial decision failed to adequately explain the denial.[109] On remand, the Corps denied PLP's permit without prejudice, concluding that it could no longer grant the permit in light of the Veto.[110] Because of the EPA's actions, the State has never completed its own permitting process for the Pebble Deposit.[111]

The State of Alaska filed suit on April 11, 2024.[112] The State now seeks an order from the Court declaring the Veto unlawful and vacating and setting it aside.[113]

## LEGAL STANDARD

An agency's "action, findings, [or] conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" must be "[held] unlawful and set aside."[114] The Court must "decide all relevant questions of law" and cannot defer to an agency's interpretation.[115] The Court must set aside an action as arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider

---

[109] *Administrative Appeal Decision*, USACE, POA-2017-00271 (Apr. 24, 2023), bit.ly/3pT7ryO.

[110] *Notification of Appeal Remand Decision for Pebble Limited Partnership's Application*, USACE, POA-2017-00271 (Apr. 15, 2024) bit.ly/486z3nZ.

[111] EPA_AR_0015381, 0078393, 0082990-91.

[112] The State has also filed a lawsuit in the Court of Federal Claims against the United States, raising contract and takings claims stemming from the Veto. *See Alaska v. United States*, No. 24-cv-396 (Fed. Cl.).

[113] Importantly, the State is not seeking an order requiring the Corps to approve PLP's (or anyone else's) Section 404(a) permit to discharge dredged or fill materials in the Veto areas. The State seeks only to vacate and set aside the Veto so that any future requests for permits can be properly considered.

[114] 5 U.S.C. §706(2).

[115] §706; *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400, 412-13 (2024).

*Northern Dynasty Minerals Ltd. v. EPA*      Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief      19
Case 3:24-cv-00059-SLG     Document 167     Filed 10/03/25     Page 27 of 54

an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[116]

## JURISDICTION

This Court has jurisdiction because the Veto is a final agency action.[117] The State also is "aggrieved" by the Veto and has Article III standing.[118] The Veto causes "direct harm to [the State's] economic, environmental, [and] administrative interests."[119] The State owns all of the lands subject to the Prohibition and nearly all of the lands subject to the Restriction.[120] The Veto "decrease[s] … the market value" of these State lands.[121] It not only permanently bars PLP's mining proposal at the Pebble Deposit, but it "entirely preclude[s] mineral development" in the Prohibition and Restriction areas by anyone, stripping these lands of any "economically viable use."[122] And it prevents the State from collecting taxes and royalties from the development of mining claims in these vast regions, depriving the State of billions of dollars in revenue from lost taxes and royalty payments.[123] The Veto also nullifies the State's

---

[116] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).
[117] 5 U.S.C. §704.
[118] §702.
[119] *Clean Wis. v. EPA*, 964 F.3d 1145, 1158 (D.C. Cir. 2020).
[120] *See, e.g.*, Ex. 1 at 4, ¶¶18, 20-21; EPA_AR_0015368; Pub. L. 94-204, §12(d)(1); *see also* Ex. 2 at 5-8, ¶¶14-21.
[121] *Weyerhaeuser Co. v. USFWS*, 586 U.S. 9, 19 n.1 (2018).
[122] EPA_AR_0015410.
[123] EPA_AR_0015392-93, 0015410-11.

*Northern Dynasty Minerals Ltd. v. EPA*                                    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                                    20
Case 3:24-cv-00059-SLG          Document 167          Filed 10/03/25          Page 28 of 54

permitting process for regulating the Pebble Deposit and surrounding areas.[124] These injuries are traceable to the Veto and would be redressed by a favorable decision setting aside the Veto.

## ARGUMENT

The Veto is unlawful and must be set aside for at least three reasons. *First*, the Veto is a major question and a land-use regulation that requires clear authorization from Congress, but the Veto prevents the State from leasing the Pebble Deposit in violation of the Statehood Act and the Land Exchange, and it regulates lands and non-navigable waters in violation of the CWA. *Second*, the Veto exceeds the bounds of the CWA by finding "unacceptable adverse effects" based on harms to waters that aren't known to be navigable and on activities unrelated to discharges. *Third*, the EPA performed a flawed cost-benefit analysis that inflates the size and likelihood of the Veto's benefits, dismisses the Veto's costs as speculative, and fails entirely to assess the costs of the Restriction. The Veto must be held unlawful and set aside.

## I.    The EPA has no statutory authority to issue the Veto.

It is "axiomatic that administrative agencies may act only pursuant to authority delegated to them by Congress."[125] If an agency lacks authority under a statute, then "its action is plainly contrary to law."[126] Here, the EPA lacked statutory authority for its actions and so the Veto must be "[held] unlawful and set aside."[127]

---

[124] EPA_AR_0015381, 0078393, 0082990-91; *see, e.g.*, *Maine v. Norton*, 257 F. Supp. 2d 357, 374 (D. Me. 2003) (Maine had standing to challenge federal action that "prohibit[ed] the State from exercising its sovereign power to determine the extent to which persons may fish for Atlantic salmon").

[125] *NRDC v. Regan*, 67 F.4th 397, 401 (D.C. Cir. 2023) (cleaned up).

[126] *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001).

[127] 5 U.S.C. §706.

*Northern Dynasty Minerals Ltd. v. EPA*                                                  Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                                                            21
Case 3:24-cv-00059-SLG        Document 167        Filed 10/03/25        Page 29 of 54

## A. The court cannot uphold the Veto without clear Congressional authorization.

Given the EPA's extraordinary assertion of power, two canons of construction apply here: (1) the major-questions doctrine, and (2) the federalism canon. Under both canons, this Court cannot uphold the EPA's actions without "'clear congressional authorization.'"[128]

*First*, the Veto presents a major question. When a statute "confers authority upon an administrative agency, that inquiry must be 'shaped, at least in some measure, by the nature of the question presented'—whether Congress in fact meant to confer the power the agency has asserted."[129] But when an agency action presents a "major questio[n]," courts demand "something more than a merely plausible textual basis for the agency action."[130] The agency instead "must point to 'clear congressional authorization' for the power it claims."[131]

This case has all the hallmarks of a major question. The Veto is no "'everyday exercise of federal power.'"[132] With the stroke of a pen, the Veto has eliminated tens of billions of dollars economic activity, billions of dollars in lost revenue to the State, thousands of high paying jobs, and tens of billions of pounds of copper and other precious metals. The "size [and] scope" of the Veto is right in line with other major-question cases.[133]

---

[128] *West Virginia v. EPA*, 597 U.S. 697, 723 (2022); *see also Sackett*, 598 U.S. at 679 (requiring "'exceedingly clear language'").

[129] *West Virginia*, 597 U.S. at 721.

[130] *Id.* at 723.

[131] *Id.*

[132] *NFIB v. OSHA*, 595 U.S. 109, 117 (2022).

[133] *E.g.*, *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (eviction moratorium would affect "between 6 and 17 million tenants" and have an "economic impact" of "$50 billion"); *NFIB*, 595 U.S. at 120 (OSHA mandate would impose "billions of dollars in unrecoverable compliance costs").

The Veto's size is also "unprecedented."[134] Before now, the largest disposal site vetoed under Section 404(c) was about 4.68 square miles of wetlands, and that veto area was drawn specifically around the affected waters.[135] But the Veto here covers 309 square miles—66 times larger than any previous veto—and was drawn, not merely around the waters affected by the Pebble mine, but around vast swaths of *land*.[136] The "'lack of historical precedent'" for the Veto is a "'telling indication'" that the EPA has overstepped.[137]

The EPA's theory of statutory authority also has "no limit."[138] Under its interpretation of the CWA, the EPA could issue preemptive vetoes over any and all lands in the country— even an entire State—without ever determining which waters were "waters of the United States" and without limiting its veto to those waters. Such an extreme interpretation cannot stand without "'clear congressional authorization.'"[139]

*Second*, the federalism canon imposes a heightened obligation on the EPA. Congress must "'enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power,'" and the "[r]egulation of land and water use lies at the core of traditional state authority."[140] As the Supreme Court has repeatedly recognized, "[a]n overly broad interpretation of the CWA's reach would impinge on this authority."[141]

---

[134] *West Virginia*, 597 U.S. at 728; *see Biden v. Nebraska*, 600 U.S. 477, 501 (2023) (major question where the agency's prior enforcement of the statute was "extremely modest and narrow in scope").

[135] *See* 50 Fed. Reg. 47267, 47268 (Nov. 15, 1985).

[136] *See* EPA_AR_0083172-73.

[137] *NFIB*, 595 U.S. at 119.

[138] *Ala. Realtors*, 594 U.S. at 765.

[139] *West Virginia*, 597 U.S. at 723.

[140] *Sackett*, 598 U.S. at 679.

[141] *Id.* at 680.

Here, the authority over the land that the EPA is claiming is "vast" and "the scope of the EPA's conception" of its Section 404(c) power is "truly staggering," as it is asserting jurisdiction over areas that are "generally dry."[142] In light of "the CWA's express policy to 'preserve' the States' 'primary' authority over land and water use," this Court cannot uphold the Veto without a "clear statement from Congress" that gives EPA the power it is claiming.[143]

## B. The Veto violates the Statehood Act and the Cook Inlet Land Exchange.

The EPA claims its veto authority under Section 404(c) of the CWA. But the EPA cannot exercise this authority if doing so would violate other federal statutes.[144] Here, the Veto must be set aside because it violates the Cook Inlet Land Exchange and the Statehood Act.[145]

In the Land Exchange, the State received federal lands within the Prohibition and the Restriction that had previously been set aside for conservation purposes but were known to have enormous mineral potential.[146] These lands were critical to the continued well-being of Alaska, which had long relied on its resource-rich lands to fund the State and local governments and provide for the needs of its people.[147] To secure these rights, the Land Exchange promised that the land grants to Alaska "shall include mineral deposits" and the "[m]ineral deposits in such lands shall be subject to lease by the State as the State legislature

---

[142] *Id.*

[143] *Id.*

[144] *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (agencies cannot violate "*any* law, and not merely those laws that the agency itself is charged with administering").

[145] The Land Exchange and the Statehood Act are statutes as well as contracts. Pub. L. 85-508; Pub. L. 94-204; *Texas v. New Mexico*, 482 U.S. 124, 128 (1987) ("[A] compact when approved by Congress becomes a law of the United States."); *Oklahoma v. New Mexico*, 501 U.S. 221, 235 n.5 (1991) (same).

[146] *Supra* pp. 7-10.

[147] *Id.*

*Northern Dynasty Minerals Ltd. v. EPA*                    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                    24
Case 3:24-cv-00059-SLG     Document 167     Filed 10/03/25     Page 32 of 54

may direct."[148] As reflected by these terms, all parties understood that the State was being given the regulatory power to use its new lands—when it deemed it appropriate—for mining purposes. Indeed, a primary reason that Alaska participated in the Land Exchange was to "select lands in the Bristol Bay region that the federal government had previously placed off-limits to state selections" and which contained enormous "mineral potential."[149]

Despite these promises, the Veto effectively prevents any mining from occurring on the Pebble Deposit or in the surrounding area.[150] The Veto thus violates the terms of the parties' agreements. If the United States wanted to "conserve and restore [Alaska's] most cherished lands and waters,"[151] it shouldn't have given this land to Alaska for mineral exploration in exchange for consideration.[152] The EPA has essentially used the CWA to create another federal preserve—which it has no authority to do.[153] By changing the deal to make more State-owned lands off-limits to development, the EPA improperly "upse[t]" Alaska's "settled expectations."[154]

---

[148] Statehood Act §6(i); *see* Pub. L. 94-204, §12(d)(1).

[149] Ex. 2 at 6-8, ¶¶18-23; *see also* EPA_AR_0015368, 0015391, 0015410.

[150] EPA_AR_0015388, 0015392, 0015410.

[151] EPA, *Biden-Harris Administration Announces Action to Help Protect Bristol Bay Salmon Fisheries* (Jan. 31, 2023), perma.cc/K263-77S3.

[152] *Cf. ASARCO Inc. v. Kadish*, 490 U.S. 605, 632 (1989) ("Congress could not, for instance, grant lands to a State on certain specific conditions and then later, after the conditions had been met and the lands vested, succeed in upsetting settled expectations through a belated effort to render those conditions more onerous.").

[153] *See* 16 U.S.C. §3213(a) (prohibiting the "executive branch [from] withdraw[ing] more than five thousand acres [about 8 square miles] of public lands within the State of Alaska" except by a joint resolution of approval from Congress).

[154] *ASARCO*, 490 U.S. at 632.

The EPA (with little analysis) asserted that the Veto was proper because "nothing in the" Statehood Act or the Land Exchange "precludes the application of a duly enacted federal law."[155] But the Statehood Act and the Land Exchange contain "specific provision[s] applying to a very specific situation," while the CWA "is of general application."[156] Thus, without "'clear intention [from Congress] otherwise,'" these "'specific'" terms cannot "'be controlled or nullified by a general'" statute like the CWA.[157]

The "historical context" of the Land Exchange reinforces this interpretation.[158] In the Land Exchange, the State insisted on receiving these mineral-rich lands in exchange for surrendering its claims to other valuable lands.[159] The State never would have entered into this agreement if the benefit of the bargain could be so easily voided. Nor is it surprising that Congress didn't intend for the CWA to override these Alaska-specific laws. The "simple truth" is that "'Alaska is often the exception, not the rule.'"[160] Federal law "repeatedly recognizes that Alaska is different," including in "'the need for development and use of Arctic resources.'"[161]

Given Alaska's unique history, the EPA needed a "'clear and manifest' statement from Congress" before it could deprive Alaska of the United States' promises in the Statehood Act

---

[155] EPA_AR_0082989, 0082991; *see also* EPA_AR_0083592-97.

[156] *Morton v. Mancari*, 417 U.S. 535, 550 (1974); *see Shoshone-Bannock Tribes of Fort Hall Rsrv. v. DOI*, --- F.4th ---, 2025 WL 2424422, at *9-10 (9th Cir. Aug. 22, 2025).

[157] *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987); *cf.* Restatement (Second) of Contracts §203(e) (1981) ("[I]n case of conflict the specific or exact term is more likely to express the meaning of the parties with respect to the situation than the general language.").

[158] *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 509 (2010).

[159] *Supra* pp. 8-10.

[160] *Yellen v. Confederated Tribes of the Chehalis Rsrv.*, 594 U.S. 338, 342 (2021) (citing cases).

[161] *Sturgeon I*, 577 U.S. at 438-39.

*Northern Dynasty Minerals Ltd. v. EPA*                                    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                                    26
Case 3:24-cv-00059-SLG     Document 167     Filed 10/03/25     Page 34 of 54

and Land Exchange.[162] The CWA contains no such language. When the United States agreed that the land Alaska received "shall include mineral deposits" that "shall be subject to lease by the State as the State legislature may direct," it did not allow the EPA to impose new requirements decades later that shut down any mineral leasing from occurring on those lands.[163] The EPA thus lacks statutory authority for the Veto.

### C. The Veto exceeds the EPA's authority under the Clean Water Act.

Even standing on its own, the CWA doesn't give the EPA the authority it claims. Section 404(c) of the CWA authorizes the EPA to prohibit or restrict discharges into a "defined area," which can only be "waters of the United States."[164] But the EPA didn't limit its "defined area" to these waters. Instead, the EPA simply drew two circles around Alaska's *land* (one for the Prohibition and one for the Restriction) and asserted that no discharges could occur on any "waters of the United States" within these areas, wherever those waters may be. That was unlawful.

Section 404(a) of the CWA authorizes the Corps to "issue permits … for the discharge of dredged or fill material into the navigable waters at specified disposal sites."[165] For example, the Corps can issue a permit allowing the discharge of materials into a river to create a road going across the water.[166] Section 404(c), however, gives the EPA a limited "backstop" power

---

[162] *Rapanos v. United States*, 547 U.S. 715, 738 (2006) (plurality); *cf. In re Binghamton Bridge*, 3 Wall. 51, 74 (1866) ("All contracts are to be construed to accomplish the intention of the parties."); *Am. Tr. Co. v. Smyth*, 247 F.2d 149, 152 (9th Cir. 1957) (same).

[163] *See, e.g., Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) ("[T]he legislature says what it means and means what it says." (cleaned up)).

[164] 33 U.S.C. §§1344(a), (c), 1362(7).

[165] §1344(a).

[166] *See, e.g., Nationwide Permit 15, U.S. Coast Guard Approved Bridges*, USACE (Feb. 25, 2022), bit.ly/46PQoAr.

*Northern Dynasty Minerals Ltd. v. EPA*                 Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                    27
Case 3:24-cv-00059-SLG     Document 167     Filed 10/03/25     Page 35 of 54

(what is commonly known as a "veto") over the Corp's authority.[167] Section 404(c) authorizes the EPA to "prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and … to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site" when it determines that "the discharge of such materials into such area will have an unacceptable adverse effect on," among other things, "fishery areas."[168] Section 404(c) is a "'tool of last resort'" that has rarely been invoked.[169] Since 1972, the EPA has invoked Section 404(c) only 13 times.[170]

Congress constrained the EPA's Section 404(c) veto power by insisting that the EPA act with precision and within its jurisdictional limits. The EPA is authorized to veto discharges only into a "defined area as a disposal site."[171] The CWA contains no definition of "defined area" or "disposal site," but the surrounding text shows that the phrase "defined area as a disposal site" must mean a specific "navigable water" (or "waters of the United States"). Section 404(a) authorizes the Corps to issue permits only "into the navigable waters at specified disposal sites."[172] Accordingly, a dry piece of land could never be a "defined area as a disposal site." This reading is confirmed by Section 404(c), which allows a veto when "the discharge of such materials *into such area* will have an unacceptable adverse effect."[173] Again,

---

[167] *Mingo Logan Coal Co. v. EPA*, 714 F.3d 608, 610 (D.C. Cir. 2013).
[168] 33 U.S.C. §1344(c).
[169] EPA_AR_0015406.
[170] *See* EPA, *Chronology of CWA Section 404(c) Actions*, perma.cc/F2JY-XSEE.
[171] 33 U.S.C. §1344(c).
[172] §1344(a).
[173] §1344(c) (emphasis added).

*Northern Dynasty Minerals Ltd. v. EPA*                                    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                                      28
Case 3:24-cv-00059-SLG          Document 167          Filed 10/03/25          Page 36 of 54

because the CWA authorizes the EPA to veto discharges only into "navigable waters," a veto over a "defined area as a disposal site" can only cover specific "waters of the United States."[174]

But the EPA didn't take that approach. Its "Defined Area for Prohibition" and "Defined Area for Restriction" are enormous areas of *land*, irrespective of any "waters of the United States" that may or may not be present.[175] The EPA was forced to take this sweeping approach because it never issued an official jurisdictional determination to identify which waters covered by the Veto were "waters of the United States."[176] The EPA likely kept itself it the dark because it knew that its regulatory definition of "waters of the United States" could not withstand judicial scrutiny, which is exactly what happened a few months later in *Sackett*.[177]

The EPA tried to skirt the constraints of Section 404(c) through a sleight of hand. Although the "defined areas" of the Prohibition and Restriction are *lands*, the EPA claimed that the Veto applies only to the "waters of the United States" (wherever they may be) in those areas.[178] But the CWA doesn't allow this imprecision. Because the EPA's jurisdiction is limited

---

[174] §§1344(a), (c), 1362(7); *see, e.g., Ky. Waterways All. v. Ky. Utilities Co.*, 905 F.3d 925, 929 (6th Cir. 2018), *abrogated on other grounds*, 590 U.S. 165 (2020) ("[F]ederal regulation under the CWA only extends to pollutants discharged into navigable waters … leaving the states to regulate all pollution of non-navigable waters."); *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 798-99 (Fed. Cir. 1993) (same).

[175] EPA_AR_0082957-58.

[176] EPA_AR_0083614.

[177] The Supreme Court granted certiorari in *Sackett* on January 24, 2022, to consider "the proper test for determining whether wetlands are 'waters of the United States' under the Clean Water Act." Docket, *Sackett v. United States*, No. 21-454, perma.cc/LX4D-ZBZ2. The EPA issued its proposed veto four months later in May 2022 and its final veto in January 2023. The *Sackett* opinion nullifying the EPA's definition of "waters of the United States" was issued in May 2023.

[178] EPA_AR_0083618-19.

*Northern Dynasty Minerals Ltd. v. EPA*                                    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                                      29
Case 3:24-cv-00059-SLG     Document 167     Filed 10/03/25     Page 37 of 54

to "waters of the United States," any "defined area" under Section 404(c) also must be limited to "waters of the United States," not an area of land that may or may not contain such waters.

The EPA's interpretation of its powers is also at odds with the structure of Section 404, which repeatedly demands precision from the agencies. The Corps can issue permits for the discharge of dredged material "into the navigable waters at *specified* disposal sites."[179] And the EPA can prohibit only a "*defined* area as a disposal site" and restrict only the use of a "*defined* area for *specification*."[180] Nothing about Section 404(c) suggests that Congress wanted the EPA to have the sweeping power it now claims.

The Veto also marks a sharp departure from past 404(c) vetoes where the EPA limited its veto to specific "waters of the United States." For example, the EPA's last veto in 2011 "prohibit[ed] the specification of the defined area constituting [the] Pigeonroost Branch [stream], Oldhouse Branch [stream], and their tributaries"—"all of which are waters of the United States"—"for use as a disposal site associated with future surface coal mining."[181] Likewise, in 2008, the EPA "prohibit[ed] … the specification of the subject … waters of the United States … as a disposal site for the discharge of dredged or fill material" to construct a "pumping station that would pump surface water out of the Yazoo Backwater Area during high water events on the Mississippi River."[182] And in 1992, the EPA vetoed the "disposal of dredged or fill material in the subject waters of the United States [Ware Creek] for the purpose

---

[179] 33 U.S.C. §1344(a) (emphasis added).
[180] §1344(c) (emphasis added).
[181] EPA, *Final Determination Concerning the Spruce No. 1 Mine, Logan County, West Virginia* at 6 (Jan. 13, 2011), bit.ly/46xtcFO.
[182] EPA, *Final Determination Concerning the Proposed Yazoo Backwater Area Pumps Project, Issaquena County, Mississippi* at i, iv (Aug. 31, 2008), bit.ly/4nH79n2.

*Northern Dynasty Minerals Ltd. v. EPA*                                        Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                                            30
Case 3:24-cv-00059-SLG     Document 167     Filed 10/03/25     Page 38 of 54

of constructing … [a] water supply dam and reservoir" for local residents.[183] The Veto here contains no similar limitations to "waters of the United States."

Because the Veto is not limited to a "defined area" of "waters of the United States," the EPA exceeded its authority under the CWA.

## II. The EPA failed to properly analyze whether discharges into "waters of the United States" would have an unacceptable adverse effect.

The Veto is also arbitrary and capricious because the EPA did not properly analyze whether discharges into navigable waters would have unacceptable adverse effects. The EPA erroneously (1) based the Veto on harms to certain waters and wetlands without ever determining that these waters and wetlands were "waters of the United States," and (2) found unacceptable effects based on activities that were not "discharges" into "waters of the United States" (what the EPA dubbed "secondary effects").

### A. The EPA considered harms from the loss of waters and wetlands without ever determining whether these waters and wetlands were "waters of the United States."

The CWA is not a license for the EPA to regulate all land and water use in the country. The default presumption is that the States will retain this power, because the "[r]egulation of land and water use lies at the core of traditional state authority."[184] Section 404(c) carefully delineates the EPA's authority. The EPA can prohibit or restrict a defined area as a disposal site when it determines that "the discharge of [dredged or fill] materials into such area" will have certain unacceptable adverse effects.[185] Section 404(a) makes clear that "such area" means

---

[183] EPA, *Final Determination on Remand Concerning the Proposed Ware Creek Water Supply Impoundment, James City County, Virginia* at 1 (Mar. 27, 1992), bit.ly/47Pe9tx.
[184] *Id.*
[185] 33 U.S.C. §1344(c).

*Northern Dynasty Minerals Ltd. v. EPA*                                    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                                    31
Case 3:24-cv-00059-SLG     Document 167     Filed 10/03/25     Page 39 of 54

"into the navigable waters" (or "waters of the United States"), as that is the only place where the Corps can grant a permit for discharges.[186] The EPA therefore cannot issue a Section 404(c) veto unless the discharge of dredged or fill materials "into the navigable waters" will have certain unacceptable effects.

But the EPA didn't limit its analysis to "waters of the United States." In fact, the Veto contains almost no analysis at all of any "waters of the United States" in the Prohibition and the Restriction.[187] The EPA determined that "discharges of dredged or fill material for the construction and routine operation of the mine" within the Prohibition and Restriction areas would result in the loss of 8.5 miles of "anadromous fish streams"; the loss of 91 miles of "additional streams that support anadromous fish streams"; the loss of 2,108 acres of "wetlands and other waters that support anadromous fish streams"; and adverse impacts on 29 additional miles of "anadromous fish streams."[188] But the Veto has a crucial omission: The EPA never claimed that these streams and wetlands were "waters of the United States." The EPA thus based its harms on discharges that occurred in *any* waters and wetlands, regardless of whether they were jurisdictional waters.

The EPA has no authority to ignore the CWA's limits. "'[W]hen Congress directs an agency to consider only certain factors in reaching an administrative decision, the agency is not free to trespass beyond the bounds of its statutory authority by taking other factors into

---

[186] §§1344(a), (c), 1362(7).
[187] *See generally* EPA_AR_0082943-65.
[188] EPA_AR_0082957.

*Northern Dynasty Minerals Ltd. v. EPA*                    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                    32
Case 3:24-cv-00059-SLG     Document 167     Filed 10/03/25     Page 40 of 54

account.'"[189] The EPA needed to limit its analysis to the effects of discharges into "waters of the United States," as the CWA directs.

At times, the EPA appeared to recognize this limitation on its authority.[190] But when pressed, it backpedaled. According to the EPA, it looked at "maps of aquatic resources" (not an official "jurisdictional determination") and determined that "*at least some* of these aquatic resources within the defined areas are waters of the United States."[191] This "close enough" reasoning was a "clear error of judgment" because it failed to show a "rational connection between the facts found and the [determination] made."[192] The EPA cannot "base its decision on an inadequate record"[193] or simply "eyeball" the record to make "'[u]nsubstantiated' or 'bare assumptions'"[194] about the presence of "waters of the United States."

The EPA's analysis is especially problematic after *Sackett*, which made clear that not all "streams, wetlands, lakes, and ponds"[195] will be "waters of the United States." Streams and

---

[189] *Murray Energy Corp. v. EPA*, 936 F.3d 597, 623 (D.C. Cir. 2019); *see, e.g.*, *Ctr. for Biological Diversity v. USFWS*, 67 F.4th 1027, 1039 (9th Cir. 2023) (where the Endangered Species Act "expressly instruct[ed] [USFWS] to focus its inquiry on the time of a species' listing, evidence falling outside a reasonable definition of that timeframe [was] not a 'relevant factor'"); *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1034 (9th Cir. 2022) (a statute that lists the subjects that "may [be] include[d]" in "compact negotiat[ions]" excludes negotiation over other subjects).

[190] *See* EPA_AR_0083063 ("[T]his section provides EPA's evaluation regarding how certain discharges of dredged or fill material *into certain waters of the United States* … will have unacceptable adverse effects." (emphasis added)).

[191] EPA_AR_0083615.

[192] *Ariz. Cattle Growers' Ass'n v. USFW*, 273 F.3d 1229, 1243-48 (9th Cir. 2001) (agency's issuance of "Incidental Take Statements" under the Endangered Species Act, without first establishing that various endangered species were present, was arbitrary and capricious).

[193] *Sierra Club v. Bosworth*, 510 F.3d 1016, 1026 (9th Cir. 2007).

[194] *NRDC v. EPA*, 31 F.4th 1203, 1207 (9th Cir. 2022).

[195] EPA_AR_0082954.

lakes are not "waters of the United States" unless they are "'relatively permanent, standing or continuously flowing.'"[196] Wetlands are not "waters of the United States" unless they have a "continuous surface connection" with navigable waters.[197] And ponds are not "waters of the United States" unless they are "'adjacent to open water.'"[198] Without a jurisdictional determination, the EPA had no idea if it was staying in its lane or venturing into the State's domain of regulating land and water use. This failure to conduct the proper analysis renders the Veto arbitrary and capricious.[199]

### B. The EPA improperly considered whether other activities besides "discharges" would have an unacceptable adverse effect.

Section 404(c) authorizes the EPA to issue a veto only when it determines that "the *discharge* of [dredged or fill] *materials into*" "waters of the United States" will have certain adverse effects.[200] But the EPA didn't limit its analysis to "discharge[s] … into" such waters. Instead, the EPA relied on so-called "secondary effects" from the operation of the mine to justify the Veto. These secondary effects include:

1. "Fragmentation of aquatic resources," which would occur when mining infrastructure "separates" a body of water so that water no longer flows between the separated portions.[201]

2. "Fugitive dust," which is dust that would be produced from wind or machinery, such as driving vehicles over exposed soil or using equipment to dig up soil.[202]

---

[196] *Sackett*, 598 U.S. at 671.

[197] *Id.* at 678.

[198] *Id.* at 666.

[199] *See, e.g.*, *League of United Latin Am. Citizens v. Regan*, 996 F.3d 673, 697 n.138 (9th Cir. 2021) (agency's failure to "make a [statutorily] required [factual] determination … [is] arbitrary and capricious").

[200] 33 U.S.C. §§1344(c), 1362(7) (emphasis added).

[201] EPA_AR_0083067-69.

[202] EPA_AR_0083067, 0083155, 0095761.

*Northern Dynasty Minerals Ltd. v. EPA*                                       Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                                        34
Case 3:24-cv-00059-SLG          Document 167          Filed 10/03/25          Page 42 of 54

3. "Dewatering," which could occur when water is pumped out of the wells near the open mining pit,[203] or when groundwater flowed into mining infrastructure, such as water management ponds and drainage systems.[204]

Relying on these "secondary effects" was arbitrary and capricious. Section 404(c) authorizes the EPA to issue a veto only when "discharges" into waters of the United States will have certain unacceptable adverse effects.[205] The text does not authorize the EPA to issue a veto based on other environmental considerations.[206] Controlling any harmful "secondary effects" of mining is for *the State* to regulate, not the EPA.[207] The EPA had no right to "'trespass beyond the bounds'" of Section 404(c) to consider the effects of anything other than "discharges."[208]

These "secondary effects" formed a critical piece of the EPA's analysis. The EPA attributed the losses of streams and wetlands to a *combination* of discharges and secondary effects, with a particular emphasis on fragmentation and dewatering.[209] Indeed, the EPA estimated that roughly one-third of the total aquatic resource losses underlying the Veto— 29.9 miles of the lost streams and 845 acres of the lost wetlands—would be directly attributable to these "secondary effects."[210] The EPA therefore lumped together the harms caused by

---

[203] EPA_AR_0082973, 0083067-69, 0083154.

[204] EPA_AR_0095763.

[205] 33 U.S.C. §1344(c).

[206] *Id.*

[207] *See Haw. Wildlife Fund*, 590 U.S. at 174-75 ("[A]s to groundwater pollution and nonpoint source pollution, Congress intended to leave substantial responsibility and autonomy to the States…. The Act envisions EPA's role in managing nonpoint source pollution and groundwater pollution as limited to studying the issue, sharing information with and collecting information from the States, and issuing monetary grants.").

[208] *Murray Energy*, 936 F.3d at 623.

[209] *See, e.g.*, EPA_AR_0083067, 0083071, 0083101, 0083103, 0083112, 0083118, 0083121; *see also* EPA_AR_0083142, 0083144, 0083153-56.

[210] EPA_AR_0083156.

*Northern Dynasty Minerals Ltd. v. EPA*                    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                    35
Case 3:24-cv-00059-SLG     Document 167     Filed 10/03/25     Page 43 of 54

discharges and secondary effects without clarifying whether the harms of "discharges" would be "unacceptable" on their own. The full extent of the EPA's reliance on secondary effects to justify its Veto thus "cannot 'reasonably be discerned,'" making it impossible to conclude that the EPA's errors were harmless.[211]

## III. The EPA failed to properly assess the costs and benefits of the Veto.

Under the APA and the CWA, the EPA was required to conduct a cost-benefit analysis that fully weighed the costs and benefits of the Veto. But the EPA's cost-benefit analysis was botched on multiple fronts: It improperly discounted billions of dollars in economic costs and it failed to properly assess the economic costs of the Restriction. Because of these errors, the EPA did not properly consider the costs of the Veto, and its determination that harms to fisheries would be "unacceptable" was arbitrary and capricious.

### A. The EPA was required to perform a cost-benefit analysis.

It is a fundamental principle of administrative law that "administrative agencies are required to engage in 'reasoned decisionmaking.'"[212] As a general rule, the costs of an agency's action are a "centrally relevant factor" that the agency must consider before deciding whether to act.[213] "Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions."[214] "It also reflects the reality that 'too much wasteful expenditure devoted to one

---

[211] *Brown-Hunter v. Colvin*, 806 F.3d 487, 495 (9th Cir. 2015); *see Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1121 (9th Cir. 2010) (a court "cannot defer to a void").
[212] *Michigan*, 576 U.S. at 750.
[213] *Id.* at 752-53.
[214] *Id.* at 753.

*Northern Dynasty Minerals Ltd. v. EPA*                    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                          36
Case 3:24-cv-00059-SLG     Document 167     Filed 10/03/25     Page 44 of 54

problem may well mean considerably fewer resources available to deal effectively with other (perhaps more serious) problems.'"[215]

The EPA's obligation to consider costs is confirmed by Section 404(c), which "reinforces the agency's bedrock duty under the [APA] to consider costs."[216] Under Section 404(c), the EPA cannot issue a veto unless it first determines that the discharge at issue will have "an *unacceptable* adverse effect on … fishery areas."[217] "One does not need to open up a dictionary in order to realize the capaciousness of this phrase."[218] "The word 'unacceptable' is capacious and necessarily encompasses consideration of costs."[219]

Then-Judge Kavanaugh has explained how this analysis should unfold in practice:

> [S]uppose that the disposal of fill material from a surface mining project is certain to harm some salamanders. Does the disposal activity have an 'unacceptable adverse effect' on salamanders? The answer would presumably be yes if the disposal activity could be prohibited at zero cost—say, if the fill material could just as easily be dumped at another site devoid of salamanders. On the other hand, the answer would presumably be no if the mining project would contribute millions of dollars to the local economy and lower the price of electricity. … [T]he balance of the benefits of reducing the adverse effect on animals and the costs of shutting down the mining operation plainly influences the determination whether or not the adverse effect is 'unacceptable.'[220]

The EPA noted that its "longstanding position" is that Section 404(c) "'does not require a balancing of environmental benefits against non-environmental costs such as the

---

[215] *Id.*

[216] *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 734 (D.C. Cir. 2016) (Kavanaugh, J., dissenting).

[217] 33 U.S.C. §1344(c) (emphasis added).

[218] *Michigan*, 576 U.S. at 752.

[219] *Mingo Logan Coal*, 829 F.3d at 734 (Kavanaugh, J., dissenting).

[220] *Id.*

benefits of the foregone project.'"[221] But this view (announced in 1979) is irreconcilable with recent Supreme Court precedent, such as *Michigan v. EPA*, and conflicts with the plain text of Section 404(c). The EPA must perform a cost-benefit analysis.

### B.    The EPA improperly assessed the costs of the Veto.

Perhaps recognizing its legal obligation, the EPA begrudgingly agreed to "conside[r] and weig[h] the totality of the circumstances, including costs, to determine whether there are unacceptable adverse effects" from its Veto.[222] But the EPA's analysis was flawed because it improperly discounted the costs that would flow from the Veto.

The enormous societal costs to forgoing the mine cannot be overstated:

- More than $61 billion in economic activity will never occur;[223]
- The State will lose between $2.8 and $5.4 billion in taxes and royalties;[224]
- Thousands of jobs will never be created, resulting in more than $10 billion in lost labor income;[225]
- The world will be deprived of 2.8 million metric tons of copper, 202 metric tons of gold, 135,851 metric tons of molybdenum, 933 metric tons of silver, and 208 metric tons of rhenium;[226] and
- Alaska Natives, Tribes, and Alaska Native Corporations will never receive between $200 and $240 million in dividends.[227]

The EPA used two tactics—which it described as "key aspects" of its analysis[228]—to downplay the Veto's costs. Both were flawed.

---

[221] EPA_AR_0084182 (quoting 44 Fed. Reg. 58076, 58078 (Oct. 9, 1979)).
[222] EPA_AR_0084182-83.
[223] EPA_AR_0141362.
[224] EPA_AR_0015393.
[225] EPA_AR_0141362.
[226] EPA_AR_0141364.
[227] EPA_AR_0141368.
[228] EPA_AR_0141303.

*Northern Dynasty Minerals Ltd. v. EPA*                                    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                                      38
Case 3:24-cv-00059-SLG          Document 167          Filed 10/03/25          Page 46 of 54

*First*, the EPA erroneously claimed that the costs of the Veto were "highly uncertain."[229] The EPA argued that because PLP was not guaranteed to obtain all the necessary permits to operate the Pebble mine, there was a "reasonable possibility that none of [the mine's economic benefits] would be accrued at all."[230] The EPA also speculated that the Pebble mine—even if approved—was "'unlikely to yield a positive rate of return'"[231] and therefore might not end up operating at all.[232] At the same time, however, the EPA claimed that the "broad range of significant benefits" from *preventing* a mine would occur "with a high degree of certainty."[233]

This reasoning is arbitrary and capricious because it is "'internally inconsistent.'"[234] The only way that the EPA can gain the benefits of its Veto is by assuming that the mine will occur and be fully operational.[235] "[I]f development of the Deposit is so uncertain, there simply is no benefit to invoking 404(c) since no harm from development will ever occur."[236] The EPA cannot have it both ways.[237]

The EPA's speculations are far-fetched in any event. The Pebble Deposit is "the world's largest undeveloped copper deposit."[238] Between the sale of copper and other

---

[229] EPA_AR_0141303-04, 0141318-22.

[230] EPA_AR_0141303.

[231] EPA_AR_0141304 (quoting EPA_AR_0138671).

[232] EPA_AR_0141304.

[233] EPA_AR_0141310-11, 0141323-55.

[234] *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141, 1145 (9th Cir. 2015).

[235] EPA_AR_0078416.

[236] *Id.*

[237] *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1218 (5th Cir. 1991) ("[I]t would skew the results [of a cost-benefit analysis] to discount only costs without according similar treatment to the benefits side of the equation.").

[238] EPA_AR_0078416.

*Northern Dynasty Minerals Ltd. v. EPA*                    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                          39
Case 3:24-cv-00059-SLG    Document 167    Filed 10/03/25    Page 47 of 54

valuable metals, including rare earth minerals, the mine is expected to generate more than $31 billion in revenue.[239] The EPA could not rationally conclude from the record that mining the Pebble Deposit would be unsuccessful. Indeed, that PLP—the entity with the most at stake—has devoted years of efforts and hundreds of millions of dollars to obtaining regulatory approval belies any speculation that the mine would not be profitable.[240]

*Second*, the EPA improperly assumed that many of the harms from the Veto could be avoided if PLP invested its money elsewhere.[241] For example, the EPA asserted that PLP could "re-purpos[e]" the capital it would have used for developing the Pebble mine and use it "for other productive business endeavors elsewhere in the economy," such as "the construction of housing and apartments at an alternative location … like Anchorage or other Western U.S. urban areas."[242] This "transfer" of capital, the EPA concluded, would "offset" a "portion of the total impacts" to "economic activity and jobs."[243]

This reasoning is speculative and absurd. The notion that obliterating over $61 billion in lost economic activity from mining the world's largest undeveloped copper deposit could be offset by PLP—a mining company—repurposing its business to start building apartments in Anchorage is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[244] The EPA "presented no evidence" that such a dramatic shift

---

[239] EPA_AR_0141360.

[240] EPA_AR_0078426.

[241] EPA_AR_0141304-05; *see also* EPA_AR_0084258-59.

[242] EPA_AR_0141304-05.

[243] EPA_AR_0141305, 0084258.

[244] *State Farm*, 463 U.S. at 43; *see also Competitive Enter. Inst. v. NHTSA*, 956 F.2d 321, 324 (D.C. Cir. 1992) (NHTSA could not use "statistical legerdemain" to make "conclusory assertions that its decision had no safety cost at all").

*Northern Dynasty Minerals Ltd. v. EPA*                    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                         40
Case 3:24-cv-00059-SLG     Document 167     Filed 10/03/25     Page 48 of 54

in capital expenditure has "ever [been] seen in practice."[245] Indeed, it is basic economics that if a once-in-a-lifetime investment opportunity is eliminated, the funds earmarked for that project may simply sit idle rather than be invested in less profitable or more risky enterprises.[246]

Because of these mistakes, the EPA failed to satisfy the minimum criteria for a reasoned cost-benefit analysis. "[T]he balance of the benefits of reducing the adverse effect on [fish] and the costs of shutting down [a] mining operation plainly influences the determination whether or not the adverse effect is 'unacceptable.'"[247] The EPA thus cannot downplay or discount costs to make its Veto appear to be a "net benefit."[248] But the EPA did just that, making multiple "'clear error[s] in judgment.'"[249]

## C. The EPA failed to adequately assess the costs of the Restriction.

The EPA also failed to quantify the costs of the Restriction (as opposed to the Prohibition) so that it could properly weigh the costs and benefits. This failure further renders the agency's action arbitrary and capricious.

The EPA intentionally drew the Restriction—which is 309 square miles and more than 12 times larger than the Prohibition—to cover mining claims and mineral deposits in

---

[245] *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1150 (D.C. Cir. 2011).

[246] *See, e.g.*, True Tamplin, *Dry Powder | Definition, Reasons, Sources, and Strategies*, Nasdaq (Jan. 30, 2024), bit.ly/4gzl0JM ("Investors hold back funds, waiting for the perfect moment to invest when the market conditions are most favorable."); Lucy Battersby, *BlackRock Head Says $70 Trillion in Cash Sitting Idle as Opportunities Dry Up*, The Age (Sept. 9, 2019), bit.ly/46zZb8m ("[T]here is more than [$73] trillion in cash sitting idle in portfolios around the world due to a lack of investment opportunities.").

[247] *Mingo Logan Coal*, 829 F.3d at 734 (Kavanaugh, J., dissenting).

[248] *Bus. Roundtable*, 647 F.3d at 1148-49, 1151, 1153-56; *see Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1198-1200 (9th Cir. 2008).

[249] *Council of Parent Att'ys & Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 54 (D.D.C. 2019).

*Northern Dynasty Minerals Ltd. v. EPA*                                    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                                    41
Case 3:24-cv-00059-SLG     Document 167     Filed 10/03/25     Page 49 of 54

addition to PLP's proposed mine site.[250] The costs of the Restriction thus will obviously be exponentially larger than those of the Prohibition: There will be more lost revenue from now-valueless mining claims, more lost jobs, more lost economic productivity and growth, and more lost tax revenue and royalties to the State. The EPA had an obligation to consider these costs too—not just the costs of the Prohibition—when performing its cost-benefit analysis. Yet the EPA refused to include any discussion of the economic costs of that decision in its cost-benefit analysis.[251]

This refusal was arbitrary and capricious. Every cost-benefit analysis must begin by "adequately … quantify[ing]" the costs and benefits of the agency action.[252] If the EPA has "uncertainty" about the numerical value of the costs and benefits, it must "exercise its expertise to make tough choices about which of the competing estimates is most plausible, and to hazard a guess as to which is correct, even if the estimate will be imprecise."[253] If an estimation is impossible, the EPA must still "determine" a numerical "range" of costs and benefits.[254] And an estimate or range must be based in "evidence," not "mere speculation."[255] "[U]ncertainty" over the numerical value "does not excuse the [EPA] from its statutory obligation to do what it can to apprise itself … of the economic consequences of a proposed

---

[250] EPA_AR_0083172-73.
[251] *See generally* EPA_AR_0141310-14, 0141318-22, 0141356-69.
[252] *Bus. Roundtable*, 647 F.3d at 1149; *see, e.g.*, *Ctr. for Bio. Diversity*, 538 F.3d at 1198-1203.
[253] *Chamber of Com. of SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005) (cleaned up).
[254] *Id.*
[255] *Bus. Roundtable*, 647 F.3d at 1150; *see California v. FCC*, 905 F.2d 1217, 1231 (9th Cir. 1990) ("[T]he cost/benefit analysis [must have] record support.").

*Northern Dynasty Minerals Ltd. v. EPA*                                    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                                          42
Case 3:24-cv-00059-SLG     Document 167     Filed 10/03/25     Page 50 of 54

regulation before it decides whether to adopt [it]."[256] If the EPA cannot quantify even a non-speculative estimate or range, it must "explain why."[257]

Here, the EPA did not even try to analyze or quantify any of the costs of the Restriction, much less determine "the full scope and costs of … precluding development" in the Restriction area.[258] Commenters pointed out this error,[259] but the EPA refused to correct it.[260] Instead of quantifying and analyzing the Restriction's costs, the EPA analyzed only its environmental and other benefits.[261] The EPA baldly asserted that it had "considered" the Restriction's costs, but it did not dispute that those costs were entirely missing from the final cost-benefit analysis.[262] The EPA also never explained why it excluded those costs from its analysis.[263] The EPA never generated an "estimate[d]" cost or "range" of potential costs, and it never explained why such estimates were infeasible.[264] The EPA likely refused to "hazard a guess" because the estimated amount would be astronomical—and because, no matter the costs, the EPA would move forward with the Restriction anyway.[265] This failure to assess the costs and benefits of its actions is arbitrary and capricious.

---

[256] *Chamber of Com.*, 412 F.3d at 144.

[257] *Bus. Roundtable*, 647 F.3d at 1149.

[258] EPA_AR_0078416.

[259] EPA_AR_0015392, 0015410, 0078416.

[260] *See* EPA_AR_0141296-375; *see also* EPA_AR_0084254.

[261] EPA_AR_0141310.

[262] *See* EPA_AR_0084254; *WildEarth Guardians v. EPA*, 759 F.3d 1064, 1073 (9th Cir. 2014) (an agency may not "simply stat[e] that the required factors were considered, but fai[l] to consider them").

[263] *See* EPA_AR_0084254.

[264] *Chamber of Com.*, 412 F.3d at 143; *Bus. Roundtable*, 647 F.3d at 1149.

[265] *Chamber of Com.*, 412 F.3d at 143.

*Northern Dynasty Minerals Ltd. v. EPA*                    Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                                43
Case 3:24-cv-00059-SLG     Document 167     Filed 10/03/25     Page 51 of 54

## CONCLUSION

The Court should declare that the Veto is unlawful and vacate it and set it aside.

DATED: October 3, 2025

Respectfully submitted,

By: */s/ J. Michael Connolly*

J. Michael Connolly (*pro hac vice*)
Gilbert C. Dickey (*pro hac vice*)
Steven C. Begakis (*pro hac vice*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Telephone: (703) 243-9423
mike@consovoymccarthy.com
gilbert@consovoymccarthy.com
steven@consovoymccarthy.com

STEPHEN J. COX
ATTORNEY GENERAL
Ronald W. Opsahl
(Alaska Bar No. 2108081)
Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: ron.opsahl@alaska.gov

*Attorneys for the State of Alaska*

## CERTIFICATE OF SERVICE

I certify that on October 3, 2025, I electronically filed the foregoing document with the

Clerk of the Court using the CM/ECF system, serving all counsel of record.

 /s/ J. Michael Connolly
J. Michael Connolly

*Northern Dynasty Minerals Ltd. v. EPA* Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief 45
Case 3:24-cv-00059-SLG Document 167 Filed 10/03/25 Page 53 of 54

**CERTIFICATE OF COMPLIANCE**

Per Local Civil Rule 7.4(a)(3), I certify that this memorandum complies with the type-volume limitation of 7.4(a)(1) and contains 44 pages, excluding the parts exempted by Local Civil Rule 7.4(a)(4), in compliance with the page limit requested in the State's Motion for Leave to File Excess Pages, which is filed concurrently.

*/s/ J. Michael Connolly*
J. Michael Connolly

*Northern Dynasty Minerals Ltd. v. EPA*                                Case No.: 3:24-cv-59-SLG
State of Alaska's Opening Brief                                                              46
Case 3:24-cv-00059-SLG       Document 167       Filed 10/03/25       Page 54 of 54