IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| PEBBLE LIMITED PARTNERSHIP, | )<br>)<br>) |
| Plaintiff, | )<br>)<br>) |
| vs. | )<br>) |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and DENNIS J. MCLERRAN, in his official capacity as Regional Administrator of EPA Region 10, | ) Case No. 3:14-cv-00097-HRH<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

## DECLARATION OF MICHAEL C. T. SMITH

I, Michael Smith, declare:

1. I was the chief negotiator for the State of Alaska in the land exchange known as the Cook Inlet Land Exchange, which included over 3 million acres and is likely the largest land exchange in American history. I make this declaration based on my personal knowledge.

### Education and Employment

2. I have a B.S. degree in Wildlife Management from Cornell University (1964) and an M.S. in Wildlife Management from the University of Alaska (1966). From 1967-69 I was a Fulbright Scholar at the University of Canterbury in Christchurch, New Zealand. I earned a Ph.D. in Natural Resources Management from Cornell University in 1973. I have served as a senior lecturer (1979) in the Department of Natural Resources at Cornell.

3. Since 1980 I have been President of Terra Nord Natural Resources Consulting, an Alaska sole proprietorship. My firm provided strategic research and analytical services for natural resources management, land planning, land exchanges, assessment of environmental

impacts from development projects and major project environmental permitting. From March 2004 to December 2011 I was employed by the Pebble Limited Partnership as NEPA and Permitting Manager. Since December 2011, I have been retired other than two very small projects.

4. In November 1971, I became the Lands Coordinator for the Alaska Department of Fish and Game (ADF&G), and from June 1972 until December 1974 I was Chief of the Habitat Protection Section of that agency. The Alaska Habitat Protection Section was responsible for protecting habitat for fish and game species. One of the Section's responsibilities was to issue permits for projects that affected anadromous stream habitat. In this position, I oversaw the State of Alaska's fish and wildlife habitat protection activities associated with construction of the Trans-Alaska Oil Pipeline.

5. In December 1974, I became Director of the Alaska Division of Lands in the Department of Natural Resources. As Director, I was responsible for managing the State's land and associated resources (the State was allowed to select approximately 103 million acres of federal land under the Alaska Statehood Act). I managed timber, grazing, mining, oil and gas, and other surface and subsurface resources. As Director of the Division of Lands I was the lead negotiator, on behalf of the State, for the Cook Inlet Land Exchange.

## Federal Resource Management in Alaska

6. At the time of Statehood, Alaskans strongly believed the federal government had badly mishandled natural resource management in Alaska, particularly the salmon fishery, since it purchased the territory in 1867. The lingering perception in the mid-1970s of the federal government's historical mismanagement, and its then current national interests versus Alaska's interests, were an important backdrop for the Cook Inlet Land Exchange negotiations.

2

7. As one example of mismanagement, the federal government had allowed commercial fishermen primarily based out of Puget Sound to catch the largest share of salmon in the state. These fishermen built large fish traps at the mouths of rivers, but they could not always process all the salmon trapped. Huge numbers of salmon simply died in the traps and were wasted, yet Natives living near those fish traps were not allowed to take them and were prosecuted if they did. Fish traps were the single biggest issue for Alaskans during the push for Statehood, and whether to include language specifically prohibiting fish traps in the Alaska Constitution itself was very hotly debated during the Constitutional Convention.

8. In the 1970s there was also a widespread fear in Alaska that the federal government would withdraw the Bristol Bay area from all development by changing its status – to a national fish refuge or some other status – in a way that would prevent any development. Soon after Statehood, Alaska had used some of its Statehood Act land entitlement to select the lands in the Bristol Bay region that eventually became the Wood River-Tikchik State Park. The reason for that selection was specifically to block the federal government from making yet another national park. State officials strongly believed the State could protect the Bristol Bay salmon fishery while allowing some careful development, whereas the federal government would block development completely.

## Alaska Native Land Claim Disputes

9. The Alaska Native Claims Settlement Act (ANCSA) was enacted in December 1971. It authorized Native village and regional corporations to receive title to 44 million acres of Alaska land that was "like and similar" to the lands they had traditionally inhabited. The acreage allocated among these corporations was based on complicated formulas.

3

10. Because a substantial portion of the "like and similar" lands within southcentral Alaska had long been withdrawn by the federal government as wildlife refuges, national forests or for military purposes, or had been selected and patented to the State of Alaska under its Statehood Act land entitlement, insufficient "like and similar" lands remained for the Secretary of Interior to make available to the regional corporation for that area, Cook Inlet Region, Inc. (CIRI), and for CIRI's villages. Virtually all the land around the village locations in particular had already been patented to the State.

11. When CIRI and it villages surveyed the lands that had been withdrawn by the Secretary of Interior for their ANCSA land selections, they characterized them as "nothing but mountaintops and glaciers" as opposed to the lands they had traditionally inhabited. CIRI negotiated with the Secretary of Interior seeking better land selection options. When those negotiations failed, CIRI filed a lawsuit against the federal government in or about 1974 demanding more suitable land selections.

12. In the early days of ANCSA implementation, the Secretary of Interior, under Section (d)(2) of ANCSA, withdrew a large area surrounding Lake Clark from operation of the public land laws, precluding selection by the State of Alaska under the Statehood Act. These "(d)(2)" withdrawals were made throughout Alaska to protect the lands by keeping them in federal ownership until Congress could act on their permanent status. To fulfill his responsibility for Native land selections under the Act, however, the Secretary was forced to designate over 100,000 acres surrounding Lake Clark itself (the Lake Clark deficiency withdrawal), in the very heart of the future park, for selection by Cook Inlet Region, Inc. (CIRI) and by the Native villages in that region. The Native villages initially selected over 87,000 of those acres immediately surrounding the lake, including virtually the entire lake shore. CIRI was also

4

entitled to select tens-of-thousands of addition acres in the withdrawal area. Despite the desire of the National Park Service and conservationists to rid the future park of these selections, under ANCSA the federal government had no recourse but to allow the selections. In short, the Native villages had valid selection rights to lands the federal government badly wanted.

13. The State, however, had patented title to "like and similar" lands immediately around the locations of CIRI's villages that the village corporations wanted but could not select under ANCSA.

### Negotiating the Cook Inlet Exchange

14. While the CIRI lawsuit was pending, I became the Director of the Division of Lands. Initially, the Division of Lands was not involved in the CIRI-federal government dispute. But I believed the State had a significant interest in the outcome. CIRI's villages had valid selections to lands the federal government wanted to retain, and CIRI was suing to get better options for its remaining selections. The State had lands that CIRI and its villages wanted, and the federal government retained lands that were of interest to the State.

15. I became involved in the CIRI-federal government negotiations in approximately March 1975. I offered to make available to CIRI's villages state lands in return for the right of the State to select lands in the Bristol Bay region that the federal government had previously put off-limits to State selection.

16. The federal government had two primary goals. First, it wanted to resolve CIRI's and its villages' land selection claims against it. Second, the federal government sought to create a viable Lake Clark National Park, but selections already made by CIRI's villages substantially impeded this goal. About two-thirds of the area sought for the national park fell within CIRI's Region. Ultimately, approximately 49,000 acres of the CIRI villages' initial 89,000 acres of

5

selections in the Lake Clark deficiency withdrawal were determined to be valid. The federal government wanted to prevent these village corporations from having such substantial inholdings in the heart of the future national park.

17. The negotiations lasted for approximately nine months, starting in March of 1975, and they were intense. Eventually, we reached a three-way land exchange agreement among the parties. While the overall exchange was very complicated and had many elements, the portions involving the future Lake Clark National Park were as follows. CIRI's villages relinquished all their valid land selections (approximately 49,000 acres) in the Lake Clark deficiency withdrawal. In return, CIRI's villages received over 12,000 acres of prime patented state lands near their village locations in the Matanuska and Susitna valleys, and on the Kenai Peninsula. In return for the State's cooperation, the federal government gave the State at least 525,000 acres of additional federal land selections, above and beyond its Statehood Act entitlement, in the Lake Iliamna area and the Nushagak River and Koksetna River drainages of Bristol Bay then off limits to state selection under an ANCSA Section 17(d)(2) withdrawal. In addition, the State agreed to refrain from selecting, under its separate Statehood Act entitlement, all lands in an approximately 675,000 acre area so these lands could be added to the future Lake Clark National Park and Preserve.

**Reasons for the State's Selections**

18. Because the State had agreed to convey significant lands to CIRI's villages in lieu of their valid Lake Clark selections, the State wanted to be made whole by the federal government. For the acreage Alaska gave to the villages, we received the right to select lands in the Bristol Bay region that the federal government had previously placed off-limits to state selections.

19. The State sought Bristol Bay region lands in an amount that came to 22.8 townships. In fact, the State did not want lands elsewhere. We used this exchange as an opportunity to supersede the ANCSA provision that gave the Secretary of Interior authority to prevent state selection of federal lands in Bristol Bay.

20. The lands the State selected in the Bristol Bay area were chosen for multiple resource management purposes. But many of these lands—including the area of the Pebble deposit—were specifically selected for their mineral potential. (In fact, they were later referred to in a National Parks Conservation Association press release lamenting a possible mining district south of the present park boundaries.) But for the State's commitment of thousands of acres of its prime lands to CIRI's villages ("The Lake Clark Trade Out"), however, and but for the State's agreement to eschew approximately 675,000 acres of Statehood Act land selections so they could be incorporated into the future Lake Clark National Park and Preserve, the park would be nothing like it is today. Rather, the park, if it existed, would be doughnut-shaped, surrounding at least 49,000 acres of private lands immediately adjacent to Lake Clark itself.

21. I resigned as Director of the Division of Lands on May 1, 1979. While I did not direct the land selections that were made under the Cook Inlet Land Exchange, I am well aware of the State's goals. The State wanted enough land in the Bristol Bay region to block the federal government from classifying those lands, in addition to the area of the Lake Clark National Park and Preserve, in a way that would withdraw the lands from development. State officials viewed preventing withdrawal of these lands as very important to the State's well-being. Thus, the Cook Inlet Exchange gave the State the right to select lands in the Bristol Bay watershed that were at that time withdrawn from state selection by the Secretary of Interior.

22. Unquestionably, the opportunity for exploration and development of mineral resources motivated the State's selection of these Bristol Bay lands. We knew there were mineral resources in the vicinity of the Pebble deposit area. Based on United States Geological Survey analysis, as well as that of the State's own Division of Geological and Geophysical Services, state officials were aware these lands had significant mineral development potential. Although we did not know the extent of these resources, the State wanted the opportunity to explore them and ultimately to obtain economic benefit from them.

23. I discussed this goal with Alaska State leaders on several occasions, and federal and CIRI negotiators were well aware of the State's interest in these lands. I recall conversations with my federal counterparts in which this state goal was openly discussed.

THIS CONCLUDES MY STATEMENT.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: June 17, 2014.

By: *Michael C. T. Smith* (signature)

Michael C. T. Smith