Damien M. Schiff, Cal. Bar No. 235101*
Luke A. Wake, Cal. Bar No. 264647*
Charles T. Yates, Cal. Bar No. 327704*
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
DSchiff@pacificlegal.org
LWake@pacificlegal.org
CYates@pacificlegal.org

*Pro Hac Vice

Attorneys for Plaintiffs
Iliamna Natives Ltd. and
Alaska Peninsula Corp.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTHERN DYNASTY MINERALS LTD., et al., | Case No. 3:24-cv-00059-SLG |
| Plaintiffs, | |
| v. | CONSOLIDATED |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., | LEAD CASE |
| Defendants, | |
| and | |
| BRISTOL BAY NATIVE ASSOCIATION, INC., et al., | |
| Intervenor-Defendants. | |

STATE OF ALASKA,

        Plaintiff,

  v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

        Defendant,

  and

TROUT UNLIMITED, et al.,

        Intervenor-Defendants.

Case No. 3:24-cv-00084-SLG

CONSOLIDATED

---

ILIAMNA NATIVES LTD. and
ALASKA PENINSULA CORP.,

        Plaintiffs,

  v.

ENVIRONMENTAL PROTECTION
AGENCY; et al.,

        Defendants,

  and

BRISTOL BAY ECONOMIC
DEVELOPMENT CORPORATION,
et al.,

        Intervenor-Defendants.

Case No. 3:24-cv-00132-SLG

CONSOLIDATED

**PLAINTIFFS ILIAMNA NATIVES LIMITED AND ALASKA
PENINSULA CORPORATION'S MOTION FOR SUMMARY
JUDGMENT AND ADMINISTRATIVE APPEAL OPENING BRIEF
(Oral Argument Requested)**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. ii

INTRODUCTION ............................................................................1

BACKGROUND AND STATEMENT OF FACTS ............................4

  I.   EPA vetos the Pebble Mine Project ...........................................4

     A.  The Clean Water Act delegates discretionary authority for the
         EPA administrator to veto permitting decisions ...................................5

     B.  EPA responds to political pressure in both proposing and
         later withdrawing a contemplated veto ...................................7

     C.  EPA changes course again with its final Veto decision ......................8

  II.  The devastating impact of the Veto on the native corporations .............9

STANDARD OF REVIEW ............................................................ 15

STANDING .................................................................................. 16

  I.   The Native Corporations have suffered an injury-in-fact ..................... 16

  II.  The Native Corporations' injuries are caused by the Veto and
       would be redressed by an order setting the Veto aside ........................ 18

SUMMARY OF ARGUMENT ........................................................ 20

ARGUMENT ................................................................................ 22

  I.   Section 404(c) violates the nondelegation doctrine............................... 22

     A.  The Constitution requires that Congress must both establish a
         general policy and impose boundaries limiting agency discretion ..... 22

     B.  Section 404(c) delegates unfettered discretionary authority in
         violation of the nondelegation doctrine................................................ 24

       i.    No policy speaks to when EPA should issue a veto........................ 24

       ii.   Congress imposed no boundaries on EPA's veto authority........... 32

CONCLUSION.............................................................................. 35

CERTIFICATE OF SERVICE ....................................................... 36

# TABLE OF AUTHORITIES

## Cases

*A.L.A. Schechter Poultry Corporation v. United States,*
295 U.S. 495 (1935)................................................................. 25-26, 32

*American Power & Light Co. v. S.E.C.,*
329 U.S. 90 (1946)..................................................................... 23-25

*Bennett v. Spear,*
520 U.S. 154 (1997)........................................................................ 18

*Citizens to Preserve Overton Park v. Volpe,*
401 U.S. 402 (1971)........................................................................ 15

*Diamond Alternative Energy, LLC v. U.S. Env't Prot. Agency,*
145 S. Ct. 2121 (2025)............................................................... 18-20

*Ecological Rights Found. v. Pac. Lumber Co.,*
230 F.3d 1141 (9th Cir. 2000).......................................................... 18

*Fed. Commc'ns Comm'n v. Consumers' Rsch.,*
145 S. Ct. 2482 (2025)..........................................2-3, 22-25, 28, 31, 34

*Fed. Radio Comm'n v. Nelson Bros. Bond & Mortgage Co.,*
289 U.S. 266 (1933).................................................................... 29-30

*Fla. Power & Light Co. v. Lorion,*
470 U.S. 729 (1985)........................................................................ 15

*Food & Drug Admin. v. All. for Hippocratic Med.,*
602 U.S. 367 (2024)........................................................................ 19

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
528 U.S. 167 (2000)........................................................................ 19

*Frlekin v. Apple, Inc.,*
979 F.3d 639 (9th Cir. 2020)........................................................... 15

*Heckler v. Chaney,*
470 U.S. 821 (1985).............................................................. 3, 24, 27

*Henzler v. Kempthorne,*
No. 3:07-cv-00220, 2009 WL 10695766 (D. Alaska Mar. 31, 2009)............ 16

*J.W. Hampton. Jr., & Co. v. United States,*
276 U.S. 394 (1928).........................................................................3

*Kaweah Delta Health Care Dist. v. Becerra*,
    123 F.4th 939 (9th Cir. 2024) ................................................ 21, 26-27, 31-32

*Koniag, Inc. v. Koncor Forest Res.*,
    39 F.3d 991 (9th Cir. 1994) .......................................................................... 10

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................ 16, 20

*Mingo Logan Coal Co. v. U.S. E.P.A.*,
    714 F.3d 608 (D.C. Cir. 2013) ................................................................. 6, 34

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ...................................................................................... 29

*NBC v. United States*,
    319 U.S. 190 (1943) ...................................................................................... 29

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*,
    402 F.3d 846 (9th Cir. 2005) ........................................................................ 19

*Panama Refining Company v. Ryan*,
    293 U.S. 388 (1935) ................................................................................. 25-29

*Phillips v. U.S. Customs & Border Prot.*,
    74 F.4th 986 (9th Cir. 2023) ........................................................................ 18

*Rodriguez v. United States*,
    480 U.S. 522 (1987) ...................................................................................... 29

*Salmon Spawning & Recovery All. v. Gutierrez*,
    545 F.3d 1220 (9th Cir. 2008) ...................................................................... 16

*San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*,
    819 F. Supp. 2d 1077 (E.D. Cal. 2011) ........................................................ 16

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001) ...................................................................................... 23

*Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*,
    5 F.4th 666 (6th Cir. 2021) .......................................................................... 34

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ...................................................................................... 18

*Trout Unlimited v. Pirzadeh*,
    1 F.4th 738 (2021) ...................................... 3-4, 7-8, 21, 24, 26, 29, 31, 33-35

*United States v. Melgar-Diaz*,
    2 F.4th 1263 (9th Cir. 2021) ........................................................................ 23

*United States v. Pheasant*,
  129 F.4th 576 (2025) ............................................................ 30-31

*United States v. Texas*,
  599 U.S. 670 (2023) .................................................................. 18

*Uzuegbunam v. Preczewski*,
  592 U.S. 279 (2021) .................................................................. 20

*W. Watersheds Project v. U.S. Forest Serv.*, No. 3:11-cv-08128,
  2012 WL 6589349 (D. Ariz. Dec. 17, 2012) ........................... 15-16

*Wayman v. Southard*,
  23 U.S. (10 Wheat. 1) 1 (1825) ............................................ 22-23

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ............................................ 22, 24-25, 35

## U.S. Constitution

U.S. Const. art. I, § 1 ................................................................. 22

U.S. Const. art. I, § 8 ................................................................. 22

## Statutes

5 U.S.C. § 706 ............................................................................ 15

5 U.S.C. § 706(2)(A) .................................................................. 16

5 U.S.C. § 706(2)(B) .................................................................. 16

5 U.S.C. § 706(2)(C) .................................................................. 16

33 U.S.C. § 1311(a) .................................................................. 1, 5

33 U.S.C. § 1343(c) ....................................................................... 6

33 U.S.C. § 1344(a) ................................................................. 1, 5-6

33 U.S.C. § 1344(b) ................................................................... 5-6

33 U.S.C. § 1344(b)(1) .................................................................. 5

33 U.S.C. § 1344(c) ................................................. 1, 6, 22, 26, 32-33

33 U.S.C. § 1362(6) ....................................................................... 5

33 U.S.C. § 1362(7) ....................................................................... 5

33 U.S.C. § 1362(12) ..................................................................... 5

43 U.S.C. § 1601, *et seq.* ............................................................. 9

43 U.S.C. § 1702(c) .................................................................. 31

43 U.S.C. § 1732(a) .................................................................. 31

43 U.S.C. § 1733(a) .................................................................. 30

## Regulation

40 C.F.R. § 231.2(e) ................................................................. 35

## Rules

Fed. R. Civ. P. 56 ......................................................................1

Fed. R. Civ. P. 56(a) ............................................................... 15

L.Civ.R. 7.1 ...............................................................................1

L.Civ.R. 16.3 ...................................................................... 1, 16

## Other Authorities

44 Fed. Reg. 58,076 (Oct. 9, 1979) ...................................... 21

Order, *Bristol Bay Econ. Dev. Co. v. Pirzadeh*, No. 3:19-cv-00265-SLG
   (D. Alaska Oct. 29, 2021), ECF No. 109 ..........................8

Samuel Johnson's Dictionary of the English Language (1785),
   https://publicdomainreview.org/collection/samuel-johnson-s-
   dictionary-of-the-english-language-1785/ ......................3

Pursuant to Federal Rule of Civil Procedure 56, L.Civ.R. 7.1, L.Civ.R. 16.3, and this Court's August 6, 2025, order, ECF No. 165, Plaintiffs Iliamna Natives Limited and Alaska Peninsula Corporation, hereby move for summary judgment, and offer the following opening brief.

## INTRODUCTION

When Congress enacted the Clean Water Act (CWA) in 1972, our elected representatives established law requiring federal permits for the discharge of any dredged or fill material within the "waters of the United States." 33 U.S.C. §§ 1311(a), 1344(a). To that end, the CWA established law governing when a permit should be issued. But then Congress did something so extraordinary that it is doubtful there is any analog in the United States Code.

Rather than simply charging the United States Army Corps of Engineers (the Corps) and the United States Environmental Protection Agency (EPA) with enforcing and administering its statutory regime, Congress gave the EPA Administrator an unprecedented—and totally discretionary—power to **override Congress' legislative judgments** "whenever" he might choose. 33 U.S.C. § 1344(c). Section 404(c) authorizes the Administrator to veto any permit that might otherwise be issued, under the standards Congress established, if the Administrator decides that a permit would result in "an unacceptable adverse effect." *Id*. But Congress did not define these terms. Instead, the CWA leaves it to the Administrator to decide for himself what will

be deemed "unacceptable." And further, the Act vests the Administrator with absolute discretion to decline to issue a veto *even if* he has decided that issuance of a specific permit will result in "an unacceptable adverse effect."

Exercising this veto authority, the Administrator has decided to prohibit *any* permit that the Pebble Limited Partnership (Pebble LP) might pursue at the Pebble deposit in Bristol Bay. This destroys any hope of developing mining operations in the area. And the veto decision has resulted in hundreds of millions of dollars in consequent injury to Iliamna Natives Limited and the Alaska Peninsula Corporation (collectively, the "Native Corporations"), which have contracted to provide essential services and leases to support the Pebble mine project. No matter how carefully designed the project might be to avoid or mitigate environmental concerns, the Administrator's veto "prohibit[s]" the Corps from even considering a permit application under the statutory standards that Congress established. As such, the Administrator's veto stands as an iron-fisted decree: "Thou shalt not mine."

The Administrator has decided for himself what the law shall be when it comes to the Pebble deposit. And, remarkably, Congress gave him that power because Section 404(c) provides no legal standard to which the Administrator must conform. *See Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 145 S. Ct. 2482, 2497 (2025) (explaining Congress must provide a charge directing what "the agency [must] do" and impose definite "boundaries on administrative

discretion"); *id.* at 2514 (Kavanaugh, J., concurring) (explaining that Congress must establish law to which the Executive Branch must "conform" and that, as such, the text must "confine" agency discretion) (quoting *J.W. Hampton. Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). Indeed, the choice as to what the Secretary should or should not do, under Section 404(c), is "committed to agency discretion." *Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 744 (2021) *(Pirzadeh)* (concluding that "the Clean Water Act contains no meaningful legal standard in its broad grant of discretion to the EPA"). The Administrator's exercise of discretion is unreviewable because there simply is "no law to apply" in assessing whether he has acted appropriately under Section 404(c). *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

For this reason, Section 404(c) is an unconstitutional delegation. There could be no more obvious nondelegation violation than a statutory provision that authorizes an agency official to alter legal rights or obligations, while vesting unreviewable discretion for the officer to do whatever he pleases. Such unconstrained discretion—to change the legal rights or obligations of others— is practically the definition of autocratic power.[1]

---

[1] In 1787 "autocrasy" was defined as "Independent power; supremacy." *See* Samuel Johnson's Dictionary of the English Language 206 (1785), https://publicdomainreview.org/collection/samuel-johnson-s-dictionary-of-the-english-language-1785/.

## I.      EPA vetos the Pebble Mine Project

The Pebble mine project is now a long running saga. Members of the Native Corporations first discovered valuable minerals at the Pebble deposit in the late 1970s and early 1980s. Declaration of David McAlister (McAlister Decl.) ¶ 7. Since then, "mining companies have considered" how to develop a viable mining operation. *Pirzadeh*, 1 F.4th at 748. Northern Dynasty Minerals Limited ("Northern Dynasty") and Pebble LP (together "PLP") have worked toward this goal since the early 2000s. McAlister Decl. ¶ 8. If the project ever comes to fruition it will not only serve America's need for gold-, copper-, and molybdenum-bearing ore and minerals, but it will bring economic vitality to an impoverished region that has seen an exodus of skilled workers who have sought opportunities elsewhere.[2]

For years, the fate of the Pebble mine project has shifted with the changing political winds in Washington, D.C. But after more than a decade of seesawing on whether to allow the Corps to issue (or even consider issuing) permits for the Pebble mine project, the EPA has invoked the Administrator's discretionary authority under Section 404(c) to definitively "veto" any permit.[3]

---

[2] The deposit contains an "12 billion tons of ore." *Pirzadeh*, 1 F.4th at 748.

[3] Radhika Fox, EPA's Assistant Administrator issued the veto, exercising sub-delegated authority from the Administrator. *See* Final Determination of the

With the stroke of her pen, the Assistant Administrator killed the project, with consequent injury to the Native Corporations.

### A. The Clean Water Act delegates discretionary authority for the EPA administrator to veto permitting decisions

In the absence of a valid permit issued by the Corps, it is unlawful to discharge dredged or fill material into the so-called "waters of the United States." *See* 33 U.S.C. §§ 1311(a), 1362(6), 1362(7), 1362(12). The CWA authorized the Corps to issue permits under Section 404 of the Act because Congress understood that dredge and fill activities are sometimes necessary. *See* 33 U.S.C. § 1344(a)-(b). As such, Congress established standards, in Section 404, that strike a balance between conservation goals and the imperative of enabling economically or socially beneficial projects.

Under this permitting regime, the Corps designates "disposal sites" for dredged or fill material, using guidelines informed by Section 404(b)(1) of the CWA. That provision directs that the Corps "shall" apply "guidelines developed by the Administrator . . ." and requires that the Administrator "shall [] base[]" these "guidelines" on "criteria comparable to the criteria applicable to the territorial seas, the contiguous zone, and the ocean under section 1343(c)." 33 U.S.C. § 1344(b)(1). As such, the CWA affords the Administrator marginal

---

U.S. Environmental Protection Agency Pursuant to 404(c) of the Clean Water Act Pebble Deposit Area, Southwest Alaska, (Jan. 2023), USACE0000346-625 ("Final Determination" or "Veto").

discretion in developing "guidelines" for reviewing dredge and fill permits; however, Congress channeled that discretion in the cross-referenced Section 403(c)—wherein Congress requires that the Administrator's guidelines "shall include" seven considerations—such as "the effect of disposal, of pollutants on esthetic, recreation, and economic values" and whether there are "other possible locations [for a project] . . . ." *Id.* § 1343(c). Additionally, Section 404(b)(2) requires consideration of the "economic impact of the site on navigation and anchorage" in certain cases. *Id.* § 1344(b).

But after establishing standards governing the Corps' review and issuance of dredge and fill permits, Congress authorized the EPA Administrator to exercise his judgment to veto any project that he deems to have an "unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." *Id.* § 1344(c). Thus, while Congress authorized the Corps to issue permits for dredged or fill material "at specified disposal sites," *id.* § 1344(a), the CWA allows the Administrator to veto issuance of any such permit at "*any* time" if he so chooses. *Mingo Logan Coal Co. v. U.S. E.P.A.*, 714 F.3d 608, 613 (D.C. Cir. 2013) (emphasis in original).

## B. EPA responds to political pressure in both proposing and later withdrawing a contemplated veto

In 2004, PLP began performing environmental studies and, thereabout, "began discussions with the EPA, the Corps, and other agencies about obtaining the permits needed to mine the Pebble deposit." *Pirzadeh*, 1 F.4th at 748. But the permitting process quickly turned political. "[I]n 2010, nine tribal governments requested that the EPA invoke its § 404(c) authority" to preemptively veto any permit that the Corps might have approved. *Id*. Additionally, other factions—ranging from "commercial and recreational fishers" to "a coalition of jewelry companies, conservation organizations, members of the faith community, and elected officials"—lobbied for the EPA to exercise its veto power. *Id*. And on the other side of the ledger, "four tribal governments, other tribal organizations, [and] the governor of Alaska" asked the EPA to "refrain from" using its Section 404(c) veto authority. *Id*.

The EPA responded by initiating a "study of the potential effects of large-scale mining[,]" and then, in 2014, by issuing "a proposed determination" to veto "any mines within the geographical area of the Pebble deposit that would result" in specified conditions—like "the loss of five miles of streams with documented salmon presence . . . ." *Id*. Yet in 2019, under the Trump Administration, EPA withdrew its veto proposal. *Pirzadeh*, 1 F.4th at 749.

Thereafter, a "sportsman's organization" brought a lawsuit, which alleged "that political considerations improperly motivated the EPA to abandon, without adequate explanation," the Section 404(c) veto process. *Id.* at 750. In that case the Ninth Circuit held that the federal courts lacked jurisdiction, under the Administrative Procedure Act, to consider the plaintiff's statutory claim because "[n]othing in the statute constrains the Administrator's discretion to . . . decline to invoke his or her § 404(c) authority[,]" *id.* at 752, and because "[t]he statute grants unfettered discretion to the Administrator to make [these] decisions." *Id.* at 753. In any event, EPA's decision to withdraw its veto was later remanded back to the agency for different reasons.[4] *See* Order, *Bristol Bay Econ. Dev. Co. v. Pirzadeh*, No. 3:19-cv-00265-SLG (D. Alaska Oct. 29, 2021), ECF No. 109.

## C. EPA changes course again with its final Veto decision

In 2017, PLP applied to the Corps for the dredge and fill permits needed to develop a mine at the Pebble deposit. USACE0000783.[5] In 2020, the Corps

---

[4] While the Court held that Section 404(c) entails "no meaningful legal standard" to assess claims that the Administrator violated the statute, it also held that EPA had bound itself to act pursuant to its implementing regulations governing the agency's process for withdrawing a proposed a veto. *Id.* at 744 (concluding that "EPA's regulations [] contain a meaningful legal standard" and that the plaintiffs could proceed in arguing that EPA's withdrawal was contrary to law under those governing regulations).

[5] The Plaintiffs cite to the administrative record as submitted by EPA in this case as "EPA_AR_#." Otherwise, they cite record cites as lodged by the Corps, in the lead case (3:24-cv-00059-SLG), as "USACE#."

denied PLP's permit application. USACE0000784. PLP then challenged that denial administratively. *Id*. And the Corp's appellate review officer determined that the denial was improper; the officer then remanded the permitting decision back to the Corp's Alaska District for further analysis under Section 404(b) standards. *Id*.

But that administrative process came to a screeching halt when, in 2023, the Biden administration issued a Final Determination to preemptively block any development of the Pebble mine project. *See* Final Determination, USACE0000346-625. In issuing this Veto, the Assistant Administrator, acting under subdelegated authority from the Administrator, concluded that the proposed mining project would "have unacceptable adverse effects on anadromous fishery areas." *Id*. at 0000624. She issued this Veto notwithstanding the Corps' determination that the mine would not measurably affect fish populations. *See* Final Determination, USACE0000407 (dismissing the Corps' finding that the "impacts on fishes would not be 'measurable'"). Consequently, the Corps denied PLP's permit application in April 2024. USACE0000789.

## II.    The devastating impact of the Veto on the native corporations

Iliamna Natives Limited (INL) and Alaska Peninsula Corporation (APC) are Alaska Native Village Corporations within the meaning of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1601, *et seq*. *See*

Declaration of Steven Reimers (Reimers Decl.) ¶ 2; McAlister Decl. ¶ 2. INL's approximately 180 shareholders are associated with the Native Village of Iliamna. Reimers Decl. ¶ 5. APC's approximately 1,000 shareholders are associated with the Native Villages of Port Heiden (Meshik), South Naknek (Qinuyang), Newhalen, Kokhanok, and Ugashik. McAlister Decl. ¶ 5.

ANCSA was passed in 1972 to provide a process to settle—through land and money grants—all claims held by Alaska Natives. *See Koniag, Inc. v. Koncor Forest Res.*, 39 F.3d 991, 995 (9th Cir. 1994). The primary purpose of ANCSA's land grant provisions was to provide capital for economic development. *See id.* at 996 ("Of these potential uses, Congress clearly expected economic development would be the most significant[.]").

Pursuant to ANCSA, INL was deeded landholdings totaling approximately 69,000 acres. Reimers Decl. ¶ 6. APC was deeded landholdings totaling approximately 400,000 acres. McAlister Decl. ¶ 6. These landholdings are adjacent to the Pebble deposit—at their nearest points being just a few miles away. *See* Reimers Decl. ¶¶ 7, 12; McAlister Decl. ¶¶ 7, 12.

Notwithstanding ANCSA's promise of economic development, the Native Corporations struggled for decades to establish a prosperous economy. *See* Reimers Decl. ¶ 9; McAlister Decl. ¶ 9. This situation became especially dire in the mid-2000s. *See* McAlister Decl. ¶ 10. During that era, energy prices in the Native Corporations' constituent villages soared. *Id.* To keep their families

warm, shareholders sold their limited entry permits to the Bristol Bay fishery. *Id*. When that money ran out, families left. *Id*. At that time, INL had never in its history been able to make a shareholder disbursement. Reimers Decl. ¶ 17. And APC had made just one disbursement. McAlister Decl. ¶ 18.

Things began to change for the better around 2007-2008. At that time, the Native Corporations began to work with Northern Dynasty and its subsidiary Pebble Limited Partnership (together, "PLP"). Reimers Decl. ¶ 10; McAlister Decl. ¶ 10. In the following years, the Native Corporations contracted with PLP to provide a variety of services as PLP pursued exploration, permitting, and development of a mine at the Pebble deposit. *See* Reimers Decl. ¶¶ 12-16; McAlister Decl. ¶¶ 12-17.

For example, beginning in 2009, INL—through its wholly owned subsidiary Iliamna Development Corporation (IDC)—entered into a contract to supply fuel to PLP during its exploration drilling. Reimers Decl. ¶ 13. Since 2009, IDC has sold PLP over $10 million worth of fuel. *Id*. Similarly, IDC also entered into contracts to provide camp services to PLP; at one point IDC was servicing a camp of over 200 people per day. *Id*. ¶ 14.

APC likewise entered a series of contracts with PLP. In 2006 APC established a wholly owned subsidiary—APC Services, LLC—to do business with PLP. McAlister Decl. ¶ 13. APC Services' first contract with PLP—entered into in 2007—was for hydrology consulting. *Id*. ¶ 14. That hydrology contract

was regularly renewed through 2014. *Id*. In 2017, APC also began expanding into other contracts with PLP. *Id*. ¶ 16. Over the following years APC Services and other APC-owned subsidiaries entered into logistics contracts for camp services, field management, aviation, transportation, bear guards, drilling support, and general labor. *Id*. These various contracts have generated over $20 million in total revenue for APC. *Id*.

As a result of these contracts with PLP, ANCSA's promises were finally being realized. After decades of population decline, many shareholders of the Native Corporations returned to work on PLP-contracted projects. *See* Reimers Decl. ¶¶ 17, 20; McAlister Decl. ¶¶ 18, 22. Indeed, at one point during exploration and development of the Pebble mine, IDC—with over 200 employees—became the largest employer in the Lake and Peninsula Borough. Reimers Decl. ¶ 17. Similarly, as early as 2009, PLP-related work enabled Newhalen and Kokhanok to achieve nearly 100% employment. McAlister Decl. ¶ 18. And significantly—as a direct result of revenue from contracts with PLP—APC was able in 2019 to make its first annual shareholder disbursement in many years. *Id*. In 2013, INL was able to make its first *ever* disbursement. Reimers Decl. ¶ 17.

These benefits are small in comparison to what the Native Corporations stand to gain should development of the mine continue. This is because APC in 2018 and INL in 2019 each entered into right-of-way agreements with PLP.

Reimers Decl. ¶ 18; McAlister Decl. ¶ 19. Under these agreements, the Native Corporations will provide PLP with access to portions of their land for the development of transportation infrastructure associated with PLP's mining plan. Reimers Decl. ¶ 18; McAlister Decl. ¶ 19. In return, PLP will make annual toll payments and pay other fees. Reimers Decl. ¶ 18; McAlister Decl. ¶¶ 19-20. Under APC's right-of-way agreement, PLP must pay APC an annual reservation fee. McAlister Decl. ¶ 20. 2019 was the first year that a reservation fee was paid, and the fee will increase over time. *Id*. Both right-of-way agreements also provide "preferential contractor" bidding status to the Native Corporations. Reimers Decl. ¶ 19; McAlister Decl. ¶ 21. Under the right-of-way agreements, the Native Corporations thus anticipate significant additional revenue. Reimers Decl. ¶¶ 18-20; McAlister Decl. ¶¶ 19-22.

The regulatory and litigation developments related to PLP's section 404 permit application, *see supra* 7-9, were complex. Nevertheless, throughout the relevant period, the Native Corporations continued to work closely with PLP as permitting, exploration, and planning continued. Reimers Decl. ¶ 27; McAlister Decl. ¶ 29.[6] This all came to a definitive halt in 2023, when EPA issued the Veto. *See* Reimers Decl. ¶ 28; McAlister Decl. ¶ 30.

---

[6] The Native Corporations submitted written comments opposing the proposed veto. EPA_AR_0000074; EPA_AR_0081524-28; EPA_AR_0256848-849; EPA_AR_0465701-705. Representatives of the Native Corporations also met

The Veto has been devastating. This is because the Native Corporations' contracts are contingent upon PLP developing a mine at the Pebble deposit. Reimers Decl. ¶ 34; McAlister Decl. ¶ 36. If PLP cannot obtain the necessary federal permits—and continue planning and development of the mine—the Native Corporations anticipate that many of their contracts with PLP will be terminated. Reimers Decl. ¶ 34; McAlister Decl. ¶ 36.

Indeed, since the Veto, IDC has sold only minor amounts of fuel to PLP. Reimers Decl. ¶ 36. Revenue from IDC's previously lucrative camp services contract with PLP has dried up. *Id.* IDC has gone from employing over 200 people, at the height of PLP's exploration operations, to now employing just 10 people. *Id.* And whereas prior to the Veto, APC Services had been expending over 10,000 man-hours per year on PLP contracts, since the Veto, that figure has dwindled to 1,000 or fewer man-hours per year. McAlister Decl. ¶ 38.

The most devastating consequence of the Veto is that the Native Corporations' right-of-way agreements with PLP now hang in the balance. Should the Veto remain in effect, the Native Corporations anticipate that PLP may issue a notice of termination. Reimers Decl. ¶ 34; McAlister Decl. ¶ 37. The most immediate effect will be that APC loses its annual reservation payments. *Id.* But all up, termination of the right-of-way agreements will cost

with EPA to voice their opposition. EPA_AR_0138492; EPA_AR_0138504; EPA_AR_0138520; EPA_AR_0138548; EPA_AR_0138554.

the Native Corporations significant sums in lost revenue. Reimers Decl. ¶¶ 34-35; McAlister Decl. ¶ 37.

Accordingly, the Native Corporations are deeply concerned that if the Veto remains in effect, their villages will return to the dire state they were in prior to 2008. Reimers Decl. ¶ 37; McAlister Decl. ¶ 39. The relationship between the Native Corporations and PLP has been fundamental to the Native Corporations' ability to provide for their shareholders. Reimers Decl. ¶ 37; McAlister Decl. ¶ 39. And without the opportunities provided by contracts with PLP, many shareholders will again be forced to leave their homes and seek employment elsewhere. Reimers Decl. ¶ 37; McAlister Decl. ¶ 39.

## STANDARD OF REVIEW

A motion for summary judgment must be granted when there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020).[7] When summary judgment is sought in an action that is based on an administrative record—such as this one—the motion serves as "the mechanism for deciding as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA

---

[7] There is here no dispute as to any material merits-related fact. *See generally* 5 U.S.C. § 706; *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)).

standard of review." *W. Watersheds Project v. U.S. Forest Serv.*, No. 3:11-cv-08128, 2012 WL 6589349, at *4 n.3 (D. Ariz. Dec. 17, 2012), *aff'd*, 603 F. App'x 612 (9th Cir. 2015) (quoting *San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*, 819 F. Supp. 2d 1077, 1083-84 (E.D. Cal. 2011)). *Accord Henzler v. Kempthorne*, No. 3:07-cv-0220, 2009 WL 10695766, at *1 n.1 (D. Alaska Mar. 31, 2009) (briefs filed under L.R. 16.3, governing administrative agency appeals, are "deemed [] cross-motion[s] for summary judgment").

Under the APA, a court must hold unlawful, set aside, and vacate agency action if it is not in accordance with law, 5 U.S.C. § 706(2)(A); contrary to any constitutional right, power, privilege or immunity, *id.* § 706(2)(B); or in excess of statutory authority, *id.* § 706(2)(C).

## STANDING

To establish Article III standing, a plaintiff must show that: "(1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision." *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1225 (9th Cir. 2008) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

## I.    The Native Corporations have suffered an injury-in-fact

The Veto prohibits the issuance of a CWA section 404 permit for the discharge of dredged and fill material into disposal sites throughout the area

of the Pebble deposit. *See supra* 4-5, 9. It, therefore, completely forecloses PLP's continued development of any mine at the Pebble deposit. *Id. See also* ECF No. 1 (3:24-cv-00059-SLG) (PLP Complaint), ¶¶ 9, 65.

The Native Corporations have significant contracts for present and future services with PLP. *See* Reimers Decl. ¶¶ 12-19; McAlister Decl. ¶¶ 12-21. These contracts were entered into to support PLP's exploration, planning, permitting, and development of a mine at the Pebble deposit. *See* Reimers Decl. ¶¶ 12-19; McAlister Decl. ¶¶ 12-21. Accordingly, these contracts are entirely contingent on PLP's *continued* development of that mine. *See* Reimers Decl. ¶ 34; McAlister Decl. ¶¶ 36-37. The Native Corporations anticipate that, should the Veto remain in effect—foreclosing further development—PLP may terminate many of these contracts. *See* Reimers Decl. ¶ 34; McAlister Decl. ¶¶ 36-37. Indeed, since the Veto, the Native Corporations have already seen a significant reduction in the value of their contracts with PLP. *See* Reimers Decl. ¶ 36; McAlister Decl. ¶ 38.

These losses will only continue to increase. Because the Veto forecloses PLP's mine development, the Native Corporations' right-of-way agreements now hang in the balance. Should PLP terminate these agreements, APC will immediately lose its annual reservation payments. McAlister Decl. ¶ 37. The Native Corporations anticipate that termination of the right-of-way

agreements will cost them significant sums in lost revenue. Reimers Decl. ¶ 35; McAlister Decl. ¶¶ 36-37.

These present and anticipated economic losses are a concrete injury-in-fact. *See Phillips v. U.S. Customs & Border Prot.*, 74 F.4th 986, 991 (9th Cir. 2023) ("Tangible injuries, like . . . monetary losses, are concrete." (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021)). *See also Diamond Alternative Energy, LLC v. U.S. Env't Prot. Agency*, 145 S. Ct. 2121, 2135 (2025) ("[M]onetary costs 'are of course an injury.'" (quoting *United States v. Texas*, 599 U.S. 670, 676 (2023))). And given that these economic injuries are already occurring, *see* Reimers Decl. ¶ 36; McAlister Decl. ¶ 38, there is no question that they are actual and imminent.

## II. The Native Corporations' injuries are caused by the Veto and would be redressed by an order setting the Veto aside

"The issue in the causation inquiry is whether the alleged injury can be traced to the defendant's challenged conduct, rather than to that of some other actor not before the court." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1152 (9th Cir. 2000). However, for an injury-in-fact to be traceable to the challenged conduct, that conduct need not be "the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997).

This case presents "the 'familiar' circumstance where government regulation of a business 'may be likely' to cause injuries to other linked

businesses." *Diamond Alternative Energy*, 145 S. Ct. at 2136 (quoting *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 384 (2024)). As the Supreme Court has explained, "when the government regulates . . . a business, the regulation . . . may cause downstream or upstream economic injuries to others . . . ." *Id.* (quoting *All. for Hippocratic Med.*, 602 U.S. at 384). In such circumstances, a court's "analysis of causation and redressability" must "recognize[] commonsense economic realities" and "[w]hen third party behavior is predictable, commonsense inferences may be drawn." *Id.*

There is no doubt that the Native Corporations' injuries are traceable to the Veto. The Native Corporations' contracts—which service PLP's planning and development of a mine—are entirely contingent upon PLP's continued development of that mine. *See* Reimers Decl. ¶ 34; McAlister Decl. ¶ 36. The Veto, however, has foreclosed PLP's mining plans. *See* PLP Complaint ¶¶ 9, 65. As PLP predictably responds to the Veto by ceasing its pursuit of a mine at the Pebble deposit, the Native Corporations stand to lose the benefits of their contracts. And again, since the Veto, the Native Corporations have already seen their contracts reduced. *See* Reimers Decl. ¶ 36; McAlister Decl. ¶ 38.

It is also "likely, as opposed to merely speculative" that these injuries "will be redressed by a favorable decision." *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). Here, the Native

Corporations ask the Court to vacate the Veto. *See* ECF No. 1 (3:24-cv-00132) at 21. Such relief would redress the Native Corporations' injuries by removing the Veto's outright foreclosure of a mine at the Pebble deposit—enabling PLP to continue with its planning and development. And it would therefore enable the Native Corporations to continue providing services to PLP. "Even 'one dollar' of additional revenue" will "satisfy the redressability component of Article III standing." *Diamond Alternative Energy*, 145 S. Ct. at 2135 (quoting *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021)). The Native Corporations stand to gain significantly more than one dollar in additional revenue, should PLP's operations continue. *See* Reimers Decl. ¶¶ 18-19, 38; McAlister Decl. ¶¶ 19-21, 40.[8]

## SUMMARY OF ARGUMENT

For decades, the EPA has interpreted Section 404(c) with the understanding that Congress wanted the EPA Administrator to act as the

---

[8] Bolstering the Native Corporations' case for standing is that where "the legality of government action or inaction" is being challenged, "there is ordinarily little question" of standing for a plaintiff who is the "object of the action (or forgone action)." *Lujan*, 504 U.S. at 561-62. The Supreme Court has recently clarified that "[w]hen the government prohibits or impedes Company A from using Company B's product, then both Company A and Company B might be deemed objects of the government action at issue." *Diamond Alternative Energy*, 145 S. Ct. at 2135. That is precisely what has occurred here. By prohibiting PLP from continued development of a mine at the Pebble deposit, the Veto impedes PLP's continued reliance upon the Native Corporations' services in furtherance of that development.

"environmental conscience" of the CWA—like an imperious Lorax, empowered to act, righteously, as he sees fit. *Pirzadeh*, 1 F.4th at 744 (quoting 44 Fed. Reg. 58,076, 58081 (Oct. 9, 1979)). The Ninth Circuit has endorsed this understanding of Act. In *Pirzadeh*, the Court held that the CWA's veto provision vests totally "unfettered discretion" to the Administrator. *Id.* at 753. But the Constitution prohibits Congress from delegating this kind of power.

The Supreme Court has made clear that a statutory delegation violates the separation of powers if Congress fails either to establish: (1) a governing policy in the law to direct agency discretion; *or* (2) objective boundaries to limit discretion. Section 404(c) fails both tests. That is because Congress has given a "blank check" for the Administrator to do whatever he "thinks is right." *Kaweah Delta Health Care Dist. v. Becerra*, 123 F.4th 939, 952 (9th Cir. 2024) ("*Kaweah*").

Rather than establishing a governing policy to guide the Administrator's discretion, Section 404(c) simply "authorize[s]" the Administrator to exercise his veto power, or to decline use his veto power if he prefers for whatever reason. *See Pirzadeh*, 1 F.4th at 752-53 (holding that decisions about whether to proceed on a veto or not are vested, in the statute, to the Administrator's "unfettered discretion"). And, likewise, rather than establish objective boundaries to limit the Administrator's power to issue vetoes, Congress has "authorized" the Administrator to decide for himself the circumstances in

which the EPA will override the legal standards that Congress established for dredge and fill permitting in CWA Sections 404(a)-(b). Indeed, the Administrator is "authorized" to issue a veto "whenever" he decides that issuance of a permit would be "unacceptable[,]" 33 U.S.C. § 1344(c)—which depends entirely on personal sensibilities, and an individual weighing of competing public values that *should be* the exclusive province of Congress.

## ARGUMENT

### I.    Section 404(c) violates the nondelegation doctrine

#### A.    The Constitution requires that Congress must both establish a general policy and impose boundaries limiting agency discretion

The Constitution vests the legislative power to "regulate" interstate commerce exclusively with Congress. U.S. Const. art. I, §§ 1, 8. "Accompanying that assignment of power to Congress is a bar on its further delegation: Legislative power, we have held, belongs to the legislative branch, and to no other." *Consumers' Rsch.*, 145 S. Ct. at 2496 (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001)). As such, Article I requires that Congress must decide the "important subject[]" of whether and to what extent to regulate American enterprise. *Wayman v. Southard*, 23 U.S. (10 Wheat. 1) 1, 20, 43 (1825). And in the context of the CWA, the Constitution's bar on the "further delegation" of legislative power, *Consumers' Rsch.*, 145 S. Ct. at 2491, 2496, requires that Congress must decide the—undoubtedly "important"—subject of

whether and to what extent to abrogate the states' sovereign power to decide how best to manage their own natural resources. *Wayman*, 23 U.S. at 43. *Cf. Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001) (recognizing that the CWA stretches "the outer limits" of Congress' Commerce Clause power).

Applying this nondelegation doctrine, the Supreme Court holds that a statute violates the separation of powers if Congress fails to either: (1) establish a "general policy" that the agency must pursue, or (2) impose objective "boundaries" to limit agency discretion. *Consumers' Rsch.*, 145 S. Ct. at 2491, 2501 (explaining that the nondelegation doctrine required the Court to decide whether the Telecommunications Act "adequately guides the FCC[,]" and that this inquiry requires deciding "whether it expresses the 'general policy' the FCC must pursue in setting contribution amounts, ***as well as*** the 'boundaries' it cannot cross") (emphasis added) (citing *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)). *Accord United States v. Melgar-Diaz*, 2 F.4th 1263, 1267 (9th Cir. 2021) (citing *American Power & Light* for the point that Congress must "ma[k]e clear . . . 'the general policy'" the agency "must pursue ***and*** the 'boundaries of [its] authority'") (emphasis added).[9] And when

_____

[9] In *Consumers' Research* the Supreme Court distinctly applied these separate tests before concluding that the Telecommunications Act lawfully delegated fee setting authority. First, the Court asked whether Congress imposed "limits on

applying these nondelegation tests, the Court has stressed that "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Consumers' Rsch.*, 145 S. Ct. at 2497 (quoting *Whitman*, 531 U.S. at 475).

## B. Section 404(c) delegates unfettered discretionary authority in violation of the nondelegation doctrine

Congress' delegation of power for the EPA Administrator to veto CWA permits violates the nondelegation doctrine because Congress failed to provide any general policy to govern the Administrator's discretion. And, separately, there is a nondelegation violation here because there are no meaningful boundaries limiting the Administrator's discretion. *Accord Pirzadeh*, 1 F.4th at 752-53 (finding questions under Section 404(c) are committed to agency discretion). *See also Heckler*, 470 U.S. at 830 (stating that there is "no law to apply" when an issue is vested to agency discretion).

### i. No policy speaks to when EPA should issue a Veto

To survive scrutiny, a statute must provide a "'general policy' that the agency must pursue." *Consumers' Rsch.*, 145 S. Ct. at 2497 (quoting *Am. Power*

_____

how much money the FCC [could] raise," before concluding that Congress set both a floor and a ceiling. *Consumers' Rsch.*, 145 S. Ct. at 2501-02. Second, the Court went on to assess whether Congress had set a policy with "adequate guidance." *Id.* at 2502-07. In doing so, the Court emphasized that the government had to prevail under *both* tests. *Id.* at 2491, 2502 (stressing the conclusion that FCC was limited to raising a "sufficient" amount "takes us only halfway, because it raises the question: Sufficient for what?").

& *Light*, 329 U.S. at 105). But this does not mean that any statutory purpose will suffice. For one, the "degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman*, 531 U.S. at 475. This means that a more specific statement of policy is required for a more significant delegation. And when setting standards that may have significant economic impacts throughout the nation, the Supreme Court has said Congress must "provide substantial guidance." *Id.*

What is more, the "general policy" test must be applied in accordance with the Supreme Court's decisions in *Panama Refining Company v. Ryan*, 293 U.S. 388 (1935), and *A.L.A. Schechter Poultry Corporation v. United States*, 295 U.S. 495 (1935) ("*Schechter*")—because those cases "offer object lessons about the amount of latitude Congress can confer." *Consumers' Rsch.*, 145 S. Ct. at 2502. It matters, therefore, that in those cases, the Supreme Court found open-ended delegations unconstitutional, notwithstanding the fact that Congress had pronounced a "[d]eclaration of [p]olicy" aimed at "rehabilitat[ing]" the national economy. *Schechter*, 295 U.S. at 534, 541-42. Congress was clear in stating its hortatory goals for the improvement of the economy and labor conditions generally. *Id.* at 534-45. Yet, that was insufficient because those vague targets did not establish any policy governing whether or when the President should approve industry codes, *id.*, or prohibit

transport of hot oil. *Panama Refining*, 293 U.S. at 430 ("Congress ha[d] declared no policy . . . established no standard, . . . laid down no rule.").

It is insufficient for the government to point to a supposed general statement policy that leaves administrative discretion to do "anything that Congress may do within the limits of the commerce clause for the betterment of business[,]" or some other hyper-generalized goal. *Schechter*, 295 U.S. at 553 (Cardozo, J., concurring). Likewise, it is insufficient for the government to point to minimal limitations that do not speak to the important subject of whether and to what extent the federal government should "regulate" the interstate aquatic channels of commerce—and, as in this case, abrogate the powers of a sovereign state.

Here, Congress established no governing policy because the CWA merely "authorize[s]" the EPA Administrator to issue a veto, ***if he chooses***. Nothing in the statute compels the Administrator to issue a veto—even if he should "determine[]" that "the discharge of [] materials into [the] area will have an unacceptable adverse effect . . . ." 33 U.S.C. § 1344(c). Indeed, the Ninth Circuit has held that the Administrator's decision to "decline" to exercise his veto power is subject to his "unfettered discretion." *Pirzadeh*, 1 F.4th at 753.

The Ninth Circuit's recent decision in *Kaweah*, 123 F.4th 939, 952, is instructive. In that case, the Secretary of the U.S. Department of Health and Human Services claimed Congress had delegated authority to make

"adjustments" to the governing law as he "deem[ed] appropriate." *Id.* at 951. But the Court held that (if this was the correct interpretation) there would be a nondelegation violation because—at that point—the statutory text would provide no direction beyond a charge that the Secretary should "do what[] he or she thinks is right." *Id.* at 952. The Secretary could elect to exercise his authority to make "adjustments[,]" or not based on nothing more than his own subjective sense of what should be done. *Id.* at 951.

In the same way, Section 404(c) delegates a totally discretionary power for the Administrator to "do what[] he or she thinks is right." *Id.* at 952. The only difference is that there was a reasonable alternative interpretation of the Medicare Act that avoided what would have otherwise been a constitutional problem in *Kaweah*. But here, the nondelegation problem is unavoidable because Congress has expressly delegated the authority to decide whether and when to issue a veto, and there is "no law" governing the exercise of that discretion. *Heckler*, 470 U.S. at 830.

Likewise, CWA Section 404(c) is closely analogous to Section 9(c) of the National Industrial Recovery Act, which the Supreme Court struck down on nondelegation grounds in *Panama Refining.* Just as CWA Section 404(c) authorizes (but does not compel) the EPA Administrator to issue a veto, NIRA Section 9(c) "authorized" (but did not compel) the President to impose a federal prohibition on private conduct. There, the statutory text said merely that "[t]he

President [wa]s authorized to prohibit the transportation" of hot oil—but the NIRA failed to provide any direction for when the President should exercise or decline to exercise this authority. *See Panama Refining*, 293 U.S. at 415 (stressing the absence of any requirement that the President justify his decision with "any finding" of fact).

The Supreme Court's reasoning in *Consumers' Research* confirms the point that Congress violates the nondelegation doctrine when it delegates authority for an agency to do as it thinks best without an objective directive. The Court concluded that the Telecommunications Act establishes a policy channeling the Federal Communications Commission's discretion to set fees to subsidize telecommunication services for the urban poor and rural residents: "If, says the statute, a substantial majority of Americans has access to a communications service that is both affordable and essential to modern life, then other Americans should have access to that service too. And to make that happen, the statute continues, carriers should kick in the needed funds." 145 S. Ct. at 2507. By contrast, CWA Section 404(c) says only that if the EPA Administrator determines that a project will have "an unacceptable adverse effect" he is "authorized" to issue a veto—but that he might just as well choose to allow the Corps to issue a dredge or fill permit. So, in contrast to the Telecommunications Act, which required the FCC to carry out a definite mission—albeit, while affording the FCC significant discretion—the CWA's

veto provision provides no directive at all. The Administrator simply has "unfettered discretion" to do as he pleases, *Pirzadeh*, 1 F.4th at 753—including discretion to weigh competing political considerations as he "may see fit." *Panama Refining*, 293 U.S. at 415. *Cf. Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (emphasizing that the weighing of "competing values . . . is the very essence of legislative choice").[10]

And unlike other cases where Congress made a policy decision offering at least some fuzzy guidance, the CWA's veto provision is utterly devoid of direction on whether to impose a veto or not. *Pirzadeh*, 1 F.4th at 753 (finding no judicially manageable standards for reviewing any decision the EPA Administrator might make). For example, in *NBC v. United States*, 319 U.S. 190 (1943), the Supreme Court interpreted nebulous statutory language as authorizing a broad delegation; the Court upheld regulations on chain broadcasting by radio networks because the statutory text directed the Federal Communications Commission to regulate those networks in the "public interest, convenience, or necessity." *Id.* at 216. But the phrase was limited "'by its context, by the nature of radio transmission and reception, [and] by the scope, character, and quality of services,'" *id.* (quoting *Fed. Radio Comm'n v.*

---

[10] *See also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 382 (2023) (it is the role of *the People's "elected representatives"* to weigh "incommensurable" values) (emphasis added).

*Nelson Bros. Bond & Mortgage Co.*, 289 U.S. 266, 285 (1933)), such that the public interest "to be served" was "the interest of the listening public in 'the larger and more effective use of radio.'" *Id.* (quoting Act). And Congress provided further contextual direction by enumerating a list of actions the FCC could do. By contrast, the CWA veto provision gives no statutory charge at all.

For the same reason, this case is easily distinguished from *United States v. Pheasant*, 129 F.4th 576 (2025). In that case, the Ninth Circuit found that Congress had established a sufficient policy to guide the discretion of the Bureau of Land Management (BLM) under the Federal Land Policy and Management Act (FLPMA) because the statute directs BLM to "issue regulations necessary to implement the provisions of [the FLPMA] with respect to the management, use, and protection of the public lands." *Id.* at 580 (quoting 43 U.S.C. § 1733(a)). Even though the Act left BLM with latitude to decide whether a specific restriction on use of these federal lands should be allowed in a given area, the statutory directive was clear enough: "The FLPMA instructs the Secretary to 'manage the public lands under principles of multiple use and sustained yield[,]'" which Congress defined as a "mandate" to ensure that those lands would be used in a manner that would utilize "'their various resource values'—including 'recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values'" while avoiding "'permanent impairment of the productivity of the land and the

quality of the environment.'" *Id*. (quoting 43 U.S.C. §§ 1732(a), 1702(c)). "Taken together, those provisions set out a clear" directive to "develop a long-term [land] management strategy . . . ." *Id*. By contrast, Section 404(c) gives no directive to the EPA Administrator; the Administrator is merely authorized to "do what[] he or she thinks is right." *Kaweah*, 123 F.4th at 952 ("Although we recognize that the Secretary was, in good faith, addressing a pressing problem here, such unrestricted power may be abused in the future—and that is why we enforce the limitations imposed by our system of separation of powers.").

Nor does Section 404(c) establish a general policy in requiring a determination that a permit will result in an "unacceptable adverse effect" as a predicate for the Administrator issuing a veto.[11] That requirement is meaningless because the CWA leaves it to the Administrator to decide for himself what will be deemed unacceptable or not. *See supra* 32-35. After all, one of *Schechter*'s vital "lessons[,]" *Consumers' Rsch*., 145 S. Ct. at 2502, was that it is insufficient for Congress to require a predicate finding of fact that does not meaningfully guide the exercise of discretion. In that case, the NIRA required the President to make a predicate finding that a proposed industry

---

[11] Even assuming for the sake of argument that Congress established some sort of policy in charging the Administrator with making this finding as a predicate to issuing a veto, the problem remains that the text allows the Administrator to override Congress' legislative policy judgments because he retains "unfettered discretion" to decline to exercise his veto power. *Pirzadeh*, 1 F.4th at 753.

code was "not designed 'to promote monopolies or to eliminate or oppress small enterprises . . . .'" *Schechter*, 295 U.S. at 522-23 (citation omitted). Yet those findings did not serve to guide the President in determining the substance of an approved industry code. *Id.* at 538 (observing that this left open the "wide field of legislative possibilities."). And the same is true here. In the absence of an objective definition of what shall constitute an "unacceptable adverse effect[,]" the charge that the Administrator should determine whether a permit will result in an "unacceptable adverse effect" provides no direction at all.

### ii. Congress imposed no boundaries on EPA's veto authority

The veto provision also violates the nondelegation doctrine because Congress failed to impose meaningful boundaries. The EPA Administrator is "authorized" to issue a veto "whenever he determines . . . that the discharge of [] materials into [a given] area will have an ***unacceptable adverse effect*** on municipal water supplies, shellfish beds and fishery areas . . . wildlife, or recreational areas." 33 U.S.C. § 1344(c) (emphasis added). But Congress never defined what is an "unacceptable adverse effect." Instead, it left it to the EPA Administrator to "determine" what will be deemed "unacceptable." *See Kaweah*, 123 F.4th at 952 (interpreting similar language as authorizing the HHS Secretary "to have an opinion").

The CWA simply does not say what kind of finding justifies a "determin[ation]" that a permit will have an "unacceptable adverse effect." 33

U.S.C. § 1344(c). The Administrator *might choose* to focus only on environmental impacts; but he retains unfettered discretion to consider economic, moral or any other consideration he might please. The Administrator might just as well choose to issue a veto because the President's family enjoys fishing or hunting in the area, or because a lobby of tribes from over 100 miles away (or a coalition of European jewelers, or members of the faith community) have raised moral concerns about allowing any project that fills any portion of any wetland or stream.

For that matter, the competing arguments in *Northern Dynasty Minerals Ltd. et al. v. U.S. E.P.A.* over whether EPA should have considered or discounted economic and social factors in its "adverse effect" analysis only underscore that Congress failed to provide any objective limit on EPA's veto power.[12] Even assuming, as others have argued, that EPA should have *considered* economic or social factors, nothing in the text speaks to *how* the Administrator should weigh such considerations in deciding what shall be deemed "unacceptable." *See Pirzadeh*, 1 F.4th at 752 ("Nothing in the statute

---

[12] *See* PLP Complaint ¶¶ 105-24 (alleging that it was arbitrary and capricious for EPA to ignore the massive economic benefits of the project for the region, and the national benefit of enabling this mining project—including the benefits it would offer in furnishing minerals needed to further America's "transition to renewable energy sources"). *See also* Final Determination, AR0000362-64 (stressing countervailing social and economic concerns over the "potential impact[]" on fisheries).

constrains the Administrator's discretion . . . to decline to invoke his or her § 404(c) authority . . . ."). *Accord Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 672 (6th Cir. 2021) (concluding that the Public Health Service Act could not be construed to delegate authority for the Centers for Disease Control and Prevention to decide for itself what would be deemed an intolerable public health risk: "Under that interpretation, the CDC [could] do anything it [could] conceive of to prevent the spread of disease.").

And even if the Administrator chooses to focus exclusively on adverse environmental impacts, the text imposes no boundary on his discretion to issue a veto to block any project that would require the discharge of even a spoonful of dredged material. Section 404(c) simply provides no yardstick for saying how much adverse impact is too much.[13] *Accord Pirzadeh*, 1 F.4th at 753

---

[13] In dicta, *Pirzadeh* suggested that the statutory text "constrains" the Administrator's discretion to impose a veto because he may exercise veto "authority only when he or she has determined that a discharge 'will have an unacceptable adverse effect.'" 1 F.4th at 752 n.4. But saying that the Administrator must find an "unacceptable adverse effect" "only takes us halfway, because it raises the question: [what is unacceptable?]" *Consumers' Rsch.*, 145 S. Ct. at 2502. And the only case that *Pirzadeh* refers to in this passing footnote merely stands for the proposition that EPA can veto after a permit has issued—which leaves the question of what is "unacceptable" unanswered. *See Mingo Logan*, 714 F.3d 608. If anything, *Mingo Logan*'s holding that Section 403(c) imposes "no temporal limit" on EPA's authority to veto an already issued permit only underscores the total lack of boundaries on the Administrator's discretion. *Id.* at 613.

(emphasizing the "practically limitless number of geographical areas" that could be restricted from issuance of a permit under Section 404(c)).

Finally, it bears emphasis that the EPA cannot fix Congress' failure to establish boundaries on the agency's authority. The EPA might seek to point to its own regulations as a limitation on the Administrator's veto authority because the EPA has defined what shall constitute an "unacceptable adverse effect" for the purpose of deciding whether the Administrator should issue a veto. 40 C.F.R. § 231.2(e). But the Supreme Court has already held that "an agency can[not] cure an unconstitutionally standardless delegation of power by declining to exercise some of that power . . . ." *Whitman*, 531 U.S. at 472-73.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for summary judgment.

DATED: October 3, 2025.

<div style="margin-left:40%">

Respectfully submitted,
DAMIEN M. SCHIFF*
LUKE A. WAKE*
CHARLES T. YATES*

</div>

*Pro Hac Vice    By /s/ Luke A. Wake
           LUKE A. WAKE, *Pro Hac Vice*
           Cal. Bar No. 264647

           *Attorneys for Plaintiffs*
           *Iliamna Natives Ltd. and*
           *Alaska Peninsula Corp.*

## CERTIFICATE OF SERVICE

I certify that on October 3, 2025, I filed the foregoing using the Court's ECF system, which will provide service to all counsel of record.

<div align="right">

/s/ Luke A. Wake
LUKE A. WAKE, *Pro Hac Vice*

</div>

*Iliamna Natives Ltd. v. EPA*      36
No. 3:24-cv-00132-SLG
Case 3:24-cv-00059-SLG     Document 169     Filed 10/03/25     Page 43 of 43