Damien M. Schiff, Cal. Bar No. 235101*
Luke A. Wake, Cal. Bar No. 264647*
Charles T. Yates, Cal. Bar No. 327704*
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
DSchiff@pacificlegal.org
LWake@pacificlegal.org
CYates@pacificlegal.org

*Pro Hac Vice

Attorneys for Plaintiffs
Iliamna Natives Ltd. and
Alaska Peninsula Corp.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTHERN DYNASTY MINERALS LTD, et al., <br><br>        Plaintiffs, <br><br>   v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br>        Defendants, <br><br>   and <br><br> UNITED TRIBES OF BRISTOL BAY, et al., <br><br>        Intervenor-Defendants. | Case No. 3:24-cv-00059-SLG |

*Iliamna Natives Ltd. v. EPA*        1
No. 3:24-cv-00132-SLG
Case 3:24-cv-00059-SLG    Document 169-1    Filed 10/03/25    Page 1 of 14

| | |
|---|---|
| STATE OF ALASKA,<br><br>        Plaintiff,<br><br>   v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>        Defendant,<br><br>  and<br><br>TROUT UNLIMITED, et al.,<br><br>        Intervenor-Defendants. | Case No. 3:24-cv-00084-SLG |
| ILIAMNA NATIVES LTD. and ALASKA PENINSULA CORP.,<br><br>        Plaintiffs,<br><br>   v.<br><br>ENVIRONMENTAL PROTECTION AGENCY; et al.,<br><br>        Defendants,<br><br>  and<br><br>UNITED TRIBES OF BRISTOL BAY, et al.,<br><br>        Intervenor-Defendants. | Case No. 3:24-cv-00132-SLG |

## DECLARATION OF DAVID MCALISTER

I, DAVID MCALISTER, am competent to testify and declare as follows:

1.    I have personal knowledge of the facts stated in this Declaration and, if called as a witness, I could and would competently testify to these facts under oath. As to those matters that reflect a matter of opinion, they reflect my personal opinion.

2.      I am a resident of Palmer, Alaska, and the Chief Executive Officer for Alaska Peninsula Corporation (APC). APC is an Alaska Native Village Corporation within the meaning of the Alaska Native Claims Settlement Act (ANCSA). I have served as CEO of APC since November 2017.

3.      I am authorized to speak on behalf of APC for purposes of this litigation.

4.      In my role as CEO of APC, I am responsible for overseeing the corporation's business operations, strategy, and mission. This includes strategic planning to increase revenue, protect APC's resources, and create economic opportunities for APC's shareholders. It also includes fulfilling the unique, long-term mission established by ANCSA—to benefit APC's shareholders and protect the culture and lands of Alaska Natives. My day-to-day responsibilities are diverse—including project management; negotiating, entering, and delivering upon contracts between APC, its subsidiaries, and third parties; management of APC's finances; and engagement with APC's shareholders.

5.      APC exists as a consolidated Village Corporation composed of five Alaska Native Village Corporations—Port Heiden (Meshik), South Naknek (Qinuyang), Newhalen, Kokhanok, and Ugashik. APC has approximately 1,000 shareholders.

6.      Pursuant to ANCSA, APC was deeded landholdings for the purpose of economic development—among other purposes. These deeded landholdings total about 400,000 acres.

7.      About 19 miles northwest of Newhalen lies the Pebble deposit—one of the world's largest deposits of gold-, copper-, and molybdenum-bearing ore and minerals. The Pebble deposit is located at the headwaters of the North Fork Koktuli River ("NFK watershed"), South Fork Koktuli River ("SFK watershed"), and Upper Talarik Creek ("UTC watershed"). Prospectors and trappers, including APC shareholders from Newhalen, first discovered gold at the Pebble deposit in the late 1970s and early 1980s.

8.      It is my understanding that in 2001, Northern Dynasty Minerals Limited (Northern Dynasty) purchased the claim for the Pebble deposit and, through its subsidiary Pebble Limited Partnership (PLP), began taking steps to develop a mine. In the years that followed, these steps included exploratory drilling, environmental review, permitting, the development of infrastructure, and numerous other activities necessary to study and prepare the mine site for operation.

9.      APC has struggled for decades to establish and maintain a prosperous local economy in the region of rural Alaska in which its shareholders live. Things had become especially dire by the mid-2000s. As a result of high fuel prices during that era, energy prices in our villages—which

were already underserved by energy infrastructure—soared. Particularly hard hit were Kokhanok and Newhalen. As a result of soaring energy prices—and to keep their families warm—shareholders living in those villages sold their limited entry permits. By selling their limited entry permits to pay for fuel, these shareholders reduced their economic reliance on the Bristol Bay fishery. When that money ran out, families left, looking for employment opportunities elsewhere. By 2008, there was a grave concern that both the Newhalen and Kokhanok schools would be closed because of a lack of students.

10.    That dire situation began to improve in 2007, when APC began to do business with Northern Dynasty and PLP (together, "PLP"), as they explored the development of a mine at the Pebble deposit.

11.    PLP's exploration and development of a mine at the Pebble deposit breathed new life into our local economy. It has already brought significant revenue to APC. And it has led to the creation of jobs and training opportunities for APC's shareholders, where previously there were none. Should an operational mine at the Pebble deposit open, we expect even greater benefits to come.

12.    Roughly 90,000 acres of land owned by APC in the Iliamna Lake region are adjacent to the Pebble deposit, with some areas being only a few miles away. Because of this proximity, APC has been able to provide PLP with a variety of services as it explored and prepared the Pebble deposit for mining

and sought permits for the proposed mining operation. Between 2008 and the present, APC entered into a series of significant contracts with PLP. These contracts were entered for both present and future services. APC also granted PLP significant land-use rights for access during the development and operation of the proposed mine.

13.     In 2006, APC established a wholly owned subsidiary—APC Services, LLC—to do business with PLP. APC Services grew quickly, employing many APC shareholders. At the height of PLP's exploration and planning of the mine, APC Services was expending over 10,000 man-hours per year on Pebble-related contracts. Some years this figure reached as high as 30,000 man-hours.

14.     APC Services' first contract with PLP—entered into in 2007—was for hydrology consulting services in Upper Talarik Creek. That hydrology contract was regularly renewed through 2014. In its first year (2007-2008), ANC Service's hydrology contract with PLP brought in approximately $400,000 in revenue. Each year for the following six years, it brought in similar revenue.

15.     During that same period between 2007 and 2014, APC Services also provided consulting services for soil testing and fisheries habitat studies.

16.     In 2017, APC began expanding into a variety of other contracts with PLP. Over the following years, APC Services and other APC-owned

subsidiaries entered logistics contracts for camp services, aviation, transportation, bear guards, drilling support, and general labor. At the same time, APC Services and a new APC subsidiary, Talarik Research and Restoration Services, LLC, organized in 2016, continued to provide consulting services such as bathometric and geophysical studies. From 2017 through today, these various contracts have generated over $20,000,000 in total revenue for APC.

17.    APC Services also continues to provide field management services to PLP at the Pebble deposit, during the summer months of each year. In 2025, APC derived approximately $38,000 in revenue from this contract.

18.    These contracts proved to be a massive boon to APC and its shareholders. After decades of population decline, many APC shareholders returned to the region to work on these PLP-contracted projects. PLP-related work also enabled the villages of Newhalen and Kokhanok to achieve 100% employment—for the first time in 2009, and again during 2017-2019. Moreover, as a direct result of the revenue generated by these deals with PLP, APC was able in 2019 to begin paying annual disbursements to its shareholders. Due to previously insufficient revenue, APC had only made such a disbursement once before in its entire history. Newhalen and Kokhanok schools—which had been on the brink of closing before PLP began exploration at the Pebble deposit—were thriving with full classrooms.

19. These benefits associated with the past exploration, permitting, planning, and development of the Pebble mine have been significant. However, APC and its shareholders stand to gain even more should planning and development of the mine continue, and should the mine become operational. This is because in 2018, APC entered into a right-of-way agreement with PLP. Under this agreement, APC will provide PLP with access to defined portions of APC lands for the development of a private road, barge landing areas, and port infrastructure associated with PLP's mining plan. In return, PLP will make annual toll payments to APC, and pay other fees prior to and during mining operations in the region.

20. Significantly, under the right-of-way agreement, PLP must pay APC an annual reservation fee. 2019 was the first year that a reservation fee was paid. Under the terms of the contract, that fee will increase over time.

21. The right-of-way agreement also provides "preferential contractor" bidding status for APC and APC shareholders. This bidding status will provide even further opportunity for APC and its shareholders as infrastructure is developed on the right-of-way.

22. All in, exploration, planning, and development for the Pebble mine has already brought hundreds of jobs to APC's shareholders. And our contracts with PLP have already provided tens of millions of dollars in direct revenue to

APC and its subsidiaries. We expect substantially more jobs and revenue should development of the mine continue.

23.     More broadly, APC and its shareholders also expect to benefit from the infrastructure developed for the Pebble mine on APC's land. Indeed, APC anticipates that pipeline, power, and transportation infrastructure developed for the Pebble mine will significantly lower the cost of energy in its constituent villages. Due to a lack of transportation infrastructure, energy costs have been historically very high in APC's constituent villages, and access to cheaper energy is vital to bringing prosperity to the region.

24.     APC and its shareholders recognize that the mine can be developed and operated in a way that respects the environment and their Indigenous culture *and* provides economic opportunities. To that end, APC has worked closely with PLP to ensure that the environment will be protected throughout the mine's development.

25.     For PLP to develop a mine at the Pebble deposit, it is necessary, and standard mining practice, to obtain a disposal site for dredged and fill material. It is my understanding that in 2004, PLP began the process of applying for a Clean Water Act (CWA) section 404 permit from the United States Army Corps of Engineers to use some bodies of water in the SFK and NFK watersheds as disposal sites for dredged and fill material.

26.    As steps were taken to obtain a CWA section 404 permit, a complicated series of regulatory and litigation developments occurred, with many changes to the status of PLP's section 404 permit application happening as court and agency decisions were issued, and as presidential administrations came and went.

27.    Early in that permitting process, outside activists and interest groups from other regions of Alaska—and even other regions of the United States and the world—began to mount opposition to the mine. These activists urged the United States Environmental Protection Agency to ban the project by exercising its powers under CWA section 404(c) to veto any plans to dispose of dredged and fill material in the area of the Pebble deposit.

28.    In 2014, EPA issued a proposed determination under section 404(c) to restrict PLP from using most waters in the SFK, NFK, and UTC watersheds as disposal sites for dredged and fill material. After litigation, that proposed determination was preliminarily enjoined, and then in 2017, withdrawn by EPA.

29.    As these regulatory developments were unfolding, APC, its subsidiaries, and its shareholders nevertheless continued to work closely with PLP, and continued to provide logistical and consulting services as permitting, exploration, planning, and development for the mine continued.

30.    That was until 2023, when EPA—after deciding to resume its section 404(c) review process—issued a final determination to preemptively veto any development of a mine at the Pebble deposit.

31.    It is my understanding that EPA's 2023 final determination "prohibits" the use of many waters in the NFK and SFK watersheds as disposal sites for discharging dredged and fill material while operating and developing a mine according to PLP's mining plan. I also understand that the final determination prohibits using these same waters as disposal sites in any *future* proposals to develop mines at the Pebble deposit that would have the same level of environmental impact on those waters as PLP's mining plan.

32.    I understand that the final determination also "restricts" the use of most waters in the NFK, SFK, *and* UTC watersheds as disposal sites in any future mine proposals if those proposals would have the same level of environmental impact on the NFK, SFK, and UTC watersheds as PLP's mining plan.

33.    As a result of that final determination, in April 2024, the Corps denied PLP's section 404 permit application on the grounds that EPA's veto prohibited PLP from using those waters in the NFK, SFK, and UTC watersheds.

34.    During EPA's section 404(c) review process, EPA was required to consult with Alaska Native Corporations such as APC. APC submitted written

comments to EPA. And I and other representatives of APC attended several meetings with EPA. We explained APC's concerns that prohibiting the mine would severely impact our local economy and remove a vital source of economic development in a region badly in need of a boost. We also explained how APC has been working with PLP to plan the mine in such a manner as to protect the nearby environment. EPA did not listen.

35.    EPA's final determination—and the Corps' subsequent denial of Pebble's section 404 permit application—has been devastating for APC and its shareholders.

36.    This is because APC's contracts are contingent upon PLP developing a mine at the Pebble deposit. If PLP cannot obtain the necessary permits—and continue planning and development of the mine—we anticipate that our contracts will be terminated.

37.    Most devastatingly, should PLP cease development of the mine, we anticipate that PLP may issue a notice of termination pursuant to the terms of APC and PLP's right-of-way agreement. The most immediate effect of this occurring is that APC will lose its annual reservation payments. But all up, termination of the right-of-way agreement will be devastating to our villages and local economies. Our shareholders will also lose the benefits of the infrastructure development, training, and employment opportunities promised by the project.

38.     Indeed, we are already seeing the negative effects of the veto today. As noted above, prior to the veto, APC Services was expending tens of thousands of man-hours per year to service contracts with PLP. Since the veto, that figure has dwindled to 1,000 or fewer man-hours per year.

39.     We are deeply concerned that if things continue along their current trajectory, our villages will return to the dire state they were in prior to 2008. The relationship between APC and PLP has been—and continues to be—fundamental to APC providing for its shareholders. And it continues to be essential to APC's shareholders maintaining their culture, traditions, and way of life. Without the revenue derived from contracts with PLP, many of APC's shareholders will again be forced to leave their homes and seek employment elsewhere.

40.     However, if EPA's final section 404(c) determination is set aside, PLP will be able to resume exploration, planning, permitting, and development of the mine. And APC will be able to continue its contracts—including its significant right-of-way agreement—with PLP. In addition to significant revenue to APC, this will provide hundreds of new jobs, new energy infrastructure, and significant training opportunities for our shareholders. The mine will again breathe new life back into our fragile economy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in __Anchorage__ , __Alaska__ , on __October 2, 2025__ .

DAVID MCALISTER