Damien M. Schiff, Cal. Bar No. 235101*
Luke A. Wake, Cal. Bar No. 264647*
Charles T. Yates, Cal. Bar No. 327704*
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
DSchiff@pacificlegal.org
LWake@pacificlegal.org
CYates@pacificlegal.org

*Pro Hac Vice

*Attorneys for Plaintiffs
Iliamna Natives Ltd. and
Alaska Peninsula Corp.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTHERN DYNASTY MINERALS LTD, et al., <br><br>    Plaintiffs, <br><br>v. <br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br>    Defendants, <br><br>and <br><br>UNITED TRIBES OF BRISTOL BAY, et al., <br><br>    Intervenor-Defendants. | Case No. 3:24-cv-00059-SLG |

| | |
|---|---|
| STATE OF ALASKA,<br><br>  Plaintiff,<br> v.<br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>  Defendant,<br> and<br>TROUT UNLIMITED, et al.,<br><br>  Intervenor-Defendants. | Case No. 3:24-cv-00084-SLG |
| ILIAMNA NATIVES LTD. and ALASKA PENINSULA CORP.,<br><br>  Plaintiffs,<br> v.<br>ENVIRONMENTAL PROTECTION AGENCY; et al.,<br><br>  Defendants,<br> and<br>UNITED TRIBES OF BRISTOL BAY, et al.,<br><br>  Intervenor-Defendants. | Case No. 3:24-cv-00132-SLG |

# DECLARATION OF STEVEN REIMERS

I, STEVEN REIMERS, am competent to testify and declare as follows:

1. I have personal knowledge of the facts stated in this Declaration and, if called as a witness, I could and would competently testify to these facts under oath. As to those matters that reflect a matter of opinion, they reflect my personal opinion.

2. I am a dual resident of Anchorage, Alaska, and Iliamna, Alaska. I am the Chief Executive Officer for Iliamna Natives Limited (INL). INL is an Alaska Native Village Corporation within the meaning of the Alaska Native Claims Settlement Act (ANCSA). I have served in this role since 2021. I previously served as the General Manager of INL from 2013 to 2021. And I've been with INL since 2008.

3. I am authorized to speak on behalf of INL for purposes of this litigation.

4. In my role as CEO of INL, I am responsible for overseeing the corporation's business operations, strategy, and mission. This includes strategic planning to increase revenue, protect INL's resources, and create economic opportunities for INL's shareholders. It also includes fulfilling the unique, long-term mission established by ANCSA—to benefit INL's shareholders and protect the culture and lands of Alaska Natives. My day-to-day responsibilities are diverse—including project management; negotiating, entering, and delivering upon contracts between INL, its subsidiaries, and third parties; management of INL's finances; and engagement with INL's shareholders.

5. INL has approximately 180 shareholders. INL's shareholders are associated with the Native Village of Iliamna, Alaska ("Iliamna Village")—a remote village in Alaska's Lake and Peninsula Borough.

6. Pursuant to ANCSA, INL was deeded landholdings for the purpose of economic development—among other purposes. These deeded landholdings total approximately 69,000 acres.

7. About 17 miles northwest of Iliamna Village lies the Pebble deposit—one of the world's largest deposits of gold-, copper-, and molybdenum-bearing ore and minerals. The Pebble deposit is located at the headwaters of the North Fork Koktuli River ("NFK watershed"), South Fork Koktuli River ("SFK watershed"), and Upper Talarik Creek ("UTC watershed").

8. It is my understanding that in 2001, Northern Dynasty Minerals Limited (Northern Dynasty) purchased the claim for the Pebble deposit and, through its subsidiary Pebble Limited Partnership (PLP), began taking steps to develop a mine. In the years that followed, these steps included exploratory drilling, environmental review, the development of infrastructure, and numerous other activities necessary to study and prepare the mine site for operation.

9. INL has struggled for decades to establish and maintain a prosperous local economy in the region of rural Alaska in which its shareholders live. With very few economic opportunities, our shareholders have suffered in a perpetually depressed economy. Young people have struggled to find opportunities for training and advancement. And many of our

shareholders have moved away, looking for employment opportunities and a better life elsewhere.

10. That began to change in 2008. That year, INL began a relationship with Northern Dynasty and PLP (together, "PLP"), by first setting up a wholly owned subsidiary—Iliamna Development Corporation (IDC)—to do business with PLP as it explored the development of a mine site at the Pebble deposit.

11. PLP's exploration and development operations at the Pebble deposit breathed new life into our local economy. PLP's operations have already brought significant revenue to INL. And they have led to the creation of jobs and training opportunities for INL's shareholders, where previously there were none. Should an operational mine at the Pebble deposit open, we expect even greater benefits to come.

12. Because of the proximity of INL's landholdings to the Pebble deposit, INL has been able to provide PLP with a variety of services as it pursued development of a mine. Beginning in 2009, INL and IDC entered a series of significant contracts for present and future services. INL also granted PLP significant land-use rights for access during development and operation of the proposed mine.

13. INL's business relationship with PLP began in 2009, when IDC approached PLP about providing fuel to PLP's operations at the Pebble deposit. IDC then entered a contract whereby it set up a barge service to ferry fuel

across Lake Iliamna to supply fuel to PLP during its exploration drilling. At one point, IDC was supplying PLP with between 1,000 and 2,000 gallons of fuel per day. Since 2009, IDC has sold PLP over $10,000,000 worth of fuel.

14. IDC also entered contracts with PLP to provide camp services to PLP. At one point, IDC was servicing a camp of over 200 people per day. This contract likewise provided INL with total revenue exceeding $10,000,000.

15. In addition to these contracts for logistical services, INL has leased land in Iliamna Village to PLP. This land has been used by PLP to store core samples gathered during exploration of the Pebble deposit. Our lease agreement also involves contracts whereby IDC has developed, and maintains, infrastructure to house the core samples.

16. Another benefit of the Pebble mine's planning and development resulted from the State of Alaska owning and operating an airport in Iliamna Village. Because this airport served as an entry point for PLP to bring in supplies and employees, Iliamna Village became a transportation hub for the proposed mine site, bringing many additional associated jobs and economic opportunities.

17. These contracts for services proved a massive boon to INL and its shareholders. After decades of population decline, many INL shareholders returned to the region to work on these PLP-contracted projects. Indeed, at one point during exploration and development of the Pebble mine—and as a direct

*Iliamna Natives Ltd. v. EPA*      6
No. 3:24-cv-00132-SLG
Case 3:24-cv-00059-SLG    Document 169-2    Filed 10/03/25    Page 6 of 13

result of contracts with PLP—IDC became the single largest employer in the Lake and Peninsula Borough. And in 2013, because of revenue generated from contracts with PLP, INL was able to make an annual disbursement to its shareholders. Due to previously insufficient revenue, INL had never made such a disbursement before in its entire history.

18. These benefits associated with the past exploration, planning, and development of the Pebble mine have been significant. However, they are small in comparison to what INL—and its shareholders—stand to gain should development of the mine continue, and should an operational mine open at the Pebble deposit. This is because in 2019 INL entered a right-of-way agreement with PLP. Under this agreement, INL will provide PLP with access to defined portions of INL's lands for the development of transportation and road infrastructure associated with PLP's mining plan. In return, PLP will make annual toll payments to INL, and pay other fees prior to and during mining operations in the region.

19. The right-of-way agreement also provides "preferential contractor" bidding status for INL. This bidding status will provide even more opportunities for INL and its shareholders, as infrastructure is developed on the right-of-way.

20. All in, the development and planning for the Pebble mine has already brought back hundreds of jobs—many of which have been occupied by

INL's shareholders. And our contracts with PLP have already provided us with over $40,000,000 in direct revenue. We expect even more jobs and revenue should exploration and development of the mine continue.

21. More broadly, INL and its shareholders also expect to benefit from the infrastructure developed for the Pebble mine on INL's land. Indeed, INL anticipates that pipeline, power, and transportation infrastructure developed for the Pebble mine will significantly lower the cost of energy in Iliamna Village and surrounding communities. Due to a lack of infrastructure, energy costs have been historically very high in Iliamna Village, and access to cheaper energy is vital to bringing prosperity to our region.

22. INL and its shareholders recognize that the mine can be developed and operated in a way that respects the environment and their Indigenous culture *and* provides economic opportunities. To that end, INL has worked closely with PLP to ensure that the environment will be protected throughout the mine's development.

23. For PLP to develop a mine at the Pebble deposit, it is necessary, and standard mining practice, to obtain a disposal site for dredged and fill material. It is my understanding that, in 2004, PLP began the process of applying for a Clean Water Act (CWA) section 404 permit from the United States Army Corps of Engineers to use some bodies of water in the SFK and NFK watersheds as disposal sites for dredged and fill material.

24. As steps were taken to obtain a CWA section 404 permit, a complicated series of regulatory and litigation developments occurred, with many changes to the status of PLP's section 404 permit application happening as court and agency decisions were issued, and as presidential administrations came and went.

25. Early in that permitting process, outside activists and interest groups from other regions of Alaska—and even other regions of the United States and the world—began to mount opposition to the mine. These activists urged the United States Environmental Protection Agency to ban the project by exercising its powers under CWA section 404(c) to veto any plans to dispose of dredged and fill material in the area of the Pebble deposit.

26. In 2014, EPA issued a proposed determination under Section 404(c) to restrict PLP from using most waters in the SFK, NFK, and UTC watersheds as disposal sites for dredged and fill material. After litigation, that proposed determination was preliminarily enjoined and, then in 2017, withdrawn by EPA.

27. As these regulatory developments related to the status of PLP's permit were unfolding, INL, IDC, and INL's shareholders nevertheless continued to work closely with PLP. During this time, we continued to contract for and provide logistical and other services as exploration, permitting, and planning of the mine continued.

28. This all came to a definitive halt in 2023, when EPA—after deciding to resume its section 404(c) review process—issued a final determination to preemptively veto any development of a mine at the Pebble deposit.

29. It is my understanding that EPA's 2023 final determination "prohibits" the use of many waters in the NFK and SFK watersheds as disposal sites for discharging dredged and fill material while operating and developing a mine according to PLP's mining plan. I also understand that the final determination prohibits using these same waters as disposal sites in any *future* proposals to develop mines at the Pebble deposit that would have the same level of environmental impact on those waters as PLP's mining plan.

30. I understand that the final determination also "restricts" the use of most waters in the NFK, SFK, *and* UTC watersheds as disposal sites in any future mine proposals if those proposals would have the same level of environmental impact on the NFK, SFK, and UTC watersheds as PLP's mining plan.

31. As a result of that final determination, in April 2024, the Corps formally denied PLP's section 404 permit application on the grounds that EPA's veto prohibited PLP from using those waters in the NFK, SFK, and UTC watersheds.

32. During EPA's section 404(c) review process, EPA was required to consult with Alaska Native Corporations such as INL. On behalf of INL, I submitted written comments to, and attended several meetings with, EPA. I explained INL's concerns that prohibiting the mine would severely impact our local economy and remove a vital source of economic development in a region badly in need of a boost. I also explained how INL has been working with PLP to plan the mine in such a manner as to protect the nearby environment. EPA did not listen.

33. EPA's final determination—and the Corps' subsequent denial of Pebble's section 404 permit application—has been devastating for INL and its shareholders.

34. This is because INL's contracts—including our right-of-way agreement—are contingent upon PLP continuing to develop a mine at the Pebble deposit. If PLP cannot obtain the necessary permits—and continue exploration and development of the mine—we anticipate that the contracts will be terminated.

35. Accordingly, if EPA's final determination remains in effect, INL stands to lose tens of millions of dollars in direct revenue. And its shareholders will further lose the benefits of the infrastructure development, training, and employment opportunities promised by the project.

36. Indeed, since the veto, IDC has sold only minor amounts of fuel to PLP under its fuel contract. Revenue from our previously lucrative camp services contract with PLP has dried up as PLP's camps sit virtually abandoned. And IDC has gone from employing over 200 people at the height of PLP's exploration operations, to now employing just 10 people. Most devastatingly, INL's right-of-way agreement with PLP—which promised to bring decades of economic opportunity and toll revenue to INL—now hangs in the balance.

37. If things continue along their current trajectory, our communities will return to the dire state they were in prior to 2008. The relationship between INL and PLP has been—and continues to be—fundamental to INL's ability to provide for its shareholders. And it continues to be essential to INL's shareholders maintaining their culture, traditions, and way of life. Without the revenue derived from contracts with PLP, many of INL's shareholders will again have no choice but leave their homes and seek employment and a better life elsewhere.

38. However, if EPA's final section 404(c) determination is set aside, PLP will be able to resume exploration, planning, permitting, and development of the mine. And INL will be able to resume its contracts—including its right-of-way agreement—with PLP. In addition to tens of millions of dollars in direct revenue to INL, this will provide hundreds of new jobs, vital transportation

infrastructure, and significant training opportunities for our shareholders. The mine will again breathe new life back into our fragile economy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in __ILIAMNA__, __ALASKA__, on __9/29/25__.

_____
STEVEN REIMERS