KEITH BRADLEY, *pro hac vice*
SCHELEESE GOUDY, *pro hac vice*
717 17th Street, Suite 1825
Denver, CO 80202
T: (303) 830-1776
F: (303) 894-9239
keith.bradley@squirepb.com
scheleese.goudy@squirepb.com

JEFFREY M. WALKER, *pro hac vice*
KATHERINE E. WENNER, *pro hac vice*
2000 Huntington Center
41 South High Street
Columbus, OH 43215
T: (614) 365-2700
F: (614) 365-2499
jeffrey.walker@squirepb.com
katherine.wenner@squirepb.com

SQUIRE PATTON BOGGS (US) LLP

THOMAS P. AMODIO
KEVIN M. BOOTS
500 L Street, Suite 300
Anchorage, AK 99501
T: (907) 222-7100
F: (907) 222-7199
tom@reevesamodio.com
kevin@reevesamodio.com

REEVES AMODIO, LLC

## ORAL ARGUMENT REQUESTED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTHERN DYNASTY MINERALS LTD. and PEBBLE LIMITED PARTNERSHIP,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>Defendants. | Case No. 3:24-cv-00059-SLG<br>and consolidated cases |

## PLP'S CORRECTED OPENING BRIEF

# TABLE OF CONTENTS

Page

I.  Background ........................................................................................................... 3

    A.  PLP developed responsible plans for mining the Deposit. .................. 3

        1.  PLP holds rights to one of the world's largest known undeveloped copper deposits. .......................................................................... 3

        2.  PLP invested over $1 billion developing a responsible, environmentally-sound mining plan. ........................................... 4

        3.  The proposed Pebble mine minimizes environmental impacts.............. 5

    B.  The government acted like Lucy with the football. ................................ 6

        1.  EPA began by obstructing the potential mine. ............................... 7

        2.  EPA and USACE reviewed PLP's application favorably. ...................... 8

        3.  USACE reversed course at the last minute. ............................... 10

        4.  EPA reversed course to issue a Veto. ...................................... 11

        5.  USACE then reversed its ROD in significant part. ........................... 12

        6.  USACE finally denied the Application based on the Veto that was in turn based on the ROD that USACE had remanded. ........................... 12

    C.  PLP challenges the Veto under the Administrative Procedure Act. ................ 13

II.  Legal Standards ............................................................................................... 13

III.  PLP's challenge is properly before the Court. .................................................. 14

IV.  The Veto is unlawful. ....................................................................................... 15

    A.  The Veto contravenes the Statehood Act and the Cook Inlet Exchange Act. 16

    B.  The Veto exceeds the 404(t) limitation on EPA's authority. ............................ 20

    C.  EPA cannot veto a discharge without at least a permit application. ................ 23

V.  EPA ignored economic reality. ......................................................................... 24

    A.  EPA refused to account for the Veto's vast economic costs. ........................... 25

    B.  EPA's supposed weighing of costs and benefits was arbitrary and capricious. ........................................................................................................ 28

    C.  EPA's economic assessment of the mine itself was irrational. ........................ 32

        1.  EPA irrationally regarded the investment as fungible. ........................... 32

        2.  EPA contradicted basic principles of supply and demand. ................... 33

        3.  EPA artificially reduced the impact on U.S. markets by insisting 94% of output would be exported. .................................................... 34

        4.      EPA counted only part of the Plan's employment benefits...................35

VI.    EPA applied the wrong standard..........................................................................36

    A.      EPA treated any amount of non-trivial adverse effect as unacceptable. ..........36

    B.      EPA improperly relied on speculative possibilities...............................39

VII.   EPA contradicted the record about the consequences of lost streams.........................41

    A.      The narrow streams near the mine site cannot alone be the "fishery areas." ..42

    B.      EPA exaggerated the impact by focusing on an arbitrarily small scale. ...........44

    C.      Linear miles are the wrong measure for habitat quantity...................................51

    D.      The "portfolio effect" does not magnify the consequences of the blocked streams. ...................................................................................................52

    E.      Blocking tributaries further upstream with no salmon has no significant effect on fishery areas. ..............................................................................55

    F.      USACE's ROD was equally irrational. ..................................................56

VIII.  EPA rejected detailed modeling about streamflow change in favor of an unsupported rough guess................................................................................................................57

IX.    The Veto depends on a misunderstanding of CWA jurisdiction ..................................60

    A.      An "unacceptable adverse effect" must come from a deposit into WOTUS. .61

    B.      EPA did not assess the effects of discharges into only WOTUS-wetlands. ....62

    C.      The vast majority of wetlands that EPA considered are not actually WOTUS. ..................................................................................................63

X.     EPA's speculations about TSF failure were irrational. ..................................................66

XI.    EPA disregarded compensatory mitigation..................................................................68

XII.   EPA considered factors that are not germane under section 404(c). ...........................70

XIII.  Vacatur is the proper remedy. ......................................................................................73

XIV.  Conclusion ....................................................................................................................73

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife Serv.*,
273 F.3d 1229 (9th Cir. 2001)................................................................................40

*ASARCO, Inc. v. Kadish*,
490 U.S. 605 (1989)................................................................................................19

*Bd. of Miss. Levee Comm'rs v. EPA*,
785 F. Supp. 2d 592 (N.D. Miss. 2011)................................................................69

*Biden v. Nebraska*,
600 U.S. 477 (2020)................................................................................................15

*Bonnichsen v. United States*,
367 F.3d 864 (9th Cir. 2004)................................................................................14

*Bristol Bay Econ. Dev't Corp. v. Hladick*,
454 F. Supp. 3d 892 (D. Alaska 2020).......................................................... 14, 69

*Bus. Roundtable v. SEC*,
647 F.3d 1144 (D.C. Cir. 2011) ..................................................................... 30, 73

*California v. Bernhardt*,
472 F. Supp. 3d 573 (N.D. Cal. 2020) ..................................................................30

*Chem. Mfrs. Ass'n v. EPA*,
28 F.3d 1259 (D.C. Cir. 1994) ..............................................................................50

*Cheneau v. Garland*,
997 F.3d 916 (9th Cir. 2021)................................................................................22

*Chlorine Chem. Council v. EPA*,
206 F.3d 1286 (D.C. Cir. 2000) ............................................................................48

*Cigar Ass'n of Am. v. FDA*,
132 F.4th 535 (D.C. Cir. 2025)............................................................................54

*City and Cnty. of S.F. v. USCIS.*,
408 F. Supp. 3d 1057 (N.D. Cal. 2019) ................................................................71

*City and Cnty. of S.F. v. USCIS*,
981 F.3d 742 (9th Cir. 2020)....................................................... 29, 52, 59

*City of L.A. v. FAA,*
    63 F.4th 835 (9th Cir. 2023)..................................................................67

*Cnty. of L.A. v. Shalala,*
    192 F.3d 1005 (D.C. Cir. 1999) .................................... 52, 710/7/20253

*Comcast Corp. v. FCC,*
    579 F.3d 1 (D.C. Cir. 2009) ...................................................................48

*Creppel v. USACE,*
    No. CIV.A. 77-25, 1988 WL 70103 (E.D. La. June 29, 1988) ...............37

*Ctr. for Biological Diversity v. Zinke,*
    900 F.3d 1053 (9th Cir. 2018)................................................................63

*Dep't of Comm. v. New York,*
    588 U.S. 752 (2019)...............................................................................34

*Elec. Consumers Rsch. Council v. FERC,*
    747 F.2d 1511 (D.C. Cir. 1984) ............................................................53

*Evergreen Shipping Agency (Am.) Corp. v. Fed. Mar. Comm'n,*
    106 F.4th 1113 (D.C. Cir. 2024)...........................................................35

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024)...............................................................................14

*Fuson v. Off. of Navajo and Hopi Indian Relocation,*
    134 F.4th 1010 (9th Cir. 2025) .............................................................50

*Gen. Chem. Corp. v. United States,*
    817 F.2d 844 (D.C. Cir. 1987) ..............................................................52

*Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC,*
    No. 24-10710, 2025 WL 2112517 (11th Cir. July 29, 2025) .................64

*GPA Midstream Ass'n v. DOT,*
    67 F.4th 1188 (D.C. Cir. 2023)....................................................... 28, 29

*Grand Canyon Univ. v. Cardona,*
    121 F.4th 717 (9th Cir. 2024) ...............................................................40

*Greater Yellowstone Coal. v. Servheen,*
    665 F.3d 1015 (9th Cir. 2011)................................................................67

*Hall v. USDA,*
    984 F.3d 825 (9th Cir. 2020) ................................................................38

*Horsehead Res. Dev. Co. v. Browner,*
    16 F.3d 1246 (D.C. Cir. 1994) .............................................................41

*James City Cnty. v. EPA,*
    12 F.3d 1330 (4th Cir. 1993) ...............................................................27

*Jicarilla Apache Nation v. U.S. Dep't of Interior,*
    613 F.3d 1112 (D.C. Cir. 2010) ...........................................................27

*Kaweah Delta Health Care Dist. v. Becerra,*
    123 F.4th 939 (9th Cir. 2024) ..............................................................73

*Kelly v. Comm'r,*
    139 F.4th 854 (9th Cir. 2025) ..............................................................21

*Kinzua Res., LLC v. Or. Dep't of Env't Quality,*
    468 P.3d 410 (Ore. 2020) .....................................................................21

*Lawson v. Suwannee Fruit & S.S. Co.,*
    336 U.S. 198 (1949) .............................................................................21

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) .............................................................................13

*Lotus Vaping Techs., LLC v. FDA,*
    73 F.4th 657 (9th Cir. 2023) ................................................................14

*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.,*
    70 F.4th 582 (D.C. Cir. 2023) .............................................................59

*Michigan v. EPA,*
    576 U.S. 743 (2015) ......................................................................26, 28

*Mingo Logan Coal Co. v. EPA,*
    70 F. Supp. 3d 151 (D.D.C. 2014) ......................................................69

*Mingo Logan Coal Co. v. EPA,*
    829 F.3d 710 (D.C. Cir. 2016) .......................................................26, 69

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1989) ..............................................24, 33, 48, 50, 51, 63

*Nat. Res. Def. Council v. Pritzker,*
    828 F.3d 1125 (9th Cir. 2016) ........................................................................... 44

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
    551 U.S. 644 (2007) ......................................................................................... 18

*Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.,*
    524 F.3d 917 (9th Cir. 2008) ........................................................................... 13

*Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.,*
    947 F. Supp. 2d 1031 (D. Alaska 2013) ........................................................... 35

*NetCoalition v. SEC,*
    615 F.3d 525 (D.C. Cir. 2010) ......................................................................... 34

*Pac. Coast Fed. of Fishermen's Ass'ns v. U.S. Bureau of Reclamation,*
    426 F.3d 1082 (9th Cir. 2005) ......................................................................... 13

*Parola v. Weinberger,*
    848 F.2d 956 (9th Cir. 1988) ........................................................................... 21

*Rapanos v. United States,*
    547 U.S. 715 (2006) ................................................................................... 65, 66

*Rock Creek All. v. U.S. Fish and Wildlife Serv.,*
    663 F.3d 439 (9th Cir. 2011) ........................................................................... 38

*Rodriguez v. United States,*
    480 U.S. 522 (1987) ......................................................................................... 26

*Sackett v. EPA,*
    598 U.S. 651 (2023) ....................................... 17, 18, 43, 62, 63, 64, 65, 66

*Sequoia ForestKeeper v. Benson,*
    108 F. Supp. 3d 917 (E.D. Cal. 2015) ............................................................. 67

*Shoshone-Bannock Tribes of Fort Hall Rsrv. v. U.S. Dep't. of Interior,*
    2025 WL 2424422 (9th Cir. Aug. 22, 2025) .............................................. 17, 18

*Snoqualmie Indian Tribe v. FERC,*
    545 F.3d 1207 (9th Cir. 2008) ......................................................................... 15

*Sovereign Inupiat for a Living Arctic v. BLM,*
    555 F. Supp. 3d 739 (D. Alaska 2021) ............................................................. 69

*Synagogue v. United States,*
    482 F.3d 1058 (9th Cir. 2007) ..................................................37

*Tenn. Valley Auth. v. Hill,*
    437 U.S. 153 (1970) ..................................................................27

*Trout Unlimited v. Pirzadeh,*
    1 F.4th 738 (9th Cir. 2021) ....................................... 14, 68, 69

*U.S. Chamber of Comm. v. SEC,*
    412 F.3d 133 (D.C. Cir. 2005) ................................................28

*Ukiah Valley Med. Ctr. v. FTC,*
    911 F.2d 261 (9th Cir. 1990) ..................................................14

*United States v. Bank of Am. Corp.,*
    753 F.3d 1335 (D.C. Cir. 2014) ..............................................43

*United States v. Todd,*
    627 F.3d 329 (9th Cir. 2010) ..................................................40

*Ursack, Inc. v. Sierra Interagency Black Bear Grp.,*
    639 F.3d 949 (9th Cir. 2011) ..................................................13

*Utility Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) ..................................................................15

*Waterkeeper All. v. EPA,*
    140 F.4th 1193 (9th Cir. 2025) ..............................................62

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ..................................................................15

**Statutes**

5 U.S.C. § 702 ..............................................................................14

5 U.S.C. § 706 ..............................................................................13

33 U.S.C. § 1251 .............................................................. 22, 25, 31

33 U.S.C. § 1311(a) .........................................................................6

33 U.S.C. § 1343 ..........................................................................38

33 U.S.C. § 1344 .................. 6, 7, 20, 21, 22, 23, 26, 36, 43, 55, 61, 70

33 U.S.C. § 1362 ...............................................................................................6, 61

33 U.S.C. § 1370 ......................................................................................................22

42 U.S.C. § 4332(C) ................................................................................................37

43 U.S.C. § 1311(d) .................................................................................................22

Pub. L. 85-508, § 6(i), 72 Stat. 339 .....................................................................3, 16

Pub. L. 93-205, § 7, 87 Stat. 892 ...........................................................................27

Pub. L. 94-204, § 12(b), 89 Stat. 1145 ..................................................................16

**Regulatory Material**

17 C.F.R. § 229.1300 ................................................................................................1

33 C.F.R. part 328 ....................................................................................................64

33 C.F.R. part 332 ......................................................................................................9

40 C.F.R. part 230 ....................................................................................................64

40 C.F.R. § 230.92 ...................................................................................................69

40 C.F.R. § 230.93 .............................................................................................68, 69

40 C.F.R. § 231.1 .....................................................................................................68

40 C.F.R. § 231.2(e) ................................................................................................68

44 Fed. Reg. 58,076 (Oct. 9, 1979).......................................................................28

45 Fed. Reg. 85,336 (Dec. 24, 1980)....................................................................36

80 Fed. Reg. 37,054 (Jun. 29, 2015)......................................................................62

84 Fed. Reg. 56,626 (Oct. 22, 2019)......................................................................62

85 Fed. Reg. 22,250 (Apr. 21, 2020)......................................................................62

88 Fed. Reg. 3,004 (Jan. 18, 2023).........................................................................65

90 Fed. Reg. 13,428 (Mar. 24, 2025)......................................................................62

Alaska Admin. Code title 5, § 67.020(2) ..........................................................39, 47

**Other Authorities**

Eric Schulmiller, *All Your Life, Charlie Brown. All Your Life: The Complete History of Lucy's Pulling the Football Away*, SLATE (Oct. 8, 2014) .................................................. 6

H.R. Rep. No. 92-1465 (1972) ........................................................................................................ 23

Off. Gen. Counsel, *EPA Statutory and Regulatory Authorities Under Which Environmental Justice Issues may be Addressed in Permitting* (Dec. 1, 2000) ................................. 23

*U.S. Army Corps poised to recommend approval of Alaska's Pebble Mine* (July 20, 2020) ........................................................................................................................................ 10

The Pebble Deposit is among the world's largest known undeveloped copper deposits. Its value to the people of Alaska and the United States is unparalleled—nearly 76 billion pounds of copper resources, equivalent to roughly 80% of the U.S. Geological Survey's current reported U.S. reserves.[1] At current metal prices, the Deposit's combined value (copper and other metals) is nearly $800 billion. It offers the potential for thousands of high-paying local jobs, hundreds of millions of dollars in taxes and royalties, and increased American production of minerals critical to the clean-energy transition. But the Environmental Protection Agency ("EPA") dredged up a rarely-used provision in the Clean Water Act ("CWA"), section 404(c), to permanently foreclose mining of the Deposit by vetoing needed permits. The Veto was meant to, and does, block all mining of the Deposit. Plaintiffs ("PLP") spent decades and a billion dollars planning the safest and least impactful mine possible. There is no cleaner way to unlock the Deposit's minerals.

EPA's extraordinary destruction of value—to the public and to PLP—demands an extraordinary justification. EPA provided the opposite. The mine would block two stretches of stream in which 27 salmon have been seen spawning (and additional stretches with no salmon at all). A recreational angler could catch those in five days (though nobody fishes these

---

[1] The Securities and Exchange Commission defines "mineral resources" to mean "a reasonable estimate of mineralization … likely to, in whole or in part, become economically extractable." 17 C.F.R. §229.1300. "Reserves" means "the economically mineable part of a measured or indicated mineral resource, which includes diluting materials and allowances for losses that may occur when the material is mined or extracted." *Id.* The Deposit's measured and indicated resources are 53 billion pounds of recoverable copper (6.46 billion tons at 0.40% copper), and inferred resources are 23 billion pounds (4.45 billion tons at 0.25%). EPA_AR_0487898. This comparison is not meant to equate resources to reserves, but rather to illustrate the relative sizes.

waters). The Bristol Bay salmon population is not at risk. Filling those stretches would not noticeably reduce salmon populations (the coho harvest is over 1,000 times larger); even the 27 salmon would likely spawn a few miles further downstream.

The Veto is unprecedented. It is the first 404(c) veto in Alaska. Covering a region the size of New York City (all five boroughs), it is orders of magnitude larger than any previous veto. The economic loss it imposes is far greater than any before. The disproportion between that loss and the purported environmental value is also greater than ever before.

Despite the significance of the decision, EPA failed to engage with it fairly. EPA somehow concluded that building one of the world's largest copper mines would not have affected copper markets, whereas protecting short stretches of stream sparsely populated with salmon (and additional stretches with none) will meaningfully affect a population over one-million times larger. EPA rejected copious scientific evidence in favor of fear and speculation. That is not what Congress mandated for something as consequential as a 404(c) veto.

PLP asks the Court to vacate the Veto. The first half of the arguments below shows the Veto's massive consequences are unlawful and EPA improperly ignored them. The second half of the brief shows EPA's statement of environmental harms from the PLP's mining plan is arbitrary and capricious, overstated, and unlawfully speculative.

# I. Background

## A. PLP developed responsible plans for mining the Deposit.

### 1. PLP holds rights to one of the world's largest known undeveloped copper deposits.

Alaska obtained certain lands from the United States, some through the statehood process and others in a bargained exchange. Congress specified the State would be able to use such lands for mining, particularly through leasing the mineral rights. Pub. L. 85-508, §6(i), 72 Stat. 339 ("Statehood Act"). In the 1980s, exploratory drilling southwest of Anchorage, and north of Lake Iliamna, revealed a promising bed of copper—the Pebble Deposit. EPA_AR_0091284-0091285.

PLP (through subsidiaries) obtained the mining rights in the early 2000s and undertook further exploration. EPA_AR_0094242. By 2011, the Deposit was realized to be over 10 times larger than earlier estimates. Today, the Deposit contains copper resources equivalent to 80% of federally-reported U.S. copper reserves. EPA_AR_0487898; EPA_AR_0482916. It sits at the headwaters of the North and South Forks of the Koktuli River ("NFK" and "SFK"), and of Upper Talarik Creek ("UTC"). EPA_AR_0082945. The NFK and SFK feed into the Mulchatna River, thus into the Nushagak, and ultimately into Bristol Bay. EPA_AR_0091353. UTC drains into Iliamna Lake, which the Kvichak River drains into Bristol Bay. EPA_AR_0094256. The settlements closest to the Deposit are Iliamna, Newhalen, and Nondalton, each about 17 miles away. EPA_AR_0082971.

The Deposit contains 76 billion pounds of recoverable copper (across all mineralization categories). EPA_AR_0487898. Copper is among the most widely-used metals

on the planet.  EPA_AR_0488506.  The United States, Europe, and China are the primary consumers.  EPA_AR_0488506.  Forecasts show copper consumption doubling (and far outstripping supply) between 2022 and 2035, largely for expanded use of electricity and renewable generation, to reduce carbon-dioxide emissions.  EPA_AR_0486748, EPA_AR_0488506.

In addition to copper, the Deposit also contains 82 million ounces of gold, 4.6 billion pounds of molybdenum; 371 million ounces of silver; and 2.9 million kilograms of rhenium— one of the rarest elements on earth.  EPA_AR_0486748, EPA_AR_0488506-0488507.

These statements are themselves the product of substantial investment in on-the-ground exploration mapping the minerals.  EPA_AR_0094242.  The Deposit may yet be larger than what has thus far been surveyed.

PLP holds mining claims, covering all the known Deposit, under Alaska law; the State owns the land itself.  EPA_AR_0487892.

## 2. PLP invested over $1 billion developing a responsible, environmentally-sound mining plan.

In 2004, PLP commissioned multiple third-party studies of environmental conditions around the Deposit.  EPA_AR_0096547-0126927.  This work, costing almost $200 million, Declaration of John Shively, ¶9 ("Shively Decl."), investigated topics such as hydrology, vegetation, aquatic life, cultures, and more.  EPA_AR_0099218-0099221.  The resulting Environmental Baseline Document (20,000-plus pages) was shared publicly at https://pebbleresearch.com/download/.  PLP did this voluntarily, at its expense, for responsible stewardship of environmental resources at the Deposit.

### 3. The proposed Pebble mine minimizes environmental impacts.

The proposal includes an open pit dug into the Deposit; tailings storage facilities ("TSFs"; "tailings" are the leftovers from separating minerals from ore); a powerplant; water-management facilities; and processing facilities, EPA_AR_0082947, as illustrated below:



EPA_AR_0082949.

As only some examples of the minimal design, PLP would:

- Segregate "pyritic" tailings—potentially acid-generating or metal-leaching materials, EPA_AR_0093776—in a fully-lined facility to be stored in the pit at mine closure, while the vast majority of tailings would be non-toxic materials in a bulk TSF specially designed to prevent failure, EPA_AR_0087359;

- Incorporate leak-detecting and automatic shut-off systems for gas, concentrate, and return water pipes, EPA_AR_0087364; and

- Avoid wetlands to the "maximum extent feasible," EPA_AR_0087359.

These are only a few of the myriad planning choices made, with significant impacts on project economics, to minimize environmental impacts. *E.g.*, EPA_AR_0087356–0087373.

### B. The government acted like Lucy with the football.[2]

The CWA generally restricts "discharges of pollutants." 33 U.S.C. §1311(a). A "discharge of a pollutant" means an "addition of any pollutant to navigable waters." *Id.* §1362(16). "Pollutant" includes "dredged spoil" and "rock." *Id.* §1362(6).

PLP must dig up rock and soil to reach the ores. EPA_AR_0094266. Much of the rock would be used in construction and, after mine closure, in restoration. EPA_AR_0094266; EPA_AR_0094268. But some waste rock and tailings are necessary at any hardrock mine. EPA_AR_0094275-0094276. Those materials must be deposited in areas that include flowing water, in part because sound practice puts the deposits into a U-shaped valley, needing man-made restraints only on two sides. For the area needed for a TSF, in the Alaskan environment there will be a watercourse somewhere.

The U.S. Army Corps of Engineers ("USACE") issues permits for depositing such materials into CWA-regulated waters. 33 U.S.C. §1344(a), (b). EPA can veto a permit if it "determines … the discharge … will have an unacceptable adverse effect on municipal water

---

[2] Eric Schulmiller, *All Your Life, Charlie Brown. All Your Life: The Complete History of Lucy's Pulling the Football Away*, SLATE (Oct. 8, 2014), https://www.slate.com/culture/2014/10/the-history-of-lucys-pulling-the-football-away-from-charlie-brown-in-peanuts.html.

supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." 33 U.S.C. §1344(c).

From 2004 to 2008, PLP met repeatedly with federal and state agencies, including EPA, the U.S. Fish and Wildlife Service ("FWS"), and USACE, in working groups assessing what information would be useful for evaluating potential mining plans, including for 404(a) permitting. Shively Decl. ¶10.

## 1. EPA began by obstructing the potential mine.

Nonetheless, EPA secretly developed a plan, through collusion with extra-governmental mining opponents, to block the mine using section 404(c). EPA_AR_0078494-0078507. Though no agency had seen PLP's actual plans (still only nascent), EPA's regional office internally requested funding for a 404(c) veto. EPA_AR_0078740. EPA then began its own environmental assessment, the Bristol Bay Assessment ("BBA"), based on unrealistic mining scenarios that EPA imagined. EPA later relied on the BBA throughout the Veto. *E.g.*, EPA_AR_0082951, EPA_AR_0083185, EPA_AR_0083191, EPA_AR_0083194.

Alaska and PLP repeatedly objected to the biased and unfair process for developing the BBA. In response, EPA asked outside consultants to review the first draft. These consultants criticized the draft for assessing hypothetical mining operations with no relation to what PLP would eventually propose, and noted EPA failed to consider what PLP might do to reduce or mitigate environmental impacts. EPA_AR_0078510-0078512.

The final BBA made assumptions deviating significantly from what PLP ultimately proposed. For example, EPA concluded mining would release harmful levels of copper into

Bristol Bay, because EPA assumed hazardous substances would leach from tailings with only 50% captured. EPA_AR_0139864. Actually, state regulations require much better, and modern mining technology can achieve those stringent emissions limitations. EPA_AR_0093031 0093034; EPA_AR_0093535; EPA_AR_0095650.

EPA then proposed to veto discharges of waste rock and tailings at the Deposit. EPA still speculated, as PLP had not submitted a plan to any agency. PLP sued EPA over both the BBA and the 2014 Proposal, particularly for its collusion with outsiders, and eventually the parties settled that case. EPA_AR_0139590-0139610.

## 2. EPA and USACE reviewed PLP's application favorably.

Then, after years of work and collaboration with USACE (and with EPA, despite its earlier obstruction), PLP applied for its permit in 2017 ("Application"). EPA_AR_0091279; EPA_AR_0084333-0085266. The Application also proposed a port terminal to transport the mine's output and inbound supplies. EPA_AR_0084349.

USACE issued over 160 requests for information, to which PLP responded diligently and completely. *E.g.*, EPA_AR_0135031–0137734. Meanwhile, in 2019, EPA formally withdrew the 2014 Proposal. Among other reasons, EPA acknowledged that PLP's actual mine plan was quite different from what EPA had anticipated, so that the 2014 Proposal "has effectively grown stale." EPA_AR_0139130.

PLP further revised its proposal in response to feedback, culminating in a 2020 mine plan (the "2020 Plan") representing the smallest operation economically feasible at the Deposit. EPA_AR_0499508-0499599. The 2020 Plan eliminates placing waste rock or tailings in certain areas such as UTC. EPA_AR_0499516. In addition, among other measures,

it forgoes the use of cyanide-extraction for gold (though that would have used closed-loop systems proven at other mines), for the sake of ameliorating even speculative fears about risk, and at the cost of abandoning significant amounts of gold. EPA_AR_0499516. Further, the 2020 Plan would extract only about 10% of the Deposit. Shiveley Decl. ¶14. During the Application review, PLP also described a hypothetical plan that could extract additional amounts. Shiveley Decl. ¶14.

USACE also asked PLP to revise its compensatory mitigation plan ("CMP"). Compensatory mitigation preserves or restores some environmental values to compensate for a project's impacts, and is commonplace in 404(a) permitting. 33 C.F.R. part 332. PLP proposed improvements to water-treatment facilities for communities nearest the mine. EPA_AR_0133745. PLP proposed to remove debris that entangles wildlife on beaches, for 7.4 miles of marine wetlands in Kamishak Bay. EPA_AR_0133724. And PLP proposed to create 8.5 miles of additional salmon-spawning habitat by removing barriers blocking fish from certain watercourses. EPA_AR_0133723-0133724.

USACE carried out a comprehensive environmental analysis under the National Environmental Policy Act. EPA_AR_0088061-0091271. USACE provided a draft environmental impact statement ("DEIS") for public comment, and held dozens of meetings with Alaska Native Groups. EPA_AR_0096392-0096404. EPA, as a cooperating agency, participated in drafting the DEIS. EPA_AR_0088067.

USACE published the final environmental impact statement ("FEIS") in July 2020. EPA_AR_0091272-0096546. Over 5,300 pages long, the FEIS is extraordinarily extensive and comprehensive. The FEIS concluded that additional updates to the Application "further

reduced project impacts." EPA_AR_0091389. The FEIS found the 2020 Plan "is not expected to have a measurable impact on fish populations." EPA_AR_0095946.

Meanwhile, EPA chose not to send a "3(b)" letter. That letter is the notice required by EPA's agreement with USACE before EPA undertakes a 404(c) veto. EPA_AR_141382. Evidently EPA decided, in early 2020, not to pursue the 404(c) process further.

In July 2020, government officials were "poised to give [their] blessing," and approve the permit for the mine.[3]

### 3. USACE reversed course at the last minute.

But a month after the FEIS's positive assessment, USACE asserted a "preliminary finding of significant degradation," and demanded a revised CMP with even more mitigation. EPA_AR_0130430-0130431. So PLP diligently revised its CMP yet again. In a September 2020 meeting about potential changes, USACE staff never suggested the revised CMP was still inadequate. EPA_AR_0129423. In October 2020, PLP received feedback from USACE in a final proposal review. EPA_AR_0129423. That conference "did not raise concerns about the sufficiency of the [CMP]." EPA_AR_0129423. The only flaw identified involved the proposed use of a lease from Alaska for certain lands to be preserved; USACE had concerns that such a lease was not sufficient for site protection. EPA_AR_0129423. USACE also wanted "additional detail … on monitoring, maintenance, and costs/financial assurance." EPA_AR_0129423. PLP's final CMP submission addressed those requests.

---

[3] Yereth Rosen, *U.S. Army Corps poised to recommend approval of Alaska's Pebble Mine* (July 20, 2020), https://www.reuters.com/article/business/environment/us-army-corps-poised-to-recommend-approval-of-alaskas-pebble-mine-idUSKCN24L2UB/.

PLP submitted the revised CMP on November 4, 2020. EPA_AR_0129273. But USACE had already prepared a Record of Decision ("ROD") denying the Application, which it issued just days after PLP filed the revised CMP. EPA_AR_0129273.

In January 2021, PLP appealed the USACE denial, through USACE's ordinary processes. EPA_AR_0129359-0129450. USACE considered that appeal over the ensuing 18 months. At USACE's appeal hearing in July 2022, David Hobbie, Chief of the Alaska Regulatory Division that issued the ROD, testified. Asked by the appeals officer to explain the decision, he repeatedly refused.

### 4. EPA reversed course to issue a Veto.

Shortly before that hearing (while USACE was reviewing PLP's concerns), EPA proposed to veto the 2020 Plan. EPA_AR_0000041-0000044.

EPA published the Veto as a Final Determination in February 2023. EPA_AR_0082927. EPA found the 2020 Plan would cause the loss of 8.5 miles of salmon habitat and 91 miles of streams not used by salmon; the loss of 2,108 acres of wetlands; and certain flow changes in the NFK and SFK. EPA_AR_0082954-0082955. EPA insisted these losses would constitute "significant degradation" under the 404(b)(1) Guidelines and therefore "unacceptable adverse effects" warranting a 404(c) veto, and that PLP's proposals could not mitigate them. EPA_AR_0082954-0082956, EPA_AR_0082962.

The Veto prohibits permits, within a 24.7-square-mile area ("Prohibition Area"), for discharges associated with the 2020 Plan or any comparable mine. EPA_AR_0082957-0082958, EPA_AR_0082961, EPA_AR_0082966-0082969. It also "restricts" discharges, for the 2020 Plan or any comparable mine, across a 309-square-mile

area ("Restriction Area").  EPA's Veto covers not only the 2020 Plan, but any mining of the Deposit that causes any one of the impacts described in the Determination, such as filling any of the wetland areas.  EPA_AR_0082957-0082958, EPA_AR_0082961, EPA_AR_0083172-83175.

### 5. USACE then reversed its ROD in significant part.

Three months after EPA's Veto, USACE decided the ROD contained multiple serious errors that the Alaska District needed to address.  Ex. F.  For example, it was irrational to reject the Application for "damage to fisheries," after the FEIS found there would be no such damage; and USACE concluded PLP's plans would not alter salmon population genetics due to a "portfolio effect."  *Id.* at 65-67.  USACE also found it irrational to invoke TSF failure, after the FEIS found such an event is not reasonably foreseeable.  *Id.* at 62-65.  And USACE noted the District had improperly disparaged the CMP, because the District failed to notify PLP of its concerns with an opportunity to address them.  *Id.* at 27-31.

### 6. USACE finally denied the Application based on the Veto that was in turn based on the ROD that USACE had remanded.

In April 2024, USACE's Alaska District responded to the remand, but did not address the ROD's defects.  Instead, the District stated the Veto forecloses a permit.  Ex. G at 6-7. USACE further denied the Application regarding port facilities, on grounds that without a permit for the mine, those facilities have no utility.  *Id.*

### C. PLP challenges the Veto under the Administrative Procedure Act.

PLP's claims contest the Veto under the Administrative Procedure Act ("APA"), 5 U.S.C. §706. PLP also contests the USACE permit denial. ECF 91, ¶¶169-191. The claims against USACE currently stand in abeyance. ECF 165.

## II. Legal Standards

The Court reviews whether EPA's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927 (9th Cir. 2008). "Although [the court] may not substitute [its] judgment for that of the agency, [the court] must engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it." *Id.* That review "must determine whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Pac. Coast Fed. of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1090 (9th Cir. 2005). "[I]f the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation … that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, the agency action may be overturned as unlawful." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1989)). The Court interprets the applicable statutes *de novo. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

"[T]he arbitrary and capricious standard [also] incorporates the substantial evidence test." *Ursack, Inc. v. Sierra Interagency Black Bear Grp.*, 639 F.3d 949, 958 n.4 (9th Cir. 2011).

That assessment "consider[s] the record as a whole, weighing both the evidence that supports and the evidence that detracts from the [agency]'s decision." *Bonnichsen v. United States*, 367 F.3d 864, 880 n.19 (9th Cir. 2004).

The Court can also take judicial notice of "a fact that ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Lotus Vaping Techs., LLC v. FDA*, 73 F.4th 657, 677 (9th Cir. 2023). *Lotus Vaping*, an APA decision, denied a motion to supplement the record but held that the court could and would take judicial notice of certain materials, including previous decisions by the agency. *Id.*

## III. PLP's challenge is properly before the Court.

PLP's claims arise under federal law, namely the APA; and 5 U.S.C. §702 waives EPA's sovereign immunity. The Court's jurisdiction depends also on PLP's standing, and on there being a final agency action, *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 266 (9th Cir. 1990) (holding final action requirement to be jurisdictional).

PLP's standing arises from its concrete plans to mine the Deposit, pursuant to its mining rights, which EPA's Veto restricts. Shively Decl. ¶¶12-16. "Government regulations ... forbid[ding] some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024).

EPA admits the Veto is final action, ECF 109, ¶84, and correctly so. *See Bristol Bay Econ. Dev't Corp. v. Hladick*, 454 F. Supp. 3d 892, 907 n.126 (D. Alaska 2020), *rev'd on other grounds*, *Trout Unlimited v. Pirzadeh*, 1 F.4th 738 (9th Cir. 2021) (noting issuance of a veto is reviewable).

PLP is a "person aggrieved" by the Veto. "[T]he applicant … holds an evident interest," placing it within the "zone of interests" under the CWA. *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1217 (9th Cir. 2008). And PLP exhausted available administrative processes, by commenting in objection to the proposed veto. EPA_AR_0078356-0079031; EPA_AR_0082908-0082910; ECF 109, ¶89 (admission responding to ECF 91).

PLP adopts and incorporates by reference the arguments made by its fellow plaintiffs in their briefs being submitted today.

## IV. The Veto is unlawful.

The Supreme Court, reviewing an action affecting $430-billion-worth of student loans, found that "staggering" impact to be "ten times the 'economic impact' … trigger[ing] analysis under the major questions doctrine." *Biden v. Nebraska*, 600 U.S. 477, 502-03 (2020). The Veto locks away nearly $800-billion-worth of minerals, including vast amounts of America's copper reserves needed for the clean-energy transition. EPA's assertion of sweeping authority to veto any discharges, for any geographic scope of any size, without regard to economic consequences, turns section 404(c) into an unheralded superintending authority over "a significant portion of the American economy," *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). The Court must "hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 700 (2022).

In fact, the Veto is straightforwardly unlawful—beyond clear limits on EPA's authority, with flimsy and pretextual reasoning contrary to the record.

## A. The Veto contravenes the Statehood Act and the Cook Inlet Exchange Act.

The Deposit sits on land conveyed to Alaska under the Statehood Act.[4]  Part also lies on land conveyed in a bargained exchange among Alaska, the United States, and a Native corporation, the Cook Inlet Land Exchange, embodied in statute, Pub. L. 94-204, §12(b), 89 Stat. 1145 ("Exchange Act").  The Exchange Act lands are "regarded for all purposes as if conveyed … pursuant to section 6 of the Alaska Statehood Act."  Exchange Act §12(d)(1).  Subsection 6(i) of the Statehood Act, in turns, mandates that the minerals contained in lands conveyed under section 6 be available for mining; indeed, if the State alienated the land or minerals contrary to that mandate, they would be forfeit to the United States.  Statehood Act §6(i).  Whatever else EPA might do with 404(c) authority, it cannot bar fulfillment of the mandate placed on this land.

When Alaska joined the Union, it had virtually no land of its own.  To facilitate the State's economy, Congress established a unique mechanism for Alaska to choose land (up to a specified quantity).  Statehood Act, §6(a).  "All grants … shall include mineral deposits." *Id.* §6(i).  And Congress required a "reservation to the State of all the minerals in the lands … together with the right to prospect for, mine, and remove the same."  *Id.*

The CWA did not implicitly repeal those conditions.  The Veto, which prohibits Alaska and the rights-holder from doing exactly what Congress mandated should be done, is therefore unlawful.  General federal authorities do not implicitly repeal prior specific conferrals like the

---

[4] The Deposit is in township S3SR35W.  EPA_AR_0083170.  This land was conveyed "pursuant to Section 6(b) of the Alaska Statehood Act."  Ex. C.

Statehood Act. For example, *Shoshone-Bannock Tribes of Fort Hall Reservation v. United States Department of Interior* addressed the government's use of the general 1976 Federal Land Policy and Management Act ("FLPMA") in a manner that contravened limitations in a 1900 land conveyance statute. No. 23-35543, 2025 WL 2424422 (9th Cir. Aug. 22, 2025). "FLPMA establishes 'uniform procedures' for the disposal of public lands, … cover[ing] 'any land … owned by the United States … without regard to how the United States acquired ownership." *Id.* at *3 (quoting FLPMA). So the government contended it could dispose of the subject land under FLPMA, without regard to the 1900 restrictions. Not so, the Ninth Circuit held, because "repeals by implication are not favored" and "a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." *Id.* at *7, *9.

The Statehood Act empowers Alaska to make use of these minerals by making exploration and extraction rights available—rights that are empty and useless if the government can prohibit the mining. The point of the conveyance was for Alaska to make economic use of the lands. The CWA—a more "generalized" statute—manifests no intention to alter that "narrow, precise, and specific" Statehood Act mandate. Indeed, the Veto operates at the very edge of (indeed beyond, *see* Sec.IV.B) CWA authority. "Congress was focused on its traditional jurisdiction over waters that were or had been navigable," *Sackett v. EPA*, 598 U.S. 651, 672 (2023); while it extended the CWA to "relatively permanent bod[ies] of water connected to traditional interstate navigable waters," *id.* at 678, the CWA "principally refers to bodies of navigable water like rivers, lakes, and oceans," *id.* at 672.

Nor is there any reason to think the CWA implicitly repealed the Statehood Act's use mandates. To the contrary, "the CWA expressly 'protect[s] the primary responsibilities and rights of State' … 'to plan the development and use … of land and water resources.'" *Id.* at 674 (quoting 33 U.S.C. §1251(b)). In truth, the two statutes can co-exist, just as FLPMA did not have to conflict with the 1900 land-transfer statute in *Shoshone-Bannock*. The conflict arises from a federal agency's use of the more general statute to defeat the earlier mandate. Even if section 404(c) theoretically allowed something like the Veto—discharges "can sweep broadly enough to criminalize mundane activities like moving dirt," *Sackett*, 598 U.S. at 669— the Court should not "read[] it for all that it might be worth" when that "runs foursquare into our presumption against implied repeals," *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 664 (2007).

That presumption is even stronger for land conveyed under the Exchange Act. Alaska received the opportunity to select valuable mineral lands including some around the Deposit. All parties understood Alaska's goal in the Exchange was to receive land for its most productive economic purpose, EPA_AR_0015369, and that such use would likely include extraction of mineral resources. EPA_AR_0015369. Indeed, as early as 1984, Alaska designated the land near the Deposit for mineral extraction. EPA_AR_00475620, EPA_AR_00475724; see also EPA_AR_0015369 0015371 (discussing the Bristol Bay Area Plan). In return, the United States freed up land for conservation as Lake Clark National Park—which exists and is inviolable. Having received that benefit, the government is blocking Alaska from enjoying its fruit from the bargain. "Congress could not … grant lands to a State on certain specific conditions and then later, after the conditions had been met and the lands

vested, succeed in upsetting settled expectations through a belated effort to render those conditions more onerous." *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 632 (1989). Neither can EPA do such a thing through an excessive assertion of authority under a general statute in which Congress did not even purport to upset the State's expectations.

The Veto definitely does foreclose any mining of the Deposit. PLP designed a mine with minimal surface footprint, approximately 8,390 acres, which USACE found was the least environmentally damaging possibility. EPA_AR_0091314; EPA_AR_0128966. EPA made the Restriction Area 23 times larger—covering "the broadest possible area where mining activity could occur at the Pebble Deposit," in order, PLP observed, "to preclude such an operation." EPA_AR_0078414. PLP also went to the limits of technology in designing the mine to limit environmental impact. Repeatedly PLP accepted costs and reduced mineral recoveries for that impact-minimizing purpose, resulting in a plan affecting significantly less than 1% of local streams and wetlands. EPA_AR_0257064. Yet EPA found even these bare-minimum impacts "unacceptable." No mine could meet EPA's demands; EPA targeted "the minimum level of impacts that could be involved with the smallest possible Pebble mine operation." EPA_AR_0257015 0256016.

Furthermore, EPA stressed that any "operation of a mine at the Pebble deposit anywhere in the SFK, NFK, and UTC watersheds" with any one of the described losses is disallowed. EPA_AR_0082956. And EPA defined "loss" incurring the prohibitions as dewatering and fragmentation—not just actual destruction. EPA_AR_0083069. EPA thereby ensured that any mine at the Deposit will generate at least some of the "losses" as EPA

described them; the Veto is "so broad as to make the restrictions completely impossible to meet," EPA_AR_0257021.

PLP and Alaska told EPA the proposed Veto would block all mining of the Deposit. EPA_AR_0083590; EPA_AR_0078414. EPA insisted it was only issuing a Veto, not a "federal land use action," and that was not addressing "discharges associated with mining the Pebble deposit that EPA did not evaluate." EPA_AR_0083597. But it could not contest the reality that its Veto does prevent mining; and indeed, EPA reiterated the breadth of its prohibitions and emphasized they apply to "future proposals … to develop the Pebble deposit," EPA_AR_0082957.

### B.    The Veto exceeds the 404(t) limitation on EPA's authority.

The Veto also transgresses the CWA directly. It prohibits discharges that Alaska would likely allow into waters squarely within the State's authority. Subsection 404(t) prohibits such action: "Nothing in this section shall preclude or deny the right of any State … to control the discharge of dredged or fill material in any portion of the navigable waters within the jurisdiction of such State." 33 U.S.C. §1344(t). The Veto would do exactly what subsection (t) forbids, by precluding Alaska from controlling the discharge of dredged material within Alaska's jurisdictional waters.

That the Veto prohibits the discharges is clear; it does so explicitly. EPA_AR_0082957-0082961; EPA_AR_0083166-0083178. That Alaska would likely allow those discharges is also clear. Alaska has repeatedly expressed its desire to see the Deposit mined, and state agencies engaged constructively with PLP on permitting. EPA_AR_0476983-0477001 (listing state permits and approvals thus far);

EPA_AR_0082174-0082176 (State's comment that the Pebble mine "would generate billions in state revenue" and "thousands" of jobs).

Allowing a particular discharge is surely an aspect of "control" that subsection (t) protects. "We interpret an undefined statutory term pursuant to its ordinary meaning." *Kelly v. Comm'r*, 139 F.4th 854, 857 (9th Cir. 2025). "Control" ordinarily means "to exercise authority over; direct; command." *Control*, COLLINS ONLINE ENGLISH DICTIONARY, http://www.collinsdictionary.com/us/dictionary/english/control. To "control" discharges must mean deciding whether they will be allowed, and under what circumstances. *Cf. Kinzua Res., LLC v. Or. Dep't of Env't Quality*, 468 P.3d 410, 416 (Ore. 2020) ("controlling" a landfill includes "'exercising power over' and 'having power over'").

"Control" is not simply a negative power to prevent a discharge. By analogy, it is often said "[s]tatutory definitions control the meaning of statutory words." *Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949). That mantra means not just that a definition limits or restricts meaning; the definition simply tells you the meaning. About a statute requiring federal compliance with local laws "respecting control and abatement of solid waste," the Ninth Circuit held "the 'usual meaning' of the words 'control' and 'abatement' is sufficiently broad to include 'collection.'" *Parola v. Weinberger*, 848 F.2d 956, 961 (9th Cir. 1988). So the government had to follow local law exclusively franchising a particular waste-collection firm. Section 404(t) similarly requires federal agencies to comply with state requirements "to control the discharge of dredged or fill material." 33 U.S.C. §1344(t). If a State mandated an exclusive discharge contractor, under *Parola* this rule would qualify as "control." "Control" encompasses the authority to direct where the waste or discharge goes.

The CWA separately protects state "limitation[s] respecting discharges of pollutants" and laws "respecting control or abatement of pollution." 33 U.S.C. §1370. "Control" must be different from "abatement" or "limitation"; otherwise this provision would not have referred to both. Also, in light of this provision, "control" in subsection 404(t) must mean something more than limiting discharges, or that clause in subsection 404(t) would be superfluous. "[A] statute ought … to be so construed that … no clause, sentence, or word shall be superfluous, void, or insignificant." *Cheneau v. Garland*, 997 F.3d 916, 921 (9th Cir. 2021) (citation omitted).

Furthermore, Congress's policy in the CWA was "to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution" *and* "to plan the development and use … of land and water resources." 33 U.S.C. §1251(b). Congress wanted States to continue both—reducing pollution and planning *use* of resources, including land resources. Interpreting subsection 404(t) to preserve only the ability to limit discharges would disrespect Congress's second purpose.

The waters near the Deposit are easily "within the jurisdiction of such State," 33 U.S.C. §1344(t). The entirety of the Prohibition Area is literally owned by Alaska. SUMF ¶¶117-122. The government reserves authority over navigation, 43 U.S.C. §1311(d); but per USACE, the streams at the mine site are nowhere close to traditionally navigable waters. SUMF ¶¶14-17. The Restriction Area is over 100 miles upstream from the Mulchatna's confluence with the Nushagak River. *Compare* EPA_AR_0094676-0094676 *with* EPA_AR_0082961. Neither the NFK nor the SFK has been found traditionally navigable. Nor has UTC. EPA_AR_009467; SUMF ¶¶14-17. Subsection 404(t) clearly contemplates there are CWA waters that are "within

the jurisdiction of" a State; otherwise the provision is meaningless. If such waters exist anywhere, the waters near the Deposit must be among them.

In short, subsection 404(t) preserves for Alaska the power to allow discharges into the waters at the proposed Pebble mine. The Veto bans those discharges, even though Alaska likely would permit them, and thus contravenes subsection 404(t).

### C. EPA cannot veto a discharge without at least a permit application.

Furthermore, section 404(c) does not authorize free-range rules banning future activities not yet even conceived. The Veto breaches that limitation by covering all future hypothetical mines. Highlighting that function, the Veto instructed future potential mine operators to seek EPA's feedback on whether their projects have the prohibited effects. EPA_AR_0083178.

Section 404(c) expresses that limitation by allowing EPA only to "prohibit the specification" or to "restrict the use of any defined area for specification." 33 U.S.C. §1344(c). Thus, the target of a 404(c) veto is the act of "specification," which under the CWA means the permitting process that fixes the site for a discharge. *Id.* §1344(b). There is no "specification" without a permit or a permit application to begin with. A "veto"—which is how EPA and congressional committee have characterized 404(c) action[5]—is "an order prohibiting some proposed or intended act." *Veto*, COLLINS ONLINE ENGLISH DICTIONARY,

---

[5] Off. Gen. Counsel, *EPA Statutory and Regulatory Authorities Under Which Environmental Justice Issues may be Addressed in Permitting* (Dec. 1, 2000), 2000 WL 35809995, *7 (discussing 404(c) "veto authority"); H.R. Rep. No. 92-1465, p.140 (1972) ("[T]he Administrator may *veto* the issuance of a[] proposed permit.").

http://www.collinsdictionary.com/us/dictionary/english/veto. The "act" in question for a section 404(c) is the "specification."

## V.    EPA ignored economic reality.

The Veto condemns Alaska and the United States to leave forever in the ground one of the planet's largest and most economically and strategically important mineral deposits. Vast amounts of American copper, rhenium, molybdenum, silver, and gold are now off-limits. Copper has no substitute for myriad crucial functions, particularly in electric motors and electricity generation. EPA_AR_0083483, EPA_AR_0083499, EPA_AR_0083501, EPA_AR_0084236, EPA_AR_0084252-0084253. Mining the Deposit means billions of dollars of economic activity, now lost. EPA_AR_0141362. EPA refused to face honestly what its Veto has cost the country.

That cost is breathtaking. But EPA insists section 404(c) is the unusual statute that "does not require a balancing of environmental benefits against non-environmental costs." EPA_AR_0083165. That interpretation is contrary to section 404(c), so EPA's refusal to weigh the enormous cost was a failure to consider an "important aspect of the problem," *State Farm*, 463 U.S. at 43. Further, although EPA prepared a putative, ancillary assessment of costs, that assessment was itself arbitrary; EPA astonishingly concluded a mine producing 0.5% of *world* copper demand would have a minor and uncertain economic impact. And that ancillary document is not an adequate rationale anyway; because EPA did not weigh even the economic consequences it acknowledged against the speculative environmental harms it discussed—just as it promised it would not. Indeed, EPA added a heavy thumb on the scale for "further[ing] [EPA's] environmental role under Section 404(c) and more broadly the overall purpose of the

CWA." EPA_AR_0084160. An analysis in which EPA's policy preference itself counts as a "benefit" is not a real cost-benefit balancing.[6]

## A. EPA refused to account for the Veto's vast economic costs.

The need to consider the consequences, in terms of the benefits foregone by prohibiting a discharge, is built into the phrase "unacceptable adverse effect." The qualifier "unacceptable" shows that not every adverse effect justifies a veto. Had Congress meant EPA can veto for any "adverse effect," it would not have included the additional word.

It stands out, too, that Congress did not set the threshold at "significant," "material," "substantial," or any other such word that might sometimes measure the magnitude of an effect on its own. Instead, Congress asked whether a given adverse effect is "unacceptable." Distinguishing between an *acceptable* adverse effect and an *unacceptable* adverse effect necessarily requires considering the benefit expected from the discharge—and the concomitant cost from banning it. After all, no adverse effect could possibly be acceptable were there nothing to gain by suffering it. None would call it acceptable to destroy a single salmon gratuitously, for no purpose or benefit. To say one impact is acceptable and another is unacceptable means concluding the benefits of the proposed discharges are not great enough to warrant the potential adverse effect. The benefit to be obtained from a project might justify a given environmental impact, and the effects that are tolerable would be greater for a greater benefit. Congress clearly adopted that principle by using the modifier "unacceptable."

---

[6] EPA also ignored another explicit purpose of the CWA—allowing States to control land use. 33 U.S.C. §1251(b).

EPA's contrary position produces absurd results. Section 404(c) asks about adverse effects not just on municipal water supplies and fisheries, but also on "recreational areas." 33 U.S.C. §1344(c). Congress could not possibly have thought recreational areas must be preserved no matter what, given that "no legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 524-25 (1987). The complete destruction of, say, a small park might well be warranted for the sake of excavating a unique and irreplaceable archaeological site. By contrast, for EPA such a total loss is unacceptable because it is "one that the [resource] cannot afford." EPA_AR_0083165. EPA could in principle deem it unacceptable to turn over a single stone if there were a pot of gold under it. That hypothetical is not too far from what happened here: Streams in which 27 salmon spawn must be preserved at the cost of nearly $800 billion in minerals.

That Congress conveyed an obligation to consider costs by using words other than cost is not novel or surprising. It is quite normal. *Michigan v. EPA* held the phrase "appropriate and necessary" "naturally and traditionally includes consideration of all the relevant factors" and "requires at least some attention to cost." 576 U.S. 743, 752 (2015). "One would not say that it is even rational, never mind 'appropriate,' to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits." *Id.* If it is not "rational" to do so, surely it is not "acceptable" either. The D.C. Circuit has said EPA should consider the costs of its 404(c) vetoes; "an agency should generally weigh the costs of its action against its benefits." *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 723 (D.C. Cir. 2016).

EPA actually acknowledges it must consider negative consequences from its vetoes, but only the environmental ones. EPA_AR_0083165. That limitation has no textual basis; if

"unacceptable" makes some types of consequences pertinent, nothing about the word suggests only the environmental consequences count.

And EPA has not been consistent on this very point; sometimes it actually has taken account of economic consequences. Indeed multiple veto decisions have assessed whether a given project has alternatives available. Exs. J, K; L; EPA_AR_0084202.[7] That assessment is an evaluation of the consequences of a veto. EPA handled this case differently, for no apparent reason. Indeed, there is no alternative for extracting the Pebble minerals. That EPA failed to consider that reality, in departure from its past practice, is another way the Veto was arbitrary and capricious. EPA_AR_0083586-0083587 (EPA's response to comments, ignoring this objection). "[R]easoned decisionmaking … necessarily requires the agency to … provide an explanation for its departure from established precedent." *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010). Flouting that obligation, EPA insisted its "discretion is unconstrained by EPA's prior action" in past 404(c) matters. EPA_AR_0083494.

Congress knows how to exclude cost considerations. The Endangered Species Act ("ESA"), a year after the CWA, barred federal actions "jeopardiz[ing] the continued existence of such endangered species" or "result[ing] in the destruction or modification of habitat of such species." Pub. L. 93-205, §7, 87 Stat. 892. Such absolute language prohibited the proscribed effects even at "the sacrifice of the anticipated benefits." *Tenn. Valley Auth. v. Hill*,

---

[7] *James City County v. EPA*, 12 F.3d 1330 (4th Cir. 1993), is not informative. The plaintiff did not "seriously contest" EPA's interpretation, *id.* at 1335, and the court accordingly did not address arguments like PLP's. The case also long predates *Michigan*.

437 U.S. 153, 173 (1970). It is implausible—and, again, contrary to *Michigan*—to think Congress coyly used "unacceptable adverse effects" to have the same consequence.

EPA maintains that because other CWA provisions mention cost, its absence from section 404(c) is significant. 44 Fed. Reg. 58,076, at 58,078. *Michigan*, rejecting just that "interpretive gerrymander[]," held it "unreasonable to infer that, by expressly making cost relevant to other decisions, [a statute] implicitly makes cost irrelevant" elsewhere. 576 U.S. at 754-55. The modifier "unacceptable" appears nowhere else in the CWA, so observations about differences in language cannot show this phrase strips out economic consequences as a consideration.

**B.    EPA's supposed weighing of costs and benefits was arbitrary and capricious.**

In ancillary documents, EPA_AR_0084182, EPA_AR_0141296, EPA purported to weigh the Veto's costs and benefits. That assessment was irrationally skewed and inconsistent.

EPA started by erroneously asserting it need not quantify the Veto's economic effects. EPA_AR_0084184. To the contrary, "a reasoned decision would explain why any unquantified benefits *cannot* reasonably be quantified." *GPA Midstream Ass'n v. DOT*, 67 F.4th 1188, 1200 (D.C. Cir. 2023) (emphasis added); *see also U.S. Chamber of Comm. v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005) (even when quantification is "difficult[]," agency must at least estimate a "range"). In *City and County of San Francisco v. USCIS*, the agency "made no attempt to quantify the financial costs" of its rule, and simply said they are "difficult to predict." 981 F.3d 742, 759 (9th Cir. 2020). The Ninth Circuit held that "fell short of the standard

established by the Supreme Court," because "an agency may not, without analysis, cite even 'substantial uncertainty' … as a justification." *Id.* at 759-60.

That refusal to quantify was central to EPA's supposed balancing. EPA said "the main disadvantages of its action are that some economic activities related to developing the Pebble deposit … may not occur," such as "valuable minerals [that] would have been extracted." EPA_AR_0084195-0084196. EPA declined to place a number on that economic value and acknowledged only a hypothetical consequence: "If the minerals … were to constitute an important source of copper," losing them "could be a significant disadvantage." EPA_AR_0084193-0084194. Meanwhile, EPA counted as a benefit of its Veto the $2.2-billion revenue of the entire Bristol Bay salmon fishery. EPA_AR_0084190. EPA also counted, on its side, the whole Bristol Bay "recreational or sport fisheries." EPA_AR_0084190. EPA said those are "economically significant," but it refused to quantify them and said instead "it is difficult to directly, quantitatively compare" that value against the Pebble minerals. (In fact, the FEIS had provided numbers: The sport fishery is worth about $66 million annually, and recreational fishing generates under $300,000. EPA_AR_0094588-0094589.) This is exactly the error that *San Francisco* criticized; simply claiming "difficult[y]" is no excuse for not quantifying an economic value. EPA purported to weigh fisheries markets against minerals. "Without quantified benefits to compare against costs, it is not apparent just how [an] agency went about weighing the benefits against the costs." *GPA Midstream*, 67 F.4th at 1200.

EPA's assessment was also irrationally one-sided. The 2020 Plan's asserted adverse effects are the loss of certain headwaters reaches. The FEIS expressly found the 2020 Plan

would cause no measurable decrease in salmon populations, EPA_AR_0095946; and EPA made no contrary finding (nor could it have, on this record). USACE itself recognized its ROD was arbitrary and capricious to the extent it depended on the notion of harm to Bristol Bay fisheries. Ex. F. And even if the mine reduced fish populations (contrary to the record), nothing in the record suggests it would destroy the fisheries *in their entirety*. Yet EPA counted, in its favor, the whole Bristol Bay fisheries—commercial and (unquantified) recreational. "[T]his type of reasoning, which fails to view a cost at the margin, is illogical, and, in an economic analysis, unacceptable." *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1151 (D.C. Cir. 2011). Meanwhile, the Veto undisputedly blocks the 2020 Plan, thus fully foreclosing that economic activity and the value of adding copper (and other minerals) to the market. The Veto also blocks any future expansion—and thus the use of the rest of the minerals, totaling nearly $800 billion-worth. These are direct and absolute consequences of the Veto, but EPA treated even the value of the initial Plan as only a possible, not a definite cost, and ignored the rest. Highlighting the inconsistency, EPA assessed environmental impact from potential expansion, EPA_AR_0083181-0083184, without counting the foreclosed expansion as a cost of the Veto. "It is arbitrary for an agency to quantify an action's benefits while ignoring its costs where tools exist to calculate those costs." *California v. Bernhardt*, 472 F. Supp. 3d 573, 623 (N.D. Cal. 2020).

An agency cannot "inconsistently and opportunistically frame[] the costs and benefits." *Bus. Roundtable*, 647 F.3d at 1148-49. For example, *Business Roundtable* found it arbitrary and capricious that an agency "anticipated frequent use" of its new rule "when estimating benefits," but "assumed infrequent use when estimating costs." *Id.* at 1154. Similarly, here,

for benefits EPA assumed worst-case scenarios for mining, going beyond anything the record supports,[8] to the hyperbolic degree of destroying the Bristol Bay fishery; but for costs it minimized the real and direct loss of mineral resources.

EPA downplayed the Deposit's value yet further by asserting it counts less, for 404(c) purposes, to the extent it accrues nationwide. EPA_AR_0084195. There is deep irony in a federal agency's countermanding the preferences of the State and nearby communities on grounds that national benefits are less important than supposed local harms. Congress's policy was to preserve State authority, not override it. 33 U.S.C. §1251(b). And section 404(c) gives no basis for discounting nationwide benefits. The CWA is a "national policy," *id.* §1251(a), so the balancing of harms and benefits from a veto should surely be nationwide.

Besides, EPA actually did count nationwide benefits of the Veto; its preference for only local impacts was, like so much else in the Veto, one-sided for EPA's rhetorical convenience. For example, EPA did not assess how much of the value of Bristol Bay salmon, and the "world-class" sport fisheries, accrues locally instead of nationally. Per a 2010 study, 83% of the Bristol Bay salmon catch is exported to other countries. EPA_AR_0023747-0023748. And "about four-fifths of the economic impacts" from Bristol Bay commercial fishing "occur[s] outside Alaska." EPA_AR_0023752. Yet EPA counted all that value in the Veto's favor. By contrast, EPA contemplated the impacts of Pebble copper on U.S. markets, ignoring the value of exports, EPA_AR_0084193-0084194; and devalued the

---

[8] EPA also counted, as a benefit, avoiding a TSF failure. As discussed below, any weight given to that risk is arbitrary and capricious, because the record shows such a failure is not reasonably foreseeable. USACE itself recognized that treating a failure as a realistic possibility is arbitrary and capricious. *See infra* Sec.X.

other economic benefits from mining because they occur nationwide, EPA_AR_0084195. EPA also counted the Veto's "non-use benefits" to Americans across the country, in that "individuals might place significant value on the fact that the Bristol Bay headwaters would continue to exist in a state undisturbed"; "even small non-use values held by a large number of households could be substantial in the aggregate." EPA_AR_0084192. EPA did not discuss what value households would place on knowing the country is making best efforts to mitigate copper shortages to facilitate the clean-energy transition.

### C. EPA's economic assessment of the mine itself was irrational.

Contributing to EPA's minimizing of the Deposit's value was an analysis of the mine's economics that defied common-sense economic logic. Simply put, even the 2020 Plan, which is the smallest economically feasible, would fill, by itself, 0.5% of world demand. EPA_AR_0141366. That proportion of the U.S. population is bigger than Phoenix; that proportion of Alaska is bigger than Fairbanks.[9] Nobody would suggest removing Phoenix or Fairbanks has minor or uncertain economic consequences. An analysis reaching that conclusion about a mine of such scale is highly suspect.

### 1. EPA irrationally regarded the investment as fungible.

EPA's theory for discounting the economic activity was that, absent a Pebble mine, "at least some portion of the[] resources [dedicated to the mining] would … be used for other

---

[9]  *See* U.S. Census Bureau, Phoenix City, Arizona, available at https://data.census.gov/profile/Phoenix_city,_Arizona?g=160XX00US0455000 (population of Phoenix is 1,608,139, approximately .48% of total U.S. population); *id.*, Fairbanks City, Alaska, available at https://data.census.gov/profile/Fairbanks_city,_Alaska?g=160XX00US0 224230.

productive business endeavors." EPA_AR_0141305. It makes no sense that investors, mining engineers, and mining equipment would pivot to something else, much less "construction of housing and apartments at an alternative location" as EPA imagined, EPA_AR_0141305. Basic economics teaches that investors and contractors are already building housing to the extent that is an attractive investment. Destroying one economic opportunity (mining the Deposit) does not make other, unrelated investments in Alaska more profitable, and suppressing this form of economic activity in Alaska will not drive investors to Anchorage. EPA's theory is so implausible it "could not be ascribed to a difference in view or the product of agency expertise," *State Farm*, 463 U.S. at 43. Manifestly, economics of this sort is not EPA's expertise.

### 2. EPA contradicted basic principles of supply and demand.

Copper demand is surging, in large part because of the clean energy transition. EPA_AR_0486748. Meanwhile supply is finite and constrained. Consequently, in 2021 copper prices had increased 50% year-on-year. EPA_AR_0482916. Prices are forecasted to rise to $15,000 by 2030. EPA_AR_0141365. The 2020 Plan would produce roughly **0.5%** of world production, EPA_AR_0141366—a staggering amount for a single mine, and one using only one tenth of its resources—yet EPA concluded that output would "negligibl[y]" impact copper prices. EPA_AR_0141365.

EPA relied on two studies that it mischaracterized. EPA_AR_0141365. Those studies, *What Drives Commodity Price Booms and Busts?* and *150 Years of Boom and Bust*, discussed shocks, meaning (on the supply side) "disruption[s] in the physical production of the respective commodity" or other "unexpected changes in inventories." EPA_AR_0486889;

EPA_AR_0496630-0496631 (similar). A decades-long mining project is obviously not such a disruption or unexpected change. From these papers about short-term shocks, EPA must have inferred that a long-term supply increase would not influence prices. EPA_AR_0141365. EPA gave no explanation why that inference would be rational. Courts do not "defer to the agency's conclusory or unsupported suppositions." *NetCoalition v. SEC*, 615 F.3d 525, 539 (D.C. Cir. 2010). And it makes no sense that adding a substantial amount of supply, over decades, would have no market impact. The Court's "review is deferential, but [it is] not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Comm. v. New York*, 588 U.S. 752, 785 (2019).

### 3. EPA artificially reduced the impact on U.S. markets by insisting 94% of output would be exported.

EPA further evaded reality by using misleading tables, mischaracterizing the impact on U.S. markets. EPA theorized Pebble would fulfill only 0.3% of U.S. copper demand based on proportions of global demand and "assuming that the same proportion … would be supplied to meet global and U.S. demand respectively." EPA_AR_0141366 n.5. But the numbers do not match. If the mine produces 0.16 million tonnes of copper, that represents 0.56% of the lower end of EPA's stated demand projections for 2030, and 0.4% of the higher end. EPA_AR_0141366. EPA purportedly assumed PLP's output would serve U.S. markets in proportion to the U.S. share of world demand. EPA_AR_0141366. But actually EPA used forecasted U.S. demand that is 10% of world demand, and assumed PLP would supply only 5.7%, the *current* U.S. share. EPA_AR_141366 n.76. EPA's unexplained mixing of time periods defies logic, and the reality is simple: If PLP supplies U.S. demand proportionally, it

must fill 0.4% to 0.6% of U.S. demand just as it is forecast to do for world demand. "Significant mathematical errors can render an agency decision arbitrary and capricious." *Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F. Supp. 2d 1031, 1056 (D. Alaska 2013).

Moreover, these numbers include only the initial mine proposal. As noted above, EPA counted the environmental impacts of a possible expansion. EPA_AR_0083181-0083184. The Veto forecloses any expanded mine too, but EPA failed to account for that consequence. "[L]ogical inconsistency" can "render[] [a decision] arbitrary and capricious." *Evergreen Shipping Agency (Am.) Corp. v. Fed. Mar. Comm'n*, 106 F.4th 1113, 1118 (D.C. Cir. 2024).

### 4. EPA counted only part of the Plan's employment benefits.

The Plan would initially generate 12,569 jobs across the United States, half in Alaska. EPA_AR_0486764. A potential expanded mine could increase mine employment in Alaska by 90% (and elsewhere by 125%) beyond that. EPA_AR_0486764. But EPA recognized only the initial phase, and disregarded the potential expansion—even though the Veto stops both. EPA_AR_0141369. EPA gave no explanation for this omission. Even for the jobs it did recognize, EPA did no real analysis; it simply hypothesized that "the estimated economic impact on the region may be less than or greater than anticipated." EPA_AR_0141369. Yet again, EPA painted costs and benefits inconsistently, particularly when contrasted with its treatment of the Bristol Bay salmon industry.

In 2010, the Bristol Bay salmon industry generated "almost 12,000" jobs, with "almost two-thirds" of them in other states. EPA_AR_0023752. Yet, EPA credited the Veto for saving the entire economic value of the Bristol Bay salmon fishery, while simultaneously

deprecating similar or greater economic value from the Plan. For instance, EPA criticized the Plan because some of the jobs created would have employees "remit[ting] a portion of their income to other regions," EPA_AR_0141369; but EPA ignored the fact that, as noted above, "about four-fifths of the economic impacts and contributions [from the salmon industry] occur outside Alaska," EPA_AR_0023752. Indeed the fishery's primary beneficiary is not Alaska, which receives roughly 20% of the economic benefit, but Washington State, receiving roughly a third. EPA_AR_0023752. The Plan is no less beneficial to Alaska's economy and employment than the salmon industry, and in many aspects—*including* employment—is more so. EPA minimized the value of the Plan because some of those benefits accrue nationwide; but the same is plainly true for the Bristol Bay fishery for which EPA counted the entire $2.2 billion, and all the jobs, as savings from the Veto. As noted above, such inconsistency is arbitrary and capricious. *Supra* Sec.V.B (quoting *Bus. Roundtable*, 647 F.3d at 1148-49).

## VI. EPA applied the wrong standard.

A 404(c) veto requires a determination that the discharge at issue "will have an unacceptable adverse effect" on the listed values. 33 U.S.C. §1344(c). EPA "ha[s] the burden to justify [its] action" on that basis. 45 Fed. Reg. 85,336, 85,338 (Dec. 24, 1980). EPA misunderstood the 404(c) standard in multiple ways, and its determination falls short of the statutory standard.

### A. EPA treated any amount of non-trivial adverse effect as unacceptable.

The Veto says an adverse effect is "unacceptable" if it is "significant." EPA_AR_0083064. "Significant," in turn, imported the standard that USACE developed in its ROD, that an impact is "significant" if it is "more than trivial." EPA_AR_0129269;

EPA_AR_0129421.  EPA also treated any non-trivial impact as sufficient to justify a 404(c) veto.  This is apparent, among other things, in the fact that the Veto covers any hypothetical mining of the Deposit with even a single impact comparable to those discussed in the Veto.  EPA_AR_0082964.

The statute requires far more than that.  No ordinary speaker would say that any impact that is significant is *unacceptable*—much less any impact that is non-trivial.  *See Synagogue v. United States*, 482 F.3d 1058, 1061-62 (9th Cir. 2007) ("[W]e give undefined terms their ordinary meanings.").  Courts have viewed the term "unacceptable" as equivalent to "devastating."  *See Creppel v. USACE*, No. CIV.A. 77-25, 1988 WL 70103, *12 (E.D. La. June 29, 1988) (accepting a 404(c) veto because the planned discharges "would have a devastating effect … on the recreational value of the area").

Congress understands that agencies will regularly undertake activities, including permitting, that have significant impacts.  In fact, they must prepare environmental analyses before actions with "significant[] [e]ffect[s]."  42 U.S.C. §4332(C).  Agencies not infrequently approve projects found to cause "significant" impacts.  For example, *Rock Creek Alliance v. United States Fish and Wildlife Service* involved a mine that would degrade 2.88 miles of a stream designated as critical habitat for a threatened species.[10]  663 F.3d 439, 442 (9th Cir. 2011).  The government identified "significant impacts," but allowed the project; and the Ninth Circuit

---

[10] No threatened or endangered species are at issue here; "there are no known breeding or otherwise significant occurrences of any species listed as threatened or endangered … nor is there any designated critical habitat."  EPA_AR_0083180.

found that outcome permissible. *Id.* at 442-44. Clearly, that an impact is "significant" does not make it *unacceptable* in the ordinary English meaning.

The word "unacceptable" is rare in federal statutes. Congress's choice of such an unusual word, rather than a more common expression such as "significant," "substantial," "material," or even "unreasonable," surely communicates a higher bar. The effects that warrant 404(c) vetoes must be more than just "significant," or Congress would have used that other word, as it does much more commonly in environmental statutes. That is how EPA originally understood section 404(c); it said "unacceptable" refers to an impact so great that "the aquatic and wetland ecosystems cannot afford" it. EPA_AR_0138921.

If "unacceptable" meant the same as "significant," section 404(c) would be a senseless parallel process. USACE permitting already must assess the degradation from a proposed discharge. 33 U.S.C. §§1343(c), 1344(b). It would make little sense for Congress to task EPA with a parallel assessment of the same substantive standard. "Congress does not use different language in different provisions to accomplish the same result." *Hall v. USDA*, 984 F.3d 825, 841 (9th Cir. 2020). Rather, the text and structure point to a clearly different meaning: Section 404(c) is an emergency backstop that protects four specific values (unlike the broader range that USACE addresses, 33 U.S.C. §1343(c)), against particularly severe impacts.

Even the complete set of effects described by EPA cannot be considered *unacceptable* (much less each individual effect (recall a mining proposal is prohibited if it causes any one of EPA's effects). As discussed below, the salmon streams to be blocked under the 2020 Plan are generally too narrow, rocky, and steep to be good habitat. EPA_AR_0095946 ("The loss of habitat is not expected to have a measurable impact on fish populations based on physical

habitat characteristics and fish density estimates in the affected reaches."); EPA_AR_0094989 ("[M]any headwater streams in the mine site area have gradients greater than 3 percent, which are generally less productive for anadromous salmonids."). Roughly 27 salmon spawn in these reaches. *See* EPA_AR_0095018. A single recreational angler could lawfully catch that many in one week. *See* Alaska Admin. Code title 5, §67.020(2) (daily limit of five salmon per person). If state game laws allow that level of impact, it surely cannot be *unacceptable*. The non-salmon streams and wetlands are almost entirely upstream of the salmon streams to be blocked, EPA_AR_0083090.[11] so the adverse consequences for salmon fisheries cannot possibly be greater than from blocking the salmon streams themselves. EPA_AR_0095259 ("The mine site area is not connected to the Togiak, Ugashik, Naknek, and Egegik watersheds and is not expected to affect fish populations or harvests from these watersheds. The mine site is not expected to affect Cook Inlet commercial fisheries.").

**B.    EPA improperly relied on speculative possibilities.**

Section 404(c) also requires a determination that the discharge "will have" unacceptable adverse effects. EPA interprets this language to require only "a reasonable likelihood that unacceptable adverse effects will occur—not absolute certainty but more than mere guesswork." EPA_AR_0138921. The Veto here did not satisfy even that standard; but EPA's interpretation disregards the words Congress chose. Myriad statutes say "likely to,"

---

[11] Exceptions include streams in the furthest headwaters of SFK, which are not upstream of salmon habitat because "relatively little suitable habitat exists even under pre-mine conditions" in those parts of the SFK. EPA_AR_0093663.

"reasonable likelihood," "may occur," or other such probabilistic formulations. Section 404(c) does not. "Will" requires a fair degree of certainty—not just "likelihood."

The Ninth Circuit has explained what it means to have "knowledge" that an act "will" take place: Because "no one 'knows' his own or anyone else's future," "[w]hen an act of Congress requires knowledge of a future action, it … requires … that the defendant know in the sense of being aware of an established modus operandi that will in the future cause [the action]." *United States v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010). As an example, the Circuit recited how "a mother who has had one child in school and prepared his lunch knows that she will prepare the school lunch for her second child," and "a judge knows that his law clerks will use Westlaw." *Id.* These are not 50/50 propositions; "will" denotes as much certainty as can conceivably be had about future events.

*Arizona Cattle Growers' Association v. United States Fish and Wildlife Service* interpreted the ESA to allow an "Incidental Take Statement" only when a "take will occur." 273 F.3d 1229, 1242 (9th Cir. 2001). The Circuit then elaborated the "will" standard: "[I]f [FWS] cannot satisfy the court to a reasonable certainty that a take will occur, then it is arbitrary and capricious for it to issue an Incidental Take Statement imposing conditions on the use of the land." *Id.* at 1243. In *Cattle Growers'*, the "will" requirement was the Circuit's inference about the operation of that statute. Here, Congress expressly required a determination that unacceptable adverse effects "will" occur. All the more so is reasonable certainty required.

That EPA "applied the wrong legal standard" already invalidates the Veto. *See Grand Canyon Univ. v. Cardona*, 121 F.4th 717, 723-24 (9th Cir. 2024) (ordering agency decision "set aside" for applying the wrong legal standards). Moreover, EPA did not even clear the lower

bar it set for itself.  The Veto is replete with "guesswork," not "reasonable likelihoods."  For example, EPA said losses of habitat "*could* cause the extirpation of unique local populations" of salmon.  EPA_AR_0083156 (emphasis added).  "Could" is not even an assertion of reasonable likelihood.  Then, that hypothetical "reduction in genetic diversity," if it occurred, "*could* adversely affect the stability and sustainability of … salmon fisheries." EPA_AR_0083156 (emphasis added).  EPA resorted to such speculation precisely because it was unable to refute the FEIS's rejection of this reduction-in-genetic-diversity effect. EPA_AR_0095992.  "[S]peculation is an inadequate replacement for the agency's duty to undertake an examination of the relevant data and reasoned analysis."  *Horsehead Res. Dev. Co. v. Browner*, 16 F.3d 1246, 1269 (D.C. Cir. 1994).  It is even more inadequate when Congress required a finding that adverse effects *will* occur and EPA itself acknowledges it needs at least a "reasonable likelihood."

## VII.  EPA contradicted the record about the consequences of lost streams.

Alaska is teeming with streams supporting abundant aquatic life, including vast numbers of salmon.  The numerical quantity of stream loss that causes an "unacceptable adverse effect" on fisheries here is necessarily different from other environments.  The 2020 Plan would (per EPA) result in the loss of 8.5 miles of salmon habitat (spawning and non-spawning), and 91 miles of non-salmon streams.  EPA said those losses are unacceptable simply because of the numbers, but that is irrational.  Any rational assessment of those impacts on *fishery areas*—the pertinent 404(c) value—would turn on the quality and character of the streams, and ultimately on how the loss of stream area would affect fish populations.

The record shows that that impact would be miniscule, either in absolute terms or at a scale relevant for Alaska and Bristol Bay. EPA overstated the loss by measuring the streams linearly rather than by area (one mile of a narrow rivulet, even if its habitat were of the same quality, hosts far less spawning salmon habitat than one mile of a broad river); it disregarded the fact that the impacted salmon streams are low-quality habitat thinly populated by salmon; and it ignored the surveys finding exceedingly few salmon in these streams. EPA_AR_0092618.

### A. The narrow streams near the mine site cannot alone be the "fishery areas."

Section 404(c) permits EPA to issue a veto when it determines a discharge will have an unacceptable adverse impact on "fishery areas." "Fishery" means "the business of catching, packing, or selling fish" or "a place where fish, etc. are caught." *Fishery*, COLLINS ENGLISH DICTIONARY, http://www.collinsdictionary.com/us/dictionary/english/fishery. "Fishery," as used in section 404(c), modifies "area," so "fishery areas" must mean locations where fish are caught or people engage in the business of fishing.

The streams and wetlands at the proposed mine site are not such areas, and even the entire NFK and SFK watersheds are not. EPA cited no evidence in the record of any commercial, subsistence, or recreational fishing in the entirety of the NFK or SFK watershed. On average, only 2.3 anglers per year fish *anywhere* on the entire Koktuli River, EPA_AR_0094584—many miles downstream from the lowest point touched by the mine—and the total recreational fishery on that river is "fewer than 50 angler days per year." EPA_AR_0095268. The Alaska Department of Fish and Game does not even present data

on fishing in the Koktuli River because "not enough survey respondents report fishing the river." EPA_AR_0095259. In no normal sense of the word would anyone define the NFK (or even the Koktuli) as a "fishery area."

EPA maintained "fishery areas" include not only "areas 'where fish are caught so they can be sold'" but also "broad habitat areas that can support fish throughout their life histories, including spawning and breeding areas." EPA_AR_0083793. For "broad habitat areas" overall, nothing in section 404(c) supports that notion. And the statutory phrase "including spawning and breeding areas," 33 U.S.C. §1344(c), does not legitimize EPA's approach either.

*Sackett* teaches how to understand an "including" clause like this. The Supreme Court interpreted the phrase "traditional navigable waters … including wetlands adjacent thereto." 598 U.S. at 675. It explained the "including" clause "merely reflects Congress's assumption that certain 'adjacent' wetlands are *part of*" the general category. *Id.* at 677. The Court refused to read "including" as meaning "and." *Id.*

Yet that is precisely how EPA interprets the "including" clause in section 404(c). Lacking any evidence that the areas covered by the Veto are ever used to catch fish, EPA regulated them anyway on the grounds that they are spawning areas. Under *Sackett* and many other precedents, that interpretation is incorrect. A 404(c) adverse effect must be on "fishery areas," including those fishery areas that are spawning and breeding areas. But in all events, the areas covered must be "fishery areas" in the ordinary English meaning. "[A] parenthetical [with the "including" clause], in other words, cannot sweep any further than the [general category] it illuminates." *Cf. United States v. Bank of Am. Corp.*, 753 F.3d 1335, 1338 (D.C. Cir. 2014).

Instead of discussing "fishery areas," the Veto mostly addresses "watersheds." *E.g.*, EPA_AR_0082997 (discussing impact to "watershed"); EPA_AR_0083074 (same). But an impact within the "watershed" might not affect the "fishery area," which is the effect that matters under section 404(c). Likewise, EPA did not say how the 2020 Plan will harm any catching of fish—the key characteristic making something a "fishery area."

EPA sometimes seemed to recognize the only potentially relevant "fishery area" here is Bristol Bay. EPA_AR_0082943-0082944 ("Bristol Bay commercial salmon fishery" and "subsistence" and "recreational" fisheries of the "Bristol Bay watershed"). But EPA was unable to find the 2020 Plan would cause any measurable impact to that fishery area. So instead, EPA narrowed its focus to a much smaller area, the NFK watershed. It is not a fishery area. Because EPA has not shown *any* impact on "fishery areas"—let alone an unacceptably adverse one—its Veto must be vacated. *See Nat. Res. Def. Council v. Pritzker*, 828 F.3d 1125, 1135 (9th Cir. 2016) ("An agency acts contrary to the law when it gives mere lip service or verbal commendation of a standard but then fails to abide the standard in its reasoning and decision.").

**B.      EPA exaggerated the impact by focusing on an arbitrarily small scale.**

EPA's chief adverse effect derives from the blocking of two salmon-habitat streams, totaling 8.5 miles. EPA_AR_0082957. Of those stretches, only 4.2 miles are used for spawning, and they are "low-use spawning habitat." EPA_AR_0092618. Most of the 8.5 miles are not spawning habitat; they are just areas where salmon have occasionally been spotted. EPA_AR_0092618. These streams have over 10 times less fish density than the wider streams into which they flow and, given their areas are significantly smaller, likewise

have a smaller proportion of total fish.  EPA_AR_0092618-0092619.  Overall, the entirety of the 8.5 miles represents the potential spawning of 27 coho salmon, EPA_AR_0092618, and just 0.08% percent of the anadromous streams in Bristol Bay watershed by length (and by area, even less).  EPA_AR_0095991.  USACE had good reason for finding the 2020 Plan would have no "measurable impact" on fish populations.  EPA_AR_0095946.

EPA characterized the two rivulets as salmon habitat, in that there has been "documented anadromous fish occurrence," EPA_AR_0083071, regardless how sparse those occurrences were; and EPA asserted that filling them is unacceptable because they constitute 13% of salmon-habitat streams in the NFK watershed.  EPA_AR_0083071.  That percentage is the only basis in the Veto for calling the loss of the 8.5 miles "unacceptable." EPA_AR_0083071.  EPA did not refute the FEIS's finding there will be no "measurable impact" on fish populations, nor that the streams have "low densities of managed species with lower habitat value characteristics."  EPA_AR_0092620.  EPA relied simply on the 13% figure.

That characterization is an arbitrary and capricious basis for finding unacceptable effects.  Imagine you rent a 3,000-square-foot house that has an unfinished basement of 400 square feet, and a leak damages 50 square feet of the basement.  With the rest of the house in fine shape, water damage to 13% of the basement would not render it uninhabitable.  The landlord would be particularly surprised by such a claim if the damaged 50-square-foot area is actually a two-foot-tall crawl space.

The 8.5 miles that would be lost under the 2020 Plan are like that, in multiple senses. *First*, they are in two small tributaries—NFK-1.190 and NFK-1.200—that are mostly too

steep and rocky to be good habitat. EPA_AR_0092567 ("Habitat data for upper drainage tributaries indicates … high gradient channels less conducive to spawning."). NFK-1.190's "substrate and physical characteristics" are not "ideal spawning or rearing habitat for spawning." EPA_AR_0095954. NFK-1.200 is low-quality habitat with no documented spawning activity at all. EPA_AR_0095022. In both streams, salmon are "at much lower densities compared to mainstem NFK reaches A, B, and C." EPA_AR_0095954; EPA_AR_094991. These very low densities "suggest that [habitat] … nearest the proposed mine is of lower quality and/or that habitats further downstream are more than adequate in quality and quantity." EPA_AR_0092568-0092571. The FEIS described the deficiencies of NFK-1.190 and NFK-1.200 in detail, such as "higher gradients, fewer off-channel and overwintering habitats, lower proportions of spawning gravels, and less woody debris when compared to downstream habitats." EPA_AR_0094991.

The Veto, resisting the FEIS's conclusion, pointed out that NFK-1.190 and NFK-1.200 have stretches with less than 3-percent slope, and such channels "frequently meet the substrate and hydraulic conditions required by stream-spawning salmon." EPA_AR_0083250. But that theoretical observation addresses only one of the flaws of these streams as spawning habitat. EPA_AR_094991; EPA_AR_0095954; EPA_AR_0095972. And EPA had no answer to the stark reality that no salmon have been observed spawning in NFK-1.200; and only 27, from only one species, in NFK-1.190.[12]

---

[12] Confirming these streams are not serious spawning habitat, Alaska's Mineral Closing Orders have not identified them for protection. EPA_AR_0082977.

**Second**, NFK-1.190 and NFK-1.200 have very low numbers of fish overall. Only 27 adult salmon (all coho) have been seen in the reaches lost. EPA_AR_0095018. For juvenile fish, densities were "substantially lower" than in downstream reaches. EPA_AR_0094991; EPA_AR_0095954. A few recreational anglers with a couple of good-sized coolers could legally catch all the adult salmon from NFK-1.190 over a weekend. *See* Alaska Admin. Code title 5, §67.020(2) (daily limit of five salmon per person). In 2016 alone, recreational anglers "harvested more than 7,500 Chinook from the Nushagak." EPA_AR_0095267.

EPA wondered if these numbers were an undercount. EPA_AR_0083254. But the data "present[ed] the most extensive fish-sampling regime that currently has been conducted in the SFK, NFK, and UTC watershed," EPA_AR_0083254, and EPA had nothing beyond speculation to suggest the numbers were off. EPA hypothesized that fish counts vary over time and space, so that the survey data in the FEIS might be an "underestimate." EPA_AR_0083252. It is just as probable that they were overestimates, and perhaps even more likely given that the surveys counted the peak days. EPA_AR_0095015, EPA_AR_0095018, EPA_AR_0095027. EPA noted the sockeye salmon run in 2022 was double its average in 2004-2008. EPA_AR_0082353. But surveys found *zero* sockeye in NFK-1.190 and NFK-1.200. EPA_AR_0092554-0092557; EPA_AR_0092618-0092619; EPA_AR_0095018-0095020. To think these streams started teeming with sockeye just because overall populations in Bristol Bay increased is wishful speculation. For coho and Chinook, even if fish counts in 2008 were low because of population fluctuation, an overall population increase would not change the proportions in NFK-1.190 and NFK-1.200. Even if it did, the Nushagak District (let alone the rest of Bristol Bay) sees commercial harvests of 96,000 coho and 40,000 Chinook

per year. EPA_AR_0094555. Were the NFK-1.190 and NFK-1.200 shares of the population 10 times larger than the data showed, they would still represent only two tenths of one percent of the annual harvest (which itself is only a portion of the overall population). "EPA cannot reject the 'best available' evidence"—which EPA admitted the fish surveys near the Deposit are, *see* EPA_AR_0083254—"simply because of the possibility of contradiction in the future by evidence unavailable at the time of action." *Chlorine Chem. Council v. EPA*, 206 F.3d 1286, 1290-91 (D.C. Cir. 2000). Truly, EPA's speculative quibbling with the fish counts cannot make these streams significant.

EPA's characterization of the lost streams as 13% of the watershed irrationally treats every foot of stream the same, without accounting for the quality of the habitat or the quantity of the fish. A decision that "runs counter to the evidence," with no explanation, is arbitrary and capricious. *State Farm*, 463 U.S. at 43. And EPA's failure to grapple with that contrary evidence is also arbitrary and capricious. *See, e.g., Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009) (agency's failure to consider relevant evidence rendered action arbitrary and capricious).

***Third***, the NFK watershed itself is small—it captures 113 square miles, "which represent 0.3 percent of Bristol Bay's 39,184-square-mile watershed." EPA_AR_0094995. The NFK's mainstem is 36 miles long, EPA_AR_0094991, with 209 miles of mapped tributary streams, EPA_AR_0083023. The NFK joins the 40-mile long mainstem of the SFK (with 194 miles of mapped streams) to form the Koktuli, which flows 39 miles downstream into the Mulchatna River. EPA_AR_0083023; EPA_AR_0094991. The Mulchatna flows 44 more miles until it joins the Nushagak, which flows 109 miles into Bristol Bay. EPA_AR_0094991.

In these river systems, there are countless small tributaries like NFK-1.190 and NFK-1.200, with many hundreds of miles of salmon habitat. In the Bristol Bay watershed, there are 9,816 miles of documented salmon streams, of which the 8.5 miles at the mine would be just 0.08%. EPA_AR_0095991. Even EPA agrees these 9,816 miles are an undercount, because while PLP prepared extensive data for tributaries near the mine site, in the overall watershed there are more salmon streams than anyone has been able to map. EPA_AR_0083251-0083252.[13]

EPA recognized that "defining and selecting appropriate spatial and temporal scales for the analysis are essential." EPA_AR_0083254. But it gave no serious explanation why the NFK watershed is the right scale for comparison. EPA trumpets that 13% is a large number; but it has no reason to think of the loss as 13% of one thing (the NFK watershed) rather than 0.08%—less than one thousandth—of the Bristol Bay watershed. EPA did not identify anything distinctive about the NFK watershed to warrant specifically preserving the small, steep upper tributaries of this particular upstream area. (In fact, EPA insisted on the larger watershed for assessing impacts to recreational fishing, because there is none in the NFK or SFK. *Supra* Sec.VII.A.) USACE's general policy is that using smaller watersheds "should be an exception," and that "in a more rural area without interference from other impacts," even larger scales are appropriate. EPA_AR_0129384. For EPA to reject the standard practice,

---

[13] EPA pointed out that a document called the Anadromous Waters Catalog underestimates the number of salmon streams. EPA_AR_0083251-0083252. That fact only undermines EPA's 13% figure, because the streams near the proposed mine site are better studied than anywhere else, so that any undercount near the mine site is less pronounced than elsewhere. If anything, the undercount means the streams lost under the 2020 Plan are a smaller proportion than one would assess based only on the region's known streams.

and treat the baseline unit as the small NFK watershed for no apparent reason, was to "ignore an important aspect of the problem." *State Farm*, 463 U.S. at 43.

To the extent EPA gave a reason, its explanation was circular. It said it assessed impacts "at the scale of the SFK, NFK, and UTC watersheds because these watersheds are the areas that would be most directly affected by" the 2020 Plan. EPA_AR_0083065. By analogy, the water damage to your hypothetical basement affects 100% of the tiny crawl space. Saying so does not make the damage worse. EPA insisted "the relative magnitude of the[] losses at larger watershed scales is not relevant to whether these losses constitute unacceptable adverse effects at the scale of the SFK, NFK, and UTC watersheds." EPA_AR_0083865. It is as though your landlord pointed out the vast majority of your living space is unaffected, and you responded that the whole house is irrelevant for understanding that the whole tiny crawl space was damaged. Remarkably, EPA said openly that the "more relevant and appropriate scale [is] where impacts would be measurable." EPA_AR_0083256.

In other words, because the scientific reality is the 2020 Plan will have no measurable impact on Bristol Bay populations, or even on populations in the Nushagak or even the smaller Koktuli River, EPA_AR_0095259; EPA_AR_0095946, EPA needed to define the scale for assessment small enough to ensure it found a measurable impact. *See, e.g.*, EPA_AR_0084007. "[C]ircular reasoning" is arbitrary and capricious. *Fuson v. Off. of Navajo and Hopi Indian Relocation*, 134 F.4th 1010, 1016 (9th Cir. 2025). And EPA's openly results-oriented strategy makes a mockery of section 404(c), and suggests "it was committed to its position regardless of any facts to the contrary." *Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1266 (D.C. Cir. 1994)

Any effect can be made to loom large if you use a tight enough lens. Removing a single rock destroys 100% of the habitat formed by that rock. EPA's task under section 404(c) was not just to find a scale at which it can describe a "measurable impact," but to determine whether the 2020 Plan will have an unacceptable adverse effect on *fishery* areas. That spawning might be affected for at most 27 coho,[14] in a region where fishermen *harvest* 90,000-plus coho in an average year, EPA_AR_0094555, and that USACE's extensive analysis found the 2020 Plan will have no "measurable impact" on fish populations, answers that question. EPA, however, refused to answer that question, and instead evaded it. *Cf. State Farm*, 463 U.S. at 43 (arbitrary and capricious to ignore "an important aspect of the problem").

### C.   Linear miles are the wrong measure for habitat quantity.

Compounding its irrational focus on the 13% figure, EPA based the figure solely on the length of the streams involved. That makes no sense for a statute concerned, as section 404(c) is, with "fishery *areas*." One mile of a 100-foot-wide river has more fish than one mile of a 10-foot-wide stream even if the habitat quality is identical. A rational assessment of habitat loss would account for the *area* lost, not just the length. The reaches to be blocked under the 2020 Plan are in places just 3 feet wide, EPA_AR_0092618-0092619, and amount to roughly 0.9% of the area of coho salmon habitat in the NFK. EPA_AR_0272308.

EPA did not explain why it insisted on a linear, rather than areal, assessment of the habitat lost and habitat remaining. EPA_AR_0083865-0083866. EPA claimed it "considered all methods in the FEIS," EPA_AR_0083865, but it gave no explanation why length is

---

[14] As EPA acknowledged, salmon are well-known to explore and shift their habitat usage. EPA_AR_0083866. So there is no basis for concluding these 27 fish would cease to spawn.

preferable to area; it simply asserted that was the method in the FEIS. That explanation cannot be adequate because EPA discarded the FEIS's analysis and conclusions on so many other points—including the FEIS's conclusion that the length of streams lost is not significant. In *County of Los Angeles v. Shalala*, the D.C. Circuit held it inadequate that an agency said a particular dataset was "unreliable" for one purpose but then, without explanation, considered the same data "suitable" for a different purpose. 192 F.3d 1005, 1022 (D.C. Cir. 1999). EPA's convenient cherry-picking from the FEIS is the same sort of error. The Veto is arbitrary and capricious twice over, as EPA failed to "deal with the problem in any meaningful way," *San Francisco*, 981 F.3d at 760, while trying to "have it both ways" when about the FEIS's data and conclusions, *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 854 (D.C. Cir. 1987).

### D. The "portfolio effect" does not magnify the consequences of the blocked streams.

Perhaps recognizing the numbers themselves cannot rationally show an unacceptable adverse effect on fishery areas, EPA theorized that each small portion of habitat must be preserved because of a "portfolio effect." *E.g.*, EPA_AR_0083077. The concept is derived from an investment portfolio, where a diversity of holdings balances the risk of a decline in any individual security. EPA_AR_0095992. Salmon, in EPA's concept, have genetic diversity that will help the population withstand a hypothetical future ecological challenge to a given subpopulation. EPA_AR_0083040-0083041.

EPA's determination of an adverse impact based on the portfolio effect was completely speculative and contrary to the record. The FEIS rejected this idea in detail. "Given the breadth and diversity of habitat (and salmon populations) in the Bristol Bay watershed," "[n]o

long-term measurable changes in the number of returning salmon are expected" from the 2020 Plan, "nor is genetic diversity expected to change; therefore, the impact to the Portfolio Effect would not be discernable." EPA_AR_0091990; EPA_AR_0095992. If anything, the FEIS found, "the Portfolio Effect may help to minimize expected impacts of the mine development on Bristol Bay's salmon fishery." EPA_AR_0091990.

EPA resisted this conclusion too, because EPA hypothesized that different habitats, even at "very fine spatial scales," might generate genetically distinct fish populations, and that loss of "any genetically distinct populations in the SFK, NFK, or UTC watersheds would constitute a measurable adverse effect." EPA_AR_0083075; EPA_AR_0083077. This is pure speculation. The environment near the Deposit is now one of the best-studied in the whole State; yet EPA did not identify any genetically distinct populations actually existing near the Deposit. EPA_AR_0083043-0083046. And EPA's own data showed that populations have at most "shallow" genetic differentiation at larger scales. EPA_AR_0486361. For example, one study characterized genetic differentiation among seven regions spanning all of West Alaska, "West Bristol Bay" and "East Bristol Bay," and found that "[g]enetic differences were small" even between these larger regions. EPA_AR_0496851. Another study discusses genetic diversity only at geographic scales much larger than the tributary-level scale that EPA proposes here. EPA_AR_0493577. EPA cannot "give[] lip service to a theoretical design and then inexplicably distort[] the theory in its application," and in no event can such theories "substitute for substantial record evidence." *Elec. Consumers Rsch. Council v. FERC*, 747 F.2d 1511, 1514 (D.C. Cir. 1984). In short, EPA had no evidence suggesting the streams to be lost under the 2020 Plan actually represent any genetic diversity against the larger watershed—and

EPA had no basis for rejecting the FEIS's finding that they do not. "[R]est[ing] on a false factual premise … in itself constitute[s] arbitrary agency action." *Cigar Ass'n of Am. v. FDA*, 132 F.4th 535, 540 (D.C. Cir. 2025).

Even if NFK-1.190 and NFK-1.200 had genetically distinct populations, there is no evidence that blocking them would mean losing those populations. The FEIS noted that the 2020 Plan involves best-practices construction to minimize the risk of harming actual fish. EPA_AR_0092620. Further, "straying is just as fundamental an attribute of salmon as homing is"; though most salmon spawn in their natal streams, some of the hypothetical unique NFK-1.190 salmon would be expected to "stray" and spawn elsewhere. EPA_AR_0472576-0472580 ("[I]f conditions in the natal river are sufficiently degraded salmon may go elsewhere to spawn."). EPA admitted this straying tendency is well-known. EPA_AR_0083860, but it did not account for that reality in its hypothesis about losing part of the genetic portfolio.

Furthermore, even if the tiny numbers of coho (there are no sockeye or chinook, EPA_AR_0095018) in NFK-1.190 (there are no salmon at all in NFK-1.200) were genetically distinct, and even if the 2020 Plan would eliminate those hypothetical subpopulations, the benefits of the portfolio theory are speculative possibilities about the future. EPA's portfolio theory is that unknown, speculative, yet-to-be-identified traits in these tiny groups of salmon may help the broader population survive an unknown, speculative, yet-to-be-identified future condition. *E.g.*, EPA_AR_0083077-0083078. There are known changes happening in the environment of Bristol Bay, such as global warming. EPA cited no evidence that the traits or genetics of the "Pebble populations" facilitate adaptation to those changes. Under EPA's

view, any loss of any salmon at all is unacceptable because of the possibility that at some future time, a given individual fish might have a trait beneficial for adaptation. That approach is unsustainable for a State that routinely harvests millions of times more fish than have been seen near the mine site. EPA_AR_0477495 (60.5 million harvest of all salmon species in Bristol Bay in 2022). And it is squarely contrary to the congressional authorization that allows a veto only to stop unacceptable adverse effects that "will" occur. 33 U.S.C. §1344(c).

### E. Blocking tributaries further upstream with no salmon has no significant effect on fishery areas.

Another supposedly "unacceptable" effect is the loss of 91 miles of streams that are not salmon habitat at all. These streams, EPA said, "support anadromous fish streams." EPA_AR_0083070. These streams contain no salmon and cannot qualify as "fishery areas" under any interpretation of section 404(c). EPA maintained their loss is unacceptable because of the "ecological subsidies" they provide.

The FEIS had rejected this "ecological subsidies" idea too. Any impact from the loss of nutrients and dissolved organic matter in supporting streams "would likely be limited to waters in the vicinity of the mine site footprint, and may not extend downstream past gage NK100B," EPA_AR_0095965—less than a half-mile from the mine site. EPA_AR_0095970. Most Chinook spawning in the NFK is 20 miles downstream from the mine site, and coho prefer a 10-mile stretch downstream from the mine. EPA_AR_0095003. Continuing the rental-home analogy, it is as though the renter claimed the water damage in the small basement crawl space is important to the second-floor living areas because it affects the overall air quality. That would seem tendentious, especially if the second floor had a separate venting

and filtration system—just as the spawning areas downstream receive nutrients from a much larger, unaffected tributary system. The FEIS concluded the impact from the lost streams "is not expected to affect overall productivity in the greater Koktuli River basin," because there are "abundant small headwater streams" in the drainage, which would be "unaffected by mine site development" and "would continue to provide downstream inputs." EPA_AR_0095966.

EPA had no reasoned response to these findings. It recited again its speculation about fish counts, relevant (supposedly) here because, if there are more salmon spawning, then there are eventually more dead fish contributing nutrients into the NFK. EPA_AR_0083250-0083251. That rationale cannot support EPA's posture about the loss of 91 miles that have no salmon. EPA_AR_0095966. EPA theorized that the removal of nutrients from the lost streams would cascade downriver—though the effects would be "increasingly dampened" further downriver—as the loss of nutrients to a particular stretch would "necessarily affect their downstream transport." EPA_AR_0083251. But EPA did not address the FEIS's conclusion that the streams to be lost are not particularly substantial sources of nutrients in the first place. EPA_AR_0094991; EPA_AR_0095966. Yet again, EPA rejected facts in favor of theory.

### F. USACE's ROD was equally irrational.

Nothing in the ROD undermines the arguments above. The ROD, like the Veto, ignored most of the detailed findings in the FEIS. Meanwhile, the ROD did accept that the 2020 Plan will not affect the Bristol Bay commercial fishery, EPA_AR_0128981; and that, at the "regional level," impacts would be "negligible." *Id.* The ROD thus found meaningful adverse effects (under a different standard) only at the same, unduly narrow scale as EPA.

EPA_AR_0128966 (evaluating mine-site impacts at the NFK, SFK, and UTC watersheds). The ROD, however, failed to withstand internal agency scrutiny, and a hearing officer vacated and remanded it after appeal. Administrative Appeal Decision, Clean Water Act, POA-2017-00271 (Alaska Dist. Apr. 24, 2023); Ex. F. This Court should just as readily find the Veto arbitrary and capricious.

## VIII. EPA rejected detailed modeling about streamflow change in favor of an unsupported rough guess.

As just discussed, EPA's first two adverse effect determinations were baseless, gerrymandered to reach EPA's preferred outcome and contrary to the record evidence and findings. EPA's third adverse effect determination was even worse. The 2020 Plan would cause various changes in streamflow. EPA_AR_0083108-0083132. To characterize those changes as excessive, EPA openly adopted a "protective approach" that section 404(c) does not permit; and it ignored record evidence about the changes where fish might actually live.

EPA complained the 2020 Plan would cause streamflow changes greater than 20% of monthly average flow in 29 miles of streams in the NFK and SFK. EPA_AR_0083131. This is not a matter of the mine depriving salmon of water; most of those >20% changes would be *increases*, not decreases. And most would be in winter months when streams and rivers are nearly flow-free, or entirely dry in the case of the SFK (which, in several areas, is only intermittent) EPA_AR_0083113; EPA_AR_0094729-0094730. Any increase from nearly zero is large on a percentage basis. But EPA cited no evidence that adding flow to a nearly-dry stream would be detrimental.

EPA shrouded its explanation in jargon and in murky cross-references to the BBA. *E.g.*, EPA_AR_0083109 (citing the entirety of BBA chapter 7). But the bottom line is simple. The FEIS found streamflow changes would be acceptable, on the basis of a detailed model (using "IFIM" and "PHABSIM" techniques), itself based on extensive measurements of streams and salmon. EPA_AR_0095946; EPA_AR_0095948; EPA_AR_0093660-EPA_AR_0093661. The FEIS acknowledged that some critics want modelers to include additional variables, such as "invertebrate drift." EPA_AR_0093660. But "IFIM and PHABSIM are the most widely used tools … in North America and are commonly used by resource agencies." EPA_AR_0093661. Based on these models, the FEIS found salmon habitat would actually *increase* throughout the NFK and SFK. EPA_AR_0093662-093664.

EPA refused to use the IFIM/PHABSIM results, but provided no modeling and no data to refute them, instead using a rough rule-of-thumb proposed in an article by Richter. EPA_AR_0083110. The EPA summarily dismissed the FEIS's PHABSIM model as "over simplified." EPA_AR_00832690; EPA_AR_0083888. In truth, this model remains the gold standard for such modeling at multiple federal and state agencies, as the FEIS recognized. EPA_AR_0093661. EPA asserted the Richter proposal was "drafted precisely because of the widely recognized limitations" like PHABSIM. EPA_AR_0083881. In truth, the Richter article nowhere mentions PHABSIM. EPA_AR_0494626-0494635. And the Richter article itself says its rule-of-thumb should be used "only where detailed scientific assessments of environmental flow needs cannot be undertaken." EPA_AR_0494626. Since "detailed scientific assessments" had already been completed, EPA's own source instructed against the 20% guideline. Furthermore, the Richter article did not provide any evidence or discussion

suggesting that flows should not *increase* by any particular percentage; the discussion is entirely about decreases. EPA_AR_0494631 (summarizing case studies, all addressing "allowable depletion"). But nearly all the >20% flows criticized by EPA under the Plan are increases, for which Richter provides no evidence supporting even the rule-of-thumb.[15] "[M]aking some mention of evidence but then coming to a contrary, 'unsupported and conclusory decision' 'add[s] nothing to the agency's defense of its thesis except perhaps the implication that it was committed to its position regardless of any facts to the contrary." *San Francisco*, 981 F.3d at 759 (alteration in original).

Moreover, the Richter article said its rule-of-thumb was a "conservative and precautionary" principle, EPA_AR_0494632; EPA_AR_0494629 ("precautionary approach … until more detailed and regionally tailored studies … can be completed"). EPA itself characterized the Richter idea that way. EPA_AR_140091 ("[A] protective approach is warranted."). This "protective approach" is unlawful. The D.C. Circuit invalidated a biological opinion in which the agency gave the "benefit of the doubt" to the species at issue, and claimed to pick a "conservative" reading of uncertainties in the data in favor of greater protection. *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 598 (D.C. Cir. 2023). The governing statute there, the ESA, does not permit any thumb on the scale in favor of the species, the court held, because it asks whether harm is "likely" to the species. *Id.* at 595. "[L]ikely" means "more likely than not"—"[n]o more and no less." *Id.* Section 404(c), even

---

[15] The two exceptions are a short stretch of SFK Reach E, which has barely any salmon at all, EPA_AR_0092558-0092559; one month's-worth of NFK Reach C, with a decrease just past the rule-of-thumb; and NFK-1.119, which is to be fully blocked as discussed above. EPA_AR_0083113.

more demanding, does not allow a veto as a protection against possibilities. *See supra* Sec.VI.B. Rejecting the best available, state-of-the-art modeling that showed the streamflow changes will not have adverse effects, in favor of a rule-of-thumb expressly designed as a precaution against uncertainty, is the opposite of what Congress mandated.

Streamflow changes are a particularly egregious basis for vetoing the 2020 Plan, because EPA understood that water would be "strategically discharged" to "optimize downstream habitat." EPA_AR_0083112; EPA_AR_0083122. If EPA wanted the discharges shifted to adjust streamflow changes, it had only to ask.[16] Over the years that PLP worked with USACE and EPA, the record does not reflect that EPA told PLP a different discharge strategy would be preferable before citing the discharge plans to justify the Veto.

## IX. The Veto depends on a misunderstanding of CWA jurisdiction.

EPA stressed repeatedly that wetlands were a central concern. One of the four principal adverse effects is "the permanent loss of approximately 2,113 acres … of wetlands." EPA_AR_0084188; EPA said the Plan has adverse effects from "[t]he discharge of dredged or fill material into wetlands," EPA_AR_0083100; and the adverse effects arise, in part, from "the discharge … into waters of the United States, including … wetlands," EPA_AR_0082954. This focus on wetlands is a foundational defect. A veto can only be based on the adverse effects of a discharge into "navigable waters" ("waters of the United States" or "WOTUS"), and for the vast majority of those wetlands EPA had no basis for

---

[16] This prospect does not mean PLP could build a mine conforming to the Veto's limitations. The perverse logic of the Veto is that EPA used its full set of purported adverse effects to justify a prohibition of mining that causes any one of the impacts. Mining the Deposit would unavoidably fill some streams.

thinking they are WOTUS. EPA issued its Veto based on consequences asserted from discharges over which it has no authority, and that cannot be the basis of a 404(c) action.

### A. An "unacceptable adverse effect" must come from a deposit into WOTUS.

This limitation is clear in section 404(c). It authorizes a veto only upon a finding that "the discharge of such materials into such area will have an unacceptable adverse effect" on one of the listed values. 33 U.S.C. §1344(c). "Such area" must refer to the "defined area" that the veto covers; EPA is vetoing the "specification … of any defined area as a disposal site" and "the use of any defined area for specification … as a disposal site." *Id.* "Specification" clearly refers to subsection (a), which authorizes USACE to "issue permits … for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Id.* §1344(a).

The statute thus twice-over limits the 404(c) consideration to WOTUS. First, the specification is for discharge "into the navigable waters." It makes no sense for a specification to be outside of "the navigable waters," *i.e.*, WOTUS. Second, a "discharge," by definition, means putting materials into waters. 33 U.S.C. §1362(12), (16). The key sentence in section 404(c) asks whether "the discharge … into such area … will have an unacceptable adverse effect." The unavoidable meaning is that EPA cannot issue a veto based on the asserted adverse effects of something that is not a discharge, or is not into "such area"; thus the veto cannot be based on effects from a disposal of dredged material onto land rather than WOTUS.

**B.    EPA did not assess the effects of discharges into only WOTUS-wetlands.**

EPA refused to assess which of the wetlands at issue are WOTUS, or what consequences might arise from mine-related discharges (if any) into WOTUS-wetlands. EPA dismissed this concern out of hand with an assertion there are WOTUS-wetlands *somewhere* at the proposed mine site. EPA_AR_0083615. Such a conclusory statement is itself arbitrary and capricious. *Cf. Waterkeeper All. v. EPA,* 140 F.4th 1193, 1228 (9th Cir. 2025) (remanding because EPA made "generic claim[s]" without any "meaningful explanation" or engagement with contrary evidence).

And EPA's assertion was not even based on the right standard: EPA maintained there are WOTUS-wetlands "by virtue of being relatively permanent and flowing to downstream traditional navigable waters either directly or indirectly by means of other tributaries." EPA_AR_0083615. Actually, "wetlands," as EPA had defined the term for many years, encompassed areas that are "saturated" but not fully flooded, so that the wetlands themselves have no continuous surface water. *See, e.g.,* 80 Fed. Reg. 37,054, 37,106 (Jun. 29, 2015); 84 Fed. Reg. 56,626, 56,669 (Oct. 22, 2019); 85 Fed. Reg. 22,250, 22,307 (Apr. 21, 2020) (same). Second, "adjacent," as EPA had interpreted the concept, went far beyond contiguity, which is all the CWA allows. *Id.*; *cf. Sackett*, 598 U.S. at 678. Third, a continuous surface connection is not enough; the relationship must be such that it is "difficult to determine" what is water or wetland. 598 U.S. at 678-79.[17]

---

[17] EPA has, since the Veto, acknowledged these elements are important. 90 Fed. Reg. 13,428 (Mar. 24, 2025).

Moreover, even if WOTUS-wetlands are somewhere at the mine, that fact is not enough. EPA needed not just to know there are such wetlands, but to assess the adverse effects from filling those wetlands. In fact, EPA did not assess whether the 2020 Plan would fill *any* wetlands that are actually WOTUS. EPA not only "failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43; EPA openly refused to do the analysis that Congress prescribed.

## C. The vast majority of wetlands that EPA considered are not actually WOTUS.

EPA stated the 2020 Plan "would result in the discharge of dredged or fill material into [WOTUS], including … wetlands." EPA_AR_0082954. Regarding wetlands, EPA had no "substantial basis in fact," *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018), for that assertion; in fact EPA had ample reason to doubt the status of the 2,100 acres of wetlands it invoked.

*Sackett* held a wetland is WOTUS only if it has a "continuous surface connection" and is "indistinguishable" from areas qualifying as WOTUS in their own right. 598 U.S. at 678 (quoting *Rapanos v. United States*, 547 U.S. 715, 742 (2006)). The Court also specifically rejected the "significant-nexus" theory on which previous EPA interpretations had relied. *Id.* at 680.

Any assumption that EPA made about the scope of WOTUS in the Prohibition or Restriction Area was wrong in light of *Sackett*. USACE had conducted a Preliminary Jurisdictional Determination concluding that a study area of nearly 45,000 acres (including the proposed mine site) contained "15,591.99 acres of wetlands and other [WOTUS]."

EPA_AR_0088966; EPA_AR_092744.[18] That analysis simply treated all wetlands as WOTUS, with no assessment whether they are truly WOTUS as properly understood. EPA simply relied on the USACE statements. EPA_AR_0000043; EPA_AR_0083614-0083615. EPA nowhere reassessed or disagreed with USACE's Preliminary Jurisdictional Determination, which had used the pre-*Sackett* misinterpretation of WOTUS.

The difference between that old determination and the truth is stark. Even "two inches of surface water, a high-water table, ground saturation, hydric soils, and wetland hydrology" are not enough to meet the *Sackett* standard of a "continuous surface connection" to bodies of water. *Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*, No. 24-10710, 2025 WL 2112517, *8 (11th Cir. July 29, 2025). By contrast, the Preliminary Jurisdictional Determination—and EPA's explanation that some wetlands "flow" to tributaries, EPA_AR_0083615—accepted connections through "subsurface hydrology." EPA_AR_0087980.

According to the coding in the National Wetlands Inventory (what USACE and EPA used, EPA_AR_0083091), it is clear most wetlands affected under the Plan are not WOTUS:[19]

- Over 2,000 acres are only saturated (not flooded) or flooded temporarily or seasonally;

---

[18] PLP gave USACE numerous maps and data describing wetlands. Those descriptions were based on the ordinary-speech meaning of "wetland." *See, e.g.*, EPA_AR_0129997-0130029; EPA_AR_0087350. They did not determine which ones qualified as WOTUS, a decision belonging to EPA and USACE. 40 C.F.R. part 230; 33 C.F.R. part 328.
[19] EPA_AR_0087350 presents a summary table of the wetlands quantities using the Inventory categorizations. Though a full assessment under *Sackett* is not in the record, PLP's assessment is that 2,041.86 out of the 2,113 acres are not WOTUS. *See* SUMF ¶127-129.

- Wetlands upslope from the river channels—are readily distinguishable from the watercourses.

- Many wetland areas have no continuous surface connection to waters that are WOTUS in their own right.

Though *Sackett* issued a few months after the Veto, EPA understood its prior interpretations were unreliable. The interpretation of WOTUS, particularly regarding wetlands, had been fiercely debated for years. EPA had revised its interpretation in 1986, 2015, and 2020. By February 2023 (when EPA finalized the Veto) there were 14 cases contesting one or another of those rules. 88 Fed. Reg. 3,004, 3,016-17 (Jan. 18, 2023) (surveying the cases). Weeks before the Veto, EPA issued yet another interpretation, deeming as WOTUS all wetlands that "either alone or in combination with similarly situated waters … significantly affect the chemical, physical, or biological integrity of waters" used in interstate commerce. *Id.* at 3,143. This interpretation, generally in line with EPA's 1986 interpretation, covered even wetlands that are only "saturated by … ground water," so long as the conditions "support … a prevalence of vegetation typically adapted for life in saturated soil conditions" with a "significant nexus" to other waters. *Id. Sackett* disqualified all four of those interpretations—1986, 2015, 2020, and January 2023.

EPA had ample forewarning of *Sackett*. None of those interpretations complied with what a Supreme Court plurality had said two decades earlier in *Rapanos*. That plurality explained that WOTUS includes "*only* those wetlands with a continuous surface connection to bodies that are [WOTUS] in their own right, so that there is no clear demarcation between

'waters' and wetlands." *Rapanos*, 547 U.S. at 724. While EPA deliberated the Veto, it was simultaneously litigating whether the Supreme Court should endorse the *Rapanos* plurality. Br. for Respondents in Opp. at 1, *Sackett v. EPA*, 598 U.S. 651 (2023), No. 21-454 2021 WL 5568045, at *1.

In sum, EPA acted based on harm from filling wetlands, without properly assessing whether the deposits of detritus it decried would, for CWA purposes, be going into WOTUS instead of simply land. Section 404(c) does not permit such a veto. EPA had warning of this problem, and barreled ahead regardless. It is now clear, from the record viewed under the prevailing law, that in fact the wetland impacts are mostly on land. To veto discharges into WOTUS on account of those impacts defies the statutory mandate.

## X.    EPA's speculations about TSF failure were irrational.

As additional concerns, EPA described various adverse consequences that might transpire if the TSF failed. EPA_AR_0083186-0083188.

In reality, PLP designed a TSF different from those that have failed in the past. EPA_AR_0093776. The bulk of the tailings, nearly 90%, would be non-acid-generating, while the smaller quantity of potentially acidic tailings would be stored separately with much less vulnerability. EPA_AR_0093776. The FEIS found the TSF has at most a "very remote" chance of any failure. EPA_AR_0093787.

Yet EPA assumed such failure is a realistic possibility. EPA refused to follow the FEIS because EPA speculated that PLP might end up building a different TSF from what it proposed, and this different TSF might have increased risks. "[T]here could be uncertainty with [the FEIS's] conclusion," EPA said, "due to the conceptual nature of [TSF] designs,

potential future changes to the … water balances due to climate change, [and] the possibility that design or operational changes could occur during implementation." EPA_AR_0083190, EPA_AR_0083191.

"[T]hat policymaking in a complex society must account for uncertainty … does not imply that it is sufficient for an agency to merely recite the terms 'substantial uncertainty' as a justification for its actions." *Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1028 (9th Cir. 2011). And manufactured uncertainty is particularly improper; an "unsupported and irrational assumption" is not part of reasoned decisionmaking, *City of Los Angeles v. FAA*, 63 F.4th 835, 842 (9th Cir. 2023). EPA offered no reason to doubt the TSF would be built and operated as PLP planned.

By comparison, *Sequoia ForestKeeper v. Benson* involved a challenge to a U.S. Forest Service plan to cut so-called "hazard trees" out of roads and recreational areas. 108 F. Supp. 3d 917, 921-22 (E.D. Cal. 2015). The Service asserted that downed trees are a safety hazard, but there was nothing in the record supporting that assumption. *Id.* at 933. "[T]hese risks are entirely speculative," the court observed. *Id.* "Because the basis for concluding that these risks exist has no identifiable basis in fact, it must be set aside." *Id.*

So too for EPA's speculation that PLP would build and operate a TSF different from what it asked USACE to authorize; there is no basis in fact for that supposition. EPA's sole purported ground was its fear of "human error." EPA_AR_0083191. Reciting that phrase is no different from intoning the mantra of uncertainty. The FEIS described controls, such as ongoing reviews and audits, to backstop against operator error. EPA_AR_0096254. EPA's

human-error hypothesis assumes PLP would build and run the TSF in violation of the permit that PLP applied for—and assumes USACE and state regulators would allow that.

A 404(c) veto must be premised on a determination of unacceptable adverse effects that "will" occur. There is nothing in the record to show that the TSF actually planned has any realistic chance of failure.[20]

## XI. EPA disregarded compensatory mitigation.

PLP's CMP included establishment of a 112,445-acre conservation area in the Koktuli watershed, preserving 27,886 acres of wetlands and 814 miles of streams, EPA_AR_0510255, EPA_AR_0510256, EPA_AR_0510284—dwarfing the impacts that the Veto decries. EPA refused to take this mitigation seriously.

First, EPA asserted the "statutory standard does not direct EPA to consider mitigation when determining what constitutes an unacceptable adverse effect." EPA_AR_0083157. But EPA's regulations promise to assess potential effects by considering the 404(b)(1) Guidelines. 40 C.F.R. §231.2(e) (emphasis added).[21] Those Guidelines, in turn, say compensatory mitigation "offset[s] environmental losses resulting from unavoidable impacts." 40 C.F.R. §230.93(a)(1). *Trout Unlimited v. Pirzadeh* held EPA must follow the 404(c) regulations even

---

[20] The FEIS modeled the consequences of certain hypothetical failures. It did so not because they are realistic possibilities, but because USACE insisted on modeling *some* sort of failure. The FEIS acknowledged the failures hypothesized are not actually realistic possibilities. EPA_AR_0096258 (explaining the modelled scenarios had a "relatively low probability of occurrence").

[21] The regulations say EPA will consider the "relevant" factors from the 404(b) Guidelines. 40 C.F.R. §231.1. That phrasing cannot mean EPA limits itself to the factors it deems relevant under section 404(c), because EPA's 404(c) decisions have repeatedly considered the availability of alternatives for a given project—a factor called out in the 404(b) Guidelines that is not explicit in section 404(c). Ex. J, K, L.

when they promise protections beyond what section 404(c) requires. 1 F.4th at 756-58. Section 404(c) surely does not prohibit the consideration of compensatory mitigation; EPA has taken account of it in previous 404(c) decisions. *E.g.*, *Bd. of Miss. Levee Comm'rs v. EPA*, 785 F. Supp. 2d 592, 601 (N.D. Miss. 2011) (discussing EPA's veto due to "inadequacy of the proposed compensatory mitigation"); *see also* Ex. J, L. One court has held that "EPA was bound to consider the mitigation measures" before vetoing a particular permit. *Mingo Logan Coal Co. v. EPA*, 70 F. Supp. 3d 151, 173 (D.D.C. 2014)*, aff'd*, 829 F.3d 710.

Second, EPA asserted the Pebble CMP "does not qualify as compensatory mitigation" because EPA insisted the area to be preserved must be the waters and wetlands at the proposed mine site. EPA_AR_0083163. That explanation contradicts the 404(b) Guidelines, under which preservation can be used throughout "the watershed," meaning "a land area that drains to a common waterway." 40 C.F.R. §§230.93(h)(1), 230.92. PLP planned its mitigation in the Koktuli watershed because that is what USACE demanded. EPA_AR_0510255 (noting USACE letter saying "compensatory mitigation within the Koktuli River watershed will be required"). EPA's own policy is that "[p]reservation … over a larger watershed scale may be appropriate." EPA_AR_0139648-013649. Indeed multiple projects have been approved in Alaska on exactly this basis. *See, e.g.*, *Sovereign Inupiat for a Living Arctic v. BLM*, 555 F. Supp. 3d 739, 792 (D. Alaska 2021) (finding USACE's "watershed approach" consistent with the CWA). EPA's Veto was supposedly based on harms to the *Bristol Bay* fisheries—*e.g.*, EPA_AR_0082943-0082945—so that should have been the scope of the watershed. EPA departed from its past policy, and from USACE's interpretation of the same policies, without acknowledging the difference or explaining why.

Third, EPA claimed PLP's plan was inadequate because it "does not meet the higher bar for permanent protection of preservation sites," EPA_AR_0083163; PLP had planned a 99-year deed restriction that EPA complained was not "permanent." EPA_AR_0083164. EPA also objected that the CMP did not adequately explain the mechanics of the deed restriction. EPA_AR_0083164. These are irrational grounds for a *veto*, because EPA gave no reason to think these could not be corrected. USACE, in its administrative appeal, recognized PLP could address these asserted deficiencies. But EPA, because of essentially a paperwork problem, vetoed future mining proposals regardless of what mitigation they might offer.

Fourth, EPA acknowledged that restoring salmon-spawning habitat, such as by removing barriers blocking fish from streams, could be sufficient mitigation. EPA_AR_0139653-0139654. EPA said PLP had declared such mitigation impossible. Actually, PLP had proposed such mitigation. EPA_AR_0078397-0078398. PLP changed its plans because USACE forced it to restrict the CMP to the Koktuli River, EPA_AR_0510255, an irrationally small scope. *See supra* VII.B.

## XII. EPA considered factors that are not germane under section 404(c).

While refusing to count the cost of its veto or to consider compensatory mitigation on a theory that section 404(c) does not require it, EPA simultaneously tallied a wide range of asserted secondary effects that section 404(c) actually excludes. Section 404(c) asks whether a "discharge of such materials into such area"—meaning a disposal of materials into WOTUS— "will have an unacceptable adverse effect" on "municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." 33 U.S.C. §1344(c). By contrast, EPA's asserted adverse effects included changes in traditional

diets, effects on social networks, and racial harmony—not among the four values in section 404(c)—arising not particularly from discharges into WOTUS, but from the broader project.

EPA purported to disclaim these considerations, calling them only "additional concerns and information" and "not the basis" for the Veto. EPA_AR_0083179. But an agency's assessment of purportedly unnecessary information is reviewable if the agency chose to include it. *City and Cnty. of S.F. v. USCIS.*, 408 F. Supp. 3d 1057, 1106 n.18 (N.D. Cal. 2019), *aff'd*, 981 F.3d 742 (rejecting argument that cost-benefit conclusion is unreviewable because it was supposedly "not part of the regulatory analysis").

EPA criticized alleged harms that do not stem from discharges into WOTUS, but from "large-scale mining" overall. EPA_AR_0083180. For example, EPA forecasted adverse effects on wildlife from "reduced habitat effectiveness," "noise pollution," and "increased conditioning on human food." EPA_AR_0083180. None of these effects arise from *discharges*.[22] EPA also asserted the 2020 Plan "would result in the permanent alteration and loss of 8,391 acres of land at the mine site that are currently available for recreation." EPA_AR_0083183. EPA worried that population growth from mine workers and road construction "could" affect municipal water supplies. EPA_AR_0083184. These complaints are explicitly about activities on *land*, not discharges into WOTUS.

---

[22] EPA also suggested that "wildlife species would also likely be affected indirectly via any reductions in salmon populations." EPA_AR_0083180. In other words, *if* salmon populations decrease, then a possible result of that decrease would be an effect on wildlife. But the FEIS found salmon populations will not decrease, and EPA made no contrary finding. EPA_AR_0095946. So this passage in the Veto is counterfactual speculation.

EPA raised other issues beyond section 404(c)'s remit. It warned "the traditional diet is heavily dependent on wild foods," and if "fewer subsistence resources were available, diets would move from highly nutritious wild foods to increased reliance on purchased processed foods." EPA_AR_0083197. EPA asserted that "social networks are highly dependent on procuring and sharing wild food resources," and that the "current social support system would be degraded." EPA_AR_0083197. EPA even asserted that "transmission of cultural values, language learning, and family cohesion" would be affected, "potentially resulting in a breakdown of cultural values, mental health degradation, and behavioral disorders." EPA_AR_0083197. Even if these speculations had any basis, section 404(c) does not authorize EPA to preserve traditional lifeways.

EPA's discussion of nonstatutory harms highlights the one-sided, biased character of EPA's decisionmaking. If factors beyond those specified in section 404(c) are relevant, then a similarly broad range of benefits should also count. EPA speculated the mine could disrupt Native cultural transmission—EPA_AR_0083197—while discounting the jobs it would bring. *See supra* Sec.V. EPA emphasized secondary effects from potential expansions of the mine, EPA_AR_0083155-0083156, but ignored the additional benefits from an expanded mine, particularly the increase in copper delivered into starved markets. While EPA insisted that the significance of stream losses be measured solely within the NFK and SFK watersheds, *supra* Sec.VII.B, and that compensatory mitigation is worthless unless provided there, *supra* Sec.XI, it measured recreational impacts at the much larger scale of the entire Nushagak watershed or even the Bristol Bay region. EPA_AR_0083182. That framing was necessary to sustain EPA's narrative, because nobody fishes in the NFK watershed. *Supra* Sec.VII. EPA projected a

decline in recreational values due to "perceived loss [of] habitat or fishery quality." EPA_AR_0083183. Yet it ignored the serious negative perceptions caused by its arbitrary rejection of the 2020 Plan after PLP spent years, in cooperation with USACE, designing it to minimize and mitigate environmental impacts. "A long line of precedent has established that agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently," *Los Angeles*, 192 F.3d at 1022 (alteration in original)—particularly when it does so "inconsistently and opportunistically," *Bus. Roundtable*, 647 F.3d at 1148. The elastic scope of EPA's harm assessment is exactly that sort of defect.

## XIII. Vacatur is the proper remedy.

Vacatur is the default remedy, and remand without vacatur is permissible "only in limited circumstances." *Kaweah Delta Health Care Dist. v. Becerra*, 123 F.4th 939, 953 (9th Cir. 2024). Before issuing that limited remedy, the Court must "weigh the seriousness of the agency's errors against the disruptive impact of an interim change." *Id.* The seriousness of EPA's errors is plain above. And vacatur will cause no disruption, because PLP still needs additional permits, including the permit from USACE that EPA stopped in its tracks. After vacatur, the start of mine construction will still be well into the future.

## XIV. Conclusion

EPA found the proposed mine will remove 8.5 miles of streams that are known to have very few salmon, spawning or otherwise; 90-odd miles, mostly upstream from those, that have no salmon at all; and roughly 2,000 acres of wetlands, upstream from all that. An exhaustive environmental analysis had already found these consequences will have no measurable impact on salmon populations. EPA, having no basis for any contrary conclusion, instead asserted

that losing 13% of linear miles in the NFK watershed is an unacceptable impact—with no reason for that comparison other than precisely that the NFK watershed is a small enough area to be able to define the impact as unacceptable.  The proposed mine will increase water flows in the uppermost reaches of the NFK and SFK in dry months; and an exhaustive environmental analysis concluded, using the state-of-the-art modeling techniques used across the country for comparable tasks, that this would increase salmon habitat.  EPA insisted it is unacceptable on the basis of a rule-of-thumb proposed in a single study that gave no evidence for disparaging flow increases, and that said its rule-of-thumb was a conservative, precautionary approach only appropriate in the absence of actual data.  In short, EPA had no rational grounds for concluding the proposed mine will have unacceptable adverse effects.

Meanwhile, EPA refused to count the massive cost of its Veto—in revenue lost to the State, in jobs not generated in nearby communities, and most fundamentally in wiping off the market the single largest known undeveloped copper deposit in the United States.

The Veto is deeply contrary to the text and to the policies of the Clean Water Act.  It should be vacated.

October 7, 2025                                 Respectfully submitted,

                                                */s/ Keith Bradley*
                                                KEITH BRADLEY, *pro hac vice*
                                                SCHELEESE GOUDY, *pro hac vice*
                                                717 17th Street, Suite 1825
                                                Denver, CO 80202
                                                T: (303) 830-1776
                                                F: (303) 894-9239
                                                keith.bradley@squirepb.com
                                                scheleese.goudy@squirepb.com

JEFFREY M. WALKER, *pro hac vice*
KATHERINE E. WENNER, *pro hac vice*
2000 Huntington Center
41 South High Street
Columbus, OH 43215
T: (614) 365-2700
F: (614) 365-2499
jeffrey.walker@squirepb.com
katherine.wenner@squirepb.com

SQUIRE PATTON BOGGS (US) LLP

THOMAS P. AMODIO
KEVIN M. BOOTS
500 L Street, Suite 300
Anchorage, AK 99501
T: (907) 222-7100
F: (907) 222-7199
tom@reevesamodio.com
kevin@reevesamodio.com

REEVES AMODIO, LLC

*Counsel for Northern Dynasty Minerals Ltd.
and Pebble Limited Partnership*

## CERTIFICATE OF WORD COUNT

I certify that PLP's Opening Brief contains 19,903 words, as determined by the word-count function of Microsoft Office 365.

*/s/ Keith Bradley*
KEITH BRADLEY, *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2025, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court of Alaska by using the CM/ECF system. Participants in this Case No. 3:24-cv-00059-SLG who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Keith Bradley
KEITH BRADLEY, *pro hac vice*