Tara M. Derbisz
David Y. Chung, *pro hac vice pending*
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Phone: (202) 624-2500
Fax: (202) 628-5116
Email: TDerbisz@crowell.com
          DChung@crowell.com

*Attorneys for National Mining Association,*
*American Exploration & Mining Association and*
*Alaska Miners Association*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | | |
|---|---|---|
| NORTHERN DYNASTY MINERALS LTD. and PEBBLE LIMITED PARTNERSHIP, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 3:24-cv-00059-SLG and consolidated cases |
| vs. | ) ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

**[PROPOSED] *AMICI CURIAE* BRIEF OF THE NATIONAL MINING ASSOCIATION, AMERICAN EXPLORATION & MINING ASSOCIATION, AND ALASKA MINERS ASSOCIATION**

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases
Case 3:24-cv-00059-SLG    Document 185-1    Filed 11/25/25    Page 1 of 29

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT...........................................1

STATEMENT OF INTEREST ..........................................................2

ARGUMENT ......................................................................4

I.    Copper and other minerals in the Pebble deposit are essential to the nation's economy and security. ......................................4

II.   The mining industry depends on predictability and regulatory certainty during permitting. ...........................................8

III.  EPA's exercise of its veto authority is contrary to the CWA and inconsistent with past regulatory practice. ...............................11

    A.    The Veto prematurely prohibits unspecified discharges that have nothing to do with the proposed project before the Corps. .................................................11

    B.    EPA erred by failing to consider required mitigation.....................18

CONCLUSION ..................................................................22

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Coeur Alaska Inc. v. Se. Alaska Conservation Council*,
557 U.S. 261 (2009) ................................................................... 8, 13

*Hill v. Boy*,
144 F.3d 1446 (11th Cir. 1998) ........................................... 14

*Hoffman Homes, Inc. v. Administrator, EPA*,
961 F.2d 1310 (7th Cir. 1992), *order vacated on other grounds*,
975 F.2d 1554 (7th Cir. 1992) ............................................. 13

*Holy Cross Wilderness Fund v. Madigan*,
960 F.2d 1515 (10th Cir. 1992) ........................................... 13

*Hughes River Watershed Conservancy v. Glickman*,
81 F.3d 437 (4th Cir. 1996) ................................................. 14

*James City Cnty. v. EPA*,
758 F. Supp. 348 (E.D. Va. 1990), *aff'd, remanded in part on
other grounds*, 955 F.3d 254 (4th Cir. 1992) ........................... 12, 14

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........................................................... 11

*Menominee Indian Tribe v. EPA*,
360 F. Supp 3d 847 (E.D. Wis. 2018), *aff'd*, 947 F.3d 106 (7th
Cir. 2020) ...................................................................... 14

*Mingo Logan Coal Co.*, 714 F.3d 608 (D.C. Cir. 2013) ...................... 13

*Talk Am., Inc. v. Mich. Bell Tel. Co.*,
564 U.S. 50 (2011) (Scalia, J., concurring) .......................... 16

*Trinity Broad. of Fla., Inc. v. FCC*,
211 F.3d 618 (D.C. Cir. 2000) ............................................. 16

*West Virginia v. EPA*,
597 U.S. 697 (2022) ........................................................... 14, 15

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

**Statutes**

30 U.S.C. §§ 21 et seq. ........................................................................7

30 U.S.C. § 21a (2023) .......................................................................7

30 U.S.C. § 1606(a)(2) .......................................................................6

33 U.S.C. § 1344(a) ......................................................................... 11

33 U.S.C. § 1344(c) .......................................................................... 12

43 U.S.C. § 1701(a)(12) ....................................................................7

National Defense Authorization Act For Fiscal Year 2004, Pub. L. 108–136 § 314(b) (2003) ................................................................. 18

**Regulations**

33 C.F.R. part 332, et seq. ............................................................... 17

33 C.F.R. § 325.1(d)(7) ..................................................................... 18

33 C.F.R. § 332.1(c)(3) ...................................................................... 18

40 C.F.R. § 230.3(f) ........................................................................... 12

40 C.F.R. § 231.2(e) .......................................................................... 18

**Other Authorities**

118 Cong. Rec. 33,699 (1972) .................................................... 12, 13

44 Fed. Reg. 58,076 (Oct. 9, 1979) ................................................. 17

73 Fed. Reg. 19,594 (Apr. 10, 2008) ............................................... 18

85 Fed. Reg. 62,539 (Oct. 5, 2020) ...................................................5

86 Fed. Reg. 11,849 (Mar. 1, 2021) ...................................................6

88 Fed. Reg. 51,792 (Aug. 4, 2023) ...................................................6

90 Fed. Reg. 11,001 (Feb. 25, 2025) .................................................6

90 Fed. Reg. 13,673 (Mar. 25, 2025) .................................................7

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

90 Fed. Reg. 37,727 (Aug. 5, 2025)................................................................. 4, 7

90 Fed. Reg. 50,494 (Nov. 7, 2025)....................................................................6

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

## INTRODUCTION AND SUMMARY OF ARGUMENT

At the heart of this dispute is a planned mine at the Pebble deposit in Alaska, which today remains the largest undeveloped copper deposit in the world. This case is exceptionally important to *amici*'s members, the mining industry, and the nation's economy. The proposed mine—which the U.S. Environmental Protection Agency ("EPA") has unlawfully vetoed—will provide a crucial source of copper for construction, transportation, electrical and electronic projects, industrial machinery, and defense applications. Copper also plays an inextricable role in nearly all forms of renewable energy. The EPA's aggressive and unprecedented use of a regulatory veto comes just as the world prepares for a global shortage of copper and other minerals due to the surging demands of digitalization and electrification. While the United States has one of the world's greatest mineral repositories, the ability to get those minerals into the supply chain to help meet America's needs is threatened by crippling regulatory uncertainty, including the overly broad nature of EPA's asserted authority.

The misuse of EPA's veto authority casts a cloud over mining projects in Alaska and beyond. Regulatory obstacles to mineral development harm not only the U.S. mining industry, but also domestic manufacturing, innovation, and security. At bottom, *amici* and their members need certainty in the federal regulatory landscape governing mining operations and urge the Court to hold EPA to its statutory mandate and to prior interpretations and practice.

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

1

**STATEMENT OF INTEREST**

The National Mining Association ("NMA"), America Exploration & Mining Association ("AEMA"), and Alaska Miners Association ("AMA") respectfully submit this brief as *amici curiae* supporting plaintiffs' Northern Dynasty Minerals Ltd. and Pebble Limited Partnership's ("PLP") Opening Brief, Docket 177. This brief both supplements plaintiffs' arguments that EPA's use of Section 404(c) is contrary to the Clean Water Act ("CWA") and past agency interpretation and policy and addresses why the power EPA claims has vast national regulatory and economic implications.

The NMA is the only national trade organization representing the interests of U.S. mining companies and promoting the full and responsible use of mineral and coal resources. Its membership includes over 250 corporations and organizations involved in various aspects of mining, including development of minerals on federal, state, and private lands throughout the United States, including Alaska. NMA's members produce a majority of America's coal, metals, and industrial minerals. The NMA works to ensure America has secure and reliable supply chains, abundant and affordable energy, and the American-sourced materials necessary for U.S. manufacturing, national security, and economic security, all delivered under world-leading environmental, safety, and labor standards. The NMA also participates in litigation on issues of concern to the mining industry.

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

American Exploration & Mining Association (AEMA) is a 130-year old, 1800+ member association representing the entire mining life cycle, from prospecting and exploration to mine development and mineral extraction, to mine reclamation and closure. AEMA members are actively involved in prospecting, exploring, mining, and mine reclamation and closure activities on both private and federally administered land throughout the United States, and in supplying and servicing those activities.

The Alaska Miners Association ("AMA") is a professional membership trade organization established in 1939 to represent the mining industry in Alaska. AMA's more than 1,400 members come from eight statewide branches: Anchorage, Denali, Fairbanks, Haines, Juneau, Kenai, Ketchikan/Prince of Wales, and Nome. Alaska's miners are individual prospectors, geologists, engineers, suction dredge miners, small family mines, junior mining companies, major mining companies, Alaska Native Corporations, and the contracting sector that supports Alaska's mining industry.

*Amici's* members develop infrastructure required to develop, extract, and transport their resources to markets and consumers. The value added by major industries that consume the $106 billion of minerals produced in the U.S. is an estimated $4 trillion[1] and coal-fired power generation contributes nearly $217.5

---

[1] U.S. Geological Survey, Mineral Commodity Summaries 2025, at 4 https://doi.org/10.3133/mcs2025.

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

billion in total U.S. economic activity.[2] Obtaining a CWA Section 404 permit from the U.S. Army Corps of Engineers ("Corps") is an essential regulatory requirement for such infrastructure. Planning for and carrying out Section 404 permitting and associated processes for mineral development are complex and time-consuming undertakings, requiring many years of environmental, economic and engineering planning, study and design, and millions of dollars in pre-permitting investment. EPA's assertion of expansive power barring development activity across a large area that is not tied to a specific disposal site proposed for regulatory approval introduces unprecedented regulatory and economic risk, confusion, and uncertainty for *amici's* members.

## ARGUMENT

I.  **Copper and other minerals in the Pebble deposit are essential to the nation's economy and security.**

The Pebble deposit is widely characterized as the world's largest known undeveloped resource of copper.[3] Under PLP's proposal, the mine site would "produce an average 613,000 tons of copper-gold concentrate" each year.[4]

---

[2] Bureau of Business & Economic Research**,** *The Economic Impact of Coal Production and Coal-Fired Power Generation in the United States,* W. Va. Univ. Coll. of Bus. and Econ., (Summer 2022), https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1352&context=bureau_be.

[3] D. Belder, *What's the Next US Copper Mine? 27 Copper Projects to Watch*, Investing News Network (Apr. 23, 2025).

[4] U.S. Envtl. Prot. Agency, *Final Determination Pursuant to Section 404(c) of the Clean Water Act: Pebble Deposit Area, Southwest Alaska,* at 2-2 (Jan. 2023).

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

4

Copper is a unique metal that is "a cornerstone for all electricity-related technologies."[5] Copper's unmatched thermal and electrical conductivity make it challenging to substitute."[6] "Copper is indispensable to critical infrastructure sectors that support the American economy, national security, and public health."[7]

Copper's centrality to infrastructure and electrification means that demand is certain to spike in the coming years. A recent report calculated that the world will need to produce more copper in the next 12 years than it has in the previous 120 years.[8]  A key demand driver will be updates to power grid infrastructure—of which copper wire is an essential component—to meet the increased use of artificial intelligence and the data centers required to power it.[9] Copper is also essential to all forms of renewable energy generation and electric vehicles. According to the International Energy Agency, "there is a significant risk of tighter markets for copper as demand increases for its use not just in energy technologies and power grids but also in construction and industrial applications" suggesting a "potential 30% shortfall in copper supply by 2035."  The United

---

[5] Int'l Energy Agency, *The Role of Critical Minerals in Clean Energy Transitions,* at 5 (2021).

[6] *Id.* at 135.

[7] Proclamation No. 10962, 90 Fed. Reg. 37,727 (Aug. 5, 2025).

[8] S&P Global, *Mine Development Times: The U.S. in Perspective*, at 9 (June 2024), https://bit.ly/4dGkMya.

[9] Wood Mackenzie, *At the Crossroads: A Reality Check on Trends in Copper Supply and Demand* (Oct. 23, 2025), https://www.woodmac.com/news/opinion/at-the-crossroads-a-reality-check-on-trends-in-copper-supply-and-demand/.

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

Nations likewise forecasted that "[g]lobal copper demand is expected to grow by over 40% by 2040, but supply isn't keeping pace."[10]

Successive administrations on both sides of the aisle have recognized the threat to our economic and national security from dependence on foreign sources of copper and other critical minerals, as well as the importance of copper to defense infrastructure.[11] In 2023, the Department of Energy ("DOE") designated copper as a "critical material" under the Energy Act of 2020, which requires finding that copper "has a high risk of a supply disruption" and that it "serves an essential function in one or more energy technologies."[12] DOE's assessment of criticality is "forward looking," with a view toward "global demand trajectories."[13]

---

[10] United Nations Conference on Trade and Development, *Global Trade Update: Focus on Critical Minerals – Copper in the New Green and Digital Economy* (May 2025), https://unctad.org/publication/global-trade-update-may-2025-critical-minerals-copper.

[11] Exec. Order No. 13,953, *Addressing the Threat to the Domestic Supply Chain From Reliance on Critical Minerals From Foreign Adversaries and Supporting the Domestic Mining and Processing Industries,* 85 Fed. Reg. 62,539, 62,540 (Oct. 5, 2020) (declaring a "national emergency to deal with [the] threat" of "our Nation's undue reliance on critical minerals . . . from foreign adversaries" and "find[ing] that the United States must broadly enhance its mining and processing capacity, including for minerals not identified as critical minerals"); Exec. Order No. 14,017, *America's Supply Chains,* 86 Fed. Reg. 11,849, 11,850 (Mar. 1, 2021) (directing Secretary of Defense to "submit a report identifying risks in the supply chain for critical minerals and other identified strategic materials" and to "update work done pursuant to Executive Order 13953").

[12] 30 U.S.C. § 1606(a)(2); U.S. Dep't of Energy, *Notice of Final Determination on 2023 DOE Critical Materials List,* 88 Fed. Reg. 51,792 (Aug. 4, 2023).

[13] *Id.* at 51,793.

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

Similarly, the Department of the Interior's U.S. Geological Survey ("USGS") recently added copper to its 2025 List of Critical Minerals.[14]

This year, President Trump signed an executive order echoing that copper "is a critical material essential to the national security, economic strength, and industrial resilience of the United States," while also highlighting the "significant vulnerabilities in the copper supply chain," due to increasing reliance on foreign sources for mined copper.[15] In outlining actions to address these vulnerabilities, President Trump stated that "copper is the second most widely used material by the Department of Defense and is a necessary input in a range of defense systems[.]"[16]

Analysts warn that a global copper shortage looms near on the horizon and warn that "[i]f governments and investors fail to act, we risk turning the metal of electrification into the metal of scarcity."[17] The country is in dire need of copper resources, and the stakes are only getting higher.

---

[14] U.S. Geological Survey, *Final 2025 List of Critical Minerals,* 90 Fed. Reg. 50,494 (Nov. 7, 2025).

[15] Exec. Order No. 14,220, *Addressing the Threat to National Security from Imports of Copper,* 90 Fed. Reg. 11,001 (Feb. 25, 2025).

[16] Proclamation No. 10,962, *Adjusting Imports of Copper Into the United States,* 90 Fed. Reg. 37,727 (Aug. 5, 2025).

[17] Wood Mackenzie, *High-wire Act: Is Soaring Copper Demand an Obstacle to Future Growth?* (Oct. 2025), https://www.woodmac.com/horizons/soaring-copper-demand-obstacle-to-future-growth/.

## II. The mining industry depends on predictability and regulatory certainty during permitting.

Domestic mining is critical to the American economy, as Congress has repeatedly acknowledged since at least 1872.[18] To combat the copper crisis and reliance on foreign sources of minerals, various administrations and agencies across the federal government have recommended increasing domestic production.[19] But in the United States, it takes an average of 29 years—the second longest in the world—to develop a new mine.[20] The delay is attributed to severe uncertainty in the legal and regulatory processes, as compared with other countries.[21] Such cumbersome and unpredictable permitting processes make the

---

[18] *See* General Mining Law, codified at 30 U.S.C. §§ 21 et seq.; *See, e.g.,* 30 U.S.C. § 21a (2023) (stating that "developing domestic mineral resources is critical for national security"); 43 U.S.C. § 1701(a)(12) (recognizing "the Nation's need for domestic sources of minerals").

[19] *See, e.g.,* Exec. Order No. 14,241, *Immediate Measures to Increase American Mineral Production,* 90 Fed. Reg. 13,673 (Mar. 25, 2025) (aiming "to facilitate domestic mineral production to the maximum possible extent"); U.S. Dep't of Defense, *Securing Defense-Critical Supply Chains,* at 43 (2022); White House, *Building Resilient Supply Chains, Revitalizing American Manufacturing, and Fostering Broad-based Growth: 100-Day Reviews Under Executive Order 14017,* at 9 (June 2021), https://www.whitehouse.gov/wp-content/uploads/2021/06/100-day-supply-chain-review-report.pdf; U.S. Dep't of Commerce, *A Federal Strategy to Ensure Secure and Reliable Supplies of Critical Minerals* (June 4, 2019), https://www.commerce.gov/sites/default/files/2020-01/Critical_Minerals_Strategy_Final.pdf.

[20] S&P Global, *Mine Development Times: The US in Perspective* (June 2024), https://subscriber.politicopro.com/eenews/f/eenews/?id=00000190-c3c8-d6d8-afdf-f3cf47a50000.

[21] *Id.*

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

U.S. import-dependent for many key minerals, and worse, undercut the domestic mining sector's ability to meet demand.

A few unique characteristics of mining render it particularly vulnerable to regulatory unpredictability. First, unlike many development projects that take place on smaller parcels, mining operations occupy vast geographic areas. Their development often spans dozens of square miles, with operational life extending well over multiple decades. The industry is distinctly capital-intensive and requires years of advance planning due to complex permitting requirements, including those related to stormwater, groundwater, and process water management; activities that necessarily implicate Sections 402 and 404 of the CWA.[22]

Mining projects also depend on significant, often irreversible, upfront investments and years or even decades can pass before any profits are realized. While environmental regulation and permitting costs are understood by project proponents and investors and can be budgeted for, deviation from settled permitting procedures undermines investment certainty. Companies simply cannot account for budgeting of mercurial agency decision-making. As described in its brief, PLP has invested over $1 billion in preparing to develop the Pebble

---

[22] *See e.g.*, *Coeur Alaska Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 274 (2009) (summarizing Corps' and EPA's issuance of 404 and 402 permits, respectively, for a mining project).

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

deposit.[23] For companies to accurately price in the costs of mitigation and alterations to project design which ensure mining proceeds in an environmentally responsible manner—and still attract willing investors—there must be predictability in the procedures and timelines that permitting authorities follow.

To be clear, *amici* do not seek laxity; but simply certainty in the actions of regulators. Here, EPA's erratic actions concerning the Pebble Project are a cautionary tale for any developer or investor. As plaintiffs' opening brief recounts in detail, the Corps and EPA have gone back and forth with PLP for decades regarding the status of a Section 404 permit necessary for mining the deposit.[24] Those substantial delays do not justify the significant cost to project proponents. Unexpected delays can significantly reduce a typical mining project's value and drastically shrink a mine's expected value before any production even begins.

EPA's Veto creates significant regulatory uncertainty, not just for the Pebble Project proponents, but for future major development projects that require Section 404 permits. The financial risk of backing a project that requires a Section 404 permit significantly increases if there is a possibility that EPA could veto *entire* watersheds, as it has done here. Obtaining a Section 404 permit already imposes significant burdens on a project proponent that must be factored into the project's overall economic cost. The additional doubt that EPA's actions

_____

[23] Dkt. 177 at 14.

[24] Dkt. 177 at 6-12.

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

cast over the long-term stability of those permits increases economic costs, thereby altering incentives to invest in projects that must pass through the Section 404 process. Such harmful effects will be felt profoundly by *amici's* members, as well as companies in other sectors, including municipal public works, residential and commercial construction, power generation and transmission, and manufacturing.

The potential harm resulting from decreased domestic and foreign investment is significant: the Corps processes approximately 60,000 permits a year, and according to some estimates, $220 billion of investment per year depends on these permits.[25] By depriving projects of certainty, EPA threatens to chill private investment in these critical sectors of the economy where billions of dollars depend on the predictability of the regulatory framework under which they operate.

## III. EPA's exercise of its veto authority is contrary to the CWA and inconsistent with past regulatory practice.

### A. The Veto prematurely prohibits unspecified discharges that have nothing to do with the proposed project before the Corps.

As detailed in plaintiffs' opening brief, Section 404 does not authorize EPA to veto activities not yet proposed, because any veto must be tethered to the

---

[25] *See* David Sunding, *Economic Incentive Effects of EPA's After-the-Fact Veto of a Section 404 Discharge Permit Issued to Arch Coal,* at 1–2 (May 2011).

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

Corps' *specification* of a discharge site in a permit or permit application.[26] Indeed, that is the "single, best meaning" of Section 404. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). *Amici* highlight that EPA's expansive view of its veto power—allowing it to prohibit future, hypothetical projects spanning a significantly larger geographical footprint beyond a project proposal—cannot be reconciled with statutory text, congressional intent, or EPA's prior interpretations.

Congress precisely delineated EPA's and the Corps' roles in the CWA. Under section 404(a), the Corps "may issue permits" for discharges of fill material "at specified disposal sites" and is responsible for administering day-to-day functions of the dredge and fill permit program.[27] It logically follows that prior to making a permitting decision, the Corps must specify a disposal site.

Section 404(c), in turn, grants EPA limited authority "to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site."[28] "Specific" (referenced nine times in § 1344, alone) is the operative term between these two provisions governing the agencies' authority and effectively cabins the reach of the EPA. EPA may only act under Section 404(c) if it demonstrates that discharge of fill material into a *specified disposal site*—again, the Corps only specifies such sites in connection with a permit

---

[26] Dkt. 177 at 23-24.

[27] 33 U.S.C. § 1344(a) (emphasis added).

[28] *Id.* § 1344(c).

application—will have an unacceptable adverse effect on municipal water supplies, shellfish beds, and fishery areas, wildlife, or recreational areas.[29] Equally important, EPA's regulations define "[d]isposal site" as "that portion of the waters of the United States where specific disposal activities are permitted."[30] The relevant statutory text could not be clearer: only when the Corps indicates its intent to issue a permit specifying a disposal site is EPA's authority to issue a veto triggered. But EPA must have something—indeed, something *specific*—to veto.

Legislative history reinforces what the text makes clear. The Senate Debate on the Conference Report explained that EPA "should have the veto over the *selection of the site for dredged spoil disposal* and over any *specific spoil* to be disposed of in any *selected site*."[31] Further, "it is expected that disposal site restrictions or prohibitions *shall be limited to narrowly defined areas.*"[32] Congress plainly intended to limit EPA's 404(c) authority to vetoing specified disposal sites; it did not envision EPA could block off vast areas of land.

---

[29] *Id.*; *see also James City Cnty. v. EPA*, 758 F. Supp. 348, 352 (E.D. Va. 1990), *aff'd, remanded in part on other grounds*, 955 F.3d 254 (4th Cir. 1992).

[30] 40 C.F.R. § 230.3(f) (emphasis added).

[31] 118 Cong. Rec. 33,699 (1972), *reprinted in* 1 Legislative History of the Federal Water Pollution Control Act Amendments of 1972, at 161,177 (1973) (Senate Debate) (emphasis added).

[32] *Id.* at 33,766 (emphasis added).

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

13

EPA's past vetoes have adhered to this statutory proscription, initiating Section 404(c) procedures only after the Corps has indicated its intent to issue a permit.[33] Even the U.S. Supreme Court has supported this reading. In *Coeur Alaska Inc. v. Southeast Alaska Conservation Council*, the Court firmly held that the CWA "gives the EPA authority to 'prohibit' any decision by the Corps to issue a permit for a *particular* disposal site."[34] Not surprisingly then, federal courts have frequently emphasized that EPA's Section 404 authority is limited to "the issuance of permits."[35]

---

[33] *See, e.g.*, EPA, *Recommended 404(c) Determination for the M.A. Norden Permit Application* at 1, Mobile District File No. AL80-00327-C (Jan. 13, 1984) ("Norden RD") (USACE indicated intent to issue permit before EPA initiated Section 404(c) procedures); EPA, *Final Determination of the Assistant Administrator for External Affairs Concerning the Sweedens Swamp Site in Attleboro, MA Pursuant to Section 404(c) of the Clean Water Act* at App. A-3 (May 13, 1986) (same); EPA, *Recommended Determination to prohibit construction of Two Forks Dam and Reservoir Pursuant to Section 404(c) of the Clean Water Act* at 2 (Mar. 1990) (same).

[34] 557 U.S. 261, 274 (2009) (emphasis added); *see also Mingo Logan Coal Co.*, 714 F.3d 608, 610 (D.C. Cir. 2013) ("Subsection 404(c) authorizes the Administrator, after consultation with the Corps, to veto *the Corps disposal site specification*.") (emphasis added).

[35] *E.g.*, *Hoffman Homes, Inc. v. Administrator, EPA*, 961 F.2d 1310, 1312 n.2 (7th Cir. 1992), *order vacated on other grounds*, 975 F.2d 1554 (7th Cir. 1992); *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1525 (10th Cir. 1992) ("The EPA may veto the issuance of a permit which will have a 'unacceptable adverse effect' on, *inter alia*, a wetland ecosystem."); *Hill v. Boy*, 144 F.3d 1446, 1448 n.5 (11th Cir. 1998) ("Section 404 gives the EPA authority to veto the Corps' *issuance* of a . . . permit.") (emphasis added); *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 442 n.4 (4th Cir. 1996) ("The EPA has the authority to veto a decision by the Corps to issue a § 404 permit . . ."); *James City Cnty. v. EPA*, 758 F. Supp. at 351 ("Once the Corps has set forth its intention to issue a particular permit, the EPA is empowered to veto said permit."); *Menominee Indian Tribe v.*

Further, in *West Virginia v. EPA*, the Court strengthened the principle that "[a]gencies only have those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency [may] add pages and change the plot line.'"[36] And particularly so where EPA's claimed authority touches on an area in which there is "economic and political significance" and on which Congress would presumably want a say in shaping policy. The CWA Section 404 process has profound economic and political significance in both Alaska and across the United States, as permits are major drivers of economic and community development. As such, before EPA expands its own power, there must be a "clear statement . . . that Congress intended to delegate authority of this breadth to regulate a fundamental sector of the economy."[37] Here, there is no such statement, and to the contrary, language explicitly constraining its authority. As the Court concluded, "[w]e presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies."[38] Congress's intent in the CWA was to grant EPA *limited* authority in the permitting process, and EPA cannot expand that authority on a whim.

---

*EPA*, 360 F. Supp 3d 847, 851 (E.D. Wis. 2018) ("EPA retains oversight of the Section 404 permitting program and may veto the Corps' approval of a permit . . ."), *aff'd*, 947 F.3d 106 (7th Cir. 2020).

[36] 597 U.S. 697 (2022).

[37] *Id.* at 715 (citation omitted).

[38] *Id.* at 722 (citation omitted).

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

15

As described in Plaintiffs' brief, EPA's Veto not only "restricts" the discharges identified in Pebble's 2020 Plan but establishes a "restriction" zone encompassing the headwaters of the Bristol Bay watershed, some 309-miles in excess of the footprint described in Pebble's permit application.[39] This is more than 23 times the size of the entire mine site in the 2020 Mine Plan.[40] In its Revised Proposed Determination, EPA explained that the proposed Restriction area is based on EPA's "belief" that "future plans to mine the Pebble Deposit could result in unacceptable adverse effects on anadromous fishery areas anywhere in [three] watersheds."[41] As such, the Restriction area is intended to include "any future plan to mine the Pebble Deposit that would either individually or collectively result in adverse effects similar or greater in nature and magnitude to those associated with the 2020 Mine Plan."[42]

But EPA cannot hang its extraordinary veto authority on the hypothetical adverse effects of "future plans," particularly where it has not vetted the impacts through the lens of an actual proposed, permit action. The Veto effectively blocks future, potentially compliant proposals that do not presently exist, before they can

---

[39] Dkt. 177 at 21.

[40] EPA_AR_0078414.

[41] U.S. Environmental Protection Agency, Region 10, *Revised Proposed Determination* (May 2022), https://www.epa.gov/system/files/documents/2022-05/Pebble-Deposit-Area-404c-Proposed-Determination-May2022.pdf

[42] *Id.* at A-2.

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

even be considered because any future mine plan, no matter how small, could be deemed to contribute to adverse effects similar to those associated with the 2020 Mine Plan if the plan is viewed *collectively* with any other present or future development within 309 square-miles. Such an unbounded interpretation of Section 404(c) injects tremendous uncertainty into how large swaths of *land* across three watersheds will be regulated,[43] absent any scientific assessment of consequent effects on fish populations. With such wide latitude, applicants are left to EPA's mercy to determine which projects move forward. Such vague authority is incompatible with basic due process.[44]

This cannot be what Congress intended when it demanded EPA act with specificity. EPA's interpretation allows it to circumnavigate the carefully choreographed interagency consultation review procedures within the CWA, designed to arm decision-makers with information necessary to determine whether and how a proposal may be modified to eliminate or address environmental concerns. EPA has characterized section 404(c) as "a tool of last

---

[43] *See infra* section 3.

[44] *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 564 U.S. 50, 69 (2011) (Scalia, J., concurring) (it defeats the principles of the Administrative Procedure Act and administrative law to permit "the agency to enact vague rules which give it the power, in future adjudications, to do what it pleases."); *see also Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000) (asking whether "a regulated party acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform'").

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

resort." The first resort should be "comment and consultation with the permitting authority at all stages of the permitting process."[45]

In summary, EPA's Veto does not comport with its own regulations, memoranda, or past agency and judicial interpretations of its authority.

**B.    EPA erred by failing to consider required mitigation.**

Plaintiffs summarize the efforts undertaken, in collaboration with the Corps and EPA, to revise their compensatory mitigation plan (CMP).[46] Compensatory mitigation measures were born from agency review and are commonly proposed during the section 404(a) permitting process to offset unavoidable environmental impacts from a project.[47] Among other measures, PLP proposed to establish a 112,445-acre conservation area in the watershed, preserving 27,886 acres of offsite wetlands and 814 miles of offsite streams.[48] But in determining what constitutes an "unacceptable adverse effect," a condition precedent to exercising its Section 404(c) veto authority, EPA incorrectly ignored these compensatory mitigation efforts and wrongly concluded that off-site mitigation was inappropriate. Consequently, EPA improperly overstated the impact of the Pebble

---

[45] U.S. EPA, *Denial or Restriction of Disposal Sites; Section 404(c) Procedures*, 44 Fed. Reg. 58,076, 58,080 (Oct. 9, 1979).

[46] Dkt. 177 at 19.

[47] 33 C.F.R. part 332, et seq.

[48] Dkt. 177 at 78.

Project by omitting key mitigation that would be required for any further development.

EPA claims the CWA does not require it to consider compensatory mitigation when determining what constitutes an unacceptable adverse effect. Not so. First, compensatory mitigation is a critical component of the Section 404 program, with a long history of demonstrated ecological value. EPA and the Corps issued a final rule on compensatory mitigation in 2008 at Congress's direction,[49] explaining that "compensatory mitigation is a critical tool in helping the federal government to meet the longstanding goal of 'no net loss' of wetland acreage and function."[50] As such, EPA and the Corps explicitly weaved this concept in throughout their Section 404 regulations and policies.[51] In arguing otherwise, EPA not only contravenes these laws, it also ignores its longstanding practice of evaluating compensatory mitigation *in past Section 404(c) actions*.[52]

---

[49] *See* National Defense Authorization Act For Fiscal Year 2004, Pub. L. 108–136 § 314(b) (2003) ("To the maximum extent practicable, the regulatory standards and criteria shall maximize the available credits and opportunities for mitigation[.]").

[50] USACE & EPA, *Compensatory Mitigation for Losses of Aquatic Resources*, 73 Fed. Reg. 19,594, 19,594 (Apr. 10, 2008) ("2008 Mitigation Rule").

[51] *See* 33 C.F.R. § 325.1(d)(7) (Section 404 application to include compensatory mitigation statement); 33 C.F.R. § 332.1(c)(3) ("Compensatory mitigation for unavoidable impacts may be required to ensure [compliance] with the Section 404(b)(1) Guidelines."); *see also* 40 C.F.R. § 231.2(e) (incorporating "relevant portions of the section 404(b)(1) guidelines" into the definition of adverse effect in EPA's Section 404(c) regulations).

[52] *See, e.g.*, U.S. EPA, *Modification to the 1985 Clean Water Act Section 404(c) Final Determination for Bayou aux Carpes* at 11 (May 28, 2009) ("Based on the minimum mitigation that the Corps has committed to . . . EPA believes that any

EPA also asserts that the Pebble CMP "does not qualify as compensatory mitigation" because it does not include the waters and wetlands at the proposed mine site. EPA's suggestion that mitigation will be ignored where it is offsite is senselessly dogmatic, finds no support in the CWA or its implementing regulations, and again, is inconsistent with past agency policy and practice. First, recognizing that Alaska is geographically unique, the Corps and EPA have specifically noted that compensatory mitigation in Alaska may not look like it does in the lower 48. As stated in a 1994 Region 10 Memorandum:

> The Clean Water Act Section 404 regulatory program provides a significant degree of flexibility in making permit decisions to reflect circumstances throughout the Nation, including Alaska. Where it is not practicable to avoid wetlands, or to restore or create wetlands, such measures are not required under the Section 404 program. . . . Given this flexibility, Alaskans should be assured that discharges of dredged or fill material into wetlands will be evaluated in a reasonable manner, consistent with the National goal of fair, flexible, and effective protection of the Nation's wetlands resources.[53]

This memorandum enunciates Alaska's uniquely pristine ecological nature and acknowledges that the fact that Alaska's wetlands are largely intact should not automatically bar future development. Rather, Section 404 requirements must

---

discharges . . . would not result in unacceptable adverse effects."); U.S. EPA, *Modification of the March 21, 1988, Russo Development Corporation Section 404(c) Final Determination* at 3 (Sept. 7, 1995) (amending final determination based on compensatory mitigation plan).

[53] Memorandum from Robert H. Wayland, III, Dir., U.S. Envtl. Prot. Agency Region X, to Alvin L. Ewing, Alaska Operations Office (May 13, 1994), https://dec.alaska.gov/media/13267/1994-wetlandsinitiative.pdf ("1994 Region 10 Memorandum").

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

be applied with more flexibility in Alaska to ensure that permits can be evaluated reasonably. That approach again features in a 2018 Memorandum of Agreement between EPA and the Corps, finding that:

> [g]iven the unique climatological and physiographic circumstances found in Alaska, it is appropriate to apply the inherent flexibility provided by the guidelines to proposed projects in Alaska. Applying this flexibility in a reasoned, commonsense approach will lead to effective decision-making and sound environmental protection in Alaska.[54]

The Corps' Alaska District likewise emphasizes this special approach[55] to considering compensatory mitigation in Alaska. The Alaska District's Compensatory Mitigation Thought Process provides that "it may be appropriate to identify compensatory mitigation options over a larger watershed scale given that compensation options are frequently limited at a smaller watershed scale" in Alaska.[56] There is simply no basis for EPA's rigid insistence that mitigation must be onsite. Indeed, EPA has regularly accepted offsite mitigation in connection with Section 404 permits in Alaska without invoking its veto authority.[57]

---

[54] Memorandum of Agreement Between the U.S. Environmental Protection Agency and the Department of the Army Concerning Mitigation Sequence for Wetlands in Alaska Under Section 404 of the Clean Water Act (2018) ("2018 Alaska MOA").

[55] Indeed, Alaska should be entitled to special treatment, as the "Last Frontier," it remains a spectacularly vast and rugged wilderness with large areas that are still remote, undeveloped, and unexplored.

[56] U.S. Army Corps of Engineers, Memorandum on Mitigation Thought Process (Apr. 8, 2023).

[57] *See, e.g.*, USACE, *Record of Decision & Permit Evaluation, Nanushuk Development Project* at 31, POA-2015-00025 (May 14, 2019) (Oil Search Alaska's CMP for oil exploration and development activity in the North Slope includes a

## CONCLUSION

The United States desperately needs copper. PLP has a lot of copper that can be mined in an environmentally responsible way. Standing between the two is the EPA's overly broad Veto, which, if upheld, will have far-reaching consequences beyond the Pebble project that will almost certainly chill investment in domestic mining activities and directly, negatively impact *amici's* members. For *amici*, a sustainable mining industry that can rely on consistent and predictable application of the Section 404 permit process is the goal, rather than an EPA that continues to move the goalposts. For the reasons described above and in Plaintiffs' brief, the Veto violates the CWA and should be vacated.

Respectfully submitted this 25th day of November 2025.

---

project to improve village wastewater treatment facilities in the native village of Nuiqsut); Alaska LNG, *Wetlands Compensatory Mitigation Plan* at 23 (Nov. 8, 2019) (Alaska LNG's CMP includes wastewater treatment improvement projects); Donlin ROD § 6.2 (Donlin Gold's CMP includes permittee-responsible mitigation preservation outside of the impact watershed and far from the project site because of the lack of sufficient available mitigation bank and in-lieu fee program credits.); USACE, *Proposed Greater Mooses Tooth Two Development Project Joint Record of Decision and Permit Evaluation* at D5.1 (Oct. 2018) (For the Greater Mooses Tooth Two Development Project, Alpine Satellite Development, USACE determined that mitigation in the form of avoidance and minimization measures were sufficient and compensatory mitigation was not required for the project. Nonetheless, the applicant requested USACE include, as a special condition to the permit, a project to help restore stream flow at culverts located south of Nuiqsut).

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

22

Tawny Bridgeford
National Mining Association
101 Constitution Avenue, N.W.
Washington, DC 20001
(202) 463-2629

/s/ Tara M. Derbisz

Tara M. Derbisz
David Y. Chung, *pro hac vice pending*
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Phone: (202) 624-2500
Fax: (202) 628-5116
Email: TDerbisz@crowell.com
         DChung@crowell.com

*Attorneys for National Mining Association, American Exploration & Mining Association and Alaska Miners Association*

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases

23

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2025, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court for the District of Alaska through the CM/ECF system, which will send notice of filing to all registered CM/ECF users.

/s/ Tara M. Derbisz
Tara M. Derbisz

Northern Dynasty Minerals Ltd. v. U.S. EPA
No. 3:24-cv-00059-SLG and consolidated cases
Case 3:24-cv-00059-SLG     Document 185-1     Filed 11/25/25     Page 29 of 29