ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

MICHAEL J. HEYMAN
United States Attorney
District of Alaska

LAURA J. BROWN
MARIO A. LUNA
United States Department of Justice - ENRD
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Phone: (202) 514-3376 (Brown)
Phone: (202) 532-3357 (Luna)
Email: laura.j.s.brown@usdoj.gov
Email: mario.luna@usdoj.gov

*Attorneys for the United States*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTHERN DYNASTY MINERALS LTD., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*, <br><br> Defendants, <br><br> and <br><br> BRISTOL BAY NATIVE ASSOCIATION, INC., et al., <br> Intervenor-Defendants. | Case No. 3:24-cv-00059-SLG <br><br><br> CONSOLIDATED <br><br><br> LEAD CASE |

STATE OF ALASKA,

     Plaintiff,

     v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

     Defendant,

     and

TROUT UNLIMITED, *et al.*,

     Intervenor-Defendants.

Case No. 3:24-cv-00084-SLG

CONSOLIDATED

---

ILIAMNA NATIVES, LTD, *et al.*,

     Plaintiffs,

     v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.*,

     Defendants,

     and

BRISTOL BAY ECONOMIC DEVELOPMENT
CORPORATION, *et al.*,

     Intervenor-Defendants.

Case No. 3:24-cv-00132-SLG

CONSOLIDATED

## DEFENDANTS' OPPOSITION TO
## PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

BACKGROUND ...................................................................................................... 4

I.    Statutory and Regulatory Authority ................................................................ 4

II.   Factual Background .................................................................................... 7

    A.   The Bristol Bay Watershed's Diverse Salmon Populations Are the Result of its Rich Aquatic Habitats.......................................................................................... 7

    B.   The Pebble Deposit Underlies Watersheds That Are Valuable for Salmon. ............... 10

    C.   EPA Has Been Studying the Impact that Discharges from Mining the Pebble Deposit Would Have on Salmon Habitat for Decades. ........................................................ 15

    D.   PLP's Permit Application Proposed Significant Levels of Aquatic Resource Loss in Alaska. ....................................................................................................... 17

    E.   EPA Evaluated the Impacts of the 2020 Mine Plan During the Permitting Process... 18

    F.   After PLP Appealed the Corps' 2020 Permit Denial, EPA Exercised its Section 404(c) Authority to Protect Salmon Fishery Areas. ........................................................... 21

    G.   The Corps Subsequently Denied PLP's Permit Application Because of EPA's Final Determination. ............................................................................................... 27

    H.   Litigation Challenging the Final Determination. ....................................................... 28

LEGAL STANDARD ................................................................................................. 29

ARGUMENT .......................................................................................................... 30

I.    EPA Appropriately Determined that Discharges to Waters of the United States from Developing the Pebble Deposit at the Levels PLP Proposed Will Cause Unacceptable Adverse Effects on Salmon Fishery Areas. ...................................................................... 31

    A.   The Record Supports EPA's Determination that Discharges into Waters of the United States at the Mine Site Area Will Have Unacceptable Adverse Effects on Fishery Areas in the SFK and NFK Watersheds. ................................................................................... 33

        1.   The record supports the conclusion that the loss of 8.5 miles of salmon streams will have an unacceptable adverse effect on NFK and SFK fishery areas. ........................................................................................... 36

2. The record supports the conclusion that the loss of 91 miles of additional streams that support salmon streams will have unacceptable adverse effects on NFK and SFK fishery areas. ................................................................... 43

3. The record supports the conclusion that the loss of wetlands and other waters that support salmon streams will have an unacceptable adverse effect on NFK and SFK fishery areas. .......................................................... 47

4. The record supports the conclusion that the streamflow changes caused by discharges into waters of the United States will have an unacceptable adverse effect on NFK and SFK fishery areas. .......................................................... 49

B. The Record Supports EPA's Determination that Discharges into Waters of the United States Elsewhere in the SFK, NFK, and UTC Watersheds Will Have Unacceptable Adverse Effects on Salmon Fishery Areas. ................................................................. 55

C. EPA Appropriately Explained the Scale It Used in Assessing Adverse Effects. .......... 58

D. EPA Appropriately Applied the Unacceptable Adverse Effects Standard. ................. 59

E. EPA Appropriately Defined "Fishery Areas" in the Final Determination. ................. 62

F. EPA Relied Upon Reasonable Predictions and not Speculation. ................................ 64

G. EPA Appropriately Considered Secondary Effects. .................................................... 68

III. EPA Properly Exercised Its Statutory Authority Under CWA Section 404(c) in Defining the Prohibition and Restriction Areas. ........................................................ 69

A. EPA Reasonably Based Its Final Determination on the 2020 Mine Plan and Appropriately Included Forward Looking Provisions. ................................................ 70

B. EPA Appropriately Defined the Areas Where the Corps Is Prohibited and Restricted from Specifying Disposal Sites. ................................................................................... 72

C. EPA Reasonably Relied on PLP's Identification of Waters of the United States in the 2020 Mine Plan. .......................................................................................................... 75

D. PLP's "Non-Germane Factors" Argument Fails. ........................................................ 78

IV. EPA Did Not "Disregard" Compensatory Mitigation. ................................................ 80

V. EPA Appropriately Conducted a Cost-Benefit Analysis. ............................................ 84

A. EPA's Alternative Basis Is Reasonable and Well-Supported. ..................................... 84

B. In the Alternative Basis, EPA Reasonably Considered the Costs of Its Action. ......... 86

C. In the Alternative Basis, EPA Reasonably Considered the Benefits of Its Action. ...... 93

D.  In the Alternative Basis, EPA Reasonably Weighed the Costs and Benefits of Its Action.................................................................................................. 96

VI.  Nothing in the Alaska Statehood Act or the Cook Inlet Land Exchange Alters the Application of CWA Section 404(c). ........................................................ 101

A.  The Alaska Statehood Act and Cook Inlet Exchange. ............................... 101

B.  Neither the Statehood Act nor the Cook Inlet Exchange Overrides the CWA.......... 103

C.  EPA Appropriately Considered Alaska's Authority and Interests............................ 109

VII.  EPA's Final Determination Does Not Implicate the Major-Questions Doctrine........114

A.  EPA's Final Determination Is a Direct and Unambiguous Exercise of Section 404(c). 114

B.  Plaintiffs' Claimed "Hallmarks" of a Major Question Are Absent Here. .................115

C.  Plaintiffs' Arguments About Costs, Economic Impacts, and Federalism Do Not Transform EPA's Final Determination Into a "Major Questions" Case.....................117

VIII.  Section 404(c) Is Not an Unconstitutional Delegation of Legislative Power. ...........118

A.  Congress May Delegate Authority So Long as It Supplies an "Intelligible Principle." 119

B.  Section 404(c) Satisfies the Intelligible-Principle Standard. .................................... 120

1.  Section 404(c) Contains a Clear Policy and Operative Standard. .............. 120

2.  Congress Imposed Meaningful Boundaries on EPA's Authority in Section 404(c). ........................................................................................ 121

C.  The Alaska Native Corporations' Specific Nondelegation Challenges Fail on Their Own Terms.......................................................................................... 122

1.  The Alaska Native Corporations' "Unfettered Discretion" Arguments Mistakes Permissible Agency Discretion for Unconstitutional Delegation.122

2.  The Alaska Native Corporations' Comparisons to Other Cases Are Unavailing, Inapposite, or Support EPA's Position..................................... 124

CONCLUSION.................................................................................... 127

# TABLE OF AUTHORITIES

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
   295 U.S. 495 (1935)..................................................................... 126

*Alameda Water & Sanitation Dist. v. EPA*,
   930 F.Supp.486 (D. Colo. 1996) ................................................ 122

*Alaska v. United States*,
   35 Fed. Cl. 685 (1996), *aff'd*, 119 F.3d 16 (Fed. Cir. 1997)............................102, 110

*All. for Wild Rockies v. Petrick*,
   68 F.4th 475 (9th Cir. 2023)....................................................112

*Am. Hosp. Ass'n v. Becerra*,
   596 U.S. 724 (2022).................................................................118

*Am. Power & Light Co. v. SEC*,
   329 U.S. 90 (1946).................................................................. 122

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Management*.,
   273 F.3d 1229 (9th Cir. 2001)............................................... 66, 67

*Arkansas v. Oklahoma*,
   503 U.S. 91 (1992).................................................................111

*ASARCO Inc. v. Kadish*,
   490 U.S. 605 (1989)........................................................ 105, 106

*Ass'n of Pac. Fisheries v. EPA*,
   615 F.2d 794 (9th Cir. 1980)............................................... 78, 99

*Balt. Gas & Elec. Co. v. NRDC*,
   462 U.S. 87 (1983).................................................................. 30

*Bd. of Miss. Levee Comm'rs v. EPA*,
   785 F. Supp. 2d 592 (N.D. Miss. 2011) ................................. 122

*Becerra v. Empire Health Found.*,
   597 U.S. 424 (2022).................................................................118

*Bersani v. EPA*,
   850 F.2d 36 (2d Cir. 1988) ..................................................... 122

*Biden v. Missouri*,
   595 U.S. 87 (2022)..................................................................118

*Biden v. Nebraska*,
   600 U.S. 477 (2023) ..................................................................................................118

*Bristol Bay Econ. Dev. Corp. v. Hladick*,
   454 F.Supp.3d 892 (D. Alaska 2020) ...................................................................... 17

*California v. FCC*,
   905 F.2d 1217 (9th Cir. 1990) ................................................................................. 86

*Case v. Bowles*,
   327 U.S. 92 (1946) ................................................................................................. 108

*Catawba County v. EPA*,
   571 F.3d 20 (D.C. Cir. 2009) ......................................................................... 86, 100

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971), *overruled on other grounds by Califano v. Saunders*, 430 U.S. 99 (1977)
   ............................................................................................................................. 30

*City & Cnty. of S.F. v. USCIS*,
   408 F. Supp. 3d 1057 (N.D. Cal. 2019), *aff'd*, 981 F.3d 742 (9th Cir. 2020) .................... 80, 99

*Corley v. United States*,
   556 U.S. 303 (2009) ..............................................................................................114

*Council of Parent Att'ys & Advocs,, Inc. v. DeVos*,
   365 F. Supp. 3d 28 (D.D.C. 2019) .......................................................................... 80

*Creppel v. USACE*,
   No. 77-25, 1988 WL 70103 (E.D. La. June 29, 1988) ........................................... 122

*Ctr. for Auto Safety v. Peck*,
   751 F.2d 1336 (D.C. Cir. 1985) .............................................................................. 86

*Ctr. for Biological Diversity v. Zinke*,
   900 F.3d 1053 (9th Cir. 2018) ................................................................................. 30

*Davis v. Michigan Dept. of Treasury*,
   489 U.S. 803 (1989) ..............................................................................................114

*Del. Dept. of Nat. Res. v. USACE*,
   751 F. Supp. 2d 715 (D. Del. 2010), *aff'd*, 685 F.3d 259 (3d Cir. 2012) ..............................113

*EME Homer City Generation, L.P.*,
   572 U.S. 489 (2014) ..............................................................................................118

*Epic Sys. Corp. v. Lewis*,
   584 U.S. 497 (2018) ..................................................................................... 104, 106

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025)........................................................................119, 120, 123, 127

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021).................................................................................... 100

*Fed. Power Comm'n v. Hope Nat. Gas Co.*,
320 U.S. 591 (1944).................................................................................... 122

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985).................................................................................... 30

*Heckler v. Chaney*,
470 U.S. 821 (1985)....................................................................... 124, 126, 127

*Hodel v. Va. Surface Mining and Reclamation Ass'n*,
452 U.S. 264 (1981)....................................................................................119

*J.W. Hampton, Jr., & Co. v. United States*,
276 U.S. 394 (1928).................................................................................... 120

*James City County, v. EPA*,
12 F.3d 1330 (4th Cir. 1993) ................................................... 44, 46, 122, 125

*John v. United States*,
720 F.3d 1214 (9th Cir. 2013) .....................................................................111

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .................................................................................... 61

*Magnetsafety.org v. Consumer Prod. Safety Comm'n*,
129 F.4th 1253 (10th Cir. 2025) .................................................................. 100

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Service*,
70 F.4th 582 (D.C. Cir. 2023) ..................................................................... 51

*Michigan v. EPA*,
576 U.S. 743 (2015).......................................................................... 3, 81, 86

*Mingo Logan Coal Co. v. EPA*,
70 F. Supp. 3d 151 (D.D.C. 2014) ........................................................ 64, 69

*Mingo Logan Coal Co. v. EPA*,
714 F.3d 608 (D.C. Cir. 2013) ......................................................... 121, 122, 125

*Mingo Logan Coal Co. v. EPA*,
829 F.3d 710 (D.C. Cir. 2016 .............................................................64, 69, 112

*Minnesota v. Hoffman*,
  543 F.2d 1198 (8th Cir. 1976) ................................................................113

*Morton v. Mancari*,
  417 U.S. 535 (1974) ............................................................................ 106

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ........................................................................... 31, 85

*Nat'l Ass'n for Surface Finishing v. EPA*,
  795 F.3d 1 (D.C. Cir. 2015) .............................................................. 86, 99

*Nat'l Broad. Co. v. United States*,
  319 U.S. 190 (1943) ..................................................................... 122, 127

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ............................................................................118

*Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*,
  470 U.S. 451 (1985) ............................................................................ 109

*Nat'l Wildlife Fed'n v. Burford*,
  871 F.2d 849 (9th Cir. 1989) ................................................................. 86

*New York v. FERC*,
  535 U.S. 1 (2002) ................................................................................118

*Newport Galleria Grp. v. Deland*,
  618 F. Supp. 1179 (D.D.C. 1985) ...................................................... 44, 62

*Nicopure Labs, LLC v. FDA*,
  266 F. Supp. 3d 360 (D.D.C. 2017), *aff'd*, 944 F.3d 267 (D.C. Cir. 2019) ........... 100

*NRDC v. EPA*,
  25 F.3d 1063 (D.C. Cir. 1994) ............................................................... 87

*Occidental Eng'g Co. v. I.N.S.*,
  753 F.2d 766 (9th Cir. 1985) ................................................................. 30

*Pan. Refin. Co. v. Ryan*,
  293 U.S. 388 (1935) ..................................................................... 125, 126

*Pebble Ltd. P'ship v. EPA*,
  155 F.Supp.3d 1000 (D. Alaska 2014) ...................................................... 16

*Pebble Ltd. P'ship v. EPA*,
  604 Fed. Appx. 623 (9th Cir. 2015) ......................................................... 16

*PUD No. 1 of Jefferson County. v. Wash. Dep't of Ecology*,
511 U.S. 700 (1994) ................................................................ 107

*Russo Dev. Corp. v. Thomas*,
735 F.Supp. 631 (D.N.J. 1989) ............................................... 122

*Sackett v. EPA*,
598 U.S. 651 (2023) ............................................................ 4, 111

*Save Jobs USA v. DHS*,
111 F.4th 76 (D.C. Cir. 2024) .................................................. 115

*Seven Cnty. Infrastructure Coal. v. Eagle County*,
605 U.S. 168 (2025) .............................................. 30, 55, 58, 59, 68

*Shoshone-Bannock Tribes of Fort Hall Reservation. v. U.S. DOI*,
153 F.4th 748 (9th Cir. 2025) ........................................... 106, 107

*Sturgeon v. Frost*,
139 S. Ct. 1066 (2019) ............................................................ 108

*Sturgeon v. Frost*,
577 U.S. 424 (2016) ................................................. 102, 103, 108

*Trout Unlimited v. Pirzadeh*,
1 F.4th 738 (9th Cir. 2021) ................ 17, 22, 61, 71, 75, 122, 124, 126, 127

*United States v. Bass*,
404 U.S. 336 (1971) ................................................................ 111

*United States v. L.A. Tucker Truck Lines, Inc.*,
344 U.S. 33 (1952) .................................................................. 112

*United States v. Pheasant*,
129 F.4th 576 (9th Cir. 2025) .................................................. 120

*United States v. Winstar Corp.*,
518 U.S. 839 (1996) ................................................................ 109

*West Virginia v. EPA*,
597 U.S. 697 (2022) ......................................... 114, 115, 116, 117

*White Stallion Energy Ctr., LLC v. EPA*,
748 F.3d 1222 (D.C. Cir. 2014) ................................................ 86

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ......................................... 114, 120, 121

**State Cases**

*State v. Lewis*,
  559 P.2d 630 (Alaska 1977) ................................................................110

*Trustees for Alaska v. Alaska*,
  736 P.2d 324 (Alaska 1987) ................................................................114

**Statutes**

5 U.S.C. § 701(a)(2) ................................................................ 132, 136

33 U.S.C § 1251(a)(2) ................................................................ 4

33 U.S.C. § 1251(a) ................................................................ 4

33 U.S.C. § 1254(a)-(b) ................................................................ 17

33 U.S.C. § 1311(a) ................................................................ 4

33 U.S.C. § 1319(a)(3) ................................................................ 5

33 U.S.C. § 1344(a) ................................................................ 4, 5, 68, 123

33 U.S.C. § 1344(b) ................................................................ 4, 5, 6

33 U.S.C. § 1344(b)(1) ................................................................ 5

33 U.S.C. § 1344(c) ................................................1, 6, 33, 62, 65, 67, 72, 77, 118, 122, 129, 134

33 U.S.C. § 1344(g) ................................................................ 121

33 U.S.C. § 1344(h) ................................................................ 5

33 U.S.C. § 1344(i) ................................................................ 5

33 U.S.C. § 1344(j) ................................................................ 5

33 U.S.C. § 1344(n) ................................................................ 5

33 U.S.C. § 1344(q) ................................................................ 5

33 U.S.C. § 1344(t) ................................................................118, 119

33 U.S.C. § 1362(12) ................................................................ 78

33 U.S.C. § 1362(16) ................................................................ 78

33 U.S.C. § 1362(6) ................................................................ 4

33 U.S.C. § 1362(7) ............................................................................................ 4, 79

33 U.S.C. § 1370 ................................................................................................113

33 U.S.C. §1344(h)(1)(A)(i) .................................................................................. 5

42 U.S.C. § 4332(C) ........................................................................................... 64

43 U.S.C. § 870(b) .............................................................................................110

Act of Jan. 25, 1927, ch. 57, 44 Stat. 1026 ......................................................110

Pub. L. No. 85-508, 72 Stat. 339 (1958) ........................................... 106, 107, 109

Pub. L. No. 92-203, 85 Stat. 688 (1971) ........................................................... 107

Pub. L. No. 94-204, 89 Stat. 1145 ........................................................... 108, 109

Pub. L. No. 96-487, 94 Stat. 2437 (1980) ......................................................... 107

**State Statutes**

Alaska Stat. § 16.05.871 .................................................................................... 64

**Code of Federal Regulations**

33 C.F.R. § 320.2(f) ........................................................................................... 30

33 C.F.R. § 323.2(e)(1) ........................................................................................ 5

33 C.F.R. § 323.6(b) ........................................................................................... 30

33 C.F.R. § 331.2 ..................................................................................... 51, 79, 80

33 C.F.R. pt. 331, App. C ......................................................................... 51, 80

40 C.F.R. § 1506.10(a) ....................................................................................... 75

40 C.F.R. § 230.10(c) ........................................................................................... 6

40 C.F.R. § 230.92 ............................................................................................. 86

40 C.F.R. § 230.93(a)(1) ..................................................................................... 86

40 C.F.R. § 230.93(a)(2) ..................................................................................... 87

40 C.F.R. § 230.93(h)(1)(iv) ............................................................................... 86

40 C.F.R. § 230.93(h)(1)(v) ............................................................................... 87

40 C.F.R. § 231.1 ................................................................................................ 6, 75

40 C.F.R. § 231.1(a) ................................................................................................. 6

40 C.F.R. § 231.2 .............................................................................. 7, 63, 64, 66, 68, 84

40 C.F.R. § 231.2(e) ............................................................................. 7, 63, 66, 68, 84

40 C.F.R. § 231.3(a) ........................................................................................... 7, 24

40 C.F.R. § 231.3(a)(2) ....................................................................................... 7, 24

40 C.F.R. § 231.4 .................................................................................................... 24

40 C.F.R. § 231.4(a) ................................................................................................. 7

40 C.F.R. § 231.4(b)-(g) ........................................................................................... 7

40 C.F.R. § 231.5 .................................................................................................... 24

40 C.F.R. § 231.5(a) ................................................................................................. 8

40 C.F.R. § 231.5(b) .......................................................................................... 8, 75

40 C.F.R. § 231.6 ..................................................................................................... 8

40 C.F.R. pt. 230 ..................................................................................................... 5

40 C.F.R. pt. 231 ................................................................................................ 6, 7

**State Regulations**

Alaska Admin. Code tit. 5 § 39.222(c)(2)(D) .......................................................... 10

Alaska Admin. Code tit. 5, § 39.222(c)(1)(G) ........................................................ 10

**Federal Register**

44 Fed. Reg. 58076 (Oct. 9, 1979) ................................................................ 6, 65, 75

82 Fed. Reg. 33123 (July 19, 2017) ....................................................................... 17

84 Fed. Reg. 45749 (Aug. 30, 2019) ....................................................................... 17

**Legislative History**

H.R. Rep. No. 104-643 (1996) .............................................................................. 103

H.R. Rep. No. 94-729 (1975) ................................................................................ 103

S. Rep. No. 83-1028 (1954) ........................................................................ 105

S. Rep. No. 95-370 (1977) ........................................................................ 113

# INTRODUCTION

To develop and mine the Pebble deposit, Plaintiff Pebble Limited Partnership (PLP) sought a Clean Water Act (CWA or Act) permit to discharge dredged or fill material into waters of the United States that—based on PLP's own mine plan submission—would result in the permanent loss of (1) 8.5 miles of salmon streams, (2) 91 miles of additional streams that support salmon streams, and (3) over 2,100 acres of wetlands that support salmon streams. PLP's proposed discharges would also alter streamflow thereby adversely affecting 29 miles of salmon streams downstream of the mine site. While the magnitude of these losses and streamflow changes is substantial, the Environmental Protection Agency (EPA) determined that the resulting adverse effects on salmon habitat are what make the effects unacceptable based on the unique facts for this specific area. Thus, using its authority under the CWA, and after a thorough technical and legal analysis EPA acted in 2023 to prohibit and restrict certain discharges in waters of the United States as described in PLP's mine plan. Plaintiffs in these consolidated actions largely question EPA's factual findings or try to second guess the Agency's conclusions. But EPA's action is backed by an adequate technical record that easily clears the Administrative Procedure Act's low bar.

The CWA and its implementing regulations contain permitting programs that limit the discharge of pollutants into waters of the United States. On top of these permit safeguards, Congress added an extra authority—CWA Section 404(c), 33 U.S.C. § 1344(c)—for discharges of dredged or fill material that, in the Administrator's judgment, will have an unacceptable adverse effect on resources of particular importance, including, as relevant here, fishery areas. Section 404(c) authorizes EPA to prohibit or restrict the use of waters of the United States as a disposal site for dredged or fill material "whenever" the Administrator determines that such

disposal will have unacceptable adverse effects on fishery areas. Since the CWA's enactment, EPA has invoked its Section 404(c) authority judiciously, taking final action a total of 14 times.

The fact-specific circumstances here reflect the complex decisions Congress charged EPA with making under Section 404(c). The Pebble deposit underlies streams, wetlands, and other waters that are critical for supporting salmon in parts of Alaska's Bristol Bay watershed, a largely undisturbed, globally significant economic, ecological, and cultural resource. PLP's mine plan calls for the disposal of large quantities of fill into waters of the United States that would destroy or comparably damage large areas of salmon habitat that are fishery areas. These streams, wetlands, and other aquatic resources provide the foundation for world-class, economically important, commercial and sport fisheries for salmon and other fish species. The region's salmon resources have also supported Alaska Native cultures for thousands of years.

EPA determined that the stream and wetland losses, and the streamflow alterations that PLP proposed would each independently cause unacceptable adverse effects on salmon habitat. Thus, EPA exercised its CWA authority to prohibit and restrict discharges that (1) occur in waters of the United States within two defined areas; (2) result from development of the Pebble deposit; and (3) result in the above-described stream or wetland losses or streamflow changes.

EPA based its Final Determination on an extensive record including PLP's own data, the State of Alaska's classification of specific streams as important waters for salmon, and the scientific record demonstrating the unique ecological connection between maintaining salmon habitat and sustaining the diversity and abundance of salmon populations in the defined areas. Streams in the defined areas are vital to salmon through their life cycle. Salmon spawn in freshwater streams and their eggs incubate in streambed gravel, protected from predators. As salmon grow, streams provide organic matter, other nutrients, and stable temperatures. And after

migrating to the sea, salmon return to their birth streams to reproduce. Supporting wetlands in the defined areas similarly contribute nutrients, regulate flow, and provide other critical functions that maintain the streams' ecological health. The degradation of salmon habitat would threaten the stability and resilience of salmon populations.

Plaintiffs disagree with the Final Determination. But Plaintiffs' disagreement does not render the Final Determination unlawful. Plaintiffs' arguments rely on (1) misrepresentations of the facts, the basis for EPA's decision, and the state of the science; (2) implausible readings of clear provisions of the CWA; and (3) recent Supreme Court precedent and constitutional principles that are inapplicable. Contrary to Plaintiffs' implications otherwise, EPA did not make the Final Determination lightly. It came after studying the waters at issue and the effects the proposed mining plan would have on the salmon habitat. Further, it reflects what EPA learned during the permitting process and developments in the legal landscape. One primary example is EPA's decision to consider costs. While Plaintiffs attempt to poke holes in that assessment, it is consistent with the Supreme Court's direction in *Michigan v. EPA*, 576 U.S. 743 (2015).

Finally, and contrary to Plaintiffs' suggestion, the Final Determination does not prohibit mining the Pebble deposit. Instead, EPA limited discharges of dredged or fill material into certain waters of the United States associated with mining the Pebble deposit that would result in the aforementioned levels of stream and wetland losses or streamflow changes proposed in PLP's mine plan. While the Final Determination prevents PLP from doing exactly as it wishes, it leaves room for other mining plans. The Final Determination is limited to the specific facts at issue here. As discussed, the defined areas at issue here are of unique socio-economic, ecological, and cultural importance and the Agency's position reflects these fact-specific circumstances. The Agency's action is consistent with Section 404(c)'s focus on site-specific and

fact-specific determinations. The Final Determination will be a useful resource to inform future mining proposals.

The Court should deny Plaintiffs' motions and enter judgment for Defendants because EPA's Final Determination is consistent with the CWA, reasonable, and amply supported by the robust record.

## BACKGROUND

### I.      Statutory and Regulatory Authority

Congress passed the CWA in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act sets several goals, including attainment and preservation of "water quality which provides for the protection and propagation of fish . . . ." *Id.* § 1251(a)(2). To further its goals, the Act prohibits the "discharge of any pollutant" into "navigable waters" except in accordance with, *inter alia*, a permit issued under Section 404 of the Act. *Id.* §§ 1311(a), 1344(a), (b). "Pollutant" includes rock and sand. *Id.* § 1362(6). "Navigable waters" means "the waters of the United States." *Id.* § 1362(7); *see Sackett v. EPA*, 598 U.S. 651, 678 (2023).

Section 404(a) authorizes the U.S. Army Corps of Engineers (Corps) to issue permits to discharge "dredged or fill material" into waters of the United States at specified disposal sites. 33 U.S.C. § 1344(a). "Fill material" constitutes pollutants when a discharge either replaces any portion of a water of the United States with dry land or changes the bottom elevation of any portion of such a water. *See* 33 C.F.R. § 323.2(e)(1). "Dredged material" means "material that is excavated or dredged from waters of the United States." *Id.* § 323.2(c). In this brief, "discharge" means discharges of dredged or fill material into waters of the United States because those are the discharges addressed by Section 404 and at issue here.

Section 404(b) requires the Corps to specify disposal sites for each permit it issues under Section 404(a). 33 U.S.C. § 1344(b). Although the Corps issues permits, the CWA vests EPA with integral authorities for the Section 404 program. *See, e.g.*, 33 U.S.C. §§ 1319(a)(3), 1344(b)(1), (h), (i), (j), (n), (q). For example, Congress charged EPA, along with the Corps, with developing the "Section 404(b)(1) Guidelines" that provide the environmental criteria for evaluating permit applications. *See id*. § 1344(b)(1), (h)(1)(A)(i); 40 C.F.R. pt. 230. Under the Guidelines, discharges are prohibited in several circumstances, including when they will "cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c).

In Section 404(c), Congress gave EPA authority over discharges that affect vital resources such as municipal water supplies and fishery areas. That provision authorizes EPA to prohibit the specification of, or deny or restrict the use of, any defined area as a disposal site for dredged or fill material.

> The [EPA] Administrator is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas.

33 U.S.C. § 1344(c). Thus, Section 404(c) allows EPA to limit the use of a defined area for discharges "whenever" the Administrator determines that the discharges will have unacceptable adverse effects on "fishery areas (including spawning and breeding areas)." *Id.*; *see also* 40 C.F.R. § 231.1(a). The Corps' authority to specify a disposal site for a permit is expressly limited by EPA's authority to prohibit, deny, or restrict that specification. 33 U.S.C. § 1344(b) ("*Subject*

*to subsection (c)* . . . , each such disposal site shall be specified for each such permit by the Secretary . . . .") (emphasis added).

In 1979, EPA promulgated regulations governing the exercise of its Section 404(c) authority. *See* 40 C.F.R. pt. 231; 44 Fed. Reg. 58076 (Oct. 9, 1979). EPA's regulations require a robust public process designed to ensure fully informed decision making. This process includes public notices, public comment, and consultation with affected parties, which all must be completed and considered before EPA may make a Section 404(c) final determination to prohibit, deny or restrict disposal in a defined area. *See* 40 C.F.R. pt. 231.

The process begins with an EPA Regional Administrator (the chief of one of 10 regional offices), who "may" initiate Section 404(c) review proceedings if he has "reason to believe," after evaluating the available information, that an "unacceptable adverse effect" could result from the use of any defined area as a disposal site for dredged or fill material. *Id.* § 231.3(a). "Unacceptable adverse effect" is defined to mean "impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies (including surface or ground water) or significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas." *Id.* § 231.2(e). The Corps, landowner, or permit-applicant (if any) may seek to demonstrate to the Regional Administrator that no unacceptable adverse effects will occur. *Id.* § 231.3(a)(2).

If the Regional Administrator still believes that unacceptable effects will occur, they publish notice of the proposed determination, and any interested person may submit comments during a comment period. *Id.* § 231.4(a). Where significant public interest in the proposed determination exists, or if an affected landowner or the permit holder or applicant requests, the Regional Administrator shall convene a public hearing. *Id.* § 231.4(b)-(g). After the public

comment period and/or hearings conclude, the Regional Administrator must either withdraw the proposed determination or prepare a recommended determination to prohibit or withdraw specification, or deny, restrict, or withdraw the use for specification. *Id.* § 231.5(a). If the Regional Administrator prepares a recommended determination, the recommendation must be "promptly" forwarded with the administrative record to EPA Headquarters for review. *Id.* § 231.5(b).

EPA Headquarters must then initiate consultation with the Corps, the owner, and the permit applicant, "if any," who have 15 days to notify EPA of their intent to act to prevent the unacceptable adverse effects. *Id.* § 231.6. EPA Headquarters must then make a final decision affirming, modifying, or rescinding the recommended determination, and publish notice of that decision in the Federal Register. *Id.* That final determination "constitutes final agency action" for the purpose of judicial review. *Id.*

## II. Factual Background

### A. The Bristol Bay Watershed's Diverse Salmon Populations Are the Result of its Rich Aquatic Habitats.

Alaska's Bristol Bay watershed is home to a globally significant salmon fishery that is unrivaled in North America. *Final Determination of the U.S. EPA Pursuant to Section 404(c) of the CWA, Pebble Deposit Area, Southwest Alaska* (January 2023) ("Final Determination" or "FD"), EPA_AR_0082927 at 0082943. The Kvichak and Nushagak are the largest two rivers that drain to Bristol Bay. EPA_AR_0082945. These rivers support all five species of wild Pacific salmon: Chinook, Chum, Coho, Pink, and Sockeye. EPA_AR_0083048. The Bristol Bay watershed and relevant sub-watersheds (including the Kvichak and Nushagak watersheds) are depicted in the Final Determination's Figure ES-1. EPA_AR_0082944.

The Bristol Bay Sockeye salmon populations are the most abundant and diverse remaining in the United States, and the watershed produces about half of the world's Sockeye salmon. EPA_AR_0082943, 0083036. Approximately half of Bristol Bay's Sockeye salmon production[1]—one quarter of the world's Sockeye salmon—comes from the Nushagak and Kvichak River watersheds. EPA_AR_0083017; EPA's 2014 Bristol Bay Watershed Assessment ("BBA"), EPA_AR_0139804 at 0139840. The Bristol Bay watershed also produces Chinook salmon runs that are frequently the world's largest, as well as significant Coho, Chum, and Pink salmon populations.[2] FD at EPA_AR_0082943. The Nushagak River watershed is the dominant producer of Chinook, Coho, Chum, and Pink salmon in the Bristol Bay watershed. EPA_AR_0083049. For example, more than 75 percent of Bristol Bay's commercial Chinook salmon catch is from the Nushagak fishing district. EPA_AR_0083017. Unlike many North American salmon fisheries, Bristol Bay's salmon populations are entirely wild and self-sustaining. EPA_AR_0082943, 0083060-61.

The total annual economic value of the Bristol Bay watershed's salmon resources was estimated at more than $2.2 billion in 2019. EPA_AR_0082945. The Bristol Bay commercial salmon fishery generates the most significant component of that economic activity, resulting in 15,000 jobs and an economic benefit of $2.0 billion in 2019, $990 million of which was in Alaska. *Id*. The salmon resources also support one of the last intact salmon-based cultures in the world. EPA_AR_0083050.

---

[1] Salmon "production" or "productivity" refers to the rate at which a particular area, (i.e., a habitat, watershed, or sub-watershed) generates new salmon through growth, survival, and reproduction.

[2] A "run" is salmon's migration from the ocean back to freshwater to spawn.

Salmon have a unique life history that requires specific environmental conditions for success. First, salmon are anadromous, meaning they hatch and grow (rear) in freshwater habitats (streams, rivers, lakes, ponds, and wetlands), migrate to sea for a period of growth, and then return to freshwater habitats to lay eggs (spawn). EPA_AR_0083010. Second, adults return to the place they were born (their natal habitat) to spawn. *Id.* This "homing" behavior fosters reproductive isolation, creating distinct, localized populations that are uniquely adapted to their natal habitats' specific environmental conditions. EPA_AR_0083010, 0083036. Because adults have only one opportunity to reproduce, spawning site availability is critical. EPA_AR_0083010. Salmon select the familiar stream of their birth to increase reproductive success. *Id.* After reproducing, salmon die and their decomposing bodies release nutrients into their spawning habitats; this slow release of ocean-derived nutrients provides critical resources for salmon offspring and many other organisms, both in the vicinity and in downstream waters. *Id.*

The Bristol Bay watershed has several characteristics that make it an optimal home for salmon. The watershed provides intact, connected habitats—from headwaters to ocean—so salmon can swim unobstructed to sea and then back to their birth streams. EPA_AR_0082998, 0083060. And the watershed is largely undisturbed by human development, a factor contributing to extinction risk for many native salmon populations elsewhere. EPA_AR_0082998. The Bristol Bay watershed has evolved into a landscape marked by abundant, high quality, and diverse freshwater habitats. EPA_AR_0082999. These streams, wetlands, and other aquatic resources support all freshwater salmon life stages. *Id*. Studies show that the innumerable array of habitats for spawning and rearing salmon directly result in distinct populations that look physically different, behave differently, and have unique genetics. EPA_AR_0083035-38.

The Bristol Bay watershed's successful salmon fisheries are linked to the "portfolio effect." EPA_AR_0083040-46. Just as a financial portfolio with assets divided among diverse investments increases financial stability, the genetic diversity among salmon populations along with asynchronous life histories (different populations spawning, rearing, and migrating at different times and locations) stabilizes overall salmon production in the Bristol Bay watershed. EPA_AR_0083037. In some years, in response to changing environmental conditions, higher numbers of certain sub-populations return to spawn compared to other sub-populations, but overall production (i.e., salmon survival and reproduction) remains stable. EPA_AR_0083041. Because the productivity of individual habitats and sub-watersheds varies with environmental conditions, maintaining habitat diversity across the landscape is necessary for maintaining the sustainability and productivity of salmon populations. EPA_AR_0083037.

The protection of salmon habitat and genetic diversity within salmon populations are key components of Alaska's sustainable salmon policy. EPA_AR_0083040; *see, e.g.*, Alaska Admin. Code tit. 5, § 39.222(c)(1)(G) (recognizing that "diversity should be maintained to the maximum extent possible, at the genetic, population, species and ecosystem levels"). *Id.* § 39.222(c)(2)(D) (directing that "salmon escapement should be managed . . . to maintain genetic and phenotypic characteristics of the stock by assuring appropriate geographic and temporal distribution of spawners as well as consideration of size range, sex ratio, and other population attributes").

**B. The Pebble Deposit Underlies Watersheds That Are Valuable for Salmon.**

The Pebble deposit is a large low-grade copper, gold, and molybdenum-bearing ore body in the Bristol Bay watershed. FD at EPA_AR_0082943, 0082945. In 2001, a Canadian company, Northern Dynasty Minerals Ltd., acquired mining claims for the Pebble deposit. PLP, wholly owned by Northern Dynasty, currently holds mining claims related to the deposit.

EPA_AR_0082977. Alaska owns the land where the Pebble deposit is located and the mineral rights in the land. *Id.* Since 2001, Northern Dynasty and PLP have been conducting data collection and analysis to develop a large-scale mine at the Pebble deposit. EPA_AR_0082947. In this brief, Northern Dynasty and PLP are collectively called PLP.

The Pebble deposit underlies portions of the South Fork Koktuli River (SFK) and North Fork Koktuli River (NFK) watersheds, which drain into the Nushagak River. As discussed above, the Nushagak River is one of the two largest rivers in the Bristol Bay watershed and is the dominant contributor of Chinook, Coho, Chum and Pink salmon and, along with the Kvichak River watershed, produces half of Bristol Bay's Sockeye salmon. EPA_AR_0083049. The Koktuli River, including SFK and NFK, is recognized as providing important spawning habitat for Chinook, Sockeye, and Chum salmon. AK Dep't of Nat. Res., Nushagak & Mulchatna Rivers Rec. Mgmt. Plan (2005), EPA_AR_0476351 at 0476418. The Nushagak River is the largest producer of Chinook salmon in the Bristol Bay watershed, and the Koktuli River is often the largest producer of Chinook salmon in the Nushagak River watershed. EPA_AR_0083030; AK Dep't of Fish & Game, Rpt. to AK Board of Fisheries (2009), EPA_AR_0481810 at EPA_AR_0481831-35.

The Pebble deposit also underlies portions of the Upper Talarik Creek (UTC) watershed, which drains to the Kvichak River via Iliamna Lake. FD at EPA_AR_0082945. The Kvichak River is often the dominant producer of Sockeye salmon in the Bristol Bay region. EPA_AR_0083049. Iliamna Lake provides the majority of Sockeye salmon rearing habitat in the Kvichak River watershed and historically has produced more Sockeye salmon than any other lake in the Bristol Bay region. EPA_AR_0083017. The UTC is recognized as providing

important spawning habitat for Chinook, Sockeye, and Coho salmon and is notable as a substantial producer of Sockeye salmon EPA_AR_008302426, 0083030.

The waters overlying the Pebble deposit are the headwaters to the SFK, NFK, and UTC watersheds. EPA_AR_0082945, 0082961 (FD Figure 4-3, below, depicts the watersheds and the headwater streams). Headwater streams are small channels where rivers originate. EPA_AR_0083006. They, along with wetlands and other waters, provide valuable habitat for the various life stages of migratory fish species, such as salmon. EPA_AR_0083006-07. They also contribute water and nutrients to the larger downstream reaches that also support salmon. EPA_AR_0083006, 0083009. Because headwater streams have a large influence on downstream flow, water chemistry, and biota, impacts to headwater streams reverberate throughout the entire downstream watershed. EPA_AR_0083006.

*This remainder of thsi page is intentionally left blank.*



Figure 4-3. Streams, rivers, and lakes with documented salmon use in the South Fork Koktuli River, North Fork Koktuli River, and Upper Talarik Creek watersheds, downstream of the Pebble 2020 Mine Plan. Species distributions are based on the Anadromous Waters Catalog (Giefer and Graziano 2022).

The SFK, NFK, and UTC watersheds overlying the deposit and downstream provide valuable salmon habitat. Alaska documented multiple salmon species at various life stages in the headwaters of these watersheds, including portions of the streams overlying the Pebble deposit, as well as the mainstem streams into which they flow (the mainstem stream is the largest channel acting as the central artery). EPA_AR_0083087, 0083062 (Figure 3-18). Coho salmon have the most widespread distribution of the five salmon species in the three watersheds and make

extensive use of mainstem and tributary habitats, including headwater streams.

EPA_AR_0083023. Chinook and Sockeye salmon have been documented throughout mainstem reaches of the three watersheds, as well as in several tributaries. *Id*. Coho and Chinook salmon spend one to three years rearing in headwater streams, meaning that headwater streams are particularly important for these species. EPA_AR_0083017, 0083014 (Table 3-4). The waters of the SFK, NFK, and UTC watersheds also have attributes of high-quality salmon habitat. EPA_AR_0083000. A high proportion of stream channels in the watersheds possess characteristics that create highly suitable stream and river habitats for Pacific salmon, including low stream gradients, gravel streambeds, sufficient annual flow, and abundant areas of groundwater exchange. EPA_AR_0083002, 0083061.

The salmon habitats both overlying the deposit and downstream support distinct salmon populations. In each of the three watersheds, streams, wetlands, lakes, ponds, and other aquatic resources combine in different ways to create unique habitat mosaics, which over thousands of years have resulted in locally adapted salmon populations. EPA_AR_0083005. The SFK, NFK, and UTC watersheds are known to support small, discrete populations of Sockeye salmon that are genetically programmed to return to specific, localized reaches or habitats to spawn. EPA_AR_0083040, 0082308. These portfolios of small populations stabilize the overall Sockeye salmon population. EPA_AR_0083046. Existing evidence shows that the watersheds also support small, discrete populations of Coho and Chinook salmon. EPA_AR_0083061, 0083075-77. Recognizing that Coho and Chinook salmon are genetically programmed on a fine geographic scale is important for several reasons. These species are the two rarest of North America's five species of Pacific salmon and are particularly vulnerable to losses of small, discrete populations. EPA_AR_0083076. Activities that cause declines in population in, for

example, Coho salmon, are more likely to have strong negative impacts than for species whose genetic variation is distributed over a broader geographic scale. EPA_AR_0083076-77. And for Chinook salmon, population declines have already occurred in the Nushagak River. EPA_AR_0083076; Dep't of Fish & Game Memo (10/7/2022), EPA_AR_0475116-20.

Finally, the SFK, NFK, and UTC watersheds make essential contributions that support downstream salmon populations. These watersheds have a high density of headwater streams, making up 65 percent of their stream channel length. FD at EPA_AR_00083086. Even though headwater streams are small, their large collective surface impacts larger downstream reaches. EPA_AR_00083008, 0083092. Because headwater streams are narrower, they proportionally get more organic input from surrounding vegetation than larger downstream waters and supply nutrients downstream. EPA_AR_0083008. The Pebble deposit area is also dominated by deciduous shrubs, which fuel production of macroinvertebrates[3] that are a key food for juvenile salmon. EPA_AR_0083008, 0083075.

### C. EPA Has Been Studying the Impact that Discharges from Mining the Pebble Deposit Would Have on Salmon Habitat for Decades.

As early as 2004, EPA Region 10 began meeting with Northern Dynasty to discuss its plans to prepare a mining proposal for CWA Section 404 permitting by the Corps, which would require compliance with the National Environmental Policy Act (NEPA). EPA_AR_0082978. From 2004 to 2010, EPA participated in different teams of federal and state agency technical staff formed at Northern Dynasty's (and later PLP's) request to facilitate coordinated agency review of environmental studies to support future environmental review and permitting actions. *Id.*

---

[3] Macroinvertebrates are backboneless animals visible without magnification (e.g., insects, crayfish and aquatic worms).

In 2010, EPA announced its intent to conduct a scientific assessment under CWA Section 104(a) and (b), 33 U.S.C. § 1254(a)-(b), to evaluate how future large-scale mining projects might affect water quality and Bristol Bay's salmon fishery (referred to as the "Assessment"). *Id.*[4] The Assessment's purpose was to characterize the biological and mineral resources of the Bristol Bay watershed; increase understanding of the potential impacts of large-scale mining on the region's fish resources; and inform future decisions by government agencies and others. EPA_AR_0082980. EPA's review and synthesis of information included PLP's 25,000-page environmental baseline document that presented the results of baseline studies from 2004 through 2008. EPA_AR_0082979-80. EPA's final Assessment was issued in January 2014. BBA at EPA_AR_0139829, FD at EPA_AR_0082981.

After issuing the Assessment, and after considering the available information, EPA initiated the Section 404(c) process to evaluate potential discharges associated with mining the Pebble deposit. EPA_AR_0082981. EPA Region 10 issued a proposed determination in July 2014 ("2014 Proposed Determination"). EPA_AR_0082982. While that Section 404(c) process was ongoing, PLP mounted a series of challenges to EPA's actions. First, PLP challenged the 2014 Proposed Determination in this Court, with Alaska participating as an intervenor. This Court dismissed that suit for lack of any final agency action. *Pebble Ltd. P'ship v. EPA*, 155 F.Supp.3d 1000 (D. Alaska 2014). The Ninth Circuit affirmed. *Pebble Ltd. P'ship v. EPA*, 604 Fed. Appx. 623 (9th Cir. 2015).

PLP brought a second challenge, primarily arguing that the Assessment was invalid because, *inter alia*, it violated the Federal Advisory Committee Act (FACA). Based on the FACA

---

[4] 33 U.S.C. § 1254(a) and (b), among other things, direct EPA to conduct research, investigations, and studies relating to pollution.

claims, this Court preliminarily enjoined EPA from further action related to its Section 404(c) process. *See* Order Granting Preliminary Injunction, ECF 90, *Pebble Ltd. P'ship* v. *EPA*, No. 3:14-cv-00171-HRH (D. Alaska Nov. 25, 2014). In 2017, EPA and PLP settled that case. *See* Settlement Agreement, EPA_0139590-610. In the settlement, PLP agreed that EPA could use the "Assessment without *any* limitation." EPA_AR_0139594 (emphasis added). In July 2017, EPA fulfilled its requirement in the settlement agreement to publish a proposal to withdraw the 2014 Proposed Determination. *See* 82 Fed. Reg. 33123 (July 19, 2017), EPA_AR_0139118. In August 2019, EPA published a final withdrawal of the Proposed Determination. 84 Fed. Reg. 45749 (Aug. 30, 2019), EPA_AR_0139126 at EPA_AR_0139133. EPA withdrew the Proposed Determination because, as discussed below, in December 2017, PLP filed a permit application with the Corps and EPA believed there would be additional facts developed in the permit review process that could inform its determination. *Id.* Several tribal, fishing, and environmental groups challenged the withdrawal, but this Court dismissed the suit, holding that the withdrawal was committed to agency discretion and not subject to judicial review. *Bristol Bay Econ. Dev. Corp.* v. *Hladick*, 454 F.Supp.3d 892, 909 (D. Alaska 2020). The Ninth Circuit reversed, as discussed below. *Trout Unlimited v. Pirzadeh,* 1 F.4th 738 (9th Cir. 2021).

### D. PLP's Permit Application Proposed Significant Levels of Aquatic Resource Loss in Alaska.

In December 2017, PLP submitted a Section 404 permit application to the Corps. FD at EPA_AR_0082947. In January 2018, the Corps notified the public that it would prepare an Environmental Impact Statement (EIS) pursuant to NEPA. EPA_AR_0082984.

PLP revised its permit application during the NEPA process, culminating in the version it submitted to the Corps in June 2020 (the "2020 Mine Plan"). 2020 Mine Plan, EPA_AR_0087313-91 (without attachments). The 2020 Mine Plan included an open-pit mine, as

well as construction of a processing plant, tailings storage facilities, water management ponds, a water treatment plant, and a 270-megawatt power plant. EPA_AR_0087328; FD at EPA_AR_0082971-73. In total, PLP proposed to mine 1.3 million tons of ore over 20 years, after which it would spend approximately 20 years engaging in closure activities. FD at EPA_AR_0082947. Post-closure activities, including long-term water management and monitoring, would last for centuries. *Id.*

The 2020 Mine Plan proposed a significant loss of salmon streams and other waters that support wild Pacific salmon. EPA_AR_0083074. Based on PLP's permit application, the Final Environmental Impact Statement (FEIS) identified 99.7 miles of streambed habitat at the mine site, approximately 8.5 miles of which are anadromous (salmon) fish streams, that would be permanently lost because of the discharges of dredged or fill material associated. FEIS, EPA_AR_0095130 at 0095953-54; FD at EPA_AR_0083071, 0083089. The FEIS also found that such discharges would result in the permanent loss of more than 2,100 acres of wetlands and other waters, with nearly all those losses occurring in the SFK and NFK watersheds. FEIS at EPA_AR_0095776; FD at EPA_AR_0083074, 0083093, 0083098, 0083102, 0083145.

### E. EPA Evaluated the Impacts of the 2020 Mine Plan During the Permitting Process.

EPA participated in the Corps' review of PLP's permit application. Through that process EPA obtained a detailed understanding of PLP's plans to mine the Pebble deposit and the effects it would have on the aquatic environments in the SFK and NFK, including the salmon habitat that it had studied as part of the Assessment.

The Corps first focused on NEPA and the development of the EIS, publishing a preliminary final EIS in February 2020. FD at EPA_AR_0082985. EPA did not draft any portion of the EIS, but was a cooperating agency, meaning that it provided feedback to the Corps.

EPA_AR_0082984. EPA submitted multiple rounds of comments to the Corps during the NEPA process. *See, e.g.*, EPA_AR_0088035-60 (Scoping Notice Comments); EPA_AR_0087756 (Prelim. FEIS Comments); EPA_AR_0087854-968 (Draft EIS Comments).

EPA submitted over 100 pages of comments on the draft EIS. Draft EIS Comments at EPA_AR_0087854. Among other things, EPA commented that the draft EIS "appears to lack certain critical information about the proposed project and mitigation," and "likely underestimates impacts and risks to groundwater and surface water flows, water quality, wetlands, aquatic resources, and air quality." EPA_AR_0087855. EPA recommended that, regarding salmon, the Corps consider the scale of impacts and conduct an impact analysis that effectively accounts for locally adapted salmon populations. Prelim. FEIS Comments at EPA_AR_0087756. EPA also explained that statements about the project's purportedly limited impacts to the "portfolio effect" "do not appear to be supported by scientific literature or the data." *Id.*

Regarding Section 404 permitting, in July 2019, EPA submitted over 50 pages of comments addressing the Corps' public notice of the permit application. 404 Permit App. Comments at EPA_AR_0087969-8028. The 1992 CWA Section 404(q) Memorandum of Agreement ("MOA") between EPA and the Corps outlines a multi-step process for, *inter alia*, EPA to elevate individual permit cases that raise concerns regarding aquatic resources of national importance. MOA, EPA_AR_0141376 at EPA_AR_0141381-85. EPA's July 2019 letter was the first step in that elevation process. 404 Permit App. Comments at EPA_AR_0087971. EPA stated that "this project as described in the [public notice] may have substantial and unacceptable adverse impacts on fisheries resources in the project area watersheds, which are aquatic resources of national importance." *Id.* EPA raised specific concerns on numerous

topics, including about the project's potential impacts to fish habitat, EPA_AR_0087992, and ultimately concluded that "the [public notice], [draft EIS], and supporting documents do not contain sufficient information to support a reasonable judgment that the proposed discharges will comply" with the Section 404(b)(1) Guidelines. EPA_AR_0087971.[5]

In addition to reviewing the draft Section 404 permit as described above, EPA participated in weekly meetings in spring 2020 with the Corps and Fish & Wildlife Service to evaluate the proposed project for compliance with the 404(b)(1) Guidelines. FD at EPA_AR_0082985. In May 2020, EPA reiterated its "concern regarding the extent and magnitude of the substantial proposed impacts to aquatic resources within the Bristol Bay watershed that would result from the project." May 2020 Letter, EPA_AR_0087752-53. EPA requested further coordination with the Corps if PLP proposed additional measures, to consider "*whether* such additional measures would *alter* EPA's views" on compliance with the 404(b)(1) Guidelines. *Id.* (emphasis added). However, in the May 2020 letter to the Corps, EPA declined to continue the MOA elevation process because "[t]he Corps ha[d] demonstrated its commitment to the spirit of the dispute resolution process" and because of "the Corps' recent commitment to continue this coordination into the future, outside of the formal dispute process" outlined in the MOA. EPA_AR_0087752. Under the MOA, EPA need not follow the elevation

---

[5] Other entities expressed concerns to the Corps. In July 2019, the Fish & Wildlife Service wrote that "the project as proposed will have significant adverse impacts on important fish, wildlife, and aquatic habitats," and recommended that a permit *not* be issued for the project as proposed. EPA_AR_0138276 at 0138278. The National Marine Fisheries Service also submitted comments to the Corps, stating that "[t]he draft [Essential Fish Habitat] Assessment generally understates the value of [essential fish habitat] that would be affected by the proposed action and the seriousness of likely adverse effects to [essential fish habitat] and federally managed fish species from the proposed action." EPA_AR_0145703 at 0145758.

process prior to initiating a Section 404(c) process: The MOA does not "diminish . . . the Administrator's authority under Section 404(c) of the [CWA]." MOA at EPA_AR_0141377.

The Corps' FEIS, released in July 2020, identified impacts to aquatic resources that EPA later determined individually would have unacceptable adverse effects on fishery areas. FEIS, Ch. 4 at 0095953-54, 0095776; *see* FD at EPA_AR_0083071, 0083089, 0083098, 0083108.

A month earlier, the Corps advised PLP that, under the Section 404(b)(1) Guidelines, its proposed discharges would potentially cause significant degradation and that substantial compensatory mitigation would be necessary to obtain a permit. PLP Permit Appeal, EPA_AR_0129359 at 0129362. After receiving PLP's request for reconsideration, EPA_AR_0130061-70, the Corps reiterated its preliminary determination. EPA_AR_0130430-32. The Corps gave PLP 90 days to submit a revised compensatory mitigation plan, which the Corps would review to determine whether the proposed compensation would "overcome significant degradation at the mine site." *Id.*

In November 2020, the Corps' Alaska District denied the permit. Corps 2020 ROD, EPA_AR_0129269 at 0129294. The District concluded, *inter alia*, that discharges associated with the proposed mine would result in significant degradation of the aquatic ecosystem and that the project was contrary to the public interest. *Id*. On January 19, 2021, PLP filed an administrative appeal. EPA_AR_0129359 at 0129362.

## F. After PLP Appealed the Corps' 2020 Permit Denial, EPA Exercised its Section 404(c) Authority to Protect Salmon Fishery Areas.

While PLP's administrative appeal was pending, in June 2021, the Ninth Circuit reversed this Court's decision to dismiss the challenge to EPA's withdrawal of its 2014 Proposed Determination. The Ninth Circuit held that, under EPA's regulations, EPA may withdraw a

proposed determination "*only* if the discharge of materials [at issue] would be unlikely to have an unacceptable adverse effect." *Pirzadeh*, 1 F.4th at 757. On remand, this Court granted EPA's request to vacate and remand the withdrawal of the 2014 Proposed Determination. ECF 109, *Bristol Bay Econ. Dev. Corp.* v. *Pirzadeh*, No. 3:19-cv-00265-SLG (D. Alaska Oct. 29, 2021).

In January 2022, EPA initiated another Section 404(c) process and notified PLP, Alaska, the Corps, and other stakeholders that, based on its evaluation to date of the available information, EPA continued to believe that the discharges associated with mining the Pebble deposit could result in unacceptable adverse effects on important fishery areas. EPA_AR_0000003-04; EPA_AR_0138406-07; EPA_AR_0138408; EPA_AR_0138409-10; *see* 40 C.F.R. § 231.3(a)(1). In May 2022, EPA issued a new proposed determination. EPA_AR_0082179-517; *see* 40 C.F.R.§ 231.3(a)(2). The notice of the proposed determination initiated a public comment period and announced public hearings. EPA_AR_0000041; 40 C.F.R. § 231.4. In June 2022, EPA held three public hearings where interested parties provided 111 oral statements. EPA_AR_0081901-2055; EPA_AR_0082056-110; EPA_AR_0082129-65. EPA also received more than 582,000 written comments. FD at EPA_AR_0082989-90. After EPA Region 10 reviewed the administrative record, including all public comments, it transmitted a recommended determination to EPA Headquarters for review and final action. EPA_AR_0082990; Recommended Determination, EPA_AR_0498929; 40 C.F.R. § 231.5. On January 30, 2023, EPA signed a Final Determination.[6] FD at EPA_AR_0083206.

_____

[6] The Assistant Administrator for Water signed Final Determination. EPA_AR_0083206. In 1984, the EPA Administrator delegated the authority to make final determinations under CWA Section 404(c) to EPA's national CWA Section 404 program manager, who is the Assistant Administrator for Water. EPA_AR_0082967.

In the Final Determination, EPA concluded that discharges into waters of the United States proposed in the 2020 Mine Plan would result in significant aquatic resource losses and streamflow changes. *See* EPA_AR_0082957, 0083166-67. Those include: (1) permanent loss of approximately 8.5 miles of anadromous fish streams; (2) permanent loss of 91 miles of additional streams that support anadromous fish streams; (3) permanent loss of approximately 2,108 acres of wetlands and other waters that support anadromous fish streams; and (4) streamflow alterations that would adversely affect approximately 29 miles of anadromous fish streams downstream of the mine site due to greater than 20 percent changes in average monthly streamflow.[7] EPA_AR_0082957.

EPA determined that each of those 2020 Mine Plan losses and streamflow changes independently would have "unacceptable adverse effects" on anadromous fishery areas (including spawning and breeding areas) in the SFK and NFK watersheds. EPA_AR_0082943, 0082945, 0082957, 0083166-67. EPA also determined that small changes to the location of the discharges within the Mine Site Area[8] that resulted in the same levels of loss or streamflow changes as the 2020 Mine Plan would have unacceptable adverse effects on anadromous fishery areas. EPA_AR_0083167. EPA's basis for these findings are found in the Final Determination's Section 4.2. To prevent those unacceptable adverse effects, in the Final Determination's Section 5.1, EPA prohibited "the specification of waters of the United States . . . as disposal sites" for "the construction and routine operation of the 2020 Mine Plan" within a defined area (the

---

[7] For the purposes of the Final Determination, "anadromous fishes" refers only to Coho (Silver) salmon, Chinook (King) salmon, Sockeye (Red) salmon, Chum (Dog) salmon, and Pink (Humpback) salmon. EPA_AR_0082943, n.1.

[8] The "Mine Site Area" is the area including and immediately surrounding the mine site footprint for the 2020 Mine Plan that involves the same aquatic resources characterized as part of the evaluation of the 2020 Mine Plan. EPA_AR_0083167. It is depicted in Figure 4-1 of the FD, EPA_AR_0083066.

"Defined Area for Prohibition"). EPA_AR_0083167. EPA defined the 2020 Mine Plan for purposes of the prohibition as (1) PLP's June 2020 Mine Plan and (2) future proposals to construct and operate a mine to develop the Pebble deposit that would result in the same or greater levels of loss or streamflow changes within a defined area (the "Defined Area for Prohibition") surrounding the portions of the mine footprint proposed in PLP's June 2020 Mine Plan that are within the SFK and NFK watersheds. EPA_AR_0082957-58, 0083166-68.

Having characterized the similarity of aquatic resources and documented fish streams of the SFK, NFK, and UTC watersheds over decades of study, in the Final Determination's Section 4.2, EPA also evaluated effects like those resulting from the 2020 Mine Plan beyond the areas around the 2020 mine footprint — due to possible relocation of discharges from mine site components to other areas. EPA determined that discharges into these watersheds would likewise "have unacceptable adverse effects on anadromous fishery areas (including spawning and breeding areas) anywhere in [those watersheds] if the adverse effects of such discharges are similar or greater in nature and magnitude" to those of the 2020 Mine Plan. EPA_AR_0082958. To prevent unacceptable adverse effects, in the Final Determination's Section 5.2, EPA restricted "the use of waters of the United States . . . for specification as disposal sites . . . associated with future proposals to construct and operate a mine to develop the Pebble deposit" that would "result in adverse effects similar or greater in nature and magnitude" for the 2020 Mine Plan.[9] EPA_AR_0083172. Proposals to discharge dredged or fill material that result in any one of these

---

[9] EPA explained that it used "similar or greater in nature and magnitude" in the restriction because discharges that are subject to the restriction are not the "same" as the discharges that are subject to the prohibition (i.e., associated with the 2020 Mine Plan). The aquatic resource losses and streamflow changes from the discharges subject to the restriction could occur at various locations within the diverse, highly connected, and ecologically valuable aquatic habitats in the SFK, NFK and UTC watersheds. EPA's Response to Comment (RTC), EPA_AR_0083362 at 0083971.

losses or streamflow changes from the 2020 Mine Plan will be subject to the restriction. *Id.* The

restriction applies only to a defined area (the "Defined Area for Restriction") within those three

watersheds. *Id.* The defined areas are depicted in Figure ES-8, copied below.



EPA's Final Determination, Section 4.3, also included, consistent with its regulations, an

analysis of the relevant portions of the CWA Section 404(b)(1) Guidelines. EPA_AR_0083132-

33. EPA's analysis supports and confirms EPA's independent unacceptable adverse effects determinations that are found in Section 4.2. EPA also discussed "Other Concerns" in Section 6, which are not a basis for EPA's ecological unacceptable adverse effects findings in Section 4.2. EPA_AR_0083179.

In issuing the Final Determination, EPA relied on the it had developed over many years other information, including information developed during the Corps' permitting process. EPA relied on the 2014 Assessment for background information about the resources at issue and effects from mining generally. [10] As part of the 2017 settlement agreement with EPA discussed above, PLP agreed that EPA could use the Assessment "without any limitation." Settlement Agreement at EPA_AR_0139594. The Assessment was one of hundreds of references supporting the Final Determination. FD at EPA_AR_0083338-61.

EPA's Final Determination also included an Alternative Basis in Section 4.4, where EPA considered the "totality of the circumstances, including quantitative and qualitative advantages and disadvantages" of its action. EPA_AR_0083165. Based on that analysis, EPA once again "determined that the discharges of dredged or fill material evaluated in this final determination will have unacceptable adverse effects on anadromous fishery areas in the SFK, NFK, and UTC watersheds." EPA_AR_0083164-65. For its Alternative Basis, EPA thoroughly considered a broad range of costs and benefits for its action. *See* Cost Report, EPA_AR_0141296-375. It employed a totality-of-the-circumstances approach to weigh the costs and benefits and concluded

---

[10] The mine scenarios EPA evaluated in the Assessment—which were based on Northern Dynasty's submissions to the U.S. Securities and Exchange Commission, EPA_AR_ 0082979— were ultimately superseded by PLP's 2020 Mine Plan that EPA evaluated for purposes of the Final Determination challenged here.

that the adverse effects on salmon fishery areas would still be unacceptable. *See* RTC at EPA_AR_0084181-96.

The Final Determination prohibits and restricts discharges of fill material into waters of the United States associated with developing the Pebble deposit, and only those discharges that result in levels of aquatic resource loss or streamflow change that EPA found unacceptable. FD at EPA_AR_0082964-65. It does not prohibit mining of the Pebble deposit or limit discharges from any other activity in the Bristol Bay region, including into waters that are not "waters of the United States." EPA_AR_0082957-58.

### G. The Corps Subsequently Denied PLP's Permit Application Because of EPA's Final Determination.

As part of PLP's administrative appeal, in April 2023, the Corps' Pacific Ocean Division remanded the permit denial to the Alaska District. ECF 171-8 ("Appeal Decision"). Because the Corps' Appeal Decision and subsequent record of decision postdate EPA's Final Determination, they are not part of the administrative record for this case and should not be considered in the Court's review of the Final Determination. Despite not raising these documents as part of negotiations over EPA's administrative record, PLP moved the Court to take judicial notice of them, which EPA opposed. ECF 171, 196. The Court has not yet resolved PLP's motion. Because PLP summarizes and characterizes these documents, we also address them.

In the Appeal Decision, the Corps Division found most of the issues PLP appealed meritless.[11] *See* Appeal Decision 2-3. Following the remand, the Alaska District denied PLP's

---

[11] The issues it remanded were narrow. For example, the Appeal Decision affirmed the District's significant degradation findings at the scale of the three watersheds, Appeal Decision, RFA I.A at 7-9, I.B at 10-20, and remanded on the narrow ground of clarifying the area analyzed for impacts. *Id.* RFA I.C at 21-25. The Appeal Decision also did not take issue with the District's overall evaluation or findings of harm, *see id.*, RFA I.B at 11, RFA III.B at 62, RFA III.B.2 at 66,

permit application without prejudice on April 15, 2024. ECF 171-9. As required under Section 404—which expressly makes the Corps' authority to specify a disposal site in a permit subject to EPA's authority under Section 404(c)—the Corps based its denial on EPA's 2023 Final Determination. *Id.* at 7; *see* 33 C.F.R. §§ 320.2(f), 323.6(b).

### H. Litigation Challenging the Final Determination.

In July 2023, Alaska moved the Supreme Court for leave to file a bill of complaint, arguing that the Final Determination violates the Alaska Statehood Act and the Cook Inlet Land Exchange, and constitutes a Fifth Amendment taking. *Alaska v. United States*, No. 22O157 (U.S. July 26, 2023). The Supreme Court denied Alaska's motion. *See id*. (Jan. 8, 2024). In March 2024, PLP filed a complaint in the Court of Federal Claims, asserting takings claims based on the Final Determination. *N. Dynasty Minerals, Ltd. v. United States*, No. 1:24-cv-000397-EGB (Fed. Cl.), ECF 1. On the same date, Alaska filed a complaint in the same court asserting takings and other claims. *Alaska v. United States*, No. 1:24-cv-000396-RAH (Fed. Cl.), ECF 1. The takings cases are currently stayed.

PLP filed its complaint in this Court on March 15, 2024. ECF 1. In August 2024, PLP supplemented its complaint to add the Corps as a defendant and to assert a new claim challenging the Corps' permit denial. ECF 91 (Supplemental Complaint). PLP's challenge to the Corps' permit denial is stayed pending resolution of its challenge to the Final Determination. ECF 165. Alaska filed its complaint on April 11, 2024, challenging the Final Determination. No. 3:24-cv-00084, ECF 1. And two Alaska Native Corporations, Iliamna Natives Limited and

---

but remanded for the District to clarify how it addressed damage to fisheries from potentially catastrophic events, *id.* at 65, 67. (EPA did not consider such events as the basis for its findings on adverse effects in Section 4.2 of the Final Determination. EPA_AR_0083185.). The Appeal Decision also identified process deficiencies related to compensatory mitigation. *Id.* at 27.

Alaska Peninsula Corporation filed a complaint challenging the Final Determination on June 24, 2024. 3:24-civ-132, ECF 1. The Court consolidated the cases on November 12, 2024. ECF 125. Twenty-one parties, representing a variety of interests, intervened on EPA's behalf.

EPA filed the administrative record on August 2, 2024, consisting of over 40,000 documents. ECF 87. The parties conferred to resolve record disputes. *See, e.g.*, ECF 88, 137. EPA filed an updated administrative record on January 17, 2025, ECF 139, which was not challenged.

## LEGAL STANDARD

In deciding a summary judgment motion in an Administrative Procedure Act (APA) case, the court does not determine whether genuine disputes of material fact exist. *See Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Instead, summary judgment serves as a mechanism for deciding, as a matter of law, whether, based on the administrative record, the agency could have reasonably found the facts that it did. *Occidental*, 753 F.2d at 769-70.

A court shall only set aside agency actions, findings, or conclusions under the APA if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018). The standard is "exceedingly deferential," and a court cannot substitute its judgment for the agency's if the agency's conclusions are rational. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *overruled on other grounds by Califano v. Saunders*, 430 U.S. 99 (1977). The agency is better equipped to assess what facts are relevant to the agency's own decision than a court is. *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 181 (2025)."Black-letter administrative law instructs that when an agency makes . . . speculative assessments or

predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its "most deferential." *Id.* at 182 *(quoting Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983)).

Courts reverse agency decisions as arbitrary and capricious only if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

EPA's Final Determination prohibiting and restricting the specification of certain waters of the United States as disposal sites for certain discharges of dredged or fill material in connection with developing a mine at the Pebble deposit is supported by an extensive record, consistent with the CWA, and lawful.

In Section I of the Argument, we establish that EPA reasonably determined the discharges of dredged or fill material into waters of the United States proposed in PLP's 2020 Mine Plan will have an "unacceptable adverse effect" on salmon fishery areas. *See* 33 U.S.C. § 1344(c). EPA also reasonably concluded that, if discharges of dredged or fill material into waters of the United States associated with mining the Pebble deposit were moved within the Mine Site Area, or to other waters within the SFK, NFK, and/or the UTC watersheds, and resulted in the levels of losses or streamflow changes as the 2020 Mine Plans, the effects of those discharges would be similarly unacceptable.

In Section II of the Argument, we establish that EPA acted within its authority under Section 404(c), 33 U.S.C. § 1344(c), when it defined the areas where the Corps is prohibited or limited from specifying disposal sites in Section 404 permits to prevent the unacceptable effects described in Part I.

In Section III, we show that EPA did not disregard PLP's compensatory mitigation plans.

In Section IV, we demonstrate that EPA appropriately considered the costs of its Final Determination.

In Section V, we establish that EPA appropriately considered Alaska's authority and interests.

Finally, in Sections VI and VII, we establish that EPA's Final Determination does not implicate the major questions doctrine and that Section 404(c) is not an unconstitutional delegation of legislative authority.

I.      **EPA Appropriately Determined that Discharges to Waters of the United States from Developing the Pebble Deposit at the Levels PLP Proposed Will Cause Unacceptable Adverse Effects on Salmon Fishery Areas.**

The South Fork Koktuli River (SFK), North Fork Koktuli River (NFK), and Upper Talarik Creek (UTC) watersheds within the greater Bristol Bay watershed provide intact and connected habitats that support genetically diverse wild Pacific salmon populations. *See* FD at EPA_AR_0082943. Those salmon populations, in turn, help maintain the watersheds' ecosystems, including other fish and wildlife. *Id.*

In the 2020 Mine Plan, PLP proposed a significant loss of salmon streams and other waters that support wild Pacific salmon. EPA_AR_0083074. The Plan proposed discharges into waters of the United States that would result in: (1) the permanent loss of approximately 8.5 miles of anadromous fish streams; (2) the permanent loss of 91 miles of additional streams that

support anadromous fish streams; (3) the permanent loss of approximately 2,108 acres of wetlands and other waters that support anadromous fish streams; and (4) streamflow alterations that would adversely affect approximately 29 miles of anadromous fish streams downstream of the mine site due to greater than 20 percent changes in average monthly streamflow. EPA_AR_0082957. We refer to these levels of aquatic resource losses and the streamflow changes collectively as the "2020 Mine Plan Impacts."

As detailed in Section I.A. below, EPA determined that each one of the four 2020 Mine Plan Impacts would independently have "unacceptable adverse effects" on salmon fishery areas within the Mine Site Area in the SFK and NFK watersheds. To prevent those unacceptable adverse effects, EPA prohibited "the specification of waters of the United States . . . as disposal sites" for "the construction and routine operation of the 2020 Mine Plan," which includes future proposals to construct and operate a mine to develop the Pebble deposit that would result in the same or greater losses or streamflow changes as the 2020 Mine Plan Impacts. FD at EPA_AR_0082957-58; *see* 0083166-67. The prohibition applies within a small defined area, just surrounding the portions of the mine footprint proposed in PLP's 2020 Mine Plan within the SFK and NFK watersheds. EPA_AR_0082957-58, 0083167-68.

As detailed in Section I.B below, EPA then zoomed out and characterized the aquatic resources and documented fish streams in the SFK, NFK, and UTC watersheds more broadly. Because these aquatic resources are similar to those within the Mine Site Area, EPA considered what would happen if the 2020 Mine Plan Impacts occurred elsewhere in those watersheds due to relocating mine components. EPA_AR_0083070-71. EPA determined that if discharges associated with mine development at the Pebble deposit were located within those three watersheds and resulted in one or more of the 2020 Mine Plan Impacts, those discharges would

likewise "have unacceptable adverse effects on anadromous fishery areas." EPA_AR_0082958.

To prevent those adverse effects, EPA restricted "the use of waters of the United States . . . for specification as disposal sites . . . associated with future proposals to construct and operate a mine to develop the Pebble deposit" that would result in the levels of losses or streamflow changes as the 2020 Mine Plans. *Id.* The restriction applies only to a defined area within those three watersheds. *Id.*

As detailed in Sections I.C through I.G below, EPA applied the correct statutory standards when it made its unacceptable-adverse-effects findings.

### A. The Record Supports EPA's Determination that Discharges into Waters of the United States at the Mine Site Area Will Have Unacceptable Adverse Effects on Fishery Areas in the SFK and NFK Watersheds.

As an initial matter, it is instructive to understand the wild Pacific salmon's unique life cycle. As described in Section II.B of the Factual Background above, adult female salmon spawn in freshwater (e.g., streams, lakes, and ponds) where adult males fertilize the eggs, which are buried in gravel nests for weeks to months until they hatch. FD, EPA_AR_0083010, 83014. Once the eggs hatch, juvenile salmon live in the freshwater habitats for months to years. EPA_AR_0083010, 0083035. As they grow or "rear" in freshwaters, the juvenile salmon imprint the smell of their natal streams. EPA_AR_0083010. Eventually, the young salmon swim towards the ocean. *Id.* After potentially years in the ocean, both male and female salmon use their unique homing skills and make the journey back upstream to return to their birth streams to spawn and fertilize eggs. EPA_AR_0083010, 0083036. After reproducing, the adult salmon die, and their bodies provide essential nutrients to the ecosystem both in the birth stream and downstream. EPA_AR_0083010. These nutrients sustain the ecosystems that support juvenile salmon, linking salmon ecosystems across generations.

Another unique feature of wild Pacific salmon is that their genetic, phenotypic (e.g., body shape), and behavioral diversity (e.g., spawn timing/location) is closely linked to their habitat. EPA_AR_0083036. The greater the habitat diversity (i.e., habitat complexity), the greater the genetic, phenotypic, and behavioral diversity (i.e., biocomplexity). *Id.* Habitat complexity and biocomplexity work together to create stability and resilience within species. EPA_AR_0083040-41. The stability and resilience born from the interaction of habitat complexity and biocomplexity is known as the "portfolio effect," because, like a financial portfolio with diverse investments, increased genetic, phenotypic, and behavioral diversity spreads risk and ensures sustainability. EPA_AR_0083041. Habitat loss, through the destruction of streams, reduces habitat diversity and weakens the "portfolio," rendering the salmon vulnerable. *See* EPA_AR_0083076. Research from the Nushagak River watershed demonstrates how productivity of Sockeye and Chinook salmon shifts within the watershed from year to year. EPA_AR_0083037 (Figure 3-12). Because the productivity of individual habitats and sub-watersheds in the Nushagak River watershed varies with environmental conditions, maintaining habitat diversity across the landscape is critical for maintaining the sustainability and productivity of the watershed's salmon populations. EPA AR 0083037.

The Final Determination describes the extensive scientific evidence documenting that Bristol Bay's many unique populations of Sockeye salmon exhibit a high level of genotypic, phenotypic, and behavioral diversity associated with the specific localized streams, rivers, lakes, and ponds in which they spawn. EPA_AR_0083040-44. Studies also show that Coho and Chinook salmon's diversity is similarly linked to habitat. EPA_AR_0083045. The "portfolio effect" is a well-established scientific concept that has been studied in the Bristol Bay watershed and beyond. *See* EPA_AR_0083040-3045. Indeed, as further evidence of the importance of

maintaining salmon's diverse gene pool in the Bristol Bay watershed, the Alaska Department of Fish and Game has implemented a "Genetic Policy" to manage Alaska's salmon fisheries to protect the integrity of the distinct salmon genetic subpopulations. EPA_AR_0083040.

Along with providing unique habitats for genetically distinct salmon, headwater salmon streams (like the 8.5 miles PLP proposed to fill) also provide critical support to downstream salmon waters. By contributing water, nutrients, gravel, and other material to downstream systems, these streams maintain downstream habitats and fuel their fish populations. EPA_AR_0083006. The permanent loss of 8.5 miles of salmon streams would be significant and cause material damage. EPA_AR_0083071-3089.

And, just as headwater salmon streams support downstream fishery areas, headwater streams, even if not salmon habitat themselves, can support salmon downstream. Here, EPA concluded that the permanent loss of 91 miles of these supporting streams will degrade the quality of downstream waters and the unique habitats they provide for wild Pacific salmon. EPA_AR_0083089-95. EPA also explained that wetlands and other aquatic resources provide critical functions to support downstream salmon. EPA_AR_0083098-104. Loss of those resources, especially at the magnitude PLP proposed, will certainly damage downstream waters and the salmon habitats they provide. *Id.* Finally, EPA reasonably concluded that PLP's proposed discharges will significantly alter streamflow in 29 miles of wild Pacific salmon habitat downstream of the mine site. EPA_AR_0083108-127.

In the four sections below, we detail each of the 2020 Mine Plan Impacts, and the basis for EPA's conclusion that each impact will have an unacceptable adverse effect on anadromous fishery areas.

1. **The record supports the conclusion that the loss of 8.5 miles of salmon streams will have an unacceptable adverse effect on NFK and SFK fishery areas.**

EPA reasonably determined that the permanent loss of 8.5 miles of documented salmon streams as proposed and within the Mine Site Area will have unacceptable adverse effects on anadromous fishery areas in the NFK and SFK watersheds.[12] EPA based this determination on a substantial record showing that those streams provide important spawning and rearing habitat for multiple salmon species and that their loss would affect salmon populations that are uniquely adapted to the physical and chemical conditions of their birth streams. FD at EPA_AR_0083074-3078. The 8.5 miles of salmon streams that would be lost are also important for maintaining downstream habitat and the genetically distinct populations of Chinook, Coho, and Sockeye salmon that habitat supports. EPA AR 0083075.

a. *The record demonstrates that EPA appropriately determined that NFK-1.190 and 1.200 are salmon streams.*

In the 2020 Mine Plan, PLP proposed to fill 8.5 miles of documented salmon streams consisting of two tributaries, identified as NFK 1.190 (and its four sub-tributaries) and NFK 1.200. EPA_AR_0083071-73. The record overwhelmingly supports EPA's factual finding that the tributaries contain salmon. First, EPA considered that the State has classified both tributaries as "important for the spawning, rearing, or migration of anadromous fishes" in its *Catalog of Waters Important for Spawning, Rearing, or Migration of Anadromous Fishes* (Giefer and Blossom 2021, ADF&G 2022b, Giefer and Graziano 2022) and its associated Atlas (hereinafter "Anadromous Waters Catalog"). FD at EPA_AR_0083073. As the title indicates, the

---

[12] To compare, 8.5 miles is the length of Alaska Route 1 between the Anchorage federal courthouse and the exit for the Elmendorf-Richardson Joint Base. https://maps.app.goo.gl/chHygUUXxoPBqqsAA.

Anadromous Waters Catalog identifies the streams, rivers, and lakes that the Alaska Department of Fish and Game has specified as "important for the spawning, rearing, or migration of anadromous fishes" pursuant to Alaska Statute 16.05.871(a). Anadromous Waters Catalog, EPA_AR_0483763 at 0483769. To qualify, the "water bodies must be documented as supporting some life function of an anadromous fish species," including salmon. Anadromous Waters Catalog: Overview, EPA_AR_0475109 at 0475114. The Alaska Department of Fish and Game specified NFK 1.190 and NFK 1.200 using number codes. *See* Anadromous Waters Catalog at EPA_AR_0484032-33. The Final Determination's Table 4-1 cross references Alaska's codes with NFK 1.190 (and its sub-tributaries) and NFK 1.200. FD at EPA_AR_0083073.

In assessing salmon occurrence, EPA relied on the State's designations, but also considered PLP's own sampling efforts, which—while subject to the limitations discussed below—documented *hundreds* of juvenile salmon in the relevant streams. FEIS Ch. 3, EPA_AR_0094490 at EPA_AR_0095026; FEIS, Appendix I, EPA_AR_0092517 at EPA_AR_0092560 (describing juvenile salmon documented in NFK 1.190 (approximately 29-52 juvenile Chinook and approximately 322-369 juvenile Coho salmon) and NFK 1.200 (approximately 12 juvenile Chinook and approximately 344 juvenile Coho salmon)).[13]

---

[13] Juvenile fish densities are included in FEIS Chapter Three, EPA_AR_0095026 (Table 3.24-10); and Appendix I, EPA_AR_ 0092560 (Table 4-9). For NFK 1.190, PLP surveyed an area of approximately 27,318 $m^2$ in 2008 and identified 0.19 juvenile Chinook and 1.35 juvenile Coho per 100$m^2$, EPA_AR_ 0095026, which converts to approximately 52 juvenile Chinook and approximately 369 juvenile Coho, respectively. Also for the NFK 1.190, PLP surveyed an area of approximately 25,947.3 $m^2$ in 2008 and identified 0.11 juvenile Chinook and 1.24 juvenile Coho per 100$m^2$, EPA_AR_0092560, which converts to approximately 29 juvenile Chinook and 322 juvenile Coho, respectively. For NFK 1.200, PLP surveyed an area of approximately 15,361 $m^2$ in 2018 and identified 0.08 juvenile Chinook and 2.24 juvenile Coho per 100$m^2$, which converts to approximately 12 juvenile Chinook and 344 juvenile Coho, respectively. EPA_AR_ 0095026; EPA_AR_0092560.

PLP asserts that most of the 8.5 miles "are not spawning habitat" and are thus unimportant. PLP Br. 44. PLP's argument is mistaken because it assumes that streams are only important for salmon if salmon spawn there. In the Final Determination, EPA explained that documented anadromous fish streams are not just important for spawning, but also for rearing and migration, consistent with Alaska's designation of streams as important based on spawning, rearing, or migration of salmon. EPA_AR_0083035, 0083254.

In addition, PLP's hyper-focus on numbers is misplaced because there is nothing in the scientific record to suggest that the number of salmon in a stream is a critical metric for determining its importance to sustaining the salmon life-cycle. To the contrary, the State does not require that a threshold number of salmon be identified for a waterbody to be specified as "important for the spawning, rearing or migration of anadromous fishes." *Id.* As noted above, to be specified as "important waters" under Alaska Statute 16.05.871, the "water bodies must be *documented* as supporting some life function of an anadromous fish species (salmon, trout, char, whitefish, sturgeon, etc.)," which means that "anadromous fish must have been *seen or collected* and identified by a qualified observer." Anadromous Waters Catalog: Overview, EPA_AR_0475114 (emphasis added). Moreover, as described above, the presence of salmon shifts within the watershed from year to year. EPA_AR_0083037. Thus, PLP is attempting to hold EPA to a higher standard than the State uses in identifying "important waters" for salmon. In any event, EPA reasonably determined that NFK1.190 and 1.200 are much more than "just areas where salmon have occasionally been spotted," PLP Br. 44, but are "important [waters] for the spawning, rearing, or migration of anadromous fishes," Anadromous Waters Catalog at EPA_AR_0483769.

To support its argument that filling 8.5 miles of documented salmon streams is trivial, PLP relies on the Corps' 2020 FEIS, which stated that only 4.2 stream miles are used for spawning and are "low-use spawning habitat." PLP Br. 44. EPA considered this statement, identified flaws, and explained (in the Final Determination's Appendix B) why it did not alter the Agency's conclusion. EPA_AR_ 0083251, 0083254. First, the Corps' statement is based on PLP's limited fish sampling. *Id.* PLP contends that only 27 spawning salmon were identified in NFK 1.190 and NFK 1.200. However that count relies solely on PLP's 2004-2008 aerial fish surveys of NFK 1.190. FD at EPA_AR_0083032 (Table 3-8). PLP did not survey NFK 1.200 during that timeframe. FEIS Ch. 3 at EPA_AR_0095026 (Table 3.24-10). Even when PLP did conduct fish counts, it used aerial surveys, and studies demonstrate that aerial surveys of spawning salmon only account for a portion of the spawning populations and, thus, the surveys should be considered *minimum* counts. FD at EPA_AR_0083252.

Additionally, PLP's sampling information showed that salmon at other life stages (i.e., not spawning) were present in NFK 1.190 and NFK 1.200 in considerable numbers. PLP itself documented hundreds of *juvenile* salmon in NFK 1.190 (in 2008) and NFK 1.200 (in 2018). FEIS at EPA_AR_0092560. And even these counts are likely an undercount. EPA_AR_0083254; RTC, EPA_AR_0083362 at 0083840. First, PLP's juvenile fish sampling efforts cover only part of the year (and over only a limited number of spawning seasons), despite the spatial and temporal variability of salmon populations *Id.* For instance, PLP's winter sampling was extremely limited due to logistical challenges. FEIS at EPA_AR_0095043; FD at EPA_AR_0083251. Yet, well-accepted science confirms that juvenile Coho and Chinook salmon "overwinter" (i.e., spend the winter season) in freshwater streams. EPA_AR_0083256. Thus, the data PLP provides are incomplete. EPA_AR_0083251.

PLP also contends that NFK-1.190 and NFK 1.200 are too steep and rocky to be good salmon habitat. PLP Br. 46-47. Again, that contention is belied by the record, which, as discussed above, demonstrates that those two streams are, *in fact,* Coho and Chinook salmon habitat. Additionally, streams with gradients of less than three percent most frequently support stream-spawning salmon and NFK 1.190 and NFK 1.200 have gradients of less than three percent. FD at EPA_AR_0083250. Thus, they are not too steep for salmon. *Id.* Finally, even if the gradients were greater than three percent, and the streams were less likely to support spawning, PLP is wrong that such streams do not support salmon. In the Final Determination, EPA explained these streams contribute water, nutrients, gravel, and other material to downstream systems, and maintain downstream habitats and fuel their fish populations. EPA_AR_0083006.

> b. *EPA reasonably determined that the loss of 8.5 miles of documented salmon streams in the Mine Site Area will have an unacceptable adverse effect on fishery areas in the SFK and NFK watersheds.*

Using the State's Anadromous Waters Catalog, EPA identified additional salmon streams within the Mine Site Area (in addition to NFK1.190 and NFK 1.200). EPA_AR_0083074. EPA determined that these additional salmon streams are part of the same hydrologically connected network of headwater streams as NFK 1.190 and NFK 1.200. *Id.* Thus, EPA concluded that, if the 2020 Mine Plan were modified to result in the loss of 8.5 miles of these other salmon streams in this area, the impacts would have the same unacceptable adverse effects.

In the Final Determination Section 4.2.1, EPA explained in detail how the loss of NFK 1.190 and NFK 1.200, or 8.5 miles of any documented salmon streams within the Mine Site Area, would have unacceptable adverse effects on anadromous fishery areas in the NFK and SFK watersheds. First, the loss of 8.5 miles of stream would result in fish displacement, injury, and mortality of Coho and Chinook salmon. EPA_AR_0083074. Additionally, those streams (and the

habitats they provide) would be lost in perpetuity and would be unavailable to future generations

of salmon for spawning and rearing, eliminating these distinct habitats and the salmon that are

uniquely adapted to them. EPA_AR_0083075. Those losses would counter the benefits of the

"portfolio effect," described in Section I.A. of the Background and above. *See*

EPA_AR_0083035-46.

EPA explained that Coho and Chinook are the two rarest of the five species of Pacific

salmon and thus are vulnerable to losses of small discrete populations. EPA_AR_0083076. For

example, certain populations of Chinook salmon that rear for one year or more in freshwater—

the dominant type in the Bristol Bay watershed—have a higher rate of extinction and are subject

to the State's conservation efforts. *Id.* Additionally, as noted above, several studies have

determined that the genetic diversity of Coho salmon is geographically linked, meaning the loss

of a particular geography threatens the genetic pool. EPA_AR_0083076-77. For example, EPA

cited a study that found that:

> Fishery management and conservation actions affecting coho salmon in Alaska must
> recognize that the genetic population structure of coho salmon occurs on a fine
> geographic scale. Activities or conditions that cause declines in population abundance are
> more likely to have strong negative impacts for coho than for species in which genetic
> variation is distributed over a broader geographic scale (e.g., chum salmon). Coho salmon
> are probably more susceptible to extirpation, less likely to be augmented or "rescued" by
> other populations through straying (gene flow), **and the loss of populations means loss
> of significant amounts of overall genetic variability. These risks underscore the
> importance of single populations to the long term viability of coho salmon in Alaska
> and justify managing and conserving coho salmon at a fine geographic scale.**

EPA_AR_0083077 (emphasis added). EPA concluded that the permanent loss of approximately

8.5 miles of documented salmon streams and associated habitats for both Coho and Chinook

salmon would "reduce both [anadromous fish] habitat complexity and biocomplexity in the NFK

watershed." EPA_AR_AR 0083078. As described above, habitat complexity and biocomplexity

work together to create stability and resilience across populations. Thus, reducing those features threatens the stability and resilience of the Coho and Chinook salmon populations.

The loss of NFK 1.190 and NFK 1.200 or 8.5 miles of similar tributaries within the Mine Site Area would also damage anadromous fish habitat downstream. Those upstream tributaries provide "ecological subsidies" downstream, including (1) flow that impacts downstream water chemistry and temperature; (2) nutrients (from decaying salmon and leaf litter) that fuel the productivity of food sources for macroinvertebrates and downstream fish; and (3) gravel in which downstream salmon spawn. EPA_AR_0083078-79.

Although the Corps' FEIS concluded, based on PLP's sampling data, that the 2020 Mine Plan would have "no measurable impact" on fish populations, EPA rebutted that finding and explained the basis for doing so in the Final Determination's Appendix B, contrary to PLP's assertion (PLP Br. 45). EPA_AR_0083248-300.

EPA also made clear in the Final Determination and in its Response to Comments that, while it was providing the percentage of the salmon stream loss in the NFK watershed—13 percent—to provide perspective on the extent of these losses, that relative scale is "*not the basis* of EPA's unacceptable adverse effects findings." RTC at EPA_AR_0083865. Because EPA did not base its unacceptable adverse effects determination on the 13 percent figure, as PLP asserts (PLP Br. 45), the Court should disregard outright PLP's comparison to 13 percent of a basement having water damage, as it is inapplicable. But even if the Court considers the analogy, it fails because the 13 percent of the documented anadromous fish streams in the NFK watershed would be *destroyed* under PLP's 2020 Mine Plan, not damaged, like PLP's basement analogy. Indeed, if 13 percent of a house's basement were destroyed by, for example, an earthquake, the house would not only be uninhabitable, but it could also collapse.

EPA's reasoning for its unacceptable adverse effects finding is detailed in the Final Determination's Section 4.2.1 and summarized above. FD at EPA_AR_0083071-3085. That the Corps purportedly came to a different conclusion in the FEIS does not call into question the lawfulness of EPA's determination. Indeed, by granting EPA the authority set forth in Section 404(c), Congress plainly expected that EPA may assess the environmental effect of discharges into waters of the United States differently from the Corps and may reach a different conclusion, and Congress gave EPA the final word. *See James City County, v. EPA*, 12 F.3d 1330, 1336 (4th Cir. 1993) ("[R]ecognizing the EPA's expertise and concentrated concern with environmental matters, Congress gave the final decision whether to permit a project to that agency."); *Newport Galleria Grp. v. Deland*, 618 F. Supp. 1179, 1184 (D.D.C. 1985) ("[I]f section 404(c) . . .is to have any meaning at all, the EPA must be able to disagree with the Corps' conclusions.").

2. **The record supports the conclusion that the loss of 91 miles of additional streams that support salmon streams will have unacceptable adverse effects on NFK and SFK fishery areas.**

The discharge of dredged or fill material into waters of the United States proposed in the 2020 Mine Plan would also result in the permanent loss of approximately 91 miles of streams that support documented salmon streams in the SFK and NFK watersheds. FD at EPA_AR_0083089. EPA reasonably determined that this permanent loss will have unacceptable adverse effects on anadromous fishery areas in the SFK and NFK watersheds.

EPA explained that most of the 91 miles of headwater streams that PLP proposed to fill in its 2020 Mine Plan are mapped as perennial, meaning they have year-round flow. EPA_AR_0083136. Like the salmon streams discussed above, these additional streams support important downstream functions. EPA_AR_0083092. For instance, EPA determined that the loss of 91 miles of streams would eliminate the downstream flow of invertebrates, organic matter,

nutrients, surface water flows, groundwater flows, and gravels that support spawning. *Id.* In addition, the loss of temperature moderation via groundwater-influenced flows to downstream anadromous fish streams would exacerbate the potentially substantial changes in stream temperature caused by discharges from water treatment plants at the mine site. *Id.* These streams can also serve as "refuge" habitat for salmon and other anadromous fish to escape predators, floods, or other inhospitable conditions in downstream waters. *Id.*

Based on the important functions these streams support, in combination with the magnitude of the losses proposed, EPA concluded that their destruction would adversely affect spawning and rearing habitat for Coho, Chinook, Sockeye, and Chum salmon downstream in the SFK and NFK watersheds. *Id.* The degradation of these downstream salmon streams will in turn erode both the habitat diversity and salmon-population diversity that help buffer salmon from sudden and extreme changes to their numbers and ultimately maintain the stability and productivity of their populations. EPA_AR_0083033, 0083093. EPA further determined that even if the 2020 Mine Plan were reconfigured within the Mine Site Area but still resulted in the loss of 91 miles of supporting streams, the adverse effects to downstream anadromous fish streams would be the same. EPA_AR_0083094.

PLP argues that EPA's findings conflict with the FEIS, asserting that the FEIS concluded that the streams are not particularly substantial sources of nutrients. PLP Br. 55. First, EPA determined that the ecological subsidies those streams provide are much *more than just nutrients*. As discussed above, EPA explained that the streams provide surface water flows, groundwater exchange (which supports temperature moderation downstream), gravels for spawning, invertebrate drift, and organic matter, and that the streams can serve as refuge habitat. FD at

EPA_AR_0083092. An extensive body of scientific evidence supports EPA's findings that these small headwater streams are integral to downstream anadromous fishery areas. *Id.*

Second, the FEIS concluded "downstream productivity in the NFK and SFK drainages would be affected with the loss of chemical, physical, and biological inputs from streams and wetlands eliminated with development of the mine site." FEIS, Ch.4, EPA_AR_0095130 at 0095966. The FEIS states that this impact to the productivity of the NFK and SFK "is certain to occur if the project is developed." *Id.* As PLP notes, the FEIS also states that the magnitude of the impacts "is not expected to affect overall productivity in the greater Koktuli River basin" because "[streams] unaffected by mine site development . . .would continue to provide downstream inputs important for stream productivity." *Id.* EPA responded to this conclusion, explaining that although some headwater streams would remain unaffected, a loss of inputs from 8.5 miles of documented anadromous fish streams and 91 miles of streams that support downstream anadromous habitats is considerable. FD at EPA_AR_0083251. Waters downstream of the lost habitats—waters that are salmon habitat—would experience a complete loss of inputs from upstream that would necessarily affect their ability to transport energy and nutrients further downstream. *Id.* Thus, impacts to a specific downstream stretch of water would result not only from the destruction of headwater habitats under the 2020 Mine Plan, but also from how those direct losses cascade downstream through intervening reaches. *Id.* at EPA_AR_0083250-51. Thus, that EPA's assessment differed from the Corps does not by itself make it unlawful. *Cf. James City*, 12 F.3d at 1336. ("[R]ecognizing the EPA's expertise and concentrated concern with environmental matters, Congress gave [EPA] the final decision" authority in Section 404(c))

Additionally, contrary to what PLP's partial quotes of the FEIS imply, PLP Br. 55-56, these fishery areas are not miles away. Salmon are present within the Mine Site Area and

immediately downstream. *See* Argument Section I.A.1, *supra*, FD at EPA_AR_0083080 (Figure 4-3, reproduced in the Background Section II.A. above). While the FEIS states that the majority of Chinook spawning habitat occurs approximately 20 miles downstream from the mine site, it also says that spawning habitat extends into the upper NFK adjacent to the mine site and just downstream. *See* FEIS, Ch. 3, EPA_AR_0094490 at EPA_AR_0095003, 0094992 (Figure 3.24-2); *see also* FD at EPA_AR_0083072-73, 0083025 (Figure 3-6), 0083080-01. In addition, as discussed above, Chinook *rear* right up to and through the mine site. FEIS at EPA_AR_0094993; FD at EPA_AR_0083072-73, 0083025. Coho spawning and rearing habitat extends up to and through the mine site. EPA_AR_0083072-73, 0083024 (Figure 3-5), 0083080-01. In addition, "[p]referred Coho spawning habitat appears to be in the 10 miles of mainstem *immediately* downstream of the mine site." FEIS, Ch. 3 at EPA_AR_0095003 (emphasis added). Sockeye rear immediately downstream of the mine footprint and Sockeye spawn within the NFK immediately adjacent to the mine site footprint. EPA_AR_0094992; FD at EPA_AR_0083026 (Figure 3-7), 0083080-01.

In attacking EPA's conclusions, PLP returns to its water-damaged basement analogy comparing the *destruction* or elimination of headwater streams to water *damage* to a basement's crawl space and asserts that one could not reasonably claim air quality on the second floor suffered as a result. PLP Br. 55. Again, this analogy rests on a faulty premise—the relevant stretches of streams will be destroyed, not damaged. But even if one indulges this faulty analogy, the rental home would be uninhabitable when considering the relevant facts (which PLP ignores). To properly reflect the connectedness of a watershed, moldy air from the crawl space in PLP's analogy would necessarily be ducted directly to the first floor and then further ducted to the second floor of the house. Although clean air is also introduced, under these circumstances, a

reasonable renter would certainly find that the water damage in the crawl space caused an unacceptable adverse effect (i.e., decreased air quality) to the otherwise habitable portions of the house. Similarly, considering all the facts and evidence before it, EPA reasonably determined that the destruction of 91 miles of supporting streams will have an unacceptable adverse effect on downstream anadromous fishery areas.

### 3. The record supports the conclusion that the loss of wetlands and other waters that support salmon streams will have an unacceptable adverse effect on NFK and SFK fishery areas.

EPA also reasonably determined that the permanent loss of approximately 2,108 acres of wetlands and other waters in the NFK and SFK, watersheds, as proposed in the 2020 Mine Plan, would have unacceptable adverse effects on downstream salmon streams in these watersheds. FD at EPA_AR_0083098. EPA further determined that even if the 2020 Mine Plan were reconfigured but would still result in the same loss of 2,108 acres of wetlands and other waters that support anadromous fish streams within the Mine Site Area, the adverse effects to downstream anadromous fish streams would be the same. EPA_AR_0083104.

EPA determined that these wetlands and other waters support anadromous fish streams for several reasons. EPA explained that many of the wetlands in the Mine Site Area are headwater wetlands. *Id.* Headwater wetlands and other waters support anadromous fish streams by moderating stream temperature and flows; maintaining baseflows; serving as groundwater recharge zones; and supplying nutrients, organic material, macroinvertebrates, algae, and other materials to abutting headwater streams and streams downstream. *Id.*

In addition, EPA also explained that these wetlands and other waters indirectly support salmon streams by providing off-channel habitat for salmon. For example, as described in the Final Determination's Section 4.2.3, the wetlands and other waters that would be permanently

lost include beaver ponds and beaver-induced wetlands. EPA_AR_0083101. Coho and Chinook salmon rear in many of the beaver-modified waters or the streams they abut. *Id.* EPA cited several studies which concluded that beaver-modified waters provide excellent rearing habitat and important overwintering and flow-velocity refuge for anadromous fishes (and may be especially important in maintaining salmon productivity). *Id.* Moreover, EPA explained that wetlands in the SFK and NFK watersheds that are contiguous with and adjacent to anadromous fish streams likely provide habitat to juvenile Coho salmon. *Id.* The lower gradient of lakes, ponds, and inundated wetlands connected to salmon streams also can provide beneficial rearing and foraging conditions compared to the mainstream channel for juvenile salmon growth. *Id.*

PLP argues that EPA erred by not independently determining that all 2,108 acres of wetlands and other waters that will be lost are "waters of the United States." PLP Br. 62-65. But as explained in Argument Section II.C, *below*, that is incorrect. PLP filed a permit application stating that these waters are in fact "waters of the United States." *See, e.g.*, PLP's 2019 CWA Permit Application, EPA_AR_0085267 at 0085287-5307. The Corps agreed with this determination. FEIS, App. J, EPA_AR_0092740 at 0092741-42. During the Section 404(c) process, PLP did not argue that the wetlands are not waters of the United States—presumably because it was PLP that had asserted that they are in fact jurisdictional waters during the Corps' permitting process. PLP is free to submit a new permit application based on a new documented assessment of "waters of the United States," and has always had the option to request a formal finding from the Corps through the approved jurisdictional determination process. *See* 33 C.F.R. § 331.2 and pt. 331, App. C. The Corps advised PLP of this process. FEIS, App. J at EPA_AR_0092741. Yet, PLP chose not to make this request and cannot now justifiably complain

about an alleged fact-bound dispute it has always been in the position to—but chosen not to—address.

      **4.  The record supports the conclusion that the streamflow changes caused by discharges into waters of the United States will have an unacceptable adverse effect on NFK and SFK fishery areas.**

Finally, EPA also determined that the discharge of dredged or fill material into waters of the United States associated with the 2020 Mine Plan will result in unacceptable adverse effects in at least 29 miles of anadromous fish streams because these streams will experience streamflow changes (in either direction) greater than 20 percent of the average monthly streamflow. FD at EPA_AR_0083108. EPA further determined that even if the 2020 Mine Plan were reconfigured but would still result in monthly average streamflow changes greater than 20 percent in at least 29 miles of anadromous fish streams within the Mine Site Area, the adverse effects would still occur. EPA_AR_0083127.

In making these findings, EPA explained the scientific consensus that a stream's natural flow regime (i.e., the characteristic pattern of its streamflow magnitude, timing, duration, and rate of change) is critical to supporting and maintaining not only the waterbody's ecosystem, but also those downstream. EPA_AR_0083109. Flow regime is often considered the most significant stream function, and each stream or river has a characteristic flow regime and a biotic community adapted to it. *Id.* Base flows, high flows, and low flows are all necessary to sustain native species. *Id.*

EPA considered published scientific literature, including the 2012 Richter paper, which evaluated case studies and decades of literature on ecological flows, and concluded that regardless of geographic location, daily streamflow alterations of greater than 20 percent (both increases and decreases) can cause major changes in the structure and function of streams that

threaten their ecological value. EPA_AR_0083110. EPA also explained that its analysis was based on the only flow modeling available for the 2020 Mine Plan, which relies on average monthly streamflow data. EPA_AR_0083110. The Agency noted that daily flows would vary more than monthly averages, so using monthly averages to identify anadromous fish streams where the most dramatic changes from natural conditions would occur provided a reasonable *minimum approximation* of effects from streamflow changes under the 2020 Mine Plan. EPA_AR_0083262; RTC at EPA_AR_0083880.

An example illustrates this point. Assume stream flow is measured daily over a month (30 days) and the following changes compared to baseline flow are recorded: for 15 days straight, flow changed by 25 percent daily; then, for the remaining 15 days, it changed by 14 percent daily. Under the scientific literature, the 15-days where change is greater than 20 percent (i.e., 25 percent) would be reason to expect major changes in the stream's function. But under EPA's analysis, the stream would not be counted as affected because the monthly average change for the stream's flow is less than 20 percent (i.e., 19.5 percent). Thus, contrary to PLP's assertions (PLP Br. 57, 59), EPA took a conservative and *less protective* approach in using a monthly-average basis. FD at EPA_AR_0083110.

As such, PLP's reliance on *Maine Lobstermen's Association v. National Marine Fisheries Service*, 70 F.4th 582, 598-99 (D.C. Cir. 2023), is misplaced. *See* PLP Br. 59. In that case, the Fish & Wildlife Service issued a biological opinion that relied on a "worst-case scenario" that it admitted was unlikely to occur when it evaluated effects on an endangered species. 70 F.4th at 582, 598-99. The court noted that, on previous occasions, the Service stated that its biological opinions must be based on effects that are "reasonably certain to occur." *Id.* Because the Service had "flip-flop[ped]" and relied on an unlikely scenario without any explanation for its change in

position, the court determined the Service acted arbitrarily and capriciously. *Id.* Here, EPA has

neither flip-flopped on its position nor relied on a "worst-case" scenario. Thus, *Maine*

*Lobstermen* is inapposite.

In the Final Determination, EPA explained that the 2020 Mine Plan will result in both

increases and decreases to streamflow. FD at EPA_AR_0083112-15, 0083120. For instance, as

described in the FEIS, streamflow would decrease from: groundwater drawdown to dewater

(remove the water from) the mine's open pit; the loss of upstream tributaries that provide

downstream flow; and the collection and rerouting of surface water runoff from the mine site,

particularly between spring and winter. EPA_AR_0083120. On the other hand, streamflow

would increase because of elevated surface run-off and routine discharges from the mine's water

treatment plants. EPA_AR_0083120. As summarized below, each type of change relative to

average baseline streamflow comes with its own adverse effects. *See* EPA_AR_0083120-24. EPA

then explained the ecological consequences of the predicted streamflow changes on the specific

life cycle needs of the Pacific salmon species in the affected streams, as well as the ecological

processes of the SFK and NFK watersheds. RTC at EPA_AR_0083879-81.

With respect to decreased flow, EPA determined that reduced streamflow would reduce

stream habitat; fragment a continuous stream system into small, isolated patches; and preclude

normal seasonal movements by salmon. FD at EPA_AR_0083121. Reduced streamflow would

also reduce the frequency and duration of connections between streams and off-channel habitats,

such as side channels and riparian wetlands. *Id.* The loss of access to off-channel areas would

remove critical rearing habitats for several species of juvenile salmon. *Id.* In addition, reduced

streamflow would result in finer sediment deposits that would suffocate salmon eggs and render

the suitable streambed less suitable to sustain those eggs. *Id.*

As for increased flow, EPA determined that it would degrade salmon habitat. *Id.* EPA cited studies showing that the stream type immediately downstream of the Mine Site Area is "very susceptible to scour and erosion and can be significantly altered and rapidly de-stabilized by channel or landscape disturbances and changes in the flow or sediment regimes of the contributing watershed." *Id.* As a result, increases in fast-moving water would (1) increase the movement of streambed sediments, potentially smothering the gravel-nested eggs, (2) wash the eggs away, causing them to die, and (3) wash away the gravel nests and expose the eggs to predators. *Id.*

PLP asserts that the FEIS found that the streamflow changes would be acceptable, relying on Instream Flow Incremental Methodology/Physical Habitat Simulation System (IFIM/PHABSIM) modeling, and that EPA rejected this assertedly widely used modeling and used an unsupported alternative. PLP Br. 58-59. The record establishes, however, that EPA provided a detailed and reasonable explanation for why it did not rely on the IFIM/PHABSIM modeling. That is all the APA requires.

First, EPA explained that the modeling assumes that water depth and velocity are the only determinants of fish habitat. EPA_AR_0083265. That simplified approach provides only a coarse assessment of suitable fish habitat and it likely underestimated changes resulting from the 2020 Mine Plan. EPA_AR_0083266. Moreover, the modeling did not consider other relevant factors. For example, groundwater can strongly interact with surface waters to influence habitat quality for fish in certain parts of the SFK and NFK watersheds. EPA_AR_0083265-66. Salmon at different life-stages select for groundwater-influenced habitats, including spawning Sockeye and Coho salmon and juvenile salmon that overwinter in streams and may depend on unfrozen waters thermally moderated by groundwater. *Id.* The model did not account for these interactions. *Id.*

Additionally, the model assumes that more water means better fish habitat, but data show the opposite is true for some salmon species. For example, EPA described data derived from PLP's sampling showing that, as water depth increased above 2.1 feet, the probability of finding juvenile Coho and Chinook salmon decreased, with no juveniles of either species found at water depths above roughly 3.7 feet. EPA _AR_0083267. EPA also noted that the data collection to support the modeling was insufficient. EPA _AR_0083266-67. Furthermore, the modeling only considers information about mainstem channels and omits tributaries and off-channel habitats. EPA _AR_0083269. Excluding those habitats results in a significant underestimate of impacts. *Id.* In any event, EPA determined that even underestimated impacts based on the modeling in the FEIS were unacceptable. *Id.*

In addition, EPA explained why the FEIS's conclusion that "most" changes in fish spawning and rearing habitats associated with the 2020 Mine Plan "would be near zero or positive" was flawed. EPA_AR_0083295. First, "most" is not all. And even the FEIS predicted a loss of Chinook salmon spawning habitat in all NFK reaches downstream of the mine site, including approximately 10 percent in the mainstem NFK below the mine site. EPA_AR_0083119. Additionally, the FEIS assumed that increases in winter flows would increase fish habitat, but that assumption is unsupported by the sampling data described above showing decreases in juvenile Coho and Chinook at water depths above 2.1 feet. EPA_AR_0083295. Further, the FEIS did not include any winter sampling data appropriate for evaluating winter flow change effects on fish. *Id.* Nor did the FEIS evaluate potential losses of incubating eggs due to increased winter flows. *Id.* And it "did not account for complex interactions of groundwater and surface water that would be disrupted due to streamflow alterations with potential implications for winter ice-free habitat and water temperatures." *Id.*

PLP mistakenly suggests that the 2020 Mine Plan would not decrease streamflow and that the streamflow increases would be beneficial because they would occur during winter months, when the streams are "nearly flow-free or entirely dry." PLP Br. 57. As discussed above, EPA concluded the opposite. EPA also explained that, in the majority of the SFK and NFK reaches, streamflow changes would vary seasonally—reaches that would experience streamflow reductions between spring and winter would also experience streamflow increases between winter and spring. FD at EPA_AR_0083115. In addition, most of the streamflow increases would occur in the mainstem NFK, which flows year-round—it is therefore not dry during the winter. FEIS App. J at EPA_AR_0092951. As recounted above, EPA reasonably concluded based on the record that significant departures from natural baseline streamflow, whether increases or decreases, do not equate to better conditions for fish. EPA_AR_0083260-61. That conclusion is entitled to deference. *Seven Cnty.,* 605 U.S. at 181-82 (explaining that courts must be "most deferential" to an agency's "scientific judgments").

Finally, PLP also argues that it would "strategically discharge" water to "optimize downstream habitat" and that EPA never told PLP that a different discharge strategy was preferrable. PLP Br. 60. In reality, EPA expressed concerns on this subject in 2019. FD at EPA_AR_0083264. As explained in the Final Determination, PLP's assertion that its discharges would be optimized to benefit priority species and life stages for each month and stream lacked any support, and were at most aspirational, rather than likely or guaranteed. EPA_AR_0083269.

For the reasons described above, EPA reasonably determined that each of the 2020 Mine Plan Impacts anywhere in the Mine Site Area, would independently have unacceptable adverse effects on anadromous fishery areas, including spawning and breeding areas. The record fully

supports EPA's factual findings and technical conclusions, which are entitled to deference. S*even Cnty.*, 605 U.S. at 181-82.

B.  **The Record Supports EPA's Determination that Discharges into Waters of the United States Elsewhere in the SFK, NFK, and UTC Watersheds Will Have Unacceptable Adverse Effects on Salmon Fishery Areas.**

Turning to the factual findings underlying the Final Determination's restriction, EPA recognized that the 2020 Mine Plan represented only one potential configuration and that other configurations could involve discharges resulting in similar adverse effects. EPA considered this possibility and concluded that it was in all stakeholders' interests to address such future mine plans in this proceeding. Thus, EPA evaluated the effects that developing the Pebble deposit elsewhere in the SFK, NFK, and the nearby UTC watersheds in a manner similar to the 2020 Mine Plan would have on anadromous fishery areas. As discussed below, EPA determined that because these watersheds share similar characteristics and aquatic habitat, discharges into the watersheds that "are similar or greater in nature and magnitude" to the 2020 Mine Plan Impacts would likewise "have unacceptable adverse effects on anadromous fishery areas (including spawning and breeding areas) anywhere" in those watersheds. FD at EPA_AR_0082958.

All three watersheds contain documented spawning and rearing habitat for Coho, Chinook, and Sockeye salmon, and spawning habitat for Chum salmon, as evidenced in the State's Anadromous Waters Catalog. EPA_AR_0083087. They are also largely undeveloped, with intact, high-quality, connected, and free-flowing aquatic habitats extending from the headwaters downstream. *Id.*

The Final Determination details why relocating the 2020 Mine Plan Impacts described above to other waters of the United States within the NFK, SFK, and UTC watersheds would also be unacceptable. First, in the Final Determination, EPA explained that the loss of 8.5 miles

of salmon streams in any part of the three watersheds associated with mining the Pebble deposit would result in unacceptable adverse effects on fishery areas that are similar to those resulting from the 2020 Mine Plan. EPA_AR_0083087-89 (Section 4.2.1.5.2). We detailed those effects in the Argument Section I.A.1 above. In sum, losing 8.5 miles of anadromous fish streams in these watersheds would: eliminate salmon spawning and rearing habitat, including overwintering areas where juvenile salmon rear; eradicate the production of "ecological subsidies" (e.g., flow, nutrients, gravel, organic materials) to downstream waters where salmon spawn; and, in turn, erode salmon populations' diversity, productivity, and resilience. EPA_AR_0083088.

EPA likewise showed that the loss of 91 miles of supporting streams in any part of the three watersheds would result in unacceptable adverse effects on fishery areas that are similar to those resulting from the 2020 Mine Plan. EPA_AR_0083095-98 (Section 4.2.2.4.2). We detailed those effects in the Argument Section I.A.2 above. In short, loss of 91 miles of stream in those watersheds would eliminate the same ecological subsidies described above to downstream anadromous fish streams where salmon spawn, which, in turn, would erode salmon populations' diversity, productivity, and resilience. EPA_AR_0083097-98.

EPA also reasonably concluded that the loss of 2,108 acres of wetlands and other supporting waters in those three watersheds would result in unacceptable adverse effects on anadromous fishery areas that are similar to those resulting from the 2020 Mine Plan. EPA_AR_0083105-08 (Section 4.2.3.4.2). We detailed those effects in the Argument Section I.A.3 above. To summarize, losing those wetlands and other waters would eliminate the support wetlands provide to anadromous fish streams, which include: providing cover; moderating stream temperature and flows; maintaining baseflows; serving as groundwater recharge zones;

and supplying nutrients, organic material, macroinvertebrates, algae, and other materials to abutting streams and downstream. EPA_AR_0083101, 0083107.

Finally, EPA reasonably reached the same finding as to streamflow changes of greater than 20 percent of average monthly stream flow in 29 miles of salmon streams in the three watersheds. EPA_AR_0083128-32 (Section 4.2.4.7.2). We described those effects in the Argument Section I.A.4 above. In sum, rising streamflow would, among other things, degrade salmon habitat by increasing the movement of sediments, which, in turn, would reduce salmon egg survival through scouring or burying. EPA_AR_0083130. In addition, streamflow reductions would reduce salmon habitat; fragment a continuous stream system into small, isolated patches; and preclude normal seasonal movements by salmon. EPA_AR_0083130. Reduced streamflow would also reduce the frequency and duration of the connection of the streams with off-channel habitats, which would remove critical rearing areas for several species of juvenile salmon. EPA_AR_0083130-31. Finally, it would also result in finer sediment deposits that would suffocate eggs and provide a less-suitable streambed to sustain salmon eggs. *Id.*

***

The record fully supports EPA's determination that the 2020 Mine Plan Impacts represent asignificant level of anadromous fish habitat loss and degradation in the Bristol Bay watershed that would adversely affect Coho, Chinook, Sockeye, and Chum salmon in the SFK, NFK, and UTC watersheds, all of which support important fisheries. Giving proper deference to EPA's technical findings and conclusions, the Court should grant summary judgment in the Agency's favor. *See Seven Cnty.,* 605 U.S. at 181-82.

**C. EPA Appropriately Explained the Scale It Used in Assessing Adverse Effects.**

EPA's Final Determination considered impacts to aquatic resources in the SFK, NFK, and UTC watersheds and, thus, assessed the ecological effects there. EPA_AR_0083291. PLP asserts that this scale is arbitrarily small and, by selectively quoting from the Final Determination, contends that EPA's explanation for it is circular. PLP Br. 49-50. The record contradicts these contentions.

EPA agrees that assessing whether measurable effects occur is scale dependent. FD at EPA_AR_0083255. If an effects assessment considers too large a spatial scale relative to the potentially impacted resource(s), the relative magnitude of any effects will be diminished, no matter how great they may be on a particular area of concern. *Id.* Here, EPA reasonably concluded that its assessment should occur at the spatial and temporal scales that are most relevant to the impacted resources. *Id.* That conclusion was reasonable. For instance, if a doctor is assessing possible damage from a blow to the knee, she would not conduct a full head-to-toe physical exam (too broad a scale) or only examine the skin of the knee (too narrow a scale). Rather, the doctor examines the leg, because that is the relevant scale of the affected area of the body. The same is true here.

In the Final Determination, the resource EPA evaluated was anadromous (salmon) fishery areas. EPA explained that the appropriate scale should allow for conclusions at the spatial and temporal scales most relevant to the species (salmon) and life stages (eggs, juveniles, adults) of concern that ultimately determine reproductive success and, thus, the long-term persistence of the species and their genetically distinct populations. RTC at EPA_AR_0083827. EPA determined that the SFK, NFK, and UTC watersheds are the scientifically-appropriate scale to assess the adverse effects at issue here because: the watersheds provide habitat for key life stages

for Coho, Chinook, Sockeye, and Chum salmon, including genetically distinct populations; these populations would be most directly impacted by mine site development; salmon habitats across the Bristol Bay watershed are not interchangeable; and the most extensive physical, chemical, and biological data currently available have been collected in these watersheds. FD at EPA_AR_0083254-59. In fact, the Corps used the same scale in its Record of Decision when it denied PLP's permit application. EPA_AR_0083291. PLP disagrees with EPA's scale choice, but EPA's decision is supported by reason and the record, and, thus, PLP's disagreement fails to meet the high bar for setting aside agency action based on the exercise of technical judgment. *See Seven Cnty.*, 605 U.S. at 181-82 (explaining that courts must be "most deferential" to an agency's "scientific judgments").

PLP also asserts that EPA should not have used linear miles for measuring the impacted streams. PLP Br. 51. The Court should reject this argument. PLP argues that linear miles are the wrong measure for habitat quantity because a wider stream would have more fish habitat than a smaller stream. While EPA describes the loss in terms of stream length, stream length is not the reason that the loss is unacceptable. *See* RTC at EPA_AR_0083864-66. As explained above, EPA thoroughly discussed the functions that these streams play and what the loss of these streams means, both at the location of the fill and for downstream waters. *Id.* Whether EPA used stream length or stream area is irrelevant. *See id.*

### D. EPA Appropriately Applied the Unacceptable Adverse Effects Standard.

PLP incorrectly alleges that EPA assessed whether discharges would have a "non-trivial" effect on fishery areas rather than an "unacceptable adverse effect," as the statute requires. The

administrative record establishes that EPA appropriately determined that the discharges within the defined areas will have an unacceptable adverse effect on salmon fishery areas.

PLP makes the unsupported assertion that EPA imported its definition for "unacceptable adverse effect" from the Corps' explanation in its permit denial that "significant degradation" means "more than trivial." PLP Br. 36-37. And EPA then treated any non-trivial impact as a basis for the Final Determination. *Id.* These incorrect assertions are directly rebutted by the Final Determination where EPA explained the standard and detailed EPA's extensive findings addressing adverse effects.

The CWA does not define "unacceptable adverse effect," but gives the Administrator discretion in determining what meets that standard. 33 U.S.C. § 1344(c). In *Loper Bright Enterprises. v. Raimondo,* the Supreme Court explained that in some statutes, Congress gives agencies authority to "regulate subject to the limits of a term or phrase that leaves agencies with flexibility." 603 U.S. 369, 395 (2024) (internal quotations omitted). Where a statutory delegation of authority "leaves [the] agenc[y] with flexibility," *id.*, a reviewing court must "respect such delegations of authority . . . and ensure that agencies exercise their discretion consistent with the APA," *id.* at 404. Here, Congress delegated to EPA the authority to determine that discharges will result in adverse effects that are "unacceptable," a flexible standard that allows EPA discretion within the APA's bounds. *See id.* at 395; *Pirzadeh*, 1 F.4th at 759 ("[w]hether 'unacceptable' adverse effects are 'likely' is a flexible standard that draws considerably on the agency's expertise and judgment.").

Here, EPA appropriately exercised its discretion and applied the definition of "unacceptable adverse effect" from its long-standing regulations, i.e., "an impact on an aquatic or wetland ecosystem which is likely to result in  . . . significant loss of or damage to fisheries  . . . "

EPA_AR_0083064 (quoting 40 C.F.R. § 231.2(e)); *see Loper Bright*, 603 U.S. at 394 (agency "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."). EPA explained that the term "unacceptable," refers to the significance of the adverse effect—"e.g., is it a large impact and is it one that the aquatic ecosystem cannot afford." EPA_AR_0083064. Indeed, an impact that an ecosystem cannot afford would be "devastating." *See* PLP Br. 37. Regardless of the precise parameters of "unacceptable," the record here amply supports EPA's conclusion that the adverse effects here are more than the relevant fishery areas can afford.

PLP claims that EPA's faulty standard is "apparent" because "the Veto covers any hypothetical mining of the Deposit with even a single impact comparable to those discussed in the Veto." *Id.* But the cited portion of the Final Determination explains the restriction is based on EPA's determination that the 2020 Mine Plan Impacts (not any hypothetical mining) within the NFK, SFK, or UTC watersheds will have unacceptable adverse effects. FD at EPA_AR_0082964-65. PLP's argument amounts to a disagreement with EPA's decision to restrict unacceptable adverse effects in the three watersheds—not the standard that EPA used to make its finding.

Next, PLP baselessly asserts that EPA's definition of "unacceptable adverse effects" equates to "significant [e]ffect[s]," as used in NEPA, 42 U.S.C. § 4332(C). But EPA has explained that unacceptable adverse effects means a "significant loss of or damage to," not simply "significant effects," as PLP asserts. FD at EPA_AR_083064 (quoting 40 C.F.R. § 231.2). "Loss of or damage to" is facially more specific than "effect." *See* 40 C.F.R. § 231.2. And that EPA and the Corps have allowed for "significant impacts" (e.g., the filling of 2.88 miles of stream) to occur in other waters of the United States (*see* PLP Br. 37) does not undermine EPA's

findings here that the losses and damage in these three watersheds, which include 8.5 miles of anadromous fish streams and many more miles and acres of harm to supporting streams and wetlands, are unacceptable.

PLP argues that if "unacceptable" means significant, then Section 404(c) would be a senseless parallel process with the Corps. But that ignores the purpose of 404(c). *See Newport Galleria Grp. v. Deland*, 618 F. Supp. 1179, 1183 (D.D.C. 1985) ("Section 404(c) would be a curious veto power, indeed, if . . . courts could prevent the EPA from reviewing those very findings upon which the Corps based its decision to issue the permit."). As to PLP's specific factual assertions that EPA's identified effects are not "unacceptable." PLP Br. 38-39, we established in Section A and B above, that those assertions are incorrect and contradicted by the record.

### E. EPA Appropriately Defined "Fishery Areas" in the Final Determination.

EPA exercised its Section 404(c) authority because the 2020 Mine Plan Impacts will have unacceptable adverse effects on anadromous fishery areas. FD, EPA_AR_0082943. PLP argues that the term "fishery areas" is limited to locations where fish are caught or people engage in the business of fishing, and that EPA cites no evidence in the Final Determination that commercial, subsistence, or recreational fishing occurs in the entirety of the NFK or SFK watershed. PLP Br. 42.

PLP is wrong in several respects. To begin, EPA's definition of fishery areas is reasonable if not the best reading of the statute. The CWA does not define "fishery areas," but it does expressly describe the phrase to "(includ[e] spawning and breeding areas)." 33 U.S.C. § 1344(c). Inclusion of that parenthetical phrase demonstrates Congress' understanding that fish often use different habitats throughout their lifespan to spawn and breed. Congress specifically identified

"breeding and spawning areas," which some might not ordinarily consider to be "fishery areas," to ensure EPA considered them when evaluating "unacceptable adverse effects" under Section 404(c).

Contrary to PLP's assertion, EPA appropriately defined the relevant "fishery areas" that will face unacceptable adverse consequences. First, EPA specified that its determination was based on the adverse effects to "anadromous fishery areas." FD at EPA_AR_0082943. Anadromous fish are those that hatch in freshwater habitats, migrate to sea for a period of growth, and then return to freshwater habitats to spawn. EPA_AR_0082968 n.15. Second, EPA explained that, for the purposes of the Final Determination, "anadromous fishery areas" include "anadromous fish streams," EPA_AR_0083070 n.53, which are streams that have documented anadromous fish occurrence, EPA_AR_00803069, in the SFK, NFK, and UTC watersheds, EPA_AR_0083065.

As described above, in identifying those streams, EPA reasonably looked to the Anadromous Waters Catalog, where the Alaska Department of Fish and Game specifies streams that are important for the spawning, rearing, or migration of anadromous fish pursuant to State law, Alaska Stat. § 16.05.871.[14] In addition, Alaska has documented salmon use both within the mine footprint for the 2020 Mine Plan and immediately downstream. *See* FD at EPA_AR_0083072-73, 3080.

In the Final Determination, EPA included a map that shows the streams, rivers, and lakes where Alaska has documented salmon use in the SFK, NFK, and UTC watersheds. FD at

_____

[14] Indeed, in its 2020 Mine Plan, PLP acknowledged that "[r]ivers near the Pebble Deposit provide habitat for five species of anadromous Pacific salmon" and that "streams in [the Pebble Deposit] area contain many features that support fish spawning and rearing, including complex off-channel habitats, river gravel that promotes spawning, beaver ponds, and combinations of run/glides and riffles." PLP 2020 Mine Plan, EPA_AR_0499508 at 9528.

EPA_AR_0083080. EPA reasonably concluded that these streams, rivers, and lakes with documented salmon use qualify as "fishery areas" within the meaning of Section 404(c).

EPA's consideration of fishery areas is also consistent with EPA's regulations and case law. As noted above, EPA has defined "unacceptable adverse effect" to mean "impact on an aquatic or wetland ecosystem" that is "likely to result in significant loss of or damage to" fishery areas. 40 C.F.R. § 231.2(e). Courts have upheld EPA's consideration of the permanent loss or damage to the aquatic ecosystem, including habitat losses and consequences alone, as the basis for the Agency exercising its Section 404(c) authority. *See Mingo Logan Coal Co. v. EPA*, 70 F. Supp. 3d 151, 172 (D.D.C. 2014), *aff'd*, 829 F.3d 710 (D.C. Cir. 2016) (finding "there is no support for the argument that EPA cannot rest the Final Determination on a loss of habitat" and upholding EPA's unacceptable adverse effects determination that involved "consideration of the larger picture: the relationship between the destruction of habitat and the wildlife that depends on that habitat.").[15] For these reasons, the Court should uphold EPA's determination that the mining discharges at issue here would adversely affect the "fishery areas" in the SFK, NFK, and UTC watersheds.

**F. EPA Relied Upon Reasonable Predictions and Not Speculation.**

Congress authorized EPA to exercise its Section 404(c) authority whenever it determines that the discharge of dredged or fill material "will have" an unacceptable adverse effect on fishery areas. 33 U.S.C. § 1344(c). PLP contends that EPA's Final Determination is based on speculation. PLP Br. 39. As established in the Argument Section I.A.1.-4. above, however, that

---

[15] While the *Mingo Logan* court, *supra*, deferred to the Agency under the now-defunct *Chevron* doctrine, that deference was unnecessary because the plaintiff had not argued that EPA's definition was inconsistent with the statute.

contention is flatly contradicted by the record, which provides robust support for EPA's assessment of adverse effects.

PLP cites the 1979 Federal Register notice that accompanied EPA's Section 404(c) regulations to argue that EPA's regulatory definition lowered the statutory standard. PLP Br. 39-40. In the relevant passage, EPA explains the difference between the standard for a proposed determination ("could" have an unacceptable effect) and a final determination ("would be likely to" have an unacceptable effect). In making that distinction, EPA stated that "[b]ecause [final] determinations are by their nature based on predictions of future impacts, what is required is a *reasonable likelihood* that unacceptable adverse effects *will* occur—not absolute certainty but more than mere guesswork." 44 Fed. Reg. 58076, 58078 (Oct. 9, 1979), EPA_AR_0138921 (emphasis added). Thus, EPA defined "unacceptable adverse effect" in its regulations to mean an effect that "is likely to result." 40 C.F.R. § 231.2(e). Although PLP asserts that the statute's use of "[w]ill requires a fair degree of certainty," PLP acknowledges that absolute certainty is not required. Moreover, PLP never pinpoints any substantive distinction between EPA's "reasonable likelihood"—which at least has legal precedent—and its utterly ambiguous "fair degree" formulation.

In any event, EPA's interpretation is reasonable. In drafting Section 404(c), Congress used the future tense "will have," with the necessary understanding that EPA's findings about future effects would be predictive and based on a scientific and technical record. Indeed, Congress made such predictions about the effects of future discharges of dredged or fill material fundamental to both the Corps' and EPA's CWA authorities. The Corps reviews proposed discharges for compliance with the Section 404(b)(1) Guidelines before determining whether to issue a permit. *See* 33 U.S.C. § 1344(a)-(b). EPA's authority is likewise necessarily predictive;

otherwise, the unacceptable adverse effects would have already occurred. In Section 404(c) Congress recognized EPA's scientific expertise in making such predictions about effects to support the required determinations.

To support its argument, PLP cites an inapplicable case interpreting criminal statutes' mens rea requirements. PLP Br. 40. PLP also relies on *Arizona Cattle Growers' Association v. U.S. Fish & Wildlife, Bureau of Land Management*., 273 F.3d 1229, 1236 (9th Cir. 2001), asserting that EPA, like the Fish & Wildlife Service in that case, did not establish with "reasonable certainty" that its predicted effects would occur. PLP Br. 40. In *Arizona Cattle*, the farmer plaintiffs sought grazing permits on federal lands. 273 F.3d at 1233. In assessing the permit application, the Service issued a biological opinion, concluding that the proposed grazing was not likely to jeopardize the existence of the affected species or result in destruction of critical habitat. *Id.* Notwithstanding, the Service determined that the grazing would "incidentally take" one or more protected species. *Id.* at 1234. The court held that the Service's "Incidental Take Statements" were arbitrary and capricious because the Service presented "*no evidence* that the endangered species existed on the land" and "*no evidence* that a take would occur if the permit were issued." *Id.* at 1233 (emphasis added).

But the facts here are distinguishable because EPA's determination is supported by evidence in the record. Indeed, in the Final Determination, EPA explained that it analyzed the aquatic resource losses that *PLP proposed* in its 2020 Mine Plan and streamflow changes based on data *PLP submitted*. Thus, those losses and streamflow changes are not speculative but expressly intended. Nor are the effects of those losses and streamflow changes on fishery areas speculative. While EPA used the word "could" in certain instances where scientifically appropriate to describe effects, EPA's unacceptable adverse effects findings are based on the

overall weight of evidence regarding the described effects that EPA found *would occur*. *See, e.g.,* EPA_AR_0083085.

PLP asserts that EPA's assessment that the destruction of aquatic habitat would threaten genetically distinct populations in the NFK, SFK and UTC watersheds is speculative. PLP Br. 53. But PLP's arguments on this point ignore much of the scientific evidence EPA considered. For instance, EPA considered several studies that found that Koktuli River (including the SFK and NFK) and UTC support genetically-distinct populations of Sockeye salmon. EPA_AR_0083075 (citing Dann et al. 2012, Shedd et al. 2016, Dann et al. 2018). EPA also discussed that, for example, Sockeye salmon that use waters approximately 0.6 mile apart (much smaller than 8.5 miles) exhibit differences in traits (e.g., spawn timing and productivity) indicating they comprise discrete populations. EPA_AR_0083046; *see also* EPA_AR_0083075-77 (discussing Coho and Chinook salmon).

And to the extent PLP acknowledges some of the evidence EPA considered, it mischaracterizes it. PLP mischaracterizes the studies at EPA_AR_0486361 and EPA_AR_0496851. The former study found that Chinook salmon that spawn in the Koktuli River near the confluence of the SFK and NFK are genetically distinct, EPA_AR_0083045, and PLP's statements regarding "'shallow' genetic differentiation at larger scales" are from the Yukon River, which is not in the Bristol Bay watershed. The latter study did not evaluate small-scale genetic differentiation in salmon. And contrary to PLP's arguments, EPA discussed why straying is unlikely to be successful. EPA_AR_0083077; 0083291-92. Finally, PLP's focus on harvest rates at larger spatial scales is misguided. Harvests cull, not destroy, multiple genetically-distinct populations. EPA_AR_0480958. EPA's action focused on the permanent loss of habitat for genetically-distinct salmon populations. *See supra* Argument Section I.A.1. The record

demonstrates that to assess effects, EPA relied on well-established scientific evidence, PLP's sampling, and its own expertise to conclude that the losses and stream flow changes *will* negatively impact the quality of salmon habitat and erode the genetic diversity uniquely necessary to sustain wild Pacific salmon fishery areas. As the Supreme Court recently reminded "[b]lack-letter administrative law instructs that when an agency makes. . . predictive or scientific judgments . . .a reviewing court must be at its 'most deferential.'" *Seven Cnt'y*, 605 U.S. at 182.

### G. EPA Appropriately Considered Secondary Effects.

Alaska asserts that EPA improperly considered secondary effects, including fragmentation, dewatering, and habitat degradation, when making its Section 404(c) determination.[16] Alaska Br. 34-35. That assertion is unfounded. EPA properly considered these effects here because they share a causal link with the proposed discharges. *See Mingo Logan Coal Co. v. EPA*, 70 F. Supp. 3d 151, 178-179, 182-183 (D.D.C. 2014), *aff'd*, 829 F.3d 710, 725-26 (D.C. Cir. 2016). For example, PLP proposed filling portions of tributaries and, as a result, the upstream and downstream segments would be cut off from the connecting flow (i.e., fragmented). FEIS, Ch. 4 at EPA_AR_ 0095760-61, 0095779 (Table 4.22-4). Thus, the filled portion of the stream would affect both upstream and downstream reaches even though those stretches would not be filled themselves. *See id.* Similarly, if a stretch of stream were filled to construct a mine tailings storage facility and diversions and the facility's drainage system pulled water from surrounding streams and wetlands (as PLP proposed to do), EPA concluded that fill and associated construction would dewater those streams and wetlands. EPA_AR_0083068.

---

[16] While Alaska also argues that EPA improperly considered fugitive dust, this analysis is found in the Final Determination's Section 4.3, where EPA, consistent with its regulations, considered the relevant portions of the CWA Section 404(b)(1) Guidelines. FD at EPA_AR_0083132-34. EPA's analysis supports and confirms EPA's unacceptable adverse effects determinations.

To be sure, there may be situations where it would be inappropriate for EPA to consider effects like fragmentation, dewatering, and habitat degradation. But here, as we explained in Argument Sections I.A and B above, EPA explained why the 2020 Mine Plan Impacts will degrade downstream anadromous fishery areas. EPA thus explained how these effects are connected to proposed discharges from the 2020 Mine Plan, which is all that is required.

## II.   EPA Properly Exercised Its Statutory Authority Under CWA Section 404(c) in Defining the Prohibition and Restriction Areas.

The CWA authorizes EPA to prohibit, restrict, or deny the Corps' authority to specify as disposal sites waters of the United States within "defined areas" "whenever" EPA determines that such discharges of dredged or fill material will have an unacceptable adverse effect on, among other things, fishery areas. 33 U.S.C. § 1344(c). In the Final Determination, EPA adopted both a prohibition and a restriction.

For the reasons described in Argument Section I.A. above, EPA determined that each one of the four 2020 Mine Plan Impacts would independently have unacceptable adverse effects on anadromous fishery areas (including spawning and breeding areas). FD at EPA_AR_0083166-67. EPA further determined that, even if the mine plan were reconfigured and discharges moved to other waters of the United States within the Mine Site Area, if those discharges resulted in the 2020 Mine Plan Impacts, those discharges would also have unacceptable adverse effects on anadromous fishery areas. *Id.* at EPA_AR_0083166. Thus, EPA prohibited the specification of dredged or fill material within a defined area in the NFK and SFK watersheds (the "Defined Area for Prohibition") to prevent extraordinary and unprecedented levels of anadromous fish habitat loss and degradation.

Additionally, to prevent those same adverse effects in the NFK, SFK, and UTC watersheds from the 2020 Mine Plan Impacts, described in Argument Section I.B. above, EPA

restricted "the use of waters of the United States . . . for specification as disposal sites . . . associated with future proposals to construct and operate a mine to develop the Pebble deposit" that would result in any one of the 2020 Mine Plan Impacts. *Id.* at EPA_AR_0082958. The restriction applies to a defined area (the "Defined Area for Restriction") within those three watersheds. *Id.*

EPA's prohibition and restriction are consistent with the Agency's authority under the CWA and supported by the record.

### A. EPA Reasonably Based Its Final Determination on the 2020 Mine Plan and Appropriately Included Forward Looking Provisions.

PLP asserts that the Final Determination's Prohibition and Restriction are unlawful because they "ban[] future activities not yet conceived." PLP Br at 23. That assertion is unfounded. The record demonstrates that EPA reasonably based the Final Determination on the discharges to waters of the United States that *PLP proposed* in its 2020 Mine Plan, not "hypothetical mines," as PLP asserts. *Id.* The Final Determination, including its Restriction,  is closely grounded in the 2020 Mine Plan Impacts that PLP proposed

Contrary to PLP's assertions, in making the Final Determination, EPA did not act in the abstract. EPA based its action on the 2020 Mine Plan Impacts. PLP asserts that the Final Determination is unlawful because, when EPA issued its Final Determination in 2023, the Corps had denied PLP's permit application (which relied on the 2020 Mine Plan). And, according to PLP, EPA cannot exercise its Section 404(c) authority in the absence of a Section 404 permit application. PLP Br. 23. That argument misrepresents the factual context of the Corps' and EPA's overlapping proceedings and is incorrect.

At the time EPA issued its Final Determination, PLP's permit application appeal was still pending with the Corps. A short reminder of the timeline is helpful. The Corps denied PLP's

permit application in November 2020, which PLP appealed in January 2021. In October 2021, while PLP's administrative appeal was still pending before the Corps, this Court vacated EPA's withdrawal of its 2014 Proposed Determination, after the Ninth Circuit's decision in *Pirzadeh*, 1 F.4th at 757. The vacatur had the effect of re-initiating the Section 404(c) process. By that time, EPA had spent years studying the aquatic resources in the SFK, NFK, and UTC watersheds and the adverse effects resulting from the 2020 Mine Plan Impacts. In January 2022, EPA began the Section 404(c) process that culminated in its January 2023 Final Determination. In April 2023, the Corps' Pacific Division completed its review of PLP's administrative appeal and remanded the Corps' 2020 permit denial to the Corps' Alaska District. So, Plaintiffs are wrong to say EPA made its decision without a pending application.

The Final Determination's Restriction was necessarily tied to the pending application: it was based on the same type and degree of impacts in the 2020 Mine Plan. EPA_AR_ EPA AR 0083172-73, 77-78. So if a future proposal were to move the discharges into different waters of the United States either within the Mine Site Area itself or within the larger SFK, NFK, and UTC watersheds, but resulted in any of the 2020 Mine Plan Impacts, those discharges too would cause unacceptable adverse effects to salmon fishery areas. EPA_AR_0082956. This action is consistent with EPA's implementing regulations, which state that "the Administrator may also prohibit the specification of a site under Section 404(c) with regard to any existing or potential disposal site before a permit application has been submitted to or approved by the Corps or a state." 40 C.F.R. § 231.1.

Contrary to Plaintiffs' assertions, EPA's decision does not categorically foreclose any mine at the Pebble deposit. Indeed, a future project proponent is free to submit a permit application to the Corps if it believes its project would not have the same degree of impacts as

the 2020 Mine Plan. *See* RTC at EPA_AR_0084029 (advising future potential mine operators to consult with EPA to determine whether a mining proposal would fall within the prohibition or restriction).[17]

## B. EPA Appropriately Defined the Areas Where the Corps Is Prohibited and Restricted from Specifying Disposal Sites.

EPA defined the geographic areas subject to the prohibition and restriction based on its determination that discharges to waters of the United States within those areas in connection with mining the Pebble deposit would result in unacceptable adverse effects to salmon fishery areas in the NFK, SFK, and UTC watersheds. Specifically, EPA based the Defined Area for Prohibition on two determinations: (1) the 2020 Mine Plan Impacts would result in unacceptable adverse effects to salmon fishery areas; and (2) discharges to waters of the United States anywhere in the Mine Site Area that would meet or exceed any one of the 2020 Mine Plan Impacts would result

---

[17] In a 2017 settlement agreement resolving claims against EPA, discussed above in the Factual Background Section, PLP agreed it "will not challenge EPA's authority to exercise CWA Section 404(c) in the absence of a Permit Application or a decision on a Permit Application, if EPA follows a CWA Section 404(c) process consistent with the terms of this Settlement Agreement." Settlement Agreement at EPA_AR_0139594.[17] EPA followed the Section 404(c) process described in the Settlement Agreement. Thus, by now challenging EPA's authority to issue a "veto . . . without at least a permit application," PLP Br. 23, PLP should be precluded from making an argument that contravenes its Agreement. Under the settlement, EPA agreed to the following process: if PLP submitted a permit application to the Corps within 30 months of the agreement's effective date of May 12, 2017, EPA Region 10 would not forward a Recommended Determination to EPA headquarters pursuant to 40 C.F.R. § 231.5(b) until (1) EPA published a notice in the Federal Register of the Final EIS regarding PLP's permit application pursuant to 40 C.F.R. § 1506.10(a) or (2) 48 months from the Effective Date of the Agreement (i.e., May 12, 2021), whichever was earlier. Settlement Agreement at EPA_AR_0139592-93. PLP submitted its permit application to the Corps on December 22, 2017. EPA published notice of the Final FEIS on July 24, 2020. EPA Region 10 did not forward a signed Recommended Determination to EPA headquarters until December 1, 2022. EPA_AR_0498929.Thus, EPA complied with the Agreement and PLP cannot challenge EPA's authority to exercise Section 404(c) in the absence of a permit application or a decision on a permit application, as PLP is plainly doing here. Settlement Agreement at EPA_AR_0139594. Thus, the Court should disregard PLP's challenge to EPA's authority.

in unacceptable adverse effects to salmon fishery areas in the NFK and SFK watersheds. FD at EPA_AR_0083166-67. To identify the Defined Area for Prohibition, EPA started with the footprint of the 2020 Mine Plan PLP proposed, then drew an outline around that area using publicly available and commonly understood property boundaries and the watershed boundaries (on the eastern border) to clearly demarcate where the prohibition applies in the future. The Defined Area for Prohibition appears in the Final Determination at Figure 5-1. EPA_AR_0083170.

The Defined Area for Restriction rests on EPA's determination that discharges to waters of the United States associated with mining the Pebble deposit anywhere in the NFK, SFK, and UTC watersheds that would result in any one of the 2020 Mine Plan Impacts would result in unacceptable adverse effects to salmon fishery areas within those three watersheds. EPA_AR_0083172-73. To define the restricted area, EPA identified the location of the mine claims in and around the Pebble deposit in the NFK, SFK, and UTC watersheds, which represent locations that could be a disposal site for dredged or fill material associated with developing the Pebble deposit. EPA_AR_0083173. EPA then outlined a contiguous area using publicly available and commonly understood property and watershed boundaries so that it is clear where the restriction applies in the future. The Defined Area for Restriction appears as Figure 5-2 in the Final Determination. EPA_AR_0083175.

Plaintiffs argue that, because the outlines for the Defined Areas encompass land, they exceed EPA's statutory authority. Alaska Br. 29-30; PLP Br. 61-62. But that argument is baseless. EPA's Prohibition and Restriction do not affect activities on dry land, and EPA has never claimed as much. The Final Determination cannot (and does not) apply to disposal activities on dry land or in non-jurisdictional waters because Section 404 permits are not required for those activities.

The Final Determination is a prohibition and a restriction of the Corps' authority to permit certain discharges into waters of the United States within the defined areas. EPA_AR_0082957-58. In making the Final Determination, EPA concluded that the discharge of dredged or fill material into certain *waters of the United States* within the defined areas will have unacceptable adverse effects on anadromous fishery areas. FD at EPA_AR_0082954.

Congress authorized EPA to prohibit or restrict the use of "*any* defined area" as disposal sites to prevent unacceptable adverse effects on fishery areas and other resources identified in Section 404(c). *See* 33 U.S.C. § 1344(c). The terms "any" and "area" convey discretion to EPA in selecting a geographic scope that prevents unacceptable adverse effects from the discharges at issue on fishery areas. *See Pirzadeh*, 1 F.4th at 752 (finding that Congress' use of "*any* defined area" in Section 404(c) conveys discretion on EPA) (emphasis in original). The word "defined" means "having a definite outline or form; clearly marked."[18] Thus, "defined area" means only that EPA's Section 404(c) action must be directed at waters of the United States within a clearly marked area. *See id.*; 44 Fed. Reg. at 58077 ("The phrase 'any defined area' . . . merely means that a Section 404(c) action must be directed at a particular or identifiable area rather than 'wetlands' or some other generic category"). Figures 5-1 and 5-2 in the Final Determination define the areas subject to its prohibition and restriction, consistent with Section 404(c)'s requirements.

PLP's and Alaska's argument that "defined area" is synonymous with "navigable waters" is misdirected because, as noted above, EPA *agrees* that only "navigable waters" within the defined area are subject to the Final Determination's prohibition and restriction. The CWA

---

[18] Oxford English Dictionary, "defined (adj.)," December 2025, https://www.oed.com/dictionary/defined_adj?tab=meaning_and_use&tl=true#7200831.

defines "discharge" to mean "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12), (16).[19] Thus, the use of "discharges" in Section 404(c) and in the Final Determination is limited *by definition* to navigable waters (i.e., waters of the United States). Thus, the statutory phrase "whenever EPA determines the *discharge* . . . into such area will have an unacceptable effect" could be rewritten as "whenever EPA determines that the addition of any pollutant to navigable waters from any point source . . . into such area will have an unacceptable adverse effect." Or, even more simply, "whenever EPA determines that the discharge of dredged or fill material into waters of the United States within a defined area will have an unacceptable adverse effect."

In short, EPA's delineation of the prohibited and restricted areas was appropriate and consistent with its CWA authority.

### C. EPA Reasonably Relied on PLP's Identification of Waters of the United States in the 2020 Mine Plan.

In the Final Determination, EPA concluded that "discharges" (which, by definition, are limited to those in "navigable waters," *see* 33 U.S.C. § 1362(7)) associated with PLP's 2020 Mine Plan would result in unacceptable adverse effects on anadromous fishery areas. FD at EPA_AR_0082954-55. PLP and Alaska incorrectly assert that EPA considered effects of discharges into non-jurisdictional waters. Alaska Br. 31-34; PLP Br. 61-62. Plaintiffs' argument relies upon a misunderstanding of the Section 404 process and misrepresents the submissions PLP made to the Corps with respect to its 2020 Mine Plan.

---

[19] "Discharge" as used in the CWA and in the Final Determination is defined to mean "discharge of a pollutant," which is further defined to apply only to "navigable waters." *See* 33 U.S.C. § 1362 (12), (16) (defining "discharge" to mean "discharge of a pollutant" and defining "discharge of a pollutant" to mean "any addition of any pollutant to navigable waters from any point source").

PLP's 2020 Mine Plan was a revised permit application submitted to the Corps in June 2020. FD at EPA_AR_0082947. In that permit application, PLP identified 15,591.99 acres of wetlands and other waters it deemed to be "waters of the United States." *See* PLP Br. 63. The Corps provided a "preliminary jurisdictional determination" and concurred that each of the aquatic resources identified in the application were jurisdictional waters. FEIS, App. J at EPA_AR_0092741. A "preliminary jurisdictional determination" does not definitively address questions of jurisdiction but treats aquatic resources within the review area as if they are jurisdictional for purposes of permit processing. *See* 33 C.F.R. § 331.2. The value of a preliminary jurisdictional determination is that it is faster to obtain than an "approved jurisdictional determination," and, when sought with a permit application, advises the proponent that fill is permitted in the presumed waters of the United States if the permit conditions are met. *See* 33 C.F.R. pt. 331, App. C.

In its preliminary jurisdictional determination here, the Corps advised PLP of its option to obtain an *approved* jurisdictional determination. FEIS, App. J at EPA_AR_0092741. An "approved jurisdictional determination" is an appealable final determination by the Corps of the presence or absence of waters of the United States within a defined area. 33 C.F.R. § 331.2. PLP did not request an approved jurisdictional determination.

Thus, the impacts to aquatic resources outlined in PLP's June 2020 permit application relied on PLP's own data, and the assumption by all parties at the time was that the aquatic resources PLP identified are "waters of the United States." It was reasonable for EPA to rely on this information, especially because neither PLP nor the State provided information to EPA during the Section 404(c) process suggesting that any aquatic resources within the defined areas are not "waters of the United States."

Citing *Sackett*, PLP now argues that wetlands within the defined areas are not "waters of the United States." PLP Br. 63-66. However, this statutory argument was not before EPA at the time it issued the Final Determination and PLP cannot raise it now. *See All. for Wild Rockies v. Petrick*, 68 F.4th at 487 (holding that failure to raise arguments before an agency waives a litigant's right to make those arguments in court.) As we have explained, EPA's Final Determination only applies to "waters of the United States," so it only applies to waters that meet that definition at the time when a discharge is proposed. If PLP believes that certain aquatic resources within the Defined Areas are not waters of the United States under present law, then PLP could request an approved jurisdictional determination from the Corps. PLP could also request an applicability determination from EPA at any time (*see* FD at EPA_AR_0083169, 0083177-78). PLP has not done so.

As to future discharges, EPA's evaluation of the Mine Site Area and the affected watersheds (which all indisputably contain waters of the United States)[20] assumed that future discharges would be into waters of the United States and the resulting prohibition and restriction only apply to "waters of the United States." *See* EPA_AR_0083177.

Finally, that on other occasions EPA limited its Section 404(c) actions to specific stretches of navigable waters does not mean that EPA's Section 404(c) authority is so circumscribed. *Cf.* Alaska Br. 30-31. First, neither the statute nor EPA's regulations impose such

---

[20] In its Response to Comments on the Proposed Determination, EPA clarified that the defined areas contain "waters of the United States" even though this issue was not disputed. RTC at EPA_AR_0083615. PLP and Alaska misinterpret EPA's response, which concludes that there are "waters of the United States" within the defined areas arguing that EPA determined that only "some" of the 2020 Mine Plan Impacts are to "waters of the United States." Alaska Br. 33; PLP Br. 62. As discussed above, EPA evaluated the 2020 Mine Plan Impacts based on PLP's Section 404 permit application, which identified the impacted aquatic resources as "waters of the United States."

a requirement explicitly. Second, while Alaska cites the Final Determination for the Yazoo Pumps project, EPA took the same approach there as it has here. Alaska also cites EPA's Section 404(c) action addressing the Spruce No. 1 Mine (the subject of the *Mingo Logan* litigation) and its 1992 action at Ware Creek (the subject of *James City County v. EPA*). But, in those instances, EPA withdrew specifications the Corps had previously authorized; thus the specific "waters of the United States" were already identified in the Corps' permits.

In sum, EPA's prohibition and restriction in the Final Determination are limited. The prohibition and restriction apply only to discharges in waters of the United States associated with developing the Pebble deposit. Additionally, with regard to developing the Pebble deposit, neither the prohibition nor restriction applies to discharges into non-jurisdictional waters or to discharges that do not result in any of the 2020 Mine Plan Impacts. Discharges that will not cause any of the 2020 Mine Plan Impacts in the Defined Areas can proceed to permitting.

### D. PLP's "Non-Germane Factors" Argument Fails.

PLP contends that EPA's Final Determination must be set aside because EPA allegedly "tallied a wide range" of "factors that are not germane under section 404(c)." PLP Br. 70. Here, PLP refers to Section 6 of the Final Determination, titled "Other Concerns and Considerations." FD at EPA_AR_0083179. However, the Final Determination explains that for EPA's ecological unacceptable adverse effects findings in Section 4.2, Section 4.2 alone sets forth the basis for its findings. EPA_AR_0083070. Indeed, EPA underscored the point by noting that its discussion of these additional concerns and information is not exhaustive given that it is not meant to be the basis for EPA's ecological unacceptable adverse effects findings. *See* RTC at EPA_AR_0084127.

Nevertheless, PLP relies on a single footnote from one judicial decision to argue that the Court should consider those "additional concerns and information." PLP Br. 71 (citing *City &*

*Cnty. of S.F. v. USCIS*, 408 F. Supp. 3d 1057, 1106 n.18 (N.D. Cal. 2019), *aff'd*, 981 F.3d 742

(9th Cir. 2020)). That footnote states, in full:

> [The Department of Homeland Security] argues that it's [sic] 2.5% figure is not
> part of the regulatory analysis and cannot be challenged because it was calculated
> pursuant to an executive order. The court disagrees. *See Council of Parent*
> *Attorneys & Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28, 54 n.11 (D.D.C. 2019)
> ("The government contended . . . that because its regulatory impact analysis was
> conducted pursuant to Executive Orders, it is not subject to judicial review . . . .
> These arguments are contrary to D.C. Circuit precedent. Because the government
> relied on its cost-benefit analysis . . . a flaw in that analysis can render the
> regulation arbitrary and capricious.").

*City & Cnty. of S.F. v. USCIS*, 408 F. Supp. 3d 1057, 1106 n.18 (N.D. Cal. 2019). Nothing in that

footnote suggests that a court should review additional discussion that an agency has expressly

identified as *not* forming the basis for its action. The point in *City & County of San Francisco* is

straightforward: regardless of how an analysis comes to be, if the government *relies* on it, then

that analysis is reviewable. Here, by contrast, EPA explicitly did *not* rely on Section 6 as a basis

for its ecological unacceptable adverse effects findings. PLP offers no authority for the

proposition that a court should set aside an agency action based on additional information that an

agency included but simultaneously and unequivocally disclaimed reliance on. The Court should

not entertain PLP's attempt to convert a non-determinative discussion into a new APA defect.

For EPA's Alternative Basis in Section 4.4 of the Final Determination, EPA did consider a

much broader range of factors in its cost-benefit analysis, guided by *Michigan v. EPA*'s

instruction that capacious statutory language requires "consideration of all the relevant factors."

576 U.S. 743, 752 (2015). Because PLP only cites Section 6 and not EPA's cost-benefit analysis

in Section 4.4, EPA does not interpret PLP as challenging the broader set of factors EPA

considered in its cost analysis. Nor would such a challenge make sense, as PLP's own cost

arguments urge EPA to consider factors that are beyond those listed in Section 404(c).[21] However, to the extent PLP has not waived that argument or is not estopped from asserting it, EPA has discretion to consider, and appropriately considered, a broader range of factors in its cost-benefit analysis. *See, e.g.*, *Michigan*, 576 U.S. at 759 (it is "up to the Agency to decide (as always, within the limits of reasonable interpretation) how to account for cost"); *see generally infra* Section IV.

## III.    EPA Did Not "Disregard" Compensatory Mitigation.

PLP argues that EPA must consider compensatory mitigation when making a Section 404(c) determination and that EPA erred in concluding that PLP's compensatory mitigation plans were invalid. PLP Br. 68-69. PLP's argument fails for two independent reasons. First, although Section 404(c) does not explicitly direct EPA to consider compensatory mitigation when determining what constitutes an unacceptable adverse effect, EPA's regulations provide that "[i]n evaluating the unacceptability of [discharge] impacts, consideration should be given to the *relevant* portions of the section 404(b)(1) guidelines." FD at EPA_AR_0083157; 40 C.F.R. § 231.2(e) (emphasis added). The Section 404(b)(1) guidelines address mitigation. 40 C.F.R. part 230 subpart J, and EPA considered mitigation here. EPA evaluated the two compensatory mitigation plans that PLP submitted to the Corps in 2020 and reasonably found that both failed to adequately mitigate the adverse effects to an acceptable level. *Id.* EPA also included an entire appendix to the Final Determination where it evaluated additional potential compensation measures proposed by PLP and others over the past decade. FD App. C at EPA_AR_0083301-61.

---

[21] *See, e.g.*, PLP Br. 35 (arguing EPA was required to consider additional employment benefits from a "potential expansion" of the mine).

The Court need not decide whether mitigation is a required consideration here because EPA evaluated the January 2020 and November 2020 compensatory mitigation plans that PLP had submitted to the Corps and reasonably concluded that both plans failed to adequately address the unacceptable adverse effects that are the subject of the Final Determination. FD at EPA_AR_0083158.

PLP seems to take issue with only one aspect of EPA's evaluation of its January 2020 plan, which EPA already addressed in the Final Determination. *See* PLP Br. 70. In PLP's January 2020 plan, it proposed, in part, to rehabilitate 8.5 miles of salmon habitat by replacing or removing culverts in the Koktuli River watershed. FD at EPA_AR_0083158. PLP argues that "EPA said PLP had declared such mitigation impossible," but that "[a]ctually, PLP had proposed such mitigation." PLP Br. 70. It is unclear what EPA statement PLP is referring to since it did not provide a citation. Nonetheless, EPA determined that culvert replacement or removal would not offset the unacceptable adverse effects because the Koktuli River watershed is almost entirely roadless and thus offers few, if any, viable culvert replacement or removal opportunities. FD at EPA_AR_0083159. Indeed, PLP did not identify any culverts in the January 2020 plan. *Id*.

Regardless, the November 2020 plan superseded the January 2020 plan, and PLP primarily takes issue with EPA's evaluation of the November 2020 plan. *See* PLP Br. 69-70; FD at EPA_AR_0083160. That plan includes a single component: the proposed preservation of 112,445 acres of State-owned land within the Koktuli River watershed, downstream from the mine site. EPA_AR_0083160. PLP's plan proposed to preserve the land by recording a deed restriction that would limit its future uses. *Id*. However, EPA found the plan lacking because it failed, in three aspects, to adequately mitigate the adverse effects of the 2020 Mine Plan to an

acceptable level, EPA_AR_0083163-64, and not because it fell outside the relevant watershed, as PLP suggests. *See* PLP Br. 69.

EPA first found that the plan does not qualify as compensatory mitigation under EPA's regulations because the proposed preservation would not protect aquatic resources that are under threat of removal or decline. Those regulations define preservation as "the removal of a threat to, or preventing the decline of, aquatic resources by an action in or near those aquatic resources" 40 C.F.R. § 230.92. The use of preservation as mitigation is only permissible when, among other things, the resources to be preserved "are under threat of destruction or adverse modification." *Id.* § 230.93(h)(1)(iv); FD at EPA_AR_0083163. While PLP would give up its mining claims within the proposed preservation area, it never credibly proposed to mine there, and the State of Alaska has already closed a portion of these lands to mining. *See* EPA_AR_0083163. Moreover, PLP's proposed preservation would not remove the threat or prevent the decline of aquatic resources because the primary "threat of destruction or adverse modification" to these resources is PLP's 2020 Mine Plan itself, whose secondary effects will degrade waters within the proposed preservation area. *See id*. Indeed, PLP is seeking to obtain as mitigation credit "preserving" aquatic resources that the record shows would be permanently degraded by its own mine. *Id.* This type of proposal simply does not qualify as permissible preservation or mitigation. In a second, related point, EPA also found that because aquatic resources within the preservation area would be ecologically degraded by the secondary effects of PLP's 2020 Mine Plan, the preservation area would not be able to adequately mitigate the adverse effects on fishery areas described in the Final Determination to an acceptable level. EPA_AR_0083164; RTC at 0083931, *see* 40 C.F.R. § 230.93(a)(1) (stating that "[t]he fundamental objective of

compensatory mitigation is to offset environmental losses resulting from unavoidable impacts to waters of the United States").

Third, EPA concluded that PLP's November 2020 plan does not provide permanent protection, as required by EPA's regulations. EPA_AR_0083163-64. Preservation is permissible only in "certain circumstances," and then only if specific criteria are met, including that the resources to be preserved will be "*permanently protected* through an appropriate real estate or other legal instrument." 40 C.F.R. § 230.93(a)(2), (h)(1)(v) (emphasis added); FD at EPA_AR_0083163-64. PLP's plan proposed to protect the preservation area by recording a 99-year deed restriction on state lands. EPA_AR_0083164. That arrangement does not meet the requirement of 40 C.F.R. § 230.93(h)(1)(v) because PLP failed to identify a mechanism that would allow it to record a deed restriction over State-owned lands. PLP cannot restrict the use of State lands, and it provided no evidence that the State had agreed to do so. FD at EPA_AR_0083164. PLP argues that "EPA gave no reason to think" that the issues with the deed restriction could not be corrected and that EPA issued the Final Determination "because of essentially a paperwork problem." PLP Br. 70. EPA, however, identified this fundamental flaw in its Proposed Determination. 2022 Proposed Determination at EPA_AR_0082368. PLP did not propose an answer or alternative in its comments to EPA on the Proposed Determination or when it was subsequently consulted on the Recommended Decision, before EPA issued the Final Determination. Therefore, EPA reiterated its concern in the Final Determination. Furthermore, EPA's concern is not a quibble over "paperwork." It goes to the core of whether PLP's proposal could legally and practically deliver the protections it claims.

Notwithstanding the above, PLP is free to submit new compensatory mitigation ideas at any time to EPA. *See* RTC at EPA_AR_0084029 ("EPA will consider all information that a future

project proponent submits to EPA in seeking an applicability determination, including potential mitigation measures and new technology.").

IV.     **EPA Appropriately Conducted a Cost-Benefit Analysis.**

Both Alaska and PLP argue that the CWA requires EPA to consider the costs of its actions under Section 404(c) and that EPA unlawfully failed to do so here. PLP Br. 25-28; Alaska Br. 36-38. The Court need not resolve that statutory question, however, because the Final Determination includes an Alternative Basis for finding "unacceptable adverse effects" to "fishery areas" under Section 404(c) in which EPA *did* consider costs. *See* FD at EPA_AR_0083164-65; *supra* Section II.F. In this case, then, there is no live dispute about whether Section 404(c) requires consideration of costs. The only question is whether EPA's Alternative Basis is arbitrary and capricious. It is not.

A.  **EPA's Alternative Basis Is Reasonable and Well-Supported.**

EPA's Final Determination involved tradeoffs. EPA readily acknowledged those competing interests in its Alternative Basis, and numerous commenters, and now litigants, have weighed in ardently on either side.[22] EPA thoroughly evaluated those competing interests and reached a reasoned judgment after weighing those advantages and disadvantages, both of which EPA found to be significant. *See* EPA_AR_0084196. Plaintiffs, if put in EPA's position, would have advanced a different weighing. But, in the end, the APA does not ask whether another outcome was possible; it asks only whether EPA's chosen course was reasonable and contained a logical connection between the facts found and the decision made. *State Farm*, 463 U.S. at 43;

---

[22] *See* RTC at EPA_AR_0084196 ("EPA weighed these advantages and disadvantages and found that both were significant."); EPA_AR_0084177-268 (numerous comments against and in favor of EPA's cost-benefit analysis); ECF 95 (granting motion to intervene by intervenor-defendants in this case).

Defendants' Opposition Brief
*Northern Dynasty Minerals Ltd. v. EPA*                          Case No. 3:24-59 (SLG) Lead Case

*see also Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989). Plaintiffs do not raise objections that rise above mere disagreement with EPA's balancing of the record evidence and, thereby, fall short of meeting the high bar for setting aside agency action.

This Court's role in reviewing EPA's decision regarding those tradeoffs is prescribed. *See White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1266 (D.C. Cir. 2014) (Kavanaugh, J., concurring in part) ("All significant regulations involve tradeoffs, and . . . Congress has assigned EPA, not the courts, to make many discretionary calls to protect both our country's environment and its productive capacity."). This Court is not to "exercise the judgment required in striking the balance between the competing costs and benefits" but rather to "be satisfied that [the agency's] assessment of the various costs and benefits is reasonable in light of the administrative record." *California v. FCC*, 905 F.2d 1217, 1231 (9th Cir. 1990). In reviewing agency decisions like these, courts are "not to substitute [their] judgment[s] for that of the agenc[ies]," *State Farm*, 463 U.S. at 43, and "[t]his is especially true when the agency is called upon to weigh the costs and benefits of alternative policies," *Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985).

For EPA's consideration of costs under Section 404(c), it is "up to the Agency to decide (as always, within the limits of reasonable interpretation) how to account for cost." *Michigan*, 576 U.S. at 759; *see also Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 10 (D.C. Cir. 2015) ("The statute does not mandate a particular method of cost-benefit analysis. Therefore, we defer to EPA's methodology as well as its ultimate balancing decisions."). For example, EPA is not required to employ a bright-line test. *See, e.g., Catawba County v. EPA*, 571 F.3d 20, 39 (D.C. Cir. 2009) ("An agency is free to adopt a totality-of-the-circumstances test to implement a statute that confers broad discretionary authority, even if that test lacks a definite 'threshold' or

'clear line of demarcation to define an open-ended term.'"). EPA is also "free to emphasize or deemphasize particular factors, constrained only by the requirements of reasoned agency decisionmaking." *NRDC v. EPA*, 25 F.3d 1063, 1071 (D.C. Cir. 1994). In sum, EPA had to conduct a reasoned evaluation of the costs and benefits of its action and make a rational determination based on that evaluation. There is no doubt that EPA did so here.

### B. In the Alternative Basis, EPA Reasonably Considered the Costs of Its Action.

EPA considered the economic costs of PLP's proposed 2020 Mine Plan not going forward due to EPA's Final Determination. *See* Cost Report at EPA_AR_0141356-69. The primary data sources supporting EPA's consideration were economic analyses conducted on behalf of PLP itself. *See* EPA_AR_0141302, 0141356. Those analyses described the gross economic activity associated with the proposed mine—every dollar spent and every dollar potentially generated from that spending. The projected gross economic activity associated with the mine does not necessarily equal the total societal cost of EPA's action. For that reason, EPA also evaluated ways in which those values might diverge, which EPA called "uncertainties." *See* EPA_AR_0141318-22.[23] EPA supported its consideration of uncertainties with relevant scientific and economic literature. *Id*. That approach to considering costs was reasonable.

Plaintiffs broadly argue that EPA's consideration of uncertainties associated with costs was so "irrational" and "flawed" as to be unlawful. PLP Br. 32; Alaska Br. 38. But those arguments fail from the outset. Despite Plaintiffs' allegations that EPA minimized costs by

---

[23] "Cost uncertainties fall into three general categories: (1) uncertainty regarding the proposed project's ability to secure all necessary permits even in the absence of any final action by EPA under CWA Section 404(c), (2) uncertainty regarding the financial viability of the proposed project outlined in the 2020 Mine Plan, and (3) uncertainties that arise from the specific data estimates provided in the [economic analyses conducted on behalf of PLP itself]." EPA_AR_0141318.

overemphasizing uncertainties, EPA concluded that the costs of its action, even after fully accounting for those uncertainties, were "significant" and "substantial." RTC at EPA_AR_0084192, 0084195-96. And EPA never stated that the uncertainties associated with costs were greater than those associated with benefits, nor did it base its decision on such a comparison. *See* EPA_AR_0084195-96. So, even if Plaintiffs are correct that certain discussions of uncertainty were flawed, they have not suggested how those purported flaws made EPA's action arbitrary, when that action was based on EPA's determination that there were "significant" costs to its action despite the uncertainty.

Plaintiffs' individual critiques of EPA's consideration of cost are also unavailing. Plaintiffs employ a kitchen-sink approach, claiming that numerous aspects of EPA's economic analysis are so irrational as to be unlawful. For example, PLP and Alaska both use inflated terms to criticize EPA's decision to describe potential economic "transfers" as uncertainties, calling the discussion "speculative," "absurd," "implausible," "irrational[]," and a violation of "basic economics." Alaska Br. 40-41; PLP Br. 32-33.

EPA's point about economic transfers, however, is simple. *See* Cost Report EPA_AR_0141304-05. It is an outgrowth of the bedrock economic principle of opportunity costs. If a mine to develop the Pebble Deposit were constructed, there would be opportunity costs. The capital, labor, and materials that would need to go towards the mine would be tied up and therefore could not be used elsewhere. Conversely, if the mine were not constructed due to EPA's Final Determination, the opportunity costs of constructing the mine would not accrue and some portion of those resources would be put towards other productive purposes rather than remain idle. Truck drivers would move different loads, investors would seek to maximize their

returns elsewhere, steel would be used to manufacture other equipment.[24] That shifting of economic activity away from the Pebble deposit and towards other ventures can be "transfers" that do not represent net losses to the United States. Therefore, the lost value of a mine not occurring would not be the *gross* value of the mine, it would be the *net* value of the mine—the difference in value between the mine and the other productive activities that could use resources that would otherwise have been devoted towards the mine. That analysis is not a violation of "basic economics;" it is a straightforward application of it.

PLP also takes issue with two aspects of EPA's analysis of copper markets. First, PLP asserts that EPA's analysis was economically irrational because EPA relied on two papers on "short-term shocks" to assess a "decades-long mining project." PLP Br. 33-34. PLP's surface-level conclusion that these papers are inapplicable is contradicted by their plain language, which clearly address a change in supply from a new mine such as Pebble. *See* EPA_AR_0486892 (commodity supply shocks include "opening of new mines in the case of metals or minerals"); EPA_AR_0496640 (discussing "'supply shocks' due to the opening of new mines").

Those papers support EPA's conclusion that commodity prices, including copper prices, are generally more sensitive to changes in demand than changes in supply. *See* Cost Report at EPA_AR_0141365; Jacks and Stuermer (2016), EPA_AR_0486885 at EPA_AR_0486889-90 ("commodity supply shocks play some role in explaining fluctuations for particular commodities, but in the main, their influence on real commodity prices is limited in its impact and transitory in nature."); Stuermer (2013) EPA_AR_0496627 at EPA_AR_0496639 ("the fluctuations in the price of copper are mainly driven by 'world output-driven demand shocks'"). Based on the logic

---

[24] Or, alternatively, in lieu of the 2020 Mine Plan proceeding, a different mine to develop the Pebble deposit might proceed that is not subject to EPA's Final Determination.

of these studies, changes in copper supply from the proposed 2020 Mine Plan would likely have little effect on copper prices in comparison to projected increases in copper demand in the coming decades, which EPA also analyzed. *See* Cost Report at EPA_AR_0141365. PLP may take issue with EPA's conclusion, but EPA's analysis is well supported and thus reasonable.

Second, PLP argues that EPA made mathematical errors in calculating the extent to which copper supply from the proposed 2020 Mine Plan could meet U.S. copper demand. PLP Br. 34-35. PLP is correct that one could derive different estimates of the U.S. proportion of global copper demand from different studies EPA cited.[25] But the differences between EPA's calculation and the ones PLP suggested are not significant and would not have altered EPA's conclusions. If EPA had chosen a different set of estimates, doing so would only have meant the difference between EPA's estimate that the proposed 2020 Mine Plan could meet 0.2-0.3% of U.S. copper demand and PLP's suggested estimates ranging from 0.3-0.6%.[26] That difference is not material in the context of EPA's point, which is that the supply of copper from the proposed 2020 Mine Plan would not meet a significant amount of the United States' copper demand. Utilizing one

---

[25] EPA cited Flanagan, 2022, for the proposition that the U.S. accounts for 5.7% of global copper demand. EPA_AR_0141366. If one instead calculated the U.S. proportion from different sources cited in Table 6-6 of the Final Determination, as PLP suggests, the values would range from 7.3% (3.5/48) to 11.0% (3.5/31.7) (encompassing the full range of potential U.S. share proportions for 2020, 2030, and 2040). *See id*.

[26] EPA's estimate using the 5.7% figure, *see supra* note 25, results in the proposed 2020 Mine Plan meeting 0.3% of U.S. demand in 2030 and 0.2% in 2040. Using different figures derived from Table 6-6 of the Final Determination, as PLP suggests, one could calculate the proposed 2020 Mine Plan to meet between 0.4% and 0.6% of U.S. demand in 2030, and between 0.3% and 0.4% of U.S demand in 2040. *See* EPA_AR_0141366 n.76 (providing the relevant equation for calculating these percentages. For example, the 0.4% figure for 2030 is calculated from the following equation: 0.4% = 0.16MMT (2020 Mine Plan average annual copper)*7.5% (Proportion of Global Demand Contributed by U.S.). That latter 7.5% figure is calculated by dividing total U.S. copper demand in 2030 (3.0MMT) by the high-end estimate of total global demand (40MMT)).

similar estimate over another is hardly the "[s]ignificant mathematical error[]" that PLP suggests. PLP Br. 35.

And EPA's estimate of how much U.S. demand the proposed 2020 Mine Plan could meet was conservative in any case, because it assumed theoretically that the United States would buy its copper evenly from the global market. However, in practice there is a mismatch between the location where PLP's copper will be refined and the location where the United States buys its copper. PLP's own documents anticipate that its copper would be processed in Asia and Europe. *See* Cost Report at EPA_AR_0141365-66; PLP Prelim. Econ. Ass., EPA_AR_0488241 at EPA_AR_0488504, 0488508. Conversely, the United States receives about 96% of its copper from North and South America, where none of Pebble's ore would be processed. *See* Cost Report at EPA_AR_0141366. Therefore, the most likely scenario based on the best available information is that very little copper ore mined from the Pebble deposit would return to the United States as finished copper. *Id.*

Alaska also argues that EPA's consideration of costs was arbitrary and capricious because EPA failed to consider the costs of the restriction. Alaska Br. 41-43. That argument is incorrect because EPA did, in fact, explicitly consider the costs of the restriction and responded to comments arguing, just as Alaska does here, that EPA failed to consider such costs. *See* Cost Report at EPA_AR_0141310, RTC at EPA_AR_0084254. EPA concluded that the costs of the restriction and prohibition were expected to be similar, such that information on the costs of the prohibition was the best information available on the costs of the restriction. RTC at EPA_AR_0084254.

EPA found such similarity because, contrary to Alaska's suggestion that the restriction covers other "mineral deposits," Alaska Br. 41-42, the restriction is specific to "future proposals

to construct and operate a mine to develop the Pebble deposit." FD at EPA_AR_0083172. In evaluating the costs of that restriction, therefore, EPA had to estimate the investment required to construct and operate a mine to develop the Pebble deposit, and the economic value that such a mine would produce. *See* RTC at EPA_AR_0084254. The economic analysis developed for the 2020 Mine Plan was exactly such an estimate. There is no reason to believe that a mine to develop the Pebble deposit that was situated in the Defined Area for Restriction would have a meaningfully different economic value than a mine situated in the Defined Area for Prohibition. *Id*. Both would require similar infrastructure, labor, and costs, and ultimately would develop the same mineral deposit that contains the same minerals. *Id*.

Alaska's contrary argument is premised on the mistaken assumption that, because the Defined Area for Restriction is much larger than the Defined Area for Prohibition, "[t]he costs of the Restriction thus will obviously be exponentially larger than those of the Prohibition." Alaska Br. 42. However, as with the prohibition, EPA's restriction applies to "*a* mine" to develop "*the* Pebble deposit" with discharges that cause the 2020 Mine Plan Impacts. FD at EPA_AR_0083172 (emphases added). The restriction does not bar all mining within the Defined Area for Restriction.

PLP argues that EPA failed to account for costs associated with the Expanded Mine Scenario and "gave no explanation for this omission." *See* PLP Br. 30, 35. PLP is correct that EPA did not include the Expanded Mine Scenario in its Alternative Basis analysis, but it is incorrect that EPA failed to explain its scoping decision. EPA pointed out that it was not analyzing the Expanded Mine Scenario because it "is not part of the 2020 Mine Plan, has not otherwise been proposed, and would require additional and separate permitting." FD at EPA_AR_0083142, RTC at EPA_AR_0083515, 0083564. EPA made the reasonable choice not

to consider either the benefits or costs associated with the expanded mine scenario. Public

comments raised the speculative nature of the expanded mine scenario. *See* EPA_AR_0083945

(State asserting that "[c]onsideration of the [e]xpanded [m]ine [s]cenario is inappropriate"); *see*

*also* EPA_AR_0083831-32 (stating regarding expanded mine scenario that mining technology is

constantly evolving). EPA also explained why the Expanded Mine Scenario appears in its Final

Determination at all. For example, EPA included the Expanded Mine Scenario as part of the

cumulative effects analysis under the 404(b)(1) Guidelines, but that analysis was not a basis for

EPA's unacceptable adverse effects determinations. *See* FD at EPA_AR_0083142-44; RTC at

EPA_AR_0083896, 0083939, 0084075.

Crucially, EPA did not rely on the benefits of preventing the Expanded Mine Scenario to

justify its decision. While EPA did briefly mention the Expanded Mine Scenario in Section 6 of

the Final Determination, *see* PLP Br. 30, EPA never purported to weigh those particular costs in

its analysis. *See, e.g.*, Cost Report at EPA_AR_0141313 ("EPA did not consider the expansion

scenario"); RTC at EPA_AR_0084217. Indeed, it would have been difficult for EPA to

meaningfully weigh the information cited by PLP as that discussion contains no more specific

information than the general truism that an expanded mine would have expanded impacts. *See*

FD at EPA_AR_0083181-84.

Alaska also argues that EPA generally overestimated the uncertainty associated with

developing the Pebble deposit. In particular, the State asserts that EPA cannot count uncertainties

associated with whether the mine will be built, because such uncertainties apply equally to

potential costs and potential benefits. Alaska Br. 39-40. EPA previously acknowledged and

agreed with that point, stating that "[s]ome uncertainties affect the likelihood of both advantages

and disadvantages accruing, such as uncertainty about whether development of the Pebble

deposit would occur even in the absence of EPA's action." RTC at EPA_AR_0084186; *see also* EPA_AR_0084254; EPA_AR_0084258.

However, once the mine is constructed, the uncertainties associated with costs and benefits diverge. Assuming the mine would be constructed but for EPA's action, there would still be uncertainties associated with costs that depend on purely economic factors such as the "profitability of the mining project," "metal commodity prices," and "ore quality [meeting] expectations." EPA_AR_0084258. On the other hand, if the mine were constructed, some ecological harm would be relatively certain because the 2020 Mine Plan directly calls for the destruction of specific waters. *See id*. Additionally, many of the uncertainties about the benefits are simply based on different facts than the uncertainties about costs. *Compare* Cost Report at EPA_AR_0141315-18 *with* EPA_AR_0141318-22. In sum, EPA thoroughly considered the concern Plaintiffs raised, explained its approach, and reached a reasonable decision. The APA required nothing more.

### C.  In the Alternative Basis, EPA Reasonably Considered the Benefits of Its Action.

To evaluate the benefits of its action, EPA considered the harm from developing the Pebble deposit that would be avoided due to EPA's Final Determination. *See* Cost Report at EPA_AR_0141323-55. EPA's benefits analysis relied upon the extensive findings in the Final Determination, which catalogued the ecological harm that the proposed 2020 Mine Plan would cause in the vicinity of the mine site. *See, e.g.*, RTC at EPA_AR_0084187 ("One of the most significant advantages of EPA's action is that it will prevent four unacceptable adverse effects to waters within the defined areas."). For its Alternative Basis, EPA also addressed avoided harms that go beyond EPA's ecology-based findings. For each of these benefits (avoided harms), EPA described both the overall value of a resource and how EPA's action would prevent or mitigate

harm to that resource. *See* Cost Report at EPA_AR_0141323-55. Like its analysis of costs, EPA considered uncertainties as to whether the predicted benefits would accrue and as to their magnitude. EPA_AR_00141315-18. EPA also grounded its analysis in relevant scientific and economic literature. *Id*. Its approach to considering benefits was reasonable and supported by a robust record.

PLP, but not Alaska, argues that EPA overestimated the benefits of its action by counting the entire value of the Bristol Bay fishery as a benefit. PLP Br. 29-30. EPA did not, as PLP avers, "count[], in its favor, the whole Bristol Bay fisheries." *Id*. at 30. Instead, as it consistently did with all benefits, EPA assessed the overall value of the fishery and analyzed the harm that EPA's action would prevent to that resource as a benefit of EPA's action. *See* Cost Report at EPA_AR_0141325-37. And like it did consistently with all benefits, EPA also described uncertainties in its assessment of this benefit. *See* EPA_AR_0141317-18. But if a resource is valuable, and EPA's action would prevent some amount of harm to that valuable resource, then that prevented harm surely is a benefit of EPA's action, which is all EPA ever claimed.

EPA's determination that its action would prevent harm to fisheries in the Bristol Bay area is supported by the record. As established in Sections I.A and I.B above, EPA had a scientific basis for concluding the 2020 Mine Plan would have unacceptable adverse effects on fishery areas within the defined areas. The 2020 Mine Plan would erode both habitat complexity and biocomplexity in the defined areas, which would weaken the population-stabilizing effect of diverse fish populations (*i.e.*, the "portfolio effect"). EPA_AR_0141327. EPA pointed to scientific literature analyzing how losses of headwater streams, such as those within the defined areas, reduce fish population stability and increase harvest variability at downstream locations. EPA_AR_0141328. EPA also considered real-world examples where losses of upstream fish

habitat contributed to fishery declines. *Id*. Record evidence also supported a finding that changes in consumer perception of fish quality and health may result from the presence of the mine. EPA_AR_0141329-30. EPA conducted similar analyses for subsistence fishing, EPA_AR_0141330-33, and recreational fishing, EPA_AR_0141333-37, among other fishery-related benefits. Because the record demonstrated the immense value of the Bristol Bay fishery and the harm that could come to it from the proposed mining activity, EPA reasonably concluded that preventing that harm was a benefit of EPA's action.

Moreover, EPA's consideration of benefits at the broader Bristol Bay scale is consistent with the scale of the Agency's cost consideration. For both costs and benefits, EPA examined the physical and economic impacts that would occur both at the mine site and downstream. *See, e.g.*, EPA_AR_0141325-28 (effects on downstream commercial fisheries); EPA_AR_0141363-68 (effects on global commodity markets). For example, as PLP concedes, EPA considered the nationwide economic costs of its action as well as nationwide benefits of its action. PLP Br. 31. Had the Agency taken a narrower view of benefits, that would have produced a misaligned and arbitrary comparison. EPA reasonably decided to consider a broader scale for both costs and benefits.

Although PLP criticizes EPA's decision to consider preventing potential harm from a Tailings Storage Facility ("TSF") failure as a benefit of its action, *Id.* at 31 n.8, 66-68, that criticism is misplaced. EPA, in its consideration of a TSF failure, made clear its recognition that such a failure was a low probability event. FD at EPA_AR_0083191; *see also* Cost Report at EPA_AR_0141354 ("the probability of a full tailings storage facility dam breach is low"). At the same time, EPA, along with the Corps, recognized that a breach of the TSF dam could have significant adverse consequences. EPA_AR_0141354. EPA also noted factual uncertainties that

prevented the Agency from completely dismissing a TSF failure as a possibility. For example, EPA analyzed the need to maintain the TSF for a very long period of time, the possibility that human error can cause failures in "even well-designed dams,"[27] and the TSF design being merely conceptual (and potentially subject to change as a result of other required permitting processes) when EPA took its action. *See* FD at EPA_AR_0083190-91. PLP essentially argues that EPA, in considering whether adverse effects are "unacceptable," is precluded from considering low-likelihood, high-consequence events such as a TSF failure. PLP Br. 68. Whether it is true that EPA cannot base a Section 404(c) action on such an event, nothing in the statute constrains EPA from considering such an event in its cost analysis. The Agency's decision to consider preventing a tailings dam failure as a benefit here was reasonable.

### D. In the Alternative Basis, EPA Reasonably Weighed the Costs and Benefits of Its Action.

Having catalogued and described the costs and benefits of its action, EPA then compared and weighed them to determine whether they supported a finding of "unacceptable adverse effects" to fishery areas. The Agency "considered and weighed the totality of the circumstances, including costs, to determine whether there are unacceptable adverse effects." RTC at EPA_AR_0084182-83. EPA set out factors that guided its analysis, including the geographic and time scale of economic activities, the connection to Section 404(c)'s enumerated resources, and Section 404(c)'s purpose within the broader scheme of section 404 and the CWA. EPA_AR_0084184-87. EPA also "weighed the significance of each advantage and disadvantage identified." EPA_AR_0084183.

---

[27] *See also* EPA_AR_0492840-62 (describing how human error was the most common cause of tailings dam incidents).

Ultimately, EPA found that both the advantages and disadvantages of taking action would be "significant." EPA_AR_0084196. However, EPA concluded that the benefits of its action were on a broader, indeterminate time scale,[28] were more geographically aligned with its action,[29] and were aligned with the purpose of Section 404(c),[30] among other things. On the other hand, the costs of EPA's action were primarily economic.[31] Based on this comparison, EPA found that "the advantages associated with taking EPA's action were enormously diverse, numerous, unique, valuable, long-lasting, and aligned with the purposes of Section 404(c) even when weighed against the substantial economic disadvantages of EPA's action." RTC at EPA_AR_0084196. Therefore, EPA concluded that there were "unacceptable adverse effects" justifying its action under Section 404(c). *Id.* The Agency's approach was reasonable and merits deference, particularly considering that Section 404(c) itself provides no specific guidance on

---

[28] *See* RTC at EPA_AR_0084185 ("EPA considered the time scales in which economic activities would occur"); 0084189 ("like the waters that EPA regulates directly with its action, the Bristol Bay watershed is expected to continue to provide these values into the future for an indeterminate period of time"); 0084190 ("that EPA's action will help preserve the sustainable economic value of this fishery is an important factor weighing in favor of the advantages of EPA's action"); 0084195.

[29] *See* EPA_AR_0084185 (EPA considered "how its action would economically affect those closest to the site of EPA's action"); 0084186 ("EPA took into account . . . the extent to which a given advantage or disadvantage accrued relative to areas that are the subject of its action"); 0084189; 0084195.

[30] *See* EPA_AR_0084195 ("These advantages align closely with the text, structure, and purpose of CWA Section 404(c). Specifically, these advantages are related to the fishery areas that EPA's action will protect from unacceptable adverse effects, the fishes that spawn and rear there, the broader ecosystem to which those fishes contribute, and the people that depend on those fishes and ecosystem economically, culturally, and otherwise. The advantages also relate more broadly to the protection of environmental resources, which is EPA's role under Section 404(c) and is in line with the purpose of the CWA").

[31] *See* EPA_AR_0084192 ("The primary disadvantage of EPA's action is its potential to prevent economic activity associated with developing the Pebble deposit from occurring."); 0084196 ("EPA recognized the immense potential economic, employment, and other values associated with developing the Pebble deposit, and the fact that EPA's action could prevent that development.").

Defendants' Opposition Brief
*Northern Dynasty Minerals Ltd. v. EPA*

Case No. 3:24-59 (SLG) Lead Case

how to conduct an appropriate cost-benefit analysis. *See Surface Finishing*, 795 F.3d at 10 ("The statute does not mandate a particular method of cost-benefit analysis. Therefore, we defer to EPA's methodology as well as its ultimate balancing decisions.").

PLP argues that EPA's weighing of costs and benefits was arbitrary because EPA failed to quantify all costs and benefits before comparing them. PLP Br. 28-29. But EPA conducted its evaluation of costs and benefits using the best available information. Often, that information included reliable quantitative estimates, including for EPA's evaluation of benefits. For example, in the Cost Report, EPA considered quantitative estimates of even difficult-to-quantify benefits such as the value of the Bristol Bay commercial fishery (EPA_AR_00141326), the value of preserving streamflow (EPA_AR_0141347), and the non-use value of preserving the land from development (EPA_AR_0141351). In other words, EPA did reasonably "reflect upon" and "grapple with" available quantitative evidence, as was required of it. *City & County of San Francisco.*, 981 F.3d at 759.

However, there were limitations to the available information that made it impossible to develop reliable estimates quantifying all aspects of EPA's cost-benefit analysis. *See* RTC at EPA_AR_0084215. EPA acknowledged "challenges with quantifying or monetizing the advantages and disadvantages of EPA's action," but determined it was "appropriate to give weight to these advantages and disadvantages, even where uncertainties make a particular advantage or disadvantage difficult to precisely quantify or monetize." EPA_AR_0084184. That choice was a reasonable one. Agencies may reasonably rely on available qualitative evidence, as EPA did here. *See, e.g.*, *Fisheries*, 615 F.2d at 809 ("The Agency need not balance the costs of compliance against effluent reduction benefits with pinpoint precision, in part because many of the benefits resulting from the effluent reduction are incapable of precise quantification.")

(citation modified); *Catawba County*, 571 F.3d at 39 ("Nor do we agree with petitioners that EPA's failure to quantify its analysis somehow rendered its interpretation . . . arbitrary and capricious"); *Nicopure Labs, LLC v. FDA*, 266 F. Supp. 3d 360, 403-406 (D.D.C. 2017), *aff'd*, 944 F.3d 267 (D.C. Cir. 2019) (finding that the agency was under no obligation to quantify benefits in any particular way and that the agency's qualitative statement of benefits "provided substantial detail on the benefits of the rule, and the reasons why quantification was not possible").

Plaintiffs fail to offer a more reasonable solution. Although they suggest that EPA could have sought to quantify more of the values relevant to its analysis, PLP Br. 28-29, all analyses are inherently susceptible to the same critique that more can always be done. But not conducting every quantification analysis that PLP called for does not make EPA's analysis unlawful. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("[a] court simply ensures that the agency has acted within a zone of reasonableness"). Ultimately, EPA must allocate limited public resources to most efficiently carry out its responsibilities under the CWA. EPA acted reasonably in relying on the best available information, both quantitative and qualitative, rather than engaging in a time- and resource-intensive effort to independently generate new information to quantify all possible costs and benefits. *See, e.g.*, *Magnetsafety.org v. Consumer Prod. Safety Comm'n*, 129 F.4th 1253, 1261 (10th Cir. 2025) ("Rather than demanding agencies create their own empirical or statistical studies, we ask that they acknowledge any limitations in their data and reasonably consider the relevant issues and reasonably explain the decision.") (citation modified).

Nor is quantification a panacea for PLP's complaints. Even if all costs and benefits were available as perfectly quantified values, EPA's decision would still require the exercise of

judgment in determining when the difference in values rises to the statutory level of "unacceptability." That is, even with perfect information about quantified values, EPA would still need to exercise judgment about how much of a quantified imbalance between costs and benefits becomes "unacceptable."

PLP also asserts that EPA treated the issue of geographic scope unfairly, discounting the costs of the Agency's action as less valuable nationwide effects while touting benefits of its action as entirely local.. PLP Br. 31-32. That assertion is inaccurate because EPA did acknowledge that significant benefits of its actions would occur at a nationwide scale. *See, e.g.*, Cost Report at EPA_AR_00141326 (describing proportion of certain commercial fishery benefits occurring in Alaska versus nationwide); EPA_AR_0141327 ("potential impacts to the Bristol Bay commercial fisheries under the 2020 Mine Plan could have far-reaching economic impacts well beyond the state of Alaska"); RTC at EPA_AR_0084192 ("EPA also considered the non-use benefits that could accrue to Americans across the country as a result of EPA's action."). Conversely, EPA also acknowledged that some of the costs of EPA's action would occur locally. *See, e.g.*, EPA_AR_0084194 ("EPA also considered that its action could result in indirect, local disadvantages."); EPA_AR_0084196.

In its weighing, however, EPA determined that "some of the most important advantages accrue directly in or near the waters directly affected by EPA's action." EPA_AR_0084195. For example, EPA determined that "[o]ne of the most significant advantages of EPA's action is that it will prevent four unacceptable adverse effects to waters within the defined areas," EPA_AR_0084187, and that "these fishery areas are in the waters that EPA directly regulates with its action." EPA_AR_0084189. Additionally, many of the benefits that EPA considered would occur in the Defined Areas or in Alaska. For example, subsistence, recreational use,

cultural resources, health and safety, and ecosystem services are all primarily local benefits. *See generally* Cost Report, EPA_AR_00141323-49. Conversely, the record also shows that significant costs to EPA's action, such as indirect economic activity and the sale and use of minerals from the mine, would accrue nationally or internationally rather than locally. *See* EPA_AR_0141362 (table describing economic activity by geography); EPA_AR_0141365 (describing copper effects on global markets). Thus, contrary to PLP's suggestion, EPA reasonably considered geographic scope as one of the factors in weighing its decision, both as to the costs and benefits of its action.

## V.  Nothing in the Alaska Statehood Act or the Cook Inlet Land Exchange Alters the Application of CWA Section 404(c).

### A.  The Alaska Statehood Act and Cook Inlet Exchange.

In 1959, Alaska entered the Union on an equal footing with the other 48 then-admitted states pursuant to the Alaska Statehood Act (Statehood Act), Pub. L. No. 85-508, 72 Stat. 339 (1958). One issue concerning its admission was how Alaska, with its vast territory but small population, would raise the revenue necessary to bear the responsibilities of statehood. *See Alaska v. United States*, 35 Fed. Cl. 685, 688-94 (1996) (reviewing legislative history), *aff'd*, 119 F.3d 16 (Fed. Cir. 1997). To address that issue, the Statehood Act granted Alaska the right to select over 103 million acres of federal land. Statehood Act § 6(a)-(b), 72 Stat. 340; *see Sturgeon v. Frost*, 577 U.S. 424, 429 (2016). Alaska was permitted to select those lands from "public lands" that were "vacant, unappropriated, and unreserved" at the time; the selections were to take place within 25 years of admission, Statehood Act § 6(b), 72 Stat. 340, a deadline that was extended in the Alaska National Interest Lands Conservation Act (ANILCA), Pub. L. No. 96-487, § 906(a), 94 Stat. 2437 (1980).

The Statehood Act's grant of federal lands included mineral rights. Section 6(i) of the Act

provides:

> All grants made or confirmed under this Act shall include mineral deposits. The grants of mineral lands to the State of Alaska under . . . are made upon the express condition that all sales, grants, deeds, or patents for any of the mineral lands so granted shall be subject to and contain a reservation to the State of all of the minerals in the lands so sold, granted, deeded, or patented, together with the right to prospect for, mine, and remove the same. Mineral deposits in such lands shall be subject to lease by the State as the State legislature may direct: Provided, that any lands or minerals hereafter disposed of contrary to the provisions of this section shall be forfeited to the United States by appropriate proceedings instituted by the Attorney General for that purpose in the United States District Court for the District of Alaska.

Statehood Act § 6(i), 72 Stat. 342.

In 1971, Congress enacted the Alaska Native Claims Settlement Act (ANCSA), Pub. L.

No. 92-203, 85 Stat. 688, which extinguished aboriginal land claims but granted 40 million acres

of federal land to corporations organized by Alaska Natives. *See Sturgeon*, 577 U.S. at 429-30.

Alaska had already selected much of the land around Cook Inlet under the Statehood Act, or it

was reserved by the federal government. *See* H.R. Rep. No. 104-643, at 3-4 (1996). As a result,

the land available to Cook Inlet Region, Inc. (CIRI), an Alaska Native Regional Corporation, was

"largely comprised of mountains and glaciers, hardly the settlement contemplated by Congress."

*Id.* at 4. To resolve the difficulty, the United States, Alaska, and CIRI agreed to a land exchange,

the terms and conditions of which were ratified in an amendment to ANCSA. Act of Jan. 2, 1976

(Cook Inlet Land Exchange Act), Pub. L. No. 94-204, § 12, 89 Stat. 1145, 1150-54; *see* Terms

and Conditions for Land Consolidation and Management in the Cook Inlet Area (Dec. 10, 1975),

reprinted in H.R. Rep. No. 94-729, at 35-52 (1975).

Section 12(d)(1) of the Cook Inlet Land Exchange Act directed the Secretary of the

Interior to convey to Alaska up to 53 townships, to be selected by the State from areas defined in

the Terms and Conditions. Cook Inlet Land Exchange Act § 12(d)(1), 89 Stat. at 1152-53.

Section 12(d)(1) also provided that lands granted pursuant to that subsection "shall be regarded for all purposes as if conveyed to the State under and pursuant to section 6 of the Alaska Statehood Act," § 12(d)(1), 89 Stat. at 1153, which includes the conveyance and reservation of mineral rights in Section 6(i) of that Act. Alaska alleges that it acquired the lands encompassing the Pebble deposit via this exchange. Alaska's Complaint, ¶¶ 22-23, No. 3:24-00084, ECF 1.

### B. Neither the Statehood Act nor the Cook Inlet Exchange Overrides the CWA.

Alaska's and PLP's claims center on Section 6(i) of the Statehood Act, which provides, *inter alia*, that the grants conveyed by the Act "shall include mineral deposits," which upon any sale of lands the "mineral" must be reserved to the State (or forfeited to the United States) and that "[m]ineral deposits in such lands shall be subject to lease by the State as the State legislature may direct." Statehood Act § 6(i), 72 Stat. at 342; *see* Cook In-let Land Exchange Act § 12(d)(1), 89 Stat. at 1153 (providing that lands conveyed under that Act "shall be regarded for all purposes as if conveyed to the State under and pursuant to section 6" of the Statehood Act). Based on that language, Alaska contends that the State "was being given the regulatory power to use its new lands—when it deemed it appropriate—for mining purposes," and the Final Determination "effectively prevents mining and violates the terms of the parties' agreements." Alaska Br. 25. Alaska and PLP contend that because of the Statehood Act, EPA cannot exercise its Section 404(c) authority with respect to the Pebble deposit.

But Plaintiffs' arguments fail at the outset, because they rest fully on the notion that EPA has prohibited any mining of the Pebble deposit. *See* PLP Br. 16-19. As explained above, and as EPA made clear in its Final Determination, that premise is wrong. Thus, PLP and Alaska have not identified an irreconcilable conflict between the Statehood Act and the CWA. This Court must therefore give effect to both statutes. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018)

("When confronted with two Acts of Congress allegedly touching on the same topic, this Court is not at 'liberty to pick and choose among congressional enactments' and must instead strive 'to give effect to both.'"). Because nothing in the CWA or EPA's Final Determination prevents Alaska from owning the subject lands or possessing, mining or leasing their mineral deposits, the Statehood Act presents no obstacle here. RTC at EPA_AR_0083593-95.

Contrary to PLP's and Alaska's arguments, Section 6(i) cannot reasonably be read as a limitation on federal regulatory authority over the conveyed lands. The grant of mineral deposits simply conveys ownership, just as the Act elsewhere does for the lands themselves. And the instruction that the deposits "shall be subject to lease by the State as the State legislature may direct" clarifies the State's leasing authority and identifies the legislature as the entity that shall decide how that authority is to be exercised. That clarification makes sense when considered alongside the rest of Section 6(i), which prohibits the State from selling its mineral rights. *See* S. Rep. No. 83-1028, at 32 (1954) (explaining this purpose of Section 6(i)); *see also State v. Lewis*, 559 P.2d 630, 640 (Alaska 1977) (describing Section 6(i) as containing "restrictions on alienation of mineral rights"). But the sentence in question does not address the regulation of mining itself or the protection of affected waters—let alone displace other federal law on those subjects.

Indeed, the Supreme Court has already interpreted the phrase "subject to lease by the State as the State legislature may direct" and rejected an argument analogous to Alaska's and PLP's here. *See ASARCO Inc. v. Kadish*, 490 U.S. 605, 625, 629-631 (1989). Congress modeled Section 6(i) on language in the Jones Act of 1927 (also known as the School Lands Act), Act of Jan. 25, 1927, ch. 57, 44 Stat. 1026, as amended, which conveyed mineral lands to every state that would otherwise have received those lands on admission to the Union but for their mineral character (about a dozen States total). *See* 43 U.S.C. § 870(b) (providing, inter alia, that "[t]he

coal and other mineral deposits in such lands . . . shall be subject to lease by the State as the State legislature may direct, the proceeds and rentals and royalties therefrom to be utilized for the support or in aid of the common or public schools"); *see ASARCO*, 490 U.S. at 626, 628. The *ASARCO* plaintiffs argued that the phrase "as the State legislature may direct" allowed Arizona to lease the minerals without regard to other federal statutory requirements. 490 U.S. at 629 (citation omitted). The Supreme Court disagreed, stating that "this language is properly viewed as authorizing the States to regulate the methods by which mineral leases are made and to specify any additional terms in those leases that are thought necessary or desirable," while still complying with other applicable law. *Id.* at 631 ("Given the preceding restrictions on the sale of minerals in [the provision], Congress may have thought it necessary to emphasize that leases were subject to no such novel limitations."). The Court should follow *ASARCO* in the analogous situation here.

Alaska and PLP nevertheless argue that the Statehood Act overrides the CWA because the former is a "'specific provision[] applying to a very specific situation,' while the [CWA] 'is of general application.'" Alaska Br. 26 (quoting *Morton v. Mancari*, 417 U.S. 535, 550 (1974)) *see also* PLP Br. 16-17. But Section 6(i)'s text contains no express limitation on federal regulatory authority, and the two statutes readily can—and should—be harmonized. *See Epic,* 584 U.S. at 510.

PLP's mistakenly relies on *Shoshone-Bannock Tribes of Fort Hall Reservation. v. U.S. DOI,* 153 F.4th 748 (9th Cir. 2025). In *Shoshone-Bannock*, the plaintiffs alleged that the Department of Interior's (DOI) transfer of land pursuant to the Federal Land Policy and Management Act (FLPMA) contravened a 1900 land conveyance statute that restricted disposal of the land ceded from the Tribes to the United States. The Ninth Circuit agreed because Section

5 of the 1900 statute specifies that the ceded lands "shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States only," and the FLPMA does not fall within the types of laws specified. *Id.* at 756. The court also considered whether the FLPMA repealed the 1900 Act's restrictions on disposal and ultimately concluded it did not after applying canons of construction specific to Tribal law. *Id.* at 759. The court found that one of the canons—the principle that Congress must clearly express its intent to abrogate a Tribe's treaty rights—resolved any ambiguity in favor of the interpretation advocated by the Tribes. *Id.* at 759.

Here, in contrast to *Shoshone-Bannock*, no irreconcilable conflict exists between the CWA and the Statehood Act. CWA Section 404(c) authorizes EPA to limit the Corps' ability to specify disposal sites but does not have any effect on the law that granted Alaska's land ownership or its ability to grant mineral leases. As discussed above, nothing in the Statehood Act addresses the regulation of waters of the United States on the subject lands. Thus, the CWA is easily harmonized with the narrow scope of the Statehood Act, and *Shoshone-Bannock* is inapposite.[32]

Without citing any statutory text, Alaska and PLP argue that the purpose of the Statehood Act's land grants was to provide the new State with revenue. PLP Br. 17; Alaska Br. 24. But that general aim cannot supply text that is absent from the grant itself. Effectively, PLP and Alaska

---

[32] Moreover, even if there was ambiguity about any conflict, the "Indian canons of construction," 153 F.4th at 765, in *Shoshone-Bannock* have no application here. Nor does the CWA contain plain language stating Congress' intent that the statute not repeal preexisting laws by implication. *Cf. id.* at 759. Although PLP is correct in noting Congress' stated "policy" in the CWA to protect the "primary" responsibility of states to plan the development and use of land and water resources, PLP Br. 18, Congress also adopted a "comprehensive" federal scheme to protect the "Nation's waters," *PUD No. 1 of Jefferson County. v. Wash. Dep't of Ecology*, 511 U.S. 700, 700 (1994), with limited exceptions for more stringent state laws, *see* 33 U.S.C. § 1370.

argue that the State's pecuniary interest trumps the congressionally mandated protections in the CWA. Following their logic, other federal health and safety statutory regimes also fall to the extent they are deemed by Alaska as preventing mining from occurring. *See* Alaska Br. 25. The Supreme Court's school-lands precedent is instructive in rejecting those arguments. In *Case v. Bowles*, 327 U.S. 92 (1946), the State of Washington argued that lands conveyed under its enabling act "for the support of common schools," *id.* at 95 (citation omitted), should be exempt from federal price-control legislation, *id.* at 100. The Supreme Court rejected that contention, reasoning that "[n]o part of all the history concerning these grants . . . indicates a purpose on the part of Congress to enter into a permanent agreement with the States under which States would be free to use the lands in a manner which would conflict with valid legislation enacted by Congress in the national interest." *Id.* So too here.

Neither Plaintiff provides a basis to infer a statutory intent to refrain from applying federal law to the Pebble deposit. True, Congress has sometimes expressly legislated special terms for Alaska. *See Sturgeon,* 577 U.S. at 430-431, 433-441 (interpreting ANILCA). But Congress did not do so in Section 6(i), and the Supreme Court has never suggested that broad regulatory exemptions for Alaska should be inferred from silence.[33] *Cf. Sturgeon*, 139 S. Ct. at 1066, 1084-85, 1087 (noting that ANILCA's statutory exemption of certain Alaska lands from National Park Service regulations is not an exemption from "generally applicable regulations," including "regulatory powers . . . exercised by the EPA, Coast Guard, and the like"). Indeed, the

---

[33] PLP and Alaska fail to articulate the scope of their novel Section 6(i) preclusion-of-federal-regulation theory. Does Alaska now believe that CWA Section 404 is wholly inapplicable to lands conveyed under the Statehood Act, such that Alaska's lessee, PLP, need not even obtain a discharge permit from the Corps? In fact, Alaska has previously agreed in litigation that Section 404's permitting requirements "apply to a mining project that might be proposed for the Pebble deposit." *See Pebble Ltd. P'ship v. EPA*, 14-cv-97, ECF 19 at ¶ 4 (D. Alaska May 30, 2014). PLP's and Alaska's reading of Section 6(i) appears to have no limiting principle.

fact that the provision at issue was derived from the Jones Act indicates that Congress had precisely the opposite intention: to place Alaska "on an equal but not a favored footing with other public land states with respect to the disposition of mineral lands." *Trustees for Alaska v. Alaska*, 736 P.2d 324, 337 (Alaska 1987).

Also lacking merit are PLP's and Alaska's arguments that the Final Determination violates the terms of the parties' contractual agreements in the Statehood Act and Cook Inlet Land Exchange Act. PLP Br. 18-19; Alaska Br. 25. To begin, it is presumed that Congress does not create contracts in statutes, *see National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465-67 (1985), and the burden of overcoming the presumption is on the party claiming a contract, *id.* at 466. Plaintiffs have not met that burden. But even if they had, principles of contract interpretation make PLP and Alaska's expansive readings of the statutes even less reasonable. Under the "unmistakability" doctrine, "a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act (including an Act of Congress), nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of sovereign power." *United States v. Winstar Corp.*, 518 U.S. 839, 878 (1996) (plurality opinion). Thus, in the absence of any stated intention to exempt Alaska from application of the CWA—or any other federal statute—a court cannot infer that Congress made a contractual commitment to do so. *See id.* at 876-79.

Because PLP and Alaska cannot show that Congress specifically undertook to exempt the State's mineral deposits from the application of federal regulatory law—or to maximize the revenue that Alaska might earn from those deposits at all costs—Alaska could have had no reasonable expectation that could be frustrated by the CWA's application to the granted lands.

*See Alaska v. United States*, 35 Fed. Cl. at 704. Nor can Alaska show that the Final Determination deprives the State of all benefit (or even a substantial portion) of the aggregate mineral rights conveyed by Section 6(i), let alone that EPA's action deprives the State of all the benefits of the conveyed lands. RTC at EPA_AR_0083596-97; *cf.*, *Pebble Ltd. P'ship v. EPA,* No. 14-cv-97 (D. Alaska Aug. 18, 2014) ECF 188, at 39-40 (explaining that Alaska indicated in 1977 that it was selecting the lands containing the Pebble deposit for numerous reasons in addition to mineral potential, including "accessibility, possible future settlement, close proximity to Lake Iliamna and 'high fisheries values' ") (citation omitted).

Finally, contrary to PLP and Alaksa's repeated assertions, the Final Determination does not foreclose mining of the Pebble deposit. Rather, the Final Determination prohibits certain discharges into waters of the United States and sets thresholds that limit the Corps' ability to authorize such discharges within the prohibited and restricted areas. The fact that the Final Determination may impact mining projects of the size, location, and character that PLP proposed does not mean that it forecloses mining of the Pebble deposit. RTC at EPA_AR_0083568-69, 0083597. Additionally, the Final Determination does not have any effect on Alaska's ownership of the land or its authority to allow the discharge of dredged and fill waters not protected by the CWA.

In sum, Alaska and PLP advance no plausible basis to conclude that the State or PLP has the right to mine lands conveyed via the Statehood Act or Exchange Act without complying with applicable federal law.

### C. EPA Appropriately Considered Alaska's Authority and Interests.

Alaska asserts that the Final Determination runs afoul of the "federalism canon," Alaska Br. 23-24, which holds that "unless Congress conveys its purpose clearly, it will not be deemed

to have significantly changed the federal-state balance." *United States v. Bass*, 404 U.S. 336, 349 (1971); *see also John v. United States*, 720 F.3d 1214, 1223 n.52 (9th Cir. 2013). But Alaska is mistaken in at least two respects.

First, EPA's Final Determination does nothing to change the federal-state balance. Alaska points to *Sackett*, where the Court applied the federalism canon when deciding the meaning of "waters of the United States" under the CWA. 598 U.S. at 671. The federal-state balance was at issue in *Sackett* because the scope of "waters of the United States" determines whether the federal government can regulate certain waters at all, or whether only the states can. Not so for Section 404(c): EPA's exercise of its Section 404(c) authority does not alter the federal-state balance. Rather, Section 404(c) explicitly authorizes EPA to limit the *Corps' authority*—not the State's authority—to permit the discharge of dredged and fill material into "waters of the United States." The State's authority is unchanged.

And contrary to Alaska's assertion, the Defined Areas for Prohibition and Restriction do not restrict activity on land, Alaska Br. 27, but are limited to waters of the United States within those areas. Nor does the Final Determination foreclose all mining of the Pebble deposit. The Final Determination only prohibits certain discharges and sets thresholds that limit the Corps' ability to authorize the discharge of dredged or fill material in waters of the United States within the prohibited and restricted areas.

Second, to the extent EPA's exercise of its Section 404(c) authority alters the federal-state balance, Congress conveyed that purpose quite clearly in the CWA. Although Congress drafted the CWA to include aspects of "cooperative federalism," *see generally Arkansas v. Oklahoma*, 503 U.S. 91, 101-03 (1992), Section 404(c) is not such a provision. It expressly and solely authorizes EPA to limit the use of any defined area for the discharge of dredged or fill material

"whenever [EPA] determines . . . that the discharge of such materials into such area will have an unacceptable adverse effect" on enumerated resources—including resources that would typically be subject to state or local regulation, including municipal water supplies and recreation areas. 33 U.S.C. § 1344(c). In contrast to other CWA provisions that give the states a regulatory role, Section 404(c) does not even mention the states. Thus, Congress was clear in authorizing EPA to act under Section 404(c) even if doing so shifts the federal-state balance. *See Mingo Logan*, 829 F.3d at 725.

PLP asserts the Final Determination intrudes on Alaska's authority in violation of CWA Section 404(t). PLP Br. 20-21. The Court should not consider that argument because neither PLP nor any other party (including the State) raised it during the public comment period, thus, it is waived. Failure to raise arguments before an agency, such as in comments during a public-comment process, generally waives a litigant's right to make those arguments in court. *All. for Wild Rockies v. Petrick*, 68 F.4th 475, 487 (9th Cir. 2023) ("[A]s a general rule . . . courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37, 73 (1952)).

However, even if the Court considers PLP's argument, it should reject it. PLP suggests a reading of Section 404(t), 33 U.S.C. § 1344(t), that is both implausible and takes the provision out of context. Congress added Section 404(t) to the Act in 1977 to reverse court decisions holding that federal facilities are not required to comply with state laws regarding discharges of dredged or fill material. Section 404(t) provides:

> (t) Navigable waters within State jurisdiction
> Nothing in this section shall preclude or deny the right of any State or interstate agency to control the discharge of dredged or fill material in any portion of the navigable waters within the jurisdiction of such State, including any activity of any Federal agency, and

each such agency shall comply with such State or interstate requirements both substantive and procedural to control the discharge of dredged or fill material to the same extent that any person is subject to such requirements. This section shall not be construed as affecting or impairing the authority of the Secretary to maintain navigation.

33 U.S.C. § 1344(t) (1977). Part of the thrust of the 1977 CWA amendments was "to indicate unequivocally that all Federal facilities and activities are subject to all of the provisions of State and local pollution laws." *Del. Dept. of Nat. Res. v. USACE*, 751 F. Supp. 2d 715, 722 (D. Del. 2010), *aff'd*, 685 F.3d 259 (3d Cir. 2012) (quoting S. Rep. No. 95–370 at 67 (1977)). With respect to Section 404(t) specifically, Congress explained that its inclusion was prompted by *Minnesota v. Hoffman*, 543 F.2d 1198 (8th Cir. 1976), where the Eighth Circuit held that the Corps was not required to comply with state environmental laws in connection with its dredging operations. S. Rep. 95-370 at 68. The amendment "clarifie[d] that [C]orps dredging activities are not exempt from State pollution abatement requirements." *Id.*

PLP takes the reader through leaps of logic attempting to turn Section 404(t) on its head, PLP Br. 21-23, but fails. By PLP's reckoning, Section 404(t)'s reference to a state's right to "control" discharges of dredged and fill material takes on an unexpected meaning: not "control" in the sense of "pollution control"—such as the Federal Water Pollution *Control* Act, more commonly known as the CWA—but "control" in the sense of "the power to *allow* discharges." *Id.* at 23. Thus, because Alaska would have "controlled" the Pebble mine discharges by allowing them, EPA's action contravened Alaska's authority under Section 404(t).

PLP's interpretive leaps cannot transform Section 404(t) into an authority that it is not. First, for the reasons explained above, PLP's reading of the statute does not represent the best reading of the text: it simply strains credulity to suggest that Congress, in the Federal Water Pollution *Control* Act, intended the word "control" in Section 404(t) to mean "allow." Instead, in logical context, Congress intended it to mean "to reduce the incidence or severity of especially to

innocuous levels." Control, Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/control. Second, courts do not read statutory provisions in isolation and must also consider the context of the relevant provision. *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (citing *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989)). As the history makes clear, Congress adopted Section 404(t) for a specific purpose, which was to ensure the states' authority to limit or abate discharges, particularly from Corps dredging projects. Third, PLP's reading would give states plenary authority to overrule the Corps' or EPA's decisions regarding discharges into "waters of the United States." That authority is precisely the type of elephantine power that Congress does not hide in a mousehole like Section 404(t). *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Finally, PLP's reading of 404(t) would impermissibly render other provisions of the CWA superfluous. *Corley v. United States*, 556 U.S. 303, 314 (2009). For example, if 404(t) granted states plenary authority to regulate or allow discharges into "waters of the United States," there would be no reason for Section 404(g), 33 U.S.C. § 1344(g), which allows states to implement the Section 404 permitting program. The Court should reject PLP's novel and impermissible reading of Section 404(t).

Finally, the Court should reject Plaintiffs' suggestion that the Final Determination intrudes upon Alaska's authority to regulate State waters. EPA's action only prohibits or restricts discharges into "waters of the United States." FD at EPA_AR_0082964. Despite PLP's and Alaska's attempts to exaggerate the Final Determination's scope, *see* Alaska Br. 23; PLP Br. 19, the record is clear that Alaska maintains its preexisting authority over waters that fall outside that ambit.

**VI.    EPA's Final Determination Does Not Implicate the Major-Questions Doctrine.**

Plaintiffs' major-questions argument fails at the threshold because the major-questions doctrine is a tool of statutory interpretation. Its function is "simple—to help courts figure out what a statute means." *Save Jobs USA v. DHS*, 111 F.4th 76, 80 (D.C. Cir. 2024). The major-questions doctrine is not a means to override agency action that opponents deem consequential or an opening to engage in a free-roaming inquiry into the policy judgment that Congress entrusted to EPA. Instead, courts apply the major-questions doctrine in cases involving transformative claims of statutory authority derived from modest, vague, or subtle statutory language. *West Virginia*, 597 U.S. at 723. Here, Plaintiffs present no particular textual anchor for their "major question." Far from doing something unexpected or novel, the action EPA took is in the very title of Section 404(c)—a denial and restriction of defined areas as disposal sites. *See* 33 U.S.C. § 1344(c). Plaintiffs' "major question" is ultimately a disagreement over the conclusions of the Final Determination; thus, the doctrine does not apply.

**A.  EPA's Final Determination Is a Direct and Unambiguous Exercise of Section 404(c).**

The major-questions doctrine applies to questions of statutory interpretation when an agency claims an "[e]xtraordinary grant[] of regulatory authority" based on "'modest words,' 'vague terms,' or 'subtle devices,'" and the "'history and the breadth'" of that asserted power provide "'reason to hesitate before concluding that Congress'" meant to confer such authority. *West Virginia*, 597 U.S. at 721-723. The Supreme Court has applied the doctrine in a handful of cases where it perceived a marked incongruity between an agency's claimed authority and the statutory provision that purportedly conferred it. *Id.* at 721-724. The Final Determination lacks the hallmarks of those cases. RTC at EPA_AR_0083628.

This is not a case where EPA relied on statutory language that is "vague," "cryptic," "ancillary," or "modest." *West Virginia*, 597 U.S. at 721-725. On the contrary, EPA directly applied Section 404(c) consistent with the plain meaning of the statute and case law that interprets it. The Final Determination manifestly reflects an action that Section 404(c) authorizes EPA to take: it prohibits and restricts the discharges of dredged or fill material into "waters of the United States" based on EPA's finding of unacceptable adverse effects on fishery areas. *See* 33 U.S.C. § 1344(a) & (c). Indeed, Alaska effectively concedes that Section 404(c) authorizes EPA to take the type of action it did in this case. Alaska Br. 28.

Plaintiffs' real disagreement is over the conclusions of the Final Determination, not over statutory interpretation. Alaska's and PLP's contention is over the size and scope of EPA's action. *See* Alaska Br. 22-23; PLP Br. 15. That is not a matter of statutory interpretation but a disagreement with EPA's analysis and the conclusions it reached. Because Plaintiffs offer no questions of textual interpretation for the major-questions doctrine to resolve, the doctrine cannot apply here to EPA's exercise of Section 404(c) here. [34]

**B. Plaintiffs' Claimed "Hallmarks" of a Major Question Are Absent Here.**

In addition, the hallmarks of an "extraordinary case" are absent here. EPA's Final Determination is not a "newfound" or "unheralded" power. Nor is it "transformative," "sweeping," "unprecedented" in scope, or "limitless." EPA acted within its Section 404(c) authority here. This is a far cry from an "extraordinary case" where the history and breadth of the authority that the agency has asserted and the economic and political consequences of that

---

[34] This is not to say that application of Section 404(c) authority could never run afoul of the major questions doctrine. For example, if the Agency were to make some novel assertion of its Section 404(c) authority, such assertion may contravene the doctrine. However, no such circumstances exist in this case.

assertion provide a reason to hesitate before concluding Congress meant to confer EPA this authority. Indeed as Alaska concedes, Section 404(c) gives EPA a "backstop" authority to the Corps' authority. Alaska Br. 27-28. Furthermore, Alaska acknowledges that EPA has exercised its Section 404(c) authority to issue a Final Determination at least 14 times since the enactment of the CWA, *id.* at 28, including a Final Determination in 1981.[35]

Nor is EPA's authority "transformative" or "a sweeping and consequential" authority that Congress delegated in a "cryptic" fashion. *West Virginia*, 597 U.S. at 721, 724. The Final Determination is a site-specific, science-based determination that is squarely within EPA's expertise and domain. EPA_AR_0083628-629. Moreover, although an EPA action under Section 404(c) may be consequential, it is not "sweeping" in the sense of the FDA regulating tobacco products as drugs, *see West Virginia*, 597 U.S. at 721, nor was Congress' delegation in any way "cryptic," *see supra* Section VI.A.

Nor is EPA's action here "unprecedented" in scope. For the major-questions doctrine, scope centers on novel assertions of agency authority, not the degree to which an agency exercises existing, longstanding, and well-established authority. Even so, Alaska asserts that the Final Determination is unprecedented in size, covering 309 square miles. First, however, that size only applies to the defined area for the Restriction. Second, notwithstanding that distinction, the defined area for the Restriction is not the largest defined area for a Section 404(c) action.

Lastly, Alaska argues that EPA's asserted authority has "no limit," positing hypotheticals in which EPA could issue 404(c) actions that apply to "any and all lands . . . even an entire State." Alaska Br. 23. But Alaska is ignoring clear statutory limitations on the Agency's

---

[35] EPA has initiated 16 additional Section 404(c) actions that never became final determinations.

authority. A Section 404(c) action must be based on unacceptable adverse effects on the resources Congress enumerated in the statute (here, fishery areas). In addition, a Section 404(c) action can only prohibit or restrict discharges to "waters of the United States" within the defined areas. That EPA did not delineate each and every subject "water of the United States" in the Final Determination does not change the fact that EPA's action only prohibits or restricts the placement of dredged or fill material in those federally regulated waters – not dry lands. *See id.* Regardless, EPA's application of Section 404(c) in this case is consistent with how EPA proceeded in prior Section 404(c) actions. *See supra* Section II.C; *cf. Biden v. Nebraska*, 600 U.S. 477, 501 (2023) (finding major questions doctrine triggered in part because agency was claiming an authority it never had previously).

### C. Plaintiffs' Arguments About Costs, Economic Impacts, and Federalism Do Not Transform EPA's Final Determination Into a "Major Questions" Case.

Invoking *Biden v. Nebraska*, PLP claims that the Final Determination "locks away nearly $800-billion-worth of minerals." PLP Br. 15. Alaska similarly identifies alleged lost revenue and jobs. Alaska Br. 22. But alleged costs alone do not trigger the major-questions doctrine. On the contrary, courts have resolved multi-billion-dollar cases without invoking that doctrine. *See Biden v. Missouri*, 595 U.S. 87 (2022); *Becerra v. Empire Health Found.*, 597 U.S. 424 (2022); *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724 (2022); *EME Homer City Generation, L.P.*, 572 U.S. 489 (2014); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005); *New York v. FERC*, 535 U.S. 1 (2002).

In any event, Plaintiffs' economic framing rests on a false premise. The Final Determination does not prohibit mining. FD at EPA_AR_0082957-58. It only prohibits and restricts the discharges that EPA found unacceptable. *Id.* Mining proposals for the Pebble deposit remain possible if, for example, the mine were configured to impact fewer jurisdictional waters.

Contrary to Alaska's suggestion, the Final Determination does not commandeer the State's land-use authority. *See* Alaska Br. 21. As noted, EPA's action prohibits and restricts the *Corps'* ability to specify certain waters of the United States as disposal areas for discharges of dredged or fill material associated with the 2020 Mine Plan that would have certain adverse effects on such waters. EPA_AR_0083580. It does not affect Alaska's authorities under federal or state law. Moreover, any argument that EPA's action constitutes an unconstitutional intrusion on Alaska's land use authority is without merit. *See Hodel v. Va Surface Mining and Reclamation Ass'n,* 452 U.S. 264, 283-292 (1981) (rejecting arguments that the Surface Mining Control and Reclamation Act, which requires the reclamation of mining sites, illegally infringed on the "States' freedom to make decisions in areas of 'integral governmental functions'" or illegally "interfere[d] with the States' ability to exercise their police powers by regulating land use."). Citing numerous cases, *Hodel* also clarified that "[a] wealth of precedent attests to congressional authority to displace or pre-empt state laws regulating private activity affecting interstate commerce when these laws conflict with federal laws." 452 U.S. at 290. The Court explained further that, "[a]lthough such congressional enactments obviously curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important, the Supremacy Clause permits no other result." *Id.*

## VII.    Section 404(c) Is Not an Unconstitutional Delegation of Legislative Power.

The Alaska Native Corporations' nondelegation challenge fails under settled law. The Supreme Court has long held, and recently affirmed, that Congress may confer discretion on agencies so long as it supplies an "intelligible principle" to guide the exercise of delegated authority. *See FCC v. Consumers' Rsch.*, 606 U.S. 656, 658 (2025). That test is an "exceedingly modest limitation" that has only been used twice, both in 1935, to invalidate statutory provisions.

*United States v. Pheasant*, 129 F.4th 576, 579 (9th Cir. 2025). This case should not be the third such decision because Section 404(c) comfortably satisfies the intelligible-principle test and represents a routine, lawful delegation of authority.

### A. Congress May Delegate Authority So Long as It Supplies an "Intelligible Principle."

Congress may "seek[] assistance from another branch" so long as it "lay[s] down by legislative act an intelligible principle" to guide the exercise of delegated authority. *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406, 409 (1928). Under this "exceedingly modest" test, the question is not whether EPA has discretion in implementation; it is whether Congress supplied a general policy, standards in pursuing that policy, and boundaries that enable the courts and the public to ascertain whether the agency followed the law. *Consumers' Rsch.*, 606 U.S. at 673, 698; *Pheasant*, 129 F.4th at 579-580.

The Supreme Court has found intelligible principles in a host of statutes giving agencies significant discretion. *See Consumers' Rsch.*, 606 U.S. at 683-684 (collecting cases). In ascertaining an intelligible principle, courts look not just at the specific statutory phrase in isolation but also at the broader statutory context. *Id.* at 684; *Pheasant*, 129 F.4th at 581. Furthermore, "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred," such that greater congressional guidance is necessary when an agency action will "affect the entire national economy." *Whitman*, 531 U.S. at 475. Courts may also examine whether "the proof is in the pudding"; that is, whether an agency has "long viewed" a statute in a way that does not evidence an unfettered delegation. *Consumers' Rsch.*, 606 U.S. at 682, 686.

## B.  Section 404(c) Satisfies the Intelligible-Principle Standard.

The Alaska Native Corporations insist that Section 404(c) is a "blank check" empowering EPA's Administrator to do "whatever he 'thinks is right.'" Iliamna Br. 20-21. Their characterization does not represent the reality of the statute Congress enacted.  Section 404(c) contains an intelligible principle that limits EPA's authority. EPA may act only upon a finding that discharges of dredged or fill material to "waters of the United States" would cause unacceptable adverse effects on specifically enumerated resources, providing Section 404(c) with a clear policy, an operative standard, and defined limits on EPA's discretion.

### 1.  Section 404(c) Contains a Clear Policy and Operative Standard.

Section 404(c) authorizes EPA to act only when it determines—after notice and opportunity for public hearings and consultation with the Corps—that a discharge of dredged or fill material into federal waters will have an unacceptable adverse effect on certain enumerated resources: municipal water supplies, shellfish beds, fishery areas (including spawning and breeding areas), wildlife, or recreational areas. 33 U.S.C. § 1344(c). Congress also required EPA to "set forth in writing and make public [its] findings and [its] reasons." *Id.*

These restrictions provide EPA with a clear policy—protection of the enumerated resources—and anchor its actions to an "unacceptable adverse effect" standard in pursuing that policy. Indeed, in evaluating Section 404(c), reviewing courts have not had difficulty discerning the purpose of the provision. *See Mingo Logan Coal Co.*, 714 F.3d at 612 ("Congress granted EPA a broad environmental 'backstop' authority over the Secretary's discharge site selection in subsection 404(c)").

The Supreme Court has upheld similar standards and policy judgments in nondelegation challenges. *See, e.g.*, *Whitman*, 531 U.S. at 472 (upholding a provision enabling EPA to set air

quality standards at levels "requisite to protect the public health"); *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946) (sustaining a delegation to the SEC to ensure that corporate structures did not "unfairly or inequitably distribute voting power" among security holders); *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225-226 (1943) ("*NBC*") (affirming authorization to regulate in the "public interest"); *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 600 (1944) (affirming authorization to set "just and reasonable" rates). This Court should do the same here because Section 404(c) easily meets the intelligible-principle test.

### 2. Congress Imposed Meaningful Boundaries on EPA's Authority in Section 404(c).

Section 404(c) operates on a site-specific basis, rather than imposing nationwide restrictions. It applies only to discharges of dredged or fill material to "waters of the United States" within a defined area. Furthermore, EPA may act only after following prescribed procedures (notice, hearing, consultation) and only upon findings, set forth in writing and made public, that discharges to the defined area would cause unacceptable adverse effects on specifically enumerated resources.

These boundaries are meaningful, as evidenced by the numerous courts that have substantively scrutinized EPA's past actions under 404(c). *See, e.g.*, *Pirzadeh*, 1 F.4th 738; *Mingo Logan*, 714 F.3d 608; *James City*, 12 F.3d at 1330; *Bersani v. EPA*, 850 F.2d 36 (2d Cir. 1988); *Bd. of Miss. Levee Comm'rs v. EPA*, 785 F. Supp. 2d 592 (N.D. Miss. 2011); *Alameda Water & Sanitation Dist. v. EPA*, 930 F.Supp.486 (D. Colo. 1996); *Russo Dev. Corp. v. Thomas*, 735 F.Supp.631 (D.N.J. 1989); *Creppel v. USACE*, No. 77-25, 1988 WL 70103(E.D. La. June 29, 1988). That EPA takes the boundaries seriously is also reflected in the fact that the Agency has limited its use of Section 404(c) to significant cases, having taken final action only 14 times since the enactment of the CWA. *Consumers' Rsch.*, 606 U.S. 686 ("the proof is in the pudding").

### C. The Alaska Native Corporations' Specific Nondelegation Challenges Fail on Their Own Terms.

The Alaska Native Corporations' nondelegation theory rests on a fundamental misapplication of the law. The Alaska Native Corporations repeatedly argue that Section 404(c) "violates the nondelegation doctrine because Congress failed to provide any general policy to govern the Administrator's discretion." *E.g.*, Iliamna Br. 24. As we established above, that argument is plainly incorrect. Moreover, in suggesting that Section 404(c) gives too much discretion to EPA in deciding when to take action in the first place, the Alaska Native Corporations confuse the well-established doctrine of enforcement discretion with the types of open-ended statutes that appropriately garner attention under the nondelegation doctrine. Furthermore, the Alaska Native Corporations' comparisons to other cases are either unavailing, inapposite, or actually support EPA's position.

#### 1. The Alaska Native Corporations' "Unfettered Discretion" Arguments Mistakes Permissible Agency Discretion for Unconstitutional Delegation.

The Alaska Native Corporations assert that EPA's discretion to exercise its Section 404(c) power is "unfettered" and, therefore, there is "no law" or policy governing the Agency's authority. *See* Iliamna Br. 3, 21. However, that assertion confuses enforcement discretion with an unconstitutional delegation of authority. The proper inquiry under the nondelegation doctrine is whether Congress supplied an intelligible principle for the exercise of the authority it conferred upon EPA. As we established in Section VII.B, *supra*, Section 404(c) easily meets that standard.

The Alaska Native Corporations nevertheless contend that "the nondelegation problem is *unavoidable* because Congress has expressly delegated the authority" to EPA to decide whether to act under Section 404(c), Iliamna Br. 27 (emphasis added), and "there is 'no law' governing the exercise of that discretion," *id.* (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). That

contention falls short for two reasons. First, the whether-to-act aspect of the Alaska Native Corporations' claim is not presented on the facts of this case. EPA acted, so the Court has no occasion to decide whether the Agency's discretion *not* to act is a concern. The Court's inquiry should end there.

Second, even if that question were presented here, the existence of unreviewable enforcement discretion is not a constitutional problem—it is a foundational doctrine of administrative law, derived from the Constitution and embedded in the APA. *See* 5 U.S.C. § 701(a)(2); *Heckler*, 470 U.S. at 833 ("[A]n agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.' U.S. Const., Art. II, § 3."). If adopted, the Alaska Native Corporations' argument would upend this well-established, bedrock doctrine. *See generally Pirzadeh*, 1 F.4th at 744, 753 ("[S]ubjecting each decision not to invoke § 404(c) could overwhelm the agency's resources and frustrate the statutory purpose of protecting the nation's waters.").

Although many of the Alaska Native Corporations' objections pertain to EPA decisions *not* to invoke its Section 404(c) authority, they also assert that the Agency's exercise of that authority is invalid because Congress provided "no legal standard" for EPA to follow. Iliamna Br. 2. As we explained above, *see* Section VII.B, *supra*, however, Section 404(c) provides the necessary policy direction, standards, and boundaries to satisfy the Supreme Court's test for an acceptable delegation of authority. Moreover, the various courts that have adjudicated challenges to EPA's Section 404(c) actions have successfully determined whether EPA complied with the

statute or failed to meet the standards of rationality imposed by the APA. *See, e.g.*, *Mingo Logan*, 714 F.3d at 616; *James City County.*, 12 F.3d at 1339.

There is likewise no merit to the Alaska Native Corporations' claim that Congress gave EPA the discretion to "override Congress' legislative judgments" whenever it might choose. Iliamna Br. 1 (emphasis omitted). First, Section 404(c) represents *Congress*' legislative judgment that EPA should have the final word in protecting the resources *Congress* enumerated from unacceptable adverse effects. 33 U.S.C. § 1344(c). Second, EPA's authority under Section 404(c) does not displace Congress' judgment; rather, as Congress intended, the Agency's authority works to restrict or prohibit the *Corps* from specifying the discharge of fill in designated waters. *Id.*

### 2. The Alaska Native Corporations' Comparisons to Other Cases Are Unavailing, Inapposite, or Support EPA's Position.

The Alaska Native Corporations contend that Section 404(c) is "closely analogous" to the statute invalidated in *Panama Refining* because both "authorized" (but did not compel) the Executive to impose a prohibition. Iliamna Br. 27 (citing *Pan. Refin. Co. v. Ryan*, 293 U.S. 388 (1935)). But the analogy ignores what *Panama Refining* held unconstitutional: Congress "declare[d] no policy," "established no standard," and required no findings, leaving the President "unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he may see fit." 293 U.S. at 415, 430. Section 404(c) is the opposite. It requires EPA to first "determine" that there will be certain unacceptable adverse effects on specific resources before it can prohibit, deny, or restrict. Congress consequently did not leave the EPA Administrator with "unlimited authority . . . to lay down the prohibition, or not to lay it down, as he may see fit." *Id.* at 415. Rather, EPA must first make a very specific finding with an express policy direction, i.e., protecting enumerated resources from unacceptable adverse effects.

The Alaska Native Corporations' reliance on *Schechter* fares no better. *Schechter* condemned a regime where statutory "findings" did not meaningfully guide discretion. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 538-39 (1935). Here, however, EPA's finding requirement is not illusory. EPA must make a determination, grounded in a record and public process, about whether discharges of dredged or fill material into "waters of the United States" within a defined area will have unacceptable adverse effects on specifically enumerated resources.

Furthermore, the Alaska Native Corporations' reliance on *Heckler* and *Pirzadeh* is misplaced. *See* Iliamna Br. 3, 21, 27, 29. Both cases address the APA reviewability of decisions left to agency discretion and rely upon the principle of enforcement discretion, as we described in the preceding section of this brief. *See Heckler*, 470 U.S. at 837-838; *Pirzadeh*, 1 F.4th at 743-44. The Alaska Native Corporations' first attempt to twist both cases to fit their narrative by eliding the cases' holdings or selectively quoting them. For example, although *Heckler* does use the words "no law to apply," it does not support the notion that EPA's exercise of discretion under Section 404(c) is unreviewable. Iliamna Br. 3. Indeed, the whole point of this litigation is to review EPA's exercise of discretion in the Final Determination. Similarly, *Pirzadeh* does not hold that Section 404(c) gives EPA "unfettered discretion," Iliamna Br. 21, nor did the court find that there are "no judicially manageable standards for reviewing any decision [EPA] might make," *id.* at 29. To the contrary, the *Pirzadeh* court made clear that EPA's discretion is unfettered and unreviewable only insofar as the Agency decides *not* to exercise its Section 404(c) authority. 1 F.4th at 753. "Of course, if the Administrator *does* choose to exercise discretion by restricting the specification of a disposal site, the statute [ ] plainly constrains that decision." *Id.* at 752 n.4.

The Alaska Native Corporations similarly blur the line between the concepts at issue in those cases and the nondelegation doctrine they push here. In *Heckler*, the Supreme Court established the test for determining when a final agency action is unreviewable under the APA because it is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Among other things, *Heckler* emphasized that agency decisions *not* to prosecute are immune from review because courts have "no law to apply" in that situation. 470 U.S. 830-831. *Pirzadeh* follows other courts in recognizing that there is likewise "no law to apply" when EPA exercises its discretion *not* to invoke Section 404(c). 1 F.4th at 753. Nothing in those reviewability cases suggests that enforcement discretion presents a constitutional delegation problem.

Moreover, and contrary to the Alaska Native Corporations' intimation, the rule in those cases does not translate to the nondelegation context. *Heckler*'s "no law to apply" formulation is the rationale for withholding judicial review of an agency decision not to act. It does not translate to the nondelegation context, where the question is not judicial review, but congressional authorization, and the issue is not an agency decision to forgo action, but unfettered agency *action*. Although the Alaska Native Corporations repeatedly intone the phrase "no law," they never successfully fit *Heckler*'s square peg into their argument's round hole.

Lastly, *Consumers' Research* and *NBC* support EPA's position. Both cases relied on the standards "sufficient" and "public interest, convenience, or necessity," respectively, and on statutory context to satisfy the intelligible-principle test. 606 U.S. at 681-84; 319 U.S. at 216. Section 404(c) is more specific than either of these standards. It turns on a finding of unacceptable adverse effects on enumerated resources, within a discrete regulatory program, after notice, hearings, and consultation, and with written findings.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motions for summary

judgment and enter judgment for Defendants.

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division


*/s/ Laura J. Brown*
LAURA J. BROWN
MARIO A. LUNA
United States Department of Justice - ENRD
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Phone: (202) 514-3376 (Brown)
Phone: (202) 532-3357 (Luna)
Email: laura.j.s.brown@usdoj.gov
Email: mario.luna@usdoj.gov

**CERTIFICATE OF WORD COUNT**

I certify that Defendants' Brief in Opposition to Plaintiffs' Motions for Summary

Judgment contains 40,809 words, as determined by the word-count function of Microsoft Word.


*/s/ Laura J. Brown*

**CERTIFICATE OF SERVICE**

I certify that on February 17, 2026, I served a copy of the foregoing Defendants' Brief in Opposition to Plaintiffs' Motions for Summary Judgment on all counsel of record by using the CM/ECF system.

*/s/ Laura J. Brown*