James C. Feldman (AK Bar No. 1702003)
Jeffrey M. Feldman (AK Bar No. 7605029)
SUMMIT LAW GROUP PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104
Phone: (206) 676-7000
jamesf@summitlaw.com
jefff@summitlaw.com

*Attorneys for Bristol Bay Economic Development Corporation
and Lead Counsel for Bristol Bay Intervenors*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTHERN DYNASTY MINERALS LTD. *et al.*, | No. 3:24-cv-00059-SLG |
| Plaintiffs, | and Consolidated Cases |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | |
| Defendants, | |
| United Tribes of Bristol Bay, *et al.*, | |
| Intervenor-Defendants. | |

## BRISTOL BAY INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................i

TABLE OF AUTHORITIES................................................................................................iii

GLOSSARY OF TERMS......................................................................................ix

I. INTRODUCTION ..................................................................................1

II. STATUTORY FRAMEWORK ...............................................................4

III. LEGAL STANDARD ...............................................................................6

IV. THE FINAL DETERMINATION COMPORTS WITH THE CWA ...................7

    A.     EPA May Exercise Its Section 404(c) Authority Independent of a Corps Permit or 404(b) Permit Application. ....................................7

    B.     EPA Correctly Determined that PLP's Mine Proposal Would Have Unacceptable Adverse Effects on Fishery Areas. ....................... 12

    C.     EPA Adequately Addressed Costs and Benefits. ........................ 30

    D.     The "Defined Areas" in EPA's Final Determination are Consistent with the Authority Vested in the Agency Under Section 404(c) of the Clean Water Act. ......................................................... 38

    E.     Preliminary Jurisdictional Determinations are Not Appealable and PLP Has Waived Any Challenge to the Corps' and EPA's Jurisdiction. .......................................................... 41

V. EPA LAWFULLY EXERCISED ITS 404(C) AUTHORITY..............................46

    A.     Section 404(c) Does Not Violate the Nondelegation Doctrine. .................. 46

    B.     The Major Questions Doctrine is Inapplicable and Does Not Preclude the Final Determination.................................................. 53

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

i

C.     Section 404(c) Accords with the Cooperative Federalism Established by the CWA and Other Environmental Laws. ...........................................58

D.     The Final Determination Is Not Prohibited Under ANILCA......................59

E.     Neither the Alaska Statehood Act nor the Cook Inlet Land Exchange Preclude State Lands from Application of Section 404(c) of the Clean Water Act. ................................................................................................63

VI.    CONCLUSION .....................................................................................69

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*A.L.A. Schechter Poultry Corporation v. United States*,
   295 U.S. 495 (1935) ................................................................. 50, 51

*Albert v. Joralemon*,
   271 F.2d 236 (9th Cir. 1959) ......................................................... 45

*American Oceans Campaign v. Daley*,
   183 F. Supp. 2d 1 (D.D.C. 2000) ..................................................... 23

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*,
   273 F.3d 1229 (9th Cir. 2001) ........................................................ 22

*ASARCO, Inc. v. Kadish*,
   490 U.S. 605 (1989) .................................................................. 66

*Bell v. Cheswick Generating Station*,
   734 F.3d 188 (3d Cir. 2013) .......................................................... 59

*Bennett v. Spear*,
   520 U.S. 154 (1997) .................................................................. 44

*Biden v. Nebraska*,
   600 U.S. 477 (2023) .................................................................. 55

*Bristol Bay Econ. Dev. Corp. v. Hladick*,
   454 F. Supp. 3d 892 (D. Alaska 2020) ................................................. 6

*Cal. State Water Res. Control Bd. v. FERC*,
   43 F.4th 920 (9th Cir. 2022) ......................................................... 59

*City and County of San Francisco v. U.S. Dep't of Transp.*,
   796 F.3d 993 (9th Cir. 2015) ......................................................... 52

*Cty. of Amador v. U.S. Dep't of the Interior*,
   872 F.3d 1012 (9th Cir. 2017) ........................................................ 9

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

iii

*Coeur Alaska, Inc. v. Se. Alaska Conservation Council*,
   557 U.S. 261 (2009) ................................................................54

*Conservation Law Found. v. Ross*,
   374 F. Supp. 3d 77 (D.D.C. 2019) ...............................25, 28, 33, 38

*Darby v. Cisneros*,
   509 U.S. 137 (1993) ................................................................44

*Dep't of Commerce v. New York*,
   588 U.S. 752 (2019) ...........................................................34, 37

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ..................................................... *Passim*

*FCC v. Consumers' Research*,
   145 S. Ct. 2482 (2025) ....................................................47, 48, 52

*FPC v. Hope Natural Gas Co.*,
   320 U.S. 591 (1944) ................................................................47

*Glynn Envtl. Coal., Inc. v. Sea Island Acquisition, LLC*,
   146 F.4th 1080 (11th Cir. 2025) ...........................................42, 45

*Gonzales v. Oregon*,
   546 U.S. 243 (2006) ................................................................55

*Gundy v. United States*,
   588 U.S. 128 (2019) ................................................................48

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
   452 U.S. 264 (1981) ................................................................59

*J. W. Hampton, Jr., & Co. v. United States*,
   276 U.S. 394 (1928) ................................................................47

*James City County v. EPA*,
   12 F.3d 1330 (4th Cir. 1993) ...............................................32, 49

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................... 11

*Marsh v. Oregon Nat. Res. Council*,
   490 U.S. 360 (1989) ............................................................. 25, 26

*MCI Telecomms. Corp. v. American Telephone & Telegraph Co.*,
   512 U.S. 218 (1994) ................................................................... 55

*Michigan v. EPA*, 576 U.S. 743 (2015) ........................................ 32, 37

*Mingo Logan Coal Co. v. EPA*,
   714 F.3d 608 (D.C. Cir. 2013) ............................... 4, 8, 9, 32, 49

*Motor Vehicle Mfrs. Ass'n of the U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................. 6, 36

*Nat. Res. Def. Council v. Evans*,
   254 F. Supp. 2d 434 (S.D.N.Y. 2003) ...................................... 23

*Nat'l Broadcasting Co., Inc. v. United States*,
   319 U.S. 190 (1943) ................................................................... 47

*Nebraska v. Su*,
   121 F.4th 1 (9th Cir. 2024) .................................................. 53, 57

*North Carolina v. FERC*,
   730 F.2d 790 (D.C. Cir. 1984) .................................................. 30

*Panama Refining Co. v. Ryan*,
   293 U.S. 388 (1935) ................................................................... 51

*Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*,
   947 F. Supp. 1031 (D. Alaska 2013) ........................................ 35

*Rapanos v. United States*,
   547 U.S. 715 (2006) ..................................................................... 4

*Russello v. United States*,
   464 U.S. 16 (1983) ..................................................................... 39

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

*S.E.C. v. McCarthy*,
  322 F.3d 650 (9th Cir. 2003) ........................................................ 39

*Sackett v. EPA*,
  598 U.S. 651 (2023) .............................................................. 41, 46

*Sagebrush Rebellion, Inc. v. Hodel*,
  790 F.2d 760 (9th Cir. 1986) ........................................................ 61

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ......................................................... 6

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) .................................................. 6, 14, 20

*Shoshone-Bannock Tribes of the Fort Hall Reservation v. U.S. Dep't of the Interior*,
  153 F.4th 748 (9th Cir. 2025) .................................................... 66, 67

*Southeast Conference v. Vilsack*,
  684 F. Supp. 2d 135 (D.D.C. 2010) .......................................... 60, 61, 62, 63

*State of California v. Block*,
  690 F.2d 753 (9th Cir. 1982) ........................................................ 37

*Stavrianoudakis v. U.S. Fish & Wildlife Serv.*,
  108 F.4th 1128 (9th Cir. 2024) ...................................................... 11

*Sturgeon v. Frost*,
  577 U.S. 424 (2016) ................................................................. 67

*The Ocean Conservancy v. Gutierrez*,
  394 F. Supp. 2d 147 (D.D.C. 2005) ................................................... 22

*Trout Unlimited v. Pirzadeh*,
  1 F.4th 738 (9th Cir. 2021) ................................................... *Passim*

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
  578 U.S. 590 (2016) ................................................................. 42

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

*Util. Air Regulatory Grp. v. EPA*,
  573 U.S. 302 (2014) ................................................................ 55

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ............................................................ 53, 54

*Whitman v. American Trucking Ass'ns., Inc.*,
  531 U.S. 457 (2001) ............................................................ 32, 47


**Federal Statutes**

5 U.S.C. § 704 ........................................................................ 44

5 U.S.C. § 706 ...................................................................... 6, 13

16 U.S.C. § 410hh-5 ................................................................ 62

16 U.S.C. § 1538 .................................................................... 68

16 U.S.C. § 3101 ................................................................ 60, 63

16 U.S.C. § 3102 .................................................................... 60

16 U.S.C. § 3183 .................................................................... 62

16 U.S.C. § 3209 .................................................................... 61

16 U.S.C. § 3213 .................................................................... 60

33 U.S.C. § 1251 .......................................................... 4, 48, 50, 56

33 U.S.C. § 1311 ................................................................. 4, 48

33 U.S.C. § 1344 ............................................................... *Passim*

33 U.S.C. § 1362 ................................................................. 4, 39

42 U.S.C. § 6907 .................................................................... 68

42 U.S.C. § 7411 ....................................................................................................... 68

43 U.S.C. § 1701 ....................................................................................................... 67

43 U.S.C. § 1702 ............................................................................................... 61, 67

Pub. L. No. 83-31 ............................................................................................... 65, 67

Pub. L. No. 85-508 ............................................................................................. 65, 66

Pub. L. No. 94-204 ............................................................................................. 64, 66

Pub. L. No. 94-579 ................................................................................................... 67

**Federal Regulations & Administrative Materials**

33 C.F.R. pt. 331 ................................................................................................ 42, 44

33 C.F.R. § 320.1 ...................................................................................................... 42

40 C.F.R. pt. 231 ................................................................................................. *Passim*

40 C.F.R pt. 230 ....................................................................................... 16, 29, 49

44 Fed. Reg. 58,076 (Oct. 9, 1979) .................................................................. *Passim*

45 Fed. Reg. 85,336 (Dec. 24, 1980) ...................................................................... 15

53 Fed. Reg. 30,093 (Aug. 10, 1988) ...................................................................... 41

**Other Authorities**

U.S. Const. art. I ....................................................................................................... 46

18 Cong. Rec. 33 ...................................................................................................... 48

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

# GLOSSARY OF TERMS

| | |
|---|---|
| AIDEA | Alaska Industrial Development and Export Authority |
| ANILCA | Alaska National Interest Lands Conservation Act |
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| CWA | Clean Water Act |
| EPA | Environmental Protection Agency |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| INL | Iliamna Natives, Ltd. |
| JD | Jurisdictional Determination |
| NDM | Northern Dynasty Minerals |
| NMA | National Mining Association |
| NFK | North Fork Koktuli |
| NPV | Net Present Value |
| PEA | Preliminary Economic Assessment |
| PLP | Pebble Limited Partnership |
| ROD | Record of Decision |
| SEC | Securities and Exchange Commission |
| SFK | South Fork Koktuli |
| TSF | Tailings Storage Facility |
| USACE | United States Army Corps of Engineers |
| UTC | Upper Talarik Creek |
| WOTUS | Waters of the United States |

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

ix

# I. INTRODUCTION

The pristine Bristol Bay watershed in southwestern Alaska "is an area of unparalleled ecological value."[1] The watershed's streams, wetlands, lakes, and ponds provide habitat for the world's largest wild salmon runs and support one of the last salmon-based cultures in the world.[2] Bristol Bay's salmon are culturally, ecologically, and economically critical to Alaskan communities.[3] In addition to supporting over 15,000 jobs and generating over $2 billion in annual economic benefit, Bristol Bay's salmon sustain Alaska Native cultures in the region.[4] Indeed, "[t]he importance of salmon as a subsistence food source is inseparable from it being the basis for Alaska Native cultures."[5]

Against this backdrop, Plaintiffs Pebble Limited Partnership and its Canadian parent company, Northern Dynasty Minerals, Ltd. (collectively "PLP") propose to construct a massive open pit mine located at the headwaters of Bristol Bay to extract minerals from "a large, low-grade deposit containing copper-, gold-, and molybdenum-bearing minerals that underlie portions of the [South Fork Koktuli ("SFK") River], [North Fork Koktuli ("NFK") River], and [Upper Talarik Creek ("UTC")] watersheds."[6] The Pebble deposit that PLP seeks to exploit underlies portions of rivers and creeks that drain directly into two of the largest rivers in the Bristol Bay watershed that together typically provide over 50 percent of Bristol Bay's wild sockeye salmon harvest.[7] PLP's proposed mine would generate an estimated 150

---

[1] EPA_AR_0082943.

[2] *Id.*; EPA_AR_0082997.

[3] EPA_AR_0082943.

[4] EPA_AR_0082945, 0082997.

[5] EPA_AR_0083056.

[6] EPA_AR_0082970.

[7] EPA_AR_0082945, 0083048; Dkt. 215 at 8.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

1

million tons of waste rock and mine tailings, much of which PLP proposes to discharge into the surrounding waters and wetlands that drain into Bristol Bay.[8]

The Bristol Bay Intervenors ("BB Intervenors") are the entities and organizations that collectively represent Alaska Native Tribes, communities, fishermen, and commercial and economic interests, including the Alaska Native regional corporation whose lands include Bristol Bay, that would be adversely impacted by PLP's proposed mine.[9] PLP's proposal poses an existential threat to the Alaska Native communities in and around Bristol Bay.[10] Recognizing the unprecedented risks that discharges from PLP's mine would pose to the salmon that are the lifeblood of Bristol Bay, several of the BB Intervenors petitioned the U.S. Environmental Protection Agency ("EPA") to exercise its authority under Section 404(c) of the Clean Water Act ("CWA") to restrict the watershed's use as a disposal site for exploiting the Pebble deposit.[11]

In January 2023, after two decades of extensive analysis, scientific research, technical review, and robust stakeholder and public engagement,[12] EPA exercised its authority under

---

[8] EPA_AR_0082970-71.

[9] The BB Intervenors are United Tribes of Bristol Bay, Bristol Bay Native Association, Bristol Bay Economic Development Corporation, Bristol Bay Native Corporation, Commercial Fishermen for Bristol Bay, and Bristol Bay Regional Seafood Development Association, Inc.

[10] *See* EPA_AR_0083198 (noting long-term sociocultural impacts to Bristol Bay communities including adverse effects on community health and well-being, cultural identity and continuity, traditional knowledge transfer, language, spirituality, and social relations); *see also* EPA_AR_0083204, 0083050-56 (noting "disproportionately high and adverse effects" to subsistence way of life).

[11] EPA_AR_0082978; Dkt. 21-1, ¶ 7; Dkt. 21-2, ¶ 7; Dkt. 21-5, ¶¶ 8-9.

[12] Public engagement included seven formal public comment opportunities and thirty-eight public hearings generating over 3 million public comments. EPA_AR_0082980-90.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

2

the CWA to protect the most productive wild salmon ecosystem in the world.[13] In its comprehensive Final Determination, EPA concluded that discharges associated with PLP's Mine Plan would have unacceptable adverse effects on fishery areas in the Bristol Bay watershed.[14] EPA's conclusion was not surprising. The same conclusion has been reached by *every* administration, Republican and Democratic, to study this issue for the past twenty years.[15]

To prevent these unacceptable adverse effects and pursuant to its independent authority under 404(c), EPA, in a well-reasoned and scientifically supported Final Determination, prohibited the specification of certain waters of the United States ("WOTUS") in the Bristol Bay watershed as disposal sites for the discharge of dredged or fill material associated with the construction or routine operation of PLP's proposed mine.[16] EPA also restricted the discharge of dredged or fill material associated with future proposals to construct and operate a mine targeting the Pebble deposit that would result in similar or greater adverse effects to PLP's mine proposal.[17]

For the reasons that follow, EPA properly exercised its CWA authority to protect Bristol Bay and its remarkable fishery areas from the significant adverse effects of PLP's shortsighted mine proposal.

---

[13] EPA_AR_0082927.

[14] EPA_AR_0082943-65.

[15] *See* EPA_AR_ 0082981-86 (outlining EPA conclusions regarding unacceptable adverse effects over three presidential terms); *see also* EPA_AR_0139122 (EPA decision in 2018 to maintain a pending 404(c) action); EPA_AR_0129269 (Corps decision in 2020 to deny PLP's CWA permit application).

[16] EPA_AR_0082964.

[17] *Id.*

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

3

## II. STATUTORY FRAMEWORK

Congress passed the CWA in 1972 with the objective of restoring and maintaining the chemical, physical, and biological integrity of the Nation's waters.[18] The CWA generally prohibits the discharge of pollutants, including dredged and fill materials, into WOTUS without a permit.[19] Section 404 of the CWA tasks two agencies—the Army Corps of Engineers ("Corps") and the EPA—with responsibility for assessing and, if warranted, restricting or prohibiting discharges that would have unacceptable adverse effects.[20] The Corps is responsible for administering the 404 permitting program and issuing permits for discharges of dredged or fill materials into WOTUS.[21] Section 404(b) requires the Corps to specify each disposal site for permits issued pursuant to 404(a).[22]

Though the Corps is primarily responsible for disposal site selection, recognizing the EPA's environmental expertise and its statutory role as the environmental conscience of the CWA, "Congress granted EPA a broad environmental 'backstop' authority" in 404(c).[23]

404(c) provides:

> The [EPA] Administrator is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an

---

[18] *Rapanos v. United States*, 547 U.S. 715, 722 (2006) (citing 33 U.S.C. § 1251(a)).

[19] 33 U.S.C. §§ 1311(a), 1362(12), 1344(a).

[20] *Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 744 (9th Cir. 2021).

[21] 33 U.S.C. § 1344(a).

[22] *Trout Unlimited*, 1 F.4th at 744; 33 U.S.C. § 1344(b).

[23] *Mingo Logan Coal Co. v. EPA*, 714 F.3d 608, 612 (D.C. Cir. 2013); *Trout Unlimited*, 1 F.4th at 744.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

> unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the Administrator shall consult with the Secretary [of the Army, acting through the Corps]. The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection.[24]

Through this provision, Congress conferred broad discretion on EPA to prohibit or restrict the use of defined areas as disposal sites where the Administrator determines that such discharges would have unacceptable adverse effects on specified aquatic resources.[25]

EPA promulgated implementing regulations in 1979 to guide the agency's exercise of its 404(c) authority.[26] These regulations, among other things, define unacceptable adverse effects,[27] establish the procedures by which EPA can issue a proposed determination restricting the disposal of dredged or fill material,[28] provide a transparent process for public comment and hearings,[29] and specify the process and procedures for issuing final determinations limiting the discharge of dredged or fill materials into defined areas for specification.[30]

---

[24] 33 U.S.C. § 1344(c).

[25] *Trout Unlimited*, 1 F.4th at 752.

[26] 44 Fed. Reg. 58,076, 58,078 (Oct. 9, 1979) (codified at 40 C.F.R. §§ 231.1-231.8).

[27] 40 C.F.R. § 231.2(e).

[28] *Id.* § 231.3.

[29] *Id.* § 231.4.

[30] *Id.* §§ 231.5-231.6.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

5

Since the passage of the CWA, EPA has exercised its 404(c) authority judiciously and sparingly to block unacceptable adverse effects to aquatic resources from mines, waste storage projects, impoundments, commercial development, and more.[31]

## III.  LEGAL STANDARD

The Administrative Procedure Act ("APA") directs courts to "hold unlawful and set aside" an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[32] "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."[33] Additionally, APA review is highly deferential and the agency's decision is entitled to a presumption of regularity.[34] "This traditional deference to the agency is at its highest where a court is reviewing an agency action that required a high level of technical expertise."[35]

---

[31] *Bristol Bay Econ. Dev. Corp. v. Hladick*, 454 F. Supp. 3d 892, 895 (D. Alaska 2020), *aff'd in part, rev'd in part by Trout Unlimited*, 1 F.4th 738; *see also* Chronology of CWA Section 404(c) Actions, U.S. Envtl. Prot. Agency (Jan. 17, 2025), https://www.epa.gov/cwa-404/chronology-cwa-section-404c-actions (listing 14 Final Determinations issued from 1980 to present).

[32] 5 U.S.C. § 706(2)(A).

[33] *Motor Vehicle Mfrs. Ass'n of the U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[34] *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014).

[35] *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

## IV.   THE FINAL DETERMINATION COMPORTS WITH THE CWA[36]

**A.      EPA May Exercise Its Section 404(c) Authority Independent of a Corps Permit or 404(b) Permit Application.**

PLP contends that 404(c) allows EPA to prohibit the specification of a defined area as a disposal site or restrict the use of any defined area for specification only if there is a pending permit application with the Corps, meaning that EPA allegedly exceeded its authority in blocking future proposals to mine the Pebble deposit.[37] PLP's argument misstates the scope of EPA's decision. It also is irreconcilable with the plain text of 404(c) and its implementing regulations, as well as caselaw and decades of consistent agency practice.

### 1.      404(c) and its regulations unambiguously authorize EPA to act "whenever" it determines a discharge will have unacceptable adverse effects.

Relying on out of context dictionary definitions and misleadingly excerpted language from the CWA's legislative history, PLP contends that EPA's 404(c) authority is conditioned on the existence of a pending permit application or permit issued by the Corps.[38] PLP's reading of the CWA cannot be reconciled with the plain text of 404(c) and its implementing regulations.

404(c) provides that the EPA Administrator can act, "***whenever he determines***… that the discharge of such materials into such area will have an unacceptable adverse effect on" specific values.[39] Consistent with this language, the CWA regulations unambiguously state

---

[36] To avoid duplication, the Bristol Bay Intervenors incorporate by reference the briefing and arguments of the Federal Defendants (Dkt. 215), as well as those that will be provided by the other Intervenor-Defendants, Trout Unlimited and the NGO Intervenors.

[37] Dkt. 205-1 at 23-24.

[38] *Id.*

[39] 33 U.S.C. § 1344(c) (emphasis added).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

7

that "[t]he [EPA] Administrator may also prohibit the specification of a site under section 404(c) with regard to any existing *or potential disposal site before a permit application has been submitted to or approved by the Corps or a state*."[40]

The Court of Appeals for the D.C. Circuit considered the implications of this language as it relates to the timing of EPA's exercise of its 404(c) authority in *Mingo Logan Coal Company v. Environmental Protection Agency*.[41] Like here, *Mingo Logan* involved a mine operator's challenge to the EPA's exercise of its 404(c) authority blocking the operator's discharge of fill materials into three streams and tributaries. In that case, the Corps issued a 404(b) permit to the mine operator (Mingo Logan) authorizing the discharge of fill material into nearby streams and tributaries, but several years later the EPA withdrew the specifications of two of the three streams as disposal sites pursuant to 404(c).[42] Mingo Logan sued, arguing that EPA lacked authority to withdraw a site specification after the Corps had issued a permit.[43] Concluding that 404(c) "unambiguously expresses the intent of Congress,"[44] the D.C. Circuit held that "Section 404 imposes no temporal limit on the Administrator's authority to withdraw the Corps'[] specification but instead expressly empowers him to prohibit, restrict or withdraw the specification '*whenever*' he makes a determination that the statutory 'unacceptable adverse effect' will result."[45] The D.C. Circuit noted that by "[u]sing the expansive conjunction 'whenever,' the Congress made plain its

---

[40] 40 C.F.R. § 231.1(a) (emphasis added).

[41] 714 F.3d at 608.

[42] *Id.* at 609.

[43] *Id.*

[44] *Id.* at 612.

[45] *Id.* at 613 (internal citation omitted) (emphasis in original).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

8

intent to grant the Administrator authority to prohibit/deny/restrict/withdraw a specification at *any* time."[46]

Consistent with the statute and *Mingo Logan*, the EPA's Final Determination on the Pebble Mine explained that 404(c) "provides EPA with independent authority, separate and apart from the USACE CWA 404 permitting process, to review and evaluate potential discharges of dredged or fill materials into waters of the United States."[47] EPA noted that while 404(b) expressly makes the Corps' permitting authority subject to the EPA's authority in subsection (c), there is no corresponding language in 404(c) that constrains EPA's independent authority to act on the Corps' contemporaneous consideration of a 404(b) permit application.[48]

Additionally, "EPA has, since at least 1979 when the Agency promulgated its CWA Section 404(c) regulations, construed CWA Section 404(c) to authorize the Agency to prohibit, withdraw, deny, or restrict the use of any defined area for specification as a disposal site for the discharge of dredged or fill material into waters of the United States before a permit application has been submitted, at any point during the permitting process, or after a permit has been issued."[49] As the Ninth Circuit has cautioned, "[a] court should hesitate before construing a statute in a way that renders years of consistent agency practice unlawful."[50] This Court should decline PLP's invitation to do so here.

---

[46] *Id.* (emphasis in original).

[47] EPA_AR_0082993; *see also* EPA_AR_0083645 (response to comments noting EPA's independent authority distinct from the Corps' permitting process to exercise its 404(c) authority).

[48] EPA_AR_0082993.

[49] EPA_AR_0082992 (citing 40 C.F.R. 231.1(a)).

[50] *Cty. of Amador v. U.S. Dep't of the Interior*, 872 F.3d 1012, 1024 (9th Cir. 2017).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

### 2. EPA did not prohibit all future mining proposals and PLP does not have standing to challenge the hypothetical denial of future proposals.

PLP mischaracterizes the Final Determination as a "free-range rule banning future activities not yet conceived,"[51] and contends that the Final Determination breaches some unspecified limitation in the CWA "by covering all future hypothetical mines."[52] PLP is mistaken as a matter of fact and law. As an initial matter, EPA's findings are based on the potential direct and indirect impacts from construction and operation of the 2020 Mine Plan as described in *PLP's own 404 permit application*.[53] During the 404 permitting process, the Corps extensively documented impacts from PLP's mine proposal, including direct and permanent loss of more than 2,000 acres of wetlands and approximately 100 miles of streams.[54] Moreover, the Final Determination states that the prohibition extends to "future proposals to construct and operate a mine to develop the Pebble deposit with discharges of dredged or fill material into waters of the United States *that would result in the same or greater levels of aquatic resource loss or streamflow changes as the 2020 Mine Plan*."[55] This is not a wholesale ban on all future mining activity, but only on project iterations that would result in the same or greater levels of environmental harm as PLP's proposed mine.[56] To the extent that the discharges associated with a future mining proposal would have less

---

[51] Dkt. 205-1 at 23.

[52] *Id.*

[53] EPA_AR_0082954-58.

[54] *See* EPA_AR_0091371 (permanent loss of 2,162 acres of wetlands and other waters at the mine site); EPA_AR_0091359 ("development of the mine site would permanently remove approximately 99 miles of streambed habitat."); *see also* EPA_AR_0083099 (Table 4-3 area of wetlands and other waters lost under the Pebble 2020 Mine Plan).

[55] EPA_AR_0082964 (emphasis added).

[56] *See* EPA_AR_0084027 ("EPA's action does not prohibit mining of the Pebble deposit…. The FD does not forbid any development of the Pebble Deposit") (internal quotation marks omitted).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

drastic impacts, the Final Determination provides that "EPA will carefully evaluate all future proposals to discharge dredged or fill material in the region."[57]

In addition to being categorically incorrect, PLP's argument about future mining proposals is speculative and not ripe for adjudication in the present lawsuit. To the extent that a hypothetical future project sponsor wants to seek approval for a hypothetical future mine, they can submit that future proposal to the EPA for evaluation at any time.[58] PLP's arguments on behalf of hypothetical future mining proposals are not ripe for judicial decision, nor does PLP have standing to challenge a speculative denial of yet-to-be filed application by a currently unidentified applicant for unknown future development plans.[59]

---

[57] EPA_AR_0082965; *see also* EPA_AR_0083177-78 (listing the criteria for evaluating whether a future proposal involves discharges that would be subject to restriction).

[58] EPA_AR_0083178; *see also* EPA_AR_0084029 ("prospective project proponents may seek an FD applicability evaluation at any time."). Indeed, EPA's long-standing practice is to modify FDs based on new information. *See* https://www.epa.gov/cwa-404/chronology-cwa-section-404c-actions (Bayou Aux Carpes Site Final Determination was modified twice in 24 years since original FD; Russo Development Corporation Site Modification to Final Determination issued 7 years after FD; M.A. Norden Company Site Final Determination modified 10 years after original FD); Dkt. 215 at 71-72 (future permit application not precluded).

[59] *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (to satisfy Article III standing, a plaintiff's injury in fact must be (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical); *see also Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1139 (9th Cir. 2024) ("Constitutional ripeness overlaps with the injury-in-fact element of Article III standing, and therefore the inquiry is largely the same: whether the issues presented are definite and concrete, not hypothetical or abstract.") (internal quotations omitted).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

11

**B.  EPA Correctly Determined that PLP's Mine Proposal Would Have Unacceptable Adverse Effects on Fishery Areas.**

**1.  EPA applied the proper standards.**

As EPA explains in its brief and in the administrative record, when undertaking a 404(c) action, EPA need only find a "reasonable likelihood" that unacceptable adverse effects will occur.[60] "Unacceptable adverse effect(s)" means any "impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies or significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas"[61] and "consideration should be given to the relevant portions of the Section 404(b)(1) Guidelines" in assessing the adverse effects of a proposed project.[62]

In asserting otherwise, PLP and the State of Alaska ("State") mischaracterize the agency's 404(c) regulatory authority, side-step the agency's discretion to determine unacceptable adverse effects, conflate the importance of the 404(b)(1) guidelines analysis to the EPA's evaluation of unacceptable adverse effects under 404(c), and cherry-pick salmon data from the record.[63] In doing so, PLP and the State seek to avoid the fact that the proposed mine would cause the largest destruction of aquatic ecosystems in Alaska since the passage of the CWA—the destruction and permanent loss of 8.5 miles of anadromous fish streams, 91 miles of additional streams, and more than 2,100 acres of wetlands.[64] The agency's

---

[60] Dkt. 215 at 65; *see also* EPA_AR_0083063-65 (citing Denial or Restriction of Disposal Sites; 44 Fed. Reg. at 58,078 (CWA 404(c) regulations).

[61] 40 C.F.R. § 231.2(e).

[62] *Id.*

[63] *See*, *e.g.*, Dkt. 215 at 39 (noting PLP's reliance on incomplete fish sampling data at limited life stages to contend that tributaries contain small salmon populations).

[64] *See* EPA_AR_0083074 ("permanent loss of 8.5 miles of anadromous fish streams from a single project represents a large impact—one that is unprecedented in the context of the CWA Section 404 regulatory program in Alaska …); EPA_AR_0083093 ("the permanent destruction of approximately 91 miles of additional streams from a single project would be

---

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

12

analysis was entirely consistent with 404(c) and its implementing regulations.[65] Nothing more was required.

### a. EPA did not rely on a "more than trivial" standard in its Final Determination.

PLP argues that EPA applied the wrong standard for unacceptable adverse effects by using a "more than trivial" standard to determine if an impact is "significant."[66] To support this contention, PLP cites not to the actual record developed and relied on by EPA, but instead disingenuously *cites to its own characterization* of the Corps' permitting process.[67] The word "trivial" does not appear even once in the Final Determination.

To the contrary, EPA defined significant unacceptable adverse effects as those with "a large impact and… one that the aquatic ecosystem cannot afford.'"[68] The agency's elaboration on the phrase "significance of the adverse effect" comes directly from the

---

unprecedented for the CWA Section 404 regulatory program in the Bristol Bay watershed."); EPA_AR_0083102 ("the permanent destruction of approximately 2,108 acres of wetlands and other waters from a single project would be unprecedented for the CWA Section 404 regulatory program in the Bristol Bay watershed."); *see also* EPA_AR_0021298-300 (comparison of Pebble project impacts with other CWA Section 404 permits in Alaska); EPA_AR_0095264 (Final EIS concluding "no other wild salmon fishery in the world exists in conjunction with an active mine of this size.").

[65] 5 U.S.C. § 706.

[66] Dkt. 205-1 at 36.

[67] *Id.* at 36-37 (citing to EPA_AR_0129269 (Corps' ROD) and EPA_AR_0129421 (Declaration of PLP employee in support of PLP's permit denial appeal)). The Corps' ROD cited by PLP contains no mention of "trivial" as the standard applied. As explained by the Corps in its administrative appeal decision, ROD Attachment B2.1 (found at EPA_AR_0128966) "is the only location in the ROD that addresses the term 'more than trivial.'" *See* Dkt. 171-8 at 8.

[68] EPA_AR_0083064 (quoting 44 Fed. Reg. at 58,078); *see also*, EPA_AR_0083071 (explaining that EPA's analysis of unacceptable adverse effects is based on "why EPA considers the impacts 'large' and ones 'that the aquatic and wetland ecosystem cannot afford.'").

---

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

13

agency's 404(c) regulations[69] and has been consistently applied for more than 45 years.[70] Here, EPA devoted more than 65 pages of analysis, supported by detailed scientific evidence and findings explaining why the Pebble project's impacts on streams and wetlands that support anadromous fish habitat would be "one that the aquatic and wetland ecosystem cannot afford."[71] This is precisely the examination of relevant data and articulation of a rational connection between the facts found and the choices made that is called for by the law.[72]

Downplaying this comprehensive analysis, PLP conflates the *Corps'* "more than trivial" standard in the 404(b)(1) guidelines evaluation with *EPA's* unacceptable adverse effects findings analysis under 404(c). But these are two separate analyses, and EPA treated them as such in the Final Determination.[73] While the Final Determination contains EPA's detailed evaluation of compliance with the 404(b)(1) guidelines, this evaluation is secondary to the agency's finding of unacceptable adverse effects under the 404(c) standard.[74] EPA's

---

[69] 44 Fed. Reg. at 58,078.

[70] EPA has used the "aquatic and wetland ecosystem cannot afford" standard in previous 404(c) Final Determinations as well. *See* Spruce No. 1 Final Determination (Jan. 2011) at 50, *available at* https://www.epa.gov/cwa-404/spruce-no-1-surface-mine.

[71] EPA_AR_0083065-132. Specifically, EPA determined "[b]ecause of the nature and magnitude of the aquatic resource losses and streamflow changes described in Sections 4.2.1 through 4.2.4, EPA considers each 'a large impact' and 'one that the aquatic and wetland ecosystem cannot afford.'" EPA_AR_00830132 (quoting 44 Fed. Reg. at 58,078).

[72] *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); *see also Locke*, 776 F.3d at 994 ("deference to the agency is at its highest where a court is reviewing an agency action that required a high level of technical expertise.").

[73] *Compare* EPA_AR_0083065-132 *with* EPA_AR_0083132-64.

[74] *See* EPA_AR_0083133 ("evaluation of compliance with relevant portions of the Guidelines supports and confirms EPA's determination that discharges of dredged or fill material for the construction and routine operation of a mine at the Pebble deposit… will have unacceptable adverse effects on anadromous fishery areas.").

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

14

findings of unacceptable adverse effects are *independent of* and *confirmed by* the 404(b)(1) guidelines evaluation,[75] consistent with the 404(c) regulations.[76]

### b. EPA properly considered secondary effects based on information from PLP and the Corps.

The State and PLP argue the Final Determination's unacceptable adverse effects analysis improperly relied on "secondary effects" to characterize adverse impacts.[77] Specifically, Plaintiffs contend that EPA improperly considered factors like fragmentation of aquatic resources due to proposed tailings facilities and impoundments, fugitive dust, dewatering due to pumping water at the mine pit, and cultural impacts to traditional diets and subsistence values.[78] Plaintiffs' are mistaken for two reasons.

*First*, as to the consideration of secondary effects that the State argues are improper, consideration of those effects comports with the 404(c) regulations, which direct EPA to consider the relevant portions of the 404(b)(1) Guidelines in evaluating unacceptable

---

[75] EPA_AR_0083132-33.

[76] 40 C.F.R. § 231.2(e). In its administrative appeal of the Corps' permit denial, PLP argued unsuccessfully that the Corps' use of "more than trivial" during the CWA 404 permitting process was not an appropriate standard for assessing significant degradation under the 404(b)(1) guidelines. Dkt. 171-8, Ex. F. As the Corps' appeal Review Officer correctly determined, this argument has no merit in the context of the 404(b)(1) guidelines analysis, as the "more than trivial" standard "comes directly from regulation." Dkt. 171-8, Ex. F (citing EPA, *Guidelines for Specification of Disposal Sites for Dredged or Fill Material*, 45 Fed. Reg. 85,336, 85,343 (Dec. 24, 1980)). Thus, even if the EPA had relied solely on the Corps' "more than trivial" standard in its review of compliance with the 404(b)(1) guidelines—and it did not—this standard is appropriately used in a 404(b)(1) guidelines evaluation. EPA's approach followed established legal standards and was neither arbitrary nor capricious.

[77] Dkt. 167 at 34-36: Dkt. 205-1 at 70-72.

[78] Dkt. 167 at 34-35; Dkt. 205-1 at 71-72.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

15

adverse effects.[79] This includes certain secondary effects associated with the discharge of dredged or fill material, but not resulting from the direct placement of such material.[80] The effects that Plaintiffs contend EPA should ignore are well within the scope of secondary effects that should be considered under the 404(b)(1) guidelines as they are associated with the discharge of dredged and fill material, even if not directly resulting from the placement of that material.[81] And, as EPA explains, these secondary effects would not occur but-for construction and routine operation of the mine.[82]

**Second**, secondary effects such as impacts to traditional diets and subsistence values that PLP argues are improperly considered *were not* the basis for the Final Determination.[83] The Final Determination was based on the adverse effects associated with the 2020 Mine Plan, specifically: (1) the loss of approximately 8.5 miles of documented anadromous fish streams, (2) the loss of approximately 91 miles of additional streams that support anadromous fish streams, (3) the loss of approximately 2,108 acres of wetlands and other waters that support anadromous fish streams, and (4) the adverse impacts on approximately 29 additional miles of documented anadromous fish streams resulting from greater than 20 percent changes in average monthly streamflow.[84] These findings came from EPA's consideration of "mine site aquatic resource impacts of the 2020 Mine Plan that PLP

---

[79] 40 C.F.R. § 231.2(e).

[80] 40 C.F.R. § 230.11(h).

[81] *Id.*

[82] EPA_AR_0083068.

[83] *See* EPA_AR_0083179 ("The basis for EPA's final determination is the unacceptable adverse effects on fishery areas . . . [Section 6] describes additional concerns and information that [are] not the basis for EPA's final determination . . ."); Dkt. 215 at 78-80.

[84] EPA_AR_0082957; EPA_AR_0083063-71.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

16

proposed, and the FEIS quantified."[85] EPA properly relied on PLP's own submission as well as Corps' documents to quantify direct and secondary effects, and EPA is not required to ignore secondary effects, even if they do not provide the basis for the agency's adverse effects determination.

### c. EPA did not rely on speculative possibilities to support the Final Determination.

PLP asserts that EPA improperly relied on speculative harms to support the unacceptable adverse effects determination, claiming the statutory phrase "will have an unacceptable adverse effect" requires a higher degree of certainty than EPA provided here.[86] But as EPA explains in the preamble to its 404(c) regulations, because Final Determinations are "'by their nature based on predictions of future impacts,' . . . unacceptable adverse effects determinations draw upon the Agency's expertise and judgment and requires only a 'reasonable likelihood that unacceptable adverse effects will occur – not absolute certainty but more than mere guesswork.'"[87]

Here, EPA relied on two decades of studies, as well as extensive technical information submitted by PLP during the permitting and 404(c) processes. Parsing the verb "will," PLP relies on inapposite caselaw outside the context of 404(c) to impose a higher standard on EPA,[88] ignoring the administrative record's detailed analysis of the mine's likely

---

[85] *See* EPA_AR_0083553 ("EPA considered the direct and some secondary mine site aquatic resource impacts of the 2020 Mine Plan that PLP proposed, and the FEIS quantified."); *see also* EPA_AR_0083067 (the Final EIS evaluated secondary effects from fragmentation of aquatic resources, fugitive dust, downstream habitat degradation, and dewatering).

[86] Dkt. 205-1 at 39-41.

[87] EPA_AR_0084035 (quoting 44 Fed. Reg. at 58,078).

[88] Dkt. 205-1 at 39-41.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

17

impacts to fishery areas.[89] Unable to point to any factual uncertainty that would change the agency's quantitative assessment of the mine's impacts, PLP instead attacks the agency's discussion of the "portfolio effect" as speculative.[90] But as EPA explained, the importance of the portfolio effect is well-documented for the long-term preservation and sustainability of wild salmon populations in Bristol Bay.[91] In assessing the portfolio effect here, EPA thoroughly analyzed the impacts of the permanent loss of anadromous fish streams on the resilience and persistence of anadromous fish in light of the portfolio effect.[92]

Separately, PLP contends that EPA's tailings storage facility ("TSF") failure analysis was too speculative to support the Final Determination.[93] PLP's argument is a strawman— the Final Determination does not rely on a TSF failure as the basis for its unacceptable

---

[89] EPA_AR_0083065-132.

[90] Dkt. 205-1 at 41. The portfolio effect is a well-researched and established biological concept used to describe the complex structure of hundreds of genetically distinct wild salmon populations each adapted to localized conditions, likening the genetic fitness of these diverse populations to a diverse financial portfolio designed to increase financial stability. EPA_AR_0082997-83062; EPA_AR_0083248-83300. Moreover, PLP selectively cites from the Final Determination to argue its point that the portfolio effect finding was speculative for the use of the verb "could" instead of the word "would." Dkt. 205-1 at 41 ("that hypothetical 'reduction in genetic diversity,' if it occurred, '*could* adversely affect the stability and sustainability of … salmon fisheries.'" (citing EPA_AR_0083156) (emphasis added)). But elsewhere in the Final Determination, EPA discusses the loss of genetic diversity in more certain terms. *See* ERA_AR_0083077 ("Loss of any genetically distinct populations in the SFK, NFK, or UTC watersheds *would* constitute a measurable adverse effect, in addition to any effects these losses may have at the scale of the entire Bristol Bay watershed via the portfolio effect.") (emphasis added); *see also* Dkt. 215 at 9-10, 14, 34 (addressing portfolio effect).

[91] EPA_AR_0083077-78; EPA_AR_0083035-46; Dkt. 215 at 34.

[92] EPA_AR_0083074-78.

[93] Dkt. 205-1 at 66-68; *see id.* at 68 ("A 404(c) veto must be premised on a determination of unacceptable adverse effects that 'will' occur.").

---

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

adverse effects finding.[94] Because EPA expressly *did not* consider the impacts from TSF failure as the basis for the Final Determination, PLP's complaints about this analysis are irrelevant.

### 2. EPA's findings on stream loss and streamflow are well-supported and rational.

#### a. Stream loss presents unacceptable adverse effects on fishery areas.

EPA's determination that PLP's proposal would have unacceptable adverse effects on fishery areas is well supported by the administrative record. PLP's arguments to the contrary amount to second-guessing a decision it disagrees with. That is not grounds for reversal. Far from the "miniscule" effects that PLP suggests, EPA determined the impacts of the proposed mine on fishery areas and Bristol Bay's wild salmon fishery-based economy and Native cultural interests would be both devastating and unprecedented.[95] Relying on data from PLP's own mine plan and the Corps' FEIS, EPA concluded that the project would cause extensive and irreversible damage to anadromous fish breeding and spawning grounds.[96] Based on scientific evidence, EPA concluded that discharges from the mine would imperil Bristol Bay's wild salmon, jeopardizing in the process the way of life for thousands of Alaska Natives who depend on the region's salmon resource for survival. PLP's flyspecking of the agency's analysis of harmful impacts does not render it arbitrary or capricious.

---

[94] EPA_AR_0083179; *see also* EPA_AR_0083185 ("This final determination does not consider impacts from potential spills, accidents, and failures as a basis for its findings…").

[95] *See supra* n.64.

[96] EPA_AR_0082954.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

19

### b. EPA's approach to stream loss is well-documented in the record.

PLP's stream loss argument is another attempt to relitigate the science that supports EPA's findings of unacceptable adverse effects under 404(c).[97] PLP's criticisms are misplaced and EPA's evaluation of impacts to streams and streamflow are based on the agency's scientific expertise and are therefore entitled to deference.[98] PLP's assertions ignore EPA's compilation of evidence and detailed analysis showing that individual streams, stream reaches, wetlands, lakes, and ponds play a critical role in supporting individual salmon populations and in protecting the genetic diversity of Bristol Bay's wild salmon populations.[99] None of PLP's criticisms suggest, let alone establish, that EPA acted outside the bounds of reasoned decision-making or failed to examine relevant data when determining adverse effects to anadromous fish streams, streams that support anadromous fish streams, and streamflow.[100]

*First*, relying on a dictionary definition of "fishery," PLP contends that because fish are not actively caught around the proposed mine site, EPA improperly considered the area as a "fishery area."[101] EPA considered and rejected that argument. As EPA explained,

> Congress' inclusion of "spawning and breeding areas" in the statutory phrase referring to "fishery areas" acknowledges that fish are mobile and may use different habitat areas throughout their life histories and that EPA should consider all of these areas

---

[97] Dkt. 205-1 at 41-51.

[98] *See Locke*, 776 F.3d at 994 ("This traditional deference to the agency is at its highest where a court is reviewing an agency action that required a high level of technical expertise.").

[99] *See* EPA_AR_0082997-83062 *and* EPA_AR_0083248-83300 (Final Determination Section 3 and Appendix B regarding habitat importance and portfolio effect).

[100] *Encino Motorcars*, 579 U.S. at 221 (an agency "must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." (internal quotation omitted).

[101] Dkt. 205-1, 42-44.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

20

when evaluating whether discharges of dredged or fill material will have unacceptable adverse effects.[102]

PLP's argument that EPA should have defined fishery differently is wrong.

**Second**, PLP asserts that EPA arbitrarily used a small spatial scale to exaggerate impacts.[103] EPA explained that the scale used to determine impacts appropriately focused on the SFK, NFK, and UTC watersheds because:

> …these watersheds are the areas that would be most directly affected by mine development at the Pebble deposit and because the most extensive physical, chemical, and biological data currently available have been collected in these watersheds (e.g., PLP 2011, PLP 2018a, USACE 2020a). Evaluating the effects of discharges of dredged or fill material associated with mine site development for the Pebble deposit at the scale of the SFK, NFK, and UTC watersheds enables EPA to draw conclusions at the spatial and temporal scales that are most biologically relevant to the species (salmon) and life stages (eggs, juveniles, adults) of concern—that is, the spatial and temporal scales that ultimately determine the reproductive success and long-term persistence of these species and their genetically distinct populations.[104]

EPA's approach to scale and impacts is founded on biological relevance and supported by specific data in the record—exactly as the law requires.[105] EPA is entitled to deference in selecting the appropriate metrics and methodology to assess impacts to fishery areas, and

---

[102] EPA_AR_0083792; *see also id*. ("Congress' references to 'fishery areas' is not limited to only areas 'where fish are caught so they can be sold' but to broad habitat areas that can support fish throughout their life histories, including spawning and breeding areas.").

[103] Dkt. 205-1, 44-51.

[104] EPA_AR_0083850.

[105] *See Encino Motorcars*, 579 U.S. at 221 (an agency "must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.") (internal quotations omitted).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

PLP's difference of opinion as to the appropriate scale does not render EPA's analysis arbitrary or capricious.[106]

     ***Third***, PLP nitpicks EPA's use of linear miles to help determine affected stream habitat.[107] But linear stream miles is (1) the same metric used by the Corps in the 404 permitting process,[108] (2) the same measurement used throughout the Final EIS,[109] (3) the standard used in other 404(c) actions,[110] and (4) the most scientifically-defensible parameter for describing impacts to fish habitat.[111] Moreover, as EPA explained in its response to PLP's comments, the agency "considered all methods used" in the FEIS and the unacceptable adverse effects identified in the Final Determination "are based on linear lengths of stream and instream flow modeling reported in the FEIS."[112] Again, EPA's reasoned decision to use linear stream miles is entitled to deference.[113]

---

[106] *See The Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 157 (D.D.C. 2005) (noting the deference due to the agency when it provides a reasoned explanation for its choice of data).

[107] Dkt. 205-1, 51-52.

[108] *See, e.g.*, EPA_AR_0129276 (Corps' ROD using stream miles).

[109] *See, e.g.*, EPA_AR_0091353 (FEIS describing the existing conditions for fish and aquatic habitat in terms of stream miles).

[110] *See*, *e.g.*, Spruce No. 1 Mine Final Determination, *supra* n.70 at 6.

[111] *See*, *e.g.*, EPA_AR_0092517-739 (Essential Fish Habitat Assessment (prepared by PLP contractor)); *see also* EPA_AR_0092552 (showing pacific salmon essential fish habitat by drainage in miles and kilometers for streams and acres for lakes).

[112] EPA_AR_0083865; *see also* Dkt. 215 at 59 ("Whether EPA used stream length or stream area is irrelevant" as the analysis of impacts on streams would not change).

[113] *See Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001) ("Deference is particularly important when the agency is making predictions, within its area of special expertise, at the frontiers of science.") (internal quotation marks and citation omitted).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

**Fourth**, in asserting that EPA improperly relied on the portfolio effect in assessing impacts, PLP misstates the science around the portfolio effect and fragmentation.[114] EPA does not assume, as PLP contends, that "each small portion of habitat must be preserved because of the 'portfolio effect.'"[115] Rather, EPA found that "habitat losses of the magnitude predicted to occur under PLP's 2020 Mine Plan would constitute an unacceptable adverse effect on fishery areas."[116] In support of this finding EPA cites:

> an extensive body of scientific evidence [] that the productivity of salmon populations in the Bristol Bay region depends on the complexity of the region's aquatic habitats and the biological complexity of its salmon species (Section 3.3.3 of the FD), and that losses of such a magnitude would adversely affect habitat complexity and biological complexity in the SFK, NFK, and UTC watersheds.[117]

EPA's expert determination is supported by the administrative record and is entitled to deference.[118]

---

[114] Dkt. 205-1, 52-55.

[115] *Id.* at 52.

[116] EPA_AR_0083956.

[117] *Id.*

[118] *See Nat. Res. Def. Council v. Evans*, 254 F. Supp. 2d 434, 441 (S.D.N.Y. 2003) ("The Court defers to the Defendants' expertise, which is supported by the record."); *American Oceans Campaign v. Daley*, 183 F. Supp. 2d 1, 11-12 (D.D.C. 2000) ("Where the agency decision turns on issues requiring the exercise of technical or scientific judgment, it is essential for judges to look at the decision not as the chemist, biologist, or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.") (internal quotations omitted).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

23

**Fifth**, PLP contends that the loss of an additional 91 miles of upstream tributaries that support anadromous fish streams would have no significant effect on fishery areas.[119] EPA explains at length its conclusion that, although these streams themselves are not within the definition of fishery areas:

> the extensive permanent loss of additional streams that support anadromous fish streams and the permanent loss of the ecological subsidies these additional streams provide to downstream anadromous fish streams […] represent significant damage to these downstream anadromous fishery areas.[120]

EPA's conclusion is consistent with the Corps' findings that the proposed mine would permanently eliminate nearly 100 miles of stream habitat,[121] and its conclusion that the 2020 Mine Plan "will result in significant degradation."[122]

---

[119] Dkt. 205-1 at 55.

[120] EPA_AR_0083089; *see also* EPA_AR_0083093 (these streams "play a vital role in maintaining diverse, abundant anadromous fish populations").

[121] *See* EPA_AR_0095953 (direct loss of 99.7 miles of streambed habitat).

[122] EPA_AR_0129294; *see also* EPA_AR_0083869 (EPA explaining that the information and analysis in the Final EIS and ROD support EPA's findings in the Final Determination); EPA_AR_0083285-89 (Final Determination App'x B explaining relationship between EPA's 404(c)-related findings on the impact of streams and the Corps 404 permitting-related findings on aquatic habitats). This document is notable because it provides EPA's explanation of the relationship between the Final Determination, the FEIS, and the ROD, including addressing many points that PLP asserts are in conflict between the documents. This is exactly the kind of reasoned analysis based on the record called for by the law. *See Encino Motorcars*, 579 U.S. at 221 (an agency "must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.") (internal quotation omitted).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

*Finally*, PLP asserts that the Corps' Record of Decision ("ROD") is "irrational."[123] But the Corps' ROD is not at issue in this phase of the briefing, and any claim challenging the ROD is premature and misplaced.[124]

### c. EPA's approach to streamflow is well-supported in the record.

PLP contends that EPA's findings regarding streamflow changes resulting from mine construction are unsupported.[125] PLP criticizes EPA's methodology and contends that the agency should have instead used PLP's preferred streamflow model.[126] So long as its approach is rational and supported in the record, however, EPA is entitled to use its expertise to select the approach it deems appropriate.[127]

EPA explained in its response to comments why PLP's preferred model is not supported by science:

---

[123] Dkt. 205-1 at 56. PLP also states that "[n]othing in the ROD undermines [PLP's] arguments above" (meaning the other arguments in Section VII of PLP's brief). *Id.* This suggests that EPA and the Corps analysis and findings are somehow in tension and that EPA did not rationally address the Corps' findings. EPA, however, addressed in detail the relationship between findings in the Corps' process and the Final Determination, preparing a record document explaining those issues. EPA_AR_0083249-83300 (Final Determination App'x B); *see also* Dkt. 215 at 43 ("that the Corps purportedly came to a different conclusion [] does not call into question the lawfulness of EPA's determination").

[124] *See* Dkt. 165 at 3 (Court's Order holding in abeyance PLP's challenge to Corps' permit denial).

[125] Dkt. 205-1 at 57-60.

[126] *Id.* at 58.

[127] *See Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *see also Conservation Law Found. v. Ross*, 374 F. Supp. 3d 77, 89 (D.D.C. 2019) ("In addition, courts pay agencies an extreme degree of deference when decisions involve complex judgments about sampling methodology and data analysis that are within the agency's technical expertise.").

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

25

Aquatic ecologists have long recognized that a much fuller spectrum of flow conditions (e.g., base flows, high flows, flood flows) is needed to sustain native species than is provided by instream flow models, such as the Physical Habitat Simulation System (PHABSIM) model used to evaluate streamflow in the FEIS (Postel and Richter 2003).[128]

In contrast, EPA's approach "incorporates ecological and geomorphic considerations associated with streamflow alteration"[129] that are not included in PLP's preferred model. Again, EPA's rational selection of models is entitled to deference.[130]

### 3. EPA determined that impacts from the proposed Pebble Mine cannot be mitigated.

PLP asserts that EPA's supposed failure to consider compensatory mitigation is fatal to the Final Determination.[131] PLP is incorrect. EPA thoroughly reviewed all mitigation measures proposed by PLP and in public comments over a decade-long period before concluding the "[a]vailable information demonstrates that known compensation measures are unlikely to adequately mitigate effects described in this final determination to an acceptable level."[132] EPA's determination that the nature and location of PLP's proposed massive open pit mine cannot be avoided, minimized, or mitigated to an acceptable level is entitled to deference.

---

[128] EPA_AR_0083882; *see also* Dkt. 215 at 52-54 (EPA Brief rebutting PLP's streamflow arguments).

[129] EPA_AR_0083888.

[130] *Marsh*, 490 U.S. at 378.

[131] Dkt. 205-1 at 68-70; *see also* Dkt. 185-1 at 18-21 (*amicus* brief of National Mining Association ("NMA"), et al.).

[132] EPA_AR_0082962, 0083157, 0083163, 0083305.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

26

### a. EPA did not disregard compensatory mitigation.

Section 404(c) does not require EPA to consider mitigation when determining what constitutes an unacceptable adverse effect, nor does it restrict EPA from exercising its authority unless and until the agency has reviewed a compensatory mitigation proposal as part of a 404 permit application.[133] Nevertheless, EPA *did consider* PLP's compensatory mitigation proposal. Indeed, EPA, as a cooperating agency, was involved in the development and assessment of potential avoidance and minimization measures for PLP's 2020 Mine Plan.[134] EPA extensively examined PLP's compensatory mitigation plans submitted to the Corps[135] and devoted an entire appendix in the Final Determination to evaluating potential mitigation measures raised in public comments, including eleven measures proposed for the

---

[133] *See supra* Part IV.A.

[134] *See* EPA_AR_0128967 (ROD Attachment B2) ("USFWS and EPA were invited to recommend additional avoidance and minimization measures. These measures were considered by the applicant, and those that the applicant agreed to adopt were considered [in the ROD]."); *see also* EPA_AR_0028124-38 (EPA Memorandum to File, Subject: EPA's decision to terminate Clean Water Act Section 404(q) dispute resolution process regarding proposed Pebble Mine, Bristol Bay watershed, Alaska (POA-2017-00271) (June 12, 2020)); Dkt. 215 at 18-21 (detailing EPA involvement as cooperating agency in Corps permitting process).

[135] EPA_AR_0083156-64.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

NFK, SFK, and UTC watersheds,[136] and five measures proposed for adjoining watersheds.[137] PLP's suggestion that EPA did not consider mitigation is meritless.[138]

### b. EPA properly considered compensatory mitigation.

The voluminous administrative record's analysis of compensatory mitigation shows that the agency conducted a detailed and rational analysis of proposed mitigation measures before determining that the proposed measures were unlikely to adequately mitigate adverse effects. That PLP disagrees with EPA's conclusion on its mitigation proposals is of no consequence. "The weighing of relevant factors is a judgment left to the Agency. That [plaintiff] would have reached a different conclusion is of little moment under [the arbitrary and capricious] standard of review."[139]

PLP's assertion that EPA "refused to take mitigation seriously" by rejecting its November 2020 compensatory mitigation plan is incorrect.[140] EPA properly determined that PLP's November 2020 plan did not qualify as compensatory mitigation under the regulations for three separate reasons.[141]

---

[136] *See* EPA_AR_0083312-28 ((1) increase habitat connectivity by (a) improving access around barrier to migration, (b) removing or retrofitting road culverts, (c) excavating and engineering channels to connect isolated wetlands and ponds to main channels, (d) reconnect historic floodplains via channel engineering; (2) increase habitat quality; (3) increase habitat quantity; (4) manage water quality by (a) directing excess on-site water, (b) augmenting flows, (c) pumping water upstream; (5) manipulate water quality by (a) increasing levels of alkalinity, hardness, and total dissolved solids and (b) increasing levels of nitrogen and/or phosphorus).

[137] *See* EPA_AR_0083329-32 (remediate old mine sites, remove roads, retrofit road stream crossings, construct hatcheries, and stock fish).

[138] Dkt. 205-1 at 68-70.

[139] *Conservation Law Found.*, 374 F. Supp. 3d at 110.

[140] Dkt. 205-1 at 68; *see also* Dkt. 185-1 (NMA *amicus* brief) at 20-21.

[141] EPA_AR_0083163.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

28

**First**, EPA found that PLP's proposal fails to meet the regulatory definition and requirements for "preservation" found in 40 C.F.R. § 230.92.[142]

**Second**, EPA found that PLP's proposal did not meet the regulatory standard for preservation sites, namely that the site be permanently protected through an appropriate real estate or other legal instrument.[143]

**Finally**, EPA correctly concluded PLP's proposal does not adequately mitigate the adverse effects on anadromous fishery areas to an acceptable level "because discharges of dredged or fill material at the mine site would result in secondary effects that would degrade the aquatic resources proposed for preservation and thus would not adequately protect or maintain them."[144]

EPA never insisted that "mitigation must be onsite"[145] nor did the agency "disregard" compensatory mitigation as PLP suggests.[146] Instead, the agency thoroughly reviewed PLP's proposal, as well as an array of mitigation measures suggested by commenters and PLP in the decade leading up to the Final Determination and memorialized its findings in a 50-page appendix.[147] Nothing more was required.

---

[142] *Id.* Specifically, EPA found that although PLP would give up mining claims located within its claim block, the area proposed for preservation would not be "under threat of destruction or adverse modification" as the regulation requires. *Id.*

[143] EPA_AR_0083164 (citing 40 CFR § 230.93(h)(l)(iv)).

[144] *Id.*

[145] Dkt. 185-1 at 21.

[146] Dkt. 205-1 at 68.

[147] EPA_AR_0083157; EPA_AR_0083301-61. Notably, EPA pointed out that during the 404(c) process that no party (including PLP, the State of Alaska, and the Army Corps) suggested additional compensation measures beyond what was developed during the 404 permitting process. EPA_AR_0083157-58.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

### 4. Each effect on fishery areas from exploiting the Pebble Deposit will independently have unacceptable adverse effects.

The record supports EPA's finding that each of the impacts on aquatic resources—loss of anadromous fish streams, loss of additional streams that support anadromous fish streams, loss of wetlands and other waters that support anadromous fish streams, and changes in streamflow in downstream anadromous fish streams—"*independently* will have unacceptable adverse effects" on anadromous fishery areas (including spawning and breeding areas).[148] Each EPA finding is based on separate, but overlapping, factual bases that support separate determinations under 404(c). As EPA explains, "[e]ven considered in isolation, impacts on aquatic habitats documented in the FEIS constitute an unacceptable adverse effect on fishery areas."[149] Indeed, the agency's comprehensive review of the science compiled for the FEIS and permitting process, described above, supports this conclusion.

Notably, EPA found that each impact will *independently* have unacceptable adverse effects to support both the prohibition and the restriction.[150]

### C. EPA Adequately Addressed Costs and Benefits.

PLP and the State assert that the CWA requires EPA to consider and weigh the costs and benefits of the Final Determination, and that the economic analysis that EPA prepared was insufficient and arbitrary.[151] Both assertions are incorrect.

---

[148] EPA_AR_0082993 (emphasis added).

[149] EPA_AR_0083273.

[150] *See* EPA_AR_0083571 ("EPA intends that the prohibition and restriction in the FD are distinct and operate independently."); *see North Carolina v. FERC*, 730 F.2d 790, 795-96 (D.C. Cir. 1984) ("Whether an administrative agency's order or regulation is severable, permitting a court to affirm it in part and reverse it in part, depends on the issuing agency's intent.").

[151] Dkt. 205-1 at 24-36; Dkt. 167 at 36-44; Dkt. 184-1at 5-15 (Chamber *amicus* brief).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

In evaluating PLP's proposed mine, EPA correctly recognized that the ongoing, positive economic benefits currently provided by Bristol Bay's waters far outweigh the potential loss of speculative revenues that might be generated by PLP's mine proposal. The Final Determination protects a fishery area that provides $2.2 billion of annual economic activity from a mine that would have myriad and devastating impacts on the fishery area and the communities that depend on Bristol Bay's waters and resources. These impacts would fall disproportionately on the communities and Alaskans represented by the Bristol Bay Intervenors.

Such unacceptable adverse effects, in and of itself, are sufficient justification under the CWA for EPA's Final Determination. But the record also shows that EPA was highly sensitive and attentive to the costs and benefits associated with its decision. Before issuing the Final Determination, EPA compiled and closely analyzed expert economics reports, the FEIS, hundreds of thousands of public comments, agency guidance on analyzing costs and benefits, and PLP's own Preliminary Economic Assessment ("PEA") and filings with the Securities and Exchange Commission ("SEC"). All these data and materials were set out and analyzed in detail in an extensive report that accompanied the Final Determination and thoughtfully weighed the costs and benefits of EPA's decision.

EPA properly concluded that "the advantages associated with taking EPA's action were enormously diverse, numerous, unique, valuable, long-lasting, and aligned with the purposes of 404(c) even when weighed against the substantial economic disadvantages of EPA's action."[152] Plaintiffs disagreement with EPA's conclusion does not make the Final Determination arbitrary, capricious, or contrary to law.

---

[152] EPA_AR_0084196; EPA_AR_0083165.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

31

### 1. 404(c) does not require consideration of costs and benefits.

Contrary to Plaintiffs' claims,[153] 404(c) does not require EPA to undertake consideration of costs and benefits of the Final Determination. As detailed elsewhere in the briefing and the record, the plain text of the CWA, legislative history, and EPA's long-standing and consistent interpretation of the 404(c) factors the agency is permitted to consider do *not* include potential costs as a factor that must be considered.[154]

### 2. EPA adequately considered the costs and benefits of the Final Determination.

Though the CWA does not require an analysis of the costs and benefits of a final 404(c) action, EPA conducted one.[155] Prior to the Final Determination, EPA undertook a comprehensive review of the economic costs and benefits of the proposed mine against Bristol Bay's existing economy. Specifically, EPA developed a draft report that assessed the costs and benefits of exercising its 404(c) authority.[156] EPA solicited public comments on

---

[153] Dkt. 205-1 at 24-28; Dkt. 167 at 36-38; Dkt. 184-1 at 2-11.

[154] EPA_AR_0083164-65; EPA_AR_0084182, 0084197-209 (EPA response to comments discussing *Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001), *Michigan v. EPA*, 576 U.S. 743 (2015), *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414 (D.C. Cir. 2018), *A Cmty. Voice v. EPA*, 997 F.3d 983, (9th Cir. 2021), *Mingo Logan Coal Co.*, 829 F.3d at 608, and *James City Cty. v. EPA,* 12 F.3d 1330 (4th Cir. 1993)); EPA_AR_0021381-82.

[155] EPA_AR_0141296-375 ("Costs Report"). EPA's analysis was, in part, a response to public comments raising economics issues. *See*, *e.g.*, EPA_AR_0084177-268 (EPA response to comments on the 2022 PD regarding costs); EPA_AR_0079405-531 (BBRSDA comments on 2022 PD and 2019 Draft EIS raising economics concerns); EPA_AR_0025957-60 (BBNC comments on 2019 Draft EIS and PLP 404 permit application raising economics concerns); EPA_AR_0021380-392 and EPA_AR_0021280-360 (BBNC comments on 2022 PD raising economics concerns); EPA_AR_0027084-128 (Nondalton Tribal Council comments on 2019 Draft EIS economics).

[156] EPA_AR_0141160-215.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

the draft,[157] reviewed technical reports and PLP's own PEA and economic disclosures to the SEC,[158] compiled public comments on economics, and thoroughly responded to each comment.[159] EPA also developed a final report titled *Consideration of Potential Costs Regarding the Clean Water Act Section 404(c) Final Determination* ("Costs Report")[160] and concluded that the benefits of the Final Determination would outweigh the costs.[161] Any claim that EPA did not consider costs and benefits, or did not consider those issues sufficiently, is incorrect.

PLP and the State criticize EPA's detailed analysis, arguing that the Costs Report was irrational[162] and that EPA improperly discounted the costs that would flow from the Final Determination.[163] But the State's arguments rely on speculative costs it claims would be incurred from forgoing the mine, and ignore entirely the continued economic benefits of protecting the existing Bristol Bay ecosystem and economy. Meanwhile, EPA's finding that

---

[157] *See* EPA_AR_0082399 (2022 Proposed Determination requesting public comments "on how EPA Region 10 considered costs, including whether all appropriate costs have been considered.").

[158] EPA_AR_0141302.

[159] EPA_AR_0084177-268.

[160] EPA_AR_0141296-375.

[161] EPA_AR_0084196.

[162] Dkt 250-1 at 32-36; Dkt. 167 at 38-43. The Chamber makes similar arguments in its *amicus* brief, Dkt. 184-1 at 7, responses to which are the same as the responses to the arguments of the Plaintiffs above. While AIDEA also brings up economics in its *amicus* brief, it merely expresses disagreement with EPA's decision rather than presenting a legal argument as to why EPA's decision might violate the law. Dkt. 207-1 at 25-32. These positions are not legal arguments. Accordingly, they are not relevant to whether EPA's decision is arbitrary, capricious, or contrary to law, as per the APA legal standard of review applicable in this matter. *Conservation Law Found*, 374 F. Supp. 3d at 110.

[163] Dkt. 167 at 38-43.

---

the benefits of the proposed mine were "highly uncertain" was well-founded.[164] This is evident from disclaimers found in PLP's own economic reports and disclosures with the SEC.[165] Additionally, reports and comments from outside experts showed that PLP's 2020 Mine Plan may in fact have no Net Present Value ("NPV") at all.[166] Thus, EPA correctly concluded there is "uncertainty in[] both the financial viability of the proposed project as well as the estimated economic impacts."[167]

PLP also contends that EPA's analysis of the economic benefits of its proposed mine was flawed because the agency neglected to account for increased copper demand.[168] As an initial matter, PLP uses *today's* mineral prices and speculation about *future* prices to support its argument.[169] Yet, *today's* prices are not the relevant reference point. EPA's analysis was undertaken three years ago, and the reasonableness of its conclusion must be assessed using the data that PLP submitted and existed at *that* time.[170] EPA's Costs Report fully explains the agency's methodology for assessing the impact of copper demand on prices—utilizing

---

[164] EPA_AR_0141303-04, 0141318-22.

[165] *See* EPA_AR0141318 ("The PEA acknowledges that some of its estimates are highly uncertain, creating uncertainty about the magnitude of the costs of EPA's final determination" quoting PLP's 2022 PEA submitted to the SEC).

[166] *See*, *e.g.*, EPA_AR_0138664 (Borden, Richard, Review of the Pebble Mine Project Preliminary Economic Assessment cited by the Costs Report at EPA_AR_0141370); EPA_AR_0027084-128 (Nondalton Tribal Council comments on 2019 Draft EIS economics and NPV calculation); EPA AR 0021383-87 (BBNC comments on the draft Costs Report).

[167] EPA_AR_0141318.

[168] Dkt. 205-1 at 33-35.

[169] *Id.* at 1.

[170] *See Dep't of Commerce v. New York*, 588 U.S. 752, 780 (2019) ("a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record.").

---

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

34

PLP's own data for copper prices,[171] as well as three separate data sources to assess the potential impact of extracting the Pebble deposit on global demand and prices.[172]

PLP also asserts that EPA improperly assumed that Pebble ore would be exported.[173] But PLP concedes that it must export its copper overseas for smelting.[174] As part of this argument, PLP also contends that exploiting the Pebble deposit could have a more beneficial impact to the U.S. copper supply than EPA assumed, that is .3% vs .4 to .6% in PLP's opinion. Even if true, this difference is both *de minimus* and immaterial to the validity of a Costs Report that considered multiple factors beyond impact on U.S. copper supply from the 2020 Mine Plan. Thus, this minor issue does not undercut at all a Final Determination that considered, but is not founded on, a cost analysis.[175]

PLP also argues that EPA unreasonably and without explanation considered an expanded mine in assessing benefits of the Final Determination, but not in assessing the costs of forgoing the mine.[176] But as EPA carefully explained, the Costs Report "did not consider the expansion scenario for purposes of consistency…with the overall final

---

[171] EPA_AR_0141319-20. EPA also factored in long-term mineral price forecasts in estimating mine revenues, EPA_AR_0141360, thus underscoring the conservative nature of its analysis.

[172] EPA_AR_0141363-68.

[173] Dkt. 205-1 at 34.

[174] *See* EPA_AR_0141320 (Costs Report citing PLP's PEA).

[175] PLP cites *Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F. Supp. 1031, 1056 (D. Alaska 2013) to support its argument that a mathematical difference can render an EPA decision arbitrary and capricious. Dkt 250-1 at 35. In *Chickaloon*, the court identified mathematical errors that were central to the agency's decision whether seismic activity could harm Cook Inlet beluga whales. *See id*. Had the beluga count error not been central to the agency decision the court would have excused it. *Id. See also* Dkt. 215 at 89 ("differences between EPA's calculation and the ones PLP suggested are not significant and would not have altered EPA's conclusions").

[176] Dkt. 205-1 at 35.

---

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

determination analysis . . . [and] because the expansion scenario is not part of the 2020 Mine Plan, has not otherwise been proposed, and would require additional and separate permitting."[177] EPA analyzed the project as proposed against the status quo economy of Bristol Bay. To do more would invite speculation, thus EPA's analysis was reasonable and well-explained.

PLP additionally asserts that EPA miscalculated potential employment benefits of the proposed mine by not taking into account the potential expansion of the mine.[178] In evaluating employment issues in the Costs Report, EPA looked to, among other things, PLP's own data.[179] And again EPA explained, "[t]he overall analysis did not include the expansion scenario as part of the basis for the [FD], because [it] is not part of the 2020 Mine Plan, has not otherwise been proposed, and would require additional and separate permitting."[180]

Finally, the State argues that EPA's analysis of costs is inadequate because the agency "failed to quantify the costs of the Restriction (as opposed to the Prohibition)."[181] EPA responded to this exact concern during the public comment period, explaining how the agency expressly considered costs and benefits of *both* the prohibition and restriction.[182]

For all the reasons above, the record clearly reflects that EPA thoughtfully "examined 'the relevant data' and articulated 'a satisfactory explanation'" for its decision.[183]

---

[177] EPA_AR_0141313.

[178] Dkt. 205-1 at 35-36.

[179] EPA_AR 0141313.

[180] *Id.*

[181] Dkt. 167 at 41-43.

[182] EPA_AR_0084254.

[183] *Dep't of Commerce*, 588 U.S. at 773 (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

### 3. EPA reasonably weighed the costs and benefits of the Final Determination.

Plaintiffs argue that, even if EPA did undertake a consideration of costs, its consideration did not reasonably weigh the costs and the benefits of the Final Determination.[184] During the 404(c) process, PLP similarly complained that EPA's approach to the Costs Report "is not a valid cost benefit analysis method."[185]

Even when required, consideration of costs does not require any specific approach or methodology, or even a "formal cost benefit analysis."[186] EPA "followed longstanding practice and guidance in its presentation of potential costs," relying on the agency's standard guidance, as well as other sources of federal guidance for how to conduct economic analysis.[187] The record reflects that EPA prepared and considered an exhaustive list of costs and benefits as informed by record data and public input, including data on the project's potential contribution to meeting copper demand. It then analyzed those costs and benefits, and explained how it weighed them.[188] Finally, EPA concluded that the potential benefits from the proposed mine do not justify the adverse effects on salmon habitat and the cascading adverse effects on Bristol Bay's economy and way of life if the mine were constructed.[189] This is exactly the kind of reasoned decision-making based on the record that

---

[184] Dkt. 167 at 38; Dkt. 205-1 at 24.

[185] EPA_AR_0084251.

[186] *State of Cal. v. Block*, 690 F.2d 753, 764 (9th Cir. 1982); *Michigan v. EPA*, 576 U.S. 743, 759 (2015).

[187] *See* EPA_AR_0141311 (Costs Report explaining methodology using EPA's Guidelines for Preparing Economic Analyses and Circular A-4 guidance for Regulatory Impact Analyses under Executive Order 12866); EPA_AR_0084257 (EPA Response to Comments explaining the same).

[188] EPA_AR_0084182-196.

[189] EPA_AR_0083164-65; *see also* EPA_AR_0084194-96.

---

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

is required by the law.[190] That Plaintiffs disagree with the EPA's reasoned conclusion does not make the agency's consideration of costs and benefits arbitrary and capricious.[191]

**D.    The "Defined Areas" in EPA's Final Determination are Consistent with the Authority Vested in the Agency Under Section 404(c) of the Clean Water Act.**

The State contends that EPA exceeded its CWA authority in the Final Determination by "[drawing] two circles around Alaska's *land* (one for the Prohibition and one for the Restriction) and assert[ing] that no discharges could occur on any [WOTUS] within these areas, wherever those waters may be."[192] According to the State, the Final Determination's defined areas of prohibition and restriction are too imprecise, and EPA cannot prohibit the discharge of materials into WOTUS located within broader swaths of land.[193] The State reaches this conclusion by reasoning that when Congress used the term "defined area" in 404(c), it really meant "navigable waters" or "waters of the United States."[194] The State's argument conflicts with the plain text of the statute and with long-settled canons of statutory interpretation.

The plain language of 404(c) broadly authorizes the EPA Administrator "to prohibit the specification… of ***any defined area*** as a disposal site, and he is authorized to deny or restrict the use of ***any defined area*** for specification… as a disposal site."[195] The Ninth Circuit observed that 404(c) "clearly conveys broad discretion on the Administrator."[196] The

---

[190] *Encino Motorcars*, 579 U.S. at 220-21.

[191] *See Conservation Law Found.*, 374 F. Supp. 3d at 110 ("The weighing of relevant factors is a judgment left to the Agency. That [plaintiff] would have reached a different conclusion is of little moment under [the arbitrary and capricious] standard of review.").

[192] Dkt. 167 at 27.

[193] *Id.* at 29-30.

[194] *Id.* at 28.

[195] 33 U.S.C. § 1344(c) (emphasis added).

[196] *Trout Unlimited*, 1 F.4th at 752.

State's contention that "any defined area" really means that EPA can only deny or restrict the use of "WOTUS" or "navigable waters" is incorrect for at least three reasons.

**First**, Congress clearly understood how to use the term "navigable waters" and "waters of the United States" when those terms were intended. To be sure, Congress used the term "navigable waters,"—which the CWA defines as "waters of the United States, including the territorial seas"[197]—12 times in Section 404 of the CWA alone.[198] "It is a well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words."[199] "Congress's explicit decision to use one word over another in drafting a statute is material. It is a decision that is imbued with legal significance and should not be presumed to be random or devoid of meaning."[200] If Congress had wished to limit the EPA Administrator's 404(c) authority to "navigable waters," or "WOTUS," it would have used those terms. Congress did not use those terms, but instead, used "any defined area."[201]

**Second**, looking to the language in 404(a), the State argues that "the surrounding text shows that the phrase 'defined area as a disposal site' must mean a specific 'navigable water' (or 'waters of the United States)."[202] But the State conflates the Corps' authority to issue permits authorizing the discharge of dredged or fill material into navigable waters at specified disposal sites under 404(a) with Congress's distinct and broader grant of authority

---

[197] 33 U.S.C. § 1362(7).

[198] *Id.* § 1344.

[199] *S.E.C. v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003) (citing *Russello v. United States,* 464 U.S. 16, 23 (1983)).

[200] *Id.* (internal citations omitted).

[201] 33 U.S.C. § 1344(c).

[202] Dkt. 167 at 27-28.

to the EPA under 404(c) to prohibit, deny, or restrict the specification of "*any defined area*" as a disposal site.[203]

**Third**, contrary to the State's contention, the defined areas of prohibition and restriction in the Final Decision *are limited* to WOTUS.[204] The State alleges that EPA engaged in "sleight of hand,"[205] in identifying restricted WOTUS in this way, but there is nothing in 404(c)'s broad grant of discretion to EPA that prohibits the agency from identifying and specifying defined areas in this manner.[206] To the extent the State asserts that EPA's methodology is a departure from prior 404(c) Final Determinations,[207] the State is mistaken.[208]

---

[203] *Compare* 33 U.S.C. § 1344(a) *with* § 1344(c).

[204] *See* EPA_AR_0083167 (The Final Determination "prohibits the specification of **waters of the United States** within the Defined Area for Prohibition, as identified in Section 5.1.1, as disposal sites for the discharge of dredged or fill material for the construction and routine operation of the 2020 Mine Plan.") (emphasis added); EPA_AR_0083172 (The Final Determination "restricts the use of **waters of the United States** within the Defined Area for Restriction, as identified in Section 5.2.1, for specification as disposal sites for the discharge of dredged or fill material…") (emphasis added); EPA_AR_0083656 (explaining the defined areas for prohibition and restriction identify the geographic boundaries within which the prohibition and restriction apply to WOTUS).

[205] Dkt. 167 at 29.

[206] 33 U.S.C. § 1344(c); *see* EPA_AR_0083657 ("EPA is 'free to consider—or not—the suitability of invoking its Section 404(c) authority with respect to any given geographical area.").

[207] Dkt. 167 at 30-31.

[208] *See, e.g.*, Final Determination of the U.S. EPA's Assistant Administrator for Water, Concerning Wetlands Owned by the Russo Development Corp. in Carlstadt, NJ. https://www.epa.gov/sites/default/files/2015-05/documents/russofd.pdf, at 2-3, 20 (prohibiting the designation of entire 57.5-acre tract containing wetlands as discharge site); Final Determination of the U.S. EPA's Assistant Administrator for Water Concerning Three Wetland Properties For which Rockplowing is Proposed in East Everglades, Dade County,

---

**E. Preliminary Jurisdictional Determinations are Not Appealable and PLP Has Waived Any Challenge to the Corps' and EPA's Jurisdiction.**

Both PLP and the State argue that the Final Determination considered impacts to waters and wetlands in the project area that are not actually WOTUS over which the EPA or Corps has regulatory jurisdiction.[209] Specifically, Plaintiffs contend that EPA improperly relied on the Corps' preliminary jurisdictional determination ("JD") and erroneously assumed EPA had jurisdiction to prohibit the discharge of fill into wetlands and other waters in the project area that are not actually WOTUS in light of the Supreme Court's subsequent opinion in *Sackett v. EPA*.[210] Plaintiffs fault Federal Defendants for not issuing an approved JD formally identifying WOTUS subject to CWA jurisdiction.[211] Plaintiffs' arguments are legally and factually wrong. Legally, a preliminary JD does not constitute a final agency action and cannot be challenged in this appeal. Even if it were, PLP waived any challenge to the Corps' and EPA's jurisdiction when it accepted the preliminary JD. Factually, Plaintiffs misapprehend both who was responsible for requesting an approved JD—PLP was—and the process PLP's own contractor used to delineate wetlands for the preliminary JD that they now seek to undermine.

---

Florida, https://www.epa.gov/sites/default/files/2015-05/documents/remfd.pdf, at 1-2, 24 (restricting from designation as discharge sites entire 432-acre tract containing wetlands); *see also* 53 Fed. Reg. 30,093, 30,094 (Aug. 10, 1988) ("under the authority delegated to be me by the Administrator of the EPA, I restricted the designation of the Rem Beck and Senior Corp. sites as discharges sites for rockplowing.").

[209] Dkt. 205-1 at 60-65; Dkt. 167 at 32.

[210] 598 U.S. 651 (2023); Dkt. 205-1 at 63-65; Dkt. 167 at 33-34.

[211] Dkt. 205-1 at 63-66; Dkt. 167 at 34.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

### 1. Preliminary jurisdictional determinations are advisory and non-appealable.

Jurisdictional determinations are a tool used by the Corps to help implement Section 404 by specifying the geographic areas that are subject to regulation under the CWA.[212] "The Corps specifies whether particular property contains [WOTUS] by issuing 'jurisdictional determinations' (JDs) on a case-by-case basis."[213] "JDs come in two varieties: 'preliminary' and 'approved.' While preliminary JDs merely advise a property owner 'that there *may* be waters of the United States on a parcel,' approved JDs definitively 'stat[e] the presence or absence' of such waters."[214] Significantly, "preliminary JDs are advisory in nature and may not be appealed."[215] "Unlike preliminary JDs, approved JDs can be administratively appealed and are defined by regulation to 'constitute a Corps final agency action.'"[216] It is up to the project sponsor to determine which form of JD is most appropriate for a particular project and the Corps will only issue an approved JD if it receives a formal request for an approved JD from the project sponsor.[217]

---

[212] *See* EPA_AR_0272355 (Regulatory Guidance Letter No. 16-01); 33 C.F.R. § 331.2.

[213] *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 595 (2016) (citing 33 C.F.R. § 331.2).

[214] *Id.* (emphasis in original).

[215] 33 C.F.R. § 331.2; *see also* 33 C.F.R. § 331.5(b)(9) (identifying preliminary JDs as non-appealable actions); EPA_AR_0092741 (preliminary JD for Pebble Mine noting "[a] PJD is not appealable."); EPA_AR_0092748 (same).

[216] *Hawkes Co.*, 578 U.S. at 595 (citing 33 C.F.R. §§ 320.1(a)(6), 331.2); *Glynn Envtl. Coal., Inc. v. Sea Island Acquisition, LLC*, 146 F.4th 1080, 1083-84 (11th Cir. 2025).

[217] *See* EPA_AR_0272356 (Regulatory Guidance Letter No. 16-01 explaining "[t]he JD requestor…will determine what form of JD, if any is best for his/her particular circumstance based on all the relevant factors."); *id.* ("…the Corps will issue an AJD *upon receiving a request for a formal determination* regarding the jurisdictional status of aquatic resources on a parcel…") (emphasis added); EPA_AR_0092741 ("at any time you have the right to request and obtain an Approved Jurisdictional Determination (AJD), which can be appealed.").

## 2. The preliminary jurisdictional determination for the Pebble Project is based on PLP's own wetlands delineation.

Although Plaintiffs criticize Federal Defendants for what they contend is the preliminary JD's overinclusive identification of areas that *may* be WOTUS, this criticism is misplaced. The preliminary JD is based *entirely* on wetlands delineations and related analysis *performed by PLP's own contractors*. PLP contracted HDR Engineering "to prepare a Preliminary Determination Jurisdictional Report (PJD)," containing PLP's calculations of the jurisdictional waters and wetlands in the project area.[218] PLP initially submitted its analysis to the Corps in January 2018 and submitted revised PJD reports to the Corps in April and November 2019 to reflect updated estimates of jurisdictional WOTUS based on refinements in the project design, including an updated mine plan and transportation routes.[219]

PLP also sought and received a subsequent preliminary JD for the Diamond Point port site in June 2020.[220] PLP's own wetland scientists used the Corps' 1987 Wetlands Delineation Manual and the 2007 Alaska Regional Supplement to identify and delineate wetlands in the project area.[221] Significantly, PLP's contractors noted that the "[w]etland status assigned by investigators is based solely on criteria found in the 1987 Manual or the 2007 Alaska Regional Supplement, *not on subsequent court cases pertaining to surface water connections, referred to as jurisdictional wetlands*."[222] Each time the Corps issued a

---

[218] EPA_AR_0130003.

[219] EPA_AR_0129997-130004.

[220] EPA_AR_0092748-52.

[221] EPA_AR_0130010-11.

[222] EPA_AR_0130019 (emphasis added).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

43

preliminary JD, it accepted PLP's own calculations of WOTUS (including wetlands) in the project area.[223]

### 3. The preliminary jurisdictional determination challenged by Plaintiffs is not a final agency action subject to judicial review.

PLP's failure to request an approved JD is fatal to Plaintiffs' claims challenging the EPA's jurisdiction over waters and wetlands in the project area. Consistent with the CWA regulations,[224] the preliminary JD issued to PLP states that "[a] PJD is not appealable."[225] If Plaintiffs wished to challenge the Federal Defendants' jurisdiction over waters and wetlands in the project area, it was incumbent on PLP to request an approved JD. PLP never did so.[226] Because the wetlands determination contained in the preliminary JD is not an appealable final agency action, that decision is not subject to judicial review and the Court does not have jurisdiction over these claims.[227]

---

[223] *See* EPA_AR_0130028 (HDR PJD Report concluding "in total, 8,691.6 acres, or 26 percent of the study area is preliminarily determined to be waters of the U.S., including wetlands, and is assumed to be subject to USACE jurisdiction."); EPA_AR_0092741 (preliminary JD indicating study areas contain 8,691 acres of WOTUS under Corps jurisdiction).

[224] *See supra* Part IV.E.1; 33 C.F.R. § 331.2 ("[p]reliminary JDs are advisory in nature and may not be appealed.").

[225] EPA_AR_0092741.

[226] Even if PLP had requested an approved JD, PLP would still need to appeal that determination through the Corps' administrative appeals process prior to challenging that decision in federal court. *See* 33 C.F.R. Part 331. As such, PLP has also failed to exhaust its administrative remedies. *See Darby v. Cisneros*, 509 U.S. 137, 146 (1993) (holding a party must exhaust all administrative remedies prescribed by statute or agency rule before seeking judicial review of an agency action under the APA).

[227] *See Bennett v. Spear*, 520 U.S. 154, 175 (1997) ("The APA, by its terms, provides a right to judicial review of all 'final agency action for which there is no other adequate remedy in a court…'") (quoting 5 U.S.C. § 704)); *Darby*, 509 U.S. at 144 ("[T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury…").

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

44

## 4. By accepting the preliminary jurisdictional determination, PLP waived any challenge to the Corps' and EPA's CWA jurisdiction.

Not only is the preliminary JD non-appealable, but PLP also waived any challenge to the jurisdictional waters identified in the preliminary JD when PLP accepted and affirmatively used the preliminary JD as the basis for its 404 permit application. The explicit terms of the preliminary JD explain that accepting a preliminary JD "constitutes agreement that all wetlands and other water bodies on the site affected in any way by that activity are jurisdictional waters of the United States, and *precludes any challenge to such jurisdiction* in any administrative or judicial compliance enforcement action, or in any administrative appeal *or in any Federal court*."[228] PLP's representative signed each version of the preliminary JD, and PLP's 404 permit application materials make clear that it relied on the preliminary JD to support its application.[229] By accepting the preliminary JD, PLP explicitly waived its right to challenge the jurisdictional WOTUS identified in the preliminary JD in any subsequent administrative or judicial proceeding.[230]

---

[228] EPA_AR_0088969; EPA_AR_0092752 (emphasis added).

[229] *See* EPA_AR_0089612 (PLP's Compensatory Mitigation Plan listing Preliminary Jurisdictional Determination and Revised Preliminary Jurisdictional Determination as supporting documentation for 404 permit); EPA_AR_0092743, 0092747, 0092752 (each containing the signature of James Fueg from PLP accepting the preliminary JDs).

[230] *See Glynn Envtl. Coal.*, 146 F.4th at 1085-88 (exploring the application of the waiver language contained in a preliminary JD); *Albert v. Joralemon*, 271 F.2d 236, 240 (9th Cir. 1959) ("waiver is a voluntary and intentional relinquishment of a known right or such conduct as warrants an inference of the relinquishment of such right.") (citation omitted).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

45

5. **PLP is responsible for obtaining an approved jurisdictional determination, and PLP's perceived shortcomings in its own wetlands delineation is not a basis for reversing the Final Determination.**

To the extent that PLP now takes issue with the wetlands delineation performed by its own contractor, it only has itself to blame.[231] Notably, PLP's contractors did *not* use the "significant nexus" test rejected by the majority in *Sackett*.[232]

Ironically, the State faults EPA for not issuing an approved JD and misleadingly suggests that none was issued because the EPA purposefully wanted to keep "itself in the dark because it knew its regulatory definition of WOTUS could not withstand judicial scrutiny."[233] The State fundamentally misunderstands the process for requesting and issuing JDs. ***First***, it is the Corps—not EPA—that issues JDs. Contrary to the State's suggestion, the EPA did not decline to issue a JD; JDs are, by law, under the purview of another agency. ***Second***, the reason that no approved JD was issued by the Corps is because PLP—the project sponsor—never requested one at any point during the multi-year permitting process. Indeed, PLP requested several revisions to its preliminary JD, but never sought an approved JD.[234]

## V. EPA LAWFULLY EXERCISED ITS 404(C) AUTHORITY

## A. Section 404(c) Does Not Violate the Nondelegation Doctrine.

Iliamna Natives, Ltd. and Alaska Peninsula Corporation (collectively "INL") argue that 404(c) violates the nondelegation doctrine due to a supposed lack of (1) a guiding policy,

---

[231] *See supra* Part IV.E.2.

[232] EPA_AR_0130019 (noting wetland status assigned by investigators based on Corps wetlands manuals and Alaska regional supplement and not based on court decisions pertaining to surface water connections).

[233] Dkt. 167 at 29.

[234] EPA_AR_0130003.

and (2) boundaries on when EPA may exercise its authority.[235] The text, structure, and purpose of the CWA and 404(c) make clear that INL is wrong on both fronts.

The U.S. Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."[236] Still, Congress can give agencies discretion to implement and enforce the laws,[237] if Congress set out a guiding "intelligible principle."[238] Intelligible principles exist in many statutes giving agencies significant discretion,[239] including to set air quality standards "requisite to protect public health,"[240] to exercise licensing power for the "public interest, convenience, or necessity,"[241] and to set "just and reasonable rates."[242] A delegation is unconstitutional *only* when Congress fails to provide either a "general policy" that the agency must pursue or "boundaries [to the] delegated authority."[243] Neither is the case here.

---

[235] Dkt. 169 at 24-26, 31.

[236] U.S. CONST. art. I, § 1.

[237] *FCC v. Consumers' Research*, 145 S. Ct. 2482, 2496-97 (2025) (citations omitted).

[238] *Id.* at 2506 (quoting *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

[239] *Id.* at 2503.

[240] *Whitman*, 531 U.S. at 473.

[241] *Nat'l Broadcasting Co., Inc. v. United States*, 319 U.S. 190, 215 (1943).

[242] *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 600 (1944).

[243] *FCC*, 145 S. Ct. at 2497 (citations omitted).

### 1. Congress provided specific and objective standards to govern EPA's 404(c) authority.

"[A] nondelegation inquiry always begins (and often almost ends) with statutory interpretation."[244] Statutes should be read to comport with the Constitution, if possible.[245] Challenged statutory phrases are considered alongside their context, purpose, and history.[246]

The purpose of the CWA is to restore and maintain the Nation's waters.[247] So Congress generally, but not entirely, prohibited the discharge of pollutants.[248] But under 404(a), the Secretary of the Army Corps of Engineers ("Secretary") can issue permits for the discharge of dredged or fill materials into navigable waters at "specified disposal sites."[249] And under 404(c), the EPA Administrator may prohibit or restrict the specification of a defined area for disposal.[250] But only after notice and comment and a finding that the discharge will have "an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas."[251]

And the CWA sets forth a constellation of specific factors that guide the Corps' and EPA's consideration of whether a specified disposal site is suitable. Under 404(b)(1) the Corps specifies sites for disposal by applying guidelines that the EPA, along with the Corps,

---

[244] *Gundy v. United States*, 588 U.S. 128, 135 (2019).

[245] *FCC*, 145 S. Ct. at 2507.

[246] *See Gundy*, 588 U.S. at 136 (examining text, context, purpose, and history); *see also FCC*, 145 S. Ct. at 2503.

[247] 33 U.S.C. § 1251.

[248] *Id.* §§ 1311, 1344.

[249] *Id.* § 1344(a).

[250] *Id.* § 1344(c).

[251] *Id.*

develops.[252] That development *requires* applying criteria comparable to those for developing ocean discharge guidelines.[253] Those seven specific criteria require considering, for example, "the persistence and permanence of the effects of disposal of pollutants."[254] So Congress plainly intended that the EPA make "unacceptable adverse effects" assessments and findings by considering these same guidelines and criteria.[255] Legislative history also supports this interpretation.[256]

EPA's regulations direct that "[i]n evaluating the unacceptability of [adverse] impacts, consideration should be given to the relevant portions of the Section 404(b)(1) guidelines."[257] And the 404(c) regulations similarly provide that "one of the basic functions of 404(c) is to police the application of 404(b)(1) guidelines. Therefore, those portions of

---

[252] *Id.* § 1344(b)(1).

[253] *Id.*

[254] *Id.* § 1343(c).

[255] *Id.*; *see also Mingo Logan*, 714 F.3d at 612 ("Congress granted EPA a broad environmental 'backstop' authority over the Secretary's discharge site selection in subsection 404(c)...."); *James City Cty.*, 12 F.3d at 1336 (discussing conditions under which EPA should exercise 404(c) authority). The EPA considered the 404(b) guidelines to reach the Final Decision. *See* EPA_AR_0082962.

[256] *See* Conference Report and Debates *reprinted in* 1 Legislative History of the Water Pollution Control Act Amendments of 1972, at 177 (specifically mentioning, among other resources, "fishery areas" as a focus of 404(c)).

[257] 40 C.F.R. § 231.2. An entire subchapter of the 404(b) guidelines is devoted to describing actions that can minimize "adverse effects." 40 C.F.R pt. 230, subpt. H. *See also* 18 Cong. Rec. 33,699 (1972) *reprinted in* 1 Legislative History of the Water Pollution Control Act Amendments of 1972, at 177 (explaining that the EPA should "determine whether or not a site to be used for the disposal of dredged spoil is acceptable when judged against the criteria established for fresh and ocean waters similar to that which is required under Section 403"); *id.* ("[T]he Administrator must determine that the material to be disposed of will not adversely affect municipal water supplies, shellfish beds and fishery areas, . . . wildlife or recreational areas in the specified site. Should the Administrator so determine, no permit may issue.").

---

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

49

the guidelines relating to alternative sites may be considered in evaluating the unacceptability of the environmental impact."[258]

Against this statutory and regulatory backdrop, the Court can evaluate whether Congress provided an intelligible principle through a guiding policy and boundaries to inform the EPA's exercise of its 404(c) authority.[259] As explained below, the answer is yes.

### 2. Congress established guiding policies for EPA's 404(c) authority.

Congress established policies, in the CWA and in Section 404, to guide EPA's exercise of its 404(c) authority. INL mischaracterizes this authority, arguing that EPA "retains unfettered discretion to consider economic, moral or any other consideration he might please."[260] INL is mistaken.

Congress provided far more than a "general" policy for the EPA to enforce in 404(c). To start, EPA's exercise of its 404(c) authority must conform generally with the explicit policy and goals of the CWA.[261] EPA's discretion is specifically guided by whether a discharge would have an unacceptable adverse effect on recreational areas and particular environmental resources.[262] And EPA's determination is guided by the same considerations that guide the Corps' specification of disposal sites.[263]

The policies provided in Section 404 are easily distinguished from the lack of guidance in *A.L.A. Schechter Poultry Corporation v. United States*, where the Supreme Court struck down a law giving the President virtually unfettered discretion to make "codes

---

[258] 44 Fed. Reg. at 58,078.

[259] Dkt. 169 at 24-35.

[260] *Id.* at 33.

[261] 33 U.S.C. § 1251(a).

[262] *Id.* § 1344(c).

[263] *See* 33 U.S.C. §§ 1344(b), 1343(c); *supra* Part V.A.1.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

50

of fair competition" with few restrictions and no standards apart from very general and vague aims.[264] In contrast, the CWA provides extensive guidance for EPA's 404(c) authority, which it has exercised for over four decades.[265] In short, the EPA's authority to restrict or prohibit certain discharges is far less expansive than the free-ranging authority in *A.L.A. Schechter Poultry*.[266]

### 3.     Congress imposed boundaries on the EPA's 404(c) authority.

In addition to guiding policies, Congress also imposed boundaries to constrain EPA's exercise of its 404(c) authority. The EPA can only exercise its authority after a required finding that a discharge will have an unacceptable adverse effect on recreational areas or aquatic resources.[267]

The requirement to find unacceptable adverse effects is one boundary. Any finding requires application of the standards and guidance that Congress provided.[268] Further, EPA can only make a finding after public input through notice and comment.[269] In stark contrast, the Supreme Court in *Panama Refining Company v. Ryan* struck down a statute granting the President unconditional power to bar the transportation of petroleum products without making any factual determinations or findings.[270] Unlike the President's unchecked power, EPA may only exercise its 404(c) authority after making an unacceptable adverse effects determination under specific conditions outlined in the CWA.[271]

---

[264] 295 U.S. 495, 541-42 (1935).

[265] *See supra* Part II and Part V.A.1.

[266] 295 U.S. at 541-42.

[267] 33 U.S.C. § 1344(c).

[268] *See supra* Part V.A.1-2.

[269] 33 U.S.C. § 1344(c).

[270] 293 U.S. 388, 415 (1935).

[271] 33 U.S.C. § 1344(c).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

51

Further, the word "unacceptable" in 404(c) imposes a clear boundary: it creates a binary universe and sets a meaningful floor. As EPA noted in the preamble to the 404(c) regulations, "the term 'unacceptable'… refers to the significance of the adverse effect—e.g. is it a large impact and is it one that the aquatic and wetland ecosystem cannot afford."[272] In *Consumers' Research,* the Supreme Court determined that the word "sufficient" set a floor and a ceiling, constraining the agency's discretion.[273] There is no persuasive argument that the word "sufficient," found to be a valid and constitutional standard, provides more meaningful guidance or a clearer boundary than does the word "unacceptable," at issue here.[274]

Relying on dicta from the Ninth Circuit's opinion in *Trout Unlimited v. Pirzadeh*,[275] INL argues that 404(c) unconstitutionally provides unfettered discretion to the EPA Administrator. INL is mistaken. In *Pirzadeh*, the Ninth Circuit's use of "unfettered discretion" referred to the EPA's discretion not to undertake or complete a 404(c) action.[276] The Ninth Circuit did *not* hold that the EPA can limit or prohibit discharges based on subjective whim. Rather, the EPA's 404(c) discretion "involve[s] balancing a number of considerations, including availability and allocation of agency resources, the predicted outcome of any [investigation], and agency policies and priorities."[277]

---

[272] 44 Fed. Reg. at 58,078; *see also supra* Part V.A.1 (legislative history supporting EPA's approach).

[273] *FCC*, 145 S. Ct. at 2502.

[274] *Id.* at 2501-04.

[275] 1 F.4th at 753; Dkt. 169 at 24-32.

[276] *Trout Unlimited*, 1 F.4th at 753.

[277] *Id.* at 752-53 (quoting *City and County of San Francisco v. U.S. Dep't of Transp.*, 796 F.3d 993, 1002 (9th Cir. 2015) (alterations in original)).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

Because Congress established policies and boundaries to guide the EPA's exercise of its 404(c) authority, INL's nondelegation claim fails as a matter of law.

## B.    The Major Questions Doctrine is Inapplicable and Does Not Preclude the Final Determination.

The State contends that EPA's exercise of its 404(c) authority presents a "major question" that demands additional congressional authorization.[278] Specifically, the State argues that the major questions doctrine is implicated because the size and scope of the Final Determination is large and because EPA's interpretation of its authority is without limit.[279] PLP similarly argues that the EPA's exercise of "sweeping authority…without regard to economic consequences, turns Section 404(c) into an unheralded superintending authority."[280] Plaintiffs misunderstand both the power delegated to EPA under 404(c) and the major questions doctrine's applicability.

In extraordinary cases, authority asserted by an agency requires "clear congressional authorization" and will not be read into an ambiguous statute.[281] The major question doctrine applies when an agency: (1) claims to discover "unheralded power" representing a transformative expansion of its regulatory authority in the vague language of a long-extant statute, *and* (2) does so on a matter of "vast economic and political significance."[282] When both of these conditions are met, the acting agency must demonstrate that the power it claims is clearly authorized.[283]

---

[278] Dkt 167 at 22-23.

[279] *Id.*

[280] Dkt. 205-1 at 15.

[281] *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (citations omitted).

[282] *Id*. at 724; *Nebraska v. Su*, 121 F.4th 1, 14 (9th Cir. 2024) (citation omitted).

[283] *West Virginia*, 597 U.S. at 723.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

53

Here, the major questions doctrine does not apply because (1) the EPA authority to restrict or prohibit sites for disposal is unambiguous and expressly granted to the EPA Administrator by Congress, (2) far from being an "unheralded power," the EPA has exercised its 404(c) authority on numerous occasions, and (3) because PLP's mine proposal is of questionable economic viability and does not involve a matter of vast economic and political significance.[284]

### 1. The plain language of the CWA clearly authorizes Final Determination.

The major questions doctrine does not apply when an agency unambiguously acts within the bounds of its delegated statutory authority.[285] Section 404(c) unambiguously directs the EPA Administrator to "prohibit" or "restrict" the specification of "any defined area" as a disposal site after determining unacceptable adverse impacts would result.[286] This is precisely what occurred here.[287] Because EPA had clear authority to issue the Final Determination there is no ambiguity in this statutory directive and the major questions doctrine does not apply.

---

[284] *Compare* the Supreme Court's recent decision in *Learning Res., Inc. v. Trump*, No. 24–1287, 607 U.S. _ (U.S. Feb. 20, 2026) (principal opinion of Roberts, C.J.), where the President's asserted authority to "unilaterally impose unbounded tariffs" on all trading partners was deemed to fall within the major questions doctrine because it was undisputed that the economic effect of the tariffs ranged between \$4 trillion and \$19 trillion. *Id.* slip op. at 9-13.

[285] In extraordinary cases the court is reluctant to read a claimed delegation into *ambiguous* statutory text because of separation of powers principles and a practical understanding of legislative intent. *West Virginia*, 597 U.S. at 723.

[286] 33 U.S.C. § 1344(c); *see also Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 274 (2009) (citing § 1344(c)) ("[T]he [CWA] gives the EPA authority to 'prohibit' any decision by the Corps to issue a permit for a particular disposal site.").

[287] EPA_AR_0082957.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

54

## 2. The Final Determination was not novel or unprecedented.

In addition to operating pursuant to a clear statutory directive, EPA's exercise of its 404(c) authority is neither novel nor unprecedented. Plaintiffs contend that there is no precedent for EPA's exercise of its 404(c) authority here because the Final Determination applies to a larger geographic area than prior 404(c) determinations.[288] Again, Plaintiffs are mistaken.

In prior cases invoking the major questions doctrine, agencies claimed power that transformed their authority, aligning with the common-sense maxim that Congress does not "hide elephants in mouseholes."[289] The Supreme Court has struck down agency actions seeking to make "basic and fundamental changes to [a] scheme designed by Congress" when an agency claims sweeping authority through power to "modify."[290]

Here, EPA's exercise of its 404(c) authority is not in any respect a "transformative expansion" of its regulatory authority under "a long-extant statute."[291] Although used judiciously and sparingly, EPA has previously exercised its 404(c) authority on thirteen occasions to block unacceptable adverse effects from mines, waste storage projects,

---

[288] Dkt. 167 at 23; *see also* Dkt. 205-1 at 15 (PLP contends the Final Determination turns "section 404(c) into an unheralded superintending authority.").

[289] *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006).

[290] *See Biden v. Nebraska*, 600 U.S. 477, 485, 494-96 (2023) (holding Secretary of Education's power to "modify" statutes applicable to student loans did not permit creation of a broad sweeping loan forgiveness plan); *MCI Telecomms. Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218, 220, 234 (1994) (striking down FCC's attempt to make a statutory tariff filing requirement optional through authority to "modify"); *see also Gonzales*, 546 U.S. at 262-63 (holding that U.S. Attorney General could not ban writing prescriptions for physician assisted suicide under authority to deregister individual physicians from a statute aimed at drug trafficking).

[291] *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

impoundments, commercial development, and more.[292] And Congress gave the EPA authority to "prohibit," "restrict," and "deny."[293] These words are not mouseholes. They give EPA a meaningful and important role in carrying out the CWA.[294] In this instance, EPA did no more than what the CWA's text plainly allows. It did not act based on unheralded power.

Moreover, Plaintiffs' contention that the EPA's decision is unprecedented because of its economic and geographic scope is meritless. As a factual matter, EPA's Final Determination here is well within the geographic scale of previous 404(c) determinations.[295] And in any event, any limit or prohibition is necessarily drawn in proportion to the proposed project itself.[296] It is nonsensical that Congress intended to confer authority to EPA to limit or prohibit disposal sites, but only for small projects. Adverse effects covering large geographic areas would certainly qualify and are more likely to warrant protection than smaller ones.[297] After all, EPA's 404(c) authority to prohibit and restrict discharges applies to "any defined area," not only small areas.

---

[292] *See* Chronology of CWA Section 404(c) Actions *supra* n.31.

[293] 33 U.S.C. § 1344(c).

[294] *Id.* §§ 1251, 1344(c).

[295] The Yazoo Pumps Final Determination found unacceptable adverse effects on at least 67,000 acres of wetlands and other WOTUS and their associated wildlife and fisheries resources. U.S. Envtl. Prot. Agency, *Final Determination of the U.S. Environmental Protection Agency's Assistant Administrator for Water Pursuant to Section 404(c) Of the Clean Water Act Concerning the Proposed Yazoo Backwater Area Pumps Project, Issaquena County, Mississippi* (2008) at 45. And The Mingo Logan project's scale was also on par with the Pebble Final Determination. The project would have disturbed approximately 2,278 acres (about 3.5 square miles) and buried approximately 7.48 miles of streams. *See* Spruce No. 1 Mine Final Determination, *supra* n.70 at 6.

[296] EPA_AR_0082957-61.

[297] "Unacceptable" refers "to the significance of the adverse effect—e.g. is it a large impact and is it one that the aquatic and wetland ecosystem cannot afford." 44 Fed. Reg. at 58,078.

---

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

56

### 3. This is not a case of vast economic and political significance.

To trigger the major questions doctrine, an agency's assertion of "unheralded power" must also be of "vast economic and political significance" and "extraordinary."[298] The State argues that the decision eliminated billions of dollars of economic activity and revenue for Alaska, thousands of jobs, and billions of pounds of precious metals.[299] PLP contends that the decision "locks away" hundreds of billions of dollars in minerals.[300] But the State and PLP cite speculative and disputed numbers.

There are "significant uncertainties" associated with PLP's proposed mine due to financial viability concerns.[301] EPA determined that the foregone economic activity the State and PLP claim is "likely overstated."[302] It is uncertain "that the anticipated economic activity [associated with the proposed mine] will occur at all."[303] For instance, more than two-fifths of the copper-equivalent tonnage estimated to be available in the Pebble deposit are "inferred resources" which may not materialize, resulting in the near erasure of the mine's post-tax

---

[298] *Su*, 121 F.4th at 14.

[299] Dkt. 167 at 22.

[300] Dkt. 205-1 at 15.

[301] EPA_AR_0141318. The EPA also concluded that uncertainty in modeling—like difficulty estimating the national economic benefit to commercial fisheries and recreational use and relying on sources that that tend to underestimate the extent of aquatic resources in the area—made it more likely that the benefits associated with the Final Determination were underestimated. EPA_AR_0141315, 0141317.

[302] EPA_AR_0141321.

[303] EPA_AR_0141303. *See also*, *supra* n.166 (citing to administrative record reports and comments from outside experts showing PLP's 2020 Mine Plan may in fact have no NPV at all).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

57

NPV.[304] PLP's economic assessment may overestimate foregone economic activity related to its 2020 Mine Plan by as much as 50 percent.[305]

Additionally, the State and PLP wildly overstate the size and certainty of the Final Determination's impact. Plaintiffs argue that all potential economic benefits from exploiting the Pebble deposit are lost because of EPA's decision.[306] But the decision did not prohibit mining the Pebble deposit. It prohibited and restricted specification of waters of the United States as disposal sites for mines with discharges that would produce specific effects on aquatic resources and streamflow.[307] Plaintiffs' claims that none of the economic benefits from the Pebble deposit can ever be realized are exaggerated and untrue.

There is no reliable evidence that this case presents a question of vast economic and political significance.[308] For the reasons above, the major questions doctrine does not apply.

## C. Section 404(c) Accords with the Cooperative Federalism Established by the CWA and Other Environmental Laws.

The State contends that the Final Determination is contrary to notions of federalism, and that "exceedingly clear language" is needed in 404(c) to "significantly alter the balance between state and federal power."[309] The State is wrong. The federal government's authority

---

[304] EPA_AR_0141319.

[305] EPA_AR_0141318.

[306] Dkt. 167 at 22; Dkt. 205-1 at 15.

[307] EPA_AR_0082957-58; *see supra* Part IV.A.2.

[308] The State and PLP do not argue that the major questions doctrine is triggered because this case presents a question of political significance. *See* Dkt. 167 at 22-23; Dkt. 205-1 at 15.

[309] Dkt. 167 at 23.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

58

to regulate navigable waters is unmistakable.[310] And in any case, the language of 404(c) and the CWA is exceedingly clear.[311]

To achieve the CWA's goals, Congress "enacted a scheme of cooperative federalism that gives states an important role in regulating water quality."[312] EPA's authority to limit or prohibit the use of specified waters for disposal sites does not upset the traditional balance of power.[313] The well-accepted cooperative federalism embedded in the CWA assigns the federal government responsibility to set floors for pollution regulation in navigable waters, while states are free to impose more stringent regulations.[314] Indeed, it is the State that seeks to alter this traditional balance of power, arguing that it should be allowed to disregard federal environmental laws like the CWA.[315] Cooperative federalism does not mean that Alaska gets to pick and choose which federal laws it wants to comply with.

## D. The Final Determination Is Not Prohibited Under ANILCA.

*Amicus curiae* Alaska Industrial Development and Export Authority ("AIDEA") argues that the Final Determination violates the Alaska National Interest Lands Conservation

---

[310] *See, e.g.*, *Cal. State Water Res. Control Bd. v. FERC*, 43 F.4th 920, 923-24 (9th Cir. 2022) (discussing Congress' enactment of the CWA to prevent, reduce, and eliminate pollution).

[311] *See supra* Part II, Part V.A.1, and Part V.B.1.

[312] *Cal. State Water Res. Control Bd.*, 43 F.4th at 923-24 (citation omitted).

[313] 33 U.S.C. § 1344(c).

[314] *See Cal. State Water Res. Control Bd.*, 43 F.4th at 924 ("States may adopt water quality standards that are more stringent than federal law requires…."). This cooperative federalism structure is common among federal environmental laws. *See*, *e.g.*, *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289 (1981) ("[T]he Surface Mining Act establishes a program of cooperative federalism…."); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 190 (3d Cir. 2013) (discussing Clean Air Act's cooperative federalism structure).

[315] *See* Dkt. 167 at 23-27 (arguing that the State has regulatory power to use the lands in question "when it deem[s] appropriate" for mining purposes).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

59

Act ("ANILCA") by creating a land "withdrawal" of more than 5,000 acres.[316] But the Final Determination is not a withdrawal. Nor does ANILCA give the State unbridled authority to exploit the Pebble deposit without regard for federal laws of general application.

### 1. ANILCA withdrawals exempt covered land from general land laws.

Congress passed ANILCA in 1980 to preserve certain lands and waters in Alaska containing "nationally significant natural, scenic, historic, archeological, geological, scientific, wilderness, cultural, recreational, and wildlife values."[317] Congress intended ANILCA to strike the appropriate balance between varied interests and obviate the need for designation of new conservation system units, national conservation areas, and national recreation areas.[318] Accordingly, ANILCA's so-called "no more" clause put teeth to this by restricting withdrawals of public lands exceeding 5,000 acres in Alaska.[319] Although ANILCA does not define the term "withdrawal,"[320] an EPA action restricting harmful discharges pursuant to the CWA is not a new conservation or recreation area withdrawal contemplated by ANILCA.

In the absence of a definition, courts "look to how other, related statutes define withdrawal" and to "the context in which the term is used in the statute at issue."[321] Though AIDEA fails to provide a definition of "withdrawal" for the "no more" clause, its brief supports (as does the law), that an appropriate definition is an action that "exempts covered

---

[316] Dkt. 207-1 at 23-25.

[317] 16 U.S.C. § 3101(a).

[318] *Id.* § 3101(d).

[319] *Id.* § 3213(a).

[320] *See id.* § 3102 (ANILCA definitions).

[321] *See Se. Conference v. Vilsack*, 684 F. Supp. 2d 135, 143 (D.D.C. 2010) (citations omitted).

land from the operation of laws that otherwise authorize the transfer of federal lands to the private domain for private use."[322]

This definition accords with the related Federal Land Policy and Management Act's ("FLPMA") definition.[323] Like ANILCA, FLPMA governs the management of certain federal lands.[324] FLPMA's statutory definition of withdrawal is:

> withholding [of] an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program.[325]

This has been interpreted to mean that a withdrawal exempts covered land from the operation of general land laws (which authorize and regulate the transfer of federal lands to the public domain).[326] The same approach should apply to the term withdrawal under ANILCA.

Such a definition also accords with the use of the terms withdrawal and withdraw elsewhere in ANILCA.[327] A provision of ANILCA on the "[e]ffect of prior withdrawals" indicates that withdrawals will not be "deemed available for selection, appropriation, or disposition except as expressly provided by [ANILCA]" and refers to "conservation system unit[s], national conservation area[s], national recreation area[s], or national forest addition[s]" as "withdrawals and reservations."[328] Another provision related to mining and

---

[322] *Se. Conference*, 684 F. Supp. 2d at 143; Dkt. 207-1 at 24.

[323] *See Se. Conference*, 684 F. Supp. 2d at 143-44 (holding same).

[324] *Id.* at 143.

[325] 43 U.S.C. § 1702(j).

[326] *Se. Conference*, 684 F. Supp. 2d at 143 (citations omitted); *see also Sagebrush Rebellion, Inc. v. Hodel*, 790 F.2d 760, 761 n.1 (9th Cir. 1986) (citing FLPMA's definition of withdrawal).

[327] *See Se. Conference*, 684 F. Supp. 2d at 143-44 (holding same).

[328] 16 U.S.C. § 3209.

mineral leasing indicates that "the Federal lands within units of the National Park System established or expanded by or pursuant to this Act are hereby *withdrawn* from all forms of appropriation or disposal under" general land laws.[329] In ANILCA, Congress made clear that withdrawn lands under the "no more" clause are exempt from operation of general land laws.[330]

### 2. The Final Determination is not a withdrawal under ANILCA.

AIDEA does not argue that the Final Determination exempts the defined area from the application of general land laws.[331] And AIDEA does not explain how the Final Determination creates a "de facto preserve[]."[332] Instead it incorrectly argues that "the EPA has deprived Alaska of almost all productive use of its land."[333] The Final Determination does not preclude the use of the defined area (including to derive economic benefits), nor does it even prevent mining in that area.[334] In choosing the land that contains the Pebble deposit, Alaska had far more than mining in mind: accessibility; possible future settlement; close proximity to Lake Iliamna; "high fisheries values;" and "superb recreational opportunities."[335] Alaska's rationale is borne out by the continued success of the Bristol Bay

---

[329] 16 U.S.C. § 410hh-5 (emphasis added); *see also* 16 U.S.C. § 3183(f) (emphasis added) ("[A]ll Federal land within the region (except that land conveyed by title IX . . . to the State of Alaska and Federal lands located within the boundaries of conservation system units) shall be *withdrawn* from all forms of appropriation under the public land laws.").

[330] *Se. Conference*, 684 F. Supp. 2d at 143.

[331] Dkt. 207-1 at 23-25.

[332] *Id.* at 25.

[333] *Id.*

[334] *See supra* Part IV.A.2 and Part V.B.3.

[335] *See infra* Part V.E.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

62

fishery for subsistence, commercial and sport fishing and hardly constitutes a deprivation of productive use the land, as AIDEA asserts.[336]

And the Final Determination certainly does not prevent the application of "laws that otherwise authorize the transfer of federal lands to the private domain for private use."[337] At most, EPA's 404(c) authority limits the Corps' ability to issue 404 permits to discharge dredged or fill material into WOTUS within areas specifically defined by EPA.[338] And the EPA did no more than that in the Final Determination.[339]

## E. Neither the Alaska Statehood Act nor the Cook Inlet Land Exchange Preclude State Lands from Application of Section 404(c) of the Clean Water Act.

PLP and the State argue that the CWA does not apply on State lands because the State's interest in mining the selected lands was purportedly known to all parties of the Cook Inlet Land Exchange ("Land Exchange"), and contend that the Final Determination forecloses mining the Pebble deposit.[340] According to Plaintiffs, the State's ability to extract mineral deposits is paramount on State land under the Land Exchange and the Alaska Statehood Act.[341] Plaintiffs also assert that EPA's exercise of its 404(c) authority requires

---

[336] Dkt. 207-1 at 25.

[337] *Se. Conference*, 684 F. Supp. 2d at 143.

[338] 33 U.S.C. § 1344(c).

[339] *See supra* Part IV. AIDEA argues that ANILCA reinforces Congressional intent to turn over Statehood Act land and its resource development to the State, without future federal government limitation. Dkt. 207-1 at 25. Far from that, ANILCA explicitly states that its purpose is accomplished by its provisions. *See* 16 U.S.C. § 3101(d). The Final Determination was not a withdrawal and thus did not disrupt the balance ANILCA sets. ANILCA therefore forbids the inference that AIDEA invites.

[340] Dkt. 167 at 24-25; Dkt. 205-1 at 18-20.

[341] Dkt. 167 at 24-25; Dkt. 205-1 at 16-20.

an implied repeal of the Statehood Act.[342] Plaintiffs' arguments rest on flawed premises and are incorrect.

*First*, Plaintiffs' attempt to rewrite history in claiming that the lands above the Pebble deposit were selected primarily for their mineral resources.[343] The Land Exchange's explicit purpose was to settle claims, consolidate land ownership, facilitate land management, and "create land ownership patterns which encourage settlement and development in appropriate areas."[344] The State's own publications show that Plaintiffs overstate the role mineral potential played in selection of the lands at issue. A *State* Public Draft Comment from selection explains that the State valued the land for its accessibility, "high value for possible future settlement," "superb recreational opportunities," and "high fisheries value."[345] When the State finally selected the lands, *its reasoning* highlighted "outstanding values in the area" like "fisheries, recreation potential, and access."[346] The *State* noted that the area "provide(s) key habitat for an important subsistence fishery, a multi-million-dollar commercial salmon fishery, and a sport fishery that is unequalled in quality anywhere in" Alaska.[347] And a *State* press release on the Land Exchange touts that the Iliamna Lake area is a very productive fishery with "high wildlife and recreational values."[348] The history is clear. The State selected the land for a host of reasons. Mineral potential was not paramount. The Final

---

[342] Dkt. 167 at 26-27; Dkt. 205-1 at 16.

[343] *See* Dkt. 167 at 24-25; Dkt. 205-1 at 18-19.

[344] Cook Inlet Land Exchange Act, Pub. L. No. 94-204, § 12(a), 89 Stat. 1150 (1976).

[345] EPA_AR_0272221, 0272228.

[346] EPA_AR_0272207.

[347] EPA_AR_0272206-07. These are the resources and values that the Bristol Bay Intervenors and the EPA now seek to protect. Dkt. 21 at 2-5, 9-13; Dkt. 215 at 31; *supra* Part I.

[348] EPA_AR_0272219.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

64

Determination does not deprive the State of the benefit of any bargain from the Land Exchange.

**Second**, the Final Determination does not foreclose mining. The EPA addressed *the discharge of mine waste* in certain waters that would have unacceptable adverse effects, not mining itself.[349] If a proposed mine does not impose unacceptably adverse effects, then the Final Determination would not apply.[350]

Undeterred, Plaintiffs argue that the federal government has no authority to regulate mining on State lands.[351] But neither the Statehood Act nor the Land Exchange preclude the CWA's application whenever it may affect activities on Land Exchange or Statehood Act lands.

The federal government's ability to regulate navigable waters was not curtailed by the Statehood Act. Instead, the Statehood Act incorporates the Submerged Lands Act of 1953 and provides that Alaska "shall have the same rights as do existing States" under that Act.[352] And in the Submerged Lands Act, the United States "retain[ed] all its navigational servitude and rights in and powers of regulation and control of… navigable waters for the constitutional purposes of commerce [and] navigation."[353] Therefore, Congress's Commerce Clause power to regulate navigable water limits the rights of the states under the Submerged Lands Act, including Alaska—which has not more, not less, but "the same

---

[349] *See supra* Parts IV.A.2 and V.B.3.

[350] *See supra* Part IV.A.2.

[351] *See* Dkt. 167 at 25 (arguing Alaska was given "regulatory powers" to use the land).

[352] Alaska Statehood Act, Pub. L. No. 85-508, § 6(m), 72 Stat. 339 (1958).

[353] Submerged Lands Act, Pub. L. No. 83-31, § 6, 67 Stat. 29, 32 (1953).

---

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

65

rights" as existing states.[354] Nothing in the text of either the Statehood Act or the Land Exchange supports the interpretation that conduct affecting navigable waters on State lands is exempt from generally applicable federal law.

The Land Exchange also does not exempt conduct on State-selected land from the CWA.[355] Those lands are "regarded for all purposes as if conveyed to the State under and pursuant to section 6 of the Alaska Statehood Act."[356] So the same Statehood Act analysis above applies.

Plaintiffs attempt to liken this case to *Shoshone-Bannock Tribes of Fort Hall Reservation v. United States Department of the Interior*, arguing that the generally applicable CWA impliedly repeals the more "specific" Statehood and Land Exchange mandates.[357] But that case actually demonstrates that the Statehood Act and the Land Exchange *do not* prevent CWA's application here. In *Shoshone-Bannock Tribes*, the Ninth Circuit held that the Bureau of Land Management's ("BLM") transfer of federal land in Idaho contravened restrictions on its disposal.[358] An act ("disposal act") specified that the

---

[354] Submerged Lands Act, § 6; Alaska Statehood Act, § 6(m). The Commerce Clause power "shall be paramount to… the rights of management, administration, leasing, use, and development of the lands and natural resources which are specifically recognized, confirmed, established, and vested in and assigned to the respective States and others by" the rights of the states under the Submerged Lands Act. Submerged Lands Act, § 6. Those rights include "the right and power to manage, administer, lease, develop, and use . . . natural resources all in accordance with applicable State law." *Id.* at § 3. So, the Submerged Land Act does not permit states to develop natural resources irrespective of federal Commerce Clause power.

[355] PLP argues that applying the CWA to the Land Exchange land "upset[s] settled expectations" by making mining "more onerous." Dkt. 205-1 at 18-19 (quoting *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 632 (1989)).

[356] Cook Inlet Land Exchange, § 12(d)(1), 89 Stat. 1150 (1976).

[357] 153 F.4th 748 (9th Cir. 2025); Dkt. 205-1 at 16-18; Dkt. 167 at 26.

[358] 153 F.4th at 756.

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

66

land "shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States *only*."[359] But the BLM attempted to dispose of the land under a general land-management law, which the court found improper.[360]

Here, the Statehood Act and the Land Exchange have no analogous limit to the disposal act from *Shoshone-Bannock Tribes* which precludes the application of the CWA. Instead, the Statehood Act and the Land Exchange provide for the retention of federal authority over navigable waters pursuant to Congress's Commerce Clause power by reference to the Submerged Lands Act.[361]

And in *Shoshone-Bannock Tribes*, the general act did not impliedly repeal the disposal act not least because the general act expressly repealed a long list of other statutes governing disposal.[362] Yet, the CWA need not impliedly repeal the Statehood Act or Land Exchange to apply evenly and fully to disposals in Alaska. The federal government's paramount Commerce Clause authority was expressly reserved.

Moreover, the logical outgrowths of the State's and PLP's arguments underscore that their reading of the Land Exchange and Statehood Act is wrong. Plaintiffs' arguments would exempt Alaska from federal regulation whenever it touches lands conferred under the Statehood Act and the Land Exchange—nearly 104 million acres of land,[363] an area the size

---

[359] *Id.* (emphasis in original).

[360] *Id.* at 754, 756 (quoting 43 U.S.C. §§ 1702(e), 1701(a)(10)).

[361] Pub. L. No. 83-31, § 6, 67 Stat. 29, 32 (1953).

[362] 153 F.4th at 754-55, 759-60 (citing Pub. L. No. 94-579 §§ 702-03, 90 Stat. 2743, 2787-91 (1976)).

[363] *Sturgeon v. Frost*, 577 U.S. 424, 429 (2016) ("The 1958 Alaska Statehood Act permitted Alaska to select 103 million acres of vacant, unappropriated, and unreserved federal land—just over a quarter of all land in Alaska—for state ownership.") (internal quotations omitted); Dkt. 167-1 at 11 (indicating that the State ultimately selected around 562,000 acres of land under the Land Exchange).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

of California[364]—and the State unilaterally determines that such regulation affects its ability to extract mineral resources. Such a scenario would defer all "regulatory power" to the State, allowing it to disregard any environmental statutes that it does not want to comply with, including the CWA, the Clean Air Act, the Endangered Species Act, the Resource Conservation and Recovery Act, the Marine Mammal Protection Act, and more.[365] Such a blanket exemption from federal law was not the intent behind the Statehood Act which gave Alaska "the same" rights as other states.[366] And it was not the intent of the Land Exchange which conferred lands "regarded for all purposes as if conveyed" under section 6 of the Alaska Statehood Act.[367] It is well accepted that Commerce Clause authority applies to projects (including mines) on State lands in Alaska.[368] Congress never intended to give

---

[364] *See* U.S. Census Bureau, *State Area Measurements and Internal Point Coordinates*, https://www.census.gov/geographies/reference-files/2010/geo/state-area.html (last visited Dec. 9, 2025).

[365] *See, e.g.* 42 U.S.C. § 7411 (requiring Administrator to create standards of performance for new stationary sources under the Clean Air Act); 16 U.S.C. § 1538 (prohibiting taking of endangered species of fish or wildlife under Endangered Species Act); 42 U.S.C. § 6907 (requiring Administrator to develop guidelines for solid waste management).

[366] Statehood Act, § 6(m), *supra* n.352.

[367] Cook Inlet Land Exchange, § 12(d)(1), *supra* n.356.

[368] *See, e.g.* Alaska Dep't of Envtl. Conservation, *Certificate of Reasonable Assurance* (July 2007), https://dnr.alaska.gov/mlw/mining/large-mines/fort-knox/pdf/adec/401scert.pdf (last visited Dec. 9, 2025) (certifying reasonable assurance that Fort Knox Mine's proposed activity and resultant discharge will comply with Section 401) Alaska Dep't of Natural Resources, Division of Mining, Land & Water, *Fort Knox Mine*, https://dnr.alaska.gov/mlw/mining/large-mines/fort-knox/ (last visited Dec. 9, 2025) (providing that the Fort Knox Mine is located on State and private lands); U.S. Envtl. Prot. Agency, *Northern Star (Pogo) LLC Penalized $600,000 for Hazardous Waste Management Violations*, https://www.epa.gov/newsreleases/northern-star-pogo-llc-penalized-600000-hazardous-waste-management-violations, Northern Star (Pogo) LLC penalized $600,000 for hazardous waste management, hazardous wastes from laboratory tests (last visited Dec. 9, 2025) (discussing that Pogo mine was cited for violating RCRA and agreed to pay a

---

Alaska alone, among all states, such broad authority over mining so as to relinquish Congress's Commerce Clause authority. This straightforward application of the CWA requires no implied repeal.

## VI. CONCLUSION

For the reasons articulated above, as well as those reasons in the Federal Defendants and Intervenors answering briefs, the Court should deny Plaintiffs' respective motions for summary judgment.

DATED this 3rd day of March, 2026.

By: *s/ James C. Feldman*
James C. Feldman (AK Bar No. 1702003)
Jeffrey M. Feldman (AK Bar No. 7605029)
SUMMIT LAW GROUP PLLC
*Attorneys for Bristol Bay Economic Development Corporation*

By: *s/ Peter Van Tuyn*
Peter Van Tuyn (AK Bar No. 8911086)
Karen Schmidt (AK Bar No. 1211113)
BESSENEY & VAN TUYN, L.L.C.
*Attorneys for Bristol Bay Native Corporation*

By: *s/ Joshua Baskin*
Megan R. Condon (AK Bar No. 1810096)
David Berger (*pro hac vice*)
Joshua Baskin (*pro hac vice*)
NATIVE AMERICAN RIGHTS FUND
WILSON SONSINI GOODRICH & ROSATI
*Attorneys for United Tribes of Bristol Bay and Commercial Fishermen for Bristol Bay*

---

$600,000 fine); Alaska Dep't of Natural Resources, Division of Mining, Land & Water, *Pogo Mine,* https://dnr.alaska.gov/mlw/mining/large-mines/pogo/ (last visited Dec. 9, 2025) (providing that the Pogo Gold Mine is located on State land).

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

69

By: _s/ Felipe Farley_        
Felipe Farley (AK Bar. No. 1904029)
BRISTOL BAY NATIVE ASSOCIATION
_Attorney for Bristol Bay Native Association_

By: _s/ Scott Kendall_        
Scott Kendall (AK Bar. No. 0405019)
CASHION GILMORE & LINDEMUTH
_Attorney for Bristol Bay Regional_
_Seafood Development Association, Inc._

_Northern Dynasty Minerals, Ltd. v. EPA_
Case No. 3:24-cv-00059-SLG

## <u>CERTIFICATE OF COMPLIANCE WITH WORD LIMITS</u>

I certify that this document contains 19,526 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits established by the Court's Orders at Docket 209 at 3 (granting Intervenors' request for proportionate overlength response (57%) to NDM/PLP's Opening Brief of 19,917 words (11,352 words)), *State of Alaska v. U.S. EPA*, Case No. 3:24-cv-00084-SLG, ECF No. 57 at 6 (D. Alaska Aug. 23, 2024) (granting motion to intervene and limiting Intervenors to 5,700 words to respond to State of Alaska's Opening Brief), and *Iliamna Natives Ltd. v. U.S. EPA*, Case No. 3:24-cv-00132-SLG, ECF No. 39 at 5 (D. Alaska Oct. 10, 2024) (granting motion to intervene and limiting Intervenors to 5,700 words to respond to INL's Opening Brief), for a total of 22,752 allowable words.


*s/ James C. Feldman*
James C. Feldman

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

**CERTIFICATE OF SERVICE**

I hereby certify that on March 3, 2026, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court of Alaska by using the CM/ECF system. Participants in this Case No. 3:24-cv-00059-SLG who are registered CM/ECF users will be served by the CM/ECF system.

SUMMIT LAW GROUP, PLLC

*s/ James C. Feldman*
James C. Feldman

*Northern Dynasty Minerals, Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG