Paul A. Werner (*pro hac vice*)
Steven P. Hollman (*pro hac vice*)
Abraham J. Shanedling (*pro hac vice*)
Hannah J. Wigger (*pro hac vice*)
Christopher L. Bauer (*pro hac vice*)
Alexandra Bustamante (*pro hac vice*)
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
2099 Pennsylvania Avenue, NW,
Suite 100
Washington, DC 20006-6801
 (202) 747-1900
pwerner@sheppard.com
shollman@sheppard.com
ashanedling@sheppard.com
hwigger@sheppard.com
cbauer@sheppard.com
abustamante@sheppard.com

Austin Williams (AK Bar No. 0911067)
TROUT UNLIMITED
600 Clipper Ship Court
Anchorage, AK 99515
 (907) 227-1590
Austin.Williams@tu.org

*Attorneys for Trout Unlimited*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTHERN DYNASTY MINERALS LTD. and PEBBLE LIMITED PARTNERSHIP*,* <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*, <br><br> Defendants, <br><br> and <br><br> BRISTOL BAY NATIVE ASSOCIATION, INC., *et al.*, <br><br> Intervenor-Defendants. | No. 3:24-cv-00059-SLG Consolidated Lead Case |

| | |
|---|---|
| STATE OF ALASKA, | No. 3:24-cv-00084-SLG |
|     Plaintiff, | Consolidated |
|     v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | |
|     Defendant, | |
|     and | |
| TROUT UNLIMITED, *et al.*, | |
|     Intervenor-Defendants. | |
| ILIAMNA NATIVES, LTD, *et al* | No. 3:24-cv-00132-SLG |
|     v. | Consolidated |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | |
|     Defendants, | |
|     and | |
| BRISTOL BAY ECONOMIC DEVELOPMENT CORPORATION, *et al.*, | |
|     Intervenor-Defendants. | |

## TROUT UNLIMITED'S RESPONSE TO PLAINTIFFS' OPENING BRIEFS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

LIST OF SHORT NAMES AND ACRONYMS ............................................ viii

INTRODUCTION ........................................................................................ 1

BACKGROUND ........................................................................................... 2

    A.    The Bristol Bay Watershed Is A Unique And Highly Productive Natural Resource. ................................................................................ 2

    B.    Four Major Mining Companies, Seven Presidential Administrations, Both Alaska's Current Senators, And The EPA Have Rejected Mining Operations In Bristol Bay – For Good Reason. .............................. 5

    C.    Following Years Of Litigation, The EPA Issued A Final Determination Barring Large-Scale Commercial Mining In Bristol Bay ............................................................................................... 9

STANDARD OF REVIEW ......................................................................... 12

ARGUMENT .............................................................................................. 14

  I.    THE EPA ACTED ENTIRELY WITHIN ITS SECTION 404(C) AUTHORITY. ....................................................................................... 14

    A.    The EPA Applied The Correct Legal Standards Because Its Findings Of Significant Loss And Damage Represent Unacceptable Adverse Effects. ........................................................................................... 14

    B.    The EPA's Authority To Exercise Its Section 404(c) Authority Is Not Limited To The Permitting Process. ............................................. 18

    C.    Plaintiffs' Other Legal Challenges Are Meritless. ....................... 19

  II.   THE EPA'S FINDINGS ABOUT THE PEBBLE MINE'S UNACCEPTABLE ADVERSE EFFECTS ARE SUPPORTED FULLY BY AN EXTENSIVE, SCIENCE-BACKED RECORD. ............................ 26

    A.    The EPA Properly Applied The Term "Fishery Area" To The Bristol Bay Waterways. ................................................................................ 26

    B.    The Evidence Supports The Significance Of The Area To The Local Fish Population. .............................................................................. 28

    C.    The EPA Fully Explained And Supported Its Findings Regarding The Pebble Mine's Threat To Local Salmon Populations. ................. 31

III. THE EPA PROPERLY WEIGHED THE DEVASTING ECONOMIC CONSEQUENCES OF THE PEBBLE MINE COMPARED TO ITS SPECULATIVE BENEFITS FOR A CANADIAN MINING OUTFIT. .............. 35

CONCLUSION ................................................................................................. 38

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
   594 U.S. 758 (2021) ................................................................................................ 24

*Alaska Eskimo Whaling Comm'n v. EPA*,
   791 F.3d 1088 (9th Cir. 2015) ............................................................................... 13

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
   462 U.S. 87 (1983) ................................................................................................. 18

*Bersani v. EPA*,
   674 F. Supp. 405 (N.D.N.Y. 1987), *aff'd,* 850 F.2d 36 (2d Cir. 1988) ...................... 16

*Buckhorn v. Hettinger*,
   800 F. App'x 542 (9th Cir. 2020) ........................................................................... 25

*Cal. Coastal Comm'n v. Granite Rock Co.*,
   480 U.S. 572 (1987) ............................................................................................... 20

*Ctr. for Biological Diversity v. Kempthorne*,
   588 F.3d 701 (9th Cir. 2009) .......................................................................... 25, 26

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ............................................................................................... 24

*FDA v. Wages & White Lion Invs., LLC*,
   604 U.S. 542 (2025) ............................................................................................... 13

*Gonzalez v. Herrera*,
   151 F.4th 1076 (9th Cir. 2025) .............................................................................. 15

*Havasupai Tribe v. Robertson*,
   943 F.2d 32 (9th Cir. 1991) ................................................................................... 26

*Iliamna Natives Ltd. v. U.S. EPA*,
   Case No. 3:24-cv-00132-SLG, ECF No. 39 (D. Alaska Oct. 10, 2024) ...................... 1

*James City Cnty. v. EPA*,
   12 F.3d 1330 (4th Cir. 1993) ................................................................................. 16

*laws. ASARCO Inc. v. Kadish*,
    490 U.S. 605 (1989) .................................................................................... 21

*League of Cal. Cities v. FCC*,
    118 F.4th 995 (9th Cir. 2024) .................................................................. 15

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) .................................................................................... 15

*Mayfield v. U.S. Dep't of Lab.*,
    117 F.4th 611 (5th Cir. 2024) ............................................................ 23, 24

*Metlakatla Indian Cmty. v. Egan*,
    369 U.S. 45 (1962) ...................................................................................... 21

*Michigan v. EPA*,
    576 U.S. 743 (2015) .................................................................................... 36

*Mingo Logan Coal Co. v. EPA*,
    714 F.3d 608 (D.C. Cir. 2013) .................................................................. 18

*Mingo Logan Coal Co. v. EPA*,
    829 F.3d 710 (D.C. Cir. 2016) .......................................................... 16, 19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*,
    463 U.S. 29 (1983) ...................................................................................... 38

*N. Plains Res. Council v. Fid. Expl. & Dev. Co.*,
    325 F.3d 1155 (9th Cir. 2003) .................................................................. 20

*Nat'l Ass'n for Surface Finishing v. EPA*,
    795 F.3d 1 (D.C. Cir. 2015) ...................................................................... 36

*Portland Gen. Elec. Co. v. Bonneville Power Admin.*,
    501 F.3d 1009 (9th Cir. 2007) .................................................................. 26

*Protect Our Communities Found. v. LaCounte*,
    939 F.3d 1029 (9th Cir. 2019) .................................................................. 25

*Rapanos v. United States*,
    547 U.S. 715 (2006) (Kennedy, J., concurring) ...................................... 20

*Rosauer v. Alaska Diesel Elec., Inc.*,
    771 F. Supp. 3d 1092 (D. Alaska 2025) .................................................. 25

*S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*,
No. 2:17-CV-3412, 2021 WL 3931908 (D.S.C. Sept. 2, 2021) .................................. 19

*Sackett v. E.P.A.*,
598 U.S. 651 (2023) ........................................................................................... 20

*SEC v. Coinbase, Inc.*,
726 F. Supp. 3d 260 (S.D.N.Y. 2024) .......................................................... 24

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*,
605 U.S. 168 (2025) ......................................................................... 13, 17, 18

*State of Alaska v. U.S. EPA*,
Case No. 3:24-cv-00084-SLG, ECF No. 57 (D. Alaska Aug. 23, 2024) ...................... 1

*State v. Lewis*,
559 P.2d 630 (Alaska 1977) ............................................................................ 21

*State v. Su*,
121 F.4th 1 (9th Cir. 2024) ...................................................................... 22, 23

*Trout Unlimited v. Pirzadeh*,
1 F.4th 738 (9th Cir. 2021) ................................................. 2, 9, 14, 15, 18

*Trs. for Alaska v. State*,
736 P.2d 324 (Alaska 1987), *cert denied*, 486 U.S. 1032 (1988) ............... 21

*West Virginia v. EPA*,
597 U.S. 697 (2022) ............................................................................ 22, 23, 24

*White Stallion Energy Ctr., LLC v. EPA*,
748 F.3d 1222 (D.C. Cir. 2014) (Kavanaugh, J. concurring in part) .......................... 36

Statutes

33 U.S.C. § 1254(a) & (b) ................................................................................ 8

33 U.S.C. § 1344 .............................................................................................. 27

33 U.S.C. § 1344(c) ...................................................................... 8, 14, 23, 25

33 U.S.C. § 1344(t) ......................................................................................... 25

33 U.S.C. § 1362(7) ......................................................................................... 20

1927 School Lands Act .................................................................................................. 21

Alaska Statehood Act, Pub. L. 85-508, 72 Stat. 339 (Jul. 7, 1958) ............................ 20, 21

Alaska Statute § 16.05.871(a) ...................................................................................... 28

Clean Water Act § 404 ............................................................................................. *passim*

Federal Regulations

40 C.F.R. §§ 231.1–231.8 (1979) ................................................................................. 8

40 C.F.R. § 231.2(e) ..................................................................................................... 15

44 Fed. Reg. 58,076 (Oct. 9, 1979) ............................................................................. 15

44 Fed. Reg. at 58,077 .................................................................................................. 18

44 Fed. Reg. at 58,078 (Oct. 9, 1979) ......................................................................... 15

79 Fed. Reg. 42,314 (July 21, 2014) ............................................................................ 8

87 Fed. Reg. 32,021 (May 26, 2022) ........................................................................... 9

88 Fed. Reg. 7,441 (Feb. 3, 2023) ............................................................................... 10

Other Authorities

ALASKA DEP'T. OF FISH & GAME, 2025 BRISTOL BAY SALMON SEASON
    SUMMARY (Sept. 24, 2025), *available at*
    https://www.adfg.alaska.gov/static/applications/dcfnewsrelease/1738640423.p
    df ........................................................................................................................ 4

Anthony Adragna & Annie Snider, *Trump Administration Rejects Massive Alaska
    Mining Project*, POLITICO (Nov. 25, 2020), *available at*
    https://www.politico.com/news/2020/11/25/trump-administration-alaska-
    mining-project-440626 ........................................................................................ 7

*Bristol Bay*, https://www.epa.gov/bristolbay .................................................................. 3

Avery Lill, *Pebble Mine Loses Funding From First Quantum Minerals*, ALASKA
    PUB. MEDIA (May 25, 2018), *available at*
    https://www.alaskapublic.org/2018/05/25/pebble-mine-loses-funding-from-
    first-quantum-minerals/ ...................................................................................... 6

Jen Finn, *Jewelers Pledge to Stop Pebble Mine*, NAT'L FISHERMAN (June 28, 2013), *available at* https://www.nationalfisherman.com/alaska/jewelers-pledge-to-stop-pebble-mine-2 ........................................................................... 6

Liz Ruskin, *Sen. Sullivan Says Pebble Can't Shake His Opposition To Mine*, ALASKA PUB. MEDIA (Oct. 7, 2020), *available at* https://alaskapublic.org/2020/10/07/sen-sullivan-says-pebble-cant-shake-his-opposition-to-mine-pledges-to-continue-to-monitor/ .................................................... 7

Press Release, Murkowski Statement on EPA's Final Determination for Pebble Mine (Jan. 31, 2023), *available at* https://www.murkowski.senate.gov/press/release/murkowski-statement-on-epas-final-determination-for-pebble-mine ..................................................... 7

SEC, Northern Dynasty Minerals Ltd. Schedule 13G (Feb. 25, 2011), *available at* https://www.sec.gov/Archives/edgar/data/1164771/000095014211000433/eh11000089_sc13ga4-ndml.htm ............................................................................ 6

Suzanna Caldwell & Alex DeMarban, *Rio Tinto Pulls Out Of Pebble Partnership, Gifting Its Stake To Alaska Organizations*, ANCHORAGE DAILY NEWS (April 7, 2014), *available at* https://www.adn.com/economy/article/rio-tinto-pulls-out-pebble-partnership-gifting-its-ownership-alaska-organizations/2014/08/; ............. 6

Suzanne Goldenberg, *Anglo American Pulls Out Of Alaska Mines Project*, THE GUARDIAN (Sept. 16, 2013, 10:59 AM), *available at* https://www.theguardian.com/environment/2013/sep/16/anglo-american-alaska-gold-mines ....................................................................................... 6

Taryn Kiekow Heimer, *Former EPA Administrators Say 'NO' To Pebble Mine In DC Ads*, NRDC.ORG (July 2, 2018), *available at* https://www.nrdc.org/bio/taryn-kiekow-heimer/former-epa-administrators-say-no-pebble-mine-dc-ads ..................................................................................... 7

## LIST OF SHORT NAMES AND ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act, 5 U.S.C. § 706 *et seq.* |
| CWA | Clean Water Act, 33 U.S.C. § 1251 *et seq.* |
| EPA | U.S. Environmental Protection Agency |
| FEIS | Final Environmental Impact Study |
| Final Determination | EPA, Final Determination of the U.S. Environmental Protection Agency Pursuant to Section 404(C) of the Clean Water Act: Pebble Deposit Area, Southwest Alaska (Jan. 2023), EPA_AR_0083927 |
| Plaintiffs | PLP, the State, and Iliamna Natives, Ltd. |
| PLP | Plaintiffs Pebble Limited Partnership and Northern Dynasty Minerals, Ltd. |
| Response to Comments | EPA, Resp. to Comments of Final Determination (Jan. 2023), EPA_AR_0083362-0084327 |
| Section 404(c) | Section 404(c) of the CWA, 18 U.S.C. § 33 U.S.C. § 1344(c) |
| The State or Alaska | Plaintiff State of Alaska |
| TU | Trout Unlimited |
| USACE or Corps | U.S. Army Corps of Engineers |

# INTRODUCTION

One does not need more than simple common sense to conclude that a sprawling, industrial mining operation deeper than the Grand Canyon and spanning an area the size of Manhattan in the heart of the unique Bristol Bay watershed would cause unacceptable environmental ruin. But the EPA, exercising its clear statutory authority, reached that very same, sound conclusion based on an exhaustive, science-backed record developed over decades, which is an eminently reasonable and predictive judgment in the heartland of the agency's expertise entitled to judicial deference.

Plaintiffs' latest challenges to the EPA's determination are misguided and meritless, and this Court should reject them. Their arguments rest on mischaracterizations of the Clean Water Act ("CWA") and overstate the scope of Alaska's authority in a manner contrary to settled precedent and the plain text of the statute and regulations. Plaintiffs' attempts to undermine the EPA's Final Determination ignore the voluminous, science-backed record and Bristol Bay's current economic landscape, while making outlandish and incorrect claims about the fish populations in the area.

For decades, Trout Unlimited ("TU") has advocated for the conservation of the Bristol Bay watershed due to its unparalleled fisheries and the livelihoods, cultural heritage, and recreational and commercial interests that it supports, which are all threatened by Plaintiffs' challenge to the EPA's Section 404(c) Final Determination. TU has participated in both administrative and judicial proceedings involving the proposed Pebble Mine, supplying scientific expertise, public comments, and a community voice for those

who depend on a healthy, functioning watershed. The organization's direct involvement reflects the profound and lasting interests at stake. An adverse decision in this case would cause irreparable harm the Bristol Bay watershed's delicate ecosystems and thwart the longstanding protections the CWA was designed to secure.

For these reasons, the Court should deny Plaintiffs' motions for summary judgment and uphold the EPA's reasoned, science-based Final Determination to protect Bristol Bay's headwaters for present and future generations.

## **BACKGROUND**

TU agrees with the EPA's description of its regulatory process under Section 404(c) of the CWA. Doc. 215 at 4–7; *see also Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 744–47 (9th Cir. 2021). But TU adds its own, unique perspective on the relevant context and background here.

### A. **The Bristol Bay Watershed Is A Unique And Highly Productive Natural Resource.**

The Bristol Bay watershed of southwestern Alaska is an ecosystem globally recognized for its rich salmon fisheries, irreplaceable natural resources, and the vital role it plays in supporting both local economies and cultures. It is a unique and unspoiled resource home to abundant wild Pacific salmon populations that support a diverse ecosystem of other fish and wildlife species, one of the largest commercial fisheries in the world generating billions of dollars in economic output annually, and a world-class

recreational fishing destination.[1]  In the EPA's words, which have been echoed down through Executive administrations since Nixon, "Alaska's Bristol Bay watershed . . . is an area of unparalleled ecological value, boasting salmon diversity and productivity unrivaled anywhere in North America."  EPA_AR_0082943.

Bristol Bay salmon are the lifeblood of the region's watershed – an area approximately the size of Ohio.  The "streams, wetlands, and other aquatic resources of the Bristol Bay watershed . . . provide the foundation for world-class, economically important, commercial and sport fisheries for salmon and other fishes," as well as a more than 4,000-year-old, subsistence-based way of life for Alaska Natives.  EPA_AR_0082943–44 & EPA_AR_0083199 (Final Determination).  All five species of North American Pacific salmon return to the Bristol Bay region, which supports the world's largest wild sockeye salmon runs (producing approximately half of the world's wild sockeye salmon) and a Chinook salmon run rivaling any other on our planet.  EPA_AR_0082943.  The Nushagak River in Bristol Bay is the primary producer of Chinook, coho, chum, and pink salmon, and, along with the Kvichack River watershed, produces half of Bristol Bay's sockeye salmon.  EPA_AR_0083049.  Iliamna Lake, meanwhile, provides the majority of sockeye salmon rearing habitat in the Kvichack River watershed and historically has produced more sockeye salmon than any other lake in the Bristol Bay Region.  EPA_AR_0083017.

---

[1]  *See Bristol Bay*, https://www.epa.gov/bristolbay (last visited Feb. 27, 2026); EPA_AR_0016071–73 (TU Comments on Proposed Determination).

As the EPA has thus recognized, the Bristol Bay watershed is "remarkable as one of the last places on Earth with such bountiful and sustainable harvests of wild salmon." EPA_AR_0082943. Not only do those harvests supply almost half of the world's sockeye salmon, but they play an important role in Alaska's economy. EPA_AR_0083017. In 2019, Bristol Bay's salmon resources generated more than $2.2 billion in economic output. EPA_AR_0082945. The commercial fishing industry provided more than 15,000 jobs, including half of all jobs in the Bristol Bay region. EPA_AR_0082945; *see also* EPA_AR_0083048–50; EPA_AR_0083202–03. In 2022, more than 78 million sockeye salmon returned to the Bristol Bay region – the largest run on record. *See* EPA_AR_0016071; EPA_AR_0083048.[2]

Alaska Natives, who have lived in the Bristol Bay region for thousands of years, have also long relied on the bounty of the land and waters to sustain their traditional and customary way of life. EPA_AR_0083050. Generations of families have fished commercially in the region, and they continue to rely on subsistence fisheries. EPA_AR_0083050–56. "The importance of salmon as a subsistence food source is inseparable from it being the basis for Alaska Native cultures." EPA_AR_0083056.

The Bristol Bay region's flourishing fish populations also support a robust recreational industry made up of large and small businesses centered on sport fishing,

---

[2] In 2025, 56.7 million sockeye salmon returned to Bristol Bay, with a commercial harvest of 41.2 million sockeye salmon. ALASKA DEP'T. OF FISH & GAME, 2025 BRISTOL BAY SALMON SEASON SUMMARY (Sept. 24, 2025), *available at* https://www.adfg.alaska.gov/static/applications/dcfnewsrelease/1738640423.pdf.

wildlife viewing, and other outdoor activities. EPA_AR_0083056; EPA_AR_0083181. Sport fishing activities in the Bristol Bay watershed account for approximately $66.58 million in expenditures and employ more than 800 full- and part-time workers. EPA_AR_0083057. These recreational businesses depend on the Bristol Bay watershed's "intact, connected habitats – from headwaters to ocean – that support abundant, genetically diverse wild Pacific salmon populations." EPA_AR_0082943; *see also* EPA_AR_0083058. And TU's members are among the anglers, lodge owners, fishing and hunting guides, subsistence users, commercial fishers, and other Alaskans who rely on the Bristol Bay region's employment in addition to fishing, hunting, and recreation. EPA_AR_0016070. As a result, TU has worked for years to protect the Bristol Bay watershed's fisheries, including working with local tribes, anglers and hunters, commercial fishing interests and local business, and – when necessary – to reinforce this protection through litigation related to the Pebble Mine. EPA_AR_0016071.

**B.** **Four Major Mining Companies, Seven Presidential Administrations, Both Alaska's Current Senators, And The EPA Have Rejected Mining Operations In Bristol Bay – For Good Reason.**

As it happens, the Bristol Bay watershed sits atop a copper, gold, and molybdenum deposit known as the Pebble deposit. EPA_AR_0082943; EPA_AR_008294. Over the years, various mining interests have considered commercially exploiting it, but all but one have abandoned the notion as impractical and uneconomical. That is because the prime deposits for mining are so low-grade – that is, they contain relatively small amounts of metals relative to the amount of ore – that mining would be economical only, if ever, if

conducted over vast areas that "will necessarily produce large amounts of waste material." EPA_AR_0083543; *see also* EPA_AR_0083806. In light of that hard economic and geological reality, three other major mining companies that considered mining in Bristol Bay abandoned the idea as foolhardy.[3]

Even if there were a practical way to overcome this reality, commercial exploitation of the extracted minerals still would face serious challenges. More than 100 jewelers, including the world's leading jewelry companies and retailers, have vowed never to source any materials from the Pebble Mine, concluding that any minerals from the mine are not worth the havoc their extraction would wreak on the environment.[4] Extracted minerals thus would have to be sold in other markets, such as to consumer electronics manufacturers in China. EPA_AR_0141365–66; EPA_AR_0488504; EPA_AR_0488508.

---

[3] *See* SEC, Northern Dynasty Minerals Ltd. Schedule 13G (Feb. 25, 2011), *available at* https://www.sec.gov/Archives/edgar/data/1164771/000095014211000433/eh11000089_sc 13ga4-ndml.htm; Suzanne Goldenberg, *Anglo American Pulls Out Of Alaska Mines Project*, THE GUARDIAN (Sept. 16, 2013, 10:59 AM), *available at* https://www.theguardian.com/environment/2013/sep/16/anglo-american-alaska-gold-mines; Suzanna Caldwell & Alex DeMarban, *Rio Tinto Pulls Out Of Pebble Partnership, Gifting Its Stake To Alaska Organizations*, ANCHORAGE DAILY NEWS (April 7, 2014), *available at* https://www.adn.com/economy/article/rio-tinto-pulls-out-pebble-partnership-gifting-its-ownership-alaska-organizations/2014/04/08/; Avery Lill, *Pebble Mine Loses Funding From First Quantum Minerals*, ALASKA PUB. MEDIA (May 25, 2018), *available at* https://www.alaskapublic.org/2018/05/25/pebble-mine-loses-funding-from-first-quantum-minerals/.

[4] Jen Finn, *Jewelers Pledge to Stop Pebble Mine*, NAT'L FISHERMAN (June 28, 2013), *available at* https://www.nationalfisherman.com/alaska/jewelers-pledge-to-stop-pebble-mine-2; Jim Crabtree, *Jewelers Boycott Pebble Mine Gold To Save Bristol Bay Salmon*, EVN'T NEWS SERVS. (Nov. 4, 2010), *available at* https://ens-newswire.com/jewelers-boycott-pebble-mine-gold-to-save-bristol-bay-salmon/.

Recognizing the Bristol Bay watershed's value as a unique and productive natural resource, for many decades the EPA and/ or the USACE under the administrations of Presidents Nixon, Reagan, George H.W. Bush, George W. Bush, Obama, and Trump all have opposed large-scale commercial mining operations in the region.[5] Both of Alaska's current Senators have opposed the mine publicly as well.[6]

In 2001, Northern Dynasty Materials, Ltd. – a Canadian Company – acquired mining claims for the Pebble Deposit, and PLP – its wholly owned subsidiary (collectively, "PLP") – currently holds those claims. EPA_AR_0082977.

Recognizing the risks posed by large-scale mining in Bristol Bay's headwaters, numerous groups petitioned EPA in 2010 to restrict its use as a disposal site for mining the Pebble deposit by invoking the agency's authority under Section 404(c) of the CWA. EPA_AR_0082951. Under the CWA, the EPA may deny or restrict the specification of a

---

[5] Anthony Adragna & Annie Snider, *Trump Administration Rejects Massive Alaska Mining Project*, POLITICO (Nov. 25, 2020), *available at* https://www.politico.com/news/2020/11/25/trump-administration-alaska-mining-project-440626; Taryn Kiekow Heimer, *Former EPA Administrators Say 'NO' To Pebble Mine In DC Ads*, NRDC.ORG (July 2, 2018), *available at* https://www.nrdc.org/bio/taryn-kiekow-heimer/former-epa-administrators-say-no-pebble-mine-dc-ads; EPA_AR_0139118; EPA_AR_0082981–82.

[6] Press Release, Murkowski Statement on EPA's Final Determination for Pebble Mine (Jan. 31, 2023), *available at* https://www.murkowski.senate.gov/press/release/murkowski-statement-on-epas-final-determination-for-pebble-mine ("To be clear: I oppose Pebble."); Liz Ruskin, *Sen. Sullivan Says Pebble Can't Shake His Opposition To Mine*, ALASKA PUB. MEDIA (Oct. 7, 2020), *available at* https://alaskapublic.org/2020/10/07/sen-sullivan-says-pebble-cant-shake-his-opposition-to-mine-pledges-to-continue-to-monitor/.

mining disposal site "whenever [EPA Administrator] determines . . . that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas . . . wildlife, or recreational areas." 33 U.S.C. § 1344(c) (emphasis added); *see* 40 C.F.R. §§ 231.1–231.8.

Then, in 2011, PLP published and filed with the U.S. Securities and Exchange Commission plans for mining that very site. EPA_AR_0082979. PLP proposed a vast mine with a mind-boggling footprint: it would carve out a pit at the headwaters of Bristol Bay nearly as deep as the Grand Canyon with infrastructure spanning an area as large as Manhattan. *See* EPA_AR_0082947–49; EPA_AR_0082979.

Based on PLP's filing, the EPA undertook a three-year scientific study of the effects of large-scale mining on the watershed, culminating in a 2014 Watershed Assessment detailing how mining could impact the region under various mining sizes from PLP's own plans. EPA_AR_0082979–82.[7] The EPA's assessment, notably, included PLP's own environmental baseline document that included the results of its own studies from 2004 through 2008. EPA_AR_0082980. Based on the evidence adduced during that review, the EPA issued a Proposed Determination under Section 404(c) of the CWA to restrict the disposal of dredged or fill material in the Bristol Bay watershed. 79 Fed. Reg. 42,314 (July 21, 2014).

---

[7] *See* 33 U.S.C. § 1254(a) & (b) (directing the EPA to conduct research, investigations, and studies about pollution).

The EPA Regional Administrator concluded the agency "ha[d] reason to believe that," even under the rosiest scenario proposed by PLP, "mining of the Pebble deposit could result in unacceptable adverse effects on important fishery areas." EPA_AR_0083242.

### C. Following Years Of Litigation, The EPA Issued A Final Determination Barring Large-Scale Commercial Mining In Bristol Bay.

As this Court well knows, the EPA's 2014 Proposed Determination led to a flurry of litigation. *Pirzadeh*, 1 F.4th at 743–44. Years later, following a voluntary remand, the EPA reinitiated the Section 404(c) process. EPA_AR_0000003–04; EPA_AR_0138406–07; EPA_AR_0138408–10. The EPA's 2022 Section 404(c) process examined a revised Section 404 mining permit application PLP had submitted to the Corps in June 2020 (the "2020 Mine Plan"). EPA_AR_0087313–91. Under that application, PLP proposed to mine 1.3 million tons of ore over 20 years. EPA_AR_0082947. But the dredged and fill material associated with PLP's 2020 Mine Plan would result in permanent loss of salmon habitat in Bristol Bay. EPA_AR_0083074–78.

In May 2022, the EPA issued a revised proposed determination, concluding, based on a voluminous, science-based record, that PLP had failed to demonstrate no unacceptable adverse effects would result from its planned mining operations. EPA_AR_0082179–517; 87 Fed. Reg. 32,021, 32,023 (May 26, 2022). Far from it: the agency concluded that, even under the most modest version of PLP's mine, the environmental impact "would result in the total loss" of almost 100 miles of stream habitat resulting in "major changes in ecosystem structure and function" and "unacceptable adverse effects on anadromous fishery areas." EPA_AR_0082954–56; 87 Fed. Reg. 32,021, 32,023.

The EPA subsequently held multiple public hearings and received more than 582,000 written comments (including from Alaska, PLP, and TU).  EPA_AR_0016070; EPA_AR_0081901–2055;        EPA_AR_0082056–110;        EPA_AR_0082129–65; EPA_AR_0082989–90.   After reviewing the extensive record, the EPA Regional Administrator determined that the proposed mining project remained likely to have unacceptable adverse effects and consequently issued a recommended final determination in December 2022.  EPA_AR_0498929.  The EPA gave PLP and the State the opportunity to propose corrective action to prevent the unacceptable adverse effects, but the EPA was not swayed by their proposals.  *See* EPA_AR_0082990–91.

On February 3, 2023, the EPA finished the job it started more than a decade earlier. It issued a Final Determination pursuant to Section 404(c) of the CWA and its implementing regulations to restrict the use of Bristol Bay's headwaters as a disposal site for mining the Pebble deposit.  *See* EPA_AR_0082924; *see also* 88 Fed. Reg. 7,441 (Feb. 3, 2023).   Based on the voluminous scientific and technical record compiled and supplemented over two decades, the EPA found that discharges of dredged and fill material associated with PLP's proposed mine "will have unacceptable adverse effects on anadromous fishery areas in the [South Fork Koktuli River ("SFK")] and [North Fork Koktuli River ("NFK")] watersheds."  EPA_AR_0082926; *see also* EPA_AR_0083166–67.  Those "unacceptable adverse effects" include the loss of 8.5 miles of "documented anadromous fish streams" and 91 miles of "additional streams that support anadromous fish streams," along with the loss of 2,108 acres of "wetlands and other waters that support

anadromous fish streams." EPA_AR_0083166–67. The EPA further found that PLP's proposed mine would have "adverse impacts on approximately 29 additional miles" of anadromous fish streams "resulting from greater than 20 percent changes in average monthly streamflow." EPA_AR_0083166–67.

In its Final Determination, the EPA defined the area covered by its Final Determination "by outlining a contiguous area around the portions of the mine site footprint identified in PLP (2020b) that are located within the SFK and NFK watersheds." EPA_AR_0083168. The prohibited area is roughly 24.7 square miles. EPA_AR_0083168. As the EPA again explained, the discharges of dredged and fill material proposed by PLP "will have unacceptable adverse effects on anadromous fishery areas in these watersheds," as will similar discharges "anywhere at the mine site that result in any one of the losses or streamflow changes" described in the Final Determination. EPA_AR_0083168.

The EPA did not make its decision lightly or carelessly. As the EPA explained in the Final Determination – supported by years of research and a robust record – the 8.5 miles of streams that would be lost to PLP's proposed mine provide critical rearing, spawning, and migrating habitat for the coho and Chinook salmon. EPA_AR_0083073. The permanent loss of those streams would result in the loss of spawning habitat, and, in turn, the "loss of marine-derived nutrients those fishes would have contributed upon death." EPA_AR_0083074. Those losses would be "compounded" by the reality that coho and Chinook salmon are "uniquely adapted to the physical and chemical conditions of their natal streams" and show "high fidelity to their natal spawning and rearing environments,

which results in genetic variation among discrete populations." EPA_AR_0083075. The coho and Chinook salmon are "the two rarest of North America's five species of Pacific salmon," and extremely "vulnerable to losses of small, discrete populations." EPA_AR_0083076.

The loss of 91 miles of additional streams and 2,108 acres of wetlands would also result in "unacceptable adverse effects" on the salmon fisheries. EPA_AR_0083094–95; EPA_AR_0083098. The coho, Chinook, sockeye, and chum salmon populations rely on these streams for "spawning gravels, invertebrate drift, organic matter, nutrients, surface water flows, groundwater flows," "temperature moderation," and "refuge from predators." EPA_AR_0083092. Juvenile salmon in particular "move extensively within the stream system." EPA_AR_0083092. Similarly, eliminating more than 2,000 acres of wetland would cause the loss of "structurally complex and thermally and hydraulically diverse habitats, including crucial overwintering areas," that are "essential" to the salmon populations. EPA_AR_0083102.

It is therefore no surprise then that the permanent loss of the streams impacted by PLP's proposed mine represents "a large impact – one that is unprecedented in the context of the CWA Section 404 regulatory program in Alaska." EPA_AR_0083074; *see also* EPA_AR_0083093.

## STANDARD OF REVIEW

"[W]hen an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-

capricious standard." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 179–80 (2025). "Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Id*. at 180 (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). The "well-worn arbitrary-and-capricious standard ensures that an administrative agency examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 567 (2025) (quotations omitted). But that standard is "highly deferential, presuming the agency action to be valid and [requires] affirming the agency action if a reasonable basis exists for its decision." *Alaska Eskimo Whaling Comm'n v. EPA*, 791 F.3d 1088, 1095 (9th Cir. 2015) (citation omitted); *see also Seven Cnty.*, 605 U.S. at 185 ("The role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one." (citation omitted)). Applying that standard here is a no brainer and properly results in deference to the EPA's thorough, well-considered judgment backed by exhaustive record evidence and analysis.

## ARGUMENT[8]

### I.   THE EPA ACTED ENTIRELY WITHIN ITS SECTION 404(C) AUTHORITY.

#### A.   The EPA Applied The Correct Legal Standards Because Its Findings Of Significant Loss And Damage Represent Unacceptable Adverse Effects.

PLP asserts that the EPA "applied the wrong standard" in its Final Determination by treating "any amount" of "non-trivial" adverse effect as unacceptable and by relying on "speculative possibilities."  PLP's Second Corrected Br., Doc. 205-1 at 36–41.  Neither argument is correct.  Section 404(c) could not be clearer: it "authorize[s]" the EPA Administrator to "deny or restrict the use of any defined area" as a mining disposal site "whenever he determines" that the discharge of dredged or fill material "will have an unacceptable adverse effect" on environmental resources.  33 U.S.C. § 1344(c); *see also Pirzadeh*, 1 F.4th at 744–45.

1.      PLP first argues that, for an adverse effect to be "unacceptable," it must be "far more" than "significant," and that the EPA "imported the standard that USACE developed in its ROD, that an impact is 'significant' if it is 'more than trivial.' "  Doc. 205-1 at 36–37.  PLP is wrong.

In its Final Determination, the EPA relied on the exact definition of an "unacceptable adverse effect" set forth in the CWA's implementing regulations.  EPA_AR_0083064

---

[8]  This brief responds to arguments contained in the opening briefs of PLP and the State. While TU does not address here the claims by Plaintiffs Iliamna Natives Limited and Alaska Peninsula Corporation (Doc. 169), TU agrees with and supports (and adopts by reference) the arguments of the EPA and the other intervenor-Defendants in response to those claims.

TU's Response to Plaintiffs' Opening Briefs
*Northern Dynasty Minerals Ltd. v. EPA*
Case No. 3:24-cv-00059-SLG

-14-

(citing 40 C.F.R. § 231.2(e)); EPA_AR_0083164–65 (citing 40 C.F.R. § 231.2(e)). Those regulations define an "unacceptable adverse effect" as encompassing "impact on an aquatic or wetland ecosystem which is likely to result in . . . *significant* loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas."[9]  40 C.F.R. § 231.2(e) (emphasis added); *see also Pirzadeh*, 1 F.4th at 759 ("Whether 'unacceptable' adverse effects are 'likely' is a flexible standard that draws considerably on the agency's expertise and judgment.").[10]  In other words, "[t]he term 'unacceptable' . . . refers to the *significance* of the adverse effect—e.g. is it a large impact and is it one that the aquatic and wetland ecosystem cannot afford." *Denial or Restriction of Disposal Sites; Section 404(c) Procs.*, 44 Fed. Reg. 58,076, 58,078 (Oct. 9, 1979) (emphasis added).  Simply put, "Congress wanted EPA to have an opportunity to have the *final say to prevent significant adverse effects*."  44 Fed. Reg. at 58,078 (emphasis added); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning.").  This was precisely the standard the EPA employed in its Final Determination.

---

[9]  Plaintiffs also do not dispute that Section 404(c) and its implementing regulations are unambiguous and therefore should be applied based on their "plain meaning" and definition. *League of Cal. Cities v. FCC*, 118 F.4th 995, 1015–16 (9th Cir. 2024); *see also Gonzalez v. Herrera*, 151 F.4th 1076, 1081 (9th Cir. 2025) ("If the 'statutory text is plain and unambiguous[,]' we 'must apply the statute according to its terms.'" (internal citation omitted)).

[10]  "In evaluating the unacceptability of such impacts," EPA must also consider "the relevant portions of the Section 404(b)(1) guidelines." 40 C.F.R. § 231.2(e).

Specifically, in section 4 of its Final Determination, the EPA found – based on years of extensive, science-backed findings – that the proposed Pebble Mine would lead to unacceptable adverse effects in the form of significant loss of and damage to fisheries at and downstream of the discharge. *Supra* at 10–12. EPA based its conclusion on a full consideration of the salmon life cycle and habitat, including the physical and chemical stream conditions they require to migrate, spawn, and create genetically diverse populations. *Id.* These types of findings are routinely the sort upheld by courts as proper determinations of "unacceptable adverse effects" under the CWA. *See, e.g.*, *Mingo Logan Coal Co., v. EPA*, 829 F.3d 710, 724–26 (D.C. Cir. 2016) (affirming the EPA's "consideration of downstream water quality as a means of evaluating the . . . adverse effects on wildlife" under Section 404(c)); *James City Cnty. v. EPA*, 12 F.3d 1330, 1339 (4th Cir. 1993) (holding the EPA's Section 404(c) decision properly was based on "several factors, including harm to existing fish and wildlife species, damage to the ecosystem, destruction of wetlands, and inadequate mitigation" that were "supported by the administrative record . . . and . . . substantial evidence"); *Bersani v. EPA*, 674 F. Supp. 405, 419 (N.D.N.Y. 1987) (holding EPA's "Final Determination must be upheld as reasonable because it was based upon a rational, independent finding that a significant loss in wildlife resources would result from the construction of a mall"), *aff'd,* 850 F.2d 36 (2d Cir. 1988).

As the Supreme Court recently explained, agencies often "must make predictive and scientific judgments in assessing the relevant [environmental] impacts (what are the likely impacts; do they rise to the level of 'significant'?) and alternatives (what are the potential

alternatives; are they really 'feasible'?)." *Seven Cnty.*, 605 U.S. at 181.  To that end, "[b]lack-letter administrative law instructs that when an agency makes those kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its most deferential." *Id.* at 182 (quotations omitted).  That is precisely the case here.

**2.**     PLP and Alaska also contend that the EPA's findings of unacceptable adverse effects were "speculative."  State of Alaska's Opening Br., Doc. 167 at 40; Doc. 205-1 at 39–41.  But the EPA found that the proposed Pebble Mine "*will*" result in unacceptable adverse effects on anadromous fishery areas based on the submissions from PLP, the Corps, and others.  *See, e.g.*, EPA_AR_0083205 ("EPA has determined that the large-scale loss of and damage to headwater streams, wetlands, and other aquatic resources that support salmon populations in the SFK, NFK, and [Upper Talarik Creek ("UTC")] watersheds from the discharge of dredged or fill material for the construction and routine operation of the 2020 Mine Plan *will* have unacceptable adverse effects on anadromous fishery areas in the SFK, NFK, and UTC watersheds." (emphasis added)); EPA_AR_0083164 ("EPA finds that discharges of dredged or fill material for the construction and routine operation of the 2020 Mine Plan *will have* unacceptable adverse effects on anadromous fishery areas.") (emphasis added); *see also infra* Part II.  There is nothing speculative about those findings.

But even if they were "speculative assessments" or mere "predictive" judgments, that is when a reviewing court still "must be at its most deferential" to the agency, because the agency "is making predictions, within its area of special expertise, at the frontiers of

science." *Seven Cnty*. 605 U.S. at 182 (quotation omitted); *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).

### B. The EPA's Authority To Exercise Its Section 404(c) Authority Is Not Limited To The Permitting Process.

PLP further argues the "EPA cannot veto a discharge without at least a permit application." Doc. 205-1 at 23. But that argument ignores the statute's plain text and courts – including the Ninth Circuit – already have rejected that argument, and this court should do so too. Under Section 404(c), the EPA can "act ***at any time****: before a permit application has been filed, while a permit application is pending, or even after the Corps has issued a permit*." *Pirzadeh*, 1 F.4th at 745 (emphasis added) (citing 44 Fed. Reg. at 58,076 & 40 C.F.R. § 231.2(a)-(c)).

For decades, the EPA has accordingly interpreted Section 404(c) to allow the agency "to use 404(c) before an application is filed" because "the statue says that the Administrator is authorized to take action 'whenever' he makes certain determinations" and "the actions he is authorized to take are not limited to permit situations"—"[r]ather, he may prohibit the specification of a site or deny or restrict the use of a site for specification." 44 Fed. Reg. at 58,077; *see also id*. at 58,078 ("[U]nlike the Corps, EPA can use 404(c) to protect the water before someone requests a discharge permit (*e.g.* before the Corps is involved).").

Indeed, "[u]sing the expansive conjunction 'whenever,' the Congress made plain its intent to grant the Administrator authority to prohibit/deny/restrict/withdraw a specification at *any* time." *Mingo Logan Coal Co. v. EPA*, 714 F.3d 608, 613 (D.C. Cir. 2013). As such, "the unambiguous language of subsection 404(c) manifests the Congress's

intent to confer on the EPA a broad veto power extending *beyond the permit issuance*," and "Section 404 imposes no temporal limit on the Administrator's authority to withdraw the Corps' specification." *Id*. (emphasis added); *see also S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*, No. 2:17-CV-3412, 2021 WL 3931908, at *12 (D.S.C. Sept. 2, 2021) ("EPA may exercise this statutory 'veto' authority either before or after a Section 404 permit has been issued.").

PLP's crabbed "reading of the statute would eliminate the EPA's express statutory right to withdraw a specification and thereby render subsection 404(c)'s parenthetical 'withdrawal' language superfluous—a result to be avoided." *Mingo Logan*, 714 F.3d at 613–14. Accordingly, the fact that EPA exercised its Section 404(c) authority subsequent to denial of PLP's 404 permit application does not invalidate the EPA's determination or its authority. *See supra* at 9–12.

### C. Plaintiffs' Other Legal Challenges Are Meritless.

#### 1. The EPA Did Not Violate The Alaska Statehood Act Or The Cook Inlet Exchange Act.

PLP and the State argue that the EPA's actions violated the Alaska Statehood Act and the Cook Inlet Exchange Act. Doc. 167 at 24–27; Doc. 205-1 at 16–20. Specifically, they assert the Alaska Statehood Act and the Cook Inlet Exchange Act preclude the tEPA from disturbing Alaska's access to mineral deposits, Doc. 205-1 at 16–20, and the EPA's action violated Alaska's "settled expectations" based on these agreements, Doc. 167 at 25–27.

But as an initial matter, the Final Determination does not prohibit all access to mineral deposits—it only prohibits the actions specifically set forth in PLP's 2020 Mine Plan that the EPA found, based on years of careful study and an exhaustive record, would result in unacceptable adverse effects on anadromous fishery areas. EPA_AR_0083166–68.

Regardless, it is Congress – not any state – that has the constitutional power to regulate pollution of "waters of the United States." *Rapanos v. United States*, 547 U.S. 715, 782–83 (2006) (Kennedy, J., concurring); *Sackett v. E.P.A.*, 598 U.S. 651, 659-61 (2023). So, while Alaska may have "regulatory power to use its . . . lands . . . for mining purposes," Doc. 167 at 25 & Doc. 205-1 at 16–17, that authority is still subject to the limitations of the Supremacy Clause of the U.S. Constitution. *N. Plains Res. Council v. Fid. Expl. & Dev. Co.*, 325 F.3d 1155, 1164–65 (9th Cir. 2003) (explaining state law cannot "contradict or limit the scope of the CWA, for that would run squarely afoul of our Constitution's Supremacy Clause"); *see Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 580–81 (1987). And Congress expressly empowered the EPA, through Section 404 of the CWA, to regulate discharges of dredged and fill material into all jurisdictional waters of the United States, including such waters on state-owned lands – exactly what the EPA did here. *See* 33 U.S.C. § 1362(7); *Sackett*, 598 U.S. at 659-61.

Contrary to Plaintiffs' contentions, Section 6(i) of the Alaska Statehood Act does not limit federal authority in a way that would permit Alaska to dispose of mineral deposits outside the bounds of federal laws like the CWA. *See* Doc. 167 at 2 & 16–17; Doc. 205-1

at 16.  Section 6(i) of the Statehood Act just requires certain mineral deposits to be "subject to lease by the State as the State Legislature may direct."  Alaska Statehood Act, Pub. L. 85-508, 72 Stat. 339 (Jul. 7, 1958).  That leasing requirement was "taken from the 1927 School Lands Act" as a way to "ensure the economic and social well-being of the new state."  *Trs. for Alaska v. State*, 736 P.2d 324, 335–37 (Alaska 1987), *cert denied*, 486 U.S. 1032 (1988).  However, it was only meant to put Alaska "on an *equal but not a favored* footing" with other states "with respect to the disposition of mineral lands" – not to grant Alaska *more* regulatory power over its mineral lands than that which was afforded to other states.  *Trs. for Alaska*, 736 P.2d at 337 (emphasis added); *see also State v. Lewis*, 559 P.2d 630, 638 (Alaska 1977) ("The restrictions placed by Congress on alienation of Alaska's lands were of the same import as those set forth in [the 1927 School Lands] Act and applicable to the other states."); *Metlakatla Indian Cmty. v. Egan*, 369 U.S. 45, 57 (1962) ("Section 6(e) of the Alaska Statehood Act . . . contemplated transfer to the State of the same measure of administration and jurisdiction over fisheries and wildlife as possessed by other States.").

The Supreme Court has indeed interpreted the phrase "as the State Legislature may direct" *not* to mean "blanket authority for the States to lease minerals on whatever terms they wish," but rather to "authoriz[e] the States to regulate the methods by which mineral leases are made and to specify any additional terms in those leases that are thought necessary or desirable," *while still complying with other federal laws.  ASARCO Inc. v. Kadish*, 490 U.S. 605, 630–31 (1989) (emphasis added).  In other words, the Supreme

Court already has rejected an argument similar to that advanced by Plaintiffs here. This Court should do the same because there is nothing in the Alaska Statehood Act or the Cook Inlet Exchange Act that overrides the express regulatory authority that Congress conveyed to the EPA in Section 404 of the CWA.

### 2. The Major Questions Doctrine Does Not Apply Here.

The State argues that the EPA's section 404(c) action "presents a major question" that requires "clear congressional authorization." Doc. 167 at 22–24; *see* Doc. 205 at 15. But this doctrine is reserved for rare and extraordinary circumstances where an agency asserts a "transformative" and "unheralded" expansion of power based on vague or ancillary statutory language that clearly goes beyond the intent of Congress and the history and context of the statute. *See West Virginia v. EPA*, 597 U.S. 697, 721–24 (2022). Courts apply a two-prong test to determine if an agency action constitutes a major question: *First*, whether the agency action represents a novel, sweeping expansion of authority, and *second*, whether the action holds significant economic and political consequences. *See State v. Su*, 121 F.4th 1, 14 (9th Cir. 2024).

The EPA's use of Section 404(c) fails to meet either prong of this test. *First*, its exercise of Section 404(c) authority is neither "transformative" nor "sweeping." *West Virginia*, 597 U.S. at 721 & 724. Instead, the entire Section 404(c) process, culminating in a final determination, is a case-specific, science-based determination well within the EPA's core expertise. *Cf. id.* at 729 (noting when an agency lacks "comparative expertise" in making certain policy judgments, Congress presumably would not task it with making

those judgments).  Nor did the EPA ground its action in some vague or ancillary statutory provisions.  *See* Doc. 167 at 22.  Section 404(c) clearly and explicitly grants the EPA authority to restrict or prohibit the use of disposal sites when unacceptable adverse environmental effects would result.  33 U.S.C. § 1344(c); 40 C.F.R. § 231.1(a), (c).

Since 1972, the EPA has exercised Section 404(c) authority on at least thirteen occasions, further underscoring this is not an unprecedented or novel assertion of agency power.  EPA_AR_0083583; EPA_AR_0083629; *see also Su*, 121 F.4th at 14 ("[W]e conclude that the first prong of this analysis is not met because the Executive's reliance on the FPASA for the wage mandate is not a 'transformative' expansion of its authority" given that presidents had used the law in two executive orders related to the minimum wage and "the relevant provisions of the FPASA have been regularly invoked.").

Plaintiffs also fail to establish that the EPA's action was of "vast" "economic and political significance."  *See West Virginia*, 597 U.S. at 721 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000)); Doc. 167 at 30–31.  Rather, the EPA's determination here was a conventional use of the agency's express authority exercised in a limited scope in a narrow territory.  That does not rise to the level of "vast economic and political significance" in the context of the Major Questions doctrine.  While the State argues that the EPA's action "has eliminated tens of billions of dollars [of] economic activity, billions of dollars in lost revenue to the State," Doc. 167 at 22, nothing of that sort has in fact occurred, and the economic impact of the Final Determination is speculative at best and limited to the Canadian mining company itself.  *Cf. Mayfield v. U.S.*

*Dep't of Lab.*, 117 F.4th 611, 616 (5th Cir. 2024) (holding a rule with an impact of "roughly $472 million in the first year" was not significant enough to qualify as a major question); *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 283 (S.D.N.Y. 2024) (holding the cryptocurrency industry "while certainly sizable and important," is not of "vast economic and political significance," unlike the energy or student loan industries).

The State also argues that the EPA's action is "unprecedented" because the disposal site is larger than prior disposal sites, Doc. 167 at 23, and it implicates federalism considerations, *id.* But the political significance of this case is mitigated by the limited nature of its impact. Unlike in the cases relied upon by Alaska, the EPA is not asserting the power to entirely ban the sale of tobacco products or "institute a nationwide eviction moratorium in response to the COVID-19 pandemic." *West Virginia*, 597 U.S. at 721 (discussing *Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)); *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758 (2021); *see* Doc. 167 at 22–23. And by exercising its clear and existing authority to regulate mining discharges into waters of the United States pursuant to a federal statute, the EPA is not "intrud[ing] into an area that is the particular domain of state law." *Mayfield*, 117 F.4th at 616.

Even if the Major Questions doctrine applied in this case (it does not), Section 404(c) contains the type of "clear congressional authorization" necessary to justify the EPA's actions. *West Virginia*, 597 U.S. at 732. Congress explicitly permits the EPA to restrict or prohibit use of disposal sites because of unacceptable adverse effects and provides the EPA administrator with the power to "deny or restrict the use of any defined

area" as a mining disposal site "whenever he determines" that the discharge of dredged or fill material "will have an unacceptable adverse effect" on environmental resources. 33 U.S.C. § 1344(c). And that is precisely what the EPA did here.

### 3. PLP's 404(t) Argument Is Waived And Meritless.

In its brief, PLP argues for the first time that the EPA violated section 404(t) of the CWA, which provides that "[n]othing in this section shall preclude or deny the right of any State . . . to control the discharge of dredged or fill material in any portion of the navigable waters within the jurisdiction of such State." 33 U.S.C. § 1344(t); Doc. 205-1 at 20–23. But this newfound argument, absent from PLP's original or amended complaints (Doc. 1, 91), is waived and improper. *See, e.g.*, *Buckhorn v. Hettinger*, 800 F. App'x 542, 543 (9th Cir. 2020) (holding "federal notice pleading standards do not relieve Plaintiffs of the basic obligation to articulate a cause of action," and that "[i]t is impermissible to add a new claim at the summary judgment stage"); *Rosauer v. Alaska Diesel Elec., Inc.*, 771 F. Supp. 3d 1092, 1101 (D. Alaska 2025) (declining to consider claims on summary judgment that were not alleged in the complaint).

Nor did PLP raise any Section 404(t) argument during the administrative proceeding before EPA. In fact, this Section 404(t) argument was not mentioned at all in any letter sent from the State or PLP to EPA nor EPA's January 2023 responses to comments. But in the administrative process, "a participant . . . must alert the agency to their position and contentions." *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 710 (9th Cir. 2009) (brackets, internal quotation marks & citations omitted); *see also Protect Our*

*Communities Found. v. LaCounte*, 939 F.3d 1029, 1036 (9th Cir. 2019) ("Plaintiffs must structure their participation in the agency's decision making process so as to alert[ ] the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration. . . . Otherwise, the issue is waived." (internal quotation marks & citations omitted)).  This rule serves to "protect[] the agency's prerogative to apply its expertise, to correct its own errors, and to create a record for [the Court's] review." *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1024 (9th Cir. 2007). Because PLP failed to assert any Section 404(t) objection during the underlying agency proceeding, its attempt to do so now "may not form a basis for reversal of an agency decision."  *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991); *see also Kempthorne*, 588 F.3d at 710 ("Failure to raise such particular objections may result in forfeiture of any objection to the resulting regulation." (brackets & internal quotation marks omitted)).

## II.  THE EPA'S FINDINGS ABOUT THE PEBBLE MINE'S UNACCEPTABLE ADVERSE EFFECTS ARE SUPPORTED FULLY BY AN EXTENSIVE, SCIENCE-BACKED RECORD.

### A.  The EPA Properly Applied The Term "Fishery Area" To The Bristol Bay Waterways.

PLP claims that the EPA cannot regulate the proposed mine site because neither the NFK and SFK watersheds, nor the nearby streams and wetlands, properly are "fishery areas."  Doc. 205-1 at 42.  But the EPA's findings regarding the unacceptable adverse effects of the Pebble Mine on "fishery areas" in the Bristol Bay watershed are thoroughly supported by a robust scientific record.  The term "fishery area" as used in Section 404(c)

is not limited to sites where fish are physically caught, but also embraces the diverse aquatic habitats that support spawning, rearing, and migration. 33 U.S.C. § 1344 (noting fishery areas include "spawning and breeding areas"); EPA_AR_0083087; EPA_AR_0472449. Contrary to the assertion the SFK and NFK watersheds do not constitute "fishery areas," the EPA expressly found – with the support of extensive evidence – that these watersheds possess highly connected, ecologically valuable aquatic habitats that are foundational to the productivity of the region's world-class salmon fisheries. EPA_AR_0083061. Specifically, the EPA documented that aquatic habitats in the SFK, NFK, and UTC watersheds sustain reproductively isolated salmon populations which underpin valuable commercial, subsistence, and recreational fisheries. EPA_AR_0083005–86. Several studies document that the Bristol Bay Management Area contains some of the most productive waters in the world for various fish populations including Pacific salmon, rainbow trout, Arctic grayling, Arctic char, and Dolly Varden. EPA_AR_0481715; EPA_AR_0482433 & EPA_AR_0482475; EPA_AR_0083014; EPA_AR_0485053, EPA_AR_0485073; EPA_AR_0083051. All three watersheds contain documented spawning and rearing habitat for coho, chum, Chinook, and sockeye salmon. EPA_AR_0083097; EPA_AR_0470410.

PLP makes the extraordinary assertion that only 27 salmon would be affected by their mining activities in the tributaries, NFK-1.190 and NFK-1.200. Doc. 205-1 at 37. That is misleading, inaccurate, and based on PLP's own commissioned (and disputed) aerial fish surveys from 2004-2008. EPA_AR_0095018. Notably, PLP did *not* survey

NFK-1.200.  EPA_AR_0095026 (Table 3.24-10).  And, as EPA explained, the methods PLP used for fish counts had serious limitations: the aerial survey only accounted for a portion of the spawning populations, and – as PLP acknowledged – many of the methods used "were not conducive to estimate catch-per-unit effort (CPUE)."  EPA_AR_0083252.  For example, the Corps found aerial surveys in this region detect on average only 18 percent of actual abundance.  EPA_AR_0083030. Similarly, PLP's winter sampling was limited due to logistical challenges.  EPA_AR_0095043; EPA_AR_0083251.  EPA's review thus expressly cautioned that PLP's sampling regime likely underestimated actual seasonal fish distributions and abundances and emphasized that habitat value cannot be determined solely by observed numbers at a given time.   EPA_AR_0083254; *see also* EPA_AR_0083252 (explaining that "estimates based on these surveys should be considered *minimum counts*" (emphasis added)).

In any event, PLP's *own sampling* efforts documented hundreds of juvenile salmon in NFK-1.190 and NFK.1200.  EPA_AR_0095026; EPA_AR_0092560.  Even the Alaska Department of Fish and Game ("ADF&G") has classified NFK-1.190 and NFK-1.200 tributaries as "*important for spawning, rearing, or migration of anadromous fisheries*" pursuant to Alaska Statute § 16.05.871(a).

## B.    The Evidence Supports The Significance Of The Area To The Local Fish Population.

PLP also asserts that low angler counts and the lack of direct fish-catch data for specific tributaries minimize the significance of the affected waters.  Doc. 205-1 at 53.  But the EPA, relying on well-documented fish biology, determined that fish populations in the

region – including those supported by the Koktuli, SFK, and NFK watersheds – are highly migratory, with substantial movement throughout interconnected streams, wetlands, and lakes. EPA_AR_0094584. These systems sustain downstream fisheries by providing essential spawning and early life-stage rearing, without which the broader Bristol Bay region's fishery would suffer. EPA_AR_0083061. The EPA and its cooperating agencies, such as the U.S. Fish and Wildlife Service and even the State's ADF&G, noted that survey of angler efforts significantly understates the importance of the Koktuli and Mulchatna waterways, particularly for anglers undertaking multi-day float trips and those that support stock stability throughout the region. EPA_AR_0094584. The headwaters and tributaries of the SFK, NFK, and UTC thus contribute directly to fish populations that are harvested downstream, including areas of considerable economic and cultural value. EPA_AR_0083086.

Even accepting low adult fish count data at face value, aquatic habitats with no or low adult fish densities are still important for supporting and maintaining fishery resources over the lifespan of potential impacts under the 2020 Mine Plan. ERA AR 0083253. The streams that would be impacted by the proposed Pebble Mine provide critical spawning and rearing habitat for both juvenile and adult salmon across multiple life stages and years, contributing to the overall resilience and productivity of the Bristol Bay fishery. EPA_AR_0083008; EPA_AR_0497236 ("Studies on headwater . . . streams have shown that biological communities in most habitats can be characterized as forming a temporal sequence of synchronized species replacement."). The EPA concluded that using limited

fish observations as the sole basis for discounting habitat importance ignores natural variability, survey limitations, and the documented value of headwater streams for species persistence. EPA_AR_0083008; EPA_AR_0497236. PLP's argument fails to account for these fundamental ecological principles and the robust record evidence.

The EPA's record also documented these streams and wetlands are not merely passive conduits; they provide indispensable spawning and rearing habitats, including for coho, Chinook, sockeye, and chum salmon. EPA_AR_0083087, EPA_AR_0083022. The local and downstream fisheries depend on the stability of these subpopulations. Removal or impairment of even a fraction of such habitats – such as the blocking of 8.5 miles of anadromous streams cited in the Final Determination – is not trivial or negligible. Doc. 205-1 at 44. The EPA chronicled both the direct and indirect consequences, including fish mortality, displacement, and the loss of ecological functions essential to salmonid life cycles. EPA_AR_0083074; EPA_AR_0083078.

Moreover, adverse fish population-level effects frequently arise from harm to spawning and juvenile habitats, even where headwater fish densities are variable and sometimes low. EPA_AR_0497209 ("In stream ecosystems, unused or partially processed materials will tend to be transported downstream. This energy loss, however, is the energy income, together with local inputs, for communities in downstream reaches."). Specifically, headwaters contribute to nutrient cycling and water quality by delivering water, sediments, and organic material to downstream waters. EPA_AR_0497498. Headwaters also enhance flood protection and mitigation and provide recreational

opportunities. EPA_AR_0497498; EPA_AR_0485690. Headwater ecosystems provide both habitat and food resources for fish and other aquatic and riparian organisms; in turn, fish in headwaters affect food-web dynamics and contribute to the functioning of headwater ecosystems." EPA_AR_0480848; EPA_AR_0083078; EPA_AR_0083092.

This biological reality is foundational to the "portfolio effect," wherein loss of even seemingly minor, isolated populations can have outsized consequences for the stability, productivity, and resilience of the overall fishery. EPA_AR_0083040–41; EPA_AR_0083075; *see generally* EPA_AR_0495575.

The EPA addressed the limitations and probable undercounts of angler and fish survey data, cautioning that numbers observed in any single season do not reflect the full ecological value of a stream or its long-term significance to fishery productivity. EPA_AR_0083254, EPA_AR_0083030. Recognizing that fish numbers vary significantly by year and by site, and that salmon in particular return to their same streams to spawn several years later, the EPA took a cautionary approach. An area is not simply unimportant because fish counts are temporarily low or a biased survey covered a limited period and site.

### C. The EPA Fully Explained And Supported Its Findings Regarding The Pebble Mine's Threat To Local Salmon Populations.

PLP argues there will be no reduction in salmon populations, and thus no indirect effects on other wildlife. Doc. 205-1 at 71. The EPA's Final Determination directly contradicts this assertion and notes there is clear evidence that salmon populations may be destabilized by the mine activity. *Supra* at 10–12; 26–30. The watersheds affected by the

mine support sockeye salmon populations, which are "genetically programmed to return to specific, localized reaches or habitats to spawn," as well as populations of coho salmon, and Chinook salmon. EPA _AR_0083061. The losses of these salmon populations may not only negatively impact the overall genetic diversity of each species, but also "adversely affect the stability and sustainability of valuable subsistence, commercial, and recreational salmon fisheries." EPA_AR_0083156; *supra* at 2–5.

PLP further asserts that the EPA's use of the NFK watershed as the scale for assessing impacts "irrationally treats every foot of stream the same, without accounting for habitat quality or fish quantity." Doc. 205-1 at 48. But EPA identified that the SFK, NFK, and UTC watersheds are not identical stretches of habitat. EPA_AR_0083075. Instead, each supports unique and genetically distinct populations of salmon, especially sockeye, at fine geographic scales. EPA_AR_0083075; EPA_AR_0480957 (Dann et al. 2012); EPA_AR_0496230 (Shedd et al. 2016); EPA_AR_0480692 (Dann et al. 2018). These watersheds are critical for the long-term resilience and productivity of the broader Bristol Bay salmon population, including as spawning and juvenile rearing habitat for salmonids that are both ecologically and economically valuable. EPA_AR_0083087; EPA_AR_0083002. The EPA further explained that habitat characteristics in these streams – including gravel-rich, groundwater-connected channels – are particularly suitable for egg incubation, juvenile overwintering, and other vital life stages. EPA_AR_0083002; EPA_AR_0083000; EPA_AR_0473012 (Quinn 2018).

PLP's argument is based on the assumption that lost habitat in the NFK watershed could simply be replaced by abundance elsewhere. Doc. 205-1 at 54. That is scientifically inaccurate and contrary to the record, which demonstrates that salmon populations in these upper tributaries are not interchangeable with those in the greater Bristol Bay region – losing these localized populations would constitute a unique and irreplaceable harm. EPA_AR_0083086. These headwaters are also critical ecological "bottlenecks," which can serve as a shelter or refuge from environmental conditions and can significantly impact the population, its dynamic, and habitat relationships. EPA_AR_0083257. These ecological "bottlenecks" are disproportionately important to the habitat well beyond their relatively small geographic footprint. EPA_AR_0083075, EPA_AR_0083087. In fact, the EPA selected the NFK, SFK, and UTC scale *because* it encompasses waters actually affected by the mine footprint, and *because* effects at larger scales (such as all of the Bristol Bay watershed) are not meaningful measures of ecological impact when highly specialized and adapted populations are involved. EPA_AR_0083254, EPA_AR_0083865; EPA_AR_0083249–54.

Th EPA also thoroughly supported its reasoning for choosing this scale of analysis, documenting these areas not only possess the necessary physical, chemical, and biological attributes for high-quality salmon habitat, but they also serve as foundational components of the overall regional ecosystem. EPA_AR_0083002; EPA_AR_0478260; EPA_AR_0483740–41. The agency consistently explained how unique local hydrology and geomorphology contribute to successful spawning and recruitment, and how adult

salmon rely on precise natal cues for homing, making each subwatershed's contribution to the persistence of salmon in Bristol Bay indispensable. EPA_AR_0083010; EPA_AR_0470176–77 (Dittman and Quinn 1996) ("Experimental evidence indicates that the freshwater homing migrations of salmon are governed primarily by olfactory discrimination of homestream water . . . olfaction is essential for successful completion of the homing migration.").

PLP makes various baseless arguments relating to the impacts of streamflow changes. Doc. 205-1 at 57–60. For one, PLP asserts the "EPA cited no evidence that adding flow to a nearly-dry stream would be detrimental", Doc. 205-1 at 57, but the EPA specifically noted that increased streamflow can lead to erosion and changes in the gravel and sediment, reducing the spawning and survival of eggs in addition to eliminating off channel habitats. EPA_AR_0083121–22; EPA_AR_0479767 (Buffington et al. 2004) ("[I]ncreased sediment loading may lead to greater interstitial filling of bed material, resulting in reduced intragravel flow of oxygen to buried salmonid embryos, as well as creating a physical barrier to emergence"); EPA_AR_0478964 (Bjornn and Reiser 1991). PLP further contends that the EPA "only had to ask" it to shift the discharges to adjust streamflow changes, Doc. 205-1 at 60, but the EPA has already rebutted this argument, noting that manual streamflow adjustments and discharges are not a complete solution to the problem. EPA_AR_0083070. In fact, this may even create significant new problems. EPA_AR_0083070. Both streamflow increases and reductions would cause permanent harm to the area and its wildlife. EPA_AR_0083108–27. Manual streamflow increases

could impede salmon migration and degrade their habitat quality by increasing scour and sediment mobilization. EPA_AR_0083120. These effects would be felt even at the most downstream points. EPA_AR_0083120. Manual streamflow reductions, on the other hand, would reduce habitat availability, remove critical rearing habitats, inhibit the salmon's spawning activities, and even result in reduced dissolved oxygen levels. EPA_AR_0083120. Manual changes to the streamflow would result in significant adverse effects, threatening the salmon populations that depend on the area for their survival.

The bottom line here is that the EPA's findings rest on more than theoretical or speculative harms. They are overwhelmingly substantiated by ecological science, agency expertise, and empirical data showing that destruction or degradation of headwater and tributary habitats in the Pebble deposit area will reverberate through the entire Bristol Bay fisheries complex threatening not only local fish populations, but the economic, cultural, and recreational fabric of the region.

## III. THE EPA PROPERLY WEIGHED THE DEVASTING ECONOMIC CONSEQUENCES OF THE PEBBLE MINE COMPARED TO ITS SPECULATIVE BENEFITS FOR A CANADIAN MINING OUTFIT.

Plaintiffs argue the EPA did not conduct a proper cost-benefit analysis. Doc. 167 at 44–46; Doc. 205-1 at 24. Not so. With its Final Determination, the EPA issued an entire 80-page report titled, ***Consideration of Potential Costs** Regarding the Clean Water Act Section 404(c) Final Determination for the Pebble Deposit Area, Southwest Alaska*, in which the agency determined that any potential profits associated with the mine were

entirely speculative and were outweighed by the very real detrimental environmental consequences.  EPA_AR_0141296 (emphasis added).

The EPA thoroughly "considered and weighed a broad range of advantages (benefits) and disadvantages (costs)," and based on a "totality of circumstances, including quantitative and qualitative advantages and disadvantages, . . . determined that the discharges of dredged or fill material evaluated in [the] final determination will have unacceptable adverse effects on anadromous fishery areas."  EPA_AR_0083165; *see also* EPA_AR_0084183 ("EPA weighed the significance of each advantage and disadvantage identified.").  While Plaintiffs would have weighed the scale differently, in the end it is "up to the Agency to decide (as always, within the limits of reasonable interpretation) how to account for cost." *Michigan v. EPA*, 576 U.S. 743, 759 (2015).  There is no doubt that "[a]ll regulations involve tradeoffs, and . . . Congress has assigned EPA, not the courts, to make many discretionary calls to protect both our country's environment and its productive capacity." *White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1266 (D.C. Cir. 2014) (Kavanaugh, J. concurring in part); *see also Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 10 (D.C. Cir. 2015) (holding when a statute "does not mandate a particular method of cost benefit analysis," courts "defer to EPA's methodology as well as its ultimate balancing decisions").  That is exactly what the EPA did here, and the Court should accordingly defer to its judgment.

In its cost-benefit analysis, the EPA acknowledged the proposed revenues of the 2020 Mine Plan but noted that they heavily hinge on metal resource estimates, "widely"

fluctuating global prices, and the uncertain prospect of permitting and development. EPA_AR_0141312–13. The EPA also thoroughly considered employment opportunities, mine revenue estimates, and the potential value of mined minerals as referenced in the 2020 Mine Plan itself as well as the USACE study. EPA_AR_0141318–22. But the EPA explained why all of these purported "economic costs" of the Final Determination were inherently uncertain, "making it likely that the costs of the final determination . . . [were] overstated" by PLP and others. EPA_AR_0141321–22. As the EPA found, "[b]ecause there is uncertainty regarding whether the 2020 Mine Plan will be profitable over time, it is therefore also *uncertain that the anticipated economic activity will occur at all, or in part*." EPA_AR_0141304 (emphasis added); *see also* EPA_AR_0084258–59.

With the wholly speculative economic value of the proposed mine on one side of the scale, the EPA weighed the *existing* multi-billion-dollar value of the Bristol Bay fisheries, which support commercial, subsistence, and recreational fishing valued at over $2.2 billion, on the other side of the scale. EPA_AR_0141307. Even in 2019, Bristol Bay commercial salmon fisheries supported 15,000 jobs, with $990 million of economic benefit in Alaska. EPA_AR_0141307. The EPA even used PLP's own financial data in its alternative analysis and still found that the environmental, cultural, social, ecological benefits of the Final Determination far outweighed any perceived economic "costs" of restricting mining activities. EPA_AR_0083165; EPA_AR_0083181; EPA_AR_0084254, EPA_AR_0141310–14.

At the same time, the EPA's analysis found that the "[d]ischarges of dredged or fill material to construct and operate the 2020 Mine Plan's proposed mine site alone would result in the permanent loss of approximately 8.5 miles (13.7 km) of anadromous fish streams, 91 miles (147 km) of additional streams that support anadromous fish streams, and approximately 2,108 acres (8.5 km²) of wetlands and other waters in the SFK and NFK watersheds that support anadromous fish streams." EPA_AR_0083205. That would "represent[ ] a significant loss of anadromous fishery areas and the permanent loss of ecological subsidies." EPA_AR_0083071–78. These losses are not only permanent, but "unprecedented," EPA_AR_0083093, and would carry severe impacts on the important subsistence, commercial, and recreational fisheries. EPA_AR_0083093. As such, the EPA did not just reject the mine site because of "any adverse effect," as PLP asserts, Doc. 205-1 at 36, but concluded after careful and reasonable consideration of all the factors that the certain and extreme adverse effects of PLP's proposed mine would be unacceptable and vastly outweigh any and perceived benefits. *See State Farm*, 463 U.S. at 43.

## <u>CONCLUSION</u>

The Court should deny Plaintiffs' motions for summary judgment and enter judgment for Defendants.

Dated: March 3, 2026                    Respectfully submitted,

                                        By:/s/ *Paul A. Werner*
                                        Paul A. Werner (*pro hac vice*)
                                        Steven P. Hollman (*pro hac vice*)
                                        Abraham J. Shanedling (*pro hac vice*)
                                        Hannah J. Wigger (*pro hac vice*)
                                        Christopher L. Bauer (*pro hac vice*)
                                        Alexandra Bustamante (*pro hac vice*)
                                        SHEPPARD, MULLIN, RICHTER &
                                        HAMPTON LLP
                                        2099 Pennsylvania Avenue, NW, Suite 100
                                        Washington, DC 20006-6801
                                        (202) 747-1900
                                        pwerner@sheppard.com
                                        shollman@sheppard.com
                                        ashanedling@sheppard.com
                                        hwigger@sheppard.com
                                        cbauer@sheppard.com
                                        abustamante@sheppard.com

                                        By:  *s/ Austin Williams*
                                        Austin Williams
                                        TROUT UNLIMITED
                                        600 Clipper Ship Court
                                        Anchorage, AK 99515
                                         (907) 227-1590
                                        Austin.Williams@tu.org

# CERTIFICATE OF WORD COUNT

I certify that this document contains 9,656 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits established by the Court's Orders at Docket 95 (granting motion to intervene and limiting Intervenors to 5,700 words to respond to NDM/PLP's Opening Brief), Docket 209 at 3 (granting Intervenors' request for proportionate overlength response to NDM/PLP's Opening Brief), *State of Alaska v. U.S. EPA*, Case No. 3:24-cv-00084-SLG, ECF No. 57 at 6 (D. Alaska Aug. 23, 2024) (granting motion to intervene and limiting Intervenors to 5,700 words to respond to State of Alaska's Opening Brief), and *Iliamna Natives Ltd. v. U.S. EPA*, Case No. 3:24-cv-00132-SLG, ECF No. 39 at 5 (D. Alaska Oct. 10, 2024) (granting motion to intervene and limiting Intervenors to 5,700 words to respond to INL's Opening Brief).

/s/ Paul A. Werner
Paul Werner (*pro hac vice*)