Siobhan McIntyre (AK Bar No. 1206050)
Joanna Cahoon (AK Bar No. 1405034)
TRUSTEES FOR ALASKA
121 W. Fireweed Ln., Suite 105
Anchorage, AK 99503
Phone: (907) 276-4244
smcintyre@trustees.org
jcahoon@trustees.org

*Attorneys for Intervenor-Defendants
SalmonState, Alaska Community Action on
Toxics, Alaska Wilderness League, Alaska
Wildlife Alliance, Cook Inletkeeper, Friends
of McNeil River, Kachemak Bay
Conservation Society, National Parks
Conservation Association, National Wildlife
Federation, Sierra Club, The Alaska Center,
and Wild Salmon Center*

Erin Colón (AK Bar No. 1508067)
Maile Tavepholjalern (AK Bar No. 1611094)
EARTHJUSTICE
310 K Street Suite 508
Anchorage, AK 99501
Phone: (907) 277-2500
ecolon@earthjustice.org
mtave@earthjustice.org

*Attorneys for Intervenor-Defendants Center
for Biological Diversity, Earthworks, and
Friends of the Earth*

Thomas Zimpleman (*pro hac vice*)
Jacqueline Iwata (*pro hac vice*)
NATURAL RESOURCES DEFENSE
COUNCIL
1152 15th St. NW Suite 300
Washington, DC 20005
Phone: (202) 289-6868
tzimpleman@nrdc.org
jiwata@nrdc.org

Joel Reynolds (*pro hac vice*)
NATURAL RESOURCES DEFENSE
COUNCIL
1314 2nd St.
Santa Monica, CA 90401
Phone: (310) 434-2300
jreynolds@nrdc.org

*Attorneys for Intervenor-Defendant Natural
Resources Defense Council*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

NORTHERN DYNASTY
MINERALS LTD. *et al.*,

                Plaintiffs,

          v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, *et al.*,

                Defendants,
       and

BRISTOL BAY NATIVE
ASSOCIATION, INC.,
*et al.*,

         Intervenor-Defendants.

Case No. 3:24-cv-00059-SLG

CONSOLIDATED

LEAD CASE

---

STATE OF ALASKA,

              Plaintiff,
         v.

UNITED STATES
ENVIRONMENTAL
PROTECTION AGENCY,

                Defendant,
       and

TROUT UNLIMITED, *et al.*,

         Intervenor-Defendants.

Case No. 3:24-cv-00084-SLG

CONSOLIDATED

ILIAMNA NATIVES, LTD, *et al.*,

                    Plaintiffs,

          v.

UNITED STATES
ENVIRONMENTAL
PROTECTION AGENCY, *et al.*,

                    Defendants,
       and

BRISTOL BAY ECONOMIC
DEVELOPMENT CORPORATION,
*et al.*,

             Intervenor-Defendants.

Case No. 3:24-cv-00132-SLG

CONSOLIDATED

**INTERVENOR-DEFENDANTS SALMONSTATE *ET AL.*'s RESPONSE TO
MOTIONS FOR SUMMARY JUDGMENT**
(Fed. R. Civ. P. 56(a), Local Civ. R. 16.3)

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ....................................................................................... iv

LIST OF SHORT NAMES AND ACRONYMS .......................................................... xii

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 2

STANDARDS OF REVIEW ........................................................................................ 4

STATUTORY FRAMEWORK .................................................................................... 6

ARGUMENT ................................................................................................................. 7

   I.   EPA Properly Interpreted Its Section 404(c) Authority. ......................................... 8

     A.   EPA properly interpreted Section 404(c) as authorizing restrictions for similar future discharges. ................................................................................................ 9

     B.   EPA properly interpreted the term "unacceptable adverse effects." ............... 13

   II.   EPA Reasonably Concluded the Loss of 8.5 Miles of Anadromous Fish Streams Constitutes an Unacceptable Adverse Effect. .................................................. 17

     A.   EPA's record demonstrates that the Final Determination protects WOTUS. .. 18

     B.   EPA properly considered harms to downstream fishery spawning and breeding areas…………………………………………………………………………...19

     C.   EPA properly considered secondary effects from discharges. ......................... 22

     D.   EPA reasonably considered genetic diversity, salmon populations, watershed size, and linear streams.................................................................................... 23

   III.   EPA Reasonably Concluded That Additional Unacceptable Adverse Effects Will Likely Result From the 2020 Mine Plan. ........................................................... 30

     A.   EPA reasonably concluded that the loss of 91 miles of streams is another unacceptable adverse effect........................................................................... 30

     B.   EPA reasonably concluded that streamflow alterations to 29 miles of anadromous fish streams is a third unacceptable adverse effect............................... 33

C.    EPA reasonably concluded that impacts to over 2,000 acres of wetlands is a fourth unacceptable adverse effect. ............................................................................ 35

IV.    EPA's Analysis of Other Factors Was Reasonable. ............................................ 36

A.    EPA's evaluation of harms to wildlife, recreation, and subsistence did not form the basis of the Final Determination. .......................................................... 36

B.    EPA's evaluation of the risks associated with a tailings dam failure was reasonable. ...................................................................................................... 37

C.    EPA's compensatory mitigation conclusions were reasonable. ........................ 38

D.    EPA appropriately considered the costs and benefits of the Final Determination. ........................................................................................................... 40

V.    EPA Had Authority to Issue the Final Determination, and Plaintiffs' Legal Theories to the Contrary Are Unavailing. ...................................................... 46

A.    The Final Determination is consistent with the Alaska Statehood Act and Exchange. .............................................................................................................. 47

B.    This is not an extraordinary case triggering the major questions doctrine. ....... 52

C.    Section 404(c) does not violate the nondelegation doctrine. ............................ 55

1.    Section 404(c) provides meaningful limits to guide EPA's decision making and facilitate judicial review. .............................................................................. 56

2.    The Ninth Circuit's interpretation of Section 404(c) when EPA fails to act is irrelevant when EPA acts. ................................................................................. 61

VI.    If the Court Finds Legal Violations, the Court Should Remand Without Vacating. ................................................................................................................. 63

CONCLUSION ................................................................................................................ 64

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                                    page iii

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 5 of 80

# TABLE OF AUTHORITIES

**Cases**

*Alaska v. Newland*,
   No. 3:23-cv-00007-SLG, 2024 U.S. Dist. LEXIS 112920 (D. Alaska June 26, 2024)
   .................................................................................................. 54

*Alaska, Dep't of Fish & Game v. Fed. Subsistence Bd.*,
   700 F. Supp. 3d 775 (D. Alaska 2023) ....................................... 55

*A.L.A. Schechter Poultry Corp. v. United States*,
   295 U.S. 495, 541 (1935) ......................................................... 60

*All. for the Wild Rockies v. U.S. Forest Serv*,
   907 F.3d 1105, 1121 (9th Cir. 2018) ........................................ 63

*Am. Iron & Steel Inst. v. EPA*,
   115 F.3d 979 (D.C. Cir. 1997) .................................................. 34

*Am. Mining Cong. v. EPA*,
   965 F.2d 759 (9th Cir. 1992) .................................................... 49

*Am. Power & Light Co. v. Sec. Exch. Comm'n*,
   329 U.S. 90 (1946) ................................................................... 57

*ASARCO, Inc. v. Kadish*,
   490 U.S. 605 (1989) ........................................................... 51, 52

*Bd. of Nat'l Res. of State of Wash. v. Brown*,
   992 F.2d 937 (9th Cir. 1993) .................................................... 51

*Bear Valley Mut. Water Co. v. Jewell*,
   790 F.3d 977 (9th Cir. 2015) .................................................... 61

*Beartooth All. v. Crown Butte Mines*,
   904 F. Supp. 1168 (D. Mont. 1995) .......................................... 49

*Bersani v. EPA*,
   850 F.2d 36 (2d Cir. 1988) ....................................................... 39

*Biden v. Nebraska*,
   600 U.S. 477 (2023) ................................................................. 53

---

*Biden v. Texas,*
    597 U.S. 785, 802 (2022) ...................................................................... 62

*Bottinelli v. Salazar,*
    929 F.3d 1196 (9th Cir. 2019) ..................................................................... 5

*Bus. Roundtable v. SEC,*
    647 F.3d 1144 (D.C. Cir. 2011) ................................................................ 45

*Bureau of Alcohol, Tobacco and Firearms v. FLRA,*
    464 U.S. 89 (1983) ....................................................................................... 5

*Burlington Truck Lines v. United States,*
    371 U.S. 156 (1962) ..................................................................................... 5

*Cal. Cmtys. Against Toxics v. EPA,*
    688 F.3d 989, 992 (9th Cir. 2012) ............................................................ 63

*Case v. Bowles,*
    327 U.S. 92 (1946) ................................................................................... 51

*Chamber of Com. of U.S. v. SEC,*
    412 F.3d 133 (D.C. Cir. 2005) ................................................................. 45

*Chem. Mfrs. Ass'n v. EPA,*
    28 F.3d 1259 (D.C. Cir. 1994) ................................................................. 34

*City & Cnty. of S.F. v. U.S. Citizenship & Immigration Servs.,*
    408 F. Supp. 3d 1057 (N.D. Cal. 2019) ................................................... 36

*City & Cnty. of S.F. v. U.S. Citizenship & Immigration Servs.,*
    981 F.3d 742 (9th Cir. 2020) .................................................................... 45

*City & Cnty. of San Franciso v. U.S. Dept. of Transp.,*
    796 F.3d 993 (9th Cir. 2015) .................................................................... 62

*City of L.A. Dep't of Airports v. U.S. Dept. of Transp.,*
    103 F.3d 1027 (D.C. Cir. 1997) ............................................................... 42

*Cnty. of Maui, Hawaii v. Hawaii Wildlife Fund,*
    590 U.S. 165 (2020) ................................................................................. 22

*Council. of Parent Att'ys & Advocs., Inc. v. DeVos,*
    365 F. Supp. 3d 28 (D.D.C. 2019) ........................................................... 37

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.           page v

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 7 of 80

*Covad Commc'ns Co. v. FCC*,
 450 F.3d 528 (D.C. Cir. 2006)................................................................ 41

*Creppel v. U.S. Army Corps of Eng'rs*,
 No. CIV.A.77-25, 1988 WL 70103 (E.D. La. June 29, 1988) .................................. 14

*Ctr. for Biological Diversity v. Kempthorne*,
 588 F.3d 701 (9th Cir. 2009) ............................................................... 25

*Ecology Ctr. v. Castaneda*,
 574 F.3d 652 (9th Cir. 2009) ............................................................... 33

*Encino Motorcars, L.L.C. v. Navarro*,
 584 U.S. 79 (2018) ........................................................................ 14

*Epic Sys. Corp. v. Lewis*,
 584 U.S. 497 (2018) ....................................................................... 47

*FCC v. Consumers' Rsch.*,
 606 U.S. 656 (2025) ............................................................. 56, 57, 58, 59

*FCC v. Fox TV Stations, Inc.*,
 556 U.S. 502 (2009) ....................................................................... 41

*Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*,
 887 F.3d 906 (9th Cir. 2018) .............................................................. 41

*Fond du Du Lac Band of Lake Superior v. Wheeler*,
 519 F. Supp. 3d 549 (D. Minn. 2021) ....................................................... 62

*FTC v. MTK Mktg.*,
 149 F.3d 1036 (9th Cir. 1998) ............................................................. 21

*Gonzales v. Oregon*,
 546 U.S. 243 (2006) ....................................................................... 55

*Gonzalez v. U.S. Immigration & Customs Enf't*,
 975 F.3d 788 (9th Cir. 2020) .............................................................. 52

*Gundy v. United States*,
 588 U.S. 128 (2019) ............................................................... 56, 59, 60

*Hamama v. Adduci*,
 912 F.3d 869, 879 (6th Cir. 2018). ........................................................ 52

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                              page vi

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 8 of 80

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995) ................................................................. 63

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
    448 U.S. 607 (1980) ........................................................................... 58

*Inv. Co. Inst. v. Commodity Futures Trading Comm'n*,
    720 F.3d 370 (D.C. Cir. 2013) ............................................................ 41

*James City Cnty. v. EPA*,
    12 F.3d 1330 (4th Cir. 1993) ............................................................... 39

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*,
    534 U.S. 124 (2001) ........................................................................... 47

*J. W. Hampton, Jr., & Co. v. United States*,
    276 U.S. 394, 409 (1928) ................................................................... 56

*Learning Res., Inc. v. Trump, Nos. 24–1287, 25–250*,
    2026 U.S. LEXIS 714 (Feb. 20, 2026) .................................................. 59

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ..................................................................... 5, 10

*Lopez v. Garland*,
    116 F.4th 1032 (9th Cir. 2024) ............................................................. 5

*Mingo Logan Coal Co. v. EPA*,
    70 F. Supp. 3d 151 (D.D.C. 2014) ....................................................... 39

*Mingo Logan Coal Co. v. EPA*,
    714 F.3d 608 (D.C. Cir. 2013) ......................................................... 6, 10

*Mingo Logan Coal Co. v. EPA*,
    829 F.3d 710 (D.C. Cir. 2016) ....................................................... 20, 22

*Mistretta v. United States*,
    488 U.S. 361 (1989) ..................................................................... 56, 59

*Morton v. Mancari*,
    417 U.S. 535 (1974) ........................................................................... 47

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................. 5

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 9 of 80

*Murray Energy Corp. v. EPA,*
   936 F.3d 597 (D.C. Cir. 2019)...................................................................22

*N. Plains Res. Council v. Fid. Expl. & Dev. Co.,*
   325 F.3d 1155 (9th Cir. 2003) ..........................................................49, 50

*Nasdaq Stock Mkt. L.L.C. v. SEC,*
   34 F.4th 1105 (D.C. Cir. 2022) ...............................................................41

*Native Ecosystems Council v. Weldon,*
   697 F.3d 1043 (9th Cir. 2012) .................................................................25

*Nat'l Ass'n of Home Builders v. EPA,*
   682 F.3d 1032 (D.C. Cir. 2012) ..............................................................41

*Nat'l Ass'n of Home Builders v. Norton,*
   325 F.3d 1165 (9th Cir. 2003) .................................................................50

*Nat'l Cable Television Ass'n v. United States,*
   415 U.S. 336 (1974) .........................................................................59, 60

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*
   384 F.3d 1163 (9th Cir. 2004) ...................................................................5

*Nebraska v. Su,*
   121 F.4th 1 (9th Cir. 2024) ........................................................53, 54, 55

*New York v. United States,*
   505 U.S. 144 (1992) ...............................................................................50

*Opati v. Republic of Sudan,*
   590 U.S. 418, 419 (2020) ........................................................................62

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nickels,*
   150 F.4th 1260 (9th Cir. 2025) ................................................................21

*Panama Refining Co. v. Ryan*
   293 U.S. 388, 415, 430 (1935) ................................................................60

*Pollinator Stewardship Council v. U.S. EPA,*
   806 F.3d 520 (9th Cir. 2015) ...................................................................63

*Rapanos v. United States,*
   547 U.S. 715 (2006) .................................................................................18

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                          page viii

Case 3:24-cv-00059-SLG     Document 219     Filed 03/03/26     Page 10 of 80

*Rybachek v. U.S. EPA*,
    904 F.2d 1276 (9th Cir. 1990) .................................................... 49

*Sackett v. EPA*,
    598 U.S. 651 (2023) ............................................... 10, 18, 20, 21

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ..................................................... 33

*San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*,
    100 F.4th 1039 (9th Cir. 2024) .................................................... 5

*Sandifer v. U.S. Steel Corp.*,
    571 U.S. 220 (2014) ............................................................... 14

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ................................................................. 5

*Solar Energy Indus. Ass'n v. FERC*,
    80 F.4th 956 (9th Cir. 2023) ..................................................... 63

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
    555 F. Supp. 3d 739 (D. Alaska 2021) ........................................ 40

*State v. Lewis*,
    559 P.2d 630 (Alaska 1977) ...................................................... 48

*Trout Unlimited v. Pirzadeh*,
    1 F.4th 738 (9th Cir. 2021) ........................................... 10, 33, 61

*Trs. for Alaska v. Env't Prot. Agency*,
    749 F.2d 549 (9th Cir. 1984) ..................................................... 49

*United States v. Johnson*,
    256 F.3d 895 (9th Cir. 2001) ..................................................... 61

*United States v. Neal*,
    776 F.3d 645 (9th Cir. 2015) ...................................................... 5

*United States v. Pheasant*,
    129 F.4th 576 (9th Cir. 2025) ............................................... 57, 58

*Wayman v. Southard*,
    23 U.S. 1 (1825) .................................................................... 59

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.          page ix

Case 3:24-cv-00059-SLG     Document 219     Filed 03/03/26     Page 11 of 80

*West Virginia v. EPA,*
  597 U.S. 697 (2022) ........................................................................ 53, 55

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) ........................................................................ 58, 59

*Wis. Valley Improvement Co. v. FERC,*
  236 F.3d 738 (D.C. Cir. 2001) ................................................................ 38

*Wyeth v. Levine,*
  555 U.S. 555 (2009) ............................................................................ 49

*Yakus v. United States,*
  321 U.S. 414 (1944) ............................................................................ 57

*Yellen v. Confederated Tribes of the Chehalis Rsrv.,*
  594 U.S. 338 (2021) ............................................................................ 21

## Federal Statutes

5 U.S.C. § 706 ........................................................................................ 4, 63

10 U.S.C. § 183a .......................................................................................... 15

33 U.S.C. § 1251 ................................................................................... 6, 56, 57

33 U.S.C. § 1311 .......................................................................................... 15

33 U.S.C. § 1344 ................................................................................... passim

33 U.S.C. § 1413 .......................................................................................... 15

Alaska Statehood Act, Pub. L. 85–508 (1958) ........................................... 48

Cook Inlet Land Exchange, Pub. L. 94-204 (1976) .................................... 48

## State Statutes

Alaska Stat. § 38.05.185 .............................................................................. 48

## Federal Regulations & Administrative Materials

33 C.F.R. § 320 ............................................................................................ 50

33 C.F.R. § 323 ..................................................................................... 11, 50

33 C.F.R. § 325 ............................................................................................ 50

33 C.F.R. §§ 328–30 .................................................................................... 50

33 C.F.R. § 332 ............................................................................................ 50

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                          page x

Case 3:24-cv-00059-SLG     Document 219     Filed 03/03/26     Page 12 of 80

33 C.F.R. §§ 335–36...................................................................................... 50

33 C.F.R. § 338 ............................................................................................... 50

40 C.F.R. § 230........................................................................... 15, 39, 40, 50

40 C.F.R. § 231........................................................................................ passim


Disposal Site Determination, Bayou aux Carpes Swamp,
    50 Fed. Reg. 20,602 (May 17, 1985) ......................................................... 12

Investment Company Governance,
    69 Fed. Reg. 46,738 (Aug. 2, 2004) ......................................................... 45

Proposed 404(c) Determination to Prohibit, Deny, or Restrict the Specification of Use of
Three East Everglades Areas as Disposal Sites; Notice and Public Heading
Announcement,

    52 Fed. Reg. 38,519 (Oct. 16, 1987) ....................................................... 12

Letter from Ron Curry, EPA Reg. 6 Admin., to Kelli M. Dowell, Ass't Gen. Counsel
    Entergy Servs., Inc, (Dec. 2, 2014) ......................................................... 12

Office of Management and Budget, Circular A-4: Regulatory Analysis
    (Sept. 17, 2003) ........................................................................................ 42


**Other**

U.S. Const. art. I, § 1 .................................................................................... 55

The American Heritage Dictionary of the English Language (1969) ....................... 14, 16

Webster's New World Dictionary of the American Language (2d. ed. 1972)................ 14

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.      page xi

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 13 of 80

## LIST OF SHORT NAMES AND ACRONYMS

| | |
|---|---|
| PLP | Pebble Limited Partnership |
| EPA | U.S. Environmental Protection Agency |
| CWA | Clean Water Act |
| WOTUS | Waters of the United States |
| NFK | North Fork Koktuli River |
| SFK | South Fork Koktuli River |
| UTC | Upper Talarik Creek |
| FEIS | Final Environmental Impact Statement |
| NEPA | National Environmental Policy Act |
| ROD | Record of Decision |
| SalmonState *et al.* | SalmonState |
| The State | State of Alaska |

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                    page xii

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 14 of 80

# INTRODUCTION

The Bristol Bay watershed is a "globally significant ecological and cultural resource," sustaining unparalleled commercial fishing, sport fishing, wildlife viewing, and outdoor recreation industries,[1] as well as "one of the last intact salmon-based cultures in the world."[2] One of the main underpinnings of the robust Bristol Bay fisheries is the fact that the region's aquatic resources "are largely untouched and pristine, unlike the waters that support many other salmon fisheries worldwide."[3] At the headwaters of Bristol Bay's pristine watershed, however, lies the Pebble deposit, a copper and gold deposit that Plaintiff Pebble Limited Partnership (PLP) proposes to develop into a large-scale mine.[4] Large-scale hardrock mining poses a grave threat to Bristol Bay's aquatic resources and the salmon populations that depend on them. To address this threat, in 2023, the U.S. Environmental Protection Agency (EPA) utilized its well-established authority under Section 404(c) of the Clean Water Act (CWA) to restrict the scope of discharges from potential mining operations and thereby protect Bristol Bay's headwater streams and aquatic ecosystems. EPA's Section 404(c) Final Determination (Final Determination) falls comfortably within the scope of its statutory authority, and it is well supported by extensive scientific and technical findings.

---

[1] EPA_AR_0082943; EPA_AR_0083181–84.
[2] EPA_AR_0083050; EPA_AR_0082943.
[3] EPA_AR_0082943.
[4] EPA_AR_0082945–47.

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                              page 1

## FACTUAL BACKGROUND

In 2020, PLP submitted a permit application to the U.S. Army Corps of Engineers (Corps) seeking authorization under Section 404 of the CWA to discharge dredged or fill material into waters of the United States (WOTUS) in connection with its proposed development of the Pebble deposit (2020 Mine Plan).[5]

The 2020 Mine Plan proposes to mine up to 73 million tons of ore per year with 1,300 million tons of mineralized rock and 150 million tons of waste rock and overburden mined over the project's lifetime.[6] The footprint for the 2020 Mine Plan would straddle the headwaters of the North Fork Koktuli River (NFK) and South Fork Koktuli River (SFK) , which flow into the larger Koktuli River system, the Nushagak River and on to Bristol Bay.[7] The 2020 Mine Plan would also sit at the headwaters of the Upper Talarik Creek (UTC), which drains into Lake Iliamna and then into the Kvichak

---

[5] EPA_AR_0082971. The Corps assessed the 2020 Mine Plan in a final environmental impact statement (FEIS) as required by the National Environmental Policy Act (NEPA), and denied PLP's permit application in its November 2020 Record of Decision (ROD) based on its failure to comply with the Section 404(b)(1) Guidelines and its inconsistency with the public interest. EPA_AR_0129269–97. EPA submitted extensive comments to the Corps throughout the NEPA and permitting process. *See* EPA_AR_0087854–87968; EPA_AR_0087969–8028; *see also* Defs.' Opp'n to Pls.' Mot. for Summ. J. at 33, ECF No. 215 [hereinafter EPA Br.]. Although PLP appealed the Corps' ROD, the Corps ultimately denied PLP's permit application on remand, citing EPA's Section 404(c) authority and its intervening Final Determination. Ex. G to Mot. for Judicial Notice, ECF No. 171-9.

[6] EPA_AR_0082971.

[7] EPA_AR_0082960 (showing the location of the mine site in relation to these watersheds); EPA_AR_0082945 (describing the Pebble deposit's location underneath the NFK and SFK watersheds).

River and on to Bristol Bay.[8] The Nushagak River is the largest producer of Chinook salmon in Bristol Bay, and the Kvichak River is a dominant producer of Sockeye salmon in Bristol Bay.[9]

EPA applied its scientific and technical expertise to assess whether PLP's 2020 Mine Plan would result in "unacceptable adverse effects" within the meaning of Section 404(c) and concluded that it would.[10] In its Final Determination, EPA made four independent findings of unacceptable adverse effects, any one of which the agency determined would be sufficient to justify its decision.[11] EPA's determinations were based on its careful analysis and ample record evidence.

Accordingly, EPA's Final Determination prohibits the discharge of dredged and fill material into WOTUS for the construction and routine operation of the 2020 Mine Plan.[12] In addition, EPA's Final Determination restricts the use of WOTUS as disposal sites for dredged or fill material in connection with future proposals to construct and operate a mine at the Pebble deposit that would have unacceptable adverse effects similar or greater in nature and magnitude on anadromous fishery areas in the SFK, NFK, and

---

[8] EPA_AR_0082946–47.
[9] EPA_AR_0083030, 0083048–49.
[10] EPA_AR_0082956. Prior to issuing its Final Determination, EPA conducted a landmark watershed assessment of Bristol Bay's aquatic habitats and resources. EPA_AR_0139804–141156.
[11] EPA_AR_0083070.
[12] EPA_AR_0082957–58.

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                                     page 3

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 17 of 80

UTC watersheds.[13]

SalmonState *et al.* (collectively "SalmonState") have many members who rely on Bristol Bay's fisheries for food and income, as well as maintaining their culture and community ties.[14] Their health, financial well-being, and way of life would be harmed if salmon runs were contaminated or diminished by pollution from large-scale mining. SalmonState's long-standing interests in preserving and enjoying the fisheries, wilderness, wildlife, subsistence and recreational resources, and aesthetic characteristics of the Bristol Bay watershed are threatened by large-scale mining operations at the Pebble deposit and would be impaired if PLP succeeds in its challenge to EPA's Final Determination.[15]

## STANDARDS OF REVIEW

A court reviewing claims like Plaintiffs' may set aside an agency action only if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."[16] "Where scientific and technical expertise is necessarily involved in agency decision-making . . . a reviewing court must be highly deferential to the judgment

---

[13] EPA_AR_0082958.
[14] SalmonState *et al.* Mot. to Intervene at 15–20, ECF No. 32.
[15] *Id.*
[16] 5 U.S.C. § 706(2)(A), (C).

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                    page 4

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 18 of 80

of the agency."[17] A court will uphold an agency decision as long as the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'"[18]

Interpretation of a statute or regulation is a question of law decided by the court.[19] Courts are "guided by the fundamental canons of statutory construction and begin with the statutory text."[20] Courts also "look to agency interpretations for guidance."[21] An agency's experience and informed judgment may give its interpretations the "power to persuade."[22] Thorough consideration, valid reasoning, and consistency with earlier and later pronouncements all lend weight to an agency's views.[23] An agency's interpretation is "especially informative 'to the extent it rests on factual premises within the agency's expertise.'"[24]

---

[17] *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n,* 100 F.4th 1039, 1056 (9th Cir. 2024) (quoting *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1174 (9th Cir. 2004)).

[18] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

[19] *Loper Bright Enters. v. Raimondo*, 603 U.S 369, 393–96, 412–13 (2024).

[20] *Bottinelli v. Salazar*, 929 F.3d 1196, 1199 (9th Cir. 2019) (quoting *United States v. Neal*, 776 F.3d 645, 652 (9th Cir. 2015)).

[21] *Lopez v. Garland*, 116 F. 4th 1032, 1036 (9th Cir. 2024) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

[22] *Loper Bright*, 603 U.S. at 388 (quoting *Skidmore*, 323 U.S. at 139–40).

[23] *See id.*

[24] *Id.* at 402 (quoting *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 98, n.8 (1983)).

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                    page 5

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 19 of 80

## STATUTORY FRAMEWORK

Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[25] Congress sought to attain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife."[26] Through Section 404(c) of the CWA, Congress entrusted EPA with the power to protect municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreation areas "whenever" it determines that the discharge of dredged or fill material will have unacceptable adverse effects on those resources.[27]

EPA regulations set forth the process EPA must follow to issue a Section 404(c) determination, including soliciting input from the applicant, stakeholders, and the public.[28] Although EPA must consult with the Corps and take into account the Corps' analysis under relevant portions of EPA's Section 404(b)(1) guidelines, EPA does not need to defer to the Corps in making its Section 404(c) determination; indeed, it is the Corps' permitting authority that is subject to EPA's oversight.[29] EPA has the "*final say on the specified disposal site[]*."[30]

---

[25] 33 U.S.C. § 1251(a).
[26] *Id*. § 1251(a)(2).
[27] 33 U.S.C. § 1344(c) ("Section 404(c)").
[28] 40 C.F.R. §§ 231.1–231.8; *see also* EPA Br. 20–21.
[29] *See* 40 C.F.R. § 231.1(a), (b)(3).
[30] *Mingo Logan Coal Co. v. EPA* (*Mingo Logan I*), 714 F.3d 608, 614 (D.C. Cir. 2013); *see* 33 U.S.C. § 1344(c); 40 C.F.R. § 231.1(a).

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                                    page 6

Case 3:24-cv-00059-SLG     Document 219     Filed 03/03/26     Page 20 of 80

# ARGUMENT

EPA properly exercised its authority under Section 404(c) to protect the pristine headwaters of Bristol Bay from the unacceptable adverse effects of discharges associated with the 2020 Mine Plan and similar large-scale mines. To begin with, EPA correctly interpreted the statute as authorizing it to look beyond the 2020 Mine Plan to restrict potential future discharges with similar or greater adverse effects, and EPA properly interpreted the term "unacceptable adverse effect."

Moreover, EPA's Final Determination is reasonable and well-supported. After completing a thorough scientific analysis, EPA reasonably concluded that the loss of 8.5 miles of anadromous fish streams would have unacceptable adverse effects on Bristol Bay fisheries. EPA developed a robust record demonstrating that the Final Determination protects WOTUS, and EPA properly considered how the 2020 Mine Plan would harm downstream fishery areas, including spawning and breeding areas, as well as the secondary effects of mining-related discharges. EPA bolstered its decision through further stand-alone findings that unacceptable adverse effects would result from the loss of another 91 miles of streams, streamflow alterations to an additional 29 miles of anadromous fish streams, and adverse impacts to over 2,000 acres of wetlands. Beyond these grounds supporting the Final Determination, EPA appropriately acknowledged a broader array of circumstances, including the 2020 Mine Plan's threats to subsistence resources, risks associated with a tailings dam failure, the inadequacy of PLP's proposed

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                                    page 7

Case 3:24-cv-00059-SLG     Document 219     Filed 03/03/26     Page 21 of 80

compensatory mitigation plan, and the overall costs and benefits of the Final Determination.

Plaintiffs' novel legal theories and strained arguments attacking the Final Determination are unavailing. There is no conflict between EPA's well-established authority under Section 404(c) of the CWA and the Alaska Statehood Act and Cook Inlet Land Exchange (Exchange), much less an irreconcilable conflict that would exempt State lands from federal regulatory requirements. Similarly, EPA's authority to issue its Final Determination pursuant to Section 404(c) does not implicate the major questions doctrine nor violate the nondelegation doctrine.

For all these reasons, which are discussed in more detail below, EPA's Final Determination was a lawful, reasonable, and well-supported exercise of its authority under Section 404(c), and it should be upheld.

## I. EPA PROPERLY INTERPRETED ITS SECTION 404(C) AUTHORITY.

EPA properly exercised its authority under Section 404(c) to protect the pristine headwaters of Bristol Bay from the unacceptable adverse effects of discharges associated with the 2020 Mine Plan and similar large-scale mines that may be proposed in the future. Section 404(c) does not require EPA to wait for an applicant to propose similar harmful discharges or for the Corps to specify such areas for discharge before restricting such discharges.

EPA also properly interpreted the term "unacceptable adverse effect" to mean an "impact on an aquatic or wetland ecosystem which is likely to result in . . . significant loss of or damage to fisheries."[31] PLP's arguments to the contrary are unavailing.

A. **EPA properly interpreted Section 404(c) as authorizing restrictions for similar future discharges.**

EPA based its Final Determination on the unacceptable adverse effects of the discharge proposed in PLP's permit application.[32] The Final Determination also addressed, and restricted, potential future mine-related discharges in the defined area that would have effects similar to the 2020 Mine Plan.[33] PLP argues EPA cannot restrict potential future discharges unless those specific discharges are already proposed in a permit application.[34] This argument is not based on the statutory text, but on the occasional use by EPA and legislators of the shorthand term "veto" to describe a Section 404(c) action.[35] PLP defines a "veto" as action directed at an existing proposal.[36] However, the plain statutory language, regulations, agency precedent, and case law all support EPA's authority to include in its Final Determination forward-looking restrictions on discharges not yet proposed. Moreover, the forward-looking restriction here reasonably derives from PLP's existing permit application.

---

[31] 40 C.F.R. § 231.2(e).
[32] EPA_AR_0082957–58.
[33] *Id.*
[34] PLP's Second Corrected Opening Br. at 34, ECF No. 205-1 [hereinafter PLP Br.].
[35] *Id.* at 34–35.
[36] *Id.*

---

Section 404(c) explicitly authorizes the EPA Administrator to "prohibit" specification of any defined area as a disposal site, and to "deny," "restrict," or "withdraw[]" the use of any defined area for specification as a disposal site, "whenever" he makes the requisite determination.[37] It does not mention a proposal to discharge or a pending permit application.[38] Examining this statutory language, the D.C. Circuit held that Section 404(c) unambiguously "imposes no temporal limit on the [EPA] Administrator's authority."[39] The Ninth Circuit has similarly recognized that EPA's broad authority to initiate a Section 404(c) action is not limited temporally or to the geographic area specified in a pending permit.[40]

In addition to the statutory text and case law, "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."[41] EPA's

---

[37] 33 U.S.C. § 1344(c).

[38] *Id.*

[39] *Mingo Logan I*, 714 F.3d at 613. *Loper Bright* does not change *Mingo Logan I*'s conclusion because the court interpreted Section 404(c) under *Chevron* step 1. *Mingo Logan I*, 714 F.3d at 612 ("[T]he language unambiguously expresses the intent of [] Congress.").

[40] *Trout Unlimited v. Pirzadeh,* 1 F.4th 738, 752, 757–59 (9th Cir. 2021). (explaining that Congress authorized EPA's Administrator to restrict the specification of "*any* defined area . . . as a disposal site, *whenever he determines* . . . that the discharge of such materials into such area will have an unacceptable adverse effect' on specified resources," including before a permit has been issued) (emphasis in original).

[41] *Loper Bright*, 603 U.S. at 394; *see also Sackett v. EPA*, 598 U.S. 651, 720 (2023) (Kavanaugh, J., concurring) ("Longstanding agency practice reinforces the ordinary meaning of [CWA terms].").

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                    page 10

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 24 of 80

longstanding interpretation and application of its Section 404(c) authority confirm that EPA's authority is not limited temporally or geographically to discharges that are the subject of an existing permit application.

EPA's Section 404(c) implementing regulations say explicitly, "[t]he Administrator may also prohibit the specification of a site under section 404(c) with regard to any existing or potential disposal site *before a permit application has been submitted to or approved by the Corps* or a state."[42] In the preamble to these regulations, EPA addressed this point directly and explained that "the statute clearly allows [EPA] to use 404(c) before an application is filed."[43] In fact, EPA expressed a general policy preference for exercising its Section 404(c) authority prior to permit issuance both out of "concern for the plight of the applicant, and a desire to protest[sic] the site before any adverse impacts occur."[44]

More than 40 years later, EPA expressed the same concerns with respect to the Final Determination for Bristol Bay that it acknowledged when adopting its 1979 regulations. EPA explained that addressing similar discharges now would "promote regulatory certainty by facilitating planning by developers, facilitating comprehensive

---

[42] *See* 40 C.F.R. § 231.1(a) (emphasis added); *see also id.*, § 231.1(c). The Corps' Section 404(b) implementing regulations also acknowledge that EPA may act under Section 404(c) prior to a permit being issued. *See* 33 C.F.R. § 323.6(b) (outlining Corps procedures in light of Section 404(c) notice prior to permit issuance).

[43] EPA_AR_0138920.

[44] *Id.*

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                    page 11

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 25 of 80

rather than piecemeal protection of important aquatic resources, and eliminating

frustrating situations in which someone spends time and money developing a project for

an inappropriate site and learns at an advanced stage that they must start over."[45]

Indeed, EPA regularly determines whether existing Section 404(c) determinations

prohibit different projects with similar effects.[46] Where appropriate, EPA also initiates

Section 404(c) processes before a permit application is submitted to the Corps.[47]

Restricting similar future discharges based on unacceptable adverse effects is

simply part of Section 404(c)'s implementation. Here, moreover, EPA's restriction is

conservatively grounded in EPA's review of adverse impacts from the already-proposed

2020 Mine Plan. It is limited to future discharges 1) in WOTUS; 2) related to developing

the Pebble deposit; 3) that would result in adverse effects "similar or greater in nature or

magnitude" to those of the 2020 Mine Plan; 4) in the defined area for restriction, which

---

[45] EPA_AR_0083623.

[46] *See* EPA_AR_0272458 (explaining that data supporting the Final Determination for the Yazoo Pumps Project "indicates that derivatives of the prohibited projects that involve only small modifications to the operational features or location of these proposals would also likely result in unacceptable adverse effects and would generate a similar level of concern and review by EPA"); EPA_AR_0272267 (finding prior Final Determination for the Yazoo Pumps Project prohibited another pumping project); Letter from Ron Curry, EPA Reg. 6 Admin., to Kelli M. Dowell, Ass't Gen. Counsel Entergy Servs., Inc. at 1 (Dec. 2, 2014), https://www.epa.gov/system/files/documents/2024-03/entergy-final-letter-signed-12-2-2014.pdf (explaining project fit within exception on discharge prohibitions due to similarity to projects excepted previously).

[47] *See* EPA_AR_0083624–25 (citing the initiation of two 404(c) actions prior to a permit application in the Bayou aux Carpes, 50 Fed. Reg. 20602, 20603 (May 17, 1985), and in the Florida Everglades, 52 Fed. Reg. 38519, 38520 (Oct. 16, 1987)).

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                              page 12

encompasses headwaters of the watersheds that immediately surround the footprint for the 2020 Mine Plan.[48]

In sum, EPA's decision to include reasonable forward-looking restrictions in its Final Determination is consistent with the statute's text, EPA and Corps regulations, case law, and EPA's longstanding practice.

### B. EPA properly interpreted the term "unacceptable adverse effects."

EPA properly interpreted the term "unacceptable adverse effects," and PLP's arguments to the contrary are unavailing. EPA defines "unacceptable adverse effect" to mean, in pertinent part, an "impact on an aquatic or wetland ecosystem which is likely to result in . . . significant loss of or damage to fisheries."[49] "Unacceptable" refers to the degree of significance of the adverse effect, *i.e.*, it refers to "a large impact and . . . one that the aquatic ecosystem cannot afford."[50]

PLP mistakenly argues that the ordinary meaning of the term "unacceptable" is "devastating," implying that the impacts of the 2020 Mine Plan do not meet that standard.[51] As EPA explained, the standard it used in the Final Determination—"an

---

[48] EPA_AR_0083177 (describing the applicability of the restriction); EPA_AR_0083173–4 (describing the defined area for restriction); EPA_AR_0083175 (showing the location of the 2020 Mine Plan footprint in relation to the defined area for restriction and the Nushagak and Kvichak watersheds).

[49] 40 C.F.R. § 231.2(e).

[50] EPA_AR_0083064 (quoting EPA_AR_138921).

[51] PLP Br. 48.

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                                        page 13

impact that an ecosystem cannot afford"— is consistent with the term "devastating."[52] To the extent PLP thinks an even higher standard is necessary, it is incorrect.

The ordinary tools of statutory interpretation further confirm that Congress intended the term "unacceptable adverse effects" to be flexible.

To discern the meaning of statutory text, courts assume that Congress meant words to have their ordinary meaning.[53] Courts examine dictionaries contemporaneous with a statute's enactment to guide their interpretation.[54] Here, those dictionaries define the terms "unacceptable" to mean not "satisfactory" and adverse to mean "unfavorable" or "harmful"[55]—not devastating. The case PLP relies on is consistent with these definitions.[56] Moreover, contrary to PLP's contention that the term "unacceptable" is rare in federal statutes, the term appears regularly in the U.S. Code and often in contexts that

---

[52] *See* EPA Br. 75.

[53] *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 85 (2018).

[54] *See Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014).

[55] THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 7 (1969) (defining acceptable); *id.* at 19 (defining adverse); WEBSTER's NEW WORLD DICTIONARY OF THE AMERICAN LANGUAGE 8 (2d. ed. 1972) (defining acceptable as "satisfactory, or sometimes, merely adequate"); *id.* at 20 (defining adverse).

[56] PLP cites *Creppel v. U.S. Army Corps of Engineers*, No. CIV.A.77-25, 1988 WL 70103, *12 (E.D. La. June 29, 1988) for the proposition that "unacceptable" equates to "devastating." PLP Br. 48. However, *Creppel* merely holds that it was reasonable for EPA to conclude a devastating effect satisfied the "unacceptable adverse effect," it does not indicate that a "devastating" impact is necessary to meet the standard.

---

indicate Congress intended to give an agency discretion in assessing harmful consequences.[57]

PLP also provides no record support for its assertion that EPA "imported" the Corps' alleged definition of "significant" as "more than trivial."[58] As discussed above, EPA applied its longstanding interpretation of the term "unacceptable"—a large impact that the aquatic ecosystem cannot afford—which is the very same definition PLP promotes.[59]

With respect to the degree of certainty of unacceptable adverse effects occurring in the future, EPA defines "unacceptable adverse effect" as an impact "*which is likely to result in . . . significant loss of or damage to fisheries.*"[60] EPA has explained why this standard makes sense given Section 404(c)'s context. The agency's findings are "by []"

---

[57] *See* PLP Br. 49; *see, e.g.*, 33 U.S.C. § 1413(b)(3) (allowing EPA to extend the use of ocean dumping sites if continued use "does not pose an unacceptable risk to human health, aquatic resources, or the environment"); *Id*. § 1311(g)(2)(C) (allowing EPA to grant modifications for certain pollution limits only if the modification does not "pose an unacceptable risk to human health or the environment"); 10 U.S.C. § 183a(e) (allowing the Secretary of Defense to object to projects that "would result in an unacceptable risk" to national security).

[58] PLP Br. 47. The Section 404(b)(1) Guidelines require the Corps to consider whether the discharge of dredged or fill material "will cause or contribute to significant degradation of [WOTUS]." 40 C.F.R. § 230.10(c). To make this assessment, the Corps determines whether effects to aquatic resources are significant, minor, negligible, or non-existent. EPA_AR_0128966. In this context, the Corps defines "significant" to mean "more than 'trivial.'". EPA_AR_0138937.

[59] PLP Br. 49.

[60] 40 C.F.R. § 231.2(e) (emphasis added).

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                    page 15

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 29 of 80

nature based on predictions of future impacts."[61] EPA thus cannot have "absolute certainty" unacceptable adverse effects will occur, but it also engages in "more than mere guesswork."[62]

PLP erroneously contends that Section 404(c) requires a degree of certainty beyond a "reasonable likelihood."[63] Under the plain language of Section 404(c), EPA's authority does not hinge on a specific level of future probability. The ordinary meaning of "will" is used to indicate "simple" *or* "emphatic futurity" or "likelihood."[64] EPA's longstanding interpretation is that Section 404(c) requires a reasonable likelihood of unacceptable adverse effects.[65] As EPA explains, Section 404(c) by definition requires it to make predictions for which absolute certainty would be infeasible; because Congress called on EPA to make predictions, it was not asking for heightened certainty by using the word "will."[66] Requiring absolute certainty would also run counter to EPA's protective statutory role under the CWA.[67] The cases PLP cites do not demonstrate otherwise.[68] To the extent PLP tries to suggest EPA applied a lower standard than a

---

[61] EPA_AR_0138921.

[62] *Id.*

[63] PLP Br. 50–51.

[64] THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1465 (1969).

[65] EPA_AR_0138921.

[66] *See* EPA Br. 79–80.

[67] *See supra* p. 6.

[68] PLP Br. 50–51; *See* EPA Br. 80 for further discussion.

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                                    page 16

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 30 of 80

reasonable likelihood and that the Final Determination is "replete with 'guesswork,'"[69] PLP is also wrong.[70]

## II. EPA REASONABLY CONCLUDED THE LOSS OF 8.5 MILES OF ANADROMOUS FISH STREAMS CONSTITUTES AN UNACCEPTABLE ADVERSE EFFECT.

EPA based its first unacceptable adverse effect finding on the loss of 8.5 miles of streams in which Chinook and Coho salmon have been observed rearing, spawning, or migrating.[71] This finding is well-supported and reasonable. It focuses on the direct and downstream adverse impacts of the permanent loss of 8.5 miles of anadromous streams in the upper reaches of the NFK, SFK, and UTC watersheds, which are "foundation[al]" and "integral component[s] in maintaining the integrity, productivity, and sustainability" of Bristol Bay's world-renowned fisheries.[72] The proposed tailings storage facility alone would eliminate 4.8 miles of salmon rearing habitat, 3.7 miles of Coho spawning habitat, and 0.8 miles of migrating habitat for Chinook.[73] A loss of this size is "unprecedented in the context of the CWA Section 404 regulatory program in Alaska."[74] Moreover, impacts on headwater streams have a critical "influence on downstream water flow, chemistry" that "reverberate[s] throughout entire watersheds."[75] EPA also reasonably considered the

---

[69] PLP Br. 52.
[70] *See* EPA Br. 78–82.
[71] EPA_AR_0083071.
[72] EPA_AR_0083086.
[73] EPA_AR_0083073.
[74] EPA_AR_0083074.
[75] EPA_AR_0083078.

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                    page 17

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 31 of 80

impact of genetic variation on salmon population, as well as the quality and scale of the aquatic habitat impacted by the 2020 Mine Plan.

EPA reasonably concluded that the loss of 8.5 miles of anadromous fish streams is an unacceptable adverse effect arising from the 2020 Mine Plan at the Pebble deposit— not just for the NFK, SFK, and UTC tributaries, but also for the downstream Nushagak watershed and Bristol Bay's world-renowned fishery as a whole.[76]

### A. EPA's record demonstrates that the Final Determination protects WOTUS.

The Pebble deposit sits at the headwaters of Bristol Bay, straddling the NFK and SFK, which flow into the Nushagak River, and the UTC tributaries, which flow into Lake Iliamna.[77] The CWA protects all "relatively permanent, standing or continuously flowing bodies of water," such as "'streams, oceans, rivers, and lakes.'"[78] Based on extensive record evidence, EPA properly concluded that the 2020 Mine Plan site contains relatively permanent streams flowing into traditional navigable waters.[79] There is no serious argument that these rivers, streams, and lakes—which are what "the plural term 'waters … typically refers to'"[80]—are not WOTUS.

---

[76] EPA_AR_0083074–79. As EPA discusses in its response, the record also supports the Final Determination's conclusion that same or greater levels of discharge of dredged or fill material into WOTUS elsewhere in the NFK, SFK, and UTC would likewise have unacceptable adverse effects. EPA Br. 54–58.

[77] EPA_AR_0083080.

[78] *Sackett*, 598 U.S. at 671 (quoting *Rapanos v. United States*, 547 U.S. 715, 739 (2006)).

[79] *See* EPA_AR_0082945–46; EPA_AR_0083615; *see also* EPA Br. 89–92.

[80] *Sackett*, 598 U.S. at 671.

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                    page 18

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 32 of 80

The State erroneously argues that EPA did not establish that the water bodies into which dredged and fill material would be discharged under the 2020 Mine Plan are protected by the CWA.[81] EPA did not merely "'eyeball' the record" and decide that the CWA applied to streams within the mine site.[82] Instead, EPA examined "maps of aquatic resources" along with "other information about the aquatic resources within the defined areas," including PLP's "field data" and permit application, the Corps' Preliminary Jurisdiction Determination, and "stream surveys" conducted by the State.[83] As EPA explained, the record demonstrates that "anadromous fish streams" protected by the Final Determination, "are relatively permanent and are either themselves traditional navigable waters or flow into downstream traditional navigable waters."[84] In sum, EPA correctly prohibited and restricted the discharge of dredged and fill material into WOTUS associated with the construction and maintenance of the 2020 Mine Plan.

## B.    EPA properly considered harms to downstream fishery spawning and breeding areas.

PLP makes two erroneous arguments that the 2020 Mining Plan does not harm "fishery areas."[85] First, PLP claims that "fishery areas" must be streams "where fish are

---

[81] State's Opening Br., at 39–42, ECF No. 167 [hereinafter State Br.].
[82] State Br. 41.
[83] EPA_AR_0083615. EPA drew its estimate of impacted wetlands from PLP's permit application. EPA_AR_0083099 (indicating EPA's wetlands chart estimates were "adapted from the Corps' FEIS").
[84] EPA_AR_0083615.
[85] PLP Br. 53.

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                                        page 19

caught or people engage in the business of fishing."[86] In doing so, PLP incorrectly—and misleadingly—divorces the term "fishery area" from its overall statutory context. Section 404(c) authorizes EPA to prohibit discharges that "will have an unacceptable adverse effect *on . . . fishery areas (including spawning and breeding areas)*."[87] As the D.C. Circuit has explained, Section 404(c) does not require the discharge to occur at or in fishery areas, but rather to have an unacceptable adverse effect *on* such areas regardless of where the discharge originates.[88] In *Mingo Logan Coal Co. v. EPA*, the court upheld EPA's exercise of its Section 404(c) authority based on unacceptable adverse effects to wildlife downstream from the mine at issue.[89] In particular, the court found the statute's reference to municipal water supplies "telling," as any impacts to these resources are clearly downstream of the discharge.[90] Thus, the court had "little trouble concluding that, as part of the EPA's overall authority, section 404(c) authorizes it to assess the effects of the fill beyond the fill's footprint and that nothing in the statute prohibits water quality from being part of that assessment."[91]

---

[86] *Id.*

[87] 33 U.S.C. § 1344(c) (emphasis added).

[88] *See Mingo Logan Coal Co. v. EPA*, (*Mingo Logan II*) 829 F.3d 710, 725–26 (2016).

[89] *Id.*

[90] *Id.* at 725.

[91] *Id.*

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                    page 20

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 34 of 80

Second, PLP incorrectly argues that "fishery areas" do not include spawning or breeding areas outside of areas where fish are caught.[92] The plain language of Section 404(c) states that EPA may prohibit discharges in "fishery areas (including spawning or breeding areas)."[93] As a general rule of statutory construction, "'include' is frequently, if not generally used as a word of extension or enlargement rather than as one of limitation or enumeration."[94] PLP's argument that *Sackett* casts aside this well-established canon is wrong.[95] In *Sackett*, the Supreme Court sought to harmonize two separate statutory references to WOTUS to determine the extent to which these waters included adjacent wetlands.[96] This analysis has no bearing on the meaning of the term "fishery areas."

There is no indication that Congress intended to limit EPA's Section 404(c) authority to protect only areas where fish are caught and not the spawning and breeding areas that support them. Indeed, if "spawning and breeding areas" were limited to areas where fish are caught, the "including" clause in Section 404(c) would be superfluous because such areas are already encompassed by the term "fishery areas."[97] Thus, EPA

---

[92] PLP Br. 53.

[93] 33 U.S.C. § 1344(c).

[94] *FTC v. MTK Mktg.*, 149 F.3d 1036, 1040 (9th Cir. 1998); *see also Yellen v. Confederated Tribes of the Chehalis Reservation*, 594 U.S. 338, 349–51 (2021) (describing "odd result" if entities were excluded from statutory definition despite being identified in an "including" clause).

[95] 598 U.S. 651 (2023).

[96] *See Sackett*, 598 U.S. 651.

[97] *Pac. Coast Fed'n of Fisherman's Ass'ns v. Nickels*, 150 F.4th 1260, 1271 (9th Cir. 2025) (explaining courts "construe Congress' work so that effect is given to all

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                                    page 21

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 35 of 80

reasonably defined "fishery areas" to include both aquatic areas "where fish occurrence has been documented" and "that provide ecosystem functions and values that support fishery areas."[98] Moreover, EPA clearly found that the 2020 Mine Plan would have unacceptable adverse effects on both spawning and breeding areas, as well as areas where fish are caught.[99]

### C. EPA properly considered secondary effects from discharges.

In reaching its unacceptable adverse effects findings, EPA considered secondary effects from discharges of dredged or fill material from the construction and routine operation of the 2020 Mine Plan.[100] This was proper under Section 404(c). As discussed above, the D.C. Circuit held that Section 404(c) permits EPA to "assess the effects of the fill beyond the fill's footprint."[101] Likewise here, EPA appropriately considered the secondary effects that would result from the discharge of dredged and fill material if the 2020 Mine Plan was implemented.

---

provisions, so that no part will be inoperative or superfluous, void or insignificant." (quotations omitted)).

[98] EPA_AR_0083063–64.

[99] See *supra* pp.17–18; *infra* pp. 23–30; EPA Br. 50–57.

[100] EPA_AR_0083067–68.

[101] *Mingo Logan II*, 829 F.3d at 725. The State's reliance on *County of Maui, Hawaii v. Hawaii Wildlife Fund*, 590 U.S. 165 (2020) for the proposition that Congress left autonomy to the states to regulate groundwater and nonpoint source pollution is misplaced. State Br. 43. *Maui* is inapposite because Congress clearly anticipated that EPA would consider the effects of fill "beyond the fill's footprint" under Section 404(c). *Mingo Logan II*, 829 F.3d at 725. EPA, thus, did not "trespass" into the province of the states in evaluating these secondary effects. State Br. 43 (quoting *Murray Energy Corp. v. EPA*, 936 F.3d 597, 623 (D.C. Cir. 2019).

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                                    page 22

The State incorrectly argues that the Final Determination was based on effects unrelated to dredge and fill discharges.[102] EPA explained that secondary effects are "associated with the discharge of dredged or fill material" and can result in the loss of aquatic resources.[103] Contrary to the State's argument,[104] EPA clearly identified that both harms from the direct discharge and fill *and* harms from secondary effects from discharge and fill are unacceptable.[105] Thus, secondary effects were related to dredge and fill discharges and supported EPA's findings that fishery areas would experience unacceptable adverse effects.

### D. EPA reasonably considered genetic diversity, salmon populations, watershed size, and linear streams.

EPA reasonably concluded that widespread genetic variation contributes to the Bristol Bay region's robust and resilient salmon populations and that the loss of 8.5 miles of NKF, SFK, and UTC headwater streams would harm such diversity, and, thus, harm fishery areas. PLP takes issue with EPA's "portfolio effect" analogy, which reasonably explains that the "complex structure of genetically distinct populations can be likened to a financial portfolio in which assets are divided among diverse investments to increase financial stability."[106]

---

[102] *See* State Br. 42–43.
[103] EPA_AR_0083067–68.
[104] *See* State Br. 43–44.
[105] EPA_AR_0083078–79 ("The permanent loss of approximately 8.5 miles [] of anadromous fish streams would *also* adversely affect downstream anadromous fish habitat")(emphasis added).
[106] EPA_AR_0083040; *see* PLP Br. 63.

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                              page 23

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 37 of 80

The record contradicts PLP's argument that EPA's analysis is based on "pure speculation" because "EPA did not identify any genetically distinct populations actually existing near the Deposit."[107] Although EPA did not observe (i.e., catch and document) them, EPA's conclusion that distinct Coho and Chinook subpopulations exist at the mine site is reasonable. EPA found Coho and Chinook are both present in the 8.5 miles of permanently lost headwater streams[108] and "exhibit high fidelity"[109] to specific natal streams.[110] The smell of these natal streams imprint on juvenile salmon and homing skills in adulthood lead them back to spawn and breed at these highly specific locations;[111] this contributes to the development of genetically distinct populations at "very fine geographic scales."[112] Although Sockeye salmon are the most extensively studied populations, Coho and Chinook likely share the same high levels of genetic diversity because "the basic biology of these species makes such stabilization virtually inevitable."[113] Indeed, Nushagak River Chinook are known to have at least six

---

[107] PLP Br. 64.

[108] EPA_AR_0083003 (explaining Coho "use small streams for spawning and rearing and have been observed in many of the smaller streams near the Pebble deposit."); EPA_AR_0083006 ("In the Nushagak and Kvichak River watersheds, 96 percent of 108 surveyed headwater streams contained fishes, including" Coho and Chinook salmon).

[109] EPA_AR_0083075.

[110] EPA_AR_0083010, 0083036.

[111] *Id.*

[112] EPA_AR_0083075; *see also* EPA Br. 47–49.

[113] EPA_AR_0083045.

genetically distinct populations.[114] EPA thus more than adequately explained its finding that blocking the natal streams of Coho and Chinook would result in less genetic diversity, to the detriment of these populations.[115]

EPA also cited numerous studies indicating widespread genetic variation across the Bristol Bay watershed contributes to the region's robust and resilient salmon population.[116] For example, "[a]synchrony of population dynamics across a diverse set of habitats has enabled the Bristol Bay salmon fishery to be less variable and more reliable and sustainable than would otherwise be the case."[117] As EPA summarized, "the loss of a small population within the Bristol Bay watershed's overall salmon populations may have more significant effects than expected, due to the associated loss of genetic and phenotypic diversity of a discrete population."[118] While PLP disagrees with the connections EPA drew, EPA's analysis was exactly the type of "technical analysis and judgments, based on an evaluation of complex scientific data within the agency's technical expertise" that litigants may not flyspeck.[119]

---

[114] EPA_AR_0083045. PLP mischaracterizes the studies it cites, PLP Br. 64, to support its proposition that Bristol Bay salmon stocks lack genetic diversity. *See* EPA Br. 81.

[115] *Contra* PLP Br. 64.

[116] EPA_AR_0083041–42.

[117] EPA_AR_0083041.

[118] EPA_AR_0083046. Indeed, as EPA highlights, the State applies a "Genetic Policy" to protect these subpopulations and manage its salmon fisheries. EPA Br. 49.

[119] *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009); *see also Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012).

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                    page 25

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 39 of 80

PLP next argues that EPA's Final Determination is arbitrary and capricious because the loss of the NFK headwater streams is not likely to result in significant loss or damage to any fishery because these streams contain lower fish counts compared to the larger Bristol Bay watershed.[120] This argument is without merit. PLP's statement that only 27 Coho were surveyed in the 8.5 miles of streams that would be permanently lost is wrong.[121] PLP's own sampling efforts documented much higher numbers of Chinook and Coho in these streams.[122] In addition, EPA explained PLP's survey and the State's Anadromous Waters Catalog and Freshwater Fish Inventory are likely underestimates of fish distributions.[123] In truth, salmonoid species abound throughout the NFK, SFK, and UTC watersheds, including immediately downstream from the 8.5 miles of permanently lost headwater streams.[124] Regardless, EPA found the loss of these unique headwaters would harm the NFK watershed, Nushagak watershed, and the larger Bristol Bay watershed. The record supports EPA's conclusion that the 8.5 miles of headwaters streams that would be lost "play an essential role in the successful completion of the life

---

("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts . . . ." (cleaned up)); *id.* ("Courts may not impose themselves as a panel of scientists that instructs the agency chooses among scientific studies and orders the agency to explain every possible scientific uncertainty." (cleaned up)).

[120] PLP Br. 55–56.
[121] PLP Br. 55–56, 57.
[122] *See* EPA Br. 51, 53 (explaining data at EPA AR_0095026, 0092560).
[123] EPA_AR_0083251–52.
[124] EPA_AR_0083033–34 (Tables 3-9 & 3-10), 0083078.

cycle of salmon"[125] and "would result in long-term adverse effects on salmon populations in the NFK watershed."[126]

PLP is also incorrect that "EPA did not identify anything distinctive about the NFK watershed to warrant specifically preserving the small, steep upper tributaries" that would be lost under the 2020 Mine Plan.[127] PLP mischaracterizes the 8.5 miles of permanently lost headwater streams as "low-use spawning habitat" based on the Corps' FEIS analysis.[128] EPA substantiated its disagreement with the Corps' FEIS on this point.[129] EPA emphasized that the Corps had failed to recognize the critical relationship between headwater tributaries and river mainstems: "[m]ainstems and tributaries perform overlapping, but not duplicative, roles—mainstem spawning habitats are productive because the headwaters that support them are currently undeveloped and undisturbed."[130] EPA also found that the stream channels in the NFK, SFK, and UTC watersheds, in particular, "possess the broad geomorphic and hydrologic characteristics that create stream and river habitats highly suitable" for salmon.[131]

---

[125] EPA_AR_0083075.
[126] EPA_AR_0083074.
[127] PLP Br. 60.
[128] PLP Br. 55. In addition, EPA is the primary agency with expertise in protecting the nation's waters, and it oversees the Corps permitting to ensure compliance with the Section 404(b)(1) guidelines. Section 404(c) does not require EPA to defer to the Corps' findings. *See supra* p. 6.
[129] EPA_AR_0083250. *See supra* p. 26.
[130] EPA_AR_0083250.
[131] EPA_AR_0083002.

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                    page 27

Case 3:24-cv-00059-SLG   Document 219   Filed 03/03/26   Page 41 of 80

Moreover, PLP's claim that the permanent loss of these 8.5 miles of headwater streams is comparable to water damage in the basement or "tiny crawl space" of a house is unavailing.[132] This analogy fails on its own merit, as any homeowner knows that damage to a building's foundational structure is not an isolated or trivial problem. EPA properly focused its assessment on "spatial and temporal scales that are most relevant to the resources being evaluated."[133] EPA found the loss of 13 percent of salmon habitat in the NFK watershed relevant to "capture the extents of adult spawning, egg incubation, juvenile rearing and seasonal movement, and migration as potentially affected by changes in chemical, physical, or biological conditions or processes at and downstream of the mine site."[134] PLP's argument also turns on the faulty assumption that these headwater streams are fungible, arguing "there are countless small tributaries like NFK-1.190 and NFK 1.200, with many hundreds of miles of salmon habitat."[135] There is no merit to this claim. EPA found the habitat and resources in the 8.5 miles of lost streams are "not interchangeable, but represent distinct resources that play a crucial role in supporting and stabilizing productive salmon populations in these watersheds."[136] In this sense, the loss

---

[132] *See* PLP Br. 61.

[133] EPA_AR_0083255. PLP further errs in arguing that EPA erroneously relied on the loss of 13 percent of salmon habitat in the NFK watershed as "the only basis" to support its determination that the permanent loss of 8.5 miles of anadromous fish streams is an unacceptable adverse effect. PLP Br. 56, 60. As EPA explained in its response, that is not the case. *See* EPA Br. 56.

[134] EPA_AR_0083255.

[135] PLP Br. 60.

[136] EPA_AR_0083086. *See also supra* pp. 23–25.

of these streams is more analogous to damaging 13 percent of an apartment building,

displacing an entire wing and leaving tenants with nowhere to go.

Furthermore, EPA reasonably concluded that "the permanent loss of

approximately 8.5 miles . . . of anadromous fish streams represents a significant loss of

anadromous fish habitat," and that this would also reduce the NFK watershed's "habitat

complexity and biocomplexity."[137] As EPA explained, the permanent loss of this salmon

spawning habitat "would . . . result in the loss of marine-derived nutrients those fishes

would have contributed upon death."[138]

Additionally, EPA was not obligated to adopt PLP's preference for areal, rather

than linear, assessments of habitat loss.[139] It was reasonable and appropriate for EPA to

focus on the linear extent of impacts to rivers and streams, rather than obscuring such

impacts by including upland areas. In addition, EPA reasonably considered a spatial scale

that extends downstream "as far as effects could be measured or reasonably expected to

have ecological consequences."[140]

---

[137] EPA_AR_0083078. EPA found that steams are "ecologically valuable, particularly for juvenile salmon" because they contain "important overwintering and flow velocity refugia for salmonids," EPA_AR_0083074, and "biological production via inputs of leaf litter from deciduous shrubs and grasses in riparian areas, which help fuel the production of macroinvertebrates, a key food for salmonids." EPA_AR_0083075 (citations omitted).
[138] EPA_AR_0083074.
[139] *See* PLP Br. 62–63; EPA_AR_0083865.
[140] EPA_AR_0083255; *see* EPA Br. 72–73.

---

In sum, EPA reasonably determined that the permanent loss of 8.5 miles of anadromous fish streams is likely to result in impacts to the NFK, SFK, UTC watersheds, and the Bristol Bay fishery as a whole, that the aquatic ecosystem cannot afford.

\*    \*    \*

Because the Final Determination stands on each independent finding of unacceptable adverse effects, if the Court agrees EPA's first finding is reasonable, the Court does not need to review EPA's three additional unacceptable adverse effects findings. The fact that EPA found the loss of 8.5 miles of anadromous fish streams would have unacceptable adverse effects on spawning and breeding areas and the larger Bristol Bay fishery is sufficient.

## III.    EPA REASONABLY CONCLUDED THAT ADDITIONAL UNACCEPTABLE ADVERSE EFFECTS WILL LIKELY RESULT FROM THE 2020 MINE PLAN.

EPA bolstered its Final Determination through further stand-alone findings that unacceptable adverse effects would result from the loss of another 91 miles of streams, streamflow alterations to an additional 29 miles of anadromous fish streams, and adverse impacts to over 2,000 acres of wetlands.

### A.    EPA reasonably concluded that the loss of 91 miles of streams is another unacceptable adverse effect.

EPA's second unacceptable adverse effect finding is also well-supported and reasonable. EPA appropriately prohibited discharges at the Pebble deposit that would result in the loss of an additional 91 miles of streams that support anadromous fish

_N. Dynasty Mins. Ltd. v. EPA_, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                    page 30

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 44 of 80

streams and thus have unacceptable adverse effects on downstream "fishery areas."[141] As discussed above, EPA could reasonably consider harms caused by the proposed mine to fish downstream.[142] EPA reasonably concluded that headwater streams provide important ecological support for downstream fishery areas by contributing "spawning gravels, invertebrate drift, organic matter, nutrients, surface water flows, groundwater flows, and woody debris," and that mining-related discharges would interfere with these functions.[143]

PLP objects to EPA's findings and stresses that the Corps found any loss of nutrients or dissolved organic matter would be limited to the vicinity of the mine footprint.[144] Again, PLP ignores that Section 404(c) does not require EPA to reach the same conclusions as the Corps.[145] Moreover, as discussed above, EPA explained the Corps' FEIS critically failed to recognize that "mainstem spawning habitats are productive because the headwaters that support them are currently undeveloped and undisturbed."[146] For this reason, EPA expressly rejected the Corps' findings and clarified that "reaches immediately downstream of the lost habitats would experience a complete

---

[141] EPA_AR_0083089.
[142] *See supra* pp. 19–22.
[143] EPA_AR_0083092.
[144] PLP Br. 66.
[145] *See supra* p. 6.
[146] EPA_AR_0083250.

loss of inputs from upstream habitats, which would necessarily affect their downstream transport of energy and nutrients."[147]

PLP further argues that "the streams to be lost are not particularly substantial sources of nutrients in the first place."[148] PLP is wrong. Dendritic headwater streams (i.e., stream systems with a branching pattern like tree roots), such as those found in the NFK, SKF, and UTC watersheds, "receive proportionally greater inputs of organic material from the surrounding terrestrial vegetation than larger stream channels" "[b]ecause of their narrow width."[149] Through marine-derived nutrients, dendritic headwater streams "provide an important energy subsidy for juvenile salmonids."[150] Riparian vegetation at the Pebble deposit—dominated by deciduous shrubs such as willow and alder—provides "abundant, high-quality detrital inputs" downstream.[151] If the 2020 Mine Plan is implemented, "the resulting effects on salmon populations that rely on those habitats would erode habitat complexity and biocomplexity within these watersheds" and would damage downstream anadromous fishery areas.[152]

In short, EPA rationally concluded the loss of 91 miles of headwater streams constitutes an unacceptable adverse effect because it "would result in significant damage

---

[147] EPA_AR_0083251.
[148] PLP Br. 67.
[149] EPA_AR_0083008.
[150] EPA_AR_0083008.
[151] EPA_AR_0083009.
[152] EPA_AR_0083079.

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                              page 32

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 46 of 80

to downstream anadromous fishery areas that provide spawning and rearing habitat for Coho, Chinook, Sockeye, and Chum salmon in the SFK and NFK watersheds."[153]

### B. EPA reasonably concluded that streamflow alterations to 29 miles of anadromous fish streams is a third unacceptable adverse effect.

EPA's third unacceptable adverse effect finding is also reasonable and well-supported by the record. EPA concluded that discharges under the 2020 Mine Plan would "result in streamflow alterations that would adversely affect approximately 29 miles (46.7km) of additional anadromous fish streams downstream of the mine site due to greater than 20 percent changes in average monthly streamflow."[154] While PLP disagrees with how EPA modeled the effects of streamflow alterations,[155] EPA's analysis was reasonable and consistent with its duty to "use[] its environmental expertise to shape the contours of the program."[156]

Courts review modeling decisions by ensuring that "all agency choices with respect to models, methodologies, and weighing scientific evidence" are "supported by reasoned analysis."[157] A court "will hold that the agency's use of the model is arbitrary" only when "the model bears '*no* rational relationship' to the reality it purports to

---

[153] EPA_AR_0083092.
[154] EPA_AR_0082964.
[155] PLP Br. 67–70.
[156] *Trout Unlimited*, 1 F.4th at 744.
[157] *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 665 (9th Cir. 2009); *see also San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 618 (9th Cir. 2014) (courts are "at our most deferential in reviewing" technical modeling questions).

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                    page 33

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 47 of 80

represent."[158] EPA's modeling of the effects of streamflow alterations for the Final Determination far exceeds this threshold.

PLP's argument that EPA should have used the Physical Habitat Simulation System (PHABSIM) model from the Corps' FEIS is unavailing. EPA explained that PHABSIM has shortcomings and that "a much fuller spectrum of flow conditions (e.g., base flows, high flows, flood flows) is needed to sustain native species than is provided by instream flow models" like PHABSIM.[159] PLP points out that "the Richter article," one of the articles EPA cited in support of its approach, does not mention PHABSIM,[160] but it does discuss the inadequacy of static streamflow modeling like PHABSIM.[161] EPA also cited other studies critiquing the approach used in PHABSIM,[162] which PLP ignores.

PLP's argument that EPA's approach is overprotective and does not apply to *increases* in streamflow is also misguided.[163] EPA explained in detail the extent of streamflow alterations[164] and the specific impacts on the Bristol Bay watershed that would follow from those stream flow alterations, such as reduced habitat availability, fragmentation, and reduced seasonal movement.[165] EPA also explained how increased

---

[158] *Am. Iron & Steel Inst. v. EPA*, 115 F.3d 979, 1005 (D.C. Cir. 1997) (quoting *Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1265 (D.C.Cir.1994)).
[159] EPA_AR_0083881.
[160] PLP Br. 69.
[161] EPA_AR_0494627; *see* EPA_AR_0083881 (explaining Richter).
[162] EPA_AR_0083109.
[163] PLP Br. 69–70.
[164] EPA_AR_0083115–20.
[165] EPA_AR_0083120–21

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                    page 34

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 48 of 80

streamflow is harmful: those flows "would degrade habitat suitability for salmon"[166] by stirring up sediment, burying eggs, making it more difficult for juvenile salmon to forage, and reducing off-channel habitats through erosion.[167]

EPA's streamflow modeling and its conclusions in the Final Determination were reasonable, the Court should uphold them.

### C. EPA reasonably concluded that impacts to over 2,000 acres of wetlands is a fourth unacceptable adverse effect.

EPA's fourth unacceptable adverse effect finding is reasonable and well-supported by the record as well.[168] PLP argues that EPA erred because it did not independently determine whether the wetlands that PLP would dredge and fill under the 2020 Mine Plan meet the definition of WOTUS that the Supreme Court announced in *Sackett*.[169] Even assuming PLP's premise that only impacts to jurisdictional WOTUS are relevant to EPA's analysis, EPA drew the estimate of impacted wetlands from PLP's own permit application and did not err by evaluating impacts to wetlands based on that application.[170] As EPA explained in its brief, if PLP now believes that some portion of these wetlands are not subject to the CWA, it can request a final jurisdictional determination.[171]

---

[166] EPA_AR_0083121.
[167] EPA_AR_0083121–22.
[168] *See* EPA Br. 61–62.
[169] PLP Br. 73–77.
[170] EPA_AR_0083098–99, EPA_AR_0087350 (2020 permit application identifying 2,162.53 acres of wetlands to be filled at the mine site).
[171] EPA Br. 62–63.

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                          page 35

Case 3:24-cv-00059-SLG   Document 219   Filed 03/03/26   Page 49 of 80

**IV.    EPA'S ANALYSIS OF OTHER FACTORS WAS REASONABLE.**

Beyond its four unacceptable adverse effects findings, EPA appropriately acknowledged a broader array of circumstances relevant to its Final Determination, including the 2020 Mine Plan's threats to subsistence resources, risks associated with a tailings dam failure, the inadequacy of PLP's proposed compensatory mitigation plan, and the overall costs and benefits of the Final Determination. Assuming *arguendo* that the CWA requires EPA to consider such a totality of the circumstances under Section 404(c), the Court should uphold EPA's reasonable analysis in this case.

**A.    EPA's evaluation of harms to wildlife, recreation, and subsistence did not form the basis of the Final Determination.**

PLP's claim that the Final Determination improperly relied on non-statutory factors—such as wildlife, recreation, and subsistence—fails.[172] As EPA explained, these additional "concerns and considerations"[173] are related to discharges and shed light on the extent of harms to Section 404(c)'s enumerated resources.[174] EPA's inclusion of them in the record was rational. However, this broader discussion ultimately played no role in EPA's four independent unacceptable adverse effects determinations.[175] The case PLP cites, *City & County of San Francisco v. U.S. Citizenship & Immigration Services*, involved an agency's cost-benefit analysis that the agency had relied on in its decision-

---

[172] PLP Br. at 81–83.
[173] EPA_AR_0083179.
[174] EPA_AR_0083179–84.
[175] EPA_AR_0083179.

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                    page 36

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 50 of 80

making.[176] Here, harms to wildlife, recreation, and subsistence were not part of EPA's cost-benefit analysis, and EPA explicitly disclaimed that they formed any basis for the Final Determination.[177]

## B. EPA's evaluation of the risks associated with a tailings dam failure was reasonable.

PLP's argument that EPA overstated the risks of a catastrophic tailings dam failure is unconvincing.[178] EPA was correct to examine this risk. When EPA issued its Final Determination, there had been seven recent tailings dam failures, and the frequency of tailings dam failures had doubled in the previous 50 years.[179] EPA noted that three projects, the Mount Polley Mine in British Columbia and the Fundao and Feijao mines in Brazil, experienced tailings facility failures that "caused severe environmental damage and fatalities."[180] The 2020 Mine Plan also warranted additional caution for several reasons, including the area's active seismic setting and rainy climate; the sensitive receiving environment; and the large mass of chemically reactive tailings behind the dam.[181] A tailings dam failure would have dire consequences, as EPA explained in its brief.[182]

---

[176] 408 F. Supp. 3d 1057, 1106 n.18 (N.D. Cal. 2019) (citing *Council of Parent Att'ys & Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 54 n.11 (D.D.C. 2019)).
[177] EPA_AR_ 0083179.
[178] PLP Br.77–79.
[179] EPA_AR_0015434.
[180] EPA_AR_0084033.
[181] EPA_AR_0016179.
[182] EPA Br. 109–110.

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                     page 37

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 51 of 80

PLP insists that its tailings dam design is different from those that failed and that there is no significant risk of collapse.[183] However, EPA reasonably concluded that "[u]ncertainty exists as to whether severe accidents or failures could be prevented" in such a remote location for such a long period of time,[184] and that design or operational changes could affect the risk of collapse.[185] PLP dismisses EPA's rationale as an assertion that PLP "might end up building a different [tailings storage facility] from what it proposed."[186] That reductive argument ignores what EPA said: Even *if* PLP built the tailings dam that it proposed, operational and design changes or human error could still occur during and after construction, and EPA cited studies to back up that possibility.[187] Construction and maintenance of these systems has historically been subject to high rates of error, and EPA was prudent to recognize that.[188]

### C.    EPA's compensatory mitigation conclusions were reasonable.

Regardless of whether EPA was required to consider mitigation in these

---

[183] PLP Br. 77–78.

[184] EPA_AR_0082962.

[185] EPA_AR_0083190–91.

[186] PLP Br. 77.

[187] EPA_AR_0084132 ("[T]he dominant cause of failures arises from deficiencies in engineering practices associated with the spectrum of activities embraced by design, construction, quality control, and quality assurance"); *see also* EPA_AR_0084133 ("even assuming that the tailings dam is adequately designed, dam failure could still happen due to weak engineering during construction and operations.").

[188] *See Wis. Valley Improvement Co. v. FERC*, 236 F.3d 738, 747 (D.C. Cir. 2001) (an agency policy choice "based . . . on substantial scientific evidence . . . is enough to survive arbitrary-and-capricious review.").

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.    page 38

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 52 of 80

circumstances,[189] EPA reasonably concluded that PLP's compensatory mitigation plan (CMP) was not sufficient to avoid unacceptable adverse effects.

EPA considered PLP's CMP in preparing its Final Determination and reached the reasonable conclusion that PLP's proposed mitigation plan—establishing a long-term, but not permanent, conservation area in the Koktuli watershed—failed to mitigate the adverse effects from the 2020 Mine Plan to an acceptable level.[190] Like the Corps, EPA found that the proposed area does not meet the Corps' requirements for mitigation through preservation.[191] PLP's proposed conservation area sits downstream from the 2020 Mine Plan and would suffer unacceptable adverse effects if that Plan were implemented, as discussed above.[192] The Corps considers preservation as mitigation only when the resources to be preserved "are under threat of destruction or adverse modification."[193] Here, the only threat to the pristine Koktuli watershed is the 2020 Mine Plan. PLP cannot "obtain as mitigation credit 'preserving' aquatic resources that the record shows would be

---

[189] PLP argues that at least one court has held that EPA must consider mitigation, *see* PLP Br. 80, but that court explained its interpretation in the context of EPA issuing a Section 404(c) determination *after* the Corps issued a permit which took the mitigation into account, *see Mingo Logan Coal Co. v. EPA*, 70 F. Supp. 3d 151, 173 (D.D.C. 2014).

[190] EPA has found, on multiple occasions, that an applicant's proposed compensation plan fails to mitigate adverse effects to an acceptable level, including the examples cited by PLP at Exs. J, K, and L [171-12, 171-13, 171-14]. *See James City Cnty. v. EPA*, 12 F.3d 1330, 1337 (4th Cir. 1993); *Bersani v. EPA*, 850 F.2d 36, 38 n.1 (2nd Cir. 1988); EPA_AR_0083157.

[191] EPA_AR_0083163.

[192] *See supra* pp. 17–23, 30–33.

[193] 40 C.F.R. § 230.93(h)(l)(iv).

permanently degraded by its own mine plan."[194] EPA also found that PLP failed to show

that the State had agreed to its proposal to establish a conservation area in the Koktuli

watershed.[195]

Additionally, PLP's CMP failed to meet a host of compensatory mitigation

requirements set forth in the Section 404(b)(1) Guidelines.[196] Specifically, PLP failed to

provide: adequate preservation requirements; details commensurate with scale and scope

of impacts; mitigation of port site impacts; information regarding the proposed 99-year

deed for the Koktuli preservation area; a maintenance plan; performance standards;

adequate monitoring; and financial assurances.[197]

### D. EPA appropriately considered the costs and benefits of the Final Determination.

EPA's longstanding interpretation of Section 404(c) focuses on whether a project

will have an "unacceptable adverse effect" on aquatic resources without preparing an in-

depth cost-benefit analysis.[198] PLP and the State contend this approach is incorrect.[199]

While the State and PLP argue that the CWA requires EPA to analyze costs,[200] the Court

---

[194] EPA_AR_0083163. PLP notes that it also proposed mitigation in the form of removing barriers from streams. PLP Br. 81. EPA reasonably found this mitigation ineffective to offset adverse effects, considering that there are no real barriers in the remote, roadless Koktuli watershed. EPA_AR_ 0083159.

[195] EPA_AR_0083164.

[196] See 40 C.F.R. § 230.93; Sovereign Inupiat for a Living Arctic v. BLM, 555 F. Supp. 3d 739, 792 (D. Alaska 2021).

[197] EPA_AR_0083162.

[198] EPA_AR_0083165.

[199] PLP Br. 35–39; State Br. 44–46.

[200] PLP Br. 35–39; State Br. 44–46.

N. Dynasty Mins. Ltd. v. EPA, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                          page 40

Case 3:24-cv-00059-SLG   Document 219   Filed 03/03/26   Page 54 of 80

need not reach this issue. Assuming *arguendo* such analysis is required, EPA reasonably considered the costs and benefits of the Final Determination.

Even if Section 404(c) required EPA to consider costs, the agency would have discretion in how it evaluates costs so long as the agency's methods are rational and within relevant statutory boundaries.[201] When challenging an agency's evaluation of costs, the plaintiffs' "burden to show error is high" because of the complex technical questions involved.[202] EPA generally is not required to demonstrate that the benefits of the action outweigh the costs,[203] nor does the law "require agencies to measure the immeasurable," and an appropriate discussion of "unquantifiable benefits" can "fulfill[] its statutory obligation to consider and evaluate potential costs and benefits."[204] Ultimately, courts have "'never required anything more' of an agency than to weigh costs and benefits and to make 'reasonable trade-offs.'"[205]

---

[201] *See Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 922 (9th Cir. 2018) (deferring to Corps' costs evaluations); *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1039–41 (D.C. Cir. 2012).

[202] *Nat'l Ass'n of Home Builders*, 682 F.3d at 1040 (quotation omitted).

[203] *Id.* at 1039.

[204] *Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 379 (D.C. Cir. 2013); *cf. FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 519 (2009) (an agency need not "adduce empirical data" that the agency cannot measure).

[205] *Nasdaq Stock Mkt. LLC v. Sec. & Exch. Comm'n*, 34 F.4th 1105, 1113 (D.C. Cir. 2022) (quoting *Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 543 (D.C. Cir. 2006)).

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                    page 41

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 55 of 80

EPA met that obligation in the Final Determination. It developed a robust record to support its analysis,[206] including quantitative estimates of economic activity taken directly from PLP's own sources.[207] Plaintiffs' arguments against that analysis fail.

*First*, EPA correctly recognized the uncertainty of costs and benefits. EPA acknowledged that many of the costs were uncertain because PLP had not obtained either financing or a CWA permit for the project.[208] The projected revenue and employment figures for the mine were "estimates based largely on assumptions with a high degree of uncertainty," and there was "a reasonable possibility that none of these would be accrued at all."[209] EPA also acknowledged the common-sense economic notion of opportunity costs,[210] which "represent the foregone gains from choosing one option over another alternative."[211]

PLP and the State fault EPA for its discussions of uncertainty and opportunity costs but their arguments are misplaced. The State argues that EPA improperly viewed

---

[206] EPA Br. 100–110; EPA_AR_0083165.

[207] EPA_AR_0141356–63.

[208] EPA_AR_0141303–04.

[209] EPA_AR_0141303.

[210] EPA_AR_0141304–05; *see City of Los Angeles Dep't of Airports v. U.S. Dep't of Transp.*, 103 F.3d 1027, 1032 (D.C. Cir. 1997) (explaining importance of opportunity cost in an "economic conception of cost"). Guidance to federal agencies from the Office of Management and Budget described opportunity cost as "the appropriate concept for valuing both benefits and costs" and instructed that proper calculation of net benefits or costs should include the possibility of potential substitutions. *See* Office of Management and Budget, Circular A-4: Regulatory Analysis (Sept. 17, 2003), https://obamawhitehouse.archives.gov/omb/circulars_a004_a-4.

[211] EPA_AR_0141304.

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                    page 42

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 56 of 80

mining benefits as uncertain but did not similarly caveat its assessment of the benefits of the Final Determination.[212] On the contrary, EPA recognized that both costs and benefits were subject to uncertainty.[213] The difference was a matter of degree, because the damage to the fishery would begin when construction commenced while the benefits of the mine would take longer, if ever, to be realized.[214] The State argues EPA "could not rationally conclude" mining would be unsuccessful,[215] but EPA did not make such a finding. EPA explained that PLP's own economic analysis showed that the project's net present value was highly sensitive to changes in capital costs,[216] the grade of minerals actually produced,[217] and commodity prices.[218]

Both the State and PLP take issue with EPA's discussion of opportunity costs as a prediction of what would happen if EPA implemented the Final Determination[219] However, EPA simply explained an economic truism: if a particular project does not go forward, investors will go elsewhere. Their efforts to argue with EPA's analogies get them nowhere.

---

[212] State Br. 47.
[213] EPA_AR_141303–04.
[214] *See also* EPA Br. 106–07.
[215] State Br. 48.
[216] EPA_AR_0141318.
[217] EPA_AR_0141318–19.
[218] EPA_AR_0141319.
[219] State Br. 48–49; PLP Br. 43–44.

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                    page 43

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 57 of 80

*Second*, EPA's weighing of costs and benefits was legally permissible and rational. PLP and the State make a handful of arguments that are wrong on both the facts and the law. PLP complains that "EPA counted, in its favor, the whole Bristol Bay fisheries,"[220] but PLP misreads the record. When discussing the benefits of the fisheries, EPA did not assume the 2020 Mine Plan would "destroy the fisheries *in their entirety*,"[221] but rather that it could "negatively affect Bristol Bay commercial fisheries vital to the Alaskan economy,"[222] along with recreational resources.[223] As explained before, the underlying conclusion that the 2020 Mine Plan would harm salmon abundance and aquatic resources was a reasonable and well-supported conclusion.[224]

Next, PLP and the State argue that EPA should have done more to quantify costs and benefits,[225] but EPA included quantitative estimates of the capital investments for the 2020 Mine Plan's infrastructure, its annual expenditures, and its lifetime revenue,[226] along with the IHS Markit study's estimated economic impacts,[227] production estimates,[228] analysis of global and domestic copper demand,[229] and the mine's expected

---

[220] PLP Br. 41.
[221] *Id.*
[222] EPA_AR_0141325.
[223] EPA_AR_0141336–37.
[224] *See also* EPA_AR_0141327 (discussing the FEIS and its analysis of impacts on the commercial fishery); *See supra* pp. 17–36.
[225] PLP Br. 39–43; State Br. 46–49.
[226] EPA_AR_141356–60.
[227] EPA_AR_141361–63.
[228] EPA_AR_0141363–65
[229] EPA_AR_0141365–66.

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                    page 44

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 58 of 80

contribution.[230] While the State and PLP object to EPA treating these estimates as uncertain,[231] EPA explained the sources of uncertainty in detail.[232] PLP's reliance on *City and County of San Francisco v. United States Citizenship and Immigration Services*,[233] is thus unpersuasive. In that case, the agency presented "*no analysis* of the effect of the Rule on governmental entities like the plaintiffs," and relied on a "bald declaration of [its] policy preferences," despite the availability of credible data.[234] In contrast, here, EPA developed an extensive record addressing costs and benefits.[235]

PLP's objections that EPA did not consider the economic benefits of the expanded mine are likewise unpersuasive.[236] EPA explained that "[t]he Expanded Mine scenario is not part of the 2020 Mine Plan, has not otherwise been proposed, and would require

---

[230] EPA_AR_0141366.

[231] State Br. 46; PLP Br. 39–40.

[232] EPA_AR_141315–22.

[233] 981 F.3d 742 (9th Cir. 2020); PLP Br. 39–40.

[234] *Id*. at 759 (emphasis added).

[235] PLP cites (PLP Br. 39, 41) to D.C. Circuit cases in which an agency made no effort to estimate or consider certain costs, but those cases are inapposite. *See Bus. Roundtable v. SEC*, 647 F.3d 1144, 1150 (D.C. Cir. 2011) (agency "did nothing to estimate and quantify the costs" and did not "claim estimating those costs was not possible"); *Chamber of Com. of U.S. v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005) (agency "claimed it was without a 'reliable basis for determining how funds would choose to satisfy the [condition] and therefore it [was] difficult to determine the costs associated with electing independent directors.'" (quoting 69 Fed. Reg. 46378, 46387 (Aug. 2, 2004)).

[236] PLP Br. 46–47.

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                    page 45

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 59 of 80

additional and separate permitting."[237] Moreover, EPA excluded the expanded mine from both sides of the analysis.

Finally, the State's claim that EPA did not consider the costs of the Final Determination's restriction fails.[238] EPA examined "the foregone economic activity that could potentially be associated with the construction and operation of a mine at the Pebble deposit," as well as the benefits of the foregone environmental damage when considering the costs and benefits of the prohibition and the restriction.[239]

Accordingly, to the extent a cost-benefit analysis was required, EPA's analysis was reasonable and should be affirmed.

## V. EPA HAD AUTHORITY TO ISSUE THE FINAL DETERMINATION, AND PLAINTIFFS' LEGAL THEORIES TO THE CONTRARY ARE UNAVAILING.

Plaintiffs' novel legal theories and strained arguments attacking the Final Determination are unavailing. There is no conflict between EPA's well-established authority under Section 404(c) of the CWA and the Alaska Statehood Act and Cook Inlet Land Exchange (Exchange), much less an irreconcilable conflict that would exempt State lands from federal regulatory requirements. Similarly, EPA's authority to issue its Final Determination pursuant to Section 404(c) does not implicate the major questions doctrine nor violate the nondelegation doctrine.

---

[237] EPA_AR_0083142.
[238] State Br. 49–50.
[239] EPA_AR_0141302.

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                     page 46

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 60 of 80

**A. The Final Determination is consistent with the Alaska Statehood Act and Exchange.**

The Final Determination is a lawful exercise of EPA's authority under Section 404(c) that is consistent with the Statehood Act and Exchange. It is well-established that, when "confronted with two Acts allegedly touching on the same topic," courts "must strive to 'give effect to both.'"[240] Repeals by implication can only be justified by an "irreconcilable" conflict.[241] Here, Plaintiffs attempt to create a conflict where there is none. PLP argues that the Final Determination is unlawful because it supposedly prohibits what the Statehood Act and Exchange mandate—mining the Pebble deposit.[242] The State argues the Final Determination infringes upon its authority to mine the Pebble deposit.[243] These arguments fail. The alleged mining "mandate" merely restricts alienation of State mineral rights, and nothing in the Statehood Act or Exchange exempts State lands from Section 404(c). As mining is neither mandated by the Statehood Act nor entirely prohibited by the Final Determination, there is no conflict. The State's unsupported "expectations" do not alter this conclusion.

---

[240] *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 498 (2018) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).

[241] *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 141–42 (2001) (quoting *Morton*, 417 U.S. at 550).

[242] PLP Br. 27.

[243] State Br. 33.

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                                page 47

Case 3:24-cv-00059-SLG     Document 219     Filed 03/03/26     Page 61 of 80

Contrary to PLP's contentions, the Statehood Act does not mandate mining.[244] Section 6(i) of the Statehood Act simply requires the State to retain a reservation of mineral rights.[245] The Alaska Supreme Court has confirmed this reading.[246]

PLP further contends that the State risks "forfeit[ure] to the United States" under Section 6(i) should it fail to make lands "available for mining,"[247] but that is similarly incorrect. Section 6(i) expressly provides for mineral leasing "as the State legislature may direct,"[248] and Alaska law allows for lands to be closed to mining.[249] As Exchange lands were conveyed under the same conditions as the Statehood Act, there is similarly no mining mandate for Exchange lands.[250]

---

[244] PLP Br. 27.

[245] *See* Alaska Statehood Act (Statehood Act), Pub. L. No. 85-508, § 6(i), 72 Stat. 339, 342 (1958) ("The grants of mineral lands to the State of Alaska . . . are made upon the express condition that all sales, grants, deeds, or patents for any of the mineral lands so granted shall be subject to and contain a reservation to the State of all of the minerals in the lands so sold, granted, deeded, or patented, together with the right to prospect for, mine, and remove the same.")

[246] *See State v. Lewis*, 559 P.2d 630, 633–34 (1977) (explaining Section 6(i) of the Statehood Act restricts "alienation of minerals").

[247] PLP Br. 27.

[248] Statehood Act § 6(i), 72 Stat. at 342.

[249] AS 38.05.185(a) (allowing mining closures where mining "would be incompatible with significant surface uses").

[250] Cook Inlet Land Exchange, Pub. L. 94-204, § 12(d)(1), 89 Stat. 1145, 1150–51 (1976).

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                          page 48

Case 3:24-cv-00059-SLG     Document 219     Filed 03/03/26     Page 62 of 80

In truth, State mineral rights have coexisted with a wide array of federal authorities in our federal system for many years.[251] Federal environmental, health, and safety requirements all have the potential to increase operating costs and constrain options, but those statutes do not completely "ban" mining any more than the restrictions on large-scale mining under Section 404(c) in the Final Determination. Indeed, it is well-established that the CWA applies to mining activities and may result in practical limitations on the scope or extent of mining in a particular area.[252] In fact, the CWA routinely limits the use of State-owned lands and mineral resources in Alaska.[253] Both the Section 404(b)(1) Guidelines and the Corps' permitting regulations include substantive

---

[251] *Wyeth v. Levine*, 555 U.S. 555, 584 (2009) (Breyer, J., concurrence) (explaining that states "retain substantial sovereign authority" but, "[a]s long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States." (citation omitted))

[252] *See, e.g.*, *N. Plains Res. Council v. Fidelity Expl. & Dev. Corp.*, 325 F.3d 1155, 1164–65 (9th Cir. 2003) (holding that a state had no authority to create exemptions for discharges subject to the CWA); *Trs. for Alaska v. EPA*, 749 F.2d 549, 559–60 (9th Cir. 1984) (finding that mere diminution of property value resulting from CWA did not deprive miners of their property rights); *Beartooth All. v. Crown Butte Mines*, 904 F. Supp. 1168, 1173–74 (D. Mont. 1995) (stating that discharges from mines are subject to CWA requirements).

[253] *See, e.g.*, *Am. Mining Cong. v. EPA*, 965 F.2d 759, 765 (9th Cir. 1992) (upholding EPA's authority under CWA to promulgate regulations for storm water discharges from certain mine sites); *Rybachek v. EPA*, 904 F.2d 1276, 1285 (9th Cir. 1990) (stating that CWA authorizes EPA to regulate mining in order to "prevent, reduce or eliminate pollution of navigable waters"); *Trs. for Alaska*, 749 F.2d at 558 (holding that CWA gives EPA authority to promulgate regulations establishing effluent limitations for miners).

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                                        page 49

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 63 of 80

mandates that can impact the size, scope, and design of mining projects.[254] Moreover, contrary to PLP's assertions,[255] Section 404(t) does not give the State authority to override or weaken federal CWA requirements.[256] It merely reflects the well-established principle of cooperative federalism under which state governments may impose more protective water discharge requirements than federal requirements established under the CWA.[257]

The State and PLP assert that the Final Determination goes too far because it supposedly "prevents" all mining.[258] It does not. All the Final Determination prevents is mining on the massive scale proposed in PLP's 2020 Mine Plan.[259] As EPA clearly states in its response to comments, nothing prevents future proposals for smaller, less harmful mining operations.[260]

---

[254] *See generally* 40 C.F.R. § 230; 33 C.F.R. §§ 323, 320, 325, 328–30, 332, 335–36, 338.

[255] PLP Br. 31–34.

[256] *N. Plains Res. Council*., 325 F.3d at 1165 ("[I]t cannot possibly be urged that [] state law in itself can contradict or limit the scope of the CWA, for that would run squarely afoul of our Constitution's Supremacy Clause.").

[257] *See New York v. United States*, 505 U.S. 144, 167 (1992).

[258] State Br. 33, 35; PLP Br. 30–31.

[259] *See* EPA_AR_0082958 (restricting mining on a scale that would "result in adverse effects similar or greater in nature and magnitude" as the 2020 Mine Plan).

[260] *See* EPA_AR_0083438–39 ("Section 5 of the [Final Determination] is also clear that not all future proposals to develop the Pebble deposit may be subject to this [Final Determination]"); EPA_AR_0084023 ("[O]ther activity in the same area, including mining another deposit, would not be prohibited or restricted").

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                     page 50

Case 3:24-cv-00059-SLG     Document 219     Filed 03/03/26     Page 64 of 80

The fact that PLP may deem a smaller mine less feasible or profitable does not turn the Final Determination into a blanket mining prohibition.[261] Indeed, courts have repeatedly upheld the application of general laws in the national interest to state revenue-generating lands even if they reduce profits.[262]

Lacking a textual basis for their arguments, the State and PLP assert the Final Determination unlawfully upset the State's "settled expectations."[263] Specifically, Plaintiffs insist there was a general "expectation" that the State would have unfettered authority to mine on State lands,[264] and that the Final Determination impedes the "benefit of the bargain" the State received under the Exchange.[265] This argument mischaracterizes the history of the Exchange and is without merit. A key State objective in acquiring lands in the Bristol Bay region was to allow for more effective management of "the world's largest [Sockeye] salmon fishery . . . which the major portion of our citizens in the Bristol Bay Region are dependent."[266] This fishery is now worth billions.[267] In light of these and other benefits, the State's assertions that it "never would have entered into the

---

[261] *See* PLP Br. 30–31; *see also* EPA_AR_0083670–71.

[262] *See Case v. Bowles*, 327 U.S. 92, 100 (1946) (rejecting challenge to war-time price controls' application to timber harvested from Washington state lands); *Bd. of Nat. Res. of State of Wash. v. Brown*, 992 F.2d 937, 944 (9th Cir. 1993) (applying principles of *Case*).

[263] State Br. 33–34 (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 632 (1989); PLP Br. 29–30 (same).

[264] *Id.*

[265] State Br. 34; PLP Br. 29.

[266] EPA_AR_0083596 (EPA response to comments quoting a State press release).

[267] EPA_AR_0082945.

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                    page 51

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 65 of 80

agreement" if it could not mine the Pebble deposit ring hollow.[268] Whatever purported "expectations" the State may have had, the Statehood Act and Exchange do not exempt State lands from federal regulatory authority. Thus, Plaintiffs ask the Court to do what is prohibited—creating statutory text "out of thin air."[269]

Finally, Plaintiffs rely on *ASARCO Inc. v. Kadish*, but that case invalidated an Arizona lease sale law for failing to comply with the federal statute granting Arizona federal lands.[270] Explaining that subsequent federal statutes were irrelevant to its analysis, the Court surmised, "Congress could not . . . grant lands to a State on certain specific conditions and then later . . . upset[] settled expectations through a belated effort to render those conditions more onerous."[271] Importantly, the "settled expectations" discussed in *ASARCO* were requirements for state lease sales set forth in the land grant statute.[272] The Court's observation about changing specific statute-based leasing expectations stands in stark contrast to the State and PLP's unsupported "expectations."

### B. This is not an extraordinary case triggering the major questions doctrine.

Seeking to overcome the plain language of the CWA, the State and PLP argue EPA's Final Determination raises a "major question" that should make the Court

---

[268] State Br. 34.
[269] *Gonzalez v. U.S. Immigration & Customs Enf't*, 975 F.3d 788, 814 (9th Cir. 2020) (citing *Hamama v. Adduci*, 912 F.3d 869, 879 (6th Cir. 2018)).
[270] 490 U.S. at 625–33.
[271] *Id.* at 632.
[272] *Id.* at 625–26.

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                    page 52

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 66 of 80

"hesitate before concluding that Congress meant to confer" the authority asserted.[273] The major questions doctrine does not apply here. Even if it did, EPA's Final Determination would satisfy the doctrine's standard.

The major questions doctrine is only triggered by "extraordinary cases."[274] As the Ninth Circuit has explained, those are cases that meet two criteria. First, the agency action must be both "unheralded," and a "transformative expansion" of agency authority—typically one that arises under vague and rarely used statutory language.[275] Second, the action must be of "vast economic and political significance."[276] This is not such a case.

First, EPA's Final Determination is neither unheralded (that is, at odds with Section 404(c)'s history) nor transformative (that is, inflating EPA's power to a newfound breadth).[277] As to historical practice, in promulgating the Final Determination, EPA is not extending Section 404's reach to new subject matters via a novel or tenuous interpretation of an ancillary statutory provision.[278] Prohibiting and restricting the specification of disposal sites based on stream losses and harm to fisheries is an

---

[273] PLP Br. 25 (quoting *West Virginia v. EPA*, 597 U.S. 697, 721 (2022)); State Br. 30–32.
[274] *West Virginia*, 597 U.S. at 723.
[275] *Nebraska v. Su*, 121 F.4th 1, 14 (9th Cir. 2024) (quoting *West Virginia*, 597 U.S. at 724).
[276] *Id.* (quoting *West Virginia*, 597 U.S. at 716, 721).
[277] *See Biden v. Nebraska*, 600 U.S. 477, 501 (2023).
[278] *See id.* at 496–501; *West Virginia*, 597 U.S. at 724–32.

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                     page 53

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 67 of 80

archetypal exercise of EPA's Section 404(c) authority. The Final Determination is consistent with regulations that have been in place for decades,[279] and EPA has invoked Section 404(c) more than a dozen times.[280] As discussed above, EPA's use of a Section 404(c) Final Determination prior to restrict future discharges is not novel either.[281] For largely the same reasons, the Final Determination does not represent a transformative expansion of powers that EPA has long exercised in other cases.

Second, the Final Determination does not have the kind of "vast economic and political significance" required to trigger the doctrine.[282] It is a site-specific decision affecting a single mineral deposit in a limited geographic area in Southwest Alaska. Even if PLP's estimates regarding lost revenues (which are speculative at best)[283] were reasonable, economic impact alone is not sufficient to trigger the major questions doctrine in the absence of vast political significance. Preventing a specific project from moving forward does not compare to the significance of actions courts have found pose major questions—sweeping regulations with "nationwide repercussions"[284] and actions

---

[279] *See supra* pp. 8–13.
[280] *See Su*, 121 F.4th at 14 (holding major questions doctrine inapplicable where the agency regularly invoked the relevant statutory provisions).
[281] *See supra* pp. 8–13.
[282] *Su*, 121 F.4th at 14.
[283] *See supra* pp. 41–46.
[284] *Alaska v. Newland*, No. 3:23-cv-00007, 2024 U.S. Dist. LEXIS 112920, at *21 (D. Alaska June 26, 2024), *appeal dismissed*, Nos. 24-5280, 24-5285, 24-5461, 2025 U.S. App. LEXIS 23160 (9th Cir. June 30, 2025).

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                      page 54

Case 3:24-cv-00059-SLG     Document 219     Filed 03/03/26     Page 68 of 80

affecting "millions of people nationwide."[285] Nor is EPA enacting a regulatory program

that has been the subject of national debate, or which Congress has considered but

rejected.[286] The purportedly large geographic area covered by the Final Determination is

simply a byproduct of the size of the proposed Pebble Mine and the watershed it would

harm.

Even if this *were* the sort of 'extraordinary case' that implicates the major

questions doctrine, it would not change the outcome because EPA's action satisfies the

doctrine's standard: it has "clear congressional authorization."[287] The CWA expressly

states EPA "is authorized to prohibit the specification (including the withdrawal of

specification) of any defined area as a disposal site, and [EPA] is authorized to deny or

restrict the use of any defined area for specification (including the withdrawal of

specification) as a disposal site, whenever" EPA makes an appropriate unacceptable

adverse effects determination.[288] Clearer statutory authorization is difficult to find.

### C.    Section 404(c) does not violate the nondelegation doctrine.

The United States Constitution vests all legislative powers in Congress.[289]

Although Congress cannot delegate its legislative powers, it "may confer substantial

---

[285] *Alaska Dep't of Fish & Game v. Fed. Subsistence Bd.*, 700 F.Supp.3d 775, 789 (D. Alaska 2023), *aff'd in part, vacated in part on other grounds*, 139 F.4th 773 (9th Cir. 2025).

[286] *See Gonzalez v. Oregon*, 546 U.S. 243, 267 (2006); *West Virginia*, 597 U.S. at 731–32.

[287] *See West Virginia*, 597 U.S. at 732; *Su*, 121 F.4th at 14.

[288] 33 U.S.C. § 1344(c).

[289] U.S. Const. art. 1, § 1.

discretion on executive agencies to implement and enforce the laws."[290] As the Supreme Court has reaffirmed, all the Constitution requires is that Congress "set out an 'intelligible principle' to guide what it has given the agency to do."[291] Section 404(c)—directing EPA to consider whether discharges would have effects that are "unacceptable" on four specified values with the goal of maintaining the integrity of the nation's waters[292]—easily clears these hurdles.

### 1. Section 404(c) provides meaningful limits to guide EPA's decision making and facilitate judicial review.

Delegations have an intelligible principle when Congress sets forth the "general policy" to guide the agency's discretion and sets "boundaries" on this "delegated authority."[293] Section 404(c) meets both prongs of this test. Congress set the "general policy" through the CWA's purposes, and Congress set boundaries through Section 404(c)'s "unacceptable adverse effects" clause and other limiting criteria.

To start, Congress laid out a clear general policy to guide EPA's determination. In addition to the unacceptable adverse effects standard itself,[294] the CWA's stated purpose—to "restore and maintain the chemical, physical, and biological integrity of the

---

[290] *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality opinion) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)).

[291] *FCC v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025) (quoting *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

[292] 33 U.S.C §§ 1251(a), 1344(c).

[293] *Consumers' Rsch.*, 606 U.S. at 673 (cleaned up)).

[294] *See* EPA Br. 134.

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                                              page 56

Case 3:24-cv-00059-SLG   Document 219   Filed 03/03/26   Page 70 of 80

Nation's waters"—also provides EPA with policy guidance.[295] INL does not mention this policy, but courts regularly look at such statutory policies as part of the nondelegation analysis.[296] Reading Section 404(c) alongside the CWA's purpose, the operative policy objective that EPA must achieve is protecting the nation's waters to maintain or improve their ability to support human life, fish, and wildlife. Courts have regularly upheld general anti-degradation policies under the nondelegation doctrine.[297]

Moreover, EPA's exercise of Section 404(c) is subject to at least three "boundaries" based on "specific criteria," thus meeting the second prong of the nondelegation test.[298] First, the four statutorily enumerated resources (municipal water supplies, shellfish beds and fishery areas, wildlife, and recreational areas) constrain EPA's authority. EPA has based its Final Determination on the second criterion, focusing on the harm to fishery areas, and it has explained how the discharge of dredged or fill material would harm those areas.[299] This focused analysis is responsive to the statutory criteria, and it facilitates judicial review. Indeed, other courts have found Section 404(c)'s

---

[295] 33 U.S.C. § 1251(a).

[296] *See Am. Power & Light Co. v. Sec. Exch. Comm'n*, 329 U.S. 90, 105 (1946) (looking to policy objectives in rejecting nondelegation challenge); *Yakus v. United States*, 321 U.S. 414, 423 (1944) (looking to statute's "declared policy" in rejecting challenge).

[297] *See, e.g.*, *United States v. Pheasant*, 129 F.4th 576, 580 (9th Cir. 2025) (citing approvingly to general policy to prevent "permanent impairment of the land and the quality of the environment" (quoting 43 U.S.C. § 1702(c)).

[298] *Consumers' Rsch.*, 606 U.S. at 684.

[299] *See supra* pp. 17–30.

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.                              page 57

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 71 of 80

enumerated resources as providing meaningful constraints.[300] Enumerated resources combined with a policy directive against environmental degradation are more than sufficient to meet the nondelegation test.[301]

Second, the term "unacceptable" contains a significance threshold. Although EPA may act short of catastrophe, "unacceptable adverse effects" must cause more than *de minimis* harm to the named resources.[302] Threshold language triggering an agency's authority sufficiently circumscribes agency discretion for nondelegation purposes even if that standard "require[s] the EPA to make judgments of degree."[303] The Supreme Court had no trouble upholding statutes authorizing agency action when it is "fair and equitable" or in the "public interest."[304] Indeed, a significance threshold like that conveyed by the term "unacceptable" is sufficient for nondelegation purposes.[305] INL claims that Section 404(c) "provides no yardstick for saying how much adverse impact is

---

[300] *See* EPA Br. 135 (collecting cases).
[301] *See Pheasant*, 129 F.4th at 580 (upholding statute that listed several resource values and a general policy of avoiding "permanent impairment" of environmental quality).
[302] *See supra* pp. 13–17.
[303] *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001); *see also Consumers' Rsch.*, 606 U.S. at 688–89 (explaining that the agency "may still have to strike balances" when weighing a statute's criteria, but "that kind of discretion— balancing or no—does not raise a constitutional problem").
[304] *Whitman*, 531 U.S. at 474 (quotations omitted).
[305] *See Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 642– 46 (1980) (plurality opinion) (concluding statute had a "significant risk of harm" threshold for regulation and thus did not have nondelegation problem).

---

N. Dynasty Mins. Ltd. v. EPA

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.      page 58

too much,"[306] but the nondelegation doctrine has never required Congress to "decree . . . how 'hazardous' [i]s too hazardous."[307] Congress has limited EPA's authority to "unacceptable" adverse effects, and that is sufficient to avoid nondelegation concerns.

Third, EPA's Section 404(c) authority is limited to the licensing and permitting context. The nondelegation doctrine concerns Congress' transfer of "exclusively legislative" power to the executive.[308] Even nondelegation proponents recognize that "granting and policing licenses" is an "exercise of [] executive" rather than purely legislative power.[309] "[T]he degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred."[310] The limited nature of the licensing and permitting authority that Congress delegated under Section 404(c) weighs against a need for strict limitations.[311] EPA's Section 404(c) power simply limits the Corps' ability to issue permits rather than make "generally applicable rules of private

---

[306] Pls. Iliamna Natives Limited and Alaska Peninsula Corp. Mot. For Summ. J. at 41, ECF No. 169 [hereinafter INL Br.].

[307] *Whitman*, 531 U.S. at 475.

[308] *Gundy*, 588 U.S. at 135 (quoting *Wayman v. Southard*, 23 U.S. 1, 10 (1825)).

[309] *Mistretta*, 488 U.S. 361, 417 (1989) (Scalia, J., dissenting); *see also Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 342–43 (1974) (distinguishing between licensing fees and taxes for nondelegation purposes).

[310] *Consumers' Rsch.*, 606 U.S. at 673 (quoting *Whitman*, 531 U.S. at 475).

[311] *Cf. Learning Res., Inc. v. Trump*, Nos. 24–1287, 25–250, 2026 U.S. LEXIS 714, at *77 (Feb. 20, 2026) (Gorsuch, J., concurring) (explaining nondelegation applies "with less force where the President and Congress enjoy overlapping authority" (cleaned up)).

---

conduct."[312] The default rule under Section 404 is that *no one* may discharge dredged or fill material into navigable waters unless they receive a permit. EPA thus controls the "bestow[ing of] a benefit . . . not shared by other members of society" (i.e., permission to engage in conduct that Congress has lawfully prohibited).[313] EPA's authority under Section 404(c) is thus a classic example of executive decision making rather than legislative action.

These restrictions show Section 404(c) is not akin to either of the two statutes that the Supreme Court has struck down on nondelegation grounds. Those statutes each gave the President authority to broadly regulate private conduct without "'*any* policy or standard' to confine discretion."[314] In contrast, EPA can prohibit or restrict discharges under Section 404(c) only after making specific factual findings guided by specific policy principles in the limited permitting context. That is more than sufficient to satisfy the intelligible principle test.

---

[312] *Id.* at *121 (Thomas, J., dissenting) (defining legislative power); *accord Gundy*, 588 U.S. at 153 (Gorsuch, J., dissenting).

[313] *Nat'l Cable Television Ass'n*, 415 U.S. at 341.

[314] *Gundy*, 588 U.S. at 146 (emphasis in original) (quoting *Mistretta*, 488 U.S. 373 n.7) (citing *Panama Refining Co. v. Ryan*, 293 U.S. 388, 415, 430 (1935) (involving authority to ban transportation of petroleum and petroleum products); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 541 (1935) (involving authority to proscribe or approve codes of conduct for industries)).

---

## 2. The Ninth Circuit's interpretation of Section 404(c) when EPA fails to act is irrelevant when EPA acts.

INL erroneously argues that, because the Ninth Circuit found that the CWA committed to EPA's discretion the "decision to '*decline*' to exercise" its Section 404(c) power, there are insufficient boundaries to constrain EPA's decision making when it acts.[315] This novel argument lacks case law support and would seemingly render unconstitutional all statutes that give agencies discretionary flexibility.

INL ignores the important distinction between agency action and inaction. The Ninth Circuit has found judicially manageable standards for an agency action even when it finds no standards exist for the initial decision not to act.[316] Just as Congress does not exercise legislative power until it enacts a statute (even if it proposes a bill or holds hearings on an issue), neither does EPA when it simply deliberates whether to exercise its Section 404(c) authority. INL points to *Trout Unlimited v. Pirzadeh*, but that case itself forecloses its argument.[317] The Ninth Circuit made it clear that, "if the Administrator *does* choose to exercise discretion by restricting the specification of a disposal site, the statute equally plainly constrains that decision."[318]

---

[315] INL Br. 33.

[316] *See, e.g.*, *Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 989 (9th Cir. 2015).

[317] 1 F.4th 738.

[318] *Id.* at 752 n.4. The Ninth Circuit's finding that Section 404(c) constraint EPA's discretion when it chooses to act is sufficient to require dismissal of INL's claim. Where a panel confronts an issue germane to the eventual resolution of the case and resolves it after reasoned consideration in a published opinion, that ruling becomes the "law of the

The upshot of INL's novel argument is that only statutes that impose mandatory duties upon agencies are constitutional, despite the existence of innumerable statutes containing discretionary delegations.[319] Discretion is particularly common for statutes similar to Section 404(c) in which Congress delegates day-to-day operations of a regulatory program to one agency (often a state agency[320]) but allows another agency to retain oversight.[321] INL's arguments risk destabilizing these cooperative federalism schemes. Finding unconstitutional Congress' mere delegation to an agency of the ability to prioritize when to take a discretionary action runs counter to binding precedent, and it would flip the limited scope of nondelegation review on its head.

---

circuit," regardless of whether doing so is "necessary in some strict logical sense." *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc) (per curiam). The *Trout Unlimited* panel did not make its finding "casually and without analysis" or "in passing." *Id.* at 915. Rather, the court parsed Section 404(c) in detail. *Trout Unlimited*, 1 F.4th at 752 n.4.

[319] *See Biden v. Texas*, 597 U.S. 785, 802 (2022) (collecting cases in which the Court recognized that "'the word "may" *clearly* connotes discretion'" (emphasis in original) (quoting *Opati v. Republic of Sudan*, 590 U.S. 418, 419 (2020)).

[320] Section 404 has a form of this federalism-promoting structure. Although the Corps issues Section 404 permits by default, states can (and often do) assume responsibility. *See* 33 U.S.C. § 1344(g)–(h).

[321] *Cf., e.g.*, *City & Cnty. of San Francisco v. U.S. Dep't of Transp.*, 796 F.3d 993, 1001 (9th Cir. 2015) (finding federal agency's decision not to reject state agency's certification was unreviewable); *Fond du Lac Band of Lake Superior Chippewa v. Wheeler*, 519 F. Supp. 3d 549, 558 (D. Minn. 2021) (collecting cases finding statute that gave EPA discretion—but no duty—to object to state CWA permits committed that decision to EPA's discretion by law).

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                                    page 62

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 76 of 80

## VI. IF THE COURT FINDS LEGAL VIOLATIONS, THE COURT SHOULD REMAND WITHOUT VACATING.

Although vacatur of unlawful agency actions is the presumptive remedy under the APA,[322] courts remand without vacatur "when equity demands."[323] This equitable determination requires courts to "weigh the seriousness of the agency's errors against 'the disruptive consequences of an interim change that may itself be changed.'"[324] In cases involving environmental issues, this calls for considering "whether vacating a faulty [decision] could result in possible environmental harm."[325]

Here, the equities do not support vacatur. If the Final Determination were vacated, the Corps could consider and issue Section 404(b) permits inconsistent with the Final Determination, resulting in direct, indirect, and irreparable harm to aquatic habitats, wildlife, nutritional and cultural sustenance, commercial fisheries, and recreational fisheries.[326] By contrast, leaving the Final Determination in place until any remand is

---

[322] 5 U.S.C. § 706(2).

[323] *Solar Energy Indus. Ass'n v. Fed. Energy Regul. Comm'n*, 80 F.4th 956, 997 (9th Cir. 2023) (quoting *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018)); *see also Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995).

[324] *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012)).

[325] *Id.*; s*ee also, e.g.*, *Idaho Farm Bureau Fed'n*, 58 F.3d at 1405–06 (ordering remand without vacatur because setting aside Endangered Species Act listing would risk potential extinction of the species); *Cal. Cmtys. Against Toxics*, 688 F.3d at 994 (remanding without vacating because vacatur could lead to air pollution).

[326] *See supra* pp. 17–46; EPA_AR_0083060–61 (describing importance of aquatic resources). In that scenario, vacatur would be highly disruptive because it would bring about "the very danger" the CWA "aims to prevent." *Cal. Cmtys. Against Toxics*, 688 F.3d at 994.

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs. SalmonState, et al., Resp. to Mots. for Summ. J.　　　　　page 63

Case 3:24-cv-00059-SLG　　　Document 219　　　Filed 03/03/26　　　Page 77 of 80

complete will not harm Plaintiffs. The Corps has already denied PLP's permit application. [327] As such, there is currently no Corps Section 404(b) permit in place, and both agency decisions are obstacles to the proposed mine.

## **CONCLUSION**

For these reasons, the Court should deny Plaintiffs' Motions for Summary Judgment.

Respectfully submitted this 3rd day of March 2026.

<div style="margin-left: 40%">

s/ Siobhan McIntyre
Siobhan McIntyre (AK Bar No. 1206050)
Joanna Cahoon (AK Bar No. 1405034)
TRUSTEES FOR ALASKA
*Attorneys for Intervenor-Defendants SalmonState, Alaska Community Action on Toxics, Alaska Wilderness League, Alaska Wildlife Alliance, Cook Inletkeeper, Friends of McNeil River, Kachemak Bay Conservation Society, National Parks Conservation Association, National Wildlife Federation, Sierra Club, The Alaska Center, and Wild Salmon Center*

s/ Erin Colón (with consent)
Erin Colón (AK Bar No. 1508067)
Maile Tavepholjalern (AK Bar No. 1611094)
EARTHJUSTICE
*Attorneys for Intervenor-Defendants Center for Biological Diversity, Earthworks, and Friends of the Earth*

s/Thomas Zimpleman (with consent)
Thomas Zimpleman (*pro hac vice*)
Jacqueline Iwata (*pro hac vice*)
Joel Reynolds (*pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL

</div>

---

[327] *See* PLP Br. 83.

---

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                              page 64

*Attorneys for Intervenor-Defendant Natural Resources Defense Council*

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                    page 65

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 79 of 80

## CERTIFICATE OF COMPLIANCE WITH WORD LIMITS

I certify that this document contains 15,494 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits established by the Court's Orders. Order re Motions to Intervene at 15, ECF No. 95 (granting motion to intervene and limiting Intervenors to 5,700 words to respond to PLP's Brief); Order on Three Pending Motions at 3, ECF No. 209 (granting Intervenors' request for proportionate overlength response to PLP's Brief); Order re Motions to Intervene at 6, *State of Alaska v. EPA*, No. 3:24-cv-00084 (D. Alaska Aug. 23, 2024) (granting motion to intervene and limiting Intervenors to 5,700 words to respond to the State's Brief); Order re Motions to Intervene at 5, *Iliamna Natives Ltd. v. EPA*, No. 3:24-cv-00132 (D. Alaska Oct. 10, 2024) (granting motion to intervene and limiting Intervenors to 5,700 words to respond to INL's Brief).

## CERTIFICATE OF SERVICE

I certify that on March 3, 2026, I caused a copy of the INTERVENOR-DEFENDANTS SALMONSTATE ET AL.'S RESPONSE TO MOTIONS FOR SUMMARY JUDGMENT to be electronically filed with the Clerk of the Court for the U.S. District Court of Alaska using the CM/ECF system.

s/ Siobhan McIntyre
Siobhan McIntyre

*N. Dynasty Mins. Ltd. v. EPA*, No. 3:24-00059-SLG, Intervenor-Defs.
SalmonState, et al., Resp. to Mots. for Summ. J.                    page 66

Case 3:24-cv-00059-SLG    Document 219    Filed 03/03/26    Page 80 of 80