Damien M. Schiff, Cal. Bar No. 235101*
Luke A. Wake, Cal. Bar No. 264647*
Charles T. Yates, Cal. Bar No. 327704*
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
DSchiff@pacificlegal.org
LWake@pacificlegal.org
CYates@pacificlegal.org

*Pro Hac Vice

Attorneys for Plaintiffs
Iliamna Natives Ltd. and
Alaska Peninsula Corp.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTHERN DYNASTY MINERALS LTD., et al., | |
| Plaintiffs, | Case No. 3:24-cv-00059-SLG |
| v. | CONSOLIDATED |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., | LEAD CASE |
| Defendants, | |
| and | |
| BRISTOL BAY NATIVE ASSOCIATION, INC., et al., | |
| Intervenor-Defendants. | |

STATE OF ALASKA,

        Plaintiff,

  v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

        Defendant,

  and

TROUT UNLIMITED, et al.,

        Intervenor-Defendants.

Case No. 3:24-cv-00084-SLG

CONSOLIDATED

---

ILIAMNA NATIVES LTD. and ALASKA
PENINSULA CORP.,

        Plaintiffs,

  v.

ENVIRONMENTAL PROTECTION
AGENCY; et al.,

        Defendants,

  and

BRISTOL BAY ECONOMIC
DEVELOPMENT CORPORATION, et al.,

        Intervenor-Defendants.

Case No. 3:24-cv-00132-SLG

CONSOLIDATED

**PLAINTIFFS ILIAMNA NATIVES LIMITED AND ALASKA PENINSULA
CORPORATION'S REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND ADMINISTRATIVE APPEAL**
**(Oral Argument Requested)**

---

*Iliamna Natives Ltd. v. EPA*
No. 3:24-cv-00132-SLG

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION .......................................................................................................... 1

ARGUMENT.................................................................................................................. 4

    I.    Congress Established No Policy Guiding EPA's Discretion as to Whether
        or Not to Exercise Its Veto Authority ................................................................ 4

        A.   The Native Corporations' Nondelegation Challenge Appropriately
            Focuses on Congress's Failure to Establish Any General Policy Guiding
            EPA's Discretion to Choose Between Issuing a Veto or Taking No Action ........ 5

            i.    The Nondelegation Doctrine Concerns the Scope of Discretion
                 Conferred—Not the Agency's Particular Choice to Exercise Its
                 Discretion in a Specific Way ................................................................ 5

            ii.  This Case Is on the Same Footing as *Panama Refining* ................................. 6

        B.   The Administrator's Choice Between Issuing a Veto or Taking No Action
            Is Not a Matter of Enforcement Discretion or Inherent Executive Authority....... 7

        C.   The Defendants Have Failed to Identify Any General Policy Governing the
            Administrator's Choice Between Issuing a Veto or Taking No Action.............. 10

        D.   *Pirzadeh*'s Finding of "No Law to Apply" Confirms That Congress Failed
            to Establish Any General Policy on This Important Matter .............................. 11

        E.   Section 404(c)'s Unguided Discretionary Authority Is Extraordinary............... 13

    II.   There Are No Sufficient Boundaries...................................................................... 15

CONCLUSION ............................................................................................................ 20

CERTIFICATE OF SERVICE......................................................................................21

# TABLE OF AUTHORITIES

## Cases

*American Power & Light Co. v. SEC*,
329 U.S. 90 (1946)..................................................................................... 14, 19

*City & County of San Francisco v. U.S. Dep't of Transp.*,
796 F.3d 993 (9th Cir. 2015) .......................................................................... 9, 13

*Clinton v. City of New York*,
524 U.S. 417 (1998)............................................................................................ 8

*Coates v. City of Cincinnati*,
402 U.S. 611 (1971).......................................................................................... 17

*Fed. Commc'ns Comm'n v. Consumers' Rsch.*,
606 U.S. 656 (2025)................................................................... 1, 13, 15, 19

*Fed. Power Comm'n v. Hope Nat. Gas Co.*,
320 U.S. 591 (1944)......................................................................................... 15

*Gundy v. United States*,
588 U.S. 128 (2019)............................................................................. 6, 13, 15

*Industrial Union Department, AFL-CIO v. American Petroleum Inst.*,
448 U.S. 607 (1980)......................................................................................... 14

*INS v. Chadha*,
462 U.S. 919 (1983)....................................................................................... 1, 8

*Interstate Circuit, Inc. v. City of Dallas*,
390 U.S. 676 (1968)................................................................................... 17, 20

*Jarkesy v. Sec. & Exch. Comm'n*,
34 F.4th 446 (5th Cir. 2022), *aff'd and remanded*, 603 U.S. 109 (2024)...................... 8

*Kaweah Delta Health Care Dist. v. Becerra*,
123 F.4th 939 (9th Cir. 2024) ......................................................................... 16

*Mistretta v. United States*,
488 U.S. 361 (1989)......................................................................................... 15

*Nat'l Broad. Co. v. United States*,
319 U.S. 190 (1943)................................................................................... 15, 19

*Panama Refining Co. v. Ryan*,
293 U.S. 388 (1935)................................................................................. 2-3, 6-7

*Papachristou v. City of Jacksonville*,
405 U.S. 156 (1972).......................................................................................... 17

Case 3:24-cv-00059-SLG    Document 225    Filed 04/13/26    Page 4 of 26

*Trout Unlimited v. Pirzadeh*,
  1 F.4th 738 (9th Cir. 2021) ...................................................................6, 9, 12-13, 16

*United States v. Pheasant*,
  129 F.4th 576 (9th Cir. 2025) ................................................................... 15

*Wayman v. Southard*,
  23 U.S. (10 Wheat.) 1 (1825).................................................................... 10

*Webster v. Doe*,
  486 U.S. 592 (1988)................................................................................... 14

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001).............................................................5, 14, 16-17, 19

## Statutes

5 U.S.C. § 701(a)(2) ...................................................................................12-13

29 U.S.C. § 654(a) ....................................................................................... 15

29 U.S.C. § 655(b)........................................................................................ 14

33 U.S.C. § 1251 .......................................................................................... 10

33 U.S.C. § 1319 ............................................................................................ 9

33 U.S.C. § 1344(c)........................................................................................ 2

## Other Authorities

Bergin, Amee B., *Does Application of the APA's "Committed to Agency
  Discretion" Exception Violate the Nondelegation Doctrine?*,
  28 B.C. Envtl. Aff. L. Rev. 363 (2001) ...............................................13-14

# INTRODUCTION

The Federal Defendants and the Intervenor-Defendants (collectively "Defendants") claim that Congress lawfully delegated a totally "unfettered" discretionary authority to the EPA Administrator to decide for himself whether to alter the default legal standards that the Clean Water Act (CWA) establishes for reviewing permit applications necessary for a "world class" mining operation—a project that promises to produce desperately needed jobs for a dying region, and revenue for the Plaintiff Native Corporations and their members.[1] But an authority to "alter[] the legal rights" of individuals or businesses is the text-book definition of legislative power. *INS v. Chadha*, 462 U.S. 919, 952 (1983). And the Administrator's unguided judgment as to how to weigh competing economic, social, and environmental values in deciding whether to exercise this discretionary authority is the very essence of legislative judgment—which the Constitution reserves to Congress alone.

The Defendants acknowledge, as they must, that the Constitution prohibits Congress from delegating its lawmaking powers, and that Congress must both establish (1) a general policy guiding administrative discretion **and** (2) boundaries limiting agency discretion.[2] Yet in **298 pages** they have failed to demonstrate that Congress established either.

The Defendants argue that there is no constitutional problem because Congress "authorized" the EPA Administrator to issue a veto only upon finding that a contemplated project involving the discharge of dredged or fill material "will have an unacceptable

---

[1] The Administrator sub-delegated this authority to the Assistant Administrator, who acted in this case. *See* Fed. Def. Br. at 22 n.6. But this brief refers to "the Administrator" throughout because, by statute, it is his authority to exercise as he sees fit.

[2] *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025) (*Consumers*).

adverse effect on municipal water supplies, . . . [fisheries], wildlife, or recreational areas."
Fed. Def. Br. at 120 (quoting 33 U.S.C. § 1344(c)). But this ignores the Native Corporations' primary argument that Congress failed to establish *any policy* guiding the Administrator's discretion to choose between issuing a veto or taking no action once the "unacceptable adverse effect" predicate has been established. And on that issue, the Defendants admit that the Secretary has "unfettered discretion."[3]

Having admitted that Congress established no general policy on this important matter, the Defendants have conceded the critical point. The case law is clear. If Congress has failed to establish a general policy, Section 404(c) violates the nondelegation doctrine.

Yet the Defendants seek to evade that conclusion by arguing that the Native Corporations cannot raise a constitutional challenge to the Administrator's unguided discretion to choose between exercising his Section 404(c) authority and taking no action. Why? Because they say "the whether-to-act aspect of the Alaska Native Corporations' claim is not presented on the facts of this case," given that the Administrator has chosen to exercise his veto authority. Fed. Def. Br. at 123. But that argument misconceives the nondelegation doctrine—which focuses not on what the agency has done with its discretionary authority, but on the question of whether Congress has adequately directed and channeled agency discretion. This argument is squarely foreclosed by *Panama*

---

[3] Fed. Def. Br. at 125 (admitting that under binding Ninth Circuit precedent "EPA's discretion is unfettered . . . insofar as the Agency decides *not* to exercise its Section 404(c) authority."); Bristol Bay Br. at 52 (admitting the Ninth Circuit has held that EPA has "'unfettered discretion' . . . not to undertake or complete a 404(c) action.") (citations omitted); SalmonState Br. at 61 (admitting "no standards exist . . . [to review a] decision not to act").

*Refining Co. v. Ryan*, 293 U.S. 388 (1935), which found that the National Industrial Recovery Act (NIRA) violated the nondelegation doctrine in authorizing the President to prohibit the transport of hot oil without establishing any policy guiding the President's choice of whether to exercise that authority or to do nothing. As in this case, the plaintiff in *Panama Refining* was challenging an *exercise* of unguided discretionary authority.

The Defendants next argue that the nondelegation doctrine has no application because the Administrator's discretion to take no action is, supposedly, a matter of "enforcement discretion." Fed. Def. Br. at 122. But that argument is plainly wrong because the Administrator is not choosing whether to bring an enforcement action when deciding whether to exercise his delegated authority under Section 404(c); he is choosing whether to establish the law that will govern any subsequent exercise of enforcement discretion.

Relatedly, the Defendants claim that the Administrator has inherent executive authority to decide whether to exercise delegated authority under Section 404(c). But this is wrong. Nothing in the Constitution vests the Executive Branch with inherent authority to alter the legal rights of permit applicants. On the contrary, all legislative power is vested with Congress. As such, the choice of whether to alter legal rights and obligations of private parties is a *legislative choice* that Congress must decide by at least establishing a general policy guiding the Administrator's discretion.[4]

---

[4] By contrast, an agency exercises executive authority when reviewing and issuing permit applications pursuant to enacted law because it is the statute (not the agency) that speaks to the applicant's rights to pursue a permit, and to the applicant's rights and obligations once a permit is lawfully issued.

Finally, even setting aside the Administrator's discretion to decide whether to exercise his Section 404(c) authority, there is a nondelegation problem because Congress has failed to establish any meaningful boundary with respect to the predicate for exercise of the veto power. While the Defendants insist that there is some kind of boundary in the requirement that the Secretary decide whether a contemplated discharge of dredged or fill material would result in "unacceptable adverse effects[,]" their statutory arguments confirm that those supposed boundaries are illusory, or inconsequential at best. Taken as a whole, the Defendants' arguments confirm that, if there are any boundaries, they are exceedingly weak. That lack of guardrails only underscores the significance of the Administrator's Section 404(c) power, and the imperative for Congress to provide meaningful direction as to whether and when the Administrator should exercise this power, or take no action.

## ARGUMENT

### I. Congress Established No Policy Guiding EPA's Discretion as to Whether or Not to Exercise Its Veto Authority

The Defendants have acknowledged that a statute violates the nondelegation doctrine if Congress has delegated authority without establishing a general policy directing agency discretion.[5] But there is no general policy guiding the Administrator's choice as to whether to exercise his Section 404(c) authority. And the Defendants admit as much.[6]

---

[5] *See* Fed. Def. Br. at 119 (acknowledging that the question "is whether Congress supplied a general policy, standards in pursuing that policy, and boundaries . . ."); Bristol Bay Br. at 47 (acknowledging this test); SalmonState Br. at 56 (same).
[6] *See infra* n.3.

Their only play is to seek to dodge the nondelegation doctrine entirely. But all of Defendants' arguments as to why the nondelegation doctrine does not apply fall flat. As such, this Court must find a nondelegation violation because there is no law governing the Administrator's discretionary veto authority.

### A. The Native Corporations' Nondelegation Challenge Appropriately Focuses on Congress's Failure to Establish Any General Policy Guiding EPA's Discretion to Choose Between Issuing a Veto or Taking No Action.

As an initial matter, the Defendants argue that, because the Administrator "acted" under his Section 404(c) authority, "the Court has no occasion to decide whether the Agency's discretion *not* to act is a concern." Fed. Def. Br. at 123. But this argument fundamentally misunderstands the nondelegation doctrine and ignores binding case law.

### i. The Nondelegation Doctrine Concerns the Scope of Discretion Conferred—Not the Agency's Particular Choice to Exercise Its Discretion in a Specific Way.

The Defendants assert that a nondelegation challenge must focus on an agency's granular choice to exercise administrative discretion in a specific way. This is wrong. Nondelegation analysis focuses not on the specific act that caused the plaintiff's Article III injury, but on the full scope of discretion delegated to the executive officer in question. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001) (stressing that deciding the adequacy of Congress' direction requires considering the full "scope of the power [] conferred"). The nondelegation doctrine is concerned with the question of whether Congress has delegated its legislative prerogative to decide what the law will be. *Id*. at 472. As such, nondelegation analysis focuses on whether Congress has provided sufficient direction to guide the exercise of discretion. *Id*. at 475. And the nondelegation doctrine,

therefore, requires a searching inquiry into all aspects of the statute that may shed light on the question of whether Congress has provided adequate direction as to how to exercise a discretionary delegated authority. *See Gundy v. United States*, 588 U.S. 128, 136 (2019) (emphasizing that nondelegation analysis requires ascertaining the statute's full "meaning"). But in this case the Ninth Circuit has already searched in vain for anything in the statute guiding the Administrator's discretion in choosing between whether to exercise his Section 404(c) authority, or to take no action at all. *See Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 751-53 (9th Cir. 2021) (*Pirzadeh*) (concluding that there was "no law to apply").

### ii. This Case Is on the Same Footing as *Panama Refining*.

The Supreme Court's decision in *Panama Refining* makes crystal clear that a plaintiff may raise a nondelegation challenge to "the whether-to-act aspect[,]" Fed. Def. Br. at 123, of an executive officer's delegated authority. In that case the Court found a violation precisely because Congress established no general policy directing whether or when President Roosevelt should have prohibited the transportation of hot oil.

The constitutional problem, in *Panama Refining*, was that Section 9(c) of the NIRA "authorized" (but did not require) the President "to prohibit the transportation" of petroleum and petroleum products "in excess of the amount permitted to be produced or withdrawn from storage" by any state law or regulation. 293 U.S. at 405. Indeed, the NIRA authorized the President to take this action only to the extent that the predicate condition was met. But even accepting the existence of a state law or regulation restricting hot oil, the President was free "to lay down the prohibition, or not to lay it down, as he [] [saw] fit." *Id.* at 415.

*Iliamna Natives Ltd. v. EPA*      6
No. 3:24-cv-00132-SLG
Case 3:24-cv-00059-SLG     Document 225     Filed 04/13/26     Page 11 of 26

Of course, the Panama Refining Company would never have brought a nondelegation claim if the President had declined to exercise his authority under NIRA Section 9(c). Nor would the Native Corporations have brought this case if the Administrator had declined to exercise his authority under CWA Section 404(c). But the fact that the President chose to prohibit the transportation of hot oil gave the Panama Refining Company standing to bring its nondelegation claim, *id*. at 411, just as the Administrator's choice to exercise the veto authority gives rise to the Native Corporations' nondelegation claim. Because this case is in the very same posture as *Panama Refining*, this Court must find a nondelegation violation.

**B. The Administrator's Choice Between Issuing a Veto or Taking No Action Is Not a Matter of Enforcement Discretion or Inherent Executive Authority.**

The Defendants attempt to evade review under the nondelegation doctrine by characterizing the Administrator's unfettered discretion to choose between acting or not, under Section 404(c), as a matter of "enforcement discretion" that is supposedly different from "the types of open-ended statutes that appropriately garner attention under the nondelegation doctrine." Fed. Def. Br. at 122. But *Panama Refining* confirms that Congress violates the nondelegation doctrine in delegating unfettered discretionary authority to make a ***binary choice*** between prohibiting private conduct, or not. *Infra* at Section I(A). And in any event, the Defendants are plainly wrong in characterizing the Administrator's choice as a matter of "enforcement discretion" because he is not deciding whether to initiate an enforcement action to penalize or enjoin CWA violations. Instead, when weighing whether to exercise his Section 404(c) authority, the Administrator is

deciding whether to change the regulatory landscape to "alter[] the legal rights" of private parties. *Chadha*, 462 U.S. at 952.

Just as President Roosevelt was exercising legislative judgment in weighing whether (or not) to impose a prohibition on transport of hot oil in *Panama Refining*, the Administrator exercises legislative judgment in deciding whether (or not) to issue a veto under CWA Section 404(c). After all, there is no inherent executive authority to alter the "legal rights, duties and relations" of private parties. *Chadha*, 462 U.S. at 952. *See Clinton v. City of New York*, 524 U.S. 417, 441 (1998) (concluding that the President exercised legislative power in making a provision "inoperative as to appellees"). Any act that does so is necessarily legislative and must carry out a general policy established by Congress. *See Jarkesy v. Sec. & Exch. Comm'n*, 34 F.4th 446, 461 (5th Cir. 2022), *aff'd and remanded*, 603 U.S. 109 (2024) (determining that an agency had exercised legislative power and finding a nondelegation violation).

The Administrator is not exercising inherent executive authority because "enforcement discretion" presupposes the existence of a legislative rule. Unlike the highway patrol officer deciding whether to pull over a driver who is exceeding the posted speed limit, the Administrator is, under Section 404(c), like an officer who is deciding what the speed limit should be. Indeed, Sections 404(a)-(b) establish the default law governing dredged and fill permit applications. And that law applies unless and until the Administrator chooses to intervene—at which point those legal standards are replaced with an outright prohibition on the issuance of any permit within whatever geographic zone the Administrator chooses to draw.

Contrary to the Defendants' characterization, the *Pirzadeh* opinion confirms that the Administrator's "decision is not properly characterized as a decision not to take [an] enforcement action." 1 F.4th at 760. "Unlike ordinary non-enforcement actions, the agency's [decision not to exercise his veto authority] . . . has a real-world legal effect . . . ." *Id*. If the Administrator chooses not to issue a veto, the effect is to maintain the default law governing dredged and fill permit applications. If the Administrator chooses to exercise his veto authority, the effect is to impose a "prohibition on the Corps' authority to issue a permit." *Id*. And if the Administrator chooses to withdraw a previously issued veto, the effect is to "remov[e] [EPA's] . . . prohibition[,]" and restore the status *quo ante*. *Id*. Either way, the Administrator is unilaterally deciding the regulatory landscape.

The Defendants' only counterargument is the assertion that the Ninth Circuit "rel[ied] upon the principle of enforcement discretion[,]" Fed. Def. Br. at 125, presumably because *Pirzadeh* cited *City and County of San Francisco v. U.S. Department of Transportation*, 796 F.3d 993 (9th Cir. 2015) (*San Francisco*). Indeed, *San Francisco* was a case about enforcement discretion because it concerned the question of whether the Department of Transportation should "assum[e] responsibility for enforcement" under a cooperative federalism statute. *Id*. at 1002. But the Administrator's Section 404(c) authority is fundamentally different in nature. The Administrator is not deciding whether to assume enforcement responsibility when deciding whether to issue a veto. Indeed, the CWA's enforcement provisions are in an entirely different section of the statute. *See* 33 U.S.C. § 1319 (authorizing the Administrator to commence action to enjoin and penalize violations).

### C. The Defendants Have Failed to Identify Any General Policy Governing the Administrator's Choice Between Issuing a Veto or Taking No Action.

The Defendants acknowledge that the nondelegation doctrine applies when Congress delegates discretion for an Executive Branch officer to exercise legislative judgment. *E.g.*, SalmonState Br. at 61 (acknowledging that the doctrine applies when an agency "exercise[s] legislative power"). And for the reasons set out in Section I(B), the Administrator is exercising legislative judgment—not inherent executive authority. As such, the burden is on the government to demonstrate that "Congress [has] supplied a general policy, standards in pursuing that policy, ***and*** boundaries that enable the courts and the public to ascertain whether the agency followed the law." Fed. Def. Br. at 119 (emphasis added). But the Defendants have offered no argument that the CWA establishes any general policy, much less standards for pursuing that policy, on the pivotal question of whether the Administrator should exercise his extraordinary veto authority.[7]

They do argue that Congress established a policy with boundaries for determining whether a project will have an "unacceptable adverse effect." But they concede that the Administrator has "unfettered discretion" to decide whether to impose a veto even if he should find that a project will have an "unacceptable adverse effect." *See infra* n.3. At best, the supposed standards for making an "unacceptable adverse effect" determination constitute a condition precedent to issuing a veto.[8] *See supra* Section II (explaining that

---

[7] The Intervenor-Defendants suggest that the CWA's purpose provides an overarching standard to guide the Administrator's Section 404(c) decision-making, *cf.* 33 U.S.C. § 1251, but that argument is foreclosed by *Pirzadeh*. *See supra* Section I(D).

[8] It is not enough that Congress establish a boundary if it has failed to establish a general policy on the "important subject[]." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825).

---

this is, at best, a weak boundary). But the condition precedent does not speak in any way to whether the Administrator should exercise his veto—just as the condition precedent in Section 9(c) of the NIRA (*i.e.*, the existence of a state law restricting transport of certain petroleum products) did not guide President Roosevelt's exercise of discretion in deciding whether he should have exercised his delegated authority.

### D. *Pirzadeh*'s Finding of "No Law to Apply" Confirms That Congress Failed to Establish Any General Policy on This Important Matter.

The Defendants admit that, in *Pirzadeh*, the Ninth Circuit definitively held that the Administrator's "discretion is unfettered." Fed. Def. Br. at 125. They cannot dispute *Pirzadeh*'s binding conclusion that the text of the CWA establishes "no law" governing the Administrator's choice as to whether (or not) to exercise his veto authority.[9] Admitting that much, they argue only that *Pirzadeh* is inapposite. Fed. Def. Br. at 122-23, 125-26.

The Defendants maintain that *Pirzadeh* has no bearing on this controversy because it "address[ed] the [] reviewability of decisions left to agency discretion [under the APA]" and supposedly "rel[ied] upon the principle of enforcement discretion." Fed. Def. Br. at 125. But as explained in Section I(B), *Pirzadeh* said that the Administrator's choice not to exercise his veto authority is not "properly" viewed as an exercise of enforcement discretion. And even in so far as *Pirzadeh* noted that the Administrator's decision might entail certain (unguided) considerations similar to those that the Executive weighs in deciding whether to pursue an enforcement action, what matters for the purpose of

---

[9] *See infra* n.3.

nondelegation analysis is that the Ninth Circuit searched in vain for something in the statutory text—for *anything*—governing the Administrator's discretion.

It is true that *Pirzadeh* was addressing a different question; however, its textual analysis is still binding. The question presented was whether the text of the CWA established any law governing the Administrator's decision to withdraw a veto. That mattered because the APA bars judicial review of matters "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). And to determine whether a statute commits something to "agency discretion[,]" a reviewing court must "first look" to the statutory text. *Pirzadeh*, 1 F.4th at 751. Specifically, the court must look to see if the text establishes any "judicially manageable standard[]" to apply in review. *Id.* (citation omitted). If there is "no law to apply[,]" the matter is foreclosed from judicial review. *Id.* (citation omitted).

Critically, *Pirzadeh* found that the text "'authorized,' but [did] not require[]" the Administrator to issue a veto. *Id*. at 752. The opinion focused its analysis on various textual signals—all of which confirmed the "limitless" possibilities of how the Administrator might (or might not) exercise this extraordinary power. *Id*. And finding "no judicially manageable standard" in the text to govern the Administrator's discretion, the Court held that, under the CWA itself (as opposed to EPA's Section 404(c) regulations), a decision not to exercise the veto authority is unreviewable under the APA. *Id*. at 753.

Of course, this case raises the question of whether CWA Section 404(c) violates the nondelegation doctrine—not a question under APA Section 701(a)(2). Nonetheless, *Pirzadeh*'s textual analysis matters because the nondelegation doctrine requires inquiry into whether the CWA's text establishes a "general policy" guiding agency discretion. *See*

*Iliamna Natives Ltd. v. EPA*      12
No. 3:24-cv-00132-SLG
Case 3:24-cv-00059-SLG     Document 225     Filed 04/13/26     Page 17 of 26

*Gundy*, 588 U.S. at 135 ("a nondelegation inquiry always begins (and often almost ends) with statutory interpretation"). The answer is that it does not; *Pirzadeh* has examined the text and found that Congress delegated "unfettered" discretion. 1 F.4th at 753.

The Defendants are also wrong insofar as they suggest that APA Section 701(a)(2) might bar review of the Native Corporations' nondelegation claim. While *Pirzadeh* correctly held that the text of the CWA established "no law" governing the Administrator's discretion, that does not mean that there is no law to apply in evaluating whether CWA Section 404(c) violates the separation of powers. "[B]ecause delegation is a constitutional (rather than administrative) issue, it remains within a court's authority to review the legality of the delegation even where judicial review of the agency action is precluded" under the APA. Amee B. Bergin, *Does Application of the APA's "Committed to Agency Discretion" Exception Violate the Nondelegation Doctrine?*, 28 B.C. Envtl. Aff. L. Rev. 363, 396-97 (2001). *See Consumers*, 606 U.S. at 673 (affirming the constitutional test).

**E. Section 404(c)'s Unguided Discretionary Authority Is Extraordinary.**

The Defendants contend that finding a nondelegation violation in this case would call into question all of Congress's delegations of discretionary authority. This is wrong because the Administrator's "unfettered" discretion to decide whether to impose a veto is fundamentally different from inherently executive actions that are appropriately "committed to agency discretion."

Issues "committed to agency discretion" usually concern issues of enforcement discretion, agency personnel decisions, or other matters within the inherent authority of the Executive Branch. *E.g.*, *San Francisco*, 796 F.3d 993 (choice of whether to assume

enforcement responsibility); *Webster v. Doe*, 486 U.S. 592 (1988) (choice as to whether to fire an employee). But the Administrator's veto power falls into none of these buckets.

A nondelegation issue only arises when Congress has delegated authority to ***exercise legislative powers***—as with acts that change the regulatory landscape. It is unclear whether any other statute delegates this kind of authority without providing at least some "general policy" guiding the exercise of administrative discretion. *See* Bergin, 28 B.C. Envtl. Aff. L. Rev. at 397 (explaining that the courts have "found very few agency actions to be 'committed to agency discretion,' and even [] those cases . . . [concern] administrative adjudication rather than [legislative] rulemaking").

Finally, CWA Section 404(c) is extraordinary because—unlike all other seemingly broad delegations of authority cited by Defendants that the courts have upheld—Congress gave the Administrator no charge to carry out any specific policy here. For example, in *Whitman*, Congress required EPA to carry out its policy choice—which was that air pollutants should be regulated to ensure "protect[ion] [of] public health." 531 U.S. at 473. Likewise, in *American Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946), the agency was charged with carrying out a policy of prohibiting corporate structures that "unfairly or inequitably distribute [share holder] voting power." And the same is true with all the delegations at issue in the other cases that the Defendants rely on.[10] In each case the statute

---

[10] The only possible exception is the Occupational Safety and Health Act, at issue in *Industrial Union Department, AFL-CIO v. American Petroleum Institute*, 448 U.S. 607 (1980)—which contemplates that the Secretary "may" alter established national consensus health and safety standards, 29 U.S.C. § 655(b). But it is implausible to construe the OSH Act as delegating unfettered discretion to decline to promulgate standards that are

Case 3:24-cv-00059-SLG     Document 225     Filed 04/13/26     Page 19 of 26

required the agency to "carry[] out [a] charge" of some sort.[11] *Consumers*, 606 U.S. at 691 (explaining that the agency had a charge to make sure that Americans had affordable access to communication services that are essential to modern life). But this is not a "shall" case because the Administrator decides for himself whether to act as he sees fit.

## II.    There Are No Sufficient Boundaries.

Even setting aside Congress' failure to establish a general policy guiding the Administrator's choice to act or not, Section 404(c) violates the nondelegation doctrine because Congress failed to establish a sufficient "boundary" to meaningfully limit the Administrator's discretion when he chooses to act. The Defendants say that there are "[m]eaningful [b]oundaries" because the Administrator can only impose prohibitions on a "site specific-basis, rather than imposing nationwide restrictions." Fed. Def. Br. at 121. But this is not a meaningful boundary because the Administrator might choose to exercise his veto authority on any project—anywhere in the nation—whenever he deems that a project

---

[11] necessary or appropriate to protect workplace safety because the Act, elsewhere, confirms that Congress established a general policy ensuring that workplaces are "free from recognized hazards that are causing or are likely to cause death or serious physical harm" to employees. *See* 29 U.S.C. § 654(a).

[11] *See Nat'l Broad. Co. v. United States*, 319 U.S. 190 (1943) (charged with ensuring broadcasters operated consistent with the public interest); *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591 (1944) (charged with setting "just and reasonable" rates); *United States v. Pheasant*, 129 F.4th 576, 580 (9th Cir. 2025) (charged with "develop[ing] a long-term [land] management strategy . . ."); *Mistretta v. United States*, 488 U.S. 361 (1989) (charged with creating sentencing guidelines); *Gundy*, 588 U.S. 128 (charged with implementing sex offender registration requirements).

will have an "unacceptable" impact.[12] Indeed, "the number of 'any defined [geographical] area[s]'" that Administrator might restrict is "limitless[.]" *Pirzadeh*, 1 F.4th at 752.

Moreover, the Defendants' statutory arguments undermine any claim that Congress imposed meaningful geographic boundaries. The geographic limit of the CWA to "the waters of the United States" is not a meaningful boundary if, as the Defendants argue, the Administrator can presume the existence of regulable "waters of the United States" for the sake of efficiency when deciding whether to issue a veto. *See* Fed. Def. Br. at 75-77 (disavowing any independent duty, on the part of the Administrator, to verify the actual existence of "waters of the United States," or the extent of such features, at the Pebble deposit). And the Intervenor-Defendants go even further in arguing that section 404(c)'s "any defined area" language extends the Administrator's veto authority beyond "the waters of the United States." *See* Bristol Bay Br. at 38-40 ("[T]he State conflates the Corps' authority to issue permits . . . at specified disposal sites under 404(a) with Congress's distinct and broader grant of authority . . . under 404(c) to prohibit, deny, or restrict the specification of '*any defined area*' as a disposal site.").

The Defendants next argue that Section 404(c) imposes boundaries because the Administrator must go through a notice-and-comment process and determine that a

---

[12] The Defendants suggest that the Administrator's past exercise of restraint speaks to some kind of boundary. Fed. Def. Br. at 121. But there is no guarantee that future Administrators will exercise temperance. *See Kaweah Delta Health Care Dist. v. Becerra*, 123 F.4th 939, 952 (9th Cir. 2024) ("[S]uch unrestricted power may be abused in the future—and that is why we enforce the limitations imposed by our system of separation of powers."). And in any event, "an agency can[not] cure an unconstitutional[] . . . delegation . . . by declining to exercise some of that power . . . ." *Whitman*, 531 U.S. at 472-73.

contemplated project will have "unacceptable adverse effects" on specified resources before he can issue a veto. Fed. Def. Br. at 121. But the requirement to consider public comments is not a substantive restraint. And the Defendants can't explain how the text meaningfully limits the Administrator's authority to decide what constitutes an "unacceptable adverse effect" other than by reliance on EPA's regulations, which "can[not] cure" the non-delegation violation.[13] *Whitman*, 531 U.S. at 472-73.

One cannot say whether an impact is "unacceptable" without exercising subjective judgment. Courts have found similar language inherently subjective. For example, in *Interstate Circuit, Inc. v. City of Dallas*, the Supreme Court held unconstitutional an ordinance prohibiting films "***not suitable*** for young persons" because this allowed for "regulation in accordance with the beliefs of the individual censor." 390 U.S. 676, 680, 685 (1968) (emphasis added). Similarly, in *Coates v. City of Cincinnati*, the Court found void for vagueness an ordinance that criminalized conduct that was "annoying to persons passing by." 402 U.S. 611, 612-13 (1971). And in *Papachristou v. City of Jacksonville*, the Court struck down a vagrancy ordinance because it gave "unfettered discretion" to the police to decide what conduct is "appropriate." 405 U.S. 156, 168-70 (1972).

The Defendants acknowledge the subjectivity of the term "unacceptable" in pressing an elastic view of the Administrator's authority. The proof is in the pudding. The Federal Defendants devote nearly 30 pages to arguing that the Administrator "appropriately determined" the project would "cause unacceptable adverse effects" before even beginning

---

[13] *E.g.*, Bristol Bay Br. at 52 (invoking EPA's regulatory definition).

to address what the statutory text requires. Fed. Def. Br. at 31-59. And at that point they argue only that "[t]he CWA does not define 'unacceptable adverse effect,' but gives the Administrator discretion in determining what meets that standard." *Id*. at 60.

Indeed, all the Defendants' statutory arguments undermine their claim that Section 404(c) imposes meaningful boundaries.[14] For example, they argue that the Administrator can issue vetoes under Section 404(c) regardless of how economically damaging they might be for local communities. The Federal Defendants argue only that they must consider economic impacts—but that they are free to proceed with a veto even if the economic impacts are extraordinary.[15] Fed. Def. Br. at 84-86. And the Intervenor-Defendants go further to argue that the statute does not require *any* consideration of economic impacts. *See* SalmonState Br. at 40-41 (arguing "the Court need not [even] reach" the question of whether "the CWA requires EPA to analyze costs").

Ultimately the Defendants can say only that courts have upheld broad delegations in *other statutes*. But this overlooks that nondelegation analysis is always context-specific. Indeed, the statutes at issue in those cases all spoke to some objective standard when read in context. So, the question here is whether, when read in context, the term "unacceptable" entails any objective standard. It does not.

---

[14] For one, they admit that there are no temporal boundaries on the Administrator's authority. *See* Fed. Def. Br. at 69.

[15] Even in so far as they are required to think about economic impacts, they point to nothing in the statute speaking to how costs must be considered. Must the Secretary perform a cost-benefit analysis, or must he determine that the costs are justified? The statutory text simply does not provide any direction.

For example, the Defendants say that the Supreme Court upheld a "similar standard[]" in *Whitman*, Fed. Def. Br. at 120, when the Court concluded that Congress had established a sufficient policy and boundaries in directing EPA to set standards "requisite to protect public health." 531 U.S. at 473. But the term "requisite to protect public health" entailed objective meaning. As such, EPA was merely charged with carrying out a fact-finding mission as to what kind of standards were needed to achieve that statutory goal. *Id.* (air quality standards had to "reflect the latest scientific knowledge").

The Defendants point also to cases like *NBC*, 319 U.S. 190, and *American Power & Light Co.*, 329 U.S. 90, where the Supreme Court upheld delegations that used nebulous terms. But in each case the Court construed those terms not as empty vessels to be filled with whatever meaning the agency liked, but as having objective meaning that became clear enough when reading the statute as a whole. Even the capacious term "public interest" had an objective (*i.e.*, limited) meaning when understood in the context of the Communications Act in *NBC*. That phrase was limited "'by its context, by the nature of radio transmission and reception, [and] by the scope, character, and quality of services'" such that the public interest "to be served" was "the interest of the listening public in 'larger and more effective use of radio.'"[16] 319 U.S. at 216 (citations omitted). *See also Consumers*, 606 U.S. at 690 (explaining how authority to consider the "public interest" was limited by the context of the statute as a whole).

---

[16] Likewise, in *American Power & Light Co.*, the terms "unfairly or inequitably" had objective meaning; it "derive[d] much meaningful content from the purpose of the Act, its factual background and the statutory context." 329 U.S. at 104.

By contrast, the term "unacceptable" entails no objective meaning. Just like the term "unsuitable" was found inherently subjective in *Interstate Circuit*, the term "unacceptable" is an empty vessel that allows for "regulation in accordance with the [personal] beliefs [or preferences]" of the Administrator. 390 U.S. at 685 (citation omitted). That is precisely what the nondelegation doctrine forbids.

In any case, even if Section 404(c) entails boundaries of some kind, they are exceedingly weak. That only confirms the extraordinary nature of the Administrator's veto authority—which, in turn, underscores the need for Congress to have established policy guiding his choice as to whether and when to exercise this potent authority.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion.

DATED: April 13, 2026.

Respectfully submitted,

DAMIEN M. SCHIFF*
LUKE A. WAKE*
CHARLES T. YATES*

*Pro Hac Vice*

By___/s/ Luke A. Wake_____
LUKE A. WAKE, *Pro Hac Vice*
Cal. Bar No. 264647

*Attorneys for Plaintiffs*
*Iliamna Natives Ltd. and*
*Alaska Peninsula Corp.*

**CERTIFICATE OF SERVICE**

I certify that on April 13, 2026, I filed the foregoing using the Court's ECF system, which will provide service to all counsel of record.

/s/ Luke A. Wake
LUKE A. WAKE, *Pro Hac Vice*
