STEPHEN J. COX
ATTORNEY GENERAL
Ronald W. Opsahl (Alaska Bar No. 2108081)
Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: ron.opsahl@alaska.gov

J. Michael Connolly (*pro hac vice*)
Gilbert C. Dickey (*pro hac vice*)
Steven C. Begakis (*pro hac vice*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Telephone: (703) 243-9423
mike@consovoymccarthy.com
gilbert@consovoymccarthy.com
steven@consovoymccarthy.com

*Attorneys for the State of Alaska*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| NORTHERN DYNASTY MINERALS LTD., *et al.*, | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Case No. 3:24-cv-59-SLG |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | ) ) ) | CONSOLIDATED |
| *Defendants*, | ) ) | LEAD CASE |
| and | ) ) | |
| UNITED TRIBES OF BRISTOL BAY, *et al.*, | ) ) ) | |
| *Intervenor-Defendants*. | ) ) | |

| | | |
|---|---|---|
| STATE OF ALASKA,<br>    *Plaintiff*, | ) ) ) | |
| v. | ) ) | Case No. 3:24-cv-84-SLG |
| UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY,<br>    *Defendant*, | ) ) ) ) ) | CONSOLIDATED |
| and | ) ) | |
| TROUT UNLIMITED, *et al.*,<br>    *Intervenor-Defendants*. | ) ) ) ) | |
| ILIAMNA NATIVES LTD., *et al.*,<br>    *Plaintiffs*, | ) ) ) ) | |
| v. | ) ) | Case No. 3:24-cv-132-SLG |
| ENVIRONMENTAL PROTECTION<br>AGENCY, *et al.*,<br>    *Defendants*, | ) ) ) ) ) | CONSOLIDATED |
| and | ) ) | |
| BRISTOL BAY ECONOMIC<br>DEVELOPMENT CORPORATION, *et al.*,<br>    *Intervenor-Defendants*. | ) ) ) ) | |

**STATE OF ALASKA'S REPLY BRIEF**

**ORAL ARGUMENT REQUESTED**

*Northern Dynasty Minerals Ltd. v. EPA*                                     Case No.: 3:24-cv-59-SLG
State of Alaska's Reply Brief
Case 3:24-cv-00059-SLG      Document 226      Filed 04/14/26      Page 2 of 33

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................................ii

Introduction...............................................................................................................................1

Argument ..................................................................................................................................2

I.     The Veto exceeds the EPA's authority under the Clean Water Act. ...............................2

II.    The Veto violates the Statehood Act and the Cook Inlet Land Exchange.....................8

III.   The EPA failed to properly analyze whether discharges into "waters of the
United States" would have an unacceptable adverse effect. ...........................................14

IV.   The EPA improperly considered whether other activities besides "discharges into"
jurisdictional waters would have an unacceptable adverse effect.................................17

V.    The EPA failed to properly assess the costs and benefits of the Prohibition and
Restriction. .....................................................................................................................20

VI.   The Court should vacate the Veto. .................................................................................23

Conclusion ...............................................................................................................................24

Certificate of Service ..............................................................................................................26

Certificate of Compliance.......................................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Alabama v. Bozeman*,
533 U.S. 146 (2001) ............................................................................................ 10

*Arrington v. Daniels*,
516 F.3d 1106 (9th Cir. 2008) ............................................................................. 5

*ASARCO v. Kadish*,
490 U.S. 605 (1989) ............................................................................................ 11

*Bayou City Waterkeeper v. USACE*,
630 F. Supp. 3d 852 (S.D. Tex. 2022) ............................................................... 16

*Biden v. Nebraska*,
600 U.S. 477 (2023) .............................................................................................. 7

*Birth Hope Adoption Agency, Inc. v. Ariz. Health Care Cost Containment Sys.*,
218 F.3d 1040 (9th Cir. 2000) ........................................................................... 18

*Cal Rest. Ass'n v. Berkeley*,
89 F.4th 1094 (9th Cir. 2024) ............................................................................ 10

*Case v. Bowles*,
327 U.S. 92 (1946) .............................................................................................. 11

*City of Fresno v. Turner*,
2025 WL 2721390 (N.D. Cal. Sept. 23, 2025) .................................................. 18

*Ctr. for Bio Div. v. USFWS*,
33 F.4th 1202 (9th Cir. 2022) .............................................................................. 5

*Curtis v. ABB, Inc.*,
2012 WL 12919536 (C.D. Cal. May 1, 2012) .................................................... 15

*De Martinez v. Lamagno*,
515 U.S. 417 (1995) ............................................................................................ 10

*Dolan v. USPS*,
546 U.S. 481 (2006) .............................................................................................. 2

*Ebling v. DOJ*,
796 F. Supp. 2d 52 (D.D.C. 2011) ..................................................................... 15

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010) ............................................................................................ 12

*Gonda v. The Permantente Medical Gr., Inc.*,
2015 WL 678969 (N.D. Cal. Feb. 17, 2025) ..................................................... 15

*Grupo Dataflux v. Atlas Global Grp., L.P.*,
541 U.S. 567 (2004) ............................................................................................ 15

*Maldonado v. Morales*,
    556 F.3d 1037 (9th Cir. 2009) ...................................................................20

*Migrant Clinicians Network v. EPA*,
    88 F.4th 830 (9th Cir. 2023) .............................................................23, 24

*Mingo Logan Coal Co. v. EPA*,
    714 F.3d 608, (D.C. Cir. 2013) .......................................................15, 18

*Nat. Grocers v. Rollins*,
    157 F.4th 1143 (9th Cir. 2025) .......................................................23, 24

*Nat'l Ass'n of Home Builders v. EPA*,
    786 F.3d 34 (D.C. Cir. 2015) ...................................................................15

*Nat'l Parks Conservation Ass'n v. EPA*,
    788 F.3d 1134 (9th Cir. 2015) .................................................................21

*Nat'l Pork Producers Council v. EPA*,
    635 F.3d 738 (5th Cir. 2011)......................................................................2

*New Jersey v. EPA*,
    517 F.3d 574 (D.C. Cir. 2008) ...........................................................4, 17

*Oxygenated Fuels Ass'n Inc. v. Davis*,
    331 F.3d 665 (9th Cir. 2003) ...................................................................20

*Pacito v. Trump*,
    169 F.4th 895 (9th Cir. 2026) .................................................................10

*Pollinator Stewardship Council v. EPA*,
    806 F.3d 520 (9th Cir. 2015)...................................................................23

*Sackett v. EPA*,
    598 U.S. 651 (2023)....................................................................... 6, 7, 16

*SEC v. McCarthy*,
    322 F.3d 650 (9th Cir. 2003).....................................................................4

*SFFA v. Harvard*,
    600 U.S. 181 (2023)..................................................................................10

*SWANCC v. U.S. Army Corps of Engineers*,
    531 U.S. 159 (2001)............................................................................7, 20

*Trout Unlimited v. Pirzadeh*,
    1 F.4th 738 (9th Cir. 2021) ...............................................................3, 15

*Trump v. Mazars USA, LLP*,
    591 U.S. 848 (2020)..................................................................................10

*United States v. Alaska*,
    521 U.S. 1 (1997).....................................................................................12

*United States v. Olson*,
856 F.3d 1216 (9th Cir. 2017) ..........................................................................11

*United States v. Winstar Corp.*,
518 U.S. 839 (1996)................................................................................................9

**Statutes**

33 U.S.C. §1344..................................................................................................*passim*

33 U.S.C. §1362.........................................................................................................2, 7

Alaska Statehood Act, Pub. L. 85-508, 72 Stat. 339 (July 7, 1958) ........................8, 12

Pub. L. 94-204, 89 Stat 1145 (Jan. 2, 1976) ..........................................................8

**Regulations**

33 C.F.R §331.2................................................................................................16

**Other Authorities**

EPA, Final Determination Concerning the Proposed Yazoo Backwater Area
Pumps Project, Issaquena County, Mississippi (Aug. 31, 2008) .........................4, 17

EPA, Final Determination Concerning Three Wetland Properties For Which
Rockplowing Is Proposed in East Everglades, Dade County, Florida (June 15, 1988)........4

EPA, Final Determination Concerning Wetlands Owned by the Russo
Development Corporation in Carlstadt, New Jersey (March 21, 1988) .................4

S. Rep. 92-414 at 3669 (Oct. 28, 1971)...............................................................13

Scalia & Garner, *Reading Law: The Interpretation of Legal Text* (2012) ............................10

*Northern Dynasty Minerals Ltd. v. EPA*          Case No.: 3:24-cv-59-SLG
State of Alaska's Reply Brief                                          iv
Case 3:24-cv-00059-SLG     Document 226     Filed 04/14/26     Page 6 of 33

# INTRODUCTION

The EPA and the Intervenors paint the State of Alaska's challenge as merely "question[ing] EPA's factual findings" and "second guess[ing] the Agency's conclusions."[1] Nothing could be further from the truth. The State's challenges are almost entirely *legal* in nature. That isn't surprising. In its rush to turn State-owned lands into another federal preserve, the EPA blew past the strict guardrails that Congress imposed on the agency's Section 404(c) authority. The Court need barely peruse the record to rule for the State.

The EPA can prohibit the specification of a "defined area as a disposal site" only when that "defined area" is within "waters of the United States."[2] Yet the EPA drew its "defined area" around *land*, not water. The EPA can issue a veto only when the discharge of materials "into" jurisdictional waters will have certain unacceptable effects.[3] But the EPA simply "assume[d]" that the waters it examined were "waters of the United States," without ever establishing that it had jurisdiction to issue the Veto.[4] The EPA relied heavily on so-called "secondary effects" from the mine itself, which it concedes are merely "associated with" the discharge of material into waters and "do not result from actual placement of this material" "into" jurisdictional waters.[5] And although the EPA issued a restriction that covers more than 300 square miles of land, it concedes that it never assessed the costs of its actions over this area. These legal errors, among others, are fatal to the EPA's actions.

The Veto is unlawful, and it should be vacated and set aside.

---

[1] EPA Br. 1.
[2] 33 U.S.C. §1344(c).
[3] *Id.*
[4] EPA Br. 76.
[5] EPA_AR_0083068.

*Northern Dynasty Minerals Ltd. v. EPA*　　　　　　　　Case No.: 3:24-cv-59-SLG
State of Alaska's Reply Brief　　　　　　　　　　　　　　1
Case 3:24-cv-00059-SLG　　Document 226　　Filed 04/14/26　　Page 7 of 33

**ARGUMENT**

**I.     The Veto exceeds the EPA's authority under the Clean Water Act.**

**1.** The Veto has a major flaw.[6] Section 404(c) authorizes the EPA to prohibit, deny, and restrict only the specification of any "defined area as a disposal site."[7] Because the EPA has veto jurisdiction over only "navigable waters" (or "waters of the United States"), any "defined area as a disposal site" must be limited to "waters of the United States."[8] But the "Defined Area for Prohibition" and "Defined Area for Restriction" here cover large areas of land, not waters.[9] The EPA has no power to issue a prohibition and restriction in this manner.

Relying on a dictionary definition of "defined," the EPA argues that "defined area" means only "a clearly marked area" and so including land within its "defined area" was appropriate.[10] But that dictionary definition has no application in the context of the CWA.[11] Section 404(c) authorizes the EPA to prohibit the specification of any "defined area *as a disposal site*" and deny or restrict the use of any "defined area for specification … *as a disposal site*."[12] A "defined area" thus can only be "waters of the United States" because the EPA has no regulatory authority elsewhere—it cannot regulate "disposal sites" on land.[13] Similarly, the

---

[6] *See* State Br. 27-31.

[7] 33 U.S.C. §1344(c).

[8] *Id.* §§1344(a), (c), 1362(7).

[9] EPA_AR_0082957-61.

[10] EPA Br. 74 (citing Oxford English Dictionary).

[11] *See* State Br. 27-30; *Dolan v. USPS*, 546 U.S. 481, 486 (2006) ("The definition of words in isolation … is not necessarily controlling in statutory construction. … Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute.").

[12] 33 U.S.C. §1344(c).

[13] *See* State Br. 28-29 & n.174; *see also Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 750 (5th Cir. 2011) ("[T]he scope of the EPA's authority under the CWA is strictly limited to the discharge of pollutants into navigable waters." (listing cases)).

*Northern Dynasty Minerals Ltd. v. EPA*                                    Case No.: 3:24-cv-59-SLG
State of Alaska's Reply Brief                                                                            2
Case 3:24-cv-00059-SLG     Document 226     Filed 04/14/26     Page 8 of 33

EPA cannot issue a veto unless it finds that "the discharge of such materials *into such area* will have an unacceptable adverse effect."[14] Again, the EPA has no authority to issue vetoes based on the "unacceptable adverse effect" of discharges onto land. So a "defined area" can only be "waters of the United States."

The EPA responds that because Section 404(c) lets the EPA issue vetoes over "*any defined area,*"[15] the "terms 'any' and 'area' convey discretion to [the] EPA in selecting a geographic scope that prevents unacceptable adverse effects from the discharge at issue on fishery areas."[16] But the phrase "any defined area" gives the EPA discretion only to choose which defined areas of "waters of the United States" it wants to prohibit, deny, or restrict.[17] Thus, for example, in vetoing a permit specifying five miles of a navigable river as a disposal site, the EPA could issue a prohibition over one mile, a restriction over two miles, or any other "infinite variation" along the five-mile stretch of the "waters of the United States."[18] The phrase "any defined area" does not give the EPA "discretion" to exercise jurisdiction over *land.*[19]

The Bristol Bay Intervenors argue that if Congress wanted a "defined area" to be limited to "waters of the United States" it would have used that term.[20] But that tool of statutory construction has no application here because the State isn't arguing that "defined

---

[14] *Id.*
[15] 33 U.S.C. §1344(c) (emphases added).
[16] EPA Br. 74.
[17] *Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 752-53 (9th Cir. 2021).
[18] *Id.* at 752.
[19] *See* EPA Br. 74.
[20] Bristol Bay Br. 39.

*Northern Dynasty Minerals Ltd. v. EPA*                          Case No.: 3:24-cv-59-SLG
State of Alaska's Reply Brief                                                                    3

area" means the same thing as "waters of the United States."[21] Rather, Congress used "defined area" to demand that the EPA act with specificity when issuing vetoes within "waters of the United States."[22] Thus, instead of vetoing entire bodies of water (*e.g.*, the Mississippi River), Congress instructed EPA to veto only "defined areas as disposal sites."[23] That is why Congress used the term "defined area," instead of the broader term "waters of the United States."

The EPA doesn't dispute that it has many times "limited its Section 404(c) actions to specific stretches of navigable waters."[24] The EPA claims that it "took the same approach" with the Yazoo Pumps project, but that isn't correct.[25] Nor did the EPA follow this approach in the cases identified by the Bristol Bay Intervenors.[26] Regardless, even if the EPA had included extra-jurisdictional land within "defined areas" in the past, these past violations cannot help it here. "[P]revious statutory violations cannot excuse the one now before the court."[27]

---

[21] *See SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003) (discussing the canon of statutory interpretation that "the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words").

[22] State Br. 28.

[23] 33 U.S.C. §1344(c).

[24] EPA Br. 77.

[25] EPA Br. 78; *see* EPA, Final Determination Concerning the Proposed Yazoo Backwater Area Pumps Project, Issaquena County, Mississippi 73 (Aug. 31, 2008), bit.ly/4rTF7XU (prohibiting "the specification of the subject wetlands and other waters of the United States as described in the FSEIS as a disposal site").

[26] Bristol Bay Br. 40 & n.208; *see* EPA, Final Determination Concerning Wetlands Owned by the Russo Development Corporation in Carlstadt, New Jersey 2-3, 20 (March 21, 1988), bit.ly/40tNCgs (vetoing discharges into a "57.5 acre wetland in Carlstadt, New Jersey"); EPA, Final Determination Concerning Three Wetland Properties For Which Rockplowing Is Proposed in East Everglades, Dade County, Florida 1-2 (June 15, 1988), bit.ly/4cLvCFE (vetoing discharges into specific "wetland properties … in East Everglades, Dade County, Florida").

[27] *New Jersey v. EPA*, 517 F.3d 574, 583 (D.C. Cir. 2008).

*Northern Dynasty Minerals Ltd. v. EPA*     Case No.: 3:24-cv-59-SLG
State of Alaska's Reply Brief     4
Case 3:24-cv-00059-SLG     Document 226     Filed 04/14/26     Page 10 of 33

In the alternative, Defendants argue that the EPA complied with Section 404(c) because the Veto, in effect, applies "only [to] 'navigable waters' within the defined area."[28] But this argument fails too. To start, the Veto does not make the "defined areas" for prohibition and restriction "all navigable waters on these plots of land." The "defined areas" are large areas of land.[29] The EPA cannot retroactively amend its order in litigation.[30]

Even if the EPA had said that the "defined area" was "all navigable waters on these plots of land," that would not have cured the problem. As explained, Section 404(c) doesn't allow the EPA to waive its hand over vast swaths of land and issue a veto over all "waters of the United States," wherever they may be. Section 404 "repeatedly demands precision from the agencies."[31] The Corps can issue permits "into the navigable waters at *specified* disposal sites," and the EPA can prohibit only the "*specification*" of a "*defined* area as a disposal site" and restrict only the use of a "*defined* area for *specification*."[32] None of this precision exists when the EPA draws a line around land and indiscriminately prohibits and restricts placement of material anywhere within that circumference.

**2.** If there were any doubt as to the correct interpretation, the federalism canon removes it. Congress must "'enact exceedingly clear language if it wishes to significantly alter

---

[28] EPA Br. 74-75; Bristol Bay Br. 40.

[29] EPA_AR_0083168-71 (Prohibition); EPA_AR_0083172-76 (Restriction).

[30] *Ctr. for Bio Div. v. USFWS*, 33 F.4th 1202, 1223 (9th Cir. 2022) ("It is black-letter law 'that an agency's action may not be upheld on grounds other than those relied on by the agency.'"); *Arrington v. Daniels*, 516 F.3d 1106, 1113 (9th Cir. 2008) ("Post hoc explanations of agency action by [the agency's] counsel cannot substitute for the agency's own articulation of the basis for its decision.").

[31] State Br. 30.

[32] 33 U.S.C. §1344(c) (emphases added).

*Northern Dynasty Minerals Ltd. v. EPA*                                    Case No.: 3:24-cv-59-SLG
State of Alaska's Reply Brief                                                                  5
Case 3:24-cv-00059-SLG    Document 226    Filed 04/14/26    Page 11 of 33

the balance between federal and state power'" and "[r]egulation of land and water use lies at the core of traditional state authority."[33] Yet Defendants' interpretation of "defined area" would mean that the EPA could extend its reach outside of its jurisdiction. There is no "exceedingly clear language" in the CWA giving the EPA these powers.[34]

The EPA argues that the federalism canon isn't implicated because Section 404(c) merely "limit[s] the *Corps' authority*—not the State's authority—to permit the discharge of dredged and fill material into 'waters of the United States.'"[35] That is a distinction without a difference. The *effect* of a Section 404(c) veto is that the State of Alaska can no longer regulate State-owned land and waters—a quintessential State activity.[36] Indeed, the Corps stopped reviewing PLP's permit application because of the Veto.[37] The federalism canon is not so easily circumvented.

The EPA argues that Congress's intentions to "alte[r] the federal-state balance" were made clear because Section 404(c) authorizes a veto based on unacceptable adverse effects to "resources that would typically be subject to state or local regulation, including municipal water supplies and recreation areas."[38] But letting the EPA issue a veto when discharges into navigable waters have effects on non-navigable waters is plainly different from directly

---

[33] *Sackett v. EPA*, 598 U.S. 651, 679 (2023).
[34] *Id.*
[35] EPA Br. 110.
[36] *Sackett*, 598 U.S. at 679-80; State Br. 5, 10-12. This issue thus is plainly "ripe" for the Court's consideration. *See* Bristol Bay Br. 11.
[37] PLP Br. 12.
[38] EPA Br. 110-11.

*Northern Dynasty Minerals Ltd. v. EPA*          Case No.: 3:24-cv-59-SLG
State of Alaska's Reply Brief          6

regulating discharges into non-navigable waters.[39] The EPA argues that Section 404(c) "does not even mention the states."[40] But the federalism canon doesn't require Congress to use these magic words. For example, the CWA's definition of "navigable waters" never mentions states,[41] yet the Supreme Court applied the federalism canon when reviewing the EPA's interpretation of that definition.[42] Its application is warranted here too.

**3.** The State's interpretation is also supported by the major-questions doctrine, given the size, scope, and unprecedented nature of the Veto.[43] Defendants resist the major-questions label, arguing that the Veto "reflects an action that Section 404(c) authorizes EPA to take" and so the State's "real disagreement is over the conclusions of the Final Determination."[44] But the statutory question here isn't whether the EPA can issue vetoes generally (it can); it's whether the EPA can issue a veto when the "defined area" is a vast tract containing extra-jurisdictional land and ill-defined waters that may or may not be navigable. For *that* question— whether the EPA can repurpose Section 404(c) to exercise such an extraordinary and novel power—the major-questions doctrine kicks in.[45] The EPA has never issued a veto of this size and scale before—the Prohibition covers an area of land the size of Manhattan, the Restriction

---

[39] *See SWANCC v. U.S. Army Corps of Engineers*, 531 U.S. 159, 171-73 (2001) (finding no "clear indication that Congress" intended for the Corps to have "jurisdiction over nonnavigable, isolated, intrastate waters," which would "invok[e] the outer limits of Congress' power").

[40] EPA Br. 110-11.

[41] *See* 33 U.S.C. §1362(7).

[42] *Sackett*, 598 U.S. at 679.

[43] *See* State Br. 22-23.

[44] EPA Br. 115.

[45] *See, e.g.*, *Biden v. Nebraska*, 600 U.S. 477, 486 (2023) (the major questions doctrine prevented the Department of Education from transforming the HEROES Act from a limited grant of authority into a vehicle for nationwide student loan forgiveness).

covers an area of land the size of all five New York City boroughs combined, and both will prevent billions of dollars of economic activity.[46] The EPA has never included dry land within its "defined areas" for prohibition and restriction.[47] And the EPA's theory has no limit, allowing it to preemptively issue vetoes over any and all lands in the country—even an entire State—without ever determining which waters in the defined area were navigable.[48] For the EPA to assert this new power, Congress would need to speak clearly. It didn't do so here.

## II. The Veto violates the Statehood Act and the Cook Inlet Land Exchange.

The lands covered by the Veto are owned by the State of Alaska.[49] When the State received these lands through the Statehood Act and the Cook Inlet Land Exchange, it was promised that the lands "shall include mineral deposits" and the "[m]ineral deposits in such land shall be subject to lease by the State as the State legislature may direct."[50] But the EPA has revoked that promise by issuing a Veto that effectively prohibits any mining on these State-owned lands. Because the EPA has no authority to override these statutes, the Veto is unlawful.

---

[46] State Br. 2, 22, 38.

[47] *Supra* 4 & nn.24-26.

[48] State Br. 23.

[49] State Br. 7-10.

[50] Alaska Statehood Act, Pub. L. 85-508, 72 Stat. 339, §6(i) (July 7, 1958); Pub. L. 94-204, 89 Stat 1145, §12(d)(1) (Jan. 2, 1976).

*Northern Dynasty Minerals Ltd. v. EPA*                                      Case No.: 3:24-cv-59-SLG
State of Alaska's Reply Brief                                                                                        8
Case 3:24-cv-00059-SLG     Document 226     Filed 04/14/26     Page 14 of 33

Defendants don't dispute that the Veto is unlawful if it conflicts with the terms of the Land Exchange or the Statehood Act.[51] The key question, then, concerns the meaning of Section 6(i) of the Statehood Act: When the parties agreed that the land Alaska received "shall include mineral deposits" that "shall be subject to lease by the State as the State legislature may direct," did their agreements allow the EPA to impose new requirements decades later that shut down any mineral leasing from occurring on these lands? The answer is "no." Plainly read, Section 6(i) grants the State authority to lease the mineral deposits on the granted lands—Alaska can lease the minerals "as the State legislature may direct."

Defendants contend that the EPA hasn't violated Section 6(i) because the Veto "does not prohibit mining the Pebble deposit"; instead, the Veto merely prohibits certain discharges into waters of the United States.[52] That argument is formalism to the extreme. PLP had plans to build and operate a mine on State-owned property—"the smallest version of the mine that [was] economically feasible" given the geography and qualities of the mineral deposit—and it

---

[51] *See* State Br. 24 n.144. The EPA's focus on whether the Land Exchange and the Statehood Act are contracts misses the mark. The State's contractual claims for damages will be litigated in the Court of Federal Claims. *See Alaska v. United States*, No. 24-cv-396 (Ct. Fed. Cl.) (case stayed pending the action here). The EPA's focus on the unmistakability doctrine is likewise inapposite because the State doesn't ask the Court "to infer from silence [a] limit on sovereign power." *United States v. Winstar Corp.*, 518 U.S. 839, 881 (1996); *id.* at 921 (Scalia, J., concurring) (when contractual language is "unmistakably clear" there is no need for "a further promise not to go back on the promise").

[52] EPA Br. 3, 103, 109; Bristol Bay Br. 65; Trout Unlimited Br. 20.

*Northern Dynasty Minerals Ltd. v. EPA*                                   Case No.: 3:24-cv-59-SLG
State of Alaska's Reply Brief                                                                                    9
Case 3:24-cv-00059-SLG    Document 226    Filed 04/14/26    Page 15 of 33

can no longer do so because of the Veto.[53] By any measure, the Veto is a prohibition on mining. The EPA cannot avoid these statutory obligations so easily.[54]

Defendants argue that Section 6(i) merely "identifies the legislature as the entity that shall decide how that authority is to be exercised" and cannot "reasonably be read as a limitation on federal regulatory authority over the conveyed lands."[55] That argument conflicts with the plain text of Section 6(i), which says that the mineral deposits the State was receiving "shall be subject to lease by the State as the State legislature may direct." The key word is "shall." "The word '*shall* is mandatory.'"[56] As used in the parties' agreements, then, Section 6(i) conveyed to the State the absolute right to lease mineral deposits—the State *shall* have this right and the federal government was relinquishing any power to prohibit the State from extracting these minerals. EPA's argument would mean that the valuable mineral rights the State was receiving in these bargains could be taken away with the stroke of a pen through

---

[53] Dkt. 172-2 at 3-4, ¶¶14, 16 ("PLP cannot provide a different plan for mining the Pebble Deposit that would fall outside the limitations in the Veto. The Veto prevents *any* mining of the Pebble Deposit. The proposed mine is already modest in comparison to the Deposit: it will recover only about 10% of the available minerals…. [T]he Proposed Mine was the smallest version of the mine that is economically feasible.").

[54] *See SFFA v. Harvard*, 600 U.S. 181, 230 (2023) ("What cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows."); *Trump v. Mazars USA, LLP*, 591 U.S. 848, 868 (2020) (similar); *see also Cal Rest. Ass'n v. Berkeley*, 89 F.4th 1094, 1107 (9th Cir. 2024) (parties cannot "skirt the text … by doing *indirectly* what Congress says they cannot do *directly*").

[55] EPA Br. 104; Trout Unlimited Br. 21.

[56] *Pacito v. Trump*, 169 F.4th 895, 934 (9th Cir. 2026) (quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Text* 112 (2012)); *Alabama v. Bozeman*, 533 U.S. 146, 153 (2001) ("[T]he word 'shall' is ordinarily 'the language of command.'"); *De Martinez v. Lamagno*, 515 U.S. 417, 432 n.9 (1995) (noting that "'shall' generally means 'must'").

subsequent "regulation" of the land.[57] The State never would have entered agreements with such gaping loopholes.[58]

*ASARCO v. Kadish*[59] supports the State's interpretation, not the Defendants'. There, the Court held that Arizona's right to lease mineral deposits "as the State legislature may direct" in the Jones Act could not override the "specific requirements imposed by [an earlier] federal statute" that were incorporated into the Jones Act.[60] This incorporated "language of the original grants of these lands to Arizona" was "the decisive basis" for the Court's decision.[61] But here, Defendants seek to impose new restrictions that were adopted decades *after* the Statehood Act. As *ASARCO* makes clear, Congress cannot "grant lands to a State on certain specific conditions and then later, after the conditions had been met and the lands vested, succeed in upsetting settled expectations through a belated effort to render those conditions more onerous."[62] That is what the EPA is attempting to do here.

Unlike the statutes in *ASARCO* and *Case v. Bowles*,[63] moreover, the purpose and legislative history of the Statehood Act and Land Exchange confirm the State's reading. Congress gave these mineral-rich lands to Alaska because that was the only way to ensure the survival of the isolated and sparsely populated state.[64] Likewise, in the Land Exchange, the

---

[57] *United States v. Olson*, 856 F.3d 1216, 1223 (9th Cir. 2017) (statute should not be interpreted to "destroy one of the major congressional purposes" of the statute (cleaned up)).

[58] *See* State Br. 26.

[59] 490 U.S. 605 (1989).

[60] *Id.* at 625, 628-33.

[61] *Id.* at 628-33.

[62] *Id.* at 632.

[63] 327 U.S. 92 (1946).

[64] *See* State Br. 6-7; AIDEA Amicus Br. 7-15.

State insisted on receiving these mineral-rich lands in exchange for surrendering its claims to other valuable lands. This "historical context" is critical to understanding these agreements.[65] The State would never have agreed to terms that allowed the United States to destroy the benefit of the bargain so easily.[66]

Defendants note that the State sought the lands in the Land Exchange for additional reasons besides their mining potential, including for fishing and recreational reasons.[67] That is partly true,[68] but irrelevant. Defendants don't dispute that a key reason the State entered into the Land Exchange was for the mining potential of the lands it was receiving.[69] And even if other reasons mattered, it would be for *the State* to decide how to balance these interests, not the federal government. The Veto destroys the benefit of the bargain.[70]

Defendants argue that the Statehood Act and Land Exchange do not control over conflicting CWA provisions because Section 6(i) "contains no express limitation on federal regulatory authority."[71] But this silence isn't surprising. When Congress passed the Statehood

---

[65] *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 509 (2010).

[66] State Br. 24-27; *see also* AIDEA Amicus Br. 24-26.

[67] SalmonState Br. 51-52.

[68] Dkt. 167-2 (Smith Decl.) at 7 ¶20 ("The lands the State selected in the Bristol Bay area were chosen for multiple resource management purposes. But many of these lands—including the area of the Pebble deposit—were specifically selected for their mineral potential.").

[69] State Br. 7-10, 26.

[70] The Submerged Lands Act doesn't help the Defendants. *See* Bristol Bay Br. 65-66. By giving Alaska "the same rights as [other] States" under the Submerged Lands Act, Alaska Statehood Act §6(m), Alaska simply received the "submerged lands beneath tidal and inland navigable waters," *United States v. Alaska*, 521 U.S. 1, 6 (1997). This provision was not silently allowing the United States to renege on the promises it had just made in Section 6(i) of the Statehood Act.

[71] EPA Br. 105.

Case 3:24-cv-00059-SLG    Document 226    Filed 04/14/26    Page 18 of 33

Act in 1959, no federal law existed that could shut down the State's ability to lease minerals on State-owned lands. Indeed, until the CWA was enacted in 1972, "[t]he States [led] the national effort to prevent, control and abate water pollution," and "the Federal role [was] limited to support of, and assistance to, the States."[72] There thus was no need for the parties to override specific statutes.

Defendants argue that the State's interpretation would mean that Alaska is "exempt … from federal regulation whenever it touches lands conferred under the Statehood Act and the Land Exchange."[73] Not so. Unlike other federal statutes and regulations that merely "increase operating costs and constrain options,"[74] the Veto effectively makes mining impossible.[75] That federal override directly violates the terms of the Land Exchange and the Statehood Act and cannot be harmonized with them.

Finally, the federalism canon and the major-questions doctrine again support the State's interpretation. Section 6(i) was a clear grant of authority to Alaska to control and extract the minerals on its lands.[76] If Congress wanted to go back on this deal, it needed to give EPA clear authority. But it didn't do so here.

---

[72] S. Rep. 92-414 at 3669 (Oct. 28, 1971).
[73] Bristol Bay Br. 67-68; *see* EPA Br. 107.
[74] SalmonState Br. 49; *see* Bristol Bay Br. 65.
[75] *See* EPA_AR_0015356, 0015409-10; EPA_AR_0078409, 0078426-27; EPA_AR_0257015-16; Dkt. 172-2 ¶14 (Shively Decl.); Dkt. 207-1 at 23-25; *see also* Trout Unlimited Br. 5-6 (arguing that "the Pebble deposit is 'low-grade,' meaning it 'contain[s] relatively small amounts of metals relative to the amount of ore,' such that 'mining would be economical only, if ever, if conducted over vast areas'" (quoting EPA_AR_0083543)); EPA_AR_0083806 (same).
[76] *See* State Br. 24-25.

*Northern Dynasty Minerals Ltd. v. EPA*                    Case No.: 3:24-cv-59-SLG
State of Alaska's Reply Brief                                                      13
Case 3:24-cv-00059-SLG    Document 226    Filed 04/14/26    Page 19 of 33

**III. The EPA failed to properly analyze whether discharges into "waters of the United States" would have an unacceptable adverse effect.**

The EPA cannot issue a Section 404(c) veto unless it shows that the discharge of dredged or fill materials into "waters of the United States" will have certain unacceptable effects.[77] But the EPA didn't limit its analysis here to these jurisdictional waters. The EPA based the Veto on the loss of many miles of streams and wetlands, but it never said whether these streams and wetlands were actually "waters of the United States." This failure renders the Veto unlawful.

Defendants don't dispute that the EPA may consider only the effects of discharges into "waters of the United States." Nor do they claim that all of the streams and wetlands that the EPA considered in its analysis were "waters of the United States." Instead, Defendants contend that the EPA permissibly "assum[ed]" that the wetlands and other waters in its Section 404(c) determination were "waters of the United States."[78] According to Defendants, when PLP was applying for a permit, the Corps issued a "preliminary jurisdictional determination" that assumed that all of the waters within the review area (*i.e.*, the 24.7 mile area within the Prohibition) were "waters of the United States."[79] Because PLP did not seek an "approved jurisdictional determination," Defendants argue, then "PLP waived any challenge to the Corps' and EPA's jurisdiction."[80]

Defendants elide the difference between a permit application and a Section 404(c) veto. In a permit application (like the one PLP was seeking), the Corps can assume that

---

[77] 33 U.S.C. §1344(c).
[78] EPA Br. 76.
[79] *Id.*
[80] Bristol Bay Br. 41-46; *see* EPA Br. 76.

*Northern Dynasty Minerals Ltd. v. EPA*          Case No.: 3:24-cv-59-SLG
State of Alaska's Reply Brief          14
Case 3:24-cv-00059-SLG    Document 226    Filed 04/14/26    Page 20 of 33

certain waters are jurisdictional in order to speed up the permit process.[81] But a Section 404(c) veto is an EPA proceeding that is separate from the Corps' permitting process.[82] Moreover, a Section 404(c) veto applies prospectively to *everyone*, not just PLP.[83] For these reasons, PLP could not waive the State's—and everyone else's—rights to challenge the EPA's assessment under Section 404(c).[84] Before the EPA can issue a veto, it must determine that the waters it is considering are *actually* "waters of the United States"—no different from how this Court cannot act without independently concluding that it has jurisdiction over the case.[85]

Defendants criticize the State for not "provid[ing] information to EPA during the Section 404(c) process" to prove that certain waters "within the defined areas are not 'waters of the United States.'"[86] But it is the EPA's burden—not the State's—to prove that the

---

[81] *See Nat'l Ass'n of Home Builders v. EPA*, 786 F.3d 34, 37 (D.C. Cir. 2015) (preliminary jurisdictional determinations are "part of a shortcut into the permitting process" where "an applicant willing to accept a preliminary [jurisdictional determination] may move directly to permitting").

[82] *See, e.g.*, *Mingo Logan Coal Co. v. EPA*, 714 F.3d 608, 612 (D.C. Cir. 2013) ("[S]ection 404 vests the Corps, rather than EPA, with the authority to issue permits to discharge ... [while] Congress granted EPA a broad environmental 'backstop' authority over the [Corps'] discharge site selection."); *Trout Unlimited*, 1 F.4th at 744 (similar); *see also* Bristol Bay Br. 39-40 (warning against "conflat[ing] the Corps' authority to issue permits … with Congress's distinct and broader grant of authority to the EPA under 404(c)").

[83] *See Trout Unlimited*, 1 F.4th at 745 (action under 404(c) "declare[s] an area off-limits entirely" and "limit[s] the scope of any allowable §404 permit").

[84] *See Ebling v. DOJ*, 796 F. Supp. 2d 52, 64 (D.D.C. 2011) ("[W]aiver is within the control of the party who holds the right. That is, one person's waiver cannot, on its own, work a waiver of another person's independent legal right."); *cf. Gonda v. The Permanente Medical Gr., Inc.*, 2015 WL 678969, at *4 (N.D. Cal. Feb. 17, 2015) (finding "no authority for the proposition" that a party to a contract "can waive another party's rights").

[85] *See Curtis v. ABB, Inc.*, 2012 WL 12919536, at *2 (C.D. Cal. May 1, 2012) ("Parties cannot agree to … jurisdiction…. '[D]istrict courts have an independent obligation to address subject-matter jurisdiction *sua sponte*.'" (quoting *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 593 (2004) (cleaned up))).

[86] EPA Br. 76.

discharge of dredged or fill materials "into the navigable waters" will have certain unacceptable effects.[87] The CWA "requires the party asserting jurisdiction over [a water] to *establish firs[t]* that the [water] constitutes waters of the United States."[88] EPA cannot just "assum[e]" that rivers, streams, and wetlands are "waters of the United States." Nor does a preliminary jurisdictional statement provide such proof, as it indicates only that "there *may* be waters of the United States" on the land.[89] Moreover, the State was not silent on this point. The State repeatedly urged the EPA to identify which waters within the defined areas were actually "waters of the United States."[90] Yet the EPA refused to do so.

Defendants have no response to the EPA's failure to identify "waters of the United States" in the Restriction—a 309-square-mile area vastly larger than the Prohibition. PLP's application did not address the navigability of all waters within the Restriction.[91] Nor did the Corps' preliminary determination.[92] The EPA thus could not assume that any waters within the Restriction were "waters of the United States." The EPA has no authority to issue the

---

[87] 33 U.S.C. §1344(a), (c).

[88] *Sackett*, 598 U.S. at 678 (cleaned up) (emphasis added); *see also Bayou City Waterkeeper v. USACE*, 630 F. Supp. 3d 852, 871 (S.D. Tex. 2022) ("Nothing in a permit application can legally confer CWA jurisdiction, nor should it be considered as evidence of jurisdictional waters."), *vacated and remanded on other grounds*, 2023 WL 8319998.

[89] 33 C.F.R. §331.2 (emphasis added); *see* EPA_AR_0083616 ("EPA agrees that a PJD is not … determinative of CWA jurisdictional status.").

[90] *See* EPA_AR_0015401-03.

[91] *See* EPA_AR_0129997-0130060, 0131040-76; *see also, e.g.*, EPA_AR_0085267-7128.

[92] *See* EPA_AR_0092740-52.

Restriction when it doesn't even know where—or even whether—the waters within this larger area are "waters of the United States."[93]

## IV. The EPA improperly considered whether other activities besides "discharges into" jurisdictional waters would have an unacceptable adverse effect.

Section 404(c) authorizes the EPA to issue a veto only when it determines that "the discharge of [dredged or fill] materials into" "waters of the United States" will have certain adverse effects.[94] But the EPA didn't limit its analysis here to "discharge[s] … into" such waters. Instead, the EPA relied on so-called "secondary effects" from the operation of the mine to justify the Veto, including fugitive dust, dewatering, and fragmentation.

Defendants argue that EPA's consideration of secondary effects comports with EPA's Section 404(b)(1) guidelines, which instruct the agency to consider "certain secondary effects associated with the discharge of dredged or fill material, but not resulting from the direct placement of such material."[95] But whether EPA is complying with its regulation and guidelines is irrelevant; the Veto must comply with the statute—Section 404(c) of the CWA. The "'scope of an agency's power is measured by statute and may not be expanded by agency

---

[93] Contrary to the EPA's assertion, *see* EPA Br. 77-78, the Yazoo Pumps project veto based its finding of unacceptable adverse effects on discharges into "waters of the United States." *See* Final Determination Concerning the Proposed Yazoo Backwater Area Pumps Project, Issaquena County, Mississippi ii (Aug. 31, 2008), bit.ly/4rTF7XU ("[T]he proposed discharge … into 43.6 acres of wetlands and other ['waters of the United States'] … would result in unacceptable adverse effects on at least 67,000 acres of wetlands and other ['waters of the United States']".). Regardless, "previous statutory violations cannot excuse the one now before the court." *New Jersey*, 517 F.3d at 583.

[94] 33 U.S.C. §1344(c).

[95] Bristol Bay Br. 15-16; *see* EPA Br. 68 n.16.

fiat."[96] Here, Section 404(c) says that the EPA may consider only discharges "into navigable waters."[97]

Pointing to *Mingo Logan Coal*, Defendants argue that the EPA is allowed to consider "secondary effects" related to discharges into waters when they "share a causal link with the proposed discharges."[98] But Section 404(c) says nothing about "secondary effects" or "causal links"; the EPA is limited to assessing the direct effects of "discharge[s] … into" jurisdictional waters. Regardless, the EPA misstates the test. In the D.C. Circuit, the EPA is authorized to "assess *the effects of the fill* beyond the fill's footprint."[99] In other words, the EPA can consider only the effects of *discharges into* jurisdictional waters—not harms merely associated with the operation of the mine itself.

The EPA cannot make this showing with the "secondary effects" it considered. Indeed, in the Veto, the EPA defined "secondary effects" as effects that are "associated with the discharge of dredged or fill material, but *do not result from actual placement of this material*."[100] That concession is fatal.

The EPA considered the effect of "fugitive dust," which is dust that would be produced from wind or machinery, such as driving vehicles over exposed soil or using

---

[96] *Birth Hope Adoption Agency, Inc. v. Ariz. Health Care Cost Containment Sys.*, 218 F.3d 1040, 1045 (9th Cir. 2000); *see City of Fresno v. Turner*, 2025 WL 2721390, at *10 (N.D. Cal. Sept. 23, 2025) ("'[A]n agency *regulation* cannot create *statutory* authority; only Congress can do that.'").

[97] 33 U.S.C. §1344(c).

[98] EPA Br. 68; *see* SalmonState Br. 22.

[99] *Mingo Logan*, 829 F.3d at 725; *see id.* (EPA acted appropriately because it was "assessing whether discharging spoil *into a particular stream* will produce 'unacceptable adverse effect[s]' on wildlife" (emphasis added)).

[100] EPA_AR_0083068 (emphasis added).

equipment to dig up soil.[101] And Defendants effectively concede that "fugitive dust" is not created by "discharges … into" waters of the United States.[102] The EPA also considered "dewatering," which is when water is *removed* from an area.[103] The EPA notes that "if a stretch of stream were filled to construct a mine tailings storage facility," then the facility's drainage system could "pul[l] water from surrounding streams and wetlands."[104] But such a causal connection, if it even exists, is extremely attenuated. The discharges used to construct the facility would not "cause" the facility's drainage system to dewater the surrounding area. Yet even assuming this one example satisfied Section 404(c), the EPA's assessment of dewatering was far broader than this isolated example,[105] and EPA never claims otherwise.[106] Similarly, while *some* fragmentation might occur from discharges into waters, the EPA's assessment of fragmentation was likewise far more extensive, as it considered alterations of water disconnected from the discharges to be harmful "fragmentation."[107]

---

[101] State Br. 34 & n.202.

[102] EPA Br. 68 & n.16.

[103] State Br. 35 & nn. 203-04; EPA_AR_0083068 (dewatering harms come from "removing sufficient flow" to the various waters).

[104] EPA Br. 68.

[105] *See, e.g.*, EPA_AR_0082973, 0083067-69, 0083154 (assessing the effects of dewatering when water is, among other things, pumped out of wells near the open mining pit); EPA_AR_0095763 ("Drawdown of groundwater is expected primarily around the open pit from dewatering activities, but also around quarries, tailings storage facilities, and water management ponds from drainage/underdrain systems.").

[106] *See* EPA Br. 68-69.

[107] *See* EPA_AR_0095760 ("[W]etlands and other waters located upgradient of fill or a seepage collection and recycle pond were considered fragmented. Seepage collection and recycle ponds are located below each tailing storage facilities (TSF) and are designed to capture seepage from the facilities. Because this seepage would be pumped back into the TSF, the hydrology of waters flowing into these collection and recycle pond is considered fragmented.").

*Northern Dynasty Minerals Ltd. v. EPA*　　　　　　　　　　　　Case No.: 3:24-cv-59-SLG
State of Alaska's Reply Brief　　　　　　　　　　　　　　　　　　　　19
Case 3:24-cv-00059-SLG　　　Document 226　　　Filed 04/14/26　　　Page 25 of 33

The federalism canon and major-questions canon again support the State's interpretation. The regulation of these "secondary effects" is a classic function of the state government, not the federal government.[108] The EPA had no authority to override the State of Alaska's legal authority in this area.[109]

Importantly, Defendants don't dispute that its improper consideration of "secondary effects" formed "a critical piece of the EPA's analysis."[110] The EPA estimated that "roughly one-third of the total aquatic resource losses underlying the Veto … would be directly attributable to these 'secondary effects.'"[111] Likely for this reason, Defendants don't dispute that, if the Court agrees with the State on this argument, the EPA's errors cannot be considered harmless.[112]

## V. The EPA failed to properly assess the costs and benefits of the Prohibition and Restriction.

The EPA doesn't deny that a cost-benefit analysis is required.[113] The Bristol Bay Intervenors do, but they provide no reasoning for their assertion.[114] Their conclusory argument is insufficient to preserve the issue,[115] and it fails in any event.[116]

---

[108] *SWANCC*, 531 U.S. at 174 (discussing the "States' traditional and primary power over land and water use").

[109] *Oxygenated Fuels Ass'n Inc. v. Davis*, 331 F.3d 665, 673 (9th Cir. 2003) (holding that "[e]nvironmental regulation is an area of traditional state control" and there must be a clear statement from Congress showing its intent to "assert federal control" over that regulation).

[110] State Br. 35.

[111] *Id.*

[112] State Br. 35-36.

[113] EPA Br. 84.

[114] Bristol Bay Br. 32.

[115] *See Maldonado v. Morales*, 556 F.3d 1037, 1048 n.4 (9th Cir. 2009) ("Arguments made in passing and inadequately briefed are waived.").

[116] *See* State Br. 36-38.

*Northern Dynasty Minerals Ltd. v. EPA*                              Case No.: 3:24-cv-59-SLG
State of Alaska's Reply Brief                                                                          20
Case 3:24-cv-00059-SLG     Document 226     Filed 04/14/26     Page 26 of 33

On the merits, Defendants mischaracterize the State's arguments as "second guess[ing]" the EPA's conclusions.[117] To the contrary, the State focused its arguments on the key errors made by the EPA. As explained, the EPA's cost-benefit analysis was "internally inconsistent."[118] Before the agency, the EPA concluded that because PLP was not guaranteed to obtain all the necessary permits to operate the Pebble mine, there was a "reasonable possibility that none of [the mine's economic benefits] would be accrued at all."[119] The EPA now retreats from its earlier conclusions, arguing that its cost-benefit analysis was really about whether the mine would be profitable once constructed.[120] But the EPA cannot rewrite its cost-benefit conclusions in litigation. The EPA dismissed the benefits of the mine because the Army Corps denied PLP a permit in 2020, and so "[f]or the project to move forward, [the Corps] would need to reverse its decision to deny [a] permit."[121] There thus was "uncertain[ty] that the anticipated economic activity will occur at all."[122] This "significant regulatory … uncertainty" was a "key aspect" of the EPA's cost-benefit analysis.[123] The EPA's contradictory analysis—claiming benefits from stopping a mine while discounting benefits because the mine might never happen—is the definition of arbitrary and capricious.[124]

---

[117] EPA Br. 1.

[118] *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141, 1145 (9th Cir. 2015).

[119] EPA_AR_0141303.

[120] EPA Br. 92-93; *see also* SalmonState Br. 43. Notably, some Intervenors continue to defend the EPA's internally contradictory analysis. *See* Bristol Bay Br. 31, 33; Trout Unlimited Br. 36-37.

[121] EPA_AR_0141303.

[122] EPA_AR_0141304.

[123] EPA_AR_0141303.

[124] *See* State Br. 38-39.

*Northern Dynasty Minerals Ltd. v. EPA*                    Case No.: 3:24-cv-59-SLG
State of Alaska's Reply Brief                    21
Case 3:24-cv-00059-SLG    Document 226    Filed 04/14/26    Page 27 of 33

Defendants also double down on the EPA's theory that if the mine is stopped there will be "other productive activities that could use resources that would otherwise have been devoted towards the mine."[125] As explained, the EPA's argument ignores basic economics.[126] A once-in-a-lifetime mine like the Pebble Deposit creates *new* economic activity. There is no equivalent to the Pebble Deposit—a mine with 57 billion pounds of copper and copious other mineral riches.[127] If that economic activity disappears, it doesn't just "shif[t]" elsewhere (such as to "the construction of housing and apartments ... [in] Anchorage"[128]); it is gone forever.[129]

Most egregious, the EPA failed completely to quantify the costs of the Restriction.[130] Defendants don't dispute that the EPA never independently assessed the costs of the Restriction. Instead, they try to repurpose the EPA's analysis of the Prohibition: Because the Restriction prevents only "*a* mine" with discharges that cause the 2020 Mine Plan impacts, Defendants claim, the EPA could assume that "a mine to develop the Pebble deposit that was situated in the Defined Area for Restriction would [not] have a meaningfully different economic value than a mine situated in the Defined Area for Prohibition."[131]

The EPA's argument makes no sense, as a simple analogy demonstrates. Imagine that New York City passed an ordinance prohibiting any restaurant from operating if it doesn't pay

---

[125] EPA Br. 87-88; *see* SalmonState Br. 43.
[126] State Br. 40-41.
[127] *See* State Br. 13.
[128] EPA_AR_0141305; *see* State Br. 40.
[129] EPA Br. 88.
[130] State Br. 41-43.
[131] EPA Br. 91; *see also* Bristol Bay Br. 36 (asserting in conclusory fashion that EPA considered the costs of the Restriction (citing EPA_AR_0084254)); SalmonState Br. 46 (same (citing EPA_AR_0141302)).

*Northern Dynasty Minerals Ltd. v. EPA*                    Case No.: 3:24-cv-59-SLG
State of Alaska's Reply Brief                                                     22
Case 3:24-cv-00059-SLG     Document 226     Filed 04/14/26     Page 28 of 33

waiters $50 per hour. The costs of this ordinance wouldn't be the loss of one restaurant; it would be the loss of *all* restaurants in the City that don't meet the criteria. So too here. The Restriction contains about 309 square miles of State-owned lands—more than 12 times the size of the Prohibition. So the costs of the Restriction are not limited to the loss of one mine; they include *every mine* that could fit within the Restriction, an area significantly larger than the Prohibition.[132] The EPA's total failure to assess the costs of the Restriction renders its decision arbitrary and capricious.

## VI.     The Court should vacate the Veto.

The SalmonState Intervenors—but not the EPA—argue that the Court should remand without vacatur.[133] But "'vacatur and remand is the default remedy under the APA.'"[134] Remand without vacatur is appropriate "only in 'limited circumstances,'"[135] and not even the EPA argues that this case fits the criteria. When deciding whether the exception applies, the Court weighs "the seriousness of the agency's errors against 'the disruptive consequences of an interim change that may itself be changed.'"[136] Neither factor weighs against vacatur here.

---

[132] *See* EPA_AR_0083177 ("The restriction also applies to proposed discharges if such discharges would result in adverse effects greater in nature and magnitude than the adverse effects of the discharges described in Sections 4.2.1 through 4.2.4"); *see also id.* (the Restriction would prevent the construction of multiple projects "by different entities" that "cumulatively" cause the adverse effects described in the Restriction).

[133] SalmonState Br. 63-64.

[134] *Nat. Grocers v. Rollins*, 157 F.4th 1143, 1170 (9th Cir. 2025).

[135] *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 523 (9th Cir. 2015).

[136] *Migrant Clinicians Network v. EPA*, 88 F.4th 830, 848 (9th Cir. 2023).

As explained above, EPA's errors were not merely "technical or procedural,"[137] such that the EPA "could, 'by complying with procedural rules, adopt the same rule on remand.'"[138] And, contrary to SalmonState's conclusory statement, vacatur will not result in immediate "direct, indirect, and irreparable harm."[139] Any mining activities would require permits and approvals from, at a minimum, the State of Alaska, and no such application is currently pending. There thus are no immediate "'disruptive consequences'" from vacatur.[140] The court should follow the normal course in this case and vacate the Veto.

## CONCLUSION

The Court should declare that the Veto is unlawful and vacate it and set it aside.

---

[137] *Nat. Grocers*, 157 F.4th at 1170.
[138] *Migrant Clinicians*, 88 F.4th at 848 (cleaned up).
[139] SalmonState Br. 63.
[140] *Nat. Grocers*, 157 F.4th at 1170.

*Northern Dynasty Minerals Ltd. v. EPA*                                 Case No.: 3:24-cv-59-SLG
State of Alaska's Reply Brief                                                                                  24
Case 3:24-cv-00059-SLG     Document 226     Filed 04/14/26     Page 30 of 33

DATED: April 14, 2026                                    Respectfully submitted,

By: /s/ J. Michael Connolly

J. Michael Connolly (*pro hac vice*)
Gilbert C. Dickey (*pro hac vice*)
Steven C. Begakis (*pro hac vice*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Telephone: (703) 243-9423
mike@consovoymccarthy.com
gilbert@consovoymccarthy.com
steven@consovoymccarthy.com

STEPHEN J. COX
ATTORNEY GENERAL
Ronald W. Opsahl
(Alaska Bar No. 2108081)
Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: ron.opsahl@alaska.gov

*Attorneys for the State of Alaska*

*Northern Dynasty Minerals Ltd. v. EPA*                          Case No.: 3:24-cv-59-SLG
State of Alaska's Reply Brief                                                                 25
Case 3:24-cv-00059-SLG     Document 226     Filed 04/14/26     Page 31 of 33

**CERTIFICATE OF SERVICE**

I certify that on April 14, 2026, I electronically filed the foregoing document with the

Clerk of the Court using the CM/ECF system, serving all counsel of record.

/s/ J. Michael Connolly
J. Michael Connolly

*Northern Dynasty Minerals Ltd. v. EPA*                    Case No.: 3:24-cv-59-SLG
State of Alaska's Reply Brief                                                    26
Case 3:24-cv-00059-SLG    Document 226    Filed 04/14/26    Page 32 of 33

**CERTIFICATE OF COMPLIANCE**

Per Local Civil Rule 7.4(a)(3), I certify that this reply brief complies with the type-volume limitation of 7.4(a)(1) and contains 24 pages, excluding the parts exempted by Local Civil Rule 7.4(a)(4), in compliance with the page limit requested in the State's Motion for Leave to File Excess Pages, which is filed concurrently.

*/s/ J. Michael Connolly*
J. Michael Connolly

*Northern Dynasty Minerals Ltd. v. EPA*                    Case No.: 3:24-cv-59-SLG
State of Alaska's Reply Brief                                                              27
Case 3:24-cv-00059-SLG    Document 226    Filed 04/14/26    Page 33 of 33