KEITH BRADLEY, *pro hac vice*
SCHELEESE GOUDY, *pro hac vice*
717 17th Street, Suite 1825
Denver, CO 80202
T: (303) 830-1776
F: (303) 894-9239
keith.bradley@squirepb.com
scheleese.goudy@squirepb.com

JEFFREY M. WALKER, *pro hac vice*
KATHERINE E. WENNER, *pro hac vice*
2000 Huntington Center
41 South High Street
Columbus, OH 43215
T: (614) 365-2700
F: (614) 365-2499
jeffrey.walker@squirepb.com
katherine.wenner@squirepb.com

SQUIRE PATTON BOGGS (US) LLP

THOMAS P. AMODIO
KEVIN M. BOOTS
500 L Street, Suite 300
Anchorage, AK 99501
T: (907) 222-7100
F: (907) 222-7199
tom@reevesamodio.com
kevin@reevesamodio.com

REEVES AMODIO, LLC

**ORAL ARGUMENT REQUESTED**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTHERN DYNASTY MINERALS LTD. and PEBBLE LIMITED PARTNERSHIP,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>Defendants. | Case No. 3:24-cv-00059-SLG<br>and consolidated cases |

**PLP'S REPLY BRIEF**

# TABLE OF CONTENTS

**Page**

I. Background ........................................................................................................4
    A. EPA misstates the evidence about salmon near the mine site ...........................4
    B. TU misstates Pebble's economic value.................................................................5

II. Legal Standard ..................................................................................................6

III. EPA's scientific explanation is irrational and lacks substantial evidence .......................7

IV. The Veto is unlawful ........................................................................................10
    A. The Veto contravenes the Statehood Act..........................................................12
    B. The Veto contravenes section 404(t)................................................................18
    C. EPA cannot veto a discharge without at least a permit application .................22

V. EPA ignored economic reality .........................................................................24
    A. EPA's supposed weighing of costs and benefits was irrational .......................24
        1. EPA had to quantify the Veto's costs......................................................24
        2. EPA's cost-benefit assessment was irrationally inconsistent .................27
    B. EPA's economic assessment of the mine was irrational....................................30
        1. The Pebble investment is not fungible .....................................................30
        2. EPA misunderstands supply and demand.................................................31
        3. EPA miscalculated Pebble's contribution to U.S. supply......................31

VI. EPA applied the wrong standard.......................................................................32
    A. EPA misunderstood what qualifies as "unacceptable" ......................................33
    B. EPA improperly relied on speculation ..............................................................36

VII. EPA's conclusions about lost streams contradict the record .......................................40
    A. The NFK, SFK, and UTC watersheds are not "fishery areas"..........................40
    B. EPA's scale selection was arbitrary and capricious..............................................44
    C. Linear miles are the wrong measure for habitat quantity...................................47
    D. The portfolio effect does not magnify the loss ....................................................48
    E. Blocking upstream tributaries that are not salmon habitat has no significant effect on fishery areas ..........................................................................................53

VIII. EPA's conclusions about streamflow were arbitrary and capricious..............................55

IX. The Veto is based on discharges mostly outside of CWA jurisdiction ........................57

X.      EPA's speculations about TSF failure were irrational ......................................................60

XI.     EPA disregarded compensatory mitigation.......................................................................61

XII.    Remand without vacatur would be improper ...................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alaska Survival v. Surface Transp. Bd.*,
705 F.3d 1073 (9th Cir. 2013).................................................................19

*All. for Wild Rockies v. Petrick*,
68 F.4th 475 (9th Cir. 2023)........................................................ 18, 19

*All. for the Wild Rockies v. U.S. Forest Serv.*,
907 F.3d 1105 (9th Cir. 2018)...............................................................62

*Alvarez v. Hill*,
518 F.3d 1152 (9th Cir. 2008)................................................................18

*Am. Trucking Ass'ns, Inc. v. City of L.A.*,
569 U.S. 641 (2013)................................................................ 12, 13

*Arizona Cattle Growers' Ass'n v. FWS*,
273 F.3d 1229 (9th Cir. 2001)......................................................37, 38, 40

*Arteaga v. INS*,
836 F.2d 1227 (9th Cir. 1988)...............................................................33

*ASARCO, Inc. v. Kadish*,
490 U.S. 605 (1989).............................................................................14

*Ass'n of Pacific Fisheries v. EPA*,
615 F.2d 794 (9th Cir. 1980)................................................................26

*Bd. of Res. of Wash. v. Brown*,
992 F.2d 937 (9th Cir. 1993)................................................................15

*Biden v. Nebraska*,
600 U.S. 477 (2023).............................................................................11

*In re Blinds to Go Share Purchase Litig.*,
443 F.3d 1 (1st Cir. 2006)....................................................................23

*Boechler, P.C. v. Comm'r*,
596 U.S. 199 (2022).............................................................................41

*Bowen v. Am. Hosp. Ass'n*,
476 U.S. 610 (1986)..............................................................................7

*Buckhorn v. Hettinger,*
    800 F. App'x 542 (9th Cir. 2020) .......................................................................18

*Cal. Rest. Ass'n v. Berkeley,*
    89 F.4th 1094 (9th Cir. 2024) ................................................................. 13, 21

*Cal. Wilderness Coal. v. DOE,*
    631 F.3d 1072 (9th Cir. 2011)...........................................................................47

*Case v. Bowles,*
    327 U.S. 92 (1946)..............................................................................................15

*Catawba Cnty. v. EPA,*
    571 F.3d 20 (D.C. Cir. 2009) ............................................................................26

*Chem. Mfrs. Ass'n v. EPA,*
    28 F.3d 1259 (D.C. Cir. 1994) ..........................................................................45

*Chevron U.S.A. Inc. v. EPA,*
    No. 21-71132, 2023 WL 5665761 (9th Cir. Sept. 1, 2023) .......................59

*Chickasaw Nation v. United States,*
    534 U.S. 84 (2001) ........................................................................... 42, 43

*Chlorine Chem. Council v. EPA,*
    206 F.3d 1286 (D.C. Cir. 2000) ........................................................................56

*City and Cnty. of San Francisco v. USCIS,*
    981 F.3d 742 (9th Cir. 2020).............................................................................26

*Ctr. for Biological Diversity v. EPA,*
    168 F.4th 1164 (9th Cir. 2026) .........................................................................36

*Ctr. for Biological Diversity v. NHTSA,*
    538 F.3d 1172 (9th Cir. 2008)............................................................................7

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019).............................................................................................13

*Dep't of Transp. v. Pub. Citizen,*
    541 U.S. 752 (2004).............................................................................................19

*Desertrain v. City of L.A.,*
    754 F.3d 1147 (9th Cir. 2014)...........................................................................18

*Duggan v. Comm'r*,
879 F.3d 1029 (9th Cir. 2018) .................................................................20

*Elec. Consumers Res. Council v. FERC*,
747 F.2d 1511 (D.C. Cir. 1984) ...............................................................55

*FCC v. AT&T Inc.*,
562 U.S. 397 (2011) ...................................................................................35

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ...................................................................................27

*Free Speech Coal. v. Paxton*,
606 U.S. 461 (2025) .....................................................................................6

*FTC v. MTK Mktg., Inc.*,
149 F.3d 1036 (9th Cir. 1998) .................................................................41

*Galvez v. Jaddou*,
52 F.4th 821 (9th Cir. 2022) ....................................................................37

*Genuine Parts Co. v. EPA*,
890 F.3d 304 (D.C. Cir. 2018) .................................................................55

*Great Basin Mine Watch v. Hankins*,
456 F.3d 955 (9th Cir. 2006) ...................................................................20

*Groff v. DeJoy*,
600 U.S. 447 (2023) ...................................................................................35

*Horsehead Res. Dev. Co. v. Browner*,
16 F.3d 1246 (D.C. Cir. 1994) .................................................................56

*Hunter v. FERC*,
711 F.3d 155 (D.C. Cir. 2013) .................................................................16

*Johnson v. City of Shelby*,
574 U.S. 10 (2014) .....................................................................................18

*Kaweah Delta Health Care Dist. v. Becerra*,
123 F.4th 939 (9th Cir. 2024) ..................................................................63

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......................................................................32, 36, 41

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ........................................................................................23

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
  70 F.4th 582 (D.C. Cir. 2023) ........................................................................57

*Melton v. Neven*,
  712 F. App'x 610 (9th Cir. 2017) ...................................................................24

*Mingo Logan Coal Co. v. EPA*,
  70 F. Supp. 3d 151 (D.D.C. 2014) ................................................... 43, 44, 63

*Mingo Logan Coal Co. v. EPA*,
  714 F.3d 608 (D.C. Cir. 2013) ........................................................................23

*Mingo Logan Coal Co. v. EPA*,
  829 F.3d 710 (D.C. Cir. 2016) ........................................................................43

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ......................................................................................7, 51

*Nat. Res. Def. Council, Inc. v. EPA*,
  31 F.4th 1203 (9th Cir. 2022) ................................................................... 31, 38

*Nat. Res. Def. Council v. EPA*,
  966 F.2d 1292 (9th Cir. 1992) .....................................................................7, 47

*Nat. Res. Def. Council v. Pritzker*,
  828 F.3d 1125 (9th Cir. 2016) ........................................................................34

*Nat'l Ass'n of Homebuilders v. Defs. of Wildlife*,
  551 U.S. 644 (2007) ................................................................................. 16, 17

*Nat'l TPS All. v. Noem*,
  150 F.4th 1000 (9th Cir. 2025) .......................................................................15

*Nebraska v. Su*,
  121 F.4th 1 (9th Cir. 2024) .............................................................................11

*Newport Galleria Grp. v. Deland*,
  618 F. Supp. 1179 (D.D.C. 1985) ..................................................................35

*Nicopure Labs, LLC v. FDA*,
  266 F. Supp. 3d 360 (D.D.C. 2017) .......................................................... 26, 27

*Ohio v. EPA*,
  603 U.S. 279 (2024)........................................................................7, 25, 49, 50

*Port of Seattle v. FERC*,
  499 F.3d 1016 (9th Cir. 2007)................................................................55

*Portland Gen. Elec. Co. v. Bonneville Power Admin.*,
  501 F.3d 1009 (9th Cir. 2007)................................................................19

*Rock Creek All. v. FWS*,
  703 F. Supp. 2d 1152 (D. Mont. 2010) ..................................................36

*Rodriguez v. Holder*,
  683 F.3d 1164 (9th Cir. 2012)................................................................33

*Rosauer v. Alaska Diesel Elec., Inc.*,
  771 F. Supp. 3d 1092 (D. Alaska 2025)..................................................18

*Sackett v. EPA*,
  598 U.S. 651 (2023)................................................... 21, 41, 42, 43, 60

*Safe Air for Everyone v. EPA*,
  488 F.3d 1088 (9th Cir. 2007)..................................................................7

*Shoshone-Bannock Tribes of Fort Hall Rsrv. v. U.S. Dep't of Interior*,
  153 F.4th 748 (9th Cir. 2025) ................................................................16

*Sierra Club v. U.S. Dep't of Interior*,
  899 F.3d 260 (4th Cir. 2018)..................................................................16

*Sims v. Apfel*,
  530 U.S. 103 (2000)................................................................................19

*Sturgeon v. Frost*,
  577 U.S. 424 (2016)................................................................................14

*Trout Unlimited v. Pirzadeh*,
  1 F.4th 738 (9th Cir. 2021)....................................................................23

*United States v. Bank of Am. Corp.*,
  753 F.3d 1335 (D.C. Cir. 2014)..............................................................42

*United States v. Eurodif S.A.*,
  555 U.S. 305 (2009)................................................................................14

*United States v. L.A. Tucker Truck Lines, Inc.*,
  344 U.S. 33 (1952)........................................................................................................19

*United States v. McEnry*,
  659 F.3d 893 (9th Cir. 2011)........................................................................................24

*United States v. Students Challenging Regul. Agency Procs.*,
  412 U.S. 669 (1973)......................................................................................................17

*United States v. Todd*,
  627 F.3d 329 (9th Cir. 2010)........................................................................................36

*USACE v. Hawkes*,
  578 U.S. 590 (2016)......................................................................................................59

*Waterkeeper All. v. EPA*,
  140 F.4th 1193 (9th Cir. 2025) ............................................................................... 32, 33

*West Virginia v. EPA*,
  597 U.S. 697 (2022)......................................................................................................11

*Yellen v. Confederated Tribes of Chehalis Rsrv.*,
  594 U.S. 338 (2021)................................................................................................. 41, 42

**Statutes**

33 U.S.C. § 610(g)(3)(A)(ii)..............................................................................................37

33 U.S.C. § 1251(b) ................................................................................................... 21, 22

33 U.S.C. § 1311 ...............................................................................................................22

33 U.S.C. § 1342 ...............................................................................................................21

33 U.S.C. § 1344 ................................................................................... 19, 20, 21, 22, 45

33 U.S.C. § 1370 ...............................................................................................................17

33 U.S.C. § 1371(c)(1) ......................................................................................................19

33 USC § 4010(3)(B) ........................................................................................................37

Alaska Stat. § 16.05.871(d) ..................................................................................................8

## Regulatory Material

40 C.F.R. 233.70 ..............................................................................................................21

40 C.F.R.  233.71 ............................................................................................................21

40 C.F.R. part 231 .........................................................................................................19

73 Fed. Reg. 54,398 (Sep. 19, 2008)............................................................................12

76 Fed. Reg. 3,126 (Jan. 19, 2011)...............................................................................12

79 Fed. Reg. 20,802 (Apr. 14, 2014) ...........................................................................51

U.S. ARMY CORPS OF ENG'RS, REGULATORY GUIDANCE LETTER 08-02
  (June 26, 2008)...........................................................................................................59

## Other Authorities

43-101CP, Standards of Disclosure for Mineral Projects § 6.......................................25

Alex Glashausser, *The Extension Clause and the Supreme Court's Jurisdictional
  Independence*, 53 B.C. L. Rev. 1225 (2012) ................................................................37

Geoffrey Hughes, A HISTORY OF ENGLISH WORDS (2000) .......................................35

Securities Act, R.S.B.C. 1996, c. 418, §§ 155, 168.1(1) (Can.) ....................................25

Suzanne Goldenberg, *Anglo American Pulls Out of Alaska Mines Project*,
  THE GUARDIAN (Sept. 16, 2013) ...............................................................................6

What devastating harm justifies destroying an over-$1-billion investment and depriving the nation of $800-billion-worth of its mineral wealth? In the opposition briefs,[1] the assertions supposedly justifying the Veto have evaporated. All that remains is an insistence that any stream with a salmon, and any wetland upstream of it, must be inviolable. The consequences for Alaska's economy are manifest, and go far beyond the loss of the Pebble Deposit, crushing though that is in itself.

The Veto suggested the 2020 Plan's filling of salmon streams could produce unacceptable adverse effects given those streams represent "13 percent of the anadromous waters in the NFK watershed." EPA_AR_0083071. This percentage is irrational because EPA chose the scale precisely to make the effect seem large. Br.49. EPA agrees that's what it did, but says it doesn't matter because the percentage was "*not the basis*" of the decision. Opp.42 (emphasis in original).

The Veto said the effects are unacceptable given the length of streams to be filled. EPA_AR_0083864-0083865. This measure is irrational, because a mile of steep, rocky, narrow stream is less useful habitat than a mile of wider watercourse. Br.45-46. EPA responds this error is "irrelevant" because "stream length is not the reason that the loss is unacceptable." Opp.59.

The problem cannot be that these streams are unique or especially rich in salmon. There is no evidence of special features in streams at the mine site, and they are especially *low*

---

[1] PLP refers to EPA and intervenors collectively as "Respondents." It cites its opening brief as "Br.," EPA's opposition as "Opp.," and the intervenor oppositions as TU-Opp. (Trout Unlimited), SalmonState-Opp., and BBI-Opp. (Bristol Bay Intervenors).

in salmon. Only 27 have been observed spawning, in only one reach, and from only one species; in the affected reaches (both with and without spawning), salmon are an order-of-magnitude sparser than downstream. Br.44-45. In response, EPA bemoans PLP's "hyper-focus on numbers" because "the number of salmon in a stream" does not matter. Opp.38.

Preserving the Bristol Bay commercial fishery cannot be the justification. The FEIS found there will be "no measurable impact" on Bristol Bay fish populations. Br.50. The Veto, leaving that conclusion undisturbed, said "EPA has not made an unacceptable adverse effects determination at these larger scales." EPA_AR_0083287. Yet EPA's assessment counted the avoidance of harm to the Bristol Bay fishery as a benefit. EPA cannot simply speculate about an outcome contrary to the 5,000-plus-page FEIS for no reason. So EPA yet again retreats; apparently EPA meant only that avoiding any harm to the Bristol Bay fisheries, *if* the project might cause such harm, would be beneficial. Opp.94. The conclusion stands, then, as the FEIS found: The 2020 Plan will have no measurable impact on Bristol Bay fish populations.

The harm cannot be the theoretical notion of a TSF failure. Such fears were based on counterfactual musings, like what might happen if PLP built a different TSF than it applied for. Br.66-68. EPA does not assert it could or did find an unacceptable adverse effect beyond a theoretical possibility arising from "factual uncertainties." Opp.95-96.

After disavowing so much of the Veto's stated—though illogical—rationales, Respondents stand on "portfolio theory": that the salmon population at the mine site is genetically distinct; the filling of streams would prevent their spawning; and losing that genetic diversity could be detrimental to long-term population stability. Opp.34-35. The FEIS found the "impact to the Portfolio Effect would not be discernable" from the 2020 Plan.

EPA_AR_0095992. That is so, in part, because even if the 27 Coho ceased to spawn (although salmon do stray from their natal spawning grounds), that is no greater than "natural variability." EPA_AR_0095991. In other words, the 27 Coho that EPA is preserving at the cost of $800 billion might disappear naturally in any given year anyway. They might also be simply caught by the commercial fishers that take 1,000 times as many from Nushagak District (these fishes' destination as adults) every year. Br.47-48. By comparison, EPA touted a study finding behavioral differences between sockeye in close-together lakes above Iliamna Lake— "localized" differences. EPA_AR_0083038. Those lakes had *thousands* of salmon. EPA_AR_0494219. What the 2020 Plan would fill is a minuscule portion of even that "localized" habitat.

Meanwhile, the FEIS found the genetic diversity across the Bristol Bay watershed would reduce the impact of losses at the mine site. EPA_AR_0091989-0091990. EPA disregarded that finding. Not because it identified any genetically distinct population in the affected streams. "Genetic baselines for salmonid species in Alaska are being updated or are under development," and for Coho—known, since 2010, to be the only salmon species spawning near the mine site—"fine-scale population structure" no more than "*likely* exist[s]." EPA_AR_0083075-0083076 (emphasis added).

EPA lectures on the biology and ecology of salmon. This is what it looks like when an agency cloaks an irrational conclusion in a veil of science-speak. Despite the obfuscation, EPA's bottom-line position is revealed to be this: Any tiny stream with any single salmon (recall, EPA insists it does not matter how few) must be preserved because that salmon is *likely*

(per EPA) to have some genetic diversity and, under EPA's version of portfolio theory, every theoretical iota of diversity must be preserved. No matter the cost.

This is not what Congress authorized. Section 404(c) allows a veto only if a discharge "will"—not might or may—have an "unacceptable" adverse effect—unaffordable when weighed against the gains from the discharge—on (as relevant here) "fishery areas"—not fish, but *fishery*. The 2020 Plan would fill 8.5 miles of tiny streams among the least salmon-populated in the region. The FEIS's finding this project will have "no measurable impact" on Bristol Bay populations remains uncontested. EPA's Veto violates each element of section 404(c), and Respondents' briefs confirm it does so in just the ways that PLP said.

## I.    Background

### A.    EPA misstates the evidence about salmon near the mine site.

EPA displays a reckless disregard of facts, as the Veto did. For example, EPA says "[t]he Koktuli River, including SFK and NFK, is recognized as providing important spawning habitat," for which EPA invokes Alaska's regional recreation plan. Opp.11. That document refers to the Koktuli, not the SFK or NFK (much less their tiny uppermost headwaters streams). EPA_AR_0476418. And it "does *not* cover or affect … '[l]ands designated Settlement or Minerals' in the [Bristol Bay Area Plan]." EPA_AR_0476362-0476363. The Area Plan designates the Pebble area for Minerals use. EPA_AR_0475925; EPA_AR_0476062; EPA_AR_0476064; EPA_AR_0476068. EPA's purported support shows the opposite of what EPA's brief says.

EPA says "the innumerable array of habitats … result in populations that look physically different, behave differently, and have unique genetics." Opp.9. Actually, the

"population" in NFK-1.190 (the only spawning habitat that would be lost) is two-orders-of-magnitude smaller than in the studies that EPA cited for "fine-scale" behavior variation. And a comprehensive treatise on salmon explains that differences in appearance and behavior do not necessarily represent *genetic* differences, because "traits are under some degree of environmental control." EPA_AR_0472879-0472880. "We need to demonstrate … a genetic basis for the trait." EPA_AR_0472880. Furthermore, separate spawning areas do not necessarily generate genetically distinct populations; "straying" to a different spawning stream "is just as fundamental an attribute of salmon as homing is." EPA_AR_0472577. Genetic diversity is measured on the scale of thousands of kilometers. EPA_AR_0472876.

EPA asserts salmon are "genetically programmed to return to specific, localized reaches." Opp.14. That is a remarkable claim. A person goes home to a specific address every night, but not because her genetics prescribe that location. EPA's cited passages, EPA_AR_0083040, EPA_AR_0083208, do not make the statement that EPA's brief attributes to them. The scientific evidence was that salmon "select spawning sites using a complex combination of heritable homing behaviors plus proximate behavioral responses to environmental and social cues." EPA_AR_0488635. At the same time, "straying in wild populations is a critical evolutionary feature … that compliments homing." EPA_AR_0488635.

### B.    TU misstates Pebble's economic value.

Meanwhile, TU attacks the proposed mine as economically irrational. TU relies on extra-record materials not before the Court, such as press articles, and mischaracterizes them. For example, TU asserts an investor backed out because the mine would be uneconomic. TU-

PLP's Reply Brief
Northern Dynasty Minerals Ltd. v. EPA
Case No. 3:24-cv-00059-SLG

5

Case 3:24-cv-00059-SLG    Document 229    Filed 04/14/26    Page 15 of 76

Opp.5-6. TU's source actually suggests the investor withdrew because of EPA's obstruction.[2]

TU invokes a purported future jewelers' boycott of Pebble-sourced gold, a notion also outside

the record—which makes no sense economically.[3] U.S. jewelers do not drive the economic

return of a copper mine. The record includes a conservative analysis showing the mine would

clearly be economically viable, and even a >10% decrease in gold prices would not significantly

affect its value. EPA_AR_0488191. EPA's purported economic analysis did not even count

gold production. EPA_AR_0141363.

That Pebble ores are low-grade, TU-Opp.5, does not make them uneconomic. Wishing

for high-grade deposits like those of the past is a distracting fiction, not a plan to supply the

increased quantities needed for the renewable-energy transition. EPA_AR_0468570. The vast

majority of untapped copper reserves in the world have grades comparable to Pebble.

EPA_AR_0078918-0078921.

## II. Legal Standard

EPA demands "exceedingly deferential" review, Opp.29—the standard for

substantive-due-process claims, *see Free Speech Coal. v. Paxton*, 606 U.S. 461, 469 (2025)

(identifying the occasion for "exceedingly deferential"). EPA's cited cases do not even contain

those words. "Agency deference has not come so far that we will uphold regulations whenever

---

[2] Suzanne Goldenberg, *Anglo American Pulls Out of Alaska Mines Project*, THE GUARDIAN (Sept. 16, 2013), https://www.theguardian.com/environment/2013/sep/16/anglo-american -alaska-gold-mines.

[3] Wandering even further outside the record, TU touts that Alaska's congressional delegation has opposed the Pebble mine. TU-Opp.7. The suggestion that the Court might count noses politically is troubling. But if the Court wished to do so, it could note that the State's Governor and Attorney General object vehemently to the Veto, to the point of litigating alongside PLP.

it is possible to 'conceive a basis' for administrative action"; the APA standard "is not equivalent to 'the minimum rationality … to withstand analysis under the Due Process Clause.'" *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626-27 (1986) (plurality op.).

EPA insists the list of illustrative deficiencies in *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983), constitute the "only" grounds for finding an action arbitrary or capricious. Opp.30. *State Farm* did not declare its list to be exhaustive; and the Supreme Court and Ninth Circuit have identified various other arbitrary-and-capricious problems. See, for examples, *Ohio v. EPA*, 603 U.S. 279, 293-94 (2024) (lack of "reasoned response" to an objection); *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1200-03 (9th Cir. 2008) (internal inconsistency); *Nat. Res. Def. Council v. EPA*, 966 F.2d 1292, 1305 (9th Cir. 1992) ("unsubstantiated assumption[s]"); *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007) (legal error generating a "flawed premise"); Br.13-14 (citing precedents that lack of substantial evidence is arbitrary).

## III.  EPA's scientific explanation is irrational and lacks substantial evidence.

On key issues, EPA's rationalizations show the Veto was arbitrary and capricious.

***First***, EPA decries PLP's "hyper-focus on numbers," Opp.38—as though considering the numbers is a bad thing in a supposedly scientific assessment. Elsewhere, EPA begs forgiveness for declining to acknowledge the dollar cost of blocking a Pebble mine. Here, EPA insists it is inappropriate even to *think* about numbers.

EPA asserts the science does not show "the number of salmon in a stream is a critical metric." Opp.38. It is hard to comprehend how the number could *not* matter. Zero salmon is less important than one; 1 spawning salmon surely must be less important than 100. In

support of its innumeracy, EPA invokes Alaska's regulatory category of "important waters," and protests it should not face a "higher standard." Opp.38. That complaint is illogical. An "important waters" designation means one needs a state permit to fill the stream, Alaska Stat. §16.05.871(d), whereas EPA determines such a permit *cannot* be allowed. The standard for that certainly should be higher. At any rate, despite invoking science to resist PLP's "hyper-focus on numbers," EPA cites no science.

**Second**, though EPA concedes "most of the 8.5 miles" to be filled are not spawning habitat, it dislikes that focus because "rearing" and "migration" are also important. Opp.38. The statute does not mention rearing or migration. EPA's justification for the Veto is that section 404(c) protects fishery areas *and* "spawning and breeding." Opp.62. That theory cannot justify independently preserving areas other than fisheries or spawning or breeding areas. Nor does "portfolio theory" work. While salmon generally return to their spawning streams, EPA nowhere suggests they return to other types of habitats. Loss of an area used only for "rearing or migration" has no evident consequence for genetic diversity.

**Third**, Respondents disbelieve the count of spawning fish in NFK-1.190. Opp.39; TU-Opp.27-28; SalmonState-Opp.26. And EPA says PLP did not survey NFK-1.200 "during that timeframe [the same one as for NFK-1.190]." Opp.39. PLP did sample NFK-1.200, and found no spawning fish.[4] EPA_AR_0092619. Why should it matter whether the observations were contemporaneous? EPA says PLP's data are "incomplete" because PLP did not count

---

[4] TU also asserts there was no survey. TU-Opp.27-28. Actually, PLP sampled NFK-1.200 in 2018. *E.g.*, EPA_AR_0095028. The page TU cites for its erroneous assertion is a table stating that sampling. EPA_AR_0095026.

in winter.  Opp.39.  PLP's surveys remain (as the Veto acknowledged) the best available evidence about local salmon-spawning.  EPA_AR_0083254.  Even if PLP's numbers were low by **10X**—as Respondents dare not even hypothesize, *e.g.*, Opp.39; TU-Opp.28—they would still be minuscule.  Br.47-48.  Respondents have no answer.  Opp.39; TU-Opp.28.  That fish might—yet again, EPA's speculation—sometimes visit the streams during winter does not suggest more spawning than the data showed.

*Fourth*, EPA disagrees these two streams are "too steep and rocky to be good salmon habitat," since after all they have some salmon.  Opp.40.  EPA has defeated a strawman.  Of course there are a few salmon (though none in the 91 miles that EPA also says are critical).  But there are only 27 *spawning* salmon, of only one species; and at all life stages the salmon are sparser, by over an order-of-magnitude, than further downstream.  Br.46.  The low density confirms the FEIS's finding that these streams are "lower quality" habitat.  EPA_AR_0095268-0095271.  EPA reiterates some portions of NFK-1.190 and NFK-1.200 have gradients below 3%.  Opp.40.  EPA still does not address the myriad other deficiencies identified in the FEIS.  Br.46; Opp.40.

*Fifth*, EPA says it refuted the FEIS's conclusion that the 2020 Plan will produce "no measurable impact."  Opp.42.[5]  This selective quotation omits what the FEIS actually found.  The Veto noted the FEIS's finding of "no measurable impact" for *Bristol Bay*.  EPA_AR_0083286.  The Veto left that finding uncontested because "EPA has not made an

---

[5] EPA says it had concerns during the EIS drafting process.  Opp.18-20.  Yet, despite knowing what the EIS would say, EPA declined to send the requisite letter timely notifying USACE of a potential veto.

unacceptable adverse effects determination at these larger scales." EPA_AR_0083287. Instead, EPA focused on "fishery areas at the scale of the SFK, NFK, and UTC watersheds," smaller than the scale of the "FEIS conclusions." *Id.* EPA's inability to acknowledge what its Veto actually said is discouraging.

## IV. The Veto is unlawful.

Various statutory interpretations built into the Veto constitute "major questions," given EPA's sweeping assertion of authority and its massive consequences. Br.15. EPA, apparently unable to discern the interpretive disputes, thinks PLP disagrees only with EPA's policy choices. Opp.114. For convenience, PLP highlights a few of the interpretive issues here:

- EPA ruled against a wide range of future hypothetical discharges, across a vast sweep of southwestern Alaska, without any "specification" at issue. Br.23-24. EPA's position is that once somebody has applied for a permit to discharge somewhere, EPA can ban any comparable discharge anywhere. Opp.72-73. EPA's unprecedented approach transforms section 404(c) into a broad authority to write rules of the road for economic development anywhere there is water.

- EPA reads "fishery areas" to encompass any fish habitat, which even EPA acknowledges is not "the best reading" of the statute. Opp.62.

- Section 404(c) allows a veto only if a discharge "will have" unacceptable impacts. EPA reads "will have" to mean "is reasonably likely." Br.39-41. This interpretation radically

expands what vetoes EPA can issue, and arrogates yet more discretion for EPA to decide which projects it will ban.

That EPA is regulating discharges into water, Opp.116-117, is no argument against major-questions doctrine. *West Virginia v. EPA* applied major-questions analysis to EPA's regulation of power-plant emissions that were squarely within Clean Air Act purview. 597 U.S. 697 (2022). The "major question" was about *how* EPA can regulate. *Id.* at 724-32. *Biden v. Nebraska* used major-questions analysis to decide whether an agency with authority over student loans could take the particular action of waiving them. 600 U.S. 477, 502-06 (2023). Similarly, though the Veto addresses discharges into water, major-questions analysis is pertinent for assessing whether EPA has stretched section 404(c) from a "backstop," Opp.116, into a wide authority to superintend development, far beyond what Congress authorized.

EPA says economic impacts alone do not raise major questions. Opp.117-18.[6] Two criteria identify a "major question": does the action "represent[] a 'transformative expansion' in the agency's authority in the vague language of a long-extant, but rarely used, statute," and is it "of 'vast economic and political significance' and 'extraordinary' enough to trigger the doctrine." *Nebraska v. Su*, 121 F.4th 1, 14 (9th Cir. 2024). Section 404(c) is indeed "rarely used," with 13 previous vetoes over 50 years. The Veto is unheralded and unprecedented.

---

[6] BBI downplays the economic significance of Pebble because two-fifths of the total resource is "inferred." BBI-Opp.57-58. The "measured" and "indicated" copper, totaling 53 billion pounds, are not "inferred." EPA_AR_0487898. PLP's conservative planning assumed a copper price of $3.50-per-pound, making this resource worth $185 billion. EPA predicted the medium-term price will conservatively be $5.00-per-pound, EPA_AR_0141365, and perhaps higher. And that is only the copper. EPA has indeed blocked a massive economic resource.

This is by far the largest area of a 404(c) veto, and EPA cites no counterexample. Opp.116.[7] The scale reveals the consequences of EPA's explosive interpretations. EPA asserts power to ban discharges of a given description, anywhere in the country, simply by concluding those discharges are reasonably likely to have non-trivial impacts. The Veto illustrates that sweeping scope. EPA says its 404(c) authority has limits. But EPA's own interpretations erase those limits.

### A. The Veto contravenes the Statehood Act.

Record evidence shows the Veto has the intention and consequence of preventing any mining of the Deposit. Br.19-20. TU, in a moment of candor, admits the goal; it is "common sense," TU intones, there should be no industrial-scale mine in the region. TU-Opp.1.

Respondents insist that because EPA only prohibited mining of the Deposit with the waste disposed of in certain ways, EPA did not bar mining itself. BBI-Opp.65; TU-Opp.20; SalmonState-Opp.47; Opp.103-104, 109 (citing EPA_AR_0083568-0083569). This is a legal fiction. That EPA "selected an indirect but wholly effective means," *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 569 U.S. 641, 652 (2013), to prevent mining does not change the import of the Veto. By comparison, "[a] manufacturer's right to sell federally approved vehicles is

---

[7] BBI invokes the 2008 veto of the Yazoo Backwater Pumps Project, because the asserted impacts covered 67,000 acres, and the 2011 veto of the Mingo Logan project, because that project buried 7.5 miles of streams and roughly 2,000 acres of wetlands. BBI-Opp.56 n.295. Neither is comparable. Both vetoed specific projects—for Yazoo, a pumping station to drain a particular area during Mississippi River floods. 73 Fed. Reg. 54,398 (Sep. 19, 2008) (Yazoo Pumps); 76 Fed. Reg. 3,126 (Jan. 19, 2011) (Mingo Logan). Here, EPA prospectively banned a whole category of activity across an area three times larger than the Yazoo project's entire drainage plan. Beyond barring the filling of 8.5 stream miles, EPA banned future, hypothetical projects filling streams throughout an entire region.

meaningless in the absence of a purchaser's right to buy them." *Cal. Rest. Ass'n v. Berkeley*, 89 F.4th 1094, 1106-07 (9th Cir. 2024). The theoretical right to extract minerals is meaningless without the ability to manage the waste rock, which the Veto does indeed prohibit, EPA_AR_0083186-0083187 (explaining a Pebble mine would generate waste rock). *Los Angeles* (and *California Restaurant Association*) involved preemption, but explained "[w]e have often rejected efforts … to avoid preemption by shifting … regulatory focus from one company to another in the same supply chain," 569 U.S. at 652. If a rule purported not to prohibit restaurant takeout but prohibited customers from holding the packaging, that would constitute a ban on takeout. Prohibiting management of waste rock is, in reality, banning the mining itself. About that real-world meaning of the Veto, the Court is "not required to exhibit a naiveté from which ordinary citizens are free," *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (citation omitted).

SalmonState suggests the Veto prevents PLP only from making as much profit as it wants. SalmonState-Opp.51. Hypothesizing the Deposit could be mined by artisanal miners with shovels, carrying the overburden to imaginary non-wetlands areas somewhere else in the country, is also a fiction. The record shows, without refutation, that the impacts targeted in the Veto are the "minimum" for "the smallest possible Pebble mine operation." EPA_AR_0257015-0257016. USACE also made that finding. EPA_AR_0128965. And EPA acknowledged any mining of the Deposit would necessitate discharging fill material into waters of the United States. EPA_AR_0083070.

EPA defined losses that bring a proposal within the Veto's scope to include any streamflow change over 20%, or some unspecified amount of wetlands filled—in a landscape

consisting entirely of wetlands and streams. EPA_AR_0083166-0083167. No Respondent cites any evidence it would be possible to mine the Deposit without violating the Veto. "[F]orm should be disregarded for substance and the emphasis should be on economic reality." *United States v. Eurodif S.A.*, 555 U.S. 305, 317-18 (2009).

That character places the Veto in conflict with the Statehood Act, which entitled the State to make economic use of the lands conveyed, particularly by extracting the minerals. EPA complains PLP cited no statutory text suggesting economic gain was the purpose of those transfers. Opp.106. The Supreme Court has explained that "absent a land grant, there would be little land available to drive private economic activity and contribute to the state tax base"; the Statehood Act therefore included "mineral deposits"; and thanks to the land grants "Alaska could begin to fulfill its state policy [to] … develop[] … its resources by making them available for maximum use." *Sturgeon v. Frost*, 577 U.S. 424, 429 (2016) (citations omitted).

Respondents say Statehood Act section 6(i) was modeled on a 1927 law adjusting land grants to certain western States; which law, they say, did not allow States to use the minerals "without regard to other federal statutory requirements." Opp.104-05 (discussing *ASARCO, Inc. v. Kadish*, 490 U.S. 605 (1989)). TU even says *ASARCO* rejected an argument like PLP's. TU-Opp.21-22. *ASARCO* did no such thing. A 1910 statute gave Arizona certain parcels for schools, and included limitations and procedural requirements for selling or leasing those parcels. 490 U.S. at 625-26. That law had excluded lands with known minerals, so the 1927 law conveyed minerals as well. *Id.* at 626. *ASARCO* held simply that the 1927 conveyances were subject to the 1910 restrictions. *Id.* at 628. It made no broader statement about other federal statutory requirements.

Besides, Respondents prescribe a false dichotomy—either the Veto must stand or PLP is immune from general federal regulation. Opp.104; BBI-Opp.63. What is at issue is not ordinary regulatory compliance, despite how bland Respondents want the Veto to seem. The Veto bars a category of activity across a whole region. It is designed (and has the effect) to prohibit mining of these lands, for the sake of avoiding impacts that are speculative at best. Respondents cite no case in which an agency exploited purported regulatory authority to destroy mineral rights conveyed under the 1927 statute, nor in which a court approved such destruction.

*Case v. Bowles*, 327 U.S. 92 (1946), and *Board of Resources of Washington v. Brown*, 992 F.2d 937 (9th Cir. 1993), are not examples. *Contra* Opp.107; SalmonState-Opp.51. *Case* held the original grant did not entitle Washington to sell timber produced on the land at a price 10% higher than an extant price cap. Opp.95-96, 102. There is no suggestion the federal agency fully blocked all timber sales. *Board of Resources* addressed the constitutionality of a new *statute* expressly banning exports (thus prioritizing domestic sales) of timber from state-owned land in the West. 992 F.2d at 941-944. Neither case shows an agency can stretch its authority to block an activity specifically ordained by Congress. EPA is not empowered to bar Alaska from using the mineral rights that Congress expressly conveyed for economic use. And an agency has no "power to do indirectly," such as by exploiting the CWA, "what it cannot do directly." *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1021 (9th Cir. 2025) (citation omitted).

PLP is not seeking blanket immunity from federal regulation. It is urging harmonization of 404(c) authority with the Statehood Act. As PLP noted, given the rights that statute conveyed, "reading [section 404(c)] for all that it might be worth runs foursquare

into our presumption against implied repeals." Br.18 (quoting *Nat'l Ass'n of Homebuilders v. Defs. of Wildlife*, 551 U.S. 644 (2007)). As an instructive example, the Fourth Circuit held a statute generally authorizing the National Park Service to issue rights-of-way did not allow the same flexibility at the Blue Ridge Parkway, because another statute specifically described rights-of-way allowed there. *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 291 (4th Cir. 2018). The general authority did not override the other statute that "previously constrained NPS's discretion." *Id.* at 290. The D.C. Circuit rejected a claim that an agency's general authority to combat manipulative schemes in natural-gas markets applied to gas futures, because that outcome would override a different statute mandating exclusive CFTC jurisdiction over futures markets. *Hunter v. FERC*, 711 F.3d 155, 158 (D.C. Cir. 2013). And, as PLP already pointed out, the Ninth Circuit analyzed in this same way the interaction between the Federal Land Policy Management Act and a 1900 land-conveyance statute. Br.16-17 (citing *Shoshone-Bannock Tribes of Fort Hall Rsrv. v. U.S. Dep't of Interior*, 153 F.4th 748 (9th Cir. 2025)). EPA suggests *Shoshone-Bannock* identified an "irreconcilable conflict" between those statutes. Opp.106.[8] That is not what the Ninth Circuit said. It invoked *Homebuilders* and said it was "harmonizing" the statutes. 153 F.4th at 761-63.

Simply put, "as long as there is a reasonable alternative, we will not read" one statute "as impliedly abrogating" another's mandate. *Sierra Club*, 899 F.3d at 291. Discounting this commonplace principle, Respondents insist it applies only if the later statute expressly

---

[8] Had *Shoshone-Bannock* found an "irreconcilable conflict," it would have followed the later statute. *Homebuilders*, 551 U.S. at 663. The Ninth Circuit harmonized the statutes precisely because they were *not* in conflict.

disavows implied repeals.  Opp.107; BBI-Opp.66.  To the contrary, there is a "presumption against implied repeals."  *Homebuilders*, 551 U.S. at 664.  Besides, the CWA contains the disavowal that Respondents demand:  "[N]othing in this chapter in any manner affect[s] any right or jurisdiction of the States with respect to the waters … of such States."  33 U.S.C. §1370.  A comparable provision in NEPA is understood as confirming "NEPA was not intended to repeal by implication any other statute."  *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 694 (1973).  Neither was the CWA.

Respondents frame PLP as demanding blanket immunity from federal regulation because they have no real response to the actual argument:  EPA cannot push CWA authority to the limit in a way that contravenes the Statehood Act.  To be sure, Respondents pooh-pooh the Statehood Act mineral rights, because they believe Alaska selected these lands for recreation and "high fisheries value."  *E.g.*, BBI-Opp.64; Opp.109.  But Alaska's statutory "right to prospect for, mine, and remove" the minerals, and to "lease" the "[m]ineral deposits," §6(i), does not depend on why the State selected a particular parcel.

Even if it did, Respondents mischaracterize their sources.  One, a draft solicitation for comment on land selections, says the State is considering a particular area for "high fisheries values, and … hard mineral potential."  EPA_AR_0272228.  BBI quotes the first and omits the second.  BBI-Opp.64.  BBI also quotes passages regarding fisheries from a 1978 report on land selections.  BBI-Opp.64 (citing EPA_AR_0272207).  BBI omits that the report also identified "mineral potential"[9] as a key motivation.  EPA_AR_0272209.  Furthermore, the

---

[9] SalmonState says a press release cited the State's objective, in the Cook Inlet exchange, of protecting salmon fisheries.  SalmonState-Opp.51.  The release says that was the goal for

State's lead negotiator of the Cook Inlet exchange has testified the State "knew there were mineral resources in the vicinity of the Pebble deposit," and "the opportunity for exploration and development of mineral resources motivated the State's selection of these Bristol Bay lands."[10] In 1984, before the selection was finalized, the State expressly designated the Pebble area for mining. EPA_AR_ 0475724.

## B. The Veto contravenes section 404(t).

EPA urges the Court to disregard this issue as unexhausted, Opp.111;[11] but there is no issue-exhaustion requirement. *All. for Wild Rockies v. Petrick*, 68 F.4th 475 (9th Cir. 2023), did not enforce an exhaustion requirement. It held that *if* exhaustion were required, the plaintiff's comments would not suffice; and it remanded for further litigation about whether the

---

[10] Declaration of Michael C.T. Smith, *Pebble Ltd. P'ship v. EPA*, No. 3:14-CV-00097, ECF 25, p.8 (D. Alaska June 27, 2014).

selecting Iliamna Lake. EPA_AR_0272219. The accompanying report, as just explained, describes different purposes for the area of the Deposit.

[11] TU, unlike EPA, thinks the Court can ignore this important issue because of pleading rules. TU-Opp.25. PLP's complaint raised this issue by alleging the Veto is unlawful because EPA "cannot … override the State's regulatory preferences." ECF 91, ¶114. PLP was not obligated to cite each particular statutory provision; a complaint "set[s] forth … *claims for relief, not causes of action, statutes or legal theories.*" *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008) (emphasis in original). "[N]o heightened pleading rule requires plaintiffs … to invoke [a particular provision] expressly in order to state a claim." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014)). Even if the 404(t) issue were new, it is an abuse of discretion to reject new claims from a summary-judgment motion without assessing whether amendment is appropriate under the liberal standards of Rule 15. *Desertrain v. City of L.A.*, 754 F.3d 1147, 1154 (9th Cir. 2014). Perhaps the case that TU cites, *Rosauer v. Alaska Diesel Electric, Inc.*, 771 F. Supp. 3d 1092 (D. Alaska 2025), was such an abuse. But it is a different situation anyway, of a party's resisting summary judgment by shifting its claims. 771. F. Supp. 3d at 1101. *Rosauer* does not suggest it is improper to seek summary judgment on a new claim, where—per *Desertrain*—no party complains of prejudice; no party accuses PLP of bad faith; TU does not identify timeliness concerns; and the claim is not futile. *Buckhorn v. Hettinger*, 800 F. App'x 542 (9th Cir. 2020), is an unpublished summary disposition that at most shows a district court should, consistent with *Desertrain*, conduct the Rule 15 analysis.

proceedings carried an exhaustion requirement. 68 F.4th at 490 n.4. "[R]equirements of issue exhaustion are largely creatures of statute," including in *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33 (1952), EPA's other case. *Sims v. Apfel*, 530 U.S. 103, 107-08 (2000) (plurality opinion). The Ninth Circuit, responding to *Sims*, holds issue-exhaustion does not apply "in the adjudicatory context"; issue-exhaustion is for "notice-and-comment rulemaking." *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1080 (9th Cir. 2013). Here, EPA was conducting "informal adjudication," not rulemaking. EPA_AR_0083570. As in *Alaska Survival*, 705 F.3d at 1080, "neither statute nor regulation required issue exhaustion." *See generally* 33 U.S.C. §1344; 40 C.F.R. part 231 (404(c) procedures). Nor would "judicially imposed issue exhaustion," 705 F.3d at 1080, be justified.[12] As in *Alaska Survival*, the 404(c) process is "inquisitorial rather than adversarial," 705 F.3d at 1080. When an agency "does not provide notice of issue exhaustion requirements"—as EPA did not here, EPA_AR_0082179-0082517—"judicially created issue exhaustion is likely inappropriate." 705 F.3d at 1080.

Were exhaustion required, presentation by any party will suffice. *See Portland Gen. Elec.*, 501 F.3d at 1024 (no waiver "if the issue … was raised by someone other than the petitioning

---

[12] *Department of Transportation v. Public Citizen* established a judicially-created exhaustion requirement specifically for NEPA processes. 541 U.S. 752, 764 (2004) ("Persons challenging an agency's compliance with NEPA must … alert[] the agency to the[ir] … contentions."). Among TU's issue-exhaustion cases, two were applying that requirement in NEPA challenges. TU-Opp.25-26 (citing *Protect Our Communities Found. v. LaCounte*, 939 F.3d 1029 (9th Cir. 2019); *Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991)). That exhaustion rule is not at issue, because the Veto had no NEPA process. *See* 33 U.S.C. §1371(c)(1) (exempting certain CWA decisions from NEPA). TU's other exhaustion cases found their respective plaintiffs had adequately raised their issues; general discussion about exhaustion requirements in these cases was dictum that cannot contravene *Alaska Survival*. TU-Opp.25-26 (citing *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701 (9th Cir. 2009); *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009 (9th Cir. 2007)).

party"). And courts "define[] the exhaustion requirement broadly," accepting "less refined legal arguments" in a comment so long as "the appeal, taken as a whole, … afford[ed] the agency the opportunity to rectify the violations." *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 965 (9th Cir. 2006). Alaska warned the proposed veto "disregards cooperative federalism," a principle enshrined in the CWA, EPA_AR_0083617, and emphasized the areas subject to the Veto are State-owned, *e.g.*, EPA_AR_0083586. PLP contended the proposed veto violates statutes "protecting the rights of the state of Alaska." EPA_AR_0078427-0078428. No specific mention of section 404(t) was required.

On the substance, EPA insists section 404(t) cannot mean a State is allowed to control discharges within its waters, because Congress was responding to court decisions holding federal agencies do not need state permits. Opp.111-12. "[T]he best evidence of Congress['s] intent is the statutory text." *Duggan v. Comm'r*, 879 F.3d 1029, 1034 (9th Cir. 2018) (second alteration in original) (citation omitted). That text accomplishes in a separate clause the purpose that EPA ascribes to the whole subsection. "[E]ach such agency shall comply with such State or interstate requirements" regarding discharges. 33 U.S.C. §1344(t). To subject federal agencies to state permitting, nothing more was needed; EPA's limited reading of section 404(t) renders the beginning of the provision superfluous.

EPA considers PLP's interpretation of "control" incredible. "Control" quite often means the power both to authorize and to prohibit. Br.21. Though EPA found a dictionary definition with a more restrictive meaning, interpretation is a matter of context, not just dictionary definitions, Opp.112-113. PLP identified copious signals in text and context that "control" has the broader meaning. For example, throughout the CWA, Congress used other

words for limitations alone.  Br.21-22.  And the first sentence of subsection 404(t) cannot mean solely that a State is allowed to restrict a discharge that USACE or EPA permits, because section 510 already says so.  Br.22 (citing 33 U.S.C. §1370).

EPA has no response.  Instead, it points out the statute is the "Water Pollution Control Act."  Opp.112.  "[T]he 'title of a statute' … 'cannot limit the plain meaning of the text.'"  *Cal. Rest. Ass'n*, 89 F.4th at 1105 (citation omitted).  And "Control" in the title cannot connote solely limitations anyway.  The CWA's purposes include "development and use" of resources, and many provisions expressly *allow* discharges. 33 U.S.C. §1251(b); *see e.g.*, 33 U.S.C. §1342 (NPDES permit program).

PLP's reading would not make section 404(g) superfluous as EPA claims.  That subsection allows a State to receive delegated authority for permits ranking as CWA permits.[13] Such a permit carries the full benefits of a 404 permit, including that the permitted discharges are "deemed complian[t]" with sections 301, 307, and 403.  33 U.S.C. §1344(p).  Thus, for example, a 404(g) permit is also a permit for toxic effluents and other pollutants (the subjects of section 307 and 301, respectively).  By contrast, a non-404(g) state permit would not insulate the permittee from the rest of the CWA; the permit would affect (under PLP's reading) solely the application of section 404.

This difference is hardly shocking.  Section 404 concerns "dredged and fill material," 33 U.S.C. §1344(a), the broadest expansion of the CWA's ability to "sweep broadly enough to criminalize mundane activities like moving dirt," *Sackett v. EPA*, 598 U.S. 651, 669 (2023).  It

---

[13] Only Michigan and New Jersey have 404(g) delegations.  40 C.F.R. 233.70, 233.71.

makes great sense that Congress would require general CWA compliance and permitting for pollutants overall, 33 U.S.C. §1311—and allow States to handle such permitting under federal oversight, 33 U.S.C. §1344(h)-(j)—while preserving state authority over "moving dirt."

That subsection 404(t) enables a State to override a federal decision about the limited topic of "dredged or fill material," 33 U.S.C. §1344(a), is not an elephant hidden in a mousehole, Opp.113. It is exactly what subsection 404(t) says. Even under EPA's interpretation, a State can override some USACE decisions: If USACE permits a discharge of dredged material, the State could bar the discharge. That a State can also authorize what EPA wants to prohibit may be upsetting to an agency committed to its own power. But that is within Congress's prerogative and is consistent with the overarching CWA policy to "protect the primary responsibilities and rights of States … to plan the development and use … of land and water resources." 33 U.S.C. §1251(b).

### C. EPA cannot veto a discharge without at least a permit application.

Section 404(c) allows a restriction only for a particular proposal, because "specification" refers to a 404(b) permit or application. Br.23-24. In a *non sequitur*, EPA says nothing about the statute's meaning, and instead insists its Restriction was not abstract because EPA was contemplating particular types of harm. Opp.70-71. The Restriction was "tied" to PLP's application, EPA says, in that once EPA identified harms from PLP's application, EPA could prohibit similar kinds of harm anywhere. Opp.70-71.[14]

---

[14] BBI wonders whether PLP has standing on this issue. BBI-Opp.11. PLP holds leases covering all the known Deposit; has shown clearly its intention to mine; and must constrain any revised plan to conform with the Restriction (though those constraints are actually prohibitive). If "the plaintiff is himself an object of the action … there is ordinarily little

EPA makes section 404(c) an authority even more sweeping than PLP warned. EPA could write a veto saying no person shall fill any mile of stream, anywhere in Alaska, that is upstream of some salmon habitat. The justification, for EPA, would be that upon reviewing an application for one site, EPA realized the loss of a single mile is unacceptable anywhere. It is striking that EPA cannot come up with any interpretation of the actual statute to support its breathtaking claim.[15]

EPA says PLP waived this claim. Not so. The parties' 2017 settlement commits PLP not to challenge the use of a veto absent a "Permit Application." The capitalized term is defined as "the first [USACE] ENG Form 4345 filed by PLP." EPA_AR_0139591. "Where the parties to a contract take pains to define a key term specially, their dealings under the contract are governed by that definition." *In re Blinds to Go Share Purchase Litigation*, 443 F.3d 1, 7 (1st Cir. 2006). PLP had complained the 2014 veto proposal preceded even a permit application by PLP. EPA agreed to take steps to withdraw it; and if EPA complied with the processes set forth in the agreement, PLP promised not to renew that argument.

---

question that the action … has caused him injury." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992).

[15] TU says the Ninth and D.C. Circuits have rejected PLP's argument. TU-Opp.18. What TU quotes from *Trout Unlimited v. Pirzadeh* is the court's description of EPA's position. 1 F.4th 738, 745 (9th Cir. 2021). As this Court likely recalls, *Pirzadeh* decided simply that withdrawal of a veto proposal is judicially reviewable. Whether EPA can lawfully impose a veto absent a permit application—with no "specification" to veto—was not at issue. *Mingo Logan Coal Co. v. EPA*, 714 F.3d 608 (D.C. Cir. 2013), addressed whether a permit's issuance terminates EPA's ability to veto the specification—a question not present here. TU's third case, from a South Carolina district court, TU-Opp.19, was about whether EPA can veto before and after a permit issues—nothing about applications. TU says PLP's argument would prevent EPA from withdrawing specifications, *id.*, but that makes no sense. That EPA cannot veto a discharge nobody has even proposed yet does not stop EPA from withdrawing a specification in an issued permit.

PLP has not renewed that argument; the "Permit Application" did indeed precede the 2022 veto proposal. EPA pretends PLP immunized EPA to issue a region-wide, or even State-wide, regulation of future discharges not contemplated by any permit or application, with no hint of a "specification" that is the statutory target. EPA's reading of the settlement agreement is as heedless of text as EPA's disregard of the statute.

## V. EPA ignored economic reality.

The Veto said that whether adverse effects are "unacceptable" "must be narrowly focused on … the resources enumerated in [section 404(c)]," without regard to "non-environmental costs." EPA_AR_0083164-0083165. EPA declines to defend what it said, Opp.84, and thereby waives any disagreement. *Cf. United States v. McEnry*, 659 F.3d 893, 902 (9th Cir. 2011) ("the government has waived" argument omitted from its answering brief). BBI purports to dispute the point, but provides no argument, BBI-Opp.32, and thus also concedes PLP was right. *See Melton v. Neven*, 712 F. App'x 610, 613 (9th Cir. 2017) ("[A]n undeveloped argument … is waived.")

### A. EPA's supposed weighing of costs and benefits was irrational.

#### 1. EPA had to quantify the Veto's costs.

Ninth and D.C. Circuit precedents establish that obligation, especially here where EPA did quantify the main benefits, so that refusing to quantify the costs is an irrational inconsistency. Br.28-29.

EPA insists its failure to quantify the costs does not matter because knowing the Veto's real cost is not a "panacea." Opp.99-100. After all, EPA says, it would still get to exercise judgment about the balancing. *Id.* That attitude is disturbingly contrary to the APA. Even if

a veto could (hypothetically) be defended despite its massive costs, an action must be "reasonable **and** reasonably explained." *Ohio*, 603 U.S. at 292. A plea that the agency might have come to the same result with different reasoning has never been acceptable. EPA's plea is particularly dubious. If EPA could say with a straight face that abandoning the substantial amount of minerals that would be sold into starved markets, to the fiscal benefit of Alaska and the relief of metals consumers, is worthwhile to avoid even a small (and hypothetical) reduction in salmon populations, it would have done so. That EPA engaged in such contortions to avoid acknowledging the Veto's obvious economic costs tells the Court all it needs to know.

EPA says it used the "best available evidence," "includ[ing] reliable quantitative estimates" of benefits. Opp.98. The evidence also included quantitative information about economics—the value of minerals produced and the costs required—of mining the Deposit under the 2020 Plan and an expansion scenario. EPA_AR_0488275-0488277; EPA_AR_0488283-0488284. EPA has offered no reason—neither in its decision documents nor in its brief—to doubt those figures. EPA simply refuses to credit them. The documents disclose they were prepared for dissemination to investors under Canadian National Instrument 43-101. EPA_AR_0487867. That is the Canadian securities regulation specific to mining,[16] giving PLP strong incentives to present fair estimates and accurate information. EPA suggests "limitations to the available information … made it impossible to develop

---

[16] Securities Act, R.S.B.C. 1996, c. 418, §§155, 168.1(1) (Can.); 43-101CP, Standards of Disclosure for Mineral Projects §6 (explaining deviations from National Instrument 43-101 can constitute misleading disclosure).

reliable estimates." Opp.98.  But EPA does not say what those limitations were.  EPA cannot manage to tell the Court what limitations could possibly have prevented it from acknowledging honestly the economic cost of blocking a Pebble mine.

Instead, EPA pretends its obligation was simply to "grapple" with data.  Opp.98 (quoting *City and Cnty. of San Francisco v. USCIS*, 981 F.3d 742 (9th Cir. 2020)).  EPA does not grapple with the next sentence in the Ninth Circuit's opinion, which says "ma[king] no attempt to quantify the financial costs" means the agency "did not adequately deal with the financial effects."  981 F.3d at 759-60.  The Ninth Circuit held it inadequate to state just that costs are "difficult to predict."  *Id.*; Br.28-29.  Yet EPA reiterates that is exactly what it did here.  Opp.98.

EPA's purported counter-authorities, Opp.98-99, are not what EPA claims.  *Catawba Cnty. v. EPA*, 571 F.3d 20 (D.C. Cir. 2009), was not even about cost-benefit analysis.  The question was whether, in determining one area contributed to another's air pollution, EPA had to "articulate a quantified amount of contribution that would trigger a … designation." *Id.* at 39.  *Catawba County* held the pertinent statute allowed a "flexible multifactor analysis," *id.* at 40; it nowhere suggested an agency weighing costs and benefits could refuse even to identify the numerical costs.  In *Association of Pacific Fisheries v. EPA*, EPA made specific quantitative estimates of the cost of its regulation.  615 F.2d 794, 808-09 (9th Cir. 1980).  That EPA "need not balance the costs of compliance against … benefits with pinpoint precision," *id.* at 809, hardly licenses EPA to refuse altogether to acknowledge an action's quantitative costs.  In *Nicopure Labs, LLC v. FDA*, the agency also made detailed quantitative estimates of cost. 266 F. Supp. 3d 360, 404-06 (D.D.C. 2017).  It also explained why quantifying the benefits

was "not possible."[17]  *Id.* at 406.  EPA does not make that claim about the costs of blocking the Pebble mine.  Nor could it, since the record contains thorough, detailed analyses on that point.  *FCC v. Prometheus Radio Project* held the FCC was not obligated to develop its own data. 592 U.S. 414, 427 (2021).  It did not abrogate decades of APA precedents by holding an agency can disregard data already in the record.

### 2.  EPA's cost-benefit assessment was irrationally inconsistent.

EPA does not suggest an inconsistent treatment of costs and benefits, Br.29-32, would be permissible.  Instead, EPA denies it treated the whole value of the Bristol Bay fishery as a benefit.  Opp.94.  EPA says, rather, "it assessed the overall value of the fishery and analyzed the harm that EPA's action would prevent to that resource as a benefit of EPA's action." Opp.94.  This is a distinction without a difference, and just a page later EPA admits that because of the "immense value" of the fishery and "the harm that *could* come to it" from a mine, "preventing that harm was a benefit."  Opp.95 (emphasis added).  Just as PLP said.  Lest there be any doubt what EPA's decision documents said:  "The total economic value of the Bristol Bay watershed's salmon resources … was estimated at more than $2.2 billion.… [T]he commercial salmon fishing industry in Bristol Bay is economically significant, … The fact that EPA's action will help preserve the sustainable economic value of this fishery is an important factor weighing in favor of the advantages of EPA's action."  EPA_AR_0084190.  As PLP noted, an agency must treat costs and benefits "at the margin," Br.30; unless a mine would

---

[17] In the *Nicopure* appeal, this cost-benefit issue was not raised or discussed.  944 F.3d 267 (D.C. Cir. 2019).

destroy the whole fishery any logical assessment has to consider what the actual reduction would be.  EPA made no such assessment.

As PLP pointed out, there is zero evidence and no finding by EPA that the mine would destroy the entire Bristol Bay fishery.  Br.30.  To the contrary, the FEIS found the 2020 Plan will have "no measurable impact" on Bristol Bay salmon populations, and EPA left that finding undisturbed.  EPA_AR_0083287.  To say the purported preservation of the fishery is a benefit because some harm "*could* come to it," Opp.95, is taking credit for a hypothetical possibility contrary to the record.  Yet EPA tells this Court the value of the mine can be discounted because "a different mine … might proceed."  Opp.88 n.24.  It has to be at least possible (indeed it is certain) that no other Pebble mine is possible given the Veto.  EPA counted as benefit the avoidance of the speculative (really, counterfactual) loss of the entire fishery, while not acknowledging as cost the quite real prospect of losing the entire Deposit.

Similarly, EPA refused (as it admits, Opp.91-92) to count the loss of an expanded mine. It says the expansion, being outside the existing Permit Application, is "speculative." Opp.92.[18]  That assertion is inconsistent with the Veto's statement that the expansion is "reasonably foreseeable," *e.g.*, EPA_AR_0083155.  Meanwhile EPA gave free rein to speculation about benefits.  For example, "changes in consumer perception of fish quality … *may* result from the presence of the mine."  Opp.95 (emphasis added).  EPA also

---

[18] EPA admits it considered the potential economic impacts of an expanded mine "as part of the cumulative effects analysis under the 404(b)(1) Guidelines," but nowhere else.  Opp.92. So EPA considered the potential expansion when that possibility served to justify denial, and ignored the potential benefit of expansion.  EPA cannot justify that inconsistency, particularly given its speculation about decades-long factors on a "broader, indeterminate time scale." Opp.97.

counted, as a benefit, the avoidance of a theoretical TSF failure that EPA admits is unlikely. Opp.95-96. These possibilities are at least as speculative as a future mine enlargement. But EPA treated the avoidance of these hypothetical possibilities as a benefit, while refusing to acknowledge the cost of losing any possibility of mine expansion. Yet again, the thumb presses heavily on the scale.

EPA's brief redoubles its inconsistency.[19] EPA says it disregarded economic activity like the jobs from mining because if there is no mine, "some portion of those resources would be put towards other productive purposes." Opp.87. It follows, according to EPA, that the Veto's cost is only "the *net* value of the mine," *i.e.*, the value of minerals produced minus the expenditures on construction and operations. Opp.88. EPA did not apply that same principle in assessing the benefits. If the Bristol Bay fishery disappeared, people employed in fishing would get other jobs, just as "[t]ruck drivers would move different loads," and the capital invested in fishing could be redirected elsewhere. Opp.87-88. Instead, EPA discussed only the "gross" value of commercial fishing. It cited the "15,000 jobs" and the "economic output of $2.0 billion," EPA_AR_0141326[20] with no mention of the possibility that "other productive activities … could use resources," Opp.88, currently devoted to fishing.[21] EPA's "opportunity

---

[19] SalmonState similarly engages in illogical inconsistency. It says EPA discounted the economic value of mining the Deposit "because PLP had not obtained either financing or a CWA permit." SalmonState-Opp.42. The failure of the project for lack of financing or a permit would also prevent the environmental harms that Respondents fear. This supposed uncertainty infects the purported benefits of the Veto to exactly the same degree as the costs; yet SalmonState presents it as a justification for disregarding only the latter.

[20] Again, there is no evidence that all, most, or even a small portion of these jobs would be lost if PLP builds the proposed mine.

[21] PLP pointed out inconsistencies in the geographic scope of EPA's analysis. Br.31. For example, EPA disregarded much of the mining output on grounds the minerals would be sold

cost" mantra was yet another convenient tool for minimizing the Veto's apparent losses—and only the losses.

### B. EPA's economic assessment of the mine was irrational.

EPA has no answer to the fundamental observation that blocking a mine that would contribute such a significant amount to world copper supply—leaving aside the other minerals—is a massive economic cost. Br.32. Specific steps of illogic and irrationality helped EPA reach its counterintuitive conclusions.

### 1. The Pebble investment is not fungible.

EPA says "some portion" of resources freed up by blocking a Pebble mine "would be put towards other productive uses." Opp.87. That word "some" conceals a host of sin. EPA made no assessment of *how much* of the resources would be used elsewhere. One resource is the use of local workers in the nearest villages, and the provision of access across their land. EPA_AR_0095183-0095184. EPA has no evidence there are other opportunities for those resources. EPA simply assumed, contrary to logic, that because "some" resources could be redirected, it could disregard the entirety of the economic activity involved in mining the Deposit.

More broadly, the resources proposed for Pebble are there because the Deposit is an economic opportunity not available elsewhere. EPA has (and cites) no reason to think that the capital offered for a mine would, with the mine blocked, be redirected to anywhere in

---

worldwide, EPA_AR_0084193-0084194; while EPA valued the whole of the commercial salmon output even though the salmon is mostly exported. EPA ignores this problem. Opp.95. It says PLP "concedes" that EPA considered nationwide economic costs. *Id.*. PLP said EPA "counted nationwide *benefits*." Br.31.

Alaska at all, or even in the United States. EPA's "opportunity cost" theory is speculation dressed up as fallacious economics.

### 2. EPA misunderstands supply and demand.

EPA misused the two studies it relied on, because they addressed whether short-term shocks affect metal prices—not long-term supply changes. Br.33-34. EPA's brief mischaracterizes the studies yet again. Quoting them as discussing "opening of new mines," Opp.88, EPA omits key text. One said a supply shock could be "the *unexpected* opening of new mines." EPA_AR_0486892 (emphasis added). The other was actually acknowledging that new mine openings historically "put downward pressure on the price of copper." EPA_AR_0496640. The authors explained their analysis excluded those effects by focusing on "unexpected changes in production caused by, *e.g.*, cartels, strikes, or natural catastrophes." EPA_AR_0496637. EPA's "selective use" of these studies is "problematic." *Nat. Res. Def. Council, Inc. v. EPA*, 31 F.4th 1203, 1208 (9th Cir. 2022). Asserting these studies show a decades-long addition of 0.5% of world supply would have no effect on copper prices shows a remarkable disdain for the evidence. And EPA has no other support for its counterintuitive conclusion.

### 3. EPA miscalculated Pebble's contribution to U.S. supply.

EPA admits it understated what Pebble would contribute to U.S. supply, and the correct figure is double or triple what the Veto said. Opp.89-90. EPA says this error is insignificant. *Id.* By way of comparison, the loss of spawning salmon—if, against the evidence, all the salmon spawning in NFK-1.190 cease to spawn—would be less than 0.01% of the Bristol Bay Coho population (and zero of other species). EPA regards that 0.01% as

catastrophic, but a two-orders-of-magnitude-larger proportion of the entire U.S. copper market as no big deal.  If EPA had said outright that it values putative environmental benefit at a 100-to-1 ratio to the nation's economic loss, its folly would be obvious.  EPA's downrating of the true significance of the Pebble output is yet another effort to obscure what it has done.

EPA simultaneously hypothesizes it might have overestimated Pebble's contribution, because the United States imports refined copper mostly from North and South America while Pebble's production might be refined mainly in Asia and Europe.  Opp.90.  This excuse is also irrational.  Future production will be refined in those locations, according to EPA's own discussion, because that is where most new refining capacity will be built.  EPA_AR_0141365.  The United States will also depend on the new refining capacity.  EPA_AR_141366.  At any rate, copper is traded on world markets.  The notion that Pebble has no influence on U.S. prices because some of the physical copper ends up in other markets is like saying domestic oil production makes U.S. gas prices insensitive to the blocking of the Strait of Hormuz.

## VI.    EPA applied the wrong standard.

EPA half-heartedly invokes deference about the meaning of words like "unacceptable," under the observation in *Loper Bright Enterprises v. Raimondo* that some statutes "leave[] agencies with flexibility."  Opp.60 (quoting 603 U.S. 369 (2024)).  Ninth Circuit precedent forecloses that deference.  *Waterkeeper Alliance v. EPA* held that, regarding the word "appropriate" in a different CWA provision, "EPA has some discretion," but "the court must 'fix[] the boundaries of [the] delegated authority.'"  140 F.4th 1193, 1215 (9th Cir. 2025) (quoting *Loper Bright*; alterations in original).  *Waterkeeper* then used its own interpretation of "appropriate."

*Id.* at 1215-16.  Similarly, this Court must determine the meaning of section 404(c), including the word "unacceptable," when assessing whether the Veto employed the correct standard.

### A. EPA misunderstood what qualifies as "unacceptable."

EPA apparently does not dispute that "unacceptable" means a high standard, comparable to "devastating."  Br.37; Opp.61.  The Veto did not apply this "devastating" concept.  Contrary to the bedrock rule against *post-hoc* arguments, Respondents ask the Court to infer the standard EPA claims to have used was equivalent to "devastating."  Opp.61; SalmonState-Opp.13-14.  Meanwhile, EPA cannot deny USACE explicitly interpreted the 404(b) Guidelines to mean an impact is "significant" if it was "more than trivial." EPA_AR_128966 (USACE's statement).[22]  But EPA insists it was using a higher standard, because one page of the Veto quoted the preamble to the 1979 404(c) rulemaking as saying a significant impact is "one that the aquatic ecosystem cannot afford."  Opp.61 (quoting EPA_AR_0083064).

"We do not rely on the [agency's] invocation of the … standard; … our task is to determine whether the [agency] faithfully employed the … standard."  *Rodriguez v. Holder*, 683 F.3d 1164, 1170 (9th Cir. 2012).  "A boiler-plate statement … should not control, if it appears that the correct legal standard has not been applied but merely invoked as so many 'magic words.'"  *Arteaga v. INS*, 836 F.2d 1227, 1231 (9th Cir. 1988).  "An agency acts contrary

---

[22] Attachment B2.1 to the USACE decision was not, as BBI suggests, BBI-Opp.13 & n.67, an afterthought; it presents the substance of USACE's analysis in the erroneous denial. EPA_AR_0129294 (referring to Attachment B for USACE's explanation).  Meanwhile, SalmonState agrees that "more than trivial" is how USACE understands "significant." SalmonState-Opp.15 n.58.

to the law when it gives mere lip service or verbal commendation of a standard but then fails to abide the standard in its reasoning and decision." *Nat. Res. Def. Council v. Pritzker*, 828 F.3d 1125, 1135 (9th Cir. 2016).

The Veto nowhere explained why the ecosystem *cannot afford* the impacts it described.[23] Instead, it repeatedly said the impacts are "significant," and did so on the basis of USACE's decision and the 404(b) Guidelines. SalmonState says PLP provided no record evidence that EPA adopted the same standard as USACE. SalmonState-Opp.15. The evidence is throughout the Veto. For example, EPA said its evaluation of what is "unacceptable" considered whether the project would cause "significant degradation" under the 404(b) Guidelines. EPA_AR_0083132-EPA-0083133. EPA recounted the USACE finding of "significant degradation," EPA_AR_0083134, which USACE said meant "more than trivial." EPA_AR_0128966. EPA did not disagree with USACE's interpretation. To the contrary, "based on the same record, EPA has determined … similar significantly adverse effects." EPA_AR_0083137; *see also* EPA_AR_0083139 (on filing wetlands, finding "similar significantly adverse effects" as USACE "based on the same record"); EPA_AR_0083141 (same about streamflow alterations).

---

[23] PLP pointed out that, by restricting any mine with an impact comparable to any single impact discussed in the Veto, EPA confirmed how low its standard of "unacceptable" is. Br.37. EPA brushes off this observation as merely a disagreement with EPA's choices. Opp.61. But even if it were reasonable to think the ecosystem "cannot afford" the 2020 Plan's full set of consequences, EPA made no finding the ecosystem "cannot afford" any single impact, such as some streamflow increases without any filling, anywhere in a 309-square-mile area. The ease with which EPA applied its "unacceptable" label for such impacts, over the whole Restriction Area, confirms the standard applied was actually whether the impacts are non-trivial, not whether they are "devastating" or "unaffordable."

Congress's use of the word "unacceptable" refers to an effect much worse and more serious than simply being significant (and certainly far beyond "more than trivial"). Br.38. SalmonState says this word is not rare, but cites just three examples from the entire U.S. Code. SalmonState-Opp.14-15 & n.57. SalmonState cites no authority interpreting those provisions, and particularly not making them synonymous with "significant." *Id.* SalmonState proposes "unacceptable" means "not 'satisfactory,'" but based on definitions of "acceptable," not "unacceptable." SalmonState-Opp.14. This is the "etymological fallacy," Geoffrey Hughes, A HISTORY OF ENGLISH WORDS 27 (2000), that courts have repeatedly rejected. "[I]n ordinary usage, a noun and its adjective form may have meanings as disparate as any two unrelated words." *FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011). Similarly, the prefix un- makes a new word, not simply the opposite of the base word. An "undue hardship" is one that "rises to an 'excessive' or 'unjustifiable' level," *Groff v. DeJoy*, 600 U.S. 447, 469 (2023)— quite different from saying the hardship was not owed ("due") to the recipient.

EPA quibbles with PLP's comparison to a project that was found acceptable despite having significant impacts. Br.37-38; Opp.61-62.[24] EPA believes its target, "significant loss … or damage," is tougher than "significant effect." Opp.61. The Veto, belying EPA's attempted distinction, "determined … significantly adverse *effects*." EPA_AR_0083137

---

[24] EPA also says that it can decide based on the same determination that USACE made. Opp.62. EPA's case, *Newport Galleria Group v. Deland*, said EPA can reach a *different* finding from USACE about the magnitude of an impact. 618 F. Supp. 1179, 1184-85 (D.D.C. 1985). It does not follow that EPA's 404(c) decision standard can be the same as USACE's— particularly given that Congress used different words.

(emphasis added). And "Damage" was the "effect" assessed in *Rock Creek Alliance v. FWS*, with the "damage" being "loss" of an endangered species' critical habitat. 703 F. Supp. 2d 1152, 1198, 1205 (D. Mont. 2010). Regardless of EPA's semantic quarrel, the point is that Congress repeatedly used the word "significant" when that was meant, so "unacceptable" must mean something significantly worse than just "significant."

### B. EPA improperly relied on speculation.

EPA agrees the standard it used is whether an identified adverse effect is a "reasonable likelihood." Opp.65.

EPA cannot even bring itself to claim that "reasonably likely" is the best or correct interpretation of "will occur." Instead, EPA says Congress must have known the future-tense "will" necessarily entails prediction; the Court should assume Congress "recognized EPA's scientific expertise" in forecasting (for which hypothesis, EPA cites nothing); and therefore EPA's "likely" standard is "reasonable." Opp.65-66. The last step in the supposed logic fails. Respecting EPA's expertise says nothing about what certainty Congress demanded in a prediction.[25]

Besides, framing EPA's interpretation as "reasonable" is an obsolete argument. This Court must determine the actual meaning of section 404(c). *See Ctr. for Biological Diversity v. EPA*, 168 F.4th 1164, 1181 (9th Cir. 2026) (citing *Loper Bright*). EPA cannot even say out loud that the best interpretation of "will occur" is "reasonably likely," because it is not. When

---

[25] *United States v. Todd*, 627 F.3d 329 (9th Cir. 2010), which Respondents dismiss as an "inapplicable case," Opp.66, exposes EPA's *non sequitur*. That "will" requires prediction does not necessitate rough assessments about what is reasonably likely; *Todd* shows that "will" connotes fair certainty about the prediction.

Congress wants that kind of rough forecast, it says so—usually by using the word "likely." 33 USC §4010(3)(B) (addressing events that "will likely have a significant detrimental environmental … impact"); 33 U.S.C. §610(g)(3)(A)(ii) ("invasive plant species" are those whose introduction are "likely to cause economic harm").

SalmonState, making an attempt, cites a dictionary it says defines "will" as "indicat[ing] 'simple' or 'emphatic futurity' or 'likelihood.'" SalmonState-Opp.16. That dictionary says the meaning is "willingness, intention, likelihood, requirement, habitual action, or ability." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 793 (1969). Excerpting "likelihood" from the middle is misleading; the context reveals the degree of "likelihood" is comparable to "requirement" or "habitual action." Indeed, the dictionary continues that "[w]ill … is now also used more often than *shall* to express … emphatic futurity." *Id.* "Emphatic futurity" means "definiteness or inevitability." Alex Glashausser, *The Extension Clause and the Supreme Court's Jurisdictional Independence*, 53 B.C. L. REV. 1225, 1260 n.197 (2012).

SalmonState also worries that requiring substantial certainty would "run counter to EPA's protective statutory role." SalmonState-Opp.16. The Ninth Circuit disapproves that "purposes at all costs" interpretive method. "[W]e primarily interpret a statute by its text; we do not augment or make exceptions to the law as we think would better achieve the results some may reasonably interpret the law to be aimed to achieve," and "we cannot 'assume that whatever furthers [an asserted] primary objective must be the law.'" *Galvez v. Jaddou*, 52 F.4th 821, 837 n.11 (9th Cir. 2022) (quoting *Rodriguez v. United States*, 480 U.S. 522, 526 (1987)).

EPA resists *Arizona Cattle Growers' Association v. FWS*, 273 F.3d 1229 (9th Cir. 2001), because EPA thinks it had better record evidence than the agency in that case. Opp.66. PLP

disagrees, as discussed below, but that is no answer about the case's statutory interpretation. The Ninth Circuit explained the word "will" required the agency to show "a reasonable certainty" of the predicted outcome. 273 F.3d at 1243. EPA offers no reason to understand "will" differently here.

Though EPA said its standard was "reasonable likelihood," EPA_AR_0083064, and persists with it here, EPA simultaneously urges the Court to find the cited adverse effects are actually certain, not just probable. Opp.67. That effort flouts the long-standing rule that "an agency's action must be upheld, if at all, on the basis articulated by the agency itself," and "[c]ourts do not accept appellate counsel's post-hoc rationalizations." *Nat. Res. Def. Council*, 31 F.4th at 1206-07.

EPA tries to salvage its *post-hoc* rationalization by reinterpreting the word "could," replete through the Veto, to mean "will." Opp.66-67. It says it used the word "could" where "scientifically appropriate." Opp.66. Indeed. That is the point: EPA relied on evidence showing no more than a possibility of harm. The use of "could" was indeed the appropriate framing for speculative possibility, and EPA offers no reason to think scientists use the word in some other way. EPA then claims it found the "overall weight of evidence … described effects that EPA said *would occur.*" Opp.67 (emphasis in original). Its only cited instance, EPA_AR_0083085, did not say harmful effects "would occur." It said "EPA has considered and evaluated the information regarding how [the planned discharges] … would affect anadromous fishery areas." *Id.* That is stating the question, not the conclusion. The conclusion was "the loss of [streams] … will have unacceptable adverse effects." *Id.* What EPA means by "will have unacceptable adverse effects," it has made clear in its governing

regulation; repeatedly in the Veto; and in its brief here. EPA_AR_0083064; EPA_AR_0138921; Opp.64-68. By "will," EPA has said many times, EPA means "*is reasonably likely.*"

EPA cites a few record documents that it claims show certainty. Opp.66-67.[26] Actually those materials describe only possibilities. EPA's first example is "several studies that found that Koktuli River … support genetically-distinct populations of Sockeye salmon." Opp.67 (citing EPA_AR_0083075, which in turn cites three research papers). Here is how the Veto characterized those studies: "Both the Koktuli River (including the SFK and NFK) and UTC are *known to support* genetically distinct populations.… Research has shown that these distinct populations *can occur* at very fine geographic scales (Section 3.3.3). For example, Sockeye Salmon populations in close proximity … show phenotypic variations … that *suggest they may* comprise discrete populations." *See* EPA_AR_0083075 (emphasis added). The mainstem Koktuli, "known" to have genetically distinct populations, is over 30 miles downstream. EPA_AR_0094991. For the smaller-scale reaches at the mine site, the Veto used the language of speculation—"can occur" and "may." EPA's second example is that it supposedly explained why straying of salmon is unlikely to preserve the affected populations. Opp.67. The cited passage says, "Coho salmon are *probably* more susceptible to extirpation, [and] *less*

---

[26] EPA also says the stream losses and streamflow changes documented in the Veto are certain. Opp.66. That is both a tautology and a *post-hoc* rationalization. Section 404(c) does not authorize a veto if a discharge will occur. It authorizes a veto if the discharge will have unacceptable adverse effects. Accordingly, the Veto described *consequences* from the losses and changes—for example that the losses "could cause the extirpation of local populations of fishes," EPA_AR_0083156—though those consequences were speculation.

*likely* to be augmented or 'rescued' by other populations through straying (gene flow]." EPA_AR_0083077 (emphasis added).  Yet again, EPA identified likelihood, not certainty.[27]

*Arizona Cattle* disapproved an FWS decision because the agency "has presented only speculative evidence that habitat modification may impact" the endangered species, while the statute required reasonable certainty.  273 F.3d at 1244.  Facing a similar objection, EPA cites only evidence that, on its face, presents the same type of speculation.

## VII.  EPA's conclusions about lost streams contradict the record.

### A.  The NFK, SFK, and UTC watersheds are not "fishery areas."

The Veto is purportedly based on impacts to "fishery areas."  Those must be, under the ordinary English meaning of the term, areas where fish are caught.  Br.42.  Respondents offer no other potential meaning for the phrase.  Opp.62-64; TU-Opp.26-27; BBI-Opp.20-21; SalmonState-Opp.19-22.

Instead, Respondents insist the parenthetical phrase "including spawning and breeding areas" must expand the category beyond its ordinary meaning.  Opp.62-63; TU-Opp.26-27; BBI-Opp.21 & n.102; SalmonState-Opp.19-20.  EPA admits that spawning and breeding areas in general "might not ordinarily [be] consider[ed] … 'fishery areas,'" but pleads that although its approach is not "the best reading," it should be accepted as "reasonable."  Opp.62-63.  It "makes no sense to speak of a 'permissible'"—or reasonable—"interpretation that is not the

---

[27] Even Coho stray a significant degree in normal circumstances, and it is not well-understood what drives straying.  EPA_AR_0472449; EPA_AR_0472579.  Whether removal of a reach would cause those salmon to stray to other spawning areas, or instead lead them all to stop spawning, is indeed speculation–EPA's cited passage does not assert any certainty in the face of it.

one the court, after applying all relevant interpretive tools, concludes is best." *Loper Bright*, 603 U.S. at 400. "In the business of statutory interpretation, if it is not the best, it is not permissible." *Id.*

As PLP already observed, Br.43, the Supreme Court has instructed courts not to interpret the term "including" as EPA suggests here, and rejected that approach in *Sackett.* 598 U.S. at 677. SalmonState says "[t]here is no indication that Congress intended to … protect only areas where fish are caught." SalmonState-Opp.21. The clearest indication is that Congress used the word "fishery"; no Respondent disputes this word means what PLP said. A further indication that "spawning" and "breeding" do not expand the scope is that Congress used the word "including" and placed the phase in parentheses. "[A] parenthetical … is typically used to convey an '[a]side' or 'afterthought.'" *Boechler, P.C. v. Comm'r*, 596 U.S. 199, 205 (2022). Had Congress meant EPA to assess impacts to fishery areas *and* spawning and breeding areas, that is what it would have written, with the word "and."

SalmonState says "including" is "a word of extension … rather than … limitation." SalmonState-Opp.21. Its cases do not mean, by that phrase, that "include" can mean "and." *FTC v. MTK Marketing, Inc.*, held the FTC qualifies as a "person" under a California statute that says "'[p]erson' includes an individual, firm, association, … or any other business entity." 149 F.3d 1036, 1040 (9th Cir. 1998). The point was that the list following "includes" does not limit the scope of "person." *Id.* The court did not hold the list *expanded* the scope of "person." *Yellen v. Confederated Tribes of Chehalis Reservation* considered a statute describing a category of groups "recognized as eligible for the special programs … provided by the United States to Indians," and then listing examples, "including any Alaska Native village … corporation."

594 U.S. 338, 347 (2021). The Court found no inconsistency because Alaska Native corporations *are* recognized as eligible for federal programs provided to "Indians." *Id.* at 349. *Chehalis* does not suggest an "including" clause can add something that is not within the main category.

SalmonState deprecates *Sackett* as "harmoniz[ing] two separate statutory references." SalmonState-Opp.21. But it is not just *Sackett*. For example, in *Chickasaw Nation v. United States*, the pertinent statute referred to tax provisions "concerning the reporting and withholding of taxes," and also said "(including section 1441, [etc.] and chapter 35." 534 U.S. 84, 87 (2001) (citation omitted). The Supreme Court held the reference to chapter 35 cannot have "independent operative effect," because "include" means "'contain,'" *id.* at 89—*i.e.*, the things on the "included" list qualify only to the extent they are within the main category. Chapter 35 is not about reporting and withholding, so cannot be part of the broader category. *Id.* at 88. The only way it could be covered is by treating "including" as "and," the way SalmonState wants for section 404(c). *Chickasaw* refused that approach. Given the twin signals of "including" and the parentheses, the Supreme Court held the reference to chapter 35 had to be ignored. *Id.* at 88-95. "The parenthetical … cannot sweep any further than the … language it illuminates." *United States v. Bank of Am. Corp.*, 753 F.3d 1335, 1338 (D.C. Cir. 2014).

*Sackett* reiterated that "use of the term 'including' makes clear" the language following the "including" is not an addition. 598 U.S. at 677. The relevant language was "waters of the United States … including wetlands." *Id.* at 675 (citation omitted). The Court found this language suggests some wetlands are within the broader category; but to avoid turning

"including" into "and," a wetland must "qualify [as part of the broader category] in [its] own right." *Id.* at 676.

Here, the principle of *Chickasaw* and *Sackett* inescapably shows a spawning or breeding area is within scope only if it is itself a fishery area.

SalmonState complains the "including" clause would then be superfluous. SalmonState-Opp.21. That outcome is no obstacle, because that is how the sentence structure works. "The use of parentheses emphasizes that that which is within is meant … to be … redundant." *Chickasaw*, 534 U.S. at 89.

Respondents do not dispute that streams lost under the 2020 Plan; wetlands, upstream from those, to be filled; and streams where flow will change are not places where fish are caught. They are not "fishery areas." EPA says footnote 53 in the Veto stated its interpretation: "[F]ishery areas" means "streams that have documented anadromous fish occurrence." Opp.63. That contravenes the statute, because the statutory phrase is not "fish areas," but *fishery* areas. EPA cannot explain how the occurrence of fish, by itself, comports with the ordinary English meaning of that term.

In defense of this approach, Respondents invoke *Mingo Logan Coal Co. v. EPA*, 70 F. Supp. 3d 151 (D.D.C. 2014), *aff'd*, 829 F.3d 710 (D.C. Cir. 2016). Opp.64; SalmonState-Opp.20. *Mingo Logan* was not even based on harm to "fishery areas," but rather on a different

branch of section 404(c) that the Veto never invoked. 70 F. Supp. 3d at 169-70. It has nothing to teach about what qualifies as a "fishery area."[28]

Respondents note EPA is allowed to consider impacts beyond the location of a discharge. SalmonState-Opp.20; TU-Opp.26-27. Indeed, TU thinks the "fishery area" at issue is "the Bristol Bay Management Area." TU-Opp.27. This is a remarkable concession. The FEIS found the 2020 Plan will not cause any measurable impact on fish populations in Bristol Bay, or even on fish populations in the Nushagak or Koktuli River. EPA_AR_0095259; EPA_AR_0095992. EPA evaded that finding by characterizing the harm as being on the granular, small scale of the NFK and SFK watersheds. "[T]he FEIS … concludes that 'impacts to Bristol Bay salmon are not expected to be measurable,'" EPA said; "[t]his statement presupposes that the only scale at which impacts matter is the entire Bristol Bay watershed." EPA_AR_0083255. "EPA has not made an unacceptable adverse effects determination for the entire Bristol Bay watershed or for the entire Nushagak River watershed." EPA_AR_0083291. EPA said the relevant impact is on "fishery areas" in the small upstream watersheds; BBI and TU now concede those are not fishery areas.

### B. EPA's scale selection was arbitrary and capricious.

EPA's characterization of lost streams as 13% of the NFK watershed was circular, because EPA chose its scale precisely to make the impact seem large. Br.50-51. EPA agrees choice of scale can have that effect. Opp.58. And the reasoning EPA describes is exactly

---

[28] As EPA points out, the *Mingo Logan* plaintiff did not contest EPA's interpretation of "unacceptable adverse effect"; had it done so, the now-defunct *Chevron* doctrine would have governed. Opp.64 n.15. *Mingo Logan* has nothing to teach about "unacceptable" either.

what PLP said. Namely, "assessment should occur at the … scales that are most relevant to the impact resources." *Id.* That scale was "scientifically appropriate," EPA says, because fish in the small watersheds "would be most directly impacted by mine site development." *Id.* at 58-59. The Veto was breathtakingly candid: "For mine site development and operations, this spatial scale would … extend downstream as far as effects could be measured or reasonably expected to have ecological consequences." EPA_AR_0083255. Just so: As PLP said, "EPA needed to define the scale for assessment small enough to ensure it found a measurable impact." Br.50.

EPA maintains this is natural and inevitable, as though one were assessing the damage to a person's knee. Opp.58. Congress did not ask about impacts on knees or isolated body parts, or isolated hydrological constructs. EPA's task was to determine whether there will be adverse effects on "fishery areas." 33 U.S.C. §1344(c).[29] EPA turned the question around to ask what is the area in which the adverse effect can be called unacceptable. EPA's openly results-oriented approach "was committed to its position regardless of any facts to the contrary." *Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1266 (D.C. Cir. 1994).

Respondents' other answer is: "[S]almon habitats … are not interchangeable." Opp.59; *see also* SalmonState-Opp.28; TU-Opp.33. This is a remarkably bland claim to justify the scale selection determinative for the Veto destroying the Pebble Deposit. It is worth careful inspection. EPA cites pages B-6 to B-11 of the Veto. Opp.59 (citing

---

[29] As discussed above, the other Respondents say the relevant "fishery area" is Bristol Bay. At that scale EPA did not find an unacceptable adverse effect. EPA maintains the NFK, SFK, and UTC contain fishery areas, but that view contravenes the statute.

EPA_AR_0083254-0083259).  Those pages present a collection of generic descriptions, such as that monthly average streamflow obscures day-to-day variation; and "uncommon or infrequent habitat features *can* be disproportionately important."  EPA_AR_0083256-0083257 (emphasis added).

Are there such "uncommon or infrequent" features in the streams to be lost under the Plan?  In reality, these streams are particularly *poor* habitat for salmon.  Br.46 (citing record evidence).  EPA's brief does not deny that reality.  The pages it cites in the Veto describe nothing about the affected streams, or even about the NFK, SFK, or UTC, that makes them any different from anywhere else in the larger Bristol Bay region.  EPA_AR_0083254-0083259.  No "uncommon or infrequent" features, no unique hydrology.  At most these pages theorize that even though there is "[a] significant amount of baseline environmental data" about these streams, the comprehensive investigations might have missed something.  EPA_AR_0083258.  PLP complained earlier that EPA acted from speculation, not certainty.  Br. 46-48. For the notion that the streams at the mine site, or the NFK, SFK, or UTC, have special features making them not interchangeable with others, EPA did not even offer speculation. Opp.59.

Another passage must also be inspected.  EPA's cited pages said the areas to be lost "reflect local conditions," and cross-referenced Veto section 3.3.3. EPA_AR_0083256. That section says nothing specific about the lost streams.  EPA_AR_0083035-0083046.  It says salmon "fully exploit the range of habitats available throughout the Bristol Bay watershed," and different adaptations attune a given population to large rivers or small streams, floodplains or ponds, etc.  EPA_AR_0083036.  The Bristol Bay watershed has at least 9,800 miles of

anadromous streams.  Br.49.  Most of them are small.  Section 3.3.3 says nothing about the 65 miles of NFK tributaries being different from the rest.

Finally, EPA points out USACE's permit denial used the same scale as the Veto. Opp.59.  On review, USACE subsequently found the initial decision had not adequately explained its choice of scale.  ECF 171-8, p.23.  Neither has EPA.

### C.    Linear miles are the wrong measure for habitat quantity.

The Veto repeatedly stressed how many "miles" of stream would be lost.  But fish use area, not length.  Br.51.

SalmonState asserts EPA's metric was "reasonable and appropriate," but offers no explanation why, and does not respond to PLP's robust criticisms.  SalmonState-Opp.29.  BBI says EPA "considered all methods" so should get deference for this one.  BBI-Opp.22.  Choice alone has never been sufficient for deference.  "Without data supporting the [decision], we owe no deference to EPA's line-drawing"—deference is premised on "a reasoned explanation."  *Nat. Res. Def. Council*, 966 F.2d at 1306, 1308.  EPA did not explain why linear miles is an appropriate measure, Br.51; and BBI identifies no such explanation.

EPA does not defend its choice at all.  Instead, it says the error is "irrelevant" because "stream length is not the reason that the loss is unacceptable."  Opp.59.  In the Veto it said the opposite, that "[the unacceptable adverse effects findings … are based on absolute amounts of stream and wetland losses … at the scale of the SFK, NFK, and UTC watersheds." EPA_AR_0083864.  An error is harmless only if it "clearly had no bearing on … the substance of [the] decision reached."  *Cal. Wilderness Coal. v. DOE*, 631 F.3d 1072, 1090 (9th Cir. 2011). Plainly that cannot be said about this error.  Indeed, showing how essential the linear

"amounts" were to the decision, Respondents cannot manage to avoid highlighting it in their briefs. *E.g.*, SalmonState-Opp.17-18 (citing stream length as an "unprecedented" loss).

### D.  The portfolio effect does not magnify the loss.

Respondents' backstop is their "portfolio effect" that loss of "genetically distinct fish populations" must be avoided. Opp.10, 34-35, 40-42; SalmonState-Opp.23-25; TU-Opp.31-32.

Suppose, *arguendo*, that the 27 salmon spawning in NFK-1.190 are a genetically distinct population. The other salmon visiting NFK-1.190 and NFK-1.200 cannot be pertinent for portfolio theory because they are not breeding or spawning there; EPA has no evidence and made no finding that those salmon would be less likely to breed or spawn, when they grow up, just because streams they visited as juvenile fish cease to be available. Salmon home to where they spawned, Opp.9, not to other locations upstream from there. And EPA did not find—and had no rational basis for finding—that losing this tiny population of 27 spawners would be a devastating impact that Bristol Bay *cannot afford*. (As discussed above, EPA concedes that is the required standard.) As PLP noted, a single angler could take that population in a week. Br.47. The FEIS, "considering the physical characteristics and current fish use of habitat to be removed" and "the few numbers of spawning [C]oho observed," concluded the impacts of that removal "would not be measurable, and would be expected to fall within the range of natural variability." EPA_AR_0095991.

Far from disputing that conclusion, EPA agreed with it. EPA_AR_0083293 ("[C]hanges associated with construction and operation of the 2020 Mine Plan could fall within the range of recorded natural variability[.]"). But EPA chose to disregard the point

because it insisted mining "could … still represent large impacts …, thereby resulting in unacceptable adverse effects." *Id.* Notice again the language of hypothesis and possibility: the changes "could" be large. Notice also the failure to address the standard that EPA now concedes is required, that the impacts be "devastating" to the point that "cannot be afforded." Opp.Br.61. This passage equates "unacceptable" with "large." The Veto contains no more meaningful response to the FEIS's discussion. This passage cites a subsequent discussion in section B.2.2, EPA_AR_0083293, but that discussion simply reiterates the "high natural variability of these systems," such as "streamflow variability." EPA_AR_0083258. That B.2.2 discussion does not explain why the putative loss of a 27-salmon group, well within the scale of natural variation, is so "large" as to be "unacceptable." EPA_AR_0083257-0083259. And none of this addresses the actual point being made by the FEIS, and by PLP in its comments, EPA_AR_0078390, which is that a hypothetical loss of this tiny group of spawning salmon cannot be "unacceptable" because it might disappear in any given year under normal circumstances.[30]

EPA's non-response response is reminiscent of what *Ohio v. EPA* criticized. There, EPA said a particular regulatory approach was the most cost-effective given its applicability

---

[30] EPA's emphasis on large natural variability undercuts its portfolio theory. The scientific evidence showed that the more variable the environment at a location, the less likely the 27 salmon in NFK-1.190 return reliably (the necessary predicate for EPA's theory that they are genetically distinct). "Site fidelity is typically lower where unpredictable … fluctuations in habitat quality or quantity result in lower mean survival." EPA_AR_0488635-0488636. "[S]almon populations using less stable rivers (*e.g.*, … small, flashy coastal streams) might have higher straying rates than populations … in more stable habitats such as large rivers and the outlets of lakes." EPA_AR_0472579. EPA overlooked this contradiction.

across 23 States. 603 U.S. at 286-87. Commenters objected that for various reasons many States might fall out of the plan, and they noted EPA's approach would not be particularly cost-effective if applied to only a subset of the 23 States. *Id.* at 293. EPA told the Supreme Court it "*did* consider whether the [rule] could cogently be applied to a subset," and consequently included a "severability" provision. *Id.* at 294 (emphasis in original). But that missed the point. "True, the severability provision highlights that EPA was aware of the applicants' concern. But awareness is not itself an explanation." *Id.* at 295. "Put simply, EPA's response did not address the applicants' concern so much as sidestep it." *Id.* Similarly here, EPA did not address the point actually made. It said being less than natural variability does not necessarily mean an impact is small. But it did not explain why losing the tiny group of spawning salmon, an outcome that can happen naturally in any given year, will be "unacceptable."

EPA's every-habitat-makes-unique-populations argument also cuts the other way. If every small habitat produces unique subpopulations of salmon, then the Bristol Bay "portfolio" is incredibly diversified. A portfolio of tens of thousands of different securities does not become noticeably less diversified because you sell one. Similarly, the loss of eight ten-thousandths of the Bristol Bay genetic portfolio (the proportion of the overall length of streams, Br.49) does not stand out as unacceptable. The diversity of the portfolio limits the impact of this small loss. The FEIS made that finding, EPA_AR_0091990, and EPA offered no explanation why that is incorrect.

Thus, if the 27 Coho in NFK-1.190 were a genetically distinct subpopulation, the portfolio effect could not make their loss an "unacceptable adverse effect." EPA has failed to draw "a rational connection between the facts found and the conclusion drawn." *State Farm*, 463 U.S. at 43.

Meanwhile, no evidence actually shows this tiny group is genetically distinct. For comparison, the National Marine Fisheries Service has long maintained a concept of "Evolutionarily Significant Unit," a population that is "substantially reproductively isolated from other [same-species] populations," and "represent[s] an important component in the evolutionary legacy of such species." EPA_AR_0472885. These "Units," for Coho, are at the scale of central California. 79 Fed. Reg. 20,802, 20,816 (Apr. 14, 2014).[31] The claim that NFK-1.190 is genetically distinct is remarkable.

EPA says "the [NFK, SFK, and UTC] watersheds also support small, discrete populations of Coho and Chinook salmon." Opp.14 (citing EPA_AR_0083061, 0083075-0083077). Yet again, the Veto does not back up EPA's assertion. The Veto said, instead, "[r]esearch on the presence of genetically distinct populations of Coho and Chinook salmon in Alaska is *ongoing*" and "evidence *suggests* that local adaptation and fine-scale population structure *likely exist* for these species as well." EPA_AR_0083075. What was candidly speculation and possibility has, in EPA's briefing, been retooled into certainty.[32] EPA's

---

[31] NMFS has not determined an "ESU" in Alaska for any salmon species.

[32] TU claims losses of the NFK-1.190 group would impact subsistence, commercial, and recreational salmon fisheries. TU-Opp.32 (citing EPA_AR_0083156). The Veto made no finding that loss of this habitat would extirpate Coho or Chinook from even the NFK, much less downstream. It said, "impacts on salmon habitat *could cause* the extirpation of unique local

scientific evidence was similarly speculative. For example, Olsen 2003, EPA_AR_0083075, conducted genetic testing of "32 putative [C]oho salmon populations from seven regions of Alaska," such as southwest Alaska. EPA_AR_0493567. There is no sign any of those populations were near the NFK, SFK, or UTC. EPA_AR_0493570 (Table 1). Olsen concluded Coho salmon "*probably* exhibit local adaptation," EPA_AR_0493567 (emphasis added), and acknowledged other researchers did not find meaningful differences even between southern and northern Alaska Coho. EPA_AR_0493574.[33] For good reason did the Veto characterize the notion of distinct NFK/SFK subpopulations as merely a possibility. EPA's brief cannot generate the scientific finding that the Veto itself eschewed.[34]

To shore up EPA's claim, SalmonState asserts "Nushagak River Chinook are known to have at least six genetically distinct populations" of Chinook. SalmonState-Opp.24-25 (citing EPA_AR_0083045). That assertion contravenes, rather than supports, EPA's portfolio theory about the mine site. The Nushagak river system is 315 miles long, and its watershed

---

populations" and "reduction in genetic diversity *could adversely affect* the stability … of valuable fisheries." EPA_AR_0083156 (emphasis added). TU, like EPA, has manufactured certainty from the Veto's guesswork.

[33] The Veto's "ongoing research" discussion cited two other studies. Sethi and Tanner 2014 did not mention genetic variation at all. EPA_AR_0473842. Clark 2015, studying the Togiak River, concluded that "[w]hether individuals spawning in different habitats within the Togiak River are genetically distinct is *unknown*." EPA_AR_0480084 (emphasis added).

[34] The Veto cited a study by Quinn that found behavioral differences between sockeye salmon populations of thousands in close-together lakes. EPA_AR_0083045-0083046. The study had not measured genetics at all, but the Veto said those differences are "consistent" with there being discrete populations. *Id.* That it is "consistent" is not even a finding to a preponderance-type standard. And it was sensible for the Veto to be so equivocal. The study's author has written at length that behavioral differences are not necessarily the result of genetic differences. *E.g.*, EPA_AR_0472449, EPA_AR_0472879-0472880.

PLP's Reply Brief
Northern Dynasty Minerals Ltd. v. EPA
Case No. 3:24-cv-00059-SLG

52

Case 3:24-cv-00059-SLG    Document 229    Filed 04/14/26    Page 62 of 76

spans 12,700 square miles. EPA_AR_0094255. If that large an area has only six genetically distinct populations, it defies reason to think the tiny NFK-1.190 stream would house one of them.[35] The Veto proposed that "Coho may have higher rates of genetic differentiation," and that there is "[t]he potential for fine-scale population structuring." EPA_AR_0083045. "Potential," because there is no actual evidence for genetic separation at the scale of NFK-1.190, even after EPA's "decades" of studying salmon habitats near the Deposit. Opp.15.

### E. Blocking upstream tributaries that are not salmon habitat has no significant effect on fishery areas.

The upstream tributaries cannot possibly be fishery areas because they have no fish. Br.55. EPA's theory for adverse effect from these—the "91 miles" (again a linear measure)— was that they provide "ecological subsidies" to reaches that actually are salmon habitat. Opp.42.

The FEIS had concluded the loss of subsidies from these streams (nearly all of them upstream from NFK-1.190 and NFK-1.200) "is not expected to affect overall productivity in the greater Koktuli River basin." EPA_AR_0095966. EPA says it "responded to that conclusion." Opp.45. The page it cites did not even mention that conclusion. EPA_AR_0083251. EPA did respond to the notion that other streams will continue to supply materials, by simply insisting, without explanation, that nonetheless the loss of 91 miles must

---

[35] Granted, SalmonState asserted only that there are "at least six." SalmonState-Opp.24-25. But thanks to the long debate over Pebble, this is the best-studied fish habitat in Alaska. If there were a seventh genetically distinct population, it would have been identified. Of course SalmonState was discussing Chinook, not Coho (the only species whose spawning would be affected by the 2020 Plan). *Id.* SalmonState does not assert there are any known genetically distinct populations of Coho at this scale. SalmonState-Opp.23-25.

be bad.  *Id.*  EPA ignored the FEIS's additional key finding on this issue, which is that the 91 miles are not particularly substantial sources in the first place.  EPA_AR_0095966.[36]

EPA says the streams provide not just "nutrients," but also "surface water flows," "groundwater exchange," "gravels," "invertebrate drift," and "organic matter."  Opp.43-44. It remains true that EPA ignored critical evidence about the paucity of nutrients supplied by the 91 miles; EPA does not dispute this observation.  About the other inputs, the FEIS also made comparable findings, which EPA also ignored.

- "[O]pen water habitats supported by groundwater are expected to be largely unaffected by changes in flow."  Groundwater changes "are not expected to result in significant changes to groundwater functions important to fishwithin the Koktuli River basin." EPA_AR_0095964.[37]

- "[G]ravel recruitment is primarily driven by tributaries other than NF 1.190." EPA_AR_0095963.

- "[T]he extent of effects of reduced macroinvertebrate productivity to downstream resources would likely be limited to the area directly downstream of the mine site (within 5 miles)." EPA_AR_0095965.

---

[36] SalmonState maintains these 91 miles really are substantial sources.  SalmonState-Opp.32. It does so based on generic observations in the Veto, not facts about these actual streams.  *Id.* Regardless, the FEIS found these streams are not substantial sources, as SalmonState does not deny.

[37] Surface water flows would not, of course, disappear at all due to filling of the 91 miles.  They would actually mostly increase, not decrease, as discussed below.

- "Dissolved organic matter … in headwater streams is highly variable in quantity and quality." EPA_AR_0095007.

"Based on project baseline surveys, the streams directly impacted in the mine site are not considered major contributors of MDN [marine-derived nutrients]." EPA_AR_0095966. Respondents insist EPA is allowed to disagree with USACE. Opp.45; SalmonState-Opp.31. But it cannot simply ignore these contrary findings and evidence for no reason. As so often in the Veto, EPA disregarded the copious evidence that was gathered at the actual site, and analyzed thoughtfully over years by USACE, and relied instead on its own suppositions about ecology in general. "[M]ere reliance on … theory cannot substitute for substantial record evidence," *Elec. Consumers Res. Council v. FERC*, 747 F.2d 1511, 1514 (D.C. Cir. 1984), and EPA "cannot ignore evidence contradicting its position," *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018). "[A]n agency must account for evidence in the record that may dispute the agency's findings." *Port of Seattle v. FERC*, 499 F.3d 1016, 1035 (9th Cir. 2007). Instead, EPA disregarded the evidence that the 91 miles are not substantial sources for any of the inputs that it highlights.

## VIII.  EPA's conclusions about streamflow were arbitrary and capricious.

EPA's rule-of-thumb against greater-than-20% streamflow changes came solely from the Richter study; that study provided a rough guess explicitly designed to be conservative and cautious for situations with no data; and Richter gave no basis for avoiding 20% *increases*, which constitutes most of what EPA decried about the 2020 Plan. Br.57; EPA_AR_0494626-

0494635.[38]  EPA, not contesting these observations, says it relied on "published scientific papers" but cites no others.  Opp.49.  The cited passage in the Veto pulls the 20% line solely from Richter.  EPA_AR_0083110.[39]

Respondents demand deference for EPA's preference of the 20% bar over the FEIS's modeling.  Opp.52-53; BBI-Opp.25-26; SalmonState-Opp 33-34.  The APA demands more than simply potshots at the gold standard "most widely used … in North America and … commonly used by resource agencies."  EPA_AR_0093661.[40]  "EPA cannot reject the 'best available' evidence simply because of the possibility of contradiction," *Chlorine Chem. Council v. EPA*, 206 F.3d 1286, 1290 (D.C. Cir. 2000).  EPA offers no defense for the 20% line, and no response to the observation that Richter does not justify the Veto's use of it.  Lacking evidence, EPA was "relying on pure speculation," *Horsehead Res. Dev. Co. v. Browner*,

---

[38] EPA asserts that "in the majority of the SFK and NFK reaches," streamflow would sometimes decrease.  Opp.54.  The Veto acknowledged the streams with only increases total 33.3 miles, while those with 20% reductions in at least one month total 13.1 miles.  EPA_AR_0083115. EPA's convenient manipulation of numbers continues; perhaps by "the majority" it is counting the number of streams, instead of the length measure it elsewhere prefers.  Moreover, the 13.1 miles with reductions include the 8.5 miles to be filled.  *Id.* Characterizing that as an excessive streamflow reduction is a strange form of double-counting.
[39] PLP noted the Veto also cited the Bristol Bay Watershed Assessment, which in turn also relied solely on Richter.  Br.58.  An independent review had found the Assessment was prejudged, two congressional committees debunked it, and EPA had said the Assessment was not to be relied on.  *E.g.*, EPA_AR_0078542-EPA_AR_0078544; EPA_AR_0078546-EPA_AR_0078551.  EPA sensibly does not defend the Assessment here.
[40] EPA's criticisms were not even well-supported.  EPA complains the PHABSIM model shows greater depth to be favorable whereas actually water over 2.1-meters deep is progressively less useful for juvenile Coho and Chinook.  Opp.53.  The deepest among the streams with supposedly excessive low changes is only 1.0-meter deep in full flow, EPA_AR_0092563-0092565, and even the greatest increases under the 2020 Plan would not bring that to 2.1 meters.  EPA's abstract concern about the application of PHABSIM in deep rivers has nothing to do with Pebble.

16 F.3d 1246, 1269 (D.C. Cir. 1994), rather than trying to mitigate its supposed concerns with PHABSIM modeling.

EPA cannot validly use conservative assumptions (as the Richter 20% does), because section 404(c) asks what effects "will" occur.  Br.57-60.  EPA rejects the case PLP discussed, *Maine Lobstermen's Association v. National Marine Fisheries Service*, 70 F.4th 582 (D.C. Cir. 2023), because there the agency had, in a previous iteration of its decisionmaking, acknowledged it was to identify "reasonably certain" effects.  Opp.50.  But the next page of the opinion says even if the agency had not flip-flopped, "[w]e would still have to reject the argument," because "[t]he statute is focused upon 'likely' outcomes, not worst-case scenarios."  70 F.4th at 599.  Richter himself said his 20% rule-of-thumb was "precautionary."  Br.58-59.  EPA nonetheless pretends it was not violating *Lobstermen's* because daily variations might be more than the monthly predictions.  Opp.50.  EPA's hypothetical data appear nowhere in the Veto, and the whole concept is an illogical *non sequitur*.  That natural flows vary from day to day (what the Veto observed) does not show the *changes* due to the mine would vary comparably.

Finally, EPA discounts PLP's ability to adjust streamflow changes, Br.60, because EPA says this offer was "at most aspirational," Opp.54.  Actually, the FEIS included detailed explanations of how PLP can optimize discharges, and a month-by-month analysis of which species could be prioritized.  EPA_AR_0095957-0095958.  EPA continues to ignore this evidence.

## IX.    The Veto is based on discharges mostly outside of CWA jurisdiction.

The adverse effect justifying a veto must come from discharges into WOTUS.  Br.61.  EPA does not dispute this point and thus concedes PLP was correct about the limits of EPA's

PLP's Reply Brief

authority.  Opp.69.  Indeed, EPA says that when the Veto used the word "discharge," it must have meant discharges into WOTUS.  Opp.75.  That theory contradicts the Veto, because EPA had openly assessed the effects of discharges into 2,100-plus acres of wetlands, most of which cannot be WOTUS even under the standard EPA had recited.  Br.63-66.

Having wildly overstated the effects of actual discharges, EPA resorts to claims of waiver.

**First**, EPA says the question of what wetlands were WOTUS was not raised during the Veto process.  Opp.77.  As noted above, this process carries no issue-exhaustion requirement.  Besides, Alaska squarely objected that EPA had no idea which wetlands were WOTUS and was improperly relying on USACE's preliminary, thus tentative and nonbinding, determination.  EPA_AR_0083611-0083613.  EPA responded that "at least some of the[] aquatic resources within the defined area are [WOTUS]."  EPA_AR_0083615.  It did not evaluate which of them or how much.  EPA recharacterizes this statement as meaning EPA relied on PLP's Permit Application.  Opp.77 n.20.  It follows that EPA proceeded without knowing which wetlands were WOTUS, because the Application did not say.

**Second**, Respondents say PLP's Application identified the 2,100 acres as WOTUS.  It did not.  Page 9 said jurisdictional wetlands "are present throughout the Pebble Project area, including the mine site, the Amakdedori Port, [etc.]"  EPA_AR_0085287.  True enough; even at the mine site, PLP estimates about 90 acres are WOTUS.  Br.64 n.19.  Page 9 said nothing about which wetlands at the site are WOTUS or how much.  Tables 21-1-21-3 and 22-5-22-9 stated quantities of WOTUS-wetlands at the port and other areas.  EPA_AR_0085288-0085290; EPA_AR_0085304-0085307.  Tables 21-4-21-5 and 22-1a-22-4 detailed wetlands at

the mine site but, unlike those other tables, did not state jurisdictional quantities. EPA_AR_0085291-0085303. The contrast communicated clearly that PLP made no assertion about the quantities or locations of WOTUS-wetlands at the mine site.

**Third**, Respondents say PLP is bound by USACE's preliminary jurisdictional determination. Opp.76. That attitude contravenes USACE policy. A preliminary determination is "non-binding." U.S. ARMY CORPS OF ENG'RS, REGULATORY GUIDANCE LETTER 08-02, p.3 (June 26, 2008) ("RGL").[41] An applicant that receives a preliminary determination "can later raise jurisdictional issues" in appealing a denial. *Id.*, p.4. But the applicant cannot raise those issues, according to Respondents, in this different proceeding before a different agency. Respondents cannot explain why a preliminary determination has more binding force here than before USACE itself.

A preliminary determination "merely advise[s] a property owner 'that there *may* be [WOTUS] on a parcel.'" *USACE v. Hawkes*, 578 U.S. 590, 595 (2016). EPA says PLP could have given USACE additional information if PLP disagreed with the preliminary determination. Opp.76. Notwithstanding such an invitation, the Ninth Circuit says, the recipient "has no obligation to do so or even to seek further agency guidance." *Chevron U.S.A. Inc. v. EPA*, No. 21-71132, 2023 WL 5665761, *2 (9th Cir. Sept. 1, 2023) (unpublished) (considering an EPA letter analogous to a preliminary determination).

---

[41] USACE's policy is also that if any "landowner" or "affected party," not just the applicant, "contests jurisdiction over a particular water body or wetland," USACE will issue a binding jurisdictional determination, not just a preliminary determination. RGL, p.2. Alaska explicitly asked for that, and quoted the USACE policy. EPA_AR_0083613. EPA refused. EPA_AR_0083614.

EPA complains PLP provided no further information to motivate a conclusion different from USACE's preliminary determination. Opp.76. EPA's decision documents said they "do[] not rely on USACE's determinations," because "a PJD … is not determinative." EPA_AR_0083616. Rather, EPA "relie[d] upon the factual information contained in the [USACE record]" showing "the defined areas contain … wetlands with continuous surface connection to relatively permanent waters." *Id.* PLP presents its argument under *Sackett* because that case states the applicable law. Even without *Sackett*, the Veto purported to evaluate "continuous surface connection." The record already showed over 2,000 acres of the proposed fill lack surface water, Br.64, as EPA does not dispute. EPA's decision cannot rationally have been about those acres. Thus, as PLP said, EPA found an adverse effect from depositions of rock and fill without assessing whether those depositions would be discharges into WOTUS, the 404(c) prerequisite.

## X. EPA's speculations about TSF failure were irrational.

EPA disavows any role for TSF failure in the finding of an unacceptable adverse effect. Opp.95-96. That is sensible, because TSF failure is not even a reasonable likelihood, much less an event that "will" occur. Still, the theoretical possibility of TSF failure counted in cost-benefit analysis. *Id.* Accounting for remote chances just because EPA cannot "completely dismiss[]" them, *id.*, makes the cost-benefit analysis yet more irrationally one-sided. EPA cannot "completely dismiss" prospects that copper demand drives prices to $20 per pound and supply from Pebble is crucial for the survival of key American industries. It did not contemplate that risk as a cost of its Veto.

## XI. EPA disregarded compensatory mitigation.

The Veto said EPA "does not view the mitigation provisions to be a relevant portion of the [404(b)] Guidelines." EPA_AR_0083157. EPA yet again disavows what it said, and now concedes those Guidelines required consideration of mitigation measures. Opp.80.

Claiming ignorance of PLP's proposal to generate additional salmon-spawning habitat by replacing or removing culverts, EPA insists it is implausible because there are few roads in the region. Opp.81. PLP's January 2020 proposal listed and mapped the culverts, totaling over 65 miles of salmon habitat to be regenerated including 10.5 miles in the Nushagak watershed (to which the Koktuli flows). EPA_AR_0133904-0133913. EPA has no reason to blind itself to that proposal. EPA insists an application has no significance for a veto, Opp.72n.17, yet when there is an application, EPA thinks it must look at only one version. In comments on the proposed Veto, PLP pointed to the January 2020 mitigation proposal and told EPA that version was pertinent. EPA_AR_0078397-0078399. EPA ignored this input, and asserted—contrary to that evidence—that PLP had said such mitigation is impossible. Br.70.

That this mitigation is not feasible in the narrow watershed nearest the project, Opp.81, is exactly the irrational explanation that PLP criticized. That attitude is contrary to the 404(b) Guidelines (which EPA purports to consider) and EPA policy; and EPA gave no justification for the departure. Br.69. EPA offers no justification here either.

Respondents insist that preservation (under the plan's latest version) cannot qualify as mitigation because PLP would be mitigating harm from its own activities. Opp.82. This interpretation of the Guidelines, for which Respondents cite no authority, is remarkably

circular. EPA would bar any permit applicant from mitigating the downstream effects of its discharges, allowing preservation-type mitigation only for projects that need no mitigation.[42]

EPA says PLP did not show it can improve on the 99-year deed restriction that EPA deemed insufficiently permanent. Opp.83. PLP had negotiated that restriction in line with what USACE and EPA have accepted for other major projects. EPA_AR_0078404-0078405. That PLP followed those precedents does not imply nothing more is possible. EPA, unlike a permitting agency, issued a veto blocking all further permitting attempts. It had the burden to find not just that a given iteration of proposed mitigation is deficient, but that adequate mitigation is impossible. EPA suggests it would consider more information that PLP might later submit, Opp.83-84; but the Plan that PLP has been pursuing stands vetoed, and EPA rules have no mechanism for requesting reconsideration.

## XII. Remand without vacatur would be improper.

*Vacatur* is the presumptive remedy. *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121-22 (9th Cir. 2018). EPA does not object to that remedy if the Court rules for PLP on the merits. But SalmonState, a permissive intervenor with no stake in the matter, pleads for an equitable exception that the actual defendant does not seek. SalmonState-Opp.63-64.

SalmonState suggests vacating the Veto will cause environmental harm. *Id.* This is not serious. PLP does not have a USACE permit, and USACE refuses to even consider the matter

---

[42] EPA and USACE have formally agreed that preservation should be viable mitigation in Alaska. EPA_AR_0139648, EPA_AR_0139654. An interpretation that eviscerates that agreement is probably incorrect.

with the Veto in place. ECF 172, ¶2. Were the Veto vacated tomorrow, USACE would still take time to deliberate on the Application, with the outcome unknown. Assuming USACE grants a permit, PLP needs multiple other permits. ECF 172, ¶5. Even after those permits are granted, initial construction would take over four years. EPA_AR_0087334-0087335. It would be a long time before the first teaspoon of rock reaches the streams. And, as Respondents have stressed, EPA is not shy about vetoing a discharge after permit issuance. See *Mingo Logan*, 70 F. Supp. 3d 151. In short, vacating the Veto will not generate any disruptive consequences, and does not in itself risk environmental harm.

Furthermore, "to remand without vacatur, we must first find that the agency can correct the error on remand." *Kaweah Delta Health Care Dist. v. Becerra*, 123 F.4th 939, 953 (9th Cir. 2024). SalmonState does not attempt that showing, and therefore cannot qualify the Veto for the "limited circumstances," *id.*, for remand without vacatur.

April 14, 2026

Respectfully submitted,

/s/ *Keith Bradley*
KEITH BRADLEY, *pro hac vice*
SCHELEESE GOUDY, *pro hac vice*
717 17th Street, Suite 1825
Denver, CO 80202
T: (303) 830-1776
F: (303) 894-9239
keith.bradley@squirepb.com
scheleese.goudy@squirepb.com

JEFFREY M. WALKER, *pro hac vice*
KATHERINE E. WENNER, *pro hac vice*
2000 Huntington Center
41 South High Street
Columbus, OH 43215
T: (614) 365-2700
F: (614) 365-2499
jeffrey.walker@squirepb.com
katherine.wenner@squirepb.com

SQUIRE PATTON BOGGS (US) LLP

THOMAS P. AMODIO
KEVIN M. BOOTS
500 L Street, Suite 300
Anchorage, AK 99501
T: (907) 222-7100
F: (907) 222-7199
tom@reevesamodio.com
kevin@reevesamodio.com

REEVES AMODIO, LLC

*Counsel for Northern Dynasty Minerals Ltd.
and Pebble Limited Partnership*

PLP'S REPLY BRIEF
NORTHERN DYNASTY MINERALS LTD. V. EPA
CASE NO. 3:24-CV-00059-SLG

64

Case 3:24-cv-00059-SLG    Document 229    Filed 04/14/26    Page 74 of 76

# CERTIFICATE OF WORD COUNT

I certify that PLP's Reply Brief contains 17,991 words, as determined by the word-count function of Microsoft Office 365.

*/s/ Keith Bradley*
KEITH BRADLEY, *pro hac vice*

# CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2026, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court of Alaska by using the CM/ECF system.  Participants in this Case No. 3:24-cv-00059-SLG who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Keith Bradley
KEITH BRADLEY, *pro hac vice*