UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTHERN DYNASTY MINERALS, LTD., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>Defendants,<br><br>and<br><br>BRISTOL BAY NATIVE ASSOCIATION, INC., et al.,<br><br>Intervenor-Defendants. | CASE NO. 3:24-cv-00059-SLG<br>CONSOLIDATED LEAD CASE |
| STATE OF ALASKA,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>Defendant,<br><br>and<br><br>TROUT UNLIMITED, et al.,<br><br>Intervenor-Defendants. | CASE NO. 3:24-cv-00084-SLG<br>CONSOLIDATED |

TRANSCRIPT OF MOTION HEARING
**BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
Thursday - June 25, 2026
1:31 p.m. - 3:59 p.m.

**SONJA L. REEVES**
**Registered Diplomate Reporter**
**Certified Realtime Reporter**
**Federal Official Court Reporter**

**FOR PLAINTIFFS NORTHERN DYNASTY MINERALS LTD. and PEBBLE LIMITED PARTNERSHIP:**

Squire Patton Boggs, LLP
BY: KEITH BRADLEY
717 17th Street, Suite 1825
Denver, Colorado 80202

Squire Patton Boggs, LLP
BY: ERIN HASSETT and JEFFREY WALKER
2000 Huntington Center, 41 South High Street
Columbus, Ohio 43215

**FOR PLAINTIFF STATE OF ALASKA:**

Consovoy McCarthy, PLLC
BY: JOHN MICHAEL CONNOLLY
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209

Alaska Department of Law
BY: RONALD WALTER OPSAHL
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501

**FOR PLAINTIFFS ILIAMNA NATIVES LTD. and ALASKA PENINSULA CORPORATION:**

Pacific Legal Foundation
BY: LUKE A. WAKE
555 Capitol Mall, Suite 1290
Sacramento, California 95814

**FOR DEFENDANTS UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, UNITED STATES ARMY CORPS OF ENGINEERS, BRUNO PIGOT and JANE NISHIDA:**

United States Department of Justice
Environmental and Natural Resources Division
BY: LAURA JANE BROWN and MARIO ALFONSO LUNA
P.O. Box 7611
Washington, DC 20044

**FOR INTERVENOR-DEFENDANTS:**

Bessenyey & Van Tuyn, LLC
BY: PETER H. VAN TUYN
310 K Street, Suite 200
Anchorage, Alaska 99501

Summit Law Group, PLLC
BY: JAMES C. FELDMAN
315 5th Avenue South, Suite 1000
Seattle, Washington 98104

(Call to Order of the Court at 1:31 p.m.)

DEPUTY CLERK: Your Honor, we're on record in case 3:24-civil-59, *Northern Dynasty Minerals Limited, et al., versus the United States Environmental Protection Agency, et al.*

Will counsel please state your appearance for the record.

THE COURT: Beginning with plaintiff.

MR. BRADLEY: Keith Bradley for PLP.

MR. WAKE: Luke Wake for Iliamna Natives.

MR. CONNOLLY: Michael Connolly for the State of Alaska.

MS. HASSETT: Erin Hassett for PLP.

MR. WALKER: And Jeffrey Walker for PLP.

MS. BROWN: Laura Brown for the EPA.

MR. LUNA: Al Luna for the EPA.

MR. VAN TUYN: Peter Van Tuyn, defendant-intervenors.

MR. FELDMAN: James Feldman on behalf of Bristol Bay Economic Development Corporation.

THE COURT: Mr. Opsahl, I see you moved into the jury box.

MR. OPSAHL: There wasn't room at the table. I thought I would sit in the jury box instead.

THE COURT: That's fine. All right. Very good. We are here on oral argument on the filings of the parties. I

have reviewed the filings. I did an order regarding the length of time and directed the parties to sort out among themselves how to go forward.

So is plaintiff ready to proceed?

MR. BRADLEY: Yes.

THE COURT: Go ahead, then, Mr. Bradley.

MR. BRADLEY: I'm going to set my stopwatch because I see there is no timer, and I want to make sure I can keep track of time.

One piece of housekeeping, Your Honor. I'm planning to speak for 30 minutes, of which I would like to reserve four for rebuttal. And then Mr. Connolly will be speaking for the State for 20 minutes, of which he might tell you about his rebuttal plans. And then Mr. Wake for Iliamna Natives for ten minutes.

THE COURT: All right. Very good. And don't feel you need to use all the time.

MR. BRADLEY: Well, it all depends what is most useful to you and what questions you might have.

THE COURT: Fair enough. Go ahead.

MR. BRADLEY: So you hear a lot from the government about deference and how simply disagreeing with their scientific judgment is not enough. What we have put in front of the Court is multiple ways in which EPA's explanation was illogical or internally inconsistent or lacked evidence or

was -- ignored the contrary evidence that was before it.

That's not just disagreement. That's arbitrary and capricious. But there are more fundamental problems. Congress set a standard. EPA had to find that there will be an unacceptable adverse effect on fishery areas. They recited that mantra maybe 70 times in the veto, but they reinterpreted it. EPA's actual assessment was that it is reasonably likely there will be a significant impact on fish habitat. That's not the finding that Congress asked for. "Will" is not the same as "reasonably likely."

Now, the veto does use the word "will" a lot, but we know what EPA meant by that because the veto says so right at the outset. It's not even the same as more likely than not in their view. It's just more than mere guesswork.

I will tell you the Department of Justice --

THE COURT: I have the final determination here. Which page of the record are you looking at?

MR. BRADLEY: I believe -- would you mind passing up the --

THE COURT: I have got the executive summary right here.

MR. BRADLEY: Yeah. It's in the executive summary, I believe. It's the beginning of Section 4, where they lay out how their regulation --

THE COURT: So in Section 4, not the executive

summary.

MR. BRADLEY: Not the executive summary. It's the beginning of Section 4.

THE COURT: All right. I have that.

MR. BRADLEY: And it's a page number is going to be in the AR pagination, 83064.

THE COURT: All right.

MR. BRADLEY: So that says there more than mere guesswork. I submit to you that the Department of Justice knows that "likely" is different from "will." The last time the Court looked at the Pebble Project, the government stood here and emphasized the difference between "likely" and "will."

Congress knows the difference as well. The word "likely" gets used in statute after statute in various places, including elsewhere in the Clean Water Act, but not here.

"Significant" is not the same as "unacceptable." EPA sometimes seems to acknowledge that unacceptable means something more like devastating, but they also -- that's not what the veto did, and it also says it means just significant loss or damage. And the briefing in this court recommits them to that lower standard.

We pointed out that the loss of 27 spawning salmon cannot be unacceptable given that the commercial fishery takes thousands of times more than that every year. And EPA's response was that 404(c) should not have a higher standard than

state permitting rules. But it has to because Congress used this unusual and unusually restrictive word.

Fishery areas is not the same as fish habitat. EPA focused its attention on the North Fork Koktuli. But we know what the fishery is. It's Bristol Bay. The Army Corps found there will be no measurable impact on fish populations in Bristol Bay. Not just no unacceptable impact or no significant impact, no measurable impact, and EPA never disavowed that finding.

Words, Your Honor, are how Congress gives an agency its instructions. And those words have meaning. What we have here is simply no finding that there will be an unacceptable adverse effect on fishery areas. And really EPA could not make that finding on this record. That's reason enough to vacate the veto.

THE COURT: I'm looking back on the page of the AR that you cited, and it talks about -- which is likely to result in significant loss, and it quotes the regulation, which is from 1979 or thereabouts. So is it your position that the regulation is invalid or improper interpretation of the statute?

MR. BRADLEY: Yes. And that -- the fact that that might not have come up in the 13 prior occasions is not particularly informative. It's a statute that doesn't get used very much.

THE COURT: All right.

MR. BRADLEY: So I just want to remind Your Honor if you vacate, as we ask you to do, that does not mean that the company goes off to start building a mine. What that allows the company to do is continue pursuing the permit from the Army Corps. And if that gets close to becoming a permit, obviously, EPA has never been shy about vetoing late in the process.

So now let's talk about deference. What did EPA say were the reasons that it thought there could be an unacceptable adverse effect?

They talked about four types of impact. First, we have got the eight and a half miles. Will filling eight and a half miles of salmon habitat have a devastating impact on the Bristol Bay fishery? Obviously not. The EPA doesn't even claim that it might.

This is not Arizona. This is Alaska. That is one-hundredth of 1 percent of the map streams in the Bristol Bay watershed, and that's the map streams, which EPA acknowledges is a significant underestimate of what's really there.

We pointed out various ways that EPA's treatment of that eight and a half miles is irrational, and the response to most of that was that the Court doesn't need to consider it because that's not the basis for the veto. So what is the basis?

It seems to be the portfolio theory. Really it defies belief that taking a handful of salmon that a gillnet fisher could take in one outing is going to have a devastating impact on the Bristol Bay fishery.

But I want to pause here because there are some quibbles about exactly how many spawning salmon we're talking about. There are some theories and speculation that the measurement might have been low for one reason or another. Nonetheless, those numbers are the only evidence in the record of salmon actually spawning in these streams, and for 20 years, so far as I know, nobody else has gone to look.

But let it be twice that many. Let it be five times that many. The point would still be the same. The portfolio theory is unfounded in this context and also backwards.

First, there is no evidence that the salmon in these streams have any genetic difference from the ones across the valley or the ones next down river.

Second, there is no evidence that if there were such genetic diversity in these reaches, that it would contribute to the adaptation of the species in -- for a given future hypothetical environmental challenge.

Third, the Army Corps pointed out that the vast amount of salmon habitat in this area counteracts the loss of this. It actually works the other way. To use EPA's investment analogy, it's like you got a portfolio with 10,000 stocks in it

and EPA insists you cannot sell any single share. That's not how investment diversification works, and it's not how ecological diversification works.

Fourth, recall that the company's original proposal was to restore ten times as much habitat as they would be filling. That's in the original mitigation proposal. So diversity on the portfolio theory, if the mine could be built, diversity would be increasing, not decreasing.

And then fifth, EPA's rigid portfolio theory is actually internally inconsistent. The concept is, at least as I understand it, that these salmon are genetically distinct and that diversity would be lost because salmon home to where they were spawned. But if that's so, then they can't contribute to the adaptation of the rest of the population.

In reality, salmon do stray. The record shows that. Also, in reality -- and I want to -- full disclosure, I'm going to say something outside the record because it's a decision from the government one month ago. The federal government just made a decision about the relevant conservation units for Chinook in the Gulf of Alaska, and the relevant units are northwest, central, southeast Gulf of Alaska. Why? Because the fish mingle on smaller scales.

THE COURT: Which agency was that?

MR. BRADLEY: NOAA. And we would be happy to give you the citation.

THE COURT: That's fine. Go ahead.

MR. BRADLEY: So no, the portfolio theory is not a legitimate excuse here.

We have the 91 miles. These are tiny streams, rivulets some of them, some of them ephemeral. Three-fourths of them the government didn't even know about until the company mapped this area. These watersheds have hundreds of thousand of streams like that. I'm sorry, hundreds of thousands of miles of streams like that.

We have the stream flow changes. For that, EPA is relying solely on this Richter study, and Richter says -- and also this is also what the Bristol Bay assessment said in 2014, that its rule of thumb was designed as a precautionary principle for use in the face of uncertainty caused by lack of data.

A precautionary principle means something designed to protect against the risk of harm that is far short of even finding that the harm is reasonably likely, much less that the harm will occur.

And there is no lack of data. This area is the best studied in all of Alaska because of the company's efforts. EPA simply prefers to throw out this data in favor of this rule of thumb.

THE COURT: And so you're saying that's arbitrary and capricious, correct?

MR. BRADLEY: Yes.

THE COURT: And so what's your response to the Supreme Court's holding on *Seven County* about the deference a court is supposed to give or required to give to agencies for these types of what seem to be these scientific judgments?

MR. BRADLEY: Well, I don't take *Seven County* to have rewritten the decades of law about the APA, particularly since it was specifically a NEPA case. I don't think it rewrote decades of law about NEPA review, either. Deference has never been absolute.

And we cited in the briefing copious cases in which courts do give the, for a scientific assessment, the searching judgment that was it rational, supported by evidence, reasonably explained?

I'll give you an example. There is a case in which EPA used a model to figure out the visibility changes from maybe a power plant. I forget exactly what it was. And the Ninth Circuit said in the face of a challenge to your use of that model, the agency must provide a full analytical defense.

THE COURT: What case was that? I'm sure it's in your briefing.

MR. BRADLEY: I regret to say it may not even be in the briefing.

THE COURT: Take a moment. That's fine. You can come back to that later on.

MR. BRADLEY: We'll come back to that. It's National Parks Conservation Association is the plaintiff versus EPA.

THE COURT: Thank you.

MR. BRADLEY: And the answer in that case, by the way, was the agency's use of the model was arbitrary and capricious. So deference has never been absolute.

Finally, there is the wetlands. I think EPA agrees that the only cognizable adverse effects are those that result from a discharge into waters of the United States.

Not all wetlands are waters of the United States before or after *Sackett*. That's always been the case. And EPA declined to make an assessment of which and how many of the wetlands actually were waters of the United States, so that simply cannot be a basis for the veto.

THE COURT: As I understood their argument or their response on that was that PLP could have requested a -- I forgot the term, but a more definitive ruling on the jurisdiction and didn't. Do you know what --

MR. BRADLEY: I do know what you're talking about, yes. The terminology is there is a preliminary jurisdictional interpretation and the other kind is an approved jurisdictional interpretation, yes.

So the problem with that argument is the weight and the -- multiple problems, actually. One is that the weight and binding effect that they are giving to it is something that the

Army Corps that issues those documents does not itself give to them.

Under Army Corps guidance and regulations, you are allowed to live with -- go forward on the basis of preliminary JD and then challenge that on appeal if you want, but apparently, we can't challenge it here.

The second thing is that whole argument is contrary to the decision itself. In the decision, EPA said it was not relying on the preliminary JD, and now they turn around and say they were entitled to. As you know, that kind of post hoc statement is not permitted.

Now, to find an effect unacceptable requires an analysis of what would be the benefit of the project that would be doing the discharges? EPA doesn't contest that point. So what was their cost-benefit analysis?

Let's say there is no mine -- let's say there is no veto. The mine could be built, needs a permit obviously, but it could be built with the billions of dollars in revenue and the taxes and the royalties and the jobs. EPA says that is speculative, but it's not really.

The economic analysis that the company put in the record was prepared -- it's very robust, prepared over years by independent engineers under the watchful eye of securities regulators intended to be a communication to investors to give them a fair and accurate portrayal of the prospects, and at the

risk of serious securities liability for the company and those independent engineers if that analysis were shaded in favor of the project.

EPA says that they should discount, take out of this the value of the economic activity, the jobs, et cetera, because the investors -- if there were no mine, the investors will do some other economic activity in Alaska. That's not really true, either. The Pebble Deposit is a unique resource of the people of Alaska.

THE COURT: It seems -- there is probably a middle ground on that point. Some investors would go elsewhere, some would not.

MR. BRADLEY: I think I would reframe the middle ground differently, Your Honor, which is that some of the economic inputs probably are fungible but not all of them. But that's the Court and me speculating about that. The agency's decision wiped it all out.

THE COURT: I have the cost study by the EPA that was filed. Can you -- I didn't bring out, I meant to, but the appendix that lists the table of contents. I'm assuming the SEC study that you're referring to is in the record?

MR. BRADLEY: Yes.

THE COURT: So I can find that later?

MR. BRADLEY: Yes. The title that it will go by is the preliminary economic analysis. And that word "preliminary"

is a technical word about the securities regulation is applicable to mining.

THE COURT: All right.

MR. BRADLEY: It's simply what you call it at this stage of the process.

THE COURT: That's fine.

MR. BRADLEY: But now let's talk about the other side. What happens if there is a veto? EPA says, "Well, we are preserving Bristol Bay fishery from destruction." That's not just speculative; that's counterfactual.

And I point out to you that EPA did not discount the jobs, et cetera, on that side of the equation. Again and again, they make assumptions in one way when it suits the predetermined outcome, and they make assumptions the opposite way when it suits them to oppose the mine.

THE COURT: And so what case in the Ninth Circuit or the Supreme Court, for that matter, do you think best supports your client's perspective on that issue, that picking and choosing numbers, if you will, in that manner is arbitrary and capricious?

MR. BRADLEY: There are -- I'm actually going to point you first, Your Honor, to the DC Circuit rather than the Supreme Court or the Ninth, and I'll come back to the Ninth.

In the DC Circuit, we have *Business Roundtable*. We have *County of Los Angeles versus Shalala* and several others.

What these stand for is a couple of different propositions.

One is inconsistent treatment of making the convenient assumption one way on one side and then the other way on the other side. *Business Roundtable* is very clear about that. *County of LA* is a great case about using the data one way and then discounting it when it doesn't suit you.

And the Ninth Circuit, if I recall correctly, I think it might be *Pacific Coast Federation Fishermen*, but the Ninth Circuit has adopted this principle as well.

THE COURT: All right.

MR. BRADLEY: So the bottom line is that's not rational decision-making.

But I want to -- I'll just come back to where I started at the outset. I pointed out -- the briefs go through a variety of other fatal flaws at length, and we appreciate your patience on that. But rather than go through all of that, I'm going to come back to where I started.

I have just described various ways in which the reasoning was arbitrary and capricious. But before we even get to that, there is no finding that there will be an unacceptable adverse effect on fishery areas. And without that, there cannot be a veto, full stop.

THE COURT: So would that be in violation of law, not arbitrary and capricious, under the APA?

MR. BRADLEY: I would call that contrary to law, yes.

THE COURT: All right.

MR. BRADLEY: But I'm going to add one gloss on that, if I could, Your Honor. With my law students, I go over this constantly and it's a wrestle, which is if an agency takes an action in which it did not make the required analysis because it just didn't respect the standard, you could think of it as arbitrary and capricious as well as contrary to law.

THE COURT: Right. No, I understand your point there. The terms overlap to some extent.

MR. BRADLEY: Yes.

THE COURT: Fair enough.

MR. BRADLEY: If I could come back for a moment, Your Honor. You had asked about the case I was telling you about, about the full analytical justification or full analytical defense, I think is the words. That's 788 F.3d 1134 from the Ninth Circuit in 2015, and that's the Ninth Circuit version of this. The DC Circuit has said that a dozen times.

THE COURT: Do you take any position or does PLP take any position on the issues raised by the Native corporations with regard to this delegation doctrine?

MR. BRADLEY: Our view is that -- in general, yes, we did adopt what they had said in their brief. If the statute means what EPA thinks it does, then there really is a nondelegation problem for certain, Your Honor, because it has no bounds. In all of the various ways we have talked about,

EPA's view is that it can write a rule for anywhere in the country based on an assessment that based on more than mere guesswork there will be a significant effect on what, on habitat. So it is -- that is unfounded.

THE COURT: Does that tie in at all, in your mind, with discussion by the Ninth Circuit back in the first round of Pebble where it talked about it's unreviewable by statute, only by regulation?

MR. BRADLEY: It does, I mean, and I take my colleague's point that the statute itself says you may. It doesn't say anything about withdrawing. And the only basis, as I understood the Ninth Circuit's decision, the only basis for that withdrawal being reviewable was simply the regulation, and a regulation is certainly a logical ply we have learned, but a regulation can't solve a nondelegation problem.

THE COURT: All right. Other points you wanted to make at this time?

MR. BRADLEY: No. Thank you. I see I'm running nearly up against having four minutes left.

THE COURT: Thank you.

MR. CONNOLLY: Michael Connolly for the State of Alaska. I would like to reserve four minutes for rebuttal.

THE COURT: All right.

MR. CONNOLLY: Under the Constitution, the State is the primary regulator of land and water use. That means that

it is for the State to decide whether and how to allow mining on state-owned lands. Section 404(c) of the Clean Water Act gives the EPA a limited power in these matters. The EPA can prohibit the specification of a defined area as a disposal site when it determines that the discharge of fill materials in the waters of the United States will have certain unacceptable effects.

As we explained in our brief, the EPA failed to stay within its statutory authority in multiple ways. It improperly relied on secondary effects. It failed to limit its analysis to discharges in the waters of the United States. And it improperly identified a defined area as a disposal site. For these reasons, the Court should vacate the final determination.

Now I want to start with the issue of secondary effects. So the EPA here relied heavily on secondary effects. And how it defines secondary effects are effects that are, quote, "associated with the discharge of dredged or fill material but do not result from the actual placement of this material." That is on page --

THE COURT: Go ahead, yes. You were about to state the page.

MR. CONNOLLY: On page 83068. They say it multiple times in the final determination. It also comes from a regulation, 40 CFR 230.11(h). For example, what EPA did is they relied on things like dewatering, fugitive dust and

fragmentation.

Now, these effects don't actually come from discharges into the waters. So, for example, dewatering. What dewatering -- how that will occur is, for example, there are wells all around the area through the operation of the mine site. The wells will be pumping water out of the ground, and EPA determined that this pumping water out of the ground will lead to certain losses of streams and wetlands.

Now, the problem for EPA is that 404(c) doesn't allow this.

THE COURT: I'm looking at page 83179 of the record, which is the beginning of Section 6, and I think the EPA cited this in their briefing, that Section 6 was to describe additional concerns, but is not the basis for EPA's final determination. I'm reading from what they said.

So why then is there error if the agency didn't -- certainly identified issues but didn't rely on them?

MR. CONNOLLY: So those are secondary effects that are separate from what we're speaking of. In Section 4.2, this is where they rely heavily on what they describe as secondary effects. So the three they point to are fragmentation, fugitive dust and dewatering.

THE COURT: Which section of 4 is this?

MR. CONNOLLY: Section 4.2, and the pages I would point you to where EPA discusses this are pages 83067 and

82954.

THE COURT: So you're saying it's the analysis within Section 4 that is problematic insofar as it includes effects that don't directly relate to the impact on the fishery?

MR. CONNOLLY: Correct, of discharges into waters of the United States. And there is a difference here between the analyses.

So relying on secondary effects might be proper for the Corps under Section 404(a), but that's a very different statute. Section 404(a) and Section 404(b) incorporate the 404(b)(1) guidelines that do discuss secondary effects. But 404(c) is a much more limited scope of authority for the EPA, and all that says is discharges into waters of the United States.

An example I would give is the *Mingo Logan* case. In *Mingo Logan*, we have got a West Virginia mining company that is going to take the tops off of mountains and take that fill material. They are going to put it directly into three streams that are waters of the United States, and EPA determined this discharge directly into these streams are going to have harmful effects.

That is the type of analysis that EPA was supposed to be limited to here, but they went far beyond into secondary effects. And this is something that the statute just does not allow for them to do.

THE COURT: So you're not challenging, then, Section 6 of the final determination? You're focused on this component of Section 4?

MR. CONNOLLY: Correct. If I recall, Section 6 is --

THE COURT: A lot of other concerns.

MR. CONNOLLY: A lot of other stuff. No, what we're talking about here is Section 4.2 and Section 4.3 as well when they are talking about fugitive dust, dewatering and fragmentation.

Now, we have got secondary effects on one side. And EPA said they also relied on what they called direct effects. And so this is when it's actually discharged into the waters. Now, this, they are getting closer. That's the type of analysis they are supposed to be doing. But the problem is, is that it has to be only discharges into waters of the United States.

So if you look at Section 404(c) and have this understanding, you would think that in the final determination there would be something where EPA says, all right, here is the map and these streams are waters of the United States, and these wetlands are waters of the United States, and when there is discharges into here, there will be these certain harms. But it didn't do that.

For example, that's what they did in the *Mingo Logan* case. In the *Mingo Logan* case, they say these three streams

are waters of the United States, and when you discharge into them, there will be harmful effects.

THE COURT: So does this go to your issue with the use of a map that includes land in addition to the streams themselves?

MR. CONNOLLY: It is related. That's the third point I'm going to get to. So this is part of how the EPA came to its unacceptability finding. So it looked at two types of effects: Secondary effects and direct effects. And we think both were flawed. Just talked about secondary effects. And direct effects are flawed because they had to look at waters of the United States.

So here is what EPA does. In its brief -- this is on page 76 -- EPA says, "We could assume that all of these streams and all of these wetlands are waters of the United States because of PLP's application and because of a preliminary jurisdictional determination." Neither of those works.

So, first, PLP's application -- this is on page 85287 -- PLP does say that there are waters of the United States on the property. But it never says that every single discharge of wetlands and streams are waters of the United States. So there is nothing from that application where EPA could assume that no matter where a discharge goes, it will be waters of the United States.

The second point is they rely on a preliminary

jurisdictional determination. But both in the regulation and the actual PJD is what we call it sometimes, both of them, all it says is that there may be waters of the United States.

So I would point the Court to page 88969. This is the preliminary jurisdictional determination where EPA just says there may be waters, and then the regulation itself is 33 CFR 331.2.

THE COURT: Am I correct that your position is that EPA, as part of its final determination, was required to go from "may" to what actually is the waters of the United States?

MR. CONNOLLY: Correct.

THE COURT: And what impact -- was that raised at the agency level?

MR. CONNOLLY: Yes, it was. I would point the Court to page 15401 through 15404. These are the State's comments where we repeatedly asked for the EPA to identify the waters of the United States.

And I think that's an important point to make again is that even if the Court somehow assumes that PLP forfeited or waived this issue or something, the State of Alaska certainly did not. These are state-owned lands, and the State was repeatedly saying you need -- the State needs to actually -- sorry, the EPA needs to actually identify where the waters of the United States are.

And the last point --

THE COURT: Does the final determination or the response to the comments come back to that point on the State's request to identify the actual specific waters?

MR. CONNOLLY: Yes. On page 83615, the EPA makes this comment where they say some of the wetlands and waters supporting the streams are waters of the United States. So they actually appear to admit that only some of these waters are waters of the United States.

And EPA right now doesn't even appear to be relying on anything it said in its comments, any of the findings that it made. It's relying on this quote, "assumption" on page 76 that they think they can make because of what PLP said.

THE COURT: And you're saying since the State raised the issue and comments, it's before for the Court here on review?

MR. CONNOLLY: Correct. The analogy I would make is when two parties come into this court and they both tell the Court, "You have federal jurisdiction," you can't just take their word for it. You have to actually say, "Well, do I have federal jurisdiction?"

And that's the same thing here. It is in the statute of Section 404(c). They can only consider discharges into waters of the United States.

Final point I want to make before I sit down for rebuttal is the issue you just flagged about the defined area

as a disposal site.

THE COURT: I need to back up and ask a very basic question, and that is, I understand there is a restricted map and then the smaller prohibited map. And prohibited is prohibited. What is the substance of what is restricted in that area that is in the larger map?

MR. CONNOLLY: What the EPA did is they say -- first, they apply to the prohibition and they prohibit the mine plan within that prohibition. And then for the restriction, it's a far bigger area. It's about 300 square miles.

THE COURT: Right. I saw the maps, yes.

MR. CONNOLLY: What they say for that is that -- I might not get the language exactly right, but essentially any plan where the discharges to mine the Pebble Deposit will be similar to what happened in the prohibition that is not allowed. And the Pebble Deposit is not just within the prohibition, the Pebble Deposit extends into the restriction.

THE COURT: Thank you.

MR. CONNOLLY: And you can see those on those maps.

So the last point is this issue of the defined area as a disposal site. So EPA can prohibit the specification of a defined area as a disposal site. I think the parties at this point would agree that a defined area as a disposal site has to be waters of the United States. That's because the EPA does not have authority to regulate just dry land, so an isolated

pond or an isolated wetland can't be a defined area as a disposal site.

So then the question is: Can the EPA do what it did here, which is draw a big circle around land and then say, "All right, if there are any waters of the United States within here, we're not going to say where they are, but if there are any waters of the United States in here, you can't do discharges that will lead to certain results."

THE COURT: Into those waters?

MR. CONNOLLY: Into those waters. But Section 404(c) doesn't allow that type of really a very vague defined areas of disposal site.

Two parts from the text that I would point to. "Prohibit the specification," so when Congress is talking about the specification there, they are referencing 404(a). And 404(a) gives the Corps the power to issue permits at specified disposal sites.

If you think about what the Corps does, the Corps would never draw a big circle around land and tell a company, "Hey, if you find waters of the United States in there, you're allowed to discharge." The Corps would very specifically identify, pinpoint waters of the United States and say, "You are allowed to do a discharge right here." So when 404(c) is referencing "prohibit the specification," that's what they are talking about.

The second thing is defined area as a disposal site. Again, a disposal site is a very specific point of a waters of the United States. And defined area reenforces that. You have to define the disposal site.

Again, I love this case. I keep coming back to it, is the *Mingo Logan* case. *Mingo Logan*, they withdrew the specification for three specific streams. So the regulated entity looks at this and they say, all right, I know what I can and cannot do.

When the State of Alaska looks at this, there is no indication about what is and isn't allowed. In order to make that determination, the State would have to go to the Corps, go to the EPA and ask for an approved jurisdictional determination just to understand where the veto even applies.

And so --

THE COURT: What's the problem with that?

MR. CONNOLLY: The problem with that is that it chills the operation of the State from using its land. The State would have to hire consultants. They would have to do all this sort of thing.

THE COURT: So you're saying that the agency should affirmatively take on that responsibility and not make it the State's task?

MR. CONNOLLY: Correct. Section 404(c) is a big, big deal. They have used this power, I think, 13 times. When you

issue a veto like this, you're essentially putting all of this land off limits. We don't think it's that much to ask for the EPA to actually specifically say, "Here is where the veto applies and here is where it doesn't."

THE COURT: Is there any case that has addressed this specific issue, that you're aware of?

MR. CONNOLLY: Not that I know of. Section 404(c) has been used very rarely. If you pull up some of the vetoes that we referenced, they operate in a similar fashion. Some of them aren't the clearest, but they are actually saying, hey, these wetlands right here, you're not allowed to do a discharge, or these three streams, you're not allowed to do a discharge.

I looked through the vetoes that they have done in the past, and I couldn't find anything where they have drawn a big circle around land and just said, "If there are waters of the United States in there, it applies."

So those are the big three points I wanted to hit. I will reserve the rest of my time for rebuttal unless you have questions.

THE COURT: Not at this time. Thank you.

MR. WAKE: Good afternoon. Luke Wake on behalf of Iliamna Natives and the Alaska Peninsula Corporation, who are already suffering the devastating impacts of EPA's unconstitutional veto of this world class mining project that had promised to bring much needed revenue to their communities.

I would like to make just three points today. First, EPA -- first, Congress established no policy speaking to whether EPA should exercise this extraordinary veto power, and that failure is fatal.

Moreover, that problem is all the more significant given that Congress provided at best only an exceedingly weak boundary on EPA's 404(c) authority.

Second, a decision finding 404(c) unconstitutional would not be breaking any new ground here, because this case is on all fours with *Panama Refining* and because the district court would merely be accepting the statutory interpretation that the Ninth Circuit already resolved in *Pirzadeh*.

And third, striking down 404(c) on these narrow grounds would leave Congress's 404 permitting regime intact. It would not call into question any permitting regime, as far as we know. 404(c) truly is we believe a white whale. We're not aware of any other statute in which Congress has established a permitting regime that is covered by a set of standards and then allowed an agency to come in and decide on its own whether to simply replace that regime with an outright prohibition, an ironclad prohibition.

On the first point, everyone here seems to agree that Congress must establish a general policy to satisfy the nondelegation doctrine. Indeed, in *Panama Refining*, the Supreme Court struck down a provision of the National

Industrial Recovery Act precisely because Congress had given the President the power to change the legal landscape, but without speaking to whether the President should actually exercise that power or just maintain the status quo.

And, of course, that's precisely what Congress has done here in giving the EPA administrator a legislative power to change the rules of the game if he pleases or to do nothing at all.

As in *Panama*, 404(c) has a predicate. In *Panama*, the predicate on the President's authority to exercise that extraordinary power to prohibit transport of hot oil was that there had to be a state law restricting hot oil in some way. The President could not act without that predicate.

Again, the same is true here. A finding that the project is unacceptable merely opens the door for the administrator to decide whether to exercise the veto power or not. And for that reason alone, this Court should find a nondelegation violation.

But there is also a boundaries problem here because the term "unacceptable" is an empty vessel, at least as EPA interpreted it, just like the term "not suitable" or the term "annoying" was found to be standardless in *Interstate Circuit* and in *City of Cincinnati*. So at best, unacceptable is an exceedingly weak boundary.

And that only underscores the significance of the veto

power and the constitutional imperative really for Congress to establish a policy speaking to whether that power should be exercised or when.

On the second point, everyone here acknowledges that the Ninth Circuit has already definitively interpreted 404(c) as giving the administrator unfettered discretion, that is even assuming that there is unacceptable effect, to either act or not act.

The defendants' really only answer is that *Pirzadeh* was not a nondelegation case. While that's true, it's beside the point. What matters for the nondelegation doctrine is that Congress must establish a general policy speaking to whether an agency or when an agency should exercise a significant authority, and that policy has to be found in the statutory text. But, again, *Pirzadeh* looked to the statutory text and found nothing but unfettered discretion. And that textual interpretation is, of course, binding here.

On the final point, the defendants suggest that ruling for us would somehow open Pandora's box, but that is not true. Again, 404(c) is different from anything else in the U.S. code, as far as we're aware. And there is a world of difference between allowing an agency a degree of discretion in executing and deciding whether a permit can be processed under existing standards and giving an agency just unfettered discretion to decide whether to entirely foreclose even the possibility of

pursuing the permit.

For that matter, there is also a world of difference between exercising prosecutorial discretion and exercising a power to change the legal landscape, which is what we have here. So unlike the highway patrol officer who is deciding whether to pull over a vehicle that has exceeded the posted speed limit, the administrator under 404(c) is like an officer who is deciding what the speed limit should be.

And finally, I think it bears emphasis here that ruling for us would not upset the APA's bar on judicial review for matters committed to agency discretion, because unlike in this case, the vast majority of issues that the courts have held vested to agency discretion concerns matters actually of prosecutorial discretion or other matters within the inherent authority of the executive branch.

But, again, 404(c) is different because 404(c) allows the administrator to change the legal rights and obligations of private parties, which is quintessentially legislative activity.

If the Court has no questions --

THE COURT: How do you respond -- and I can hear from the other plaintiffs as well in due course. But how do you respond to the EPA's argument that this really does not prohibit the development of mining in this area, it just vetoes the plan that was put forward in 2020?

MR. WAKE: It nonetheless changes the legal landscape in the sense that under the existing permitting process, the default permitting process under 404(a) and (b), that hasn't played its way out. We don't know for sure what would play out if PLP was allowed to pursue and have its application actually reviewed under those standards what the final outcome of that would be.

But what we do know is that there is some possibility that that permit would be granted, and, of course, we would like to see it granted. But with this veto decision, they have changed the legal landscape in the sense that no project can move forward. They are not applying -- this is different from, for example, a regime in which an agency is deciding whether or not, sort of taking second review on whether or not a project has sort of met established standards. This is, in fact, a question about whether to displace those standards altogether.

THE COURT: Thank you.

MR. WAKE: If I can reserve three minutes of my time, I will be happy to.

THE COURT: Very good. We'll take about 15 minutes here and come back and then hear from the defendant. We'll go off record.

(Recessed from 2:21 p.m. to 2:39 p.m.)

THE COURT: All right. We are back on record and ready to hear from the defendant.

Go ahead, please.

MS. BROWN: Good afternoon, may it please the Court, Laura Brown on behalf of EPA. With me is my colleague, Al Luna. Also present today are Ashley Bruner (ph), Heidi Nalven (ph) and Chase Rain (ph), who are all attorneys at EPA; in addition, Peter Van Tuyn, counsel for the Bristol Bay intervenors, will be arguing on behalf of all intervenor-defendants. And we have divided the allotted time so that intervenor-defendants will have ten minutes of defendants' argument.

My colleague, Mr. Luna, and I have divided the issues to address today on the EPA's behalf. Mr. Luna will be addressing EPA's evaluation of costs, compensatory mitigation, the major question doctrine and the nondelegation doctrine. And I will address the remaining issues.

Contrary to what the Court just heard, EPA lawfully exercised its Clean Water Act 404(c) authority to limit the Corps' authority to permit discharges of dredged or fill material into waters of the United States at the discharges PLP proposed in its 2020 mine plan.

Well, EPA did not make this decision lightly. It came after years of extensive analysis of the aquatic resources at issue as well as the salmon that use those waters.

PLP proposed to destroy large areas of waters of the United States and to destroy and degrade salmon habitat which

threatens the resilience and productivity of certain species of salmon.

The final determination is based on EPA's scientific reasoned judgments. It is supported by a robust record and it is consistent with the Clean Water Act and the Administrative Procedures Act.

Now I would like to address five main points, and then I will turn the argument to my colleague. First, I will explain why the final determination is not a ban on mining nor is it an action to turn state-owned lands into a federal reserve or otherwise infringe on state rights.

Second, I will explain why EPA's interpretation of the statutory phrase "fishery areas, including spawning and breeding areas," to mean areas of waters where fish breed, spawn and rear is the best reading of the statute.

Third, I will explain why the record fully supports EPA's determination that PLP's proposed discharges in its 2020 mine plan will have unacceptable adverse effects on those fishery areas.

Fourth, I will explain why EPA appropriately considered secondary effects, PLP's proposed discharges.

And finally, I will explain why EPA's approach to waters of the United States within the two defined areas is appropriate.

Now, turning to my first point, EPA's action is not a

ban on mining. EPA's action limits only the Corps' authority to specify waters of the United States as disposal sites of fill material in the two defined areas, but it only limits those discharges if they amount to one of four thresholds.

So that would be, as we heard, loss of 8.5 miles of salmon stream, loss of 91 miles of non-salmon stream, loss of 2,108 acres of wetlands or other waters, an alteration of monthly stream flow by 20 percent in more than 29 miles of salmon streams.

What this means is that if PLP or any other mining company proposes to develop the Pebble Deposit and proposes to discharge dredged or fill material into waters of the United States but the discharges are below any of the four thresholds I just described, then the final determination is not triggered and that --

THE COURT: Any of the four or all of the four?

MS. BROWN: Any one of those four.

Then the final determination is not triggered, and that permit application can move forward with the Corps.

Now, PLP contends that the final determination effectively bans mining because the proposed discharges it included in its 2020 mine plan represent the smallest economically viable mine. But this assertion is based really on speculation.

PLP has acknowledged that the economic value of its

mine is uncertain and that capital costs can be anywhere from 50 percent higher or lower than what it has reported.

Moreover, PLP now asserts that some of the wetlands identified in its 2020 mine plan are no longer waters of the United States under the Supreme Court's holding in *Sackett*. PLP is and always has been free to submit a new jurisdictional analysis to the Corps and EPA. And if it is accurate, then those wetlands are no longer waters -- those wetlands are no longer waters of the United States, then the Clean Water Act doesn't apply to them and they don't count towards the threshold identified in the final determination.

PLP is also free to reconfigure the components of its mine to reduce impacts to waters of the United States. For example, EPA identified to PLP some changes it could make in its proposed water management plan that would reduce the stream flow changes.

The final determination may impact PLP's desire to create the mine that it included in its 2020 mine plan. It certainly does prohibit that mine plan, but it certainly doesn't mean there can't be mining of the Pebble Deposit. There is certainly different opportunities and new technology that are available to PLP and any other mining company.

Because the final determination doesn't prohibit mining of the Pebble Deposit, it does not alter the State's authority or conflict with the Statehood Act.

Contrary to Alaska's assertions, the final determination does not regulate activity on dry land. The final determination is clear that it only applies to waters of the United States in the two defined areas.

Again, it only restricts the levels of waters of the United States that can -- that are not allowed to be used as disposal sites for dredged and fill material. It has no impact on the State's ability to lease the underlying minerals.

Now, there is nothing in the Statehood Act or the Land Exchange Act that limits the application of federal law to mineral lands. Alaska has asserted in its reply brief that application of the final determination may make its ability to lease the Pebble Deposit more onerous. But courts have long held that environmental laws represent an appropriate exercise of congressional authority even if they represent or impose some restriction on state activities.

Certainly a holding by this Court that the Statehood Act exempts mineral lands from application of the Clean Water Act would call into question application of the Clean Water Act in the western states where there was similar language that is included -- or identical language that is included in the Statehood Act where mineral lands were conveyed and those states have authority to lease those lands.

Turning to my second point, in the final determination, EPA appropriately interpreted the statutory

phrase "fishery areas, including spawning and breeding areas" to mean anadromous fish stream where salmon breed, spawn and rear. EPA relied on the State's Anadromous Water Catalogue to identify the salmon fishery areas when those are waters that the State has designated as important for the spawning, rearing and migration of salmon, and the State has protected those waters.

Now, PLP argues that fishery areas can only mean where fish are caught, but this interpretation ignores the plain language of the statute. The parenthetical "including spawning and breeding areas" demonstrates a congressional intent that fishery areas include areas where fish reproduce and grow.

Now, salmon spawn and their offspring rear in freshwater streams -- streams and lakes. Then they migrate to the ocean, where they grow into adults, and that's where they are frequently caught. Those that can escape then return to their native freshwater streams to spawn. So the freshwater habitat must be protected to ensure propagation of the species, which is one of the Clean Water Act's stated goals.

This does not mean that no salmon habitat could ever be filled under the Clean Water Act. Rather, here, EPA has determined that it's the magnitude of the impact that PLP proposed in its 2020 mine plan that would have an unacceptable adverse effect on fishery areas.

EPA's interpretation of the term "fishery areas, to

include spawning and breeding areas," again, is the best reading of the statute.

Turning to my third point, the record fully supports EPA's determination that PLP's proposed discharges to the waters of the United States will have an unacceptable adverse effect on salmon fishery areas.

First, EPA applied the correct standard. The Clean Water Act does not define unacceptable adverse effects. But by using the flexible term "unacceptable," Congress authorized EPA to use both its discretion and its expertise in making that determination.

As the Supreme Court has recently held in *Loper Bright*, the Court must respect that discretionary authority while ensuring EPA exercises its discretion consistent with the APA.

Now, under EPA's longstanding regulations, unacceptable adverse effect means an impact on an aquatic or wetland ecosystem which is likely to result in significant loss or damage to fishery areas. EPA has also described this loss as one an ecosystem cannot afford.

And I would also note in *Loper*, the Supreme Court made clear that courts can and should rely on longstanding agency interpretation in discerning the meaning of statutory language. Certainly the Court can rely on EPA's definition of unacceptable adverse effects.

Here, EPA's exercise of its discretion in determining that PLP's proposed discharges amount to an unacceptable adverse effect is consistent with the requirements of *Loper Bright* and in the Ninth Circuit's decision in *Waterkeeper versus EPA*, which PLP cites in its reply. In *Waterkeeper*, the Court explained that EPA's discretion in determining what is appropriate under another Clean Water Act section is bound by the statute's substantive requirements and the APA.

And here, EPA's exercise of its discretion in determining what effects are unacceptable is consistent with the Clean Water Act's substantive requirements that the agency regulate discharges to protect fishery areas, including spawning and breeding areas. And it's based on EPA's reasoned evaluation that the adverse effects caused by the magnitude of the discharges proposed by PLP.

EPA made this determination after an exhaustive study of the relevant aquatic resources, PLP's data, its description of its discharges, the State of Alaska's identification of important salmon stream, and the scientific literature demonstrating the unique ecological connection between habitat -- maintaining habitat diversity and sustaining the diversity and abundance of salmon populations, which is referred to as the portfolio effect, not the portfolio theory, as my colleague referred.

Now, I would like to explain this in a bit more

detail. So the Pebble Deposit overlays three watersheds: The SFK, the NFK, and the UTC. Now, the record demonstrates that these watersheds are known to support discrete populations of sockeye salmon. Those salmon are genetically primed to return to the streams of their birth to spawn.

EPA cited studies showing that sockeye that use waters approximately six-tenths of a mile apart exhibit different physical, behavioral and genetic traits, demonstrating that although they are geographically proximate, the sockeye in these waters constitute distinct populations.

EPA also cited current research indicating that the three watersheds, SFK, NFK and UTC, also support discrete populations of coho and Chinook salmon that are similarly genetically primed to return to the streams of their birth to spawn.

Now, coho and Chinook salmon are the rarest species of wild Pacific salmon, and are particularly vulnerable to losses of discrete populations. For instance, EPA described the State's concern about recent declines in Chinook salmon populations in the Nushagak River watershed, which includes the NFK and SFK. And these concerns underscore the importance of avoiding large-scale impacts to Chinook salmon habitat, which is just what PLP proposed here.

Now, PLP proposed destroying 8.5 miles of stream where Chinook salmon spawn and rear. And I just want to clarify. So

the EPA relied on the State's Anadromous Water Catalogue to identify the streams where salmon spawn and rear, and the State defines rearing as really where once -- so spawning is once the eggs are fertilized, and then rearing is where those eggs develop and then grow and where juvenile salmon grow over winter.

And so in PLP's reply brief, they try to make the distinction, well, the statute doesn't use the word "rear," so that couldn't possibly mean that Congress intended to protect waters where salmon rear. Again, that's somewhat illogical because in order to protect adult fish, you must protect them at every stage of their lifecycle.

So I'll return back to the 8.5 miles of salmon stream that PLP proposed to destroy. And this loss would be -- is really unprecedented or is unprecedented in the State of Alaska or -- in the District of Alaska's 404 program.

And EPA explained why this loss will result in long-term adverse effects on salmon population in the NFK watershed. And the NFK is where that 8.5 miles of stream is that they sought to fill, and that's because the 8.5 miles of stream will be lost forever. The salmon that are -- the adult salmon that are currently in the ocean that would plan to return there to spawn can never return, and future generations can never return to those streams to spawn and rear.

The science demonstrates that these waters are not

fungible because the discrete populations in the relevant watersheds are genetically, phenotypically and behaviorally distinct from those in nearby habitats.

Now, counsel for PLP referred to the genetic differences, but the portfolio effect is more than just the genetic differences. That's one component. It's also the phenotypic, which is sort of the physical characteristics of these salmon and how they behave, which includes when they return to spawn.

In addition to the 8.5 miles of salmon stream PLP proposed to permanently destroy, it also proposed to permanently destroy 91 miles of non-salmon stream and over 2,100 acres of wetland and other waters. As a result of those discharges, none of those aquatic resources would be available to provide ecological subsidies downstream, so that would be nutrients, flow, temperature regulation, which is very important for salmon spawning, and predator refuge.

Finally, EPA reasonably explained why changes in stream flow beyond 20 percent of the monthly average, a number that's well accepted by the scientific consensus, will degrade fishery areas.

PLP complains that EPA did not use its preferred model when it calculated those stream flow changes, but EPA explained its decision and is entitled to deference when it makes such a choice based on its technical expertise. The record fully

supports EPA's determination that the destruction and damage to the waters of the United States at the magnitude PLP proposed threatens the stability and resilience of specific salmon populations in these fishery areas.

The EPA's findings in this regard are not speculative. First, EPA didn't theorize about the lengths of stream and the acres of wetlands that would be destroyed. PLP proposed them in its mine plan. And the portfolio effect, again, it is not a theory. It's been demonstrated in scientific studies of watersheds within the Bristol Bay watershed. It's also evidenced by the fact that the State uses a genetic policy to protect its own unique genetic stocks.

Contrary to PLP's claim, EPA need not demonstrate with absolute certainty that the adverse effects will occur. Instead, consistent with its longstanding regulations, EPA must provide a rational explanation for its prediction that the effects are reasonably likely.

As Your Honor mentioned, in *Seven County* the Supreme Court has stated it's black letter administrative law that when an agency makes predictive or scientific judgment, a reviewing court must be its most deferential. Now, notably, the State is not challenging EPA's record on its ecological findings or EPA's methodology.

Now, PLP disingenuously states that the final determination presents only 27 spawning fish, but EPA rebutted

this absurd assertion in the record. EPA explained that 27 fish was an undercount, and that's because it was obtained using an aerial survey during a limited time period. In the record, EPA explained that while aerial surveys may be useful for specific purposes, they are not intended to be a census.

For instance, EPA cited an aerial survey of Chinook in the Kenai Peninsula conducted over a five-year period which counted only 5 to 10 percent of the fish documented by a concurrent sonar weir station. Additionally, other studies show that aerial surveys capture only an average of 18 percent of a population.

PLP also identified hundreds of juvenile salmon in the 8.5 miles of stream it sought to fill, and that was also likely an undercount. Destruction of 8.5 miles of stream would not only result in salmon mortality that currently inhabit those streams, but it would also degrade downstream waters that are undisputedly salmon-spawning and rearing habitats.

PLP contends that because thousands of salmon or millions of salmon are harvested from Bristol Bay each year, the loss of spawning and rearing salmon at significantly smaller levels in the watersheds where it proposed discharges couldn't have an adverse effect. PLP is wrong on several grounds.

First, the harvest of adult salmon from Bristol Bay is not comparable to the destruction of headwater salmon streams.

It's like comparing the effect of picking apples to cutting down trees and paving the orchard.

Second, EPA explained why the whole Bristol Bay watershed was not the appropriate scale to analyze adverse effects of the proposed discharges. EPA explained that it is well accepted within the scientific community that an effects analysis should be done at the scale spatially relevant to the impacted resource.

So here, as I described, the SFK, NFK and UTC watersheds drain the Pebble Deposit, and those watersheds contain the waters PLP sought to fill. So those watersheds are the appropriate scale to analyze the effects of the proposed discharges.

And I think an analogy might help demonstrate this point. So imagine the City of Juneau is considering shutting down one of its six elementary schools and wants to determine the effect of that closure on class size. It would be unreasonable to evaluate the number of students at schools across the southeastern portion of Alaska and then conclude there would be no effect by the closure.

Rather, the proper scale of the analysis would be to evaluate the number of students in the schools of the Juneau School District because the remaining elementary schools would be the ones that would be directly affected by the closure. And the same is true here.

Additionally, EPA's selection of scale is supported by reason and record, but this Court must also defer to the agency here where admitted technical judgment is within its area of expertise.

I would also like to note that EPA's findings are consistent with Fish and Wildlife services and the National Marine Fishery Services' positions that the discharges proposed by PLP in its 2020 mine plan will have a serious adverse impact on fish habitat, and they recommended that the Corps not permit the discharges.

I would also like to note that the Corps ultimately did conclude that the discharges proposed in the 2020 mine plan would result in the significant degradation of waters of the United States, and that's why it ultimately denied the permit.

Now --

THE COURT: Denied the permit because EPA had issued the final determination.

MS. BROWN: I'm sorry. The first time it denied the permit. The first time it denied the permit, you're right, Your Honor, and then it was appealed. And then after it came down from appeal, because the final determination had been issued, it was denied again.

With respect to the FEIS, the Corps' final environmental impact statement, EPA explained in the record it devotes an entire appendix to the final determination why it

agreed with certain positions or statements the Corps had made in that document and, in particular, it disagreed on the scale.

And that was significant because, as I described, if you're viewing the effects at the wrong scale, it can certainly either overestimate or underestimate the impacts. And EPA explained in the FEIS process, as well as in the final determination, why its position was that the Corps was doing the analysis at the wrong scale.

And ultimately, the fact that the Corps and EPA may have disagreed on certain elements of that analysis does not render EPA's determination unreasonable. The whole reason Congress gave EPA authority under 404(c) is that it expected their might be an occasion where EPA and the Corps would disagree, and it determined that EPA gets the last word based on its expertise in environmental matters.

Turning to my fourth point, EPA properly considered secondary effects. I want to begin by being clear that Section 404(c) requires EPA to evaluate whether discharges will have an unacceptable adverse effect on fishery areas. The statute does not distinguish direct and secondary effects. The term "secondary effects" comes from Clean Water Act Section 404(b)(1) regulations which identify the factors that the Corps and EPA must consider when evaluating the effects of proposed discharges in connection with the Clean Water Act Section 404 permit.

Now, those regulations define secondary effects as the effects on an aquatic resource that are associated with the discharge of dredged or fill material but do not result from the actual placement.

Now, regulations provide examples of secondary effects, and they include the effect of fluctuating water levels downstream associated with the operation of a dam and the effect of surface runoff from developments on fill.

And these examples are directly analogous to the secondary effects EPA considered here. First, for example, PLP proposed to build a wastewater -- a water treatment facility on top of fill. Now, the operation of that water treatment facility would be similar to that of a dam, and it would release significant amounts of water downstream degrading salmon habitat.

Another example, PLP proposed to construct the open mine on fill material, but because that area is very wet, they would need to remove water from the surrounding areas, which would dewater, take water out of the surrounding streams and wetlands.

The Corps is required to consider these effects in a Section 404 permit application. And it's illogical and baseless for Alaska to assert that EPA cannot consider these effects in a 404(c) determination.

And I would like to note I think there was a

misstatement. The EPA considered three secondary effects with respect to its ultimate final determination, its adverse effects determination.

The citation 83067 which Mr. Connolly gave you, that lists the secondary effects the Corps considered, which included fugitive dust. The secondary effects EPA considered are at 83068, and those are just -- there are just three: dewatering; fragmentation, and that's basically when you fill right in the middle of the stream, so you're disconnecting flow, so even though the upper reach of that stream isn't filled, it's still affected; and downstream habitat degradation, which again is the loss of resources downstream caused by the fill upstream.

Finally, I would like to discuss EPA's approach to waters of the United States within the defined areas. It was eminently reasonable. In its 2020 mine plan, PLP identified waters of the United States it sought to fill. It submitted an application to the Corps. Here are the waters of the United States. We would like Clean Water Act Section 404 permit to fill.

During the 404(c) permit application process, PLP never asserted that the waters it sought to fill are not jurisdictional. It never sought an approved jurisdictional determination from the Corps, which is a method by which PLP could have been certain that the waters it identified as waters

of the United States are actually waters of the United States.

So in making the final determination, it was reasonable for EPA to rely on PLP's identification of waters of the United States in its permit application with which the Corps concurred.

I think one thing I would like to clarify is, setting aside wetlands for a moment now, there is really no dispute that these two areas, the defined area for prohibition and the defined area for restriction, contain waters of the United States.

So salmon stream is connected to a traditionally navigable water because the salmon have to get from the stream to the ocean, and all of the salmon streams, so that's -- it's also referred to as the anadromous fish stream in the final determination are perennial streams connected to a traditional navigable water.

In addition, of the 91 miles of nonanadromous fish stream that Pebble sought to fill, 77 linear feet of that were perennial. What is -- I don't think there is any question that those streams are waters of the United States.

EPA's statements in the brief are consistent with EPA's comments in the record. You heard about EPA's response to comments. And there EPA explained that it had relied on PLP's identification of waters of the United States in its permit application, but it also cited independent evidence,

which I just described to Your Honor, of why it also agreed that those are waters of the United States.

Now, citing *Sackett*, Alaska argues that EPA has the burden of proving jurisdiction. I would like to first note that *Sackett* postdates the final determination, so it's not discussed in the record. But *Sackett* didn't address which party bears the burden of proving jurisdiction. It also didn't address EPA's Section 404(c) authority. So it really is irrelevant for today's proceeding.

I just want to make clear that to the extent PLP or any other mining company seeks to discharge dredged or fill material into waters of the United States, the definition of waters of the United States that is in effect at that time will apply.

I think another point I would like to make is there is nothing in the statute that requires EPA to go out and identify every specific length of the waters of the United States within the defined area. The statute requires EPA to identify defined area where it is prohibiting the disposal or specification of dredged or fill material.

Now, the statute distinguishes between the defined area that EPA must identify and disposal sites. So disposal sites are the areas -- the portions of waters of the United States that the Corps will specify as the area where you can dispose of dredged or fill material.

So there is really -- to the extent a party is unsure if a water of the United States -- or if a water is a water of the United States and is subject to the final determination, they can seek an approved jurisdictional determination from the Corps. That is how the 404 process works.

A party, if it identifies that a water of the United States it seeks to fill, it goes to the Corps, it identifies that water. The Corps can approve, say yes, you're right, or it could say no, you're wrong, you don't need a permit. But that is the same process here. There is nothing that requires EPA in Section 404(c) to go above and beyond what the Corps would do if a permit application were before it.

THE COURT: All right.

MS. BROWN: Any questions?

THE COURT: Not at this time. Thank you.

MS. BROWN: I'll turn it over to my colleague. Thank you.

THE COURT: All right.

MR. LUNA: May it please the Court, Your Honor, my name is Al Luna. And I will first and primarily focus on EPA's economic analysis and will end by briefly addressing compensatory mitigation, major questions doctrine and nondelegation. But I can answer any of the Court's questions regarding these last three, to the extent it still has any.

One theme connects these remaining arguments to the

ones Your Honor just heard, and that is that EPA's action here presents a standard APA record review case.  As you've already heard and will continue to hear, EPA articulated a rational connection between the facts in the record and the decision it made.  EPA met its burden, and this Court should therefore uphold EPA's action here.

Plaintiffs' argument attempt to recast a 404(c) determination singularly focused on the 2020 mine plan and the development of the Pebble Deposit as something more than it is, but the record and the statute only show a well reasoned and appropriately focused action.

Turning to the EPA's economic analysis, it's worth mentioning that the Supreme Court has repeatedly held that a reviewing court is at its most deferential when it comes to agency judgments within its area of expertise.  Cost analysis is a regular and recurring part of EPA's decision-making process.  We think about when EPA promulgates a significant regulation, it has to conduct an economic impact analysis of the cost and benefits of that regulation each and every time.

To that end, EPA publishes its own guidance for conducting economic analysis, and it followed that guideline in this case, along with government-wide guidance from OMB.  EPA's expert economists have decades of experience doing the same thing they did here:  Estimating cost uncertainties and nonquantified effects.

In addition, it's important to note that *Michigan v. EPA* only requires meaningful consideration of costs sufficient to support to a reasoned decision under the governing statutory standard, in this case, unacceptable adverse effects.

EPA's analysis here supported that statutory standard. While EPA concluded that both the advantages and disadvantages of its action were significant, it found that there were certain benefits that weighed in favor of determining that there still were unacceptable adverse effects.

For example, EPA concluded that its action would protect important local fisheries and that that would continue to accrue and benefit the U.S. and U.S. society over an indefinite period of time.

Now, EPA used PLP's economic assessments and numbers to analyze the economic costs of its action. In fact, EPA plugged them right into its cost report. Plaintiffs, however, take issue with EPA's discussion of uncertainties, but EPA's determinations were consistent and reasonable here.

As one example, Your Honor, you mentioned opportunity costs, and you had a discussion with PLP's counsel about how there might be a middle ground here. And that's all EPA -- that's entirely EPA's point here, that from its perspective of the U.S. societal interest it must consider, the loss of the mine's gross value is not the value of the loss to the United States because those resources that would have gone toward the

mine would instead be absorbed by other parts of the U.S. economy.

And we acknowledge that it may not result in the same level of economic return as the mining project, but regardless, it would have been irrational to assume that capital and labor that would have gone towards the Pebble Mine would go unused for the next 20 years.

As another example, copper markets, Your Honor, EPA's discussion of copper markets was reasonable. The U.S. currently produces more copper than it can process and refine. And so consequently, the U.S. lacks the capacity to refine the copper mined at the Pebble Mine.

And based on PLP's own preliminary economic assessment, all of the Pebble Mine's copper will be exported to foreign refineries, where it will become part of the global copper market. Given that, it was reasonable for EPA to assume that the economic benefits of the Pebble Mine's copper should not assume, as PLP's analysis does, that all of that copper remains in the U.S. Instead, it was reasonable for EPA to assume that the share of the Pebble Mine's output that would return to and benefit the U.S. could equal the share of U.S. global demand for copper.

However, according to EPA's own analysis and methodology, that would only end up translating to meeting .2 to .3 percent of U.S. total copper demand. And here, accepting

EPA's own reasonable methodology, PLP even admits that the Pebble Mine at most could meet .6 percent of the U.S. total copper demand.

But both these estimates, Your Honor, are likely overestimates since PLP's own preliminary economic assessment in the record anticipates that 95 percent of Pebble's copper would go to Asian refineries, mainly in China. And meanwhile, the U.S. has near-shored its copper imports and gets 96 percent of its refined copper needs from Chile, Canada and Mexico, and only 4 percent from the rest of the world.

In light of this and considering that commodity prices, including copper prices, are generally more sensitive to changes in demand rather than supply in the long term, the Pebble Mine will, one, likely have very little effect on copper prices in comparison to projected increases in copper demand over the next coming decades, as plaintiffs emphasize, and, two, likely result in a much smaller societal benefit to the U.S. compared to the larger total value of the copper from the mine.

Next, Your Honor, touching on benefits now. PLP suggests that EPA counted the entire value of the Bristol Bay fishery as a benefit. That is not true. EPA has only ever sought to count as a benefit the extent to which the harm it prevents to headwaters would also prevent harm to the broader Bristol Bay watershed.

And I can point Your Honor to EPA's cost report at 0141323, where EPA states that the value of the fishery, that number is only used to characterize the significance of the fishery. But EPA's only considering avoided impacts to downstream waters to the extent it is associated with the prevention of harm to upstream headwaters.

And EPA's action would prevent harm to fisheries downstream, and that is well supported by the record. The 2020 mine plan would erode both habitat complexity and biocomplexity, most notably at the mine site, and that would in turn degrade downstream habitats and adversely affect the salmon species that support important subsistence, commercial and recreational fisheries.

EPA also pointed to scientific literature, analyzing how losses of headwater streams reduce fish population stability and increase harvest variability at downstream locations. And EPA also looked at real world examples where losses of upstream fish habitat contributed to downstream fishery declines.

Next, plaintiffs also take issue with the scope of EPA's analysis, in particular, the restriction. The restriction only applies to -- as Alaska's counsel stated, only applies to the development of the Pebble Deposit and not to any other activity that might occur in that defined area. So if a mining company wanted to develop other mineral deposits in the

defined area, this FD would not apply.

The purpose of the restriction was to account for different configurations or relocations of the 2020 mine plan to develop the same Pebble Deposit that would also result in the same level of impacts.

So EPA, therefore, reasonably determined that the cost of the restriction was likely similar to those of the prohibition because both would require similar infrastructure, labor, costs and ultimately would develop the same Pebble Deposit that contains the same minerals. This is why EPA also considered the benefits of the restriction to be similar to those of the prohibition.

In all aspects, EPA treated cost and benefits of its action consistently. So for EPA's economic analysis, Your Honor, EPA quantified and qualified the costs and benefits of its action. It analyzed uncertainties to contextualize those costs and benefits and then compared them. Ultimately, it found that both the advantages and disadvantages would be significant. However, certain factors did weigh in favor of the benefits to EPA's action.

Indeed, the fact that EPA's action would prevent the 2020 mine impacts alone is one of the most significant advantages of its action. As a result, EPA concluded, after considering costs and benefits, that there still were unacceptable adverse effects justifying its action under

404(c). And EPA's approach here was reasonable and merits this Court's deference.

Turning, Your Honor, to compensatory mitigation, EPA did not disregard it. PLP submitted two compensatory mitigation plans in 2020 to address the adverse effects, and EPA considered both of them.

With respect to the January 2020 mitigation plan which proposed salmon habitat restoration through the replacement or removal of culverts, EPA determined that because the relevant watershed -- in this case, the Koktuli River watershed -- is almost entirely roadless, it offered few, if any, opportunities to rehabilitate fishery areas by removing or replacing culverts.

THE COURT: So I thought the second proposed plan superseded/replaced the first plan?

MR. LUNA: It did, Your Honor.

THE COURT: So why do I need to even consider the first plan?

MR. LUNA: You don't, Your Honor. The plan that's -- the current plan -- the mitigation plan that's active is the November 2020 plan.

THE COURT: All right.

MR. LUNA: And so with respect to the 2020 mitigation plan, it focused entirely on preservation of land downstream of the mine site. EPA found, however, that it did not meet the

definition of preservation in the regulations because PLP's proposed mine itself would permanently degrade these same areas. In other words --

THE COURT: I understood your point in the briefing on that.

MR. LUNA: Thank you, Your Honor.

Moving to major questions doctrine. As for the major questions doctrine, plaintiffs' argument fail at the threshold because the major questions doctrine is a tool of statutory interpretation that courts apply to help them figure out when a statute -- what a statute means in cases involving transformative or novel claims of statutory authority derived from modest or ancillary language.

Plaintiffs here do not dispute that EPA's action is almost a word-for-word recitation of the statutory language. Instead, plaintiffs continue to focus on this incorrect notion that EPA is claiming jurisdiction beyond waters of the United States, which it is not, and plaintiffs simply offer no textual interpretation for the major questions doctrine to resolve, and that defect is fatal to their claim.

Lastly, Your Honor, the Alaska Native corporations' main argument is that decisions committed to agency discretion present a constitutional nondelegation problem. But as we explained in our brief, the Supreme Court has already addressed and answered this issue by holding that an agency's discretion

to act or not act is presumptively unreviewable.

This is a foundational doctrine of administrative law and is derived from the Constitution which charges the executive to take care that the laws be faithfully executed, including such cases as to whether to initiate proceedings in the first place.

Otherwise, as explained in our brief, Your Honor, Section 404(c) and the Clean Water Act generally provide the necessary policy, standards and boundaries to satisfy the Supreme Court's intelligible principle test for an acceptable delegation of authority. And I would just like to highlight those boundaries.

For EPA to act, there must be a discharge of dredged or fill material into waters of the United States at a defined disposal site that will cause unacceptable adverse effects to certain enumerated resources after notice opportunity for public hearing, consultation with the Corps and written public findings.

In conclusion, Your Honor, we ask that you uphold EPA's decision here because at every step of the way, the agency articulated a rational connection between the facts in the record and the decisions it made. At bottom, this is a standard APA record review case, and EPA's action here was well supported and well reasoned.

Simply put, EPA has met its burden under the APA's

highly deferential review, and the law calls for EPA's action to be upheld.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Luna.

MR. VAN TUYN: May it please the Court. Peter Van Tuyn. I represent Bristol Bay Native Corporation in this matter. With me at counsel table is James Feldman, who represents Bristol Bay Economic Development Corporation. And we appear today on behalf of all defendant-intervenors.

Out of concern for the potential impacts of mining the Pebble Deposit on salmon and the subsistence multibillion-dollar commercial fishery and sport fishing economies that they support, the tribes and other defendant-intervenors filed petitions 16 years ago that started EPA on the road to this final determination. They were also engaged throughout the agency's 13-year administrative process.

The protection of Bristol Bay's salmon-rich waters from the proposed Pebble Mine is among the most studied environmental issues ever undertaken by the agency, and, to our knowledge, no EPA issue has had more engagement from the public. It is also a rare issue on which multiple Democratic and Republican administrations have been in agreement.

EPA came to the right decision, and we stand with the agency because its decision is critical to ensuring a continued healthy and diverse Bristol Bay.

In my time, I'll focus on the fishery area issue, the scale issue, and then I'll provide some record cites and precedent to rebut some of the points that the plaintiffs made.

Pebble attacks the EPA authority on the fishery area issue because it says that they should not focus on waters where fish are not actively caught. You already heard from EPA about how the language of 404(c) extends to spawning and breeding areas. And with this language choice, Congress acknowledges that fish may use different habitats throughout their lives and that these habitats are relevant when evaluating whether discharges will have unacceptable adverse effects. And as the record documents, these biologically complex headwater streams provide incredible salmon habitat.

Further, EPA's textual and science-based approach to the meaning of "fishery area" is consistent with that used by the State in Bristol Bay. For example, the State includes Bristol Bay uplands in the Bristol Bay fisheries reserve.

Additionally, it selected these lands because they provide key habitat for an important subsistence fishery, a multimillion, now multibillion-dollar commercial salmon fishery, and a sport fishery that is unequaled in quality anywhere in Alaska. 272206 is the cite for that, Your Honor.

For its part, Pebble points to the dictionary meaning of "fishery" and the *Sackett* case to argue that EPA cannot focus on areas where fish are not caught. Pebble's reliance on

*Sackett*, however, actually undercuts its argument.

In *Sackett*, the Supreme Court specifically rejected using the dictionary to define a key term having to do with the jurisdictional reach of the Clean Water Act. Focusing instead on context, the Court rejected as implausible an expansive reading of the term at issue because it was located in an obscure Clean Water Act provision, and, per the Court, Congress does not hide elephants in mouse holes.

In our case, the relevant language is hardly in a mouse hole; it is directly in 404(c). And given the close biological relationship between waters where salmon are caught and waters where salmon spawn and breed, it would be equally implausible to find that Congress precluded EPA from focusing on headwaters that are so important to Bristol Bay's remarkable salmon runs.

In short, in line with *Loper Bright*, EPA's approach to fishery areas follows the clear authority bestowed upon EPA by Congress in Section 404(c), and it should be upheld.

Turning to my second point, and this is an example of all of the various elements in the unacceptable adverse effect findings, Pebble's proposed mine plan would destroy, as we've already discussed, eight and a half miles of salmon streams in Bristol Bay headwaters.

EPA studied the facts and the science in relation to these headwater streams. And in doing so, it found that these

waters are ecologically valuable, and their destruction would result in fish displacement, injury and mortality, as well as the permanent removal of stream flow and spawning habitat, with other effects cascading from those losses.

THE COURT: And where are you reading from there?

MR. VAN TUYN: I'll give you four record cites that support that, Your Honor. The first one is 83074, and that has to do with the prohibition in the North Fork Koktuli. The second cite I'll give you is 83088, and that has to do with the restriction. And then two other cites that are also in the record, 82943 and 83132.

THE COURT: Thank you.

MR. VAN TUYN: Pebble asserts that EPA failed to grapple with evidence that contradicts this finding, including its plainly silly proposition that only 27 coho salmon would be affected by its mine. This proposition is rejected by analysis and evidence throughout the record.

I'll give you two cites to start with: 92560, which is the essential fish habitat assessment; 95026, which comes from the Corps EIS. And as you've already heard from EPA, there is the discussion about the EIS that's at 83287, and then defects in the aerial survey methods, and that's at 83030.

Pebble argues that EPA used an arbitrarily small geographic scale to determine effects. As the record shows, however, EPA was thorough and objective in its approach to

scale. It solicited and analyzed relevant data on this point from the Corps, other federal and state expert agencies, Pebble and the public.

This information can be found in the main body of the final determination, its detailed discussion of aquatic habitats and fish, its EIS discussion, and in a formal and I'll say lengthy response to comments. And I'll give you those cites as well, Your Honor. 83072 and 83088 for the final determination. 83254 to 59 for its Appendix B in the final determination. 83291 for the discussion of the EIS. And the response to comments is 83850.

As this record shows, EPA identified the issue of geographic scale as essential to its assessment of effects and critical to capturing meaningful biological and ecological patterns. EPA rationally described the chosen scale as including all waters under the mine footprint and extending downstream as far as effects can be measured or reasonably be expected to have ecological consequences.

In making this choice, EPA described how Bristol Bay's headwater salmon habitats are not interchangeable across different scales and that using a different scale would obscure that fact. EPA's choice of scale was thus not arbitrary and capricious and is one to which the Court should defer.

In its argument, Pebble misrepresents the Corps of Engineers' Section 404 permit denial administrative appeal.

That's the first denial, Your Honor.

The Corps review officer in that matter said that the Corps' use of the smaller scale to support its analysis is fine so long as its use is rationally explained in the record. The review officer explicitly did not reject the Corps' approach but rather told the Corps that it should more fully explain its choice of scale between the EIS and the record of decision. This is at 171 -- Docket No. 171-8 at page 23.

As discussed here today, EPA's reasoning, in contrast to the Corps that -- for the review officer, is apparent, precise and based on record data and thus meets the required standard.

And moreover, big picture, Your Honor, the very existence, as you already heard, of 404(c) shows that Congress understood that the Corps and EPA may not always agree, and it gave the Corps the upper hand in that matter.

I'll give you now some record cites relating to some of the issues that came up earlier, record cites and precedent.

First, the plaintiffs tried to distinguish *Seven County* as a NEPA case. So I'll quote you from that case. "Black letter administrative law instructs that when an agency makes the kinds of speculative assessments or predictive or scientific judgments and decides what qualifies as significant or feasible or the like," unacceptable here, "a reviewing court must be at its most deferential."

It cites three cases for that proposition. The first two, *Baltimore Gas and Electric* and *Marsh*, are no doubt NEPA cases, Your Honor. The third one is *State Farm*. It is not a NEPA case. It's a National Transportation Safety case. It had to do with airbags. And the point is it's the Administrative Procedures Act and not NEPA or, in our case, the Clean Water Act that provides these standards.

Turning to the waters of the U.S. issue, Your Honor, and the approved or preliminary jurisdictional determination. The *Hawkes* case at 578 U.S. 597 to 98, and the regulatory guidance letter from the Corps, 16-01, talks to that issue about how the PJD, the preliminary jurisdictional determination, relates to the approved jurisdictional determination and backs up perfectly what EPA did in this case.

And then I'll point out that at record cite 8615 [sic], the EPA provides a number of sources that support its position about the source of waters of the U.S. and the defined areas for the prohibition and the restriction.

And the record, it shows -- this is one example, Your Honor. This is Figure 4-8 at 83090. It shows the wetlands and the streams and the rivers in the prohibition area, and it's replete with waters of the U.S., Your Honor. It's not a factual matter that's in dispute.

My last point on the record, Your Honor, will be related to the economic issue. What we heard from Pebble is

that they -- the money that they stand -- that is at issue here is not speculative, and they pointed to the eyes of the SEC to support that point.

So let's go to the SEC. I have here the financial report that Northern Dynasty Minerals submitted this year to the SEC, and I'm going to quote from it: "The Pebble Partnership's mineral property interests do not contain any known body of economic mineralization." That's from the management discussion and analysis, unequivocal.

In closing, it has been 16 years since Bristol Bay tribes, BBNC, and others petitioned the EPA to use its 404(c) authority to address the risks of Pebble. Their concerns were confirmed through the agency's process, which included a rigorous 13 years of science and deep engagement with Pebble, the State, Bristol Bay residents, and the general public, and would span four federal administrations.

In the end, EPA's final determination is a reasoned decision narrowly tailored to a legitimate national interest, rolled out in our uniquely American way, with astounding due process and a piercing focus on science and facts. The 404(c) is fully compliant with the Administrative Procedures Act, the Clean Water Act and all other laws, and the Court should uphold it in all respects.

Thank you very much.

THE COURT: Thank you.

All right. Briefly, Mr. Bradley, go ahead, please.

MR. BRADLEY: So I will try to be brief and swift because there's a lot to talk about.

First thing I'll take on, though, is that SEC filing. That's just a misunderstanding of a technical term. There are indeed no known bodies. There are measured, indicated and inferred that just has, you know -- so certainly, the company was not representing that its plans are speculative or uncertain in the way that was suggested.

The -- I told you that EPA used a reasonably likely standard. They stood up here and agreed that that is the standard that they used. That's not what the statute says.

There is a lot of invocation of the deference to the predictive judgment of the agency, but it depends what they are predicting. If they are not answering the question that Congress asked, it doesn't matter.

We have talked a lot about what are fisheries, and the notion is that Congress must have wanted to protect the upstream areas. Congress wrote the statute that it wrote. This mode of interpreting and including clause of the parenthetical is squarely contradictory to the *Chickasaw Nation* case that we discussed in the brief.

And no one is suggesting that impacts on an upstream area are irrelevant. Of course, you can --

THE COURT: But is your position I should read

spawning and breeding out of the statute?

MR. BRADLEY: No. I think that they are included to the extent that they are fishery areas. But even if they were clearly never fishery areas, *Chickasaw Nation* tells you that you do have to ignore it in a parenthetical. That's what the Supreme Court says.

THE COURT: All right.

MR. BRADLEY: But the position has never been that you have to ignore impacts that are happening in upstream areas. The question is: Do they have an unacceptable adverse effect on the fishery area? The answer to that is no.

And I told you that the EPA had never disavowed the finding that there will be no measurable impact on fish populations in Bristol Bay. We just heard nearly an hour of discussion, and no one disavowed that finding.

The company has also never claimed that there are only 27 fish at issue. The point is that there are only 27 known to spawn in the area. And for the portfolio effect, spawning is what matters. There has never been a suggestion that salmon only ever rear or wander to the place where they reared or wandered or were spawned before.

The EPA told you that there is degradation of downstream waters from the water treatment plant. I just want to be very clear. This is clear in the record. But there are -- this is not a discharge of dirty water or contaminated

water. What they are talking about is that there is a discharge of water that they consider to be too much discharge, right? It's the streamflow effect. It's just the streamflow effect.

And, yes, the EPA dislikes the model that the company used. As we pointed out with citations to cases, you cannot reject some evidence in favor of nothing.

I pointed out to you also the Ninth Circuit case saying that you have to -- when the something, you know, the Richter is challenged, the agency must provide an analytical defense. They did not. They simply asserted that it is this way because we said so.

We heard about *Loper Bright*. You're probably familiar with that case.

THE COURT: It's been cited once or twice.

MR. BRADLEY: Yes. It is remarkable, but I do get it from DOJ a lot to hear that *Loper Bright* was somehow a case that created an additional layer of deference to agencies. I think they are referring to Footnote 4 which says that there are certain special statutes.

The Fair Labor Standards Act definition of "employee" is one example where there might be a situation where Congress actually did give an agency authority to interpret. There is no sign that this is one of those.

The *Waterkeeper* case that we cited says, yes, when

there is some deferential decision to make, the agency gets deference, of course. But the Court sets the boundaries by interpreting the statute. Same here.

Ms. Brown confused me, to be honest, about what the restriction means, so I'm going to go back to what the restriction says. And this is 82958.

This is -- Your Honor, you asked about is it any of the four or all of the four? What is it?

THE COURT: Right.

MR. BRADLEY: What it says is, "Proposals to discharge that result in any one of these losses will be subject to the restriction." I do not read that to mean that you're only subject if you cause all four. It says any one of them.

THE COURT: All right.

MR. BRADLEY: There was a lot of talk about sockeye diversity. Of course, there is no sockeye spawning in these streams.

I should point, by the way -- actually, I digress a little bit. But about the use of aerial surveys, et cetera, again, nobody else has gone to look. But in 1.200, as the brief explains, it was not an aerial survey. The company went out, and I want to say stood in the stream, but I don't know how to do this kind of survey, but they -- it was not aerial. It was a survey in the stream, and how many spawning salmon it found was zero.

But we have heard about sockeye diversity. There is no sockeye spawning in these streams. The study that is being referred to was at the scale of thousands of salmon in a different species, and the scale at which in the record, as we cited in our briefs, at which diversity has been studied other than that is at the hundreds of kilometers.

A couple -- I'm nearly done. I want to provide you a couple of citations for things that I left -- case citations of stuff that we left undiscussed.

You brought up the fact that this is -- we're disputing a 45-year-old regulation. I want to assure you that that's not a problem. So the Ninth Circuit case for that is *Wind River Mining versus United States*. That's 946 F.2d 710.

THE COURT: All right.

MR. BRADLEY: I -- you asked about cases from the Ninth Circuit about the idea that inconsistent analysis is inappropriate, and I gave you the wrong Ninth Circuit case. The right one is actually *Organized Village of Kake versus USDA*. That's 795 F.3d 956 at 966.

And then my -- I think actually, finally, my -- well, my next to last is regarding waters of the United -- regarding whether this prohibits mining, there is a misunderstanding. It is the least environmentally damaging way to do this. The company spent years thinking about where in the area -- if you're going to mine in this area, you have got to put the

stuff somewhere, where can you put it to be the least damaging? And where it is right now is the least damaging place to be able to put it. That finding is also in the record. That's what the Army Corps found. It's at 91314 and 128966.

And PLP told EPA that this is the least damaging. If this is what is not good enough in the worst streams, we can't mine, there is not a finding that you could mine. There is no denying or disputing of that assertion in the record. It's simply a "we don't care," it seems to me.

THE COURT: So your point is, in your view, it's effectively prohibited?

MR. BRADLEY: Correct. That's correct.

Finally, and then last two -- two more points. About the no refining capacity, of course, what EPA is talking about about the percentage of copper that comes in or doesn't come in actually involves a math error in their determination, which is discussed in the brief. They acknowledge the math error.

THE COURT: Right.

MR. BRADLEY: But the fact that it is exported, I don't think it's a bad thing for the United States to export. Two-thirds of the salmon is exported. Nobody thinks of that as a bad thing. Half a percent of something as large as the U.S. copper market is vast. Half a percent of the U.S. population is only half a percent, but that's a lot of people.

You heard the government assert that demand has more

effect on prices than supply in the long term. That is an assertion with no basis in the record. We pointed this out in the briefs, studies about short-term effects.

And then truly, my last thing is to go back to this question about the preliminary jurisdictional determination. I'm going to quote to you -- I'm going to read to you from the response to comments. This is at 83616: "EPA agrees... that PJD... is not considered determinative of CWA jurisdictional status."

That's what they said in the decision. It's not what they are saying now, but that's what the decision said.

EPA, however, does not rely on USACE's determinations in the PJD. I don't know how the company was supposed to know in the face of that that it was very important for the company to dispute the PJD in this process.

THE COURT: All right. Thank you.

Mr. Connolly, go ahead, please.

MR. CONNOLLY: Just a very few quick points. I'm going to start with secondary effects.

So EPA focuses on the regulations. They say the regulations require this. Two problems with this. First, the regulations don't actually say you should do this. This is 40 CFR 231.2. All it says is that the relevant portions of the 404(b)(1) guidelines should be considered.

I would argue that these are not relevant portions

because 404(c) does not allow for secondary effects to be considered. However, even if the Court reads the regulation the same way as EPA does, a regulation cannot trump the statute. And so the regulation, in the end, really doesn't matter.

Second, the Corps says that it would be illogical -- I'm sorry. The EPA says that it would be illogical for the Corps in Section 404(a) to be able to consider secondary effects but not for the EPA to be able to consider it in Section 404(c).

Two responses to this. First, it's not illogical because the statute says so. The Corps in Section 404(b) is told to rely on EPA's 404(b)(1) guidelines. That is a far broader inquiry that was developed through regulations. Section 404(c) does not say the same thing. All it says is discharges into waters of the United States. That's it.

Second, as a practical matter, thinking about it broadly, it's not illogical. The Corps is the first line of review here. The Corps has a broader mandate when it's deciding whether to give a permit. The EPA, through Section 404(c), is the last ditch backstop, and all it looks at is discharges into waters of the United States and whether those will have certain harmful environmental effects.

So it is not illogical at all to think that Congress would have wanted to not give EPA the type of broad inquiries

that it gave to the Corps.

Third, there is an issue about whether fugitive dust was considered. I would point the Court to page 83155, but in the end, the key point is that there is no dispute that dewatering and fragmentation were key parts of the analysis. I would point the Court to 83068, 82973 and 83112 for when the EPA is discussing dewatering and fragmentation. And then I would also point the Court to 82954, which is when the EPA says, "We are relying on secondary effects to determine -- secondary effects caused the loss of streams and wetlands." That's where they say that.

In the end, the biggest problem they have is compare what they say about secondary effects to what the statute says. And I want to read it again because secondary effects, they define them as effects that are associated with the discharge of dredged or fill material but do not result from the actual placement of this material, 83068. And when you compare that to their statutory mandate and 404(c), they are totally incompatible.

On the waters of the United States issue, EPA says that there is no dispute that there is waters of the United States on these properties. Even if you accept that, that doesn't get them to where they need to be because EPA says the placement of fill material is going to directly cause the loss of wetlands and streams.

But in order to say that, EPA needs to actually say that those wetlands and those streams are waters of the United States. That's the only statutory authority they have to look at. And so the fact that even if you accept this, that there are waters of the United States somewhere within the prohibition or somewhere within the restriction, doesn't matter.

Last point on within the waters of the United States, if you look at the maps, the maps do define wetlands. They do show streams, but they never say "and they are waters of the United States." They never say that.

Last on the defined area, I think we have the better textual interpretation for the reason I gave in my opening. The last thing I would say is EPA didn't come up and give you a single example of where they have done this before, where they have drawn a big circle around land and said wherever the waters of the United States are, that's where the defined area as a disposal site is. They have never done that. I have never seen an example. I think that's a big indication that they have totally stepped outside of their statutory authority.

THE COURT: Thank you. Very last word, anything to add?

MR. WAKE: We still have not heard anything here about a general policy speaking to the whether to act issue. It really bears emphasis that we're not calling into question all

matters committed to agency discretion under 701 of the APA.

We're only calling into question delegations of unfettered discretion for which Congress has provided no general policy. Our arguments do not hinge on the existence of 701(a) of the APA, and I think EPA misunderstands our nondelegation argument.

There is a world of difference between EPA having unreviewable discretion under the statute and the question of whether the statute itself is subject to law. The statute itself is subject to the Constitution. The nondelegation doctrine establishes a framework for you to establish that. So we're not calling into question APA's reviewability provisions.

And I want to say I still heard no boundaries. They reject categorically any temporal limits, any geographic limits and any substantive limits. Notice of comment certainly is not a substantive limit.

That is all, Your Honor.

THE COURT: Thank you, all. Very thorough briefing and arguments today. I will take the matter under advisement and hope to get you something out on this in the near term.

We'll go off record at this time.

(Proceedings concluded at 3:59 p.m.)

CERTIFICATE

I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Columbia, do hereby certify that the foregoing transcript is a true and accurate transcript from the original stenographic record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 26th day of June, 2026.

/s/ Sonja L. Reeves
SONJA L. REEVES, RDR-CRR
FEDERAL OFFICIAL COURT REPORTER

## /

**/s** [1] - 85:8

## 0

**0141323** [1] - 61:2

## 1

**1** [1] - 8:17
**1.200** [1] - 77:20
**10** [1] - 48:8
**10,000** [1] - 9:25
**1000** [1] - 2:24
**1031** [1] - 2:11
**1134** [1] - 18:15
**128966** [1] - 79:4
**1290** [1] - 2:14
**13** [3] - 7:23, 29:25, 73:14
**13-year** [1] - 66:16
**15** [1] - 35:20
**15401** [1] - 25:15
**15404** [1] - 25:15
**16** [2] - 66:14, 73:10
**16-01** [1] - 72:11
**1600** [1] - 2:8
**171** [1] - 71:8
**171-8** [1] - 71:8
**17th** [1] - 2:3
**18** [1] - 48:10
**1825** [1] - 2:3
**1979** [1] - 7:19
**1:31** [2] - 1:23, 3:1

## 2

**2** [1] - 59:24
**2,100** [1] - 46:13
**2,108** [1] - 38:7
**20** [5] - 4:13, 9:10, 38:8, 46:19, 59:7
**200** [2] - 2:11, 2:22
**2000** [1] - 2:5
**20044** [1] - 2:19
**2014** [1] - 11:12
**2015** [1] - 18:16
**2020** [18] - 34:25, 36:20, 37:17, 38:22, 39:4, 39:18, 41:23, 50:8, 50:12, 53:16, 57:8, 61:8, 62:3, 62:22, 63:5, 63:7, 63:21, 63:23
**2026** [2] - 1:22, 85:6
**22209** [1] - 2:9
**23** [1] - 71:8
**230.11(h)** [1] - 20:24
**231.2** [1] - 80:23
**25** [1] - 1:22
**26th** [1] - 85:6
**27** [6] - 6:22, 47:25, 48:1, 69:15, 75:17
**272206** [1] - 67:22
**29** [1] - 38:8
**2:21** [1] - 35:23
**2:39** [1] - 35:23

## 3

**3** [1] - 59:25
**30** [1] - 4:11
**300** [1] - 27:10
**310** [1] - 2:22
**315** [1] - 2:24
**33** [1] - 25:6
**331.2** [1] - 25:7
**3:24-civil-59** [1] - 3:3
**3:24-cv-00059-SLG** [1] - 1:5
**3:24-cv-00084-SLG** [1] - 1:14
**3:59** [2] - 1:23, 84:22

## 4

**4** [8] - 5:23, 5:25, 6:3, 21:23, 22:3, 23:3, 60:10, 76:19
**4-8** [1] - 72:20
**4.2** [3] - 21:19, 21:24, 23:7
**4.3** [1] - 23:7
**40** [2] - 20:24, 80:23
**404** [7] - 31:14, 45:16, 51:24, 52:22, 53:19, 56:5, 70:25
**404(a** [5] - 22:9, 22:10, 28:16, 35:3, 81:8
**404(a)** [1] - 28:15
**404(b** [2] - 22:10, 81:12
**404(b)(1** [4] - 22:11, 51:22, 80:24, 81:13
**404(c** [37] - 6:25, 20:2, 21:9, 22:12, 23:17, 28:10, 28:23, 29:24, 30:7, 31:7, 31:8, 31:13, 31:16, 32:9, 33:5, 33:20, 34:7, 34:16, 36:17, 51:12, 51:18, 52:24, 53:21, 55:8, 56:11, 57:7, 65:8, 67:7, 68:18, 71:14, 73:11, 73:20, 81:1, 81:15, 81:21, 82:18
**404(c)** [4] - 26:22, 63:1, 68:10, 81:10
**41** [1] - 2:5
**43215** [1] - 2:6
**45-year-old** [1] - 78:11

## 5

**5** [1] - 48:8
**50** [1] - 39:2
**555** [1] - 2:14
**578** [1] - 72:10
**59** [1] - 70:9
**597** [1] - 72:10
**5th** [1] - 2:24

## 6

**6** [5] - 21:12, 21:13, 23:1, 23:4, 60:2

## 7

**70** [1] - 5:6
**700** [1] - 2:8
**701** [1] - 84:1
**701(a** [1] - 84:5
**710** [1] - 78:13
**717** [1] - 2:3
**76** [2] - 24:14, 26:11
**7611** [1] - 2:19
**77** [1] - 54:18
**788** [1] - 18:15
**795** [1] - 78:19

## 8

**8.5** [8] - 38:5, 44:24, 45:13, 45:19, 45:20, 46:10, 48:13, 48:14
**80202** [1] - 2:3
**82943** [1] - 69:11
**82954** [2] - 22:1, 82:8
**82958** [1] - 77:6
**82973** [1] - 82:6
**83030** [1] - 69:22
**83064** [1] - 6:6
**83067** [2] - 21:25, 53:4
**83068** [4] - 20:22, 53:7, 82:6, 82:17
**83072** [1] - 70:8
**83074** [1] - 69:7
**83088** [2] - 69:9, 70:8
**83090** [1] - 72:20
**83112** [1] - 82:6
**83132** [1] - 69:11
**83155** [1] - 82:3
**83179** [1] - 21:11
**83254** [1] - 70:9
**83287** [1] - 69:21
**83291** [1] - 70:10
**83615** [1] - 26:4
**83616** [1] - 80:7
**83850** [1] - 70:11
**85287** [1] - 24:19
**8615** [1] - 72:15
**88969** [1] - 25:4

## 9

**91** [4] - 11:4, 38:6, 46:12, 54:17
**91314** [1] - 79:4
**92560** [1] - 69:18
**946** [1] - 78:13
**95** [1] - 60:6
**95026** [1] - 69:19
**956** [1] - 78:19
**95814** [1] - 2:15
**96** [1] - 60:8
**966** [1] - 78:19
**98** [1] - 72:10
**98104** [1] - 2:25
**99501** [2] - 2:11, 2:22

## A

**ability** [2] - 40:8, 40:12
**able** [3] - 79:3, 81:8, 81:9
**above-entitled** [1] - 85:4
**absolute** [3] - 12:10, 13:6, 47:14
**absorbed** [1] - 59:1
**absurd** [1] - 48:1
**abundance** [1] - 43:22
**accept** [2] - 82:22, 83:4
**acceptable** [1] - 65:10
**accepted** [2] - 46:20, 49:6
**accepting** [2] - 31:11, 59:25
**according** [1] - 59:23
**account** [1] - 62:2
**accrue** [1] - 58:12
**accurate** [3] - 14:25, 39:7, 85:3
**acknowledge** [3] - 6:17, 59:3, 79:17
**acknowledged** [1] - 38:25
**acknowledges** [3] - 8:19, 33:4, 67:9
**acres** [3] - 38:7, 46:13, 47:7
**act** [7] - 32:13, 33:7, 33:8, 65:1, 65:13, 83:24
**Act** [28] - 6:15, 20:2, 32:1, 36:17, 37:5, 37:6, 39:9, 39:25, 40:9, 40:10, 40:18, 40:19, 40:22, 41:21, 42:8, 43:7, 51:21, 51:24, 53:19, 65:8, 68:4, 68:7, 72:6, 72:7, 73:21, 73:22, 76:21
**Act's** [2] - 41:19, 43:11
**action** [20] - 18:5, 37:10, 37:25, 38:1, 57:1, 57:6, 57:11, 58:7, 58:10, 58:15, 61:7, 62:14, 62:16, 62:20, 62:21, 62:23, 62:25, 64:14, 65:23, 66:1
**active** [1] - 63:20
**actively** [1] - 67:6
**activities** [1] - 40:16
**activity** [5] - 15:5, 15:7, 34:19, 40:2, 61:24
**actual** [6] - 5:7, 20:18, 25:2, 26:3, 52:4, 82:16
**adaptation** [2] - 9:20, 10:14
**add** [2] - 18:2, 83:22
**addition** [5] - 24:4, 36:6, 46:10, 54:17, 58:1
**additional** [2] - 21:14, 76:18
**additionally** [3] - 48:9, 50:1, 67:18
**address** [7] - 36:12, 36:15, 37:7, 55:6, 55:8, 63:5, 73:12
**addressed** [2] - 30:5, 64:24
**addressing** [2] - 36:13, 56:21
**administrations** [2] - 66:22, 73:16
**Administrative** [3] - 37:5, 72:5, 73:21
**administrative** [5] - 47:19, 65:2, 66:16, 70:25, 71:21
**administrator** [5] - 32:6, 32:16, 33:6, 34:7, 34:17
**admit** [1] - 26:7

**admits** [1] - 60:1
**admitted** [1] - 50:3
**adopt** [1] - 18:22
**adopted** [1] - 17:9
**adult** [3] - 45:11, 45:21, 48:24
**adults** [1] - 41:15
**advantages** [3] - 58:6, 62:18, 62:23
**adverse** [28] - 5:5, 7:13, 8:10, 13:8, 17:21, 37:18, 41:24, 42:5, 42:8, 42:17, 42:25, 43:3, 43:14, 45:18, 47:14, 48:22, 49:4, 50:8, 51:19, 53:2, 58:4, 58:9, 62:25, 63:5, 65:15, 67:11, 68:20, 75:10
**adversely** [1] - 61:11
**advisement** [1] - 84:19
**aerial** [8] - 48:3, 48:4, 48:6, 48:10, 69:22, 77:19, 77:21, 77:23
**affect** [1] - 61:11
**affected** [3] - 49:24, 53:11, 69:16
**affirmatively** [1] - 29:22
**afford** [1] - 42:20
**afternoon** [2] - 30:21, 36:2
**agencies** [3] - 12:4, 70:2, 76:18
**Agency** [1] - 3:4
**agency** [30] - 7:10, 10:23, 12:19, 18:4, 21:16, 25:13, 29:21, 31:19, 33:13, 33:22, 33:24, 34:11, 34:13, 35:13, 42:22, 43:11, 47:20, 50:2, 57:15, 64:22, 65:21, 66:19, 66:24, 71:21, 74:14, 76:10, 76:23, 77:1, 84:1
**AGENCY** [3] - 1:6, 1:16, 2:16
**agency's** [5] - 13:5, 15:16, 64:25, 66:16, 73:13
**ago** [2] - 10:18, 66:14
**agree** [3] - 27:23, 31:22, 71:15
**agreed** [3] - 51:1, 55:1, 74:11
**agreement** [1] - 66:22
**agrees** [1] - 13:7
**agrees..** [1] - 80:7
**ahead** [7] - 4:6, 4:20, 11:1, 20:20, 36:1, 74:1, 80:17
**airbags** [1] - 72:5
**al** [6] - 1:3, 1:6, 1:10, 1:19, 3:3, 3:5
**Al** [3] - 3:16, 36:4, 56:20
**Alaska** [21] - 2:10, 2:11, 2:22, 3:12, 8:16, 10:20, 10:21, 11:21, 15:7, 15:9, 19:22, 25:20, 29:10, 30:22, 40:11, 45:15, 49:19, 52:23, 55:3, 64:21, 67:22
**ALASKA** [4] - 1:1, 1:12, 2:7, 2:12
**Alaska's** [4] - 40:1, 43:18, 45:16, 61:22
**ALFONSO** [1] - 2:18
**allotted** [1] - 36:8
**allow** [5] - 20:1, 21:9, 22:25, 28:11, 81:1
**allowed** [10] - 14:4, 27:16, 28:21, 28:23, 29:11, 30:11, 30:12, 31:19, 35:5, 40:6
**allowing** [1] - 33:22
**allows** [2] - 8:4, 34:16
**almost** [2] - 63:11, 64:15
**alone** [2] - 32:17, 62:22
**alter** [1] - 39:24
**alteration** [1] - 38:7
**altogether** [1] - 35:16
**American** [1] - 73:19
**amount** [3] - 9:22, 38:4, 43:2
**amounts** [1] - 52:14
**anadromous** [2] - 41:2, 54:14
**Anadromous** [2] - 41:3, 45:1
**analogous** [1] - 52:9
**analogy** [3] - 9:25, 26:16, 49:14
**analyses** [1] - 22:7
**analysis** [31] - 14:13, 14:15, 14:21, 15:2, 15:25, 18:5, 20:10, 22:2, 22:22, 23:14, 36:22, 39:7, 49:7, 49:21, 51:8, 51:10, 56:21, 57:12, 57:15, 57:18, 57:21, 58:5, 59:18, 59:23, 61:21, 62:14, 69:16, 71:3, 73:9, 78:16, 82:5
**analytical** [4] - 12:19, 18:14, 76:10
**analyze** [3] - 49:4, 49:12, 58:15
**analyzed** [2] - 62:16, 70:1
**analyzing** [1] - 61:14
**Anchorage** [2] - 2:11, 2:22
**ancillary** [1] - 64:13
**Angeles** [1] - 16:25
**annoying** [1] - 32:22
**answer** [4] - 13:4, 33:9, 56:23, 75:11
**answered** [1] - 64:25
**answering** [1] - 74:15
**anticipates** [1] - 60:6
**APA** [8] - 12:7, 17:24, 42:15, 43:8, 57:2, 65:23, 84:1, 84:5
**APA's** [2] - 34:10, 65:25
**apart** [1] - 44:7
**apparent** [1] - 71:10
**appeal** [3] - 14:5, 50:21, 70:25
**appealed** [1] - 50:20
**appear** [3] - 26:7, 26:9, 66:9
**appearance** [1] - 3:6
**Appendix** [1] - 70:9
**appendix** [2] - 15:20, 50:25
**apples** [1] - 49:1
**applicable** [1] - 16:2
**application** [15] - 24:16, 24:18, 24:22, 35:5, 38:19, 40:10, 40:12, 40:18, 40:19, 52:22, 53:18, 53:21, 54:4, 54:25, 56:12
**applied** [1] - 42:7
**applies** [6] - 29:14, 30:4, 30:16, 40:3, 61:22, 61:23
**apply** [5] - 27:8, 39:10, 55:14, 62:1, 64:10
**applying** [1] - 35:12
**appreciate** [1] - 17:15
**approach** [7] - 37:22, 53:14, 63:1, 67:14, 68:16, 69:25, 71:5
**appropriate** [5] - 37:24, 40:14, 43:7, 49:4, 49:12
**appropriately** [3] - 37:20, 40:25, 57:11
**approve** [1] - 56:8
**approved** [6] - 13:21, 29:13, 53:23, 56:4, 72:9, 72:13
**aquatic** [6] - 36:22, 42:17, 43:17, 46:14, 52:2, 70:5
**AR** [2] - 6:6, 7:16
**arbitrarily** [1] - 69:23
**arbitrary** [8] - 5:2, 11:24, 13:5, 16:19, 17:19, 17:24, 18:7, 70:22
**area** [38] - 9:23, 11:7, 11:20, 20:4, 20:12, 21:5, 26:25, 27:6, 27:10, 27:20, 27:22, 27:23, 28:1, 29:1, 29:3, 34:24, 50:3, 52:17, 54:8, 54:9, 55:18, 55:19, 55:22, 55:24, 57:15, 61:24, 62:1, 67:1, 67:4, 67:15, 72:21, 74:24, 75:11, 75:18, 78:24, 78:25, 83:12, 83:17
**areas** [44] - 5:5, 7:3, 7:13, 17:21, 28:11, 36:24, 37:13, 37:14, 37:19, 37:23, 38:3, 40:4, 41:1, 41:4, 41:8, 41:11, 41:12, 41:24, 41:25, 42:1, 42:6, 42:19, 43:12, 43:13, 46:21, 47:4, 51:19, 52:18, 53:15, 54:8, 55:23, 63:12, 64:3, 67:8, 67:25, 68:17, 72:17, 74:19, 75:3, 75:4, 75:9
**argue** [2] - 67:24, 80:25
**argues** [3] - 41:8, 55:3, 69:23
**arguing** [1] - 36:7
**argument** [13] - 3:25, 13:15, 13:23, 14:7, 34:23, 36:10, 37:8, 57:7, 64:8, 64:22, 68:1, 70:24, 84:6
**arguments** [3] - 56:25, 84:4, 84:19
**Arizona** [1] - 8:16
**Arlington** [1] - 2:9
**Army** [6] - 7:5, 8:5, 9:22, 14:1, 14:3, 79:4
**ARMY** [1] - 2:16
**articulated** [2] - 57:3, 65:21
**Ashley** [1] - 36:4
**Asian** [1] - 60:7
**aside** [1] - 54:7
**aspects** [1] - 62:13
**assert** [2] - 52:23, 79:25
**asserted** [3] - 40:11, 53:22, 76:11
**assertion** [4] - 38:23, 48:1, 79:8, 80:2
**assertions** [1] - 40:1
**asserts** [2] - 39:3, 69:13
**assessment** [9] - 5:7, 11:12, 12:12, 13:12, 19:2, 59:14, 60:5, 69:19, 70:13
**assessments** [2] - 58:14, 71:22
**associated** [5] - 20:17, 52:2, 52:7, 61:5, 82:15
**Association** [1] - 13:2
**ASSOCIATION** [1] - 1:10
**assume** [6] - 24:14, 24:23, 59:5, 59:16, 59:18, 59:20
**assumes** [1] - 25:19
**assuming** [2] - 15:20, 33:7
**assumption** [2] - 17:3, 26:11
**assumptions** [2] - 16:13, 16:14
**assure** [1] - 78:11
**astounding** [1] - 73:19
**attacks** [1] - 67:4
**attempt** [1] - 57:7
**attention** [1] - 7:4
**attorneys** [1] - 36:5
**authority** [24] - 20:9, 22:12, 27:25, 31:7, 32:10, 33:14, 34:15, 36:17, 36:18, 38:1, 39:25, 40:15, 40:23, 42:13, 51:12, 55:8, 64:12, 65:11, 67:4, 68:17, 73:12, 76:23, 83:3, 83:20
**authorized** [1] - 42:9
**available** [2] - 39:22, 46:14

**Avenue** [2] - 2:11, 2:24
**average** [2] - 46:19, 48:10
**avoided** [1] - 61:4
**avoiding** [1] - 44:22
**aware** [3] - 30:6, 31:17, 33:21

## B

**backs** [1] - 72:14
**backstop** [1] - 81:21
**backwards** [1] - 9:14
**bad** [2] - 79:20, 79:22
**Baltimore** [1] - 72:2
**ban** [2] - 37:9, 38:1
**bans** [1] - 38:21
**bar** [1] - 34:10
**based** [10] - 19:2, 37:3, 38:23, 43:13, 46:25, 51:14, 59:13, 67:14, 71:11
**baseless** [1] - 52:23
**basic** [1] - 27:2
**basis** [8] - 8:24, 8:25, 13:14, 14:4, 19:11, 19:12, 21:14, 80:2
**Bay** [25] - 3:18, 7:5, 7:7, 8:14, 8:18, 9:4, 11:12, 16:9, 36:6, 47:10, 48:19, 48:24, 49:3, 60:21, 60:25, 66:6, 66:8, 66:25, 67:16, 67:17, 68:23, 73:10, 73:15, 75:14
**BAY** [1] - 1:9
**Bay's** [3] - 66:17, 68:14, 70:19
**BBNC** [1] - 73:11
**bears** [3] - 34:9, 55:7, 83:25
**become** [1] - 59:15
**becoming** [1] - 8:6
**BEFORE** [1] - 1:22
**begin** [1] - 51:17
**beginning** [4] - 3:8, 5:23, 6:3, 21:12
**behalf** [6] - 3:18, 30:21, 36:3, 36:7, 36:12, 66:9
**behave** [1] - 46:8
**behavioral** [1] - 44:8
**behaviorally** [1] - 46:2
**belief** [1] - 9:2
**below** [1] - 38:13
**benefit** [7] - 14:13, 14:15, 58:12, 59:21, 60:17, 60:22, 60:23
**benefits** [10] - 57:19, 58:8, 59:17, 60:20, 62:11, 62:13, 62:15, 62:17, 62:20, 62:24
**beside** [1] - 33:10
**Bessenyey** [1] - 2:21
**best** [6] - 11:20, 16:17, 31:6, 32:23, 37:15, 42:1
**bestowed** [1] - 68:17
**better** [1] - 83:12
**between** [11] - 6:12, 22:6, 33:22, 34:3, 43:20, 55:21, 57:4, 65:21, 68:11, 71:7, 84:7
**beyond** [4] - 22:23, 46:19, 56:11, 64:17
**big** [9] - 28:4, 28:19, 29:24, 30:14, 30:17, 71:13, 83:16, 83:19
**bigger** [1] - 27:10
**biggest** [1] - 82:12
**billions** [1] - 14:18
**binding** [2] - 13:25, 33:17
**biocomplexity** [1] - 61:10
**biological** [2] - 68:11, 70:14
**biologically** [1] - 67:12
**birth** [2] - 44:5, 44:14
**bit** [2] - 43:25, 77:19
**black** [2] - 47:19, 71:21
**bodies** [1] - 74:6
**body** [2] - 70:4, 73:8
**Boggs** [2] - 2:2, 2:4
**bottom** [2] - 17:11, 65:22
**Boulevard** [1] - 2:8
**bound** [1] - 43:7
**boundaries** [5] - 32:19, 65:9, 65:12, 77:2, 84:13
**boundary** [2] - 31:7, 32:24
**bounds** [1] - 18:25
**Box** [1] - 2:19
**box** [3] - 3:21, 3:23, 33:19
**BRADLEY** [44] - 2:2, 3:9, 4:5, 4:7, 4:18, 4:21, 5:18, 5:22, 6:2, 6:5, 6:8, 7:22, 8:2, 10:24, 11:2, 12:1, 12:6, 12:22, 13:1, 13:4, 13:19, 15:13, 15:22, 15:24, 16:4, 16:7, 16:21, 17:11, 17:25, 18:2, 18:10, 18:12, 18:21, 19:9, 19:18, 74:2, 75:2, 75:8, 76:16, 77:10, 77:15, 78:15, 79:12, 79:19
**Bradley** [3] - 3:9, 4:6, 74:1
**branch** [1] - 34:15
**breaking** [1] - 31:9
**breed** [3] - 37:14, 41:2, 68:12
**breeding** [7] - 37:14, 41:1, 41:11, 42:1, 43:13, 67:8, 75:1
**brief** [12] - 18:22, 20:8, 24:13, 40:11, 45:7, 54:21, 64:24, 65:7, 74:2, 74:22, 77:21, 79:17
**briefing** [7] - 6:20, 12:11, 12:21, 12:23, 21:13, 64:4, 84:18
**briefly** [2] - 56:21, 74:1
**briefs** [3] - 17:14, 78:5, 80:3
**Bright** [5] - 42:13, 43:4, 68:16, 76:13, 76:17
**bring** [2] - 15:19, 30:25
**Bristol** [28] - 3:18, 7:5, 7:7, 8:14, 8:17, 9:4, 11:12, 16:9, 36:6, 47:10, 48:19, 48:24, 49:3, 60:21, 60:25, 66:6, 66:8, 66:17, 66:25, 67:16, 67:17, 68:14, 68:23, 70:19, 73:10, 73:15, 75:14
**BRISTOL** [1] - 1:9
**broad** [1] - 81:25
**broader** [3] - 60:24, 81:14, 81:19
**broadly** [1] - 81:18
**brought** [1] - 78:10
**BROWN** [7] - 2:18, 3:15, 36:2, 38:17, 50:18, 56:14, 56:16
**Brown** [3] - 3:15, 36:3, 77:4
**Bruner** [1] - 36:4
**BRUNO** [1] - 2:16
**build** [1] - 52:11
**building** [1] - 8:4
**built** [3] - 10:7, 14:17, 14:18
**burden** [4] - 55:4, 55:7, 57:5, 65:25
**Business** [2] - 16:24, 17:4
**BY** [8] - 2:2, 2:5, 2:8, 2:10, 2:14, 2:18, 2:21, 2:24

## C

**calculated** [1] - 46:23
**California** [1] - 2:15
**Canada** [1] - 60:9
**cannot** [10] - 6:23, 10:1, 13:14, 17:22, 29:9, 42:20, 52:23, 67:24, 76:6, 81:3
**capacity** [2] - 59:11, 79:14
**capital** [2] - 39:1, 59:5
**Capitol** [1] - 2:14
**capricious** [8] - 5:3, 11:25, 13:5, 16:20, 17:19, 17:24, 18:7, 70:23
**capture** [1] - 48:10
**capturing** [1] - 70:14
**care** [2] - 65:4, 79:9
**cascading** [1] - 69:4
**CASE** [3] - 1:5, 1:5, 1:14
**case** [40] - 3:2, 12:8, 12:15, 12:20, 13:4, 13:11, 16:16, 17:5, 18:13, 22:15, 23:25, 29:5, 29:6, 30:5, 31:9, 33:10, 34:12, 57:2, 57:22, 58:4, 63:10, 65:23, 67:24, 68:9, 71:20, 72:4, 72:6, 72:10, 72:14, 74:22, 76:8, 76:14, 76:17, 76:25, 78:8, 78:12, 78:17
**cases** [7] - 12:11, 64:11, 65:5, 72:1, 72:3, 76:6, 78:15
**Catalogue** [2] - 41:3, 45:1
**categorically** [1] - 84:14
**caught** [5] - 41:9, 41:16, 67:6, 67:25, 68:11
**caused** [4] - 11:14, 43:14, 53:13, 82:10
**census** [1] - 48:5
**Center** [1] - 2:5
**central** [1] - 10:21
**certain** [14] - 18:24, 20:6, 21:8, 23:22, 28:8, 37:1, 51:1, 51:10, 53:25, 58:8, 62:19, 65:16, 76:20, 81:23
**certainly** [11] - 19:14, 21:17, 25:20, 39:19, 39:21, 40:17, 42:24, 51:4, 74:7, 84:15
**certainty** [1] - 47:14
**CERTIFICATE** [1] - 85:1
**Certified** [1] - 1:25
**certify** [1] - 85:3
**cetera** [3] - 15:5, 16:12, 77:19
**CFR** [3] - 20:24, 25:6, 80:23
**challenge** [4] - 9:21, 12:18, 14:5, 14:6
**challenged** [1] - 76:10
**challenging** [2] - 23:1, 47:22
**change** [4] - 32:2, 32:7, 34:4, 34:17
**changed** [1] - 35:11
**changes** [8] - 11:10, 12:16, 35:1, 39:14, 39:16, 46:18, 46:23, 60:13
**characteristics** [1] - 46:7
**characterize** [1] - 61:3
**charges** [1] - 65:3
**Chase** [1] - 36:5
**Chickasaw** [2] - 74:21, 75:4
**Chile** [1] - 60:9
**chills** [1] - 29:17
**China** [1] - 60:7
**Chinook** [7] - 10:20, 44:13, 44:16, 44:19, 44:22, 44:25, 48:6
**choice** [5] - 46:25, 67:8, 70:19, 70:22, 71:7
**choosing** [1] - 16:19
**chosen** [1] - 70:15
**Cincinnati** [1] - 32:23
**circle** [4] - 28:4, 28:19, 30:15, 83:16
**Circuit** [17] - 12:18, 16:16, 16:22, 16:24, 17:7, 17:9, 18:16, 18:17, 19:6, 31:12,

32:22, 33:5, 76:8, 78:12, 78:16, 78:17
**Circuit's** [2] - 19:12, 43:4
**citation** [2] - 10:25, 53:4
**citations** [3] - 76:6, 78:8
**cite** [3] - 67:22, 69:9, 72:15
**cited** [10] - 7:17, 12:11, 21:12, 44:6, 44:11, 48:6, 54:25, 76:15, 76:25, 78:5
**cites** [9] - 43:5, 67:2, 69:6, 69:10, 69:18, 70:8, 71:17, 71:18, 72:1
**citing** [1] - 55:3
**City** [2] - 32:23, 49:15
**claim** [3] - 8:15, 47:13, 64:20
**claimed** [1] - 75:16
**claiming** [1] - 64:17
**claims** [1] - 64:12
**clarify** [2] - 44:25, 54:6
**class** [2] - 30:24, 49:17
**clause** [1] - 74:20
**Clean** [20] - 6:15, 20:2, 36:17, 37:5, 39:9, 40:18, 40:19, 41:19, 41:21, 42:7, 43:7, 43:11, 51:21, 51:24, 53:19, 65:8, 68:4, 68:7, 72:6, 73:22
**clear** [8] - 17:4, 40:3, 42:22, 51:17, 55:10, 68:17, 75:24
**clearest** [1] - 30:10
**clearly** [1] - 75:4
**CLERK** [1] - 3:2
**client's** [1] - 16:18
**close** [2] - 8:6, 68:10
**closer** [1] - 23:13
**closing** [1] - 73:10
**closure** [3] - 49:17, 49:20, 49:24
**Coast** [1] - 17:8
**code** [1] - 33:20
**cognizable** [1] - 13:8
**coho** [3] - 44:13, 44:16, 69:15
**colleague** [5] - 36:3, 36:11, 37:8, 43:24, 56:16
**colleague's** [1] - 19:10
**Colorado** [1] - 2:3
**Columbia** [1] - 85:3
**Columbus** [1] - 2:6
**coming** [2] - 29:5, 60:16
**comment** [2] - 26:5, 84:15
**comments** [9] - 25:15, 26:2, 26:10, 26:14, 54:22, 54:23, 70:7, 70:11, 80:7
**commercial** [4] - 6:23, 61:12, 66:12, 67:20
**committed** [3] - 34:11, 64:22, 84:1
**commodity** [1] - 60:11
**communication** [1] - 14:24
**communities** [1] - 30:25
**community** [1] - 49:6
**company** [18] - 8:4, 8:5, 11:6, 14:21, 15:1, 22:16, 28:19, 38:11, 39:22, 55:11, 61:25, 74:7, 75:16, 76:5, 77:21, 78:24, 80:13, 80:14
**company's** [2] - 10:4, 11:21
**comparable** [1] - 48:25
**compare** [2] - 82:12, 82:17
**compared** [2] - 60:18, 62:17
**comparing** [1] - 49:1
**comparison** [1] - 60:15
**compensatory** [4] - 36:13, 56:22, 63:3, 63:4
**complains** [1] - 46:22
**complex** [1] - 67:13
**complexity** [1] - 61:9
**compliant** [1] - 73:21
**component** [2] - 23:2, 46:6
**components** [1] - 39:12
**concept** [1] - 10:10
**concern** [2] - 44:19, 66:10
**concerns** [5] - 21:14, 23:5, 34:13, 44:21, 73:12
**conclude** [2] - 49:19, 50:12
**concluded** [4] - 58:6, 58:10, 62:23, 84:22
**conclusion** [1] - 65:19
**concurred** [1] - 54:5
**concurrent** [1] - 48:9
**conduct** [1] - 57:18
**conducted** [1] - 48:7
**conducting** [1] - 57:21
**Conference** [1] - 85:5
**configurations** [1] - 62:3
**confirmed** [1] - 73:13
**conflict** [1] - 39:25
**conformance** [1] - 85:4
**confused** [1] - 77:4
**Congress** [28] - 5:3, 5:9, 6:13, 7:1, 7:10, 28:14, 31:2, 31:6, 31:17, 31:23, 32:1, 32:5, 33:1, 33:12, 42:9, 45:9, 51:12, 67:8, 68:7, 68:13, 68:18, 71:14, 74:16, 74:18, 74:19, 76:22, 81:24, 84:3
**Congress's** [1] - 31:14
**congressional** [2] - 40:15, 41:11
**connected** [2] - 54:11, 54:15
**connection** [4] - 43:20, 51:24, 57:4, 65:21
**connects** [1] - 56:25
**CONNOLLY** [23] - 2:8, 3:11, 19:21, 19:24, 20:22, 21:18, 21:24, 22:5, 23:4, 23:6, 24:6, 25:11, 25:14, 26:4, 26:16, 27:7, 27:12, 27:19, 28:10, 29:17, 29:24, 30:7, 80:18
**Connolly** [5] - 3:11, 4:12, 19:21, 53:4, 80:17
**consensus** [1] - 46:20
**consequences** [1] - 70:18
**consequently** [1] - 59:11
**conservation** [1] - 10:19
**Conservation** [1] - 13:2
**consider** [10] - 8:23, 26:22, 51:23, 52:21, 52:23, 58:23, 63:17, 76:2, 81:8, 81:9
**consideration** [1] - 58:2
**considered** [12] - 37:21, 51:16, 52:10, 53:1, 53:5, 53:6, 62:11, 63:6, 80:8, 80:24, 81:2, 82:3
**considering** [4] - 49:15, 60:11, 61:4, 62:24
**consistent** [9] - 37:5, 42:14, 43:3, 43:10, 47:15, 50:6, 54:21, 58:18, 67:15
**consistently** [1] - 62:14
**CONSOLIDATED** [2] - 1:5, 1:15
**Consovoy** [1] - 2:7
**constantly** [1] - 18:4
**constitute** [1] - 44:10
**Constitution** [3] - 19:24, 65:3, 84:10
**constitutional** [2] - 33:1, 64:23
**construct** [1] - 52:16
**consultants** [1] - 29:19
**consultation** [1] - 65:17
**contain** [3] - 49:11, 54:9, 73:7
**contains** [1] - 62:10
**contaminated** [1] - 75:25
**contends** [2] - 38:20, 48:18
**contents** [1] - 15:20
**contest** [1] - 14:14
**context** [2] - 9:14, 68:5
**contextualize** [1] - 62:16
**continue** [4] - 8:5, 57:3, 58:11, 64:16
**continued** [1] - 66:24
**contradictory** [1] - 74:21
**contradicts** [1] - 69:14
**contrary** [7] - 5:1, 14:7, 17:25, 18:7, 36:16, 40:1, 47:13
**contrast** [1] - 71:9
**contribute** [2] - 9:19, 10:13
**contributed** [1] - 61:18
**convenient** [1] - 17:2
**conveyed** [1] - 40:22
**copious** [1] - 12:11
**copper** [20] - 59:8, 59:9, 59:10, 59:12, 59:14, 59:16, 59:17, 59:18, 59:22, 59:25, 60:3, 60:6, 60:8, 60:9, 60:12, 60:14, 60:15, 60:18, 79:15, 79:23
**CORPORATION** [1] - 2:13
**Corporation** [4] - 3:19, 30:22, 66:6, 66:8
**corporations** [1] - 18:19
**corporations'** [1] - 64:21
**Corps** [47] - 7:5, 8:6, 9:22, 14:1, 14:3, 22:9, 28:16, 28:18, 28:21, 29:12, 38:19, 39:7, 50:9, 50:11, 51:1, 51:7, 51:9, 51:13, 51:22, 52:21, 53:5, 53:18, 53:24, 54:5, 55:24, 56:5, 56:7, 56:8, 56:11, 65:17, 69:20, 70:2, 70:24, 71:2, 71:6, 71:10, 71:15, 71:16, 72:11, 79:4, 81:6, 81:8, 81:12, 81:18, 81:19, 82:1
**CORPS** [1] - 2:16
**Corps'** [5] - 36:18, 38:1, 50:23, 71:3, 71:5
**correct** [10] - 11:25, 22:5, 23:4, 25:8, 25:11, 26:16, 29:24, 42:7, 79:12
**correctly** [1] - 17:7
**cost** [9] - 14:15, 15:18, 57:15, 57:19, 57:24, 58:16, 61:1, 62:6, 62:13
**cost-benefit** [1] - 14:15
**costs** [9] - 36:13, 39:1, 58:2, 58:15, 58:20, 62:9, 62:15, 62:17, 62:24

**counsel** [6] - 3:6, 36:6, 46:4, 58:20, 61:22, 66:7
**count** [2] - 39:10, 60:23
**counted** [2] - 48:8, 60:21
**counteracts** [1] - 9:23
**counterfactual** [1] - 16:10
**country** [1] - 19:2
**County** [5] - 12:3, 12:6, 16:25, 47:18, 71:20
**county** [1] - 17:5
**couple** [3] - 17:1, 78:7, 78:8
**course** [8] - 32:5, 33:17, 34:22, 35:9, 74:24, 77:2, 77:16, 79:14
**COURT** [86] - 1:1, 3:8, 3:20, 3:24, 4:6, 4:16, 4:20, 5:16, 5:20, 5:25, 6:4, 6:7, 7:16, 8:1, 10:23, 11:1, 11:24, 12:2, 12:20, 12:24, 13:3, 13:15, 15:10, 15:18, 15:23, 16:3, 16:6, 16:16, 17:10, 17:23, 18:1, 18:8, 18:11, 18:18, 19:5, 19:16, 19:20, 19:23, 20:20, 21:11, 21:23, 22:2, 23:1, 23:5, 24:3, 25:8, 25:12, 26:1, 26:13, 27:2, 27:11, 27:18, 28:9, 29:16, 29:21, 30:5, 30:20, 34:21, 35:17, 35:20, 35:24, 38:16, 50:16, 56:13, 56:15, 56:18, 63:14, 63:17, 63:22, 64:4, 66:4, 69:5, 69:12, 73:25, 74:25, 75:7, 76:15, 77:9, 77:14, 78:14, 79:10, 79:18, 80:16, 83:21, 84:18, 85:9
**court** [7] - 6:20, 12:3, 26:17, 31:11, 47:21, 57:14, 71:24
**Court** [45] - 1:25, 3:1, 4:24, 6:11, 8:23, 15:16, 16:17, 16:23, 20:13, 25:4, 25:14, 25:19, 26:14, 26:18, 31:25, 32:17, 34:20, 36:2, 36:16, 40:17, 42:12, 42:13, 42:21, 42:24, 43:6, 47:19, 50:2, 56:19, 57:5, 57:13, 64:24, 66:5, 68:2, 68:5, 68:7, 70:23, 73:22, 75:6, 77:2, 81:2, 82:3, 82:6, 82:8, 85:2, 85:2
**Court's** [5] - 12:3, 39:5, 56:23, 63:2, 65:10
**courts** [5] - 12:12, 34:12, 40:13, 42:22, 64:10
**covered** [1] - 31:18
**create** [1] - 39:18
**created** [1] - 76:18
**critical** [2] - 66:24, 70:14
**CRR** [1] - 85:8
**culverts** [2] - 63:9, 63:13
**current** [2] - 44:11, 63:20
**cutting** [1] - 49:1
**CWA** [1] - 80:8

## D

**dam** [2] - 52:7, 52:13
**damage** [3] - 6:20, 42:19, 47:1
**damaging** [4] - 78:23, 79:1, 79:2, 79:5
**data** [7] - 11:15, 11:20, 11:22, 17:5, 43:17, 70:1, 71:11
**Dated** [1] - 85:6
**DC** [4] - 2:19, 16:22, 16:24, 18:17
**deal** [1] - 29:25
**decades** [4] - 12:7, 12:9, 57:23, 60:16
**decide** [4] - 20:1, 31:19, 32:16, 33:25
**decides** [1] - 71:23
**deciding** [5] - 33:23, 34:5, 34:8, 35:13, 81:20
**decision** [23] - 10:17, 10:19, 14:8, 15:17, 17:12, 19:12, 31:8, 35:10, 36:21, 43:4, 46:24, 57:4, 57:16, 58:3, 65:20, 66:23, 66:24, 71:7, 73:18, 77:1, 80:10, 80:11
**decision-making** [2] - 17:12, 57:16
**decisions** [2] - 64:22, 65:22
**declined** [1] - 13:12
**declines** [2] - 44:19, 61:19
**decreasing** [1] - 10:8
**deep** [1] - 73:14
**default** [1] - 35:3
**defect** [1] - 64:20
**defects** [1] - 69:22
**defendant** [5] - 3:17, 35:21, 35:25, 66:9, 66:14
**Defendant** [1] - 1:17
**defendant-intervenors** [3] - 3:17, 66:9, 66:14
**defendants** [3] - 33:18, 36:8, 36:9
**DEFENDANTS** [2] - 2:16, 2:20
**Defendants** [3] - 1:7, 1:11, 1:20
**defendants'** [2] - 33:9, 36:10
**defense** [3] - 12:19, 18:15, 76:11
**defer** [2] - 50:2, 70:23
**deference** [10] - 4:22, 8:8, 12:3, 12:9, 13:6, 46:24, 63:2, 74:13, 76:18, 77:2
**deferential** [5] - 47:21, 57:14, 66:1, 71:25, 77:1
**defies** [1] - 9:1
**define** [6] - 29:4, 42:8, 52:1, 68:3, 82:15, 83:9
**defined** [25] - 20:4, 20:12, 26:25, 27:20, 27:22, 27:23, 28:1, 28:11, 29:1, 29:3, 37:23, 38:3, 40:4, 53:15, 54:8, 54:9, 55:18, 55:21, 61:24, 62:1, 65:14, 72:17, 83:12, 83:17
**defines** [2] - 20:16, 45:3
**definition** [4] - 42:24, 55:12, 64:1, 76:21
**definitive** [1] - 13:17
**definitively** [1] - 33:5
**degradation** [3] - 50:13, 53:12, 75:22
**degrade** [5] - 36:25, 46:20, 48:16, 61:11, 64:2
**degrading** [1] - 52:14
**degree** [1] - 33:22
**delegation** [2] - 18:20, 65:11
**delegations** [1] - 84:2
**demand** [6] - 59:22, 59:25, 60:3, 60:13, 60:15, 79:25
**Democratic** [1] - 66:21
**demonstrate** [2] - 47:13, 49:14
**demonstrated** [1] - 47:9
**demonstrates** [3] - 41:11, 44:2, 45:25
**demonstrating** [2] - 43:20, 44:8
**denial** [2] - 70:25, 71:1
**denied** [5] - 50:14, 50:16, 50:18, 50:19, 50:22
**Denver** [1] - 2:3
**denying** [1] - 79:8
**Department** [4] - 2:10, 2:17, 5:15, 6:9
**Deposit** [15] - 15:8, 27:14, 27:16, 27:17, 38:11, 39:20, 39:24, 40:13, 44:1, 49:10, 57:9, 61:23, 62:4, 62:10, 66:11
**deposits** [1] - 61:25
**DEPUTY** [1] - 3:2
**derived** [2] - 64:12, 65:3
**describe** [2] - 21:13, 21:20
**described** [9] - 17:18, 38:14, 42:19, 44:18, 49:9, 51:3, 55:1, 70:15, 70:19
**description** [1] - 43:17
**designated** [1] - 41:5
**designed** [2] - 11:13, 11:16
**desire** [1] - 39:17
**destroy** [6] - 36:24, 36:25, 45:14, 46:11, 46:12, 68:21
**destroyed** [1] - 47:7
**destroying** [1] - 44:24
**destruction** [5] - 16:9, 47:1, 48:14, 48:25, 69:1
**detail** [1] - 44:1
**detailed** [1] - 70:5
**determination** [56] - 5:16, 20:13, 20:23, 21:15, 23:2, 23:18, 24:17, 25:1, 25:5, 25:9, 26:1, 29:12, 29:13, 37:3, 37:9, 37:17, 38:14, 38:18, 38:20, 39:11, 39:17, 39:23, 40:2, 40:3, 40:12, 40:25, 42:4, 42:11, 43:16, 47:1, 47:25, 50:17, 50:21, 50:25, 51:7, 51:11, 52:24, 53:2, 53:3, 53:24, 54:2, 54:15, 55:5, 56:3, 56:4, 57:8, 66:15, 70:5, 70:9, 70:10, 72:9, 72:13, 72:14, 73:17, 79:16, 80:5
**determinations** [2] - 58:18, 80:12
**determinative** [1] - 80:8
**determine** [3] - 49:16, 69:24, 82:9
**determined** [6] - 21:7, 22:19, 41:22, 51:14, 62:6, 63:9
**determines** [1] - 20:5
**determining** [4] - 43:1, 43:6, 43:10, 58:8
**devastating** [4] - 6:18, 8:13, 9:3, 30:23
**develop** [5] - 38:11, 45:5, 61:25, 62:4, 62:9
**developed** [1] - 81:14
**Development** [2] - 3:19, 66:8
**development** [3] - 34:24, 57:9, 61:23
**developments** [1] - 52:8
**devotes** [1] - 50:25
**dewater** [1] - 52:19
**dewatering** [8] - 20:25, 21:3, 21:4, 21:22, 23:8, 53:8, 82:5, 82:7
**dictionary** [2] - 67:23, 68:3
**difference** [7] - 6:12, 6:13, 9:16, 22:6, 33:21, 34:2, 84:7

**differences** [2] - 46:5, 46:6
**different** [13] - 6:10, 17:1, 22:9, 33:20, 34:16, 35:12, 39:21, 44:7, 62:3, 67:9, 70:21, 78:4
**differently** [1] - 15:14
**digress** [1] - 77:18
**Diplomate** [1] - 1:24
**direct** [4] - 23:11, 24:9, 24:11, 51:20
**directed** [1] - 4:2
**directly** [7] - 22:4, 22:18, 22:20, 49:24, 52:9, 68:10, 82:24
**dirty** [1] - 75:25
**disadvantages** [2] - 58:6, 62:18
**disagree** [1] - 51:14
**disagreed** [2] - 51:2, 51:10
**disagreeing** [1] - 4:22
**disagreement** [1] - 5:2
**disavowed** [3] - 7:8, 75:12, 75:15
**discerning** [1] - 42:23
**discharge** [20] - 13:9, 20:5, 20:17, 22:20, 24:1, 24:21, 24:23, 28:21, 28:23, 30:11, 30:12, 38:12, 52:3, 55:11, 65:13, 75:25, 76:2, 77:10, 82:15
**discharged** [1] - 23:12
**discharges** [34] - 14:14, 20:11, 21:2, 22:5, 22:13, 23:15, 23:22, 26:22, 27:14, 28:8, 36:18, 36:19, 37:17, 37:21, 38:4, 38:13, 38:21, 42:4, 43:2, 43:12, 43:15, 43:18, 46:14, 48:21, 49:5, 49:13, 50:7, 50:10, 50:12, 51:18, 51:24, 67:11, 81:16, 81:22
**disclosure** [1] - 10:16
**disconnecting** [1] - 53:9
**discount** [2] - 15:4, 16:11
**discounting** [1] - 17:6
**discrete** [4] - 44:3, 44:12, 44:18, 46:1
**discretion** [18] - 33:6, 33:16, 33:22, 33:24, 34:3, 34:11, 34:13, 34:14, 42:10, 42:14, 43:1, 43:6, 43:9, 64:22, 64:25, 84:1, 84:3, 84:8
**discretionary** [1] - 42:13
**discuss** [2] - 22:11, 53:14
**discussed** [5] - 55:6, 68:22, 71:9, 74:22, 79:17
**discusses** [1] - 21:25
**discussing** [1] - 82:7
**discussion** [10] - 19:6, 58:17, 58:20, 59:9, 69:21, 70:5, 70:6, 70:10, 73:9, 75:15
**disingenuously** [1] - 47:24
**dislikes** [1] - 76:5
**displace** [1] - 35:16
**displacement** [1] - 69:2
**disposal** [19] - 20:4, 20:12, 27:1, 27:21, 27:22, 27:23, 28:2, 28:12, 28:17, 29:1, 29:2, 29:4, 38:2, 40:7, 55:19, 55:22, 65:15, 83:18
**dispose** [1] - 55:25
**dispute** [6] - 54:7, 64:14, 72:23, 80:15, 82:4, 82:21
**disputing** [2] - 78:11, 79:8
**disregard** [1] - 63:4
**distinct** [3] - 10:11, 44:10, 46:3
**distinction** [1] - 45:8
**distinguish** [2] - 51:20, 71:19
**distinguishes** [1] - 55:21
**DISTRICT** [3] - 1:1, 1:1, 1:22
**district** [1] - 31:10
**District** [4] - 45:16, 49:23, 85:2
**ditch** [1] - 81:21
**diverse** [1] - 66:25
**diversification** [2] - 10:2, 10:3
**diversity** [9] - 9:19, 10:7, 10:8, 10:12, 43:21, 43:22, 77:16, 78:1, 78:5
**divided** [2] - 36:8, 36:11
**Division** [1] - 2:18
**Docket** [1] - 71:8
**doctrine** [12] - 18:20, 31:24, 33:11, 36:14, 56:22, 64:7, 64:8, 64:9, 64:19, 65:2, 84:11
**document** [1] - 51:2
**documented** [1] - 48:8
**documents** [2] - 14:1, 67:12
**DOJ** [1] - 76:17
**dollar** [2] - 66:12, 67:20
**dollars** [1] - 14:18
**done** [6] - 30:13, 32:6, 49:7, 78:7, 83:15, 83:18
**door** [1] - 32:15
**doubt** [1] - 72:2
**down** [7] - 9:17, 26:24, 31:13, 31:25, 49:2, 49:16, 50:21
**downstream** [14] - 46:15, 48:16, 52:7, 52:14, 53:11, 53:12, 61:5, 61:8, 61:11, 61:16, 61:18, 63:24, 70:17, 75:23
**dozen** [1] - 18:17
**drain** [1] - 49:10
**draw** [2] - 28:4, 28:19
**drawn** [2] - 30:14, 83:16
**dredged** [10] - 20:17, 36:18, 38:12, 40:7, 52:3, 55:11, 55:20, 55:25, 65:13, 82:16
**dry** [2] - 27:25, 40:2
**due** [2] - 34:22, 73:19
**during** [2] - 48:3, 53:21
**dust** [5] - 20:25, 21:22, 23:8, 53:6, 82:2
**Dynasty** [2] - 3:3, 73:5
**DYNASTY** [2] - 1:2, 2:1

## E

**ecological** [6] - 10:3, 43:20, 46:15, 47:22, 70:14, 70:18
**ecologically** [1] - 69:1
**economic** [19] - 14:21, 15:5, 15:7, 15:15, 15:25, 38:25, 56:21, 57:12, 57:18, 57:21, 58:14, 58:15, 59:4, 59:13, 59:17, 60:5, 62:14, 72:25, 73:8
**Economic** [2] - 3:19, 66:8
**economically** [1] - 38:23
**economies** [1] - 66:13
**economists** [1] - 57:23
**economy** [1] - 59:2
**ecosystem** [2] - 42:18, 42:20
**effect** [30] - 5:5, 7:13, 8:10, 13:25, 14:12, 17:21, 19:3, 33:7, 41:24, 42:6, 42:17, 43:3, 43:23, 46:5, 47:8, 48:22, 49:1, 49:17, 49:20, 51:19, 52:6, 52:8, 55:13, 60:14, 68:20, 75:10, 75:18, 76:3, 76:4, 80:1
**effectively** [2] - 38:21, 79:11
**effects** [71] - 13:8, 20:7, 20:10, 20:15, 20:16, 21:2, 21:18, 21:21, 22:3, 22:8, 22:11, 22:21, 22:24, 23:10, 23:11, 24:2, 24:9, 24:10, 24:11, 37:18, 37:21, 42:8, 42:25, 43:10, 43:14, 45:18, 47:14, 47:17, 49:5, 49:6, 49:12, 51:4, 51:17, 51:20, 51:21, 51:23, 52:1, 52:2, 52:6, 52:10, 52:21, 52:24, 53:1, 53:3, 53:5, 53:6, 57:25, 58:4, 58:9, 62:25, 63:5, 65:15, 67:12, 69:4, 69:24, 70:13, 70:17, 80:3, 80:19, 81:1, 81:9, 81:23, 82:9, 82:10, 82:13, 82:14, 82:15
**efforts** [1] - 11:21
**eggs** [2] - 45:4
**eight** [4] - 8:12, 8:22, 68:22
**EIS** [5] - 69:20, 69:21, 70:6, 70:10, 71:7
**either** [4] - 12:9, 15:8, 33:7, 51:5
**Electric** [1] - 72:2
**elementary** [2] - 49:16, 49:23
**elements** [2] - 51:10, 68:20
**elephants** [1] - 68:8
**elsewhere** [2] - 6:15, 15:11
**eminently** [1] - 53:16
**emphasis** [2] - 34:9, 83:25
**emphasize** [1] - 60:16
**emphasized** [1] - 6:12
**employee** [1] - 76:21
**empty** [1] - 32:20
**end** [7] - 56:21, 57:20, 59:24, 73:17, 81:4, 82:4, 82:12
**engaged** [1] - 66:16
**engagement** [2] - 66:20, 73:14
**ENGINEERS** [1] - 2:16
**engineers** [2] - 14:23, 15:2
**Engineers'** [1] - 70:25
**ensure** [1] - 41:18
**ensuring** [2] - 42:14, 66:24
**entire** [2] - 50:25, 60:21
**entirely** [4] - 33:25, 58:22, 63:11, 63:24
**entitled** [3] - 14:10, 46:24, 85:4
**entity** [1] - 29:8
**enumerated** [1] - 65:16
**ENVIRONMENTAL** [3] - 1:6, 1:15, 2:16
**environmental** [6] - 9:21, 40:14, 50:24, 51:15, 66:19, 81:23
**Environmental** [2] - 2:18, 3:4
**environmentally** [1]

- 78:23
**EPA** [186] - 3:15, 3:16, 5:4, 5:12, 6:16, 7:3, 7:8, 7:13, 8:7, 8:8, 8:14, 8:18, 10:1, 11:10, 11:21, 12:16, 13:2, 13:7, 13:11, 14:8, 14:14, 14:19, 15:4, 15:18, 16:8, 16:11, 18:23, 20:3, 20:8, 20:15, 20:24, 21:7, 21:9, 21:12, 21:25, 22:12, 22:19, 22:22, 23:11, 23:19, 24:7, 24:13, 24:14, 24:22, 25:5, 25:9, 25:16, 25:23, 26:4, 26:9, 27:7, 27:21, 27:24, 28:3, 29:13, 30:3, 31:2, 31:3, 32:6, 32:20, 36:3, 36:5, 36:16, 36:21, 37:20, 39:7, 39:14, 40:25, 41:3, 41:21, 42:7, 42:9, 42:14, 42:19, 43:5, 43:16, 44:6, 44:11, 44:18, 45:1, 45:17, 46:18, 46:22, 46:23, 47:6, 47:13, 47:15, 47:25, 48:1, 48:4, 48:6, 49:3, 49:5, 50:16, 50:24, 51:5, 51:9, 51:12, 51:13, 51:14, 51:16, 51:18, 51:23, 52:10, 52:23, 53:1, 53:6, 54:3, 54:23, 55:3, 55:16, 55:18, 55:22, 56:11, 57:3, 57:5, 57:17, 57:20, 58:2, 58:6, 58:10, 58:14, 58:15, 58:21, 59:16, 59:19, 60:21, 60:22, 61:2, 61:14, 61:17, 62:6, 62:10, 62:13, 62:15, 62:23, 63:3, 63:6, 63:9, 63:25, 64:17, 65:13, 65:25, 66:15, 66:20, 66:23, 67:4, 67:6, 67:24, 68:13, 68:17, 68:24, 69:13, 69:20, 69:23, 69:25, 70:12, 70:15, 70:19, 71:15, 72:14, 72:16, 73:11, 74:10, 75:12, 75:22, 76:5, 79:5, 79:14, 80:7, 80:12, 80:20, 81:3, 81:7, 81:9, 81:20, 81:25, 82:7, 82:8, 82:20, 82:23, 83:1, 83:14, 84:5, 84:7
**EPA's** [71] - 4:24, 5:7, 6:24, 8:21, 9:24, 10:9, 19:1, 21:14, 30:23, 31:7, 34:23, 36:12, 36:13, 37:3, 37:12, 37:17, 37:22, 37:25, 38:1, 41:25, 42:4, 42:16, 42:24, 43:1, 43:6, 43:9, 43:13, 47:1, 47:5, 47:22, 47:23, 50:1, 50:5, 51:11, 53:14, 54:21, 54:22, 55:8, 56:20, 57:1, 57:6, 57:12, 57:16, 57:22, 58:5, 58:17, 58:22, 59:8, 59:23, 60:1, 61:1, 61:4, 61:7, 61:21, 62:14, 62:20, 62:21, 63:1, 64:14, 65:20, 65:23, 66:1, 67:14, 68:16, 70:22, 71:9, 73:17, 81:13, 84:12
**ephemeral** [1] - 11:5
**equal** [1] - 59:21
**equally** [1] - 68:12
**equation** [1] - 16:12
**ERIN** [1] - 2:5
**Erin** [1] - 3:13
**erode** [1] - 61:9
**error** [3] - 21:16, 79:16, 79:17
**escape** [1] - 41:16
**essential** [2] - 69:19, 70:13
**essentially** [2] - 27:13, 30:1
**establish** [4] - 31:23, 33:2, 33:12, 84:11
**established** [3] - 31:2, 31:18, 35:15
**establishes** [1] - 84:11
**estimates** [1] - 60:4
**Estimating** [1] - 57:24
**et** [9] - 1:3, 1:6, 1:10, 1:19, 3:3, 3:5, 15:5, 16:12, 77:19
**evaluate** [3] - 49:18, 49:22, 51:18
**evaluating** [2] - 51:23, 67:11
**evaluation** [2] - 36:13, 43:14
**evidence** [10] - 4:25, 5:1, 9:9, 9:15, 9:18, 12:13, 54:25, 69:14, 69:17, 76:7
**evidenced** [1] - 47:11
**exactly** [3] - 9:6, 12:17, 27:13
**example** [19] - 12:15, 20:24, 21:3, 21:4, 22:15, 23:24, 35:13, 39:14, 52:10, 52:16, 58:10, 58:19, 59:8, 67:16, 68:19, 72:19, 76:22, 83:15, 83:19
**examples** [3] - 52:5, 52:9, 61:17
**exceeded** [1] - 34:6
**exceedingly** [2] - 31:6, 32:24
**Exchange** [1] - 40:10
**excuse** [1] - 11:3
**executed** [1] - 65:4
**executing** [1] - 33:22
**executive** [6] - 5:20, 5:22, 5:25, 6:2, 34:15, 65:4
**exempts** [1] - 40:18
**exercise** [8] - 31:3, 32:4, 32:10, 32:16, 33:13, 40:14, 43:1, 43:9
**exercised** [2] - 33:3, 36:17
**exercises** [1] - 42:14
**exercising** [2] - 34:3
**exhaustive** [1] - 43:16
**exhibit** [1] - 44:7
**existence** [2] - 71:14, 84:4
**existing** [2] - 33:23, 35:2
**expansive** [1] - 68:5
**expected** [2] - 51:12, 70:18
**experience** [1] - 57:23
**expert** [2] - 57:23, 70:2
**expertise** [5] - 42:10, 46:25, 50:4, 51:15, 57:15
**explain** [7] - 37:9, 37:12, 37:16, 37:20, 37:22, 43:25, 71:6
**explained** [16] - 12:14, 20:8, 43:6, 45:17, 46:18, 46:23, 48:1, 48:4, 49:3, 49:5, 50:24, 51:6, 54:23, 64:24, 65:7, 71:4
**explains** [1] - 77:21
**explanation** [2] - 4:24, 47:16
**explicitly** [1] - 71:5
**export** [1] - 79:20
**exported** [3] - 59:14, 79:19, 79:21
**extending** [1] - 70:16
**extends** [2] - 27:17, 67:7
**extensive** [1] - 36:22
**extent** [7] - 18:9, 55:10, 56:1, 56:24, 60:23, 61:5, 75:3
**extraordinary** [2] - 31:3, 32:11
**eye** [1] - 14:23
**eyes** [1] - 73:2

## F

**F.2d** [1] - 78:13
**F.3d** [2] - 18:15, 78:19
**face** [3] - 11:14, 12:18, 80:14
**facility** [2] - 52:11, 52:13
**fact** [10] - 7:22, 35:15, 47:11, 51:9, 58:15, 62:21, 70:22, 78:10, 79:19, 83:4
**factors** [2] - 51:22, 62:19
**facts** [4] - 57:4, 65:21, 68:24, 73:20
**factual** [1] - 72:23
**fail** [1] - 64:8
**failed** [3] - 20:8, 20:10, 69:13
**failure** [1] - 31:4
**fair** [3] - 4:20, 14:25, 18:11
**Fair** [1] - 76:21
**faithfully** [1] - 65:4
**familiar** [1] - 76:13
**far** [8] - 9:11, 11:17, 22:23, 27:10, 31:15, 33:21, 70:17, 81:13
**Farm** [1] - 72:3
**fashion** [1] - 30:9
**fatal** [3] - 17:15, 31:4, 64:20
**favor** [5] - 11:22, 15:2, 58:8, 62:19, 76:7
**FD** [1] - 62:1
**feasible** [1] - 71:24
**Federal** [1] - 85:2
**federal** [8] - 1:25, 10:18, 26:18, 26:20, 37:10, 40:10, 70:2, 73:16
**FEDERAL** [1] - 85:9
**Federation** [1] - 17:8
**feet** [1] - 54:18
**FEIS** [2] - 50:23, 51:6
**Feldman** [2] - 3:18, 66:7
**FELDMAN** [2] - 2:24, 3:18
**fertilized** [1] - 45:4
**few** [2] - 63:11, 80:18
**fifth** [1] - 10:9
**Figure** [1] - 72:20
**figure** [2] - 12:16, 64:10
**filed** [2] - 15:19, 66:14
**filing** [1] - 74:4
**filings** [2] - 3:25, 4:1
**fill** [27] - 20:5, 20:17, 22:17, 36:18, 38:3, 38:12, 40:7, 45:20, 48:13, 49:11, 52:3, 52:8, 52:12, 52:17, 53:8, 53:13, 53:17, 53:20, 53:22, 54:18, 55:11, 55:20, 55:25, 56:7, 65:14, 82:16, 82:24
**filled** [2] - 41:21, 53:11
**filling** [2] - 8:12, 10:6
**final** [39] - 5:16, 20:13, 20:23, 21:14, 23:2, 23:18, 25:9, 26:1, 26:24, 33:18, 35:6, 37:3, 37:9, 38:14, 38:18, 38:20, 39:11, 39:17, 39:23, 40:1, 40:3, 40:12, 40:24, 47:24, 50:17, 50:21, 50:23, 50:25, 51:6, 53:2, 54:2, 54:14, 55:5, 56:3, 66:15, 70:5, 70:8, 70:9, 73:17
**finally** [7] - 13:7, 34:9, 37:22, 46:18, 53:14, 78:20, 79:13
**financial** [1] - 73:4
**findings** [6] - 26:10, 47:5, 47:22, 50:5, 65:18, 68:21
**fine** [5] - 3:24, 11:1, 12:24, 16:6, 71:3
**first** [30] - 8:11, 9:15, 16:22, 19:6, 24:18, 27:7, 31:1, 31:2, 31:22, 37:8, 37:25,

42:7, 47:6, 48:24, 50:18, 50:19, 52:10, 55:4, 56:20, 63:15, 63:18, 65:6, 69:7, 71:1, 71:19, 72:1, 74:4, 80:21, 81:11, 81:18
**Fish** [1] - 50:6
**fish** [25] - 5:8, 7:3, 7:6, 10:22, 37:14, 41:2, 41:9, 41:12, 45:11, 47:25, 48:2, 48:8, 50:9, 54:14, 54:17, 61:15, 61:18, 67:6, 67:9, 67:25, 69:2, 69:19, 70:6, 75:13, 75:17
**fisher** [1] - 9:2
**fisheries** [5] - 58:11, 61:7, 61:13, 67:17, 74:17
**Fishermen** [1] - 17:8
**fishery** [41] - 5:5, 6:23, 7:3, 7:5, 7:13, 8:14, 9:4, 16:9, 17:21, 22:4, 37:13, 37:19, 41:1, 41:4, 41:8, 41:12, 41:24, 41:25, 42:6, 42:19, 43:12, 46:21, 47:4, 51:19, 60:22, 61:2, 61:4, 61:19, 63:12, 66:12, 67:1, 67:4, 67:15, 67:19, 67:21, 67:24, 68:17, 75:3, 75:4, 75:11
**Fishery** [1] - 50:7
**fishing** [1] - 66:12
**five** [3] - 9:12, 37:7, 48:7
**five-year** [1] - 48:7
**flagged** [1] - 26:25
**flawed** [2] - 24:10, 24:11
**flaws** [1] - 17:15
**flexible** [1] - 42:9
**flow** [8] - 11:10, 38:8, 39:16, 46:16, 46:19, 46:23, 53:10, 69:3
**fluctuating** [1] - 52:6
**focus** [6] - 56:20, 64:16, 67:1, 67:5, 67:25, 73:20
**focused** [5] - 7:4, 23:2, 57:8, 57:11, 63:24
**focuses** [1] - 80:20
**focusing** [2] - 68:4, 68:13
**followed** [1] - 57:21
**follows** [1] - 68:17
**Footnote** [1] - 76:19
**footprint** [1] - 70:16
**FOR** [6] - 1:1, 2:1, 2:7, 2:12, 2:16, 2:20
**foreclose** [1] - 33:25
**foregoing** [1] - 85:3
**foreign** [1] - 59:15
**forever** [1] - 45:21
**forfeited** [1] - 25:19
**forget** [1] - 12:17
**forgot** [1] - 13:17
**Fork** [2] - 7:4, 69:8
**formal** [1] - 70:6
**format** [1] - 85:4
**forward** [5] - 4:3, 14:4, 34:25, 35:12, 38:19
**Foundation** [1] - 2:13
**foundational** [1] - 65:2
**four** [14] - 4:11, 8:11, 19:19, 19:22, 38:4, 38:13, 38:16, 38:17, 69:6, 73:16, 77:8, 77:13
**fours** [1] - 31:10
**fourth** [3] - 10:4, 37:20, 51:16
**Fourth** [1] - 2:11
**fourths** [1] - 11:5
**fragmentation** [6] - 21:1, 21:21, 23:9, 53:8, 82:5, 82:7
**framework** [1] - 84:11
**free** [2] - 39:6, 39:12
**frequently** [1] - 41:16
**freshwater** [3] - 41:14, 41:17
**front** [1] - 4:23
**fugitive** [5] - 20:25, 21:22, 23:8, 53:6, 82:2
**full** [5] - 10:16, 12:19, 17:22, 18:14
**fully** [5] - 37:16, 42:3, 46:25, 71:6, 73:21
**fundamental** [1] - 5:3
**fungible** [2] - 15:15, 46:1
**future** [2] - 9:20, 45:23

## G

**game** [1] - 32:7
**Gas** [1] - 72:2
**general** [6] - 18:21, 31:23, 33:12, 73:15, 83:24, 84:4
**generally** [2] - 60:12, 65:8
**generations** [1] - 45:23
**genetic** [7] - 9:16, 9:19, 44:8, 46:4, 46:6, 47:11, 47:12
**genetically** [4] - 10:11, 44:4, 44:14, 46:2
**geographic** [3] - 69:24, 70:13, 84:14
**geographically** [1] - 44:9
**gillnet** [1] - 9:2
**given** [6] - 6:23, 9:20, 31:6, 32:1, 59:16, 68:10
**GLEASON** [1] - 1:22
**global** [2] - 59:15, 59:22
**gloss** [1] - 18:2
**goals** [1] - 41:19
**governing** [1] - 58:3
**government** [7] - 4:21, 6:11, 10:18, 11:6, 57:22, 79:25
**government-wide** [1] - 57:22
**granted** [2] - 35:9, 35:10
**grapple** [1] - 69:14
**great** [1] - 17:5
**gross** [1] - 58:24
**ground** [6] - 15:11, 15:14, 21:6, 21:7, 31:9, 58:21
**grounds** [2] - 31:14, 48:23
**Group** [1] - 2:23
**grow** [4] - 41:12, 41:15, 45:5
**guesswork** [3] - 5:14, 6:9, 19:3
**guidance** [4] - 14:3, 57:20, 57:22, 72:11
**guideline** [1] - 57:21
**guidelines** [3] - 22:11, 80:24, 81:13
**Gulf** [2] - 10:20, 10:21

## H

**habitat** [22] - 5:8, 7:3, 8:13, 9:23, 10:5, 19:4, 36:25, 41:18, 41:20, 43:21, 44:22, 50:9, 52:15, 53:11, 61:9, 61:18, 63:8, 67:13, 67:19, 69:3, 69:19
**habitats** [7] - 46:3, 48:17, 61:11, 67:9, 67:10, 70:6, 70:20
**half** [7] - 8:12, 8:13, 8:22, 68:22, 79:22, 79:23, 79:24
**hand** [1] - 71:16
**handful** [1] - 9:2
**happy** [2] - 10:24, 35:19
**hardly** [1] - 68:9
**harm** [7] - 11:17, 11:18, 11:19, 60:23, 60:24, 61:6, 61:7
**harmful** [3] - 22:20, 24:2, 81:23
**harms** [1] - 23:22
**harvest** [2] - 48:24, 61:16
**harvested** [1] - 48:19
**HASSETT** [2] - 2:5, 3:13
**Hassett** [1] - 3:13
**Hawkes** [1] - 72:10
**headwater** [5] - 48:25, 61:15, 67:13, 68:25, 70:20
**headwaters** [4] - 60:24, 61:6, 68:14, 68:23
**healthy** [1] - 66:25
**hear** [6] - 4:21, 34:21, 35:21, 35:25, 57:3, 76:17
**heard** [15] - 36:16, 38:5, 54:22, 57:1, 57:3, 67:6, 69:20, 71:14, 72:25, 75:14, 76:13, 78:1, 79:25, 83:23, 84:13
**HEARING** [1] - 1:21
**hearing** [1] - 65:17
**heavily** [2] - 20:15, 21:20
**Heidi** [1] - 36:4
**held** [4] - 34:13, 40:14, 42:12, 57:13
**help** [2] - 49:14, 64:10
**hereby** [1] - 85:3
**hide** [1] - 68:8
**High** [1] - 2:5
**higher** [2] - 6:25, 39:2
**highlight** [1] - 65:11
**highly** [1] - 66:1
**highway** [1] - 34:5
**hinge** [1] - 84:4
**hire** [1] - 29:19
**hit** [1] - 30:17
**hoc** [1] - 14:10
**holding** [4] - 12:3, 39:5, 40:17, 64:25
**hole** [1] - 68:10
**holes** [1] - 68:8
**home** [1] - 10:12
**honest** [1] - 77:4
**Honor** [40] - 3:2, 4:10, 7:10, 8:2, 15:14, 16:22, 18:3, 18:13, 18:24, 47:18, 50:20, 55:1, 56:19, 57:1, 58:19, 59:8, 60:4, 60:20, 61:1, 62:15, 63:3, 63:16, 63:19, 64:6, 64:21, 65:7, 65:19, 66:3, 67:22, 69:7, 70:8, 71:1, 71:13, 72:3, 72:8, 72:20, 72:22, 72:24, 77:7, 84:17
**HONORABLE** [1] - 1:22
**hope** [1] - 84:20
**hot** [2] - 32:11, 32:12
**hour** [1] - 75:14
**housekeeping** [1] - 4:10
**hundreds** [4] - 11:7, 11:8, 48:12, 78:6
**hundredth** [1] - 8:17
**Huntington** [1] - 2:5
**hypothetical** [1] - 9:21

## I

**idea** [1] - 78:16
**identical** [1] - 40:21
**identification** [3] - 43:18, 54:3, 54:24
**identified** [9] - 20:12, 21:17, 39:4, 39:11, 39:14, 48:12, 53:16, 53:25, 70:12
**identifies** [2] - 56:6, 56:7
**identify** [10] - 25:16, 25:23, 26:3, 28:22, 41:4, 45:2, 51:22,

55:16, 55:18, 55:22
**ignore** [2] - 75:5, 75:9
**ignored** [1] - 5:1
**ignores** [1] - 41:9
**Iliamna** [3] - 3:10, 4:14, 30:22
**ILIAMNA** [1] - 2:12
**illogical** [8] - 4:25, 45:10, 52:22, 81:6, 81:7, 81:11, 81:18, 81:24
**imagine** [1] - 49:15
**impact** [18] - 5:8, 7:6, 7:7, 7:8, 8:11, 8:13, 9:3, 22:4, 25:12, 39:17, 40:7, 41:22, 42:17, 50:8, 50:24, 57:18, 75:13
**impacted** [1] - 49:8
**impacts** [10] - 30:23, 39:13, 44:22, 51:5, 61:4, 62:5, 62:22, 66:10, 74:23, 75:9
**imperative** [1] - 33:1
**implausible** [2] - 68:5, 68:13
**importance** [1] - 44:21
**important** [10] - 25:18, 41:5, 43:19, 46:17, 58:1, 58:11, 61:12, 67:19, 68:14, 80:14
**imports** [1] - 60:8
**impose** [1] - 40:15
**improper** [1] - 7:20
**improperly** [2] - 20:9, 20:12
**inappropriate** [1] - 78:17
**INC** [1] - 1:10
**include** [3] - 41:12, 42:1, 52:6
**included** [7] - 38:22, 39:18, 40:21, 53:6, 73:13, 75:2
**includes** [5] - 22:3, 24:4, 44:20, 46:8, 67:16
**including** [10] - 6:15, 37:13, 41:1, 41:10, 43:12, 60:12, 65:5, 69:14, 70:16, 74:20
**incompatible** [1] - 82:19
**inconsistent** [4] - 4:25, 10:10, 17:2, 78:16
**incorporate** [1] - 22:10
**incorrect** [1] - 64:16
**increase** [1] - 61:16
**increases** [1] - 60:15
**increasing** [1] - 10:8
**incredible** [1] - 67:13
**indeed** [3] - 31:24, 62:21, 74:6
**indefinite** [1] - 58:13
**independent** [3] - 14:23, 15:2, 54:25
**indicated** [1] - 74:6
**indicating** [1] - 44:11
**indication** [2] - 29:11, 83:19
**Industrial** [1] - 32:1
**inferred** [1] - 74:7
**information** [1] - 70:4
**informative** [1] - 7:24
**infrastructure** [1] - 62:8
**infringe** [1] - 37:11
**inhabit** [1] - 48:15
**inherent** [1] - 34:14
**initiate** [1] - 65:5
**injury** [1] - 69:2
**inputs** [1] - 15:15
**inquiries** [1] - 81:25
**inquiry** [1] - 81:14
**insists** [1] - 10:1
**insofar** [1] - 22:3
**instance** [2] - 44:18, 48:6
**instead** [6] - 3:23, 47:15, 59:1, 59:19, 64:16, 68:4
**instructions** [1] - 7:11
**instructs** [1] - 71:21
**intact** [1] - 31:14
**intelligible** [1] - 65:10
**intended** [3] - 14:24, 45:9, 48:5
**intent** [1] - 41:11
**interchangeable** [1] - 70:20
**interest** [2] - 58:23, 73:18
**interests** [1] - 73:7
**internally** [2] - 4:25, 10:10
**interpret** [1] - 76:23
**interpretation** [12] - 7:20, 13:21, 13:22, 31:11, 33:17, 37:12, 41:9, 41:25, 42:23, 64:10, 64:19, 83:13
**interpreted** [3] - 32:21, 33:5, 40:25
**interpreting** [2] - 74:20, 77:3
**Interstate** [1] - 32:22
**intervenor** [2] - 36:8, 36:9
**INTERVENOR** [1] - 2:20
**Intervenor** [2] - 1:11, 1:20
**intervenor-defendants** [2] - 36:8, 36:9
**INTERVENOR-DEFENDANTS** [1] - 2:20
**Intervenor-Defendants** [2] - 1:11, 1:20
**intervenors** [4] - 3:17, 36:7, 66:9, 66:14
**invalid** [1] - 7:20
**investment** [2] - 9:24, 10:2
**investors** [4] - 14:24, 15:6, 15:11
**invocation** [1] - 74:13
**involves** [1] - 79:16
**involving** [1] - 64:11
**ironclad** [1] - 31:21
**irrational** [2] - 8:22, 59:5
**irrelevant** [2] - 55:9, 74:24
**isolated** [2] - 27:25, 28:1
**issue** [29] - 16:18, 20:14, 24:3, 25:20, 26:14, 26:25, 27:20, 28:16, 30:1, 30:6, 36:23, 58:17, 61:20, 64:25, 66:20, 66:21, 67:1, 67:2, 67:5, 68:6, 70:12, 72:8, 72:11, 72:25, 73:1, 75:17, 82:2, 82:20, 83:24
**issued** [2] - 50:16, 50:22
**issues** [8] - 14:1, 18:19, 21:17, 34:12, 36:11, 36:15, 66:19, 71:18
**itself** [7] - 14:1, 14:8, 19:10, 25:6, 64:2, 84:9, 84:10

## J

**James** [2] - 3:18, 66:7
**JAMES** [1] - 2:24
**JANE** [2] - 2:17, 2:18
**January** [1] - 63:7
**JD** [2] - 14:5, 14:9
**JEFFREY** [1] - 2:5
**Jeffrey** [1] - 3:14
**jobs** [3] - 14:19, 15:5, 16:12
**JOHN** [1] - 2:8
**JUDGE** [1] - 1:22
**judgment** [5] - 4:23, 12:13, 47:20, 50:3, 74:14
**judgments** [4] - 12:5, 37:4, 57:15, 71:23
**judicial** [1] - 34:10
**Judicial** [1] - 85:5
**June** [2] - 1:22, 85:6
**Juneau** [2] - 49:15, 49:22
**jurisdiction** [6] - 13:18, 26:18, 26:20, 55:4, 55:7, 64:17
**jurisdictional** [16] - 13:20, 13:21, 24:17, 25:1, 25:5, 29:13, 39:6, 53:23, 56:4, 68:4, 72:9, 72:12, 72:13, 80:5, 80:8
**jury** [2] - 3:20, 3:23
**Justice** [3] - 2:17, 5:15, 6:9
**justification** [1] - 18:14
**justifying** [1] - 62:25
**juvenile** [2] - 45:5, 48:12

## K

**Kake** [1] - 78:18
**keep** [2] - 4:8, 29:5
**KEITH** [1] - 2:2
**Keith** [1] - 3:9
**Kenai** [1] - 48:7
**key** [4] - 67:19, 68:3, 82:4, 82:5
**kilometers** [1] - 78:6
**kind** [3] - 13:21, 14:10, 77:23
**kinds** [1] - 71:22
**knowledge** [1] - 66:20
**known** [4] - 44:3, 73:8, 74:6, 75:17
**knows** [2] - 6:10, 6:13
**Koktuli** [3] - 7:4, 63:10, 69:8

## L

**LA** [1] - 17:5
**Labor** [1] - 76:21
**labor** [2] - 59:5, 62:9
**lack** [2] - 11:14, 11:20
**lacked** [1] - 4:25
**lacks** [1] - 59:11
**lakes** [1] - 41:14
**land** [11] - 19:25, 24:4, 27:25, 28:4, 28:19, 29:18, 30:2, 30:15, 40:2, 63:24, 83:16
**Land** [1] - 40:9
**lands** [8] - 20:2, 25:21, 37:10, 40:11, 40:18, 40:22, 40:23, 67:18
**landscape** [4] - 32:2, 34:4, 35:1, 35:11
**language** [10] - 27:13, 40:20, 40:21, 41:10, 42:23, 64:13, 64:15, 67:7, 67:8, 68:9
**large** [3] - 36:24, 44:22, 79:22
**large-scale** [1] - 44:22
**larger** [2] - 27:6, 60:18
**last** [14] - 6:10, 25:25, 27:20, 51:14, 56:24, 72:24, 78:21, 79:13, 80:4, 81:21, 83:8, 83:12, 83:14, 83:21
**lastly** [1] - 64:21
**late** [1] - 8:7
**Laura** [2] - 3:15, 36:3
**LAURA** [1] - 2:18
**Law** [2] - 2:10, 2:23
**law** [13] - 12:7, 12:9, 17:23, 17:25, 18:3, 18:7, 32:12, 40:10, 47:19, 65:2, 66:1, 71:21, 84:9
**lawfully** [1] - 36:16
**laws** [3] - 40:14, 65:4, 73:22
**lay** [1] - 5:23
**layer** [1] - 76:18
**LEAD** [1] - 1:5
**lead** [2] - 21:8, 28:8

**learned** [1] - 19:14
**lease** [3] - 40:8, 40:13, 40:23
**least** [6] - 10:10, 32:20, 78:23, 79:1, 79:2, 79:5
**leave** [1] - 31:14
**left** [3] - 19:19, 78:8, 78:9
**Legal** [1] - 2:13
**legal** [5] - 32:2, 34:4, 34:17, 35:1, 35:11
**legislative** [2] - 32:6, 34:18
**legitimate** [2] - 11:3, 73:18
**length** [3] - 4:1, 17:15, 55:17
**lengths** [1] - 47:6
**lengthy** [1] - 70:7
**less** [1] - 11:18
**letter** [3] - 47:19, 71:21, 72:11
**level** [3] - 25:13, 59:4, 62:5
**levels** [3] - 40:5, 48:21, 52:7
**liability** [1] - 15:1
**lifecycle** [1] - 45:12
**light** [1] - 60:11
**lightly** [1] - 36:21
**likely** [16] - 5:7, 5:10, 5:13, 6:10, 6:12, 6:14, 7:17, 11:18, 42:18, 47:17, 48:13, 60:4, 60:14, 60:17, 62:7, 74:10
**limit** [5] - 20:10, 34:7, 34:8, 36:17, 84:16
**limited** [4] - 20:3, 22:12, 22:23, 48:3
**Limited** [1] - 3:3
**LIMITED** [1] - 2:1
**limits** [7] - 30:2, 38:1, 38:3, 40:10, 84:14, 84:15
**line** [3] - 17:11, 68:16, 81:18
**linear** [1] - 54:18
**lists** [2] - 15:20, 53:5
**literature** [2] - 43:19, 61:14
**live** [1] - 14:4
**lives** [1] - 67:10
**LLC** [1] - 2:21
**LLP** [2] - 2:2, 2:4
**local** [1] - 58:11
**located** [1] - 68:6
**locations** [1] - 61:17
**Logan** [6] - 22:15, 22:16, 23:24, 23:25, 29:6
**logical** [1] - 19:14
**long-term** [1] - 45:18
**longstanding** [3] - 42:16, 42:22, 47:15
**look** [6] - 9:11, 23:17, 24:11, 77:20, 83:3, 83:9
**looked** [5] - 6:11, 24:8, 30:13, 33:15, 61:17
**looking** [3] - 5:17, 7:16, 21:11
**looks** [3] - 29:8, 29:10, 81:21
**Loper** [6] - 42:12, 42:21, 43:3, 68:16, 76:13, 76:17
**Los** [1] - 16:25
**loss** [17] - 6:20, 6:22, 7:18, 9:23, 38:5, 38:6, 42:18, 42:19, 45:14, 45:17, 48:20, 53:12, 58:23, 58:24, 82:10, 82:24
**losses** [6] - 21:8, 44:17, 61:15, 61:18, 69:4, 77:11
**lost** [2] - 10:12, 45:21
**love** [1] - 29:5
**low** [1] - 9:8
**lower** [2] - 6:21, 39:2
**LTD** [3] - 1:3, 2:1, 2:12
**LUKE** [1] - 2:14
**Luke** [2] - 3:10, 30:21
**LUNA** [7] - 2:18, 3:16, 56:19, 63:16, 63:19, 63:23, 64:6
**Luna** [6] - 3:16, 36:4, 36:11, 36:12, 56:20, 66:4

## M

**magnitude** [3] - 41:22, 43:14, 47:2
**main** [3] - 37:7, 64:22, 70:4
**maintain** [1] - 32:4
**maintaining** [1] - 43:21
**major** [6] - 36:14, 56:22, 64:7, 64:9, 64:19
**majority** [1] - 34:12
**Mall** [1] - 2:14
**management** [2] - 39:15, 73:9
**mandate** [2] - 81:19, 82:18
**manner** [1] - 16:19
**mantra** [1] - 5:6
**map** [7] - 8:17, 8:18, 23:20, 24:4, 27:3, 27:4, 27:6
**mapped** [1] - 11:7
**maps** [4] - 27:11, 27:19, 83:9
**Marine** [1] - 50:7
**MARIO** [1] - 2:18
**market** [2] - 59:16, 79:23
**markets** [2] - 59:8, 59:9
**Marsh** [1] - 72:2
**material** [16] - 20:18, 20:19, 22:18, 36:19, 38:3, 38:12, 40:7, 52:3, 52:17, 55:12, 55:20, 55:25, 65:14, 82:16, 82:17, 82:24
**materials** [1] - 20:5
**math** [2] - 79:16, 79:17
**matter** [13] - 16:17, 24:23, 34:2, 66:7, 71:2, 71:16, 72:23, 74:16, 81:5, 81:17, 83:7, 84:19, 85:4
**matters** [8] - 20:3, 33:11, 34:11, 34:13, 34:14, 51:15, 75:19, 84:1
**McCarthy** [1] - 2:7
**mean** [9] - 8:3, 19:9, 37:14, 39:20, 41:2, 41:8, 41:20, 45:9, 77:12
**meaning** [4] - 7:11, 42:23, 67:15, 67:23
**meaningful** [2] - 58:2, 70:14
**means** [9] - 6:17, 6:19, 11:16, 18:23, 19:25, 38:10, 42:17, 64:11, 77:5
**meant** [2] - 5:12, 15:19
**meanwhile** [1] - 60:7
**measurable** [3] - 7:6, 7:8, 75:13
**measured** [2] - 70:17, 74:6
**measurement** [1] - 9:8
**meet** [2] - 60:2, 63:25
**meeting** [1] - 59:24
**meets** [1] - 71:11
**mentioned** [2] - 47:18, 58:19
**mentioning** [1] - 57:13
**mere** [3] - 5:14, 6:8, 19:2
**merely** [2] - 31:11, 32:15
**merits** [1] - 63:1
**met** [3] - 35:15, 57:5, 65:25
**method** [1] - 53:24
**methodology** [3] - 47:23, 59:24, 60:1
**methods** [1] - 69:22
**Mexico** [1] - 60:9
**Michael** [2] - 3:11, 19:21
**MICHAEL** [1] - 2:8
**Michigan** [1] - 58:1
**middle** [4] - 15:10, 15:13, 53:9, 58:21
**might** [13] - 4:13, 4:19, 7:23, 8:15, 9:8, 17:8, 22:8, 27:13, 49:14, 51:13, 58:21, 61:24, 76:22
**migrate** [1] - 41:14
**migration** [1] - 41:6
**mile** [1] - 44:7
**miles** [19] - 8:12, 8:13, 8:22, 11:4, 11:9, 27:10, 38:5, 38:6, 38:8, 44:24, 45:13, 45:19, 45:20, 46:10, 46:12, 48:13, 48:14, 54:17, 68:22
**millions** [1] - 48:19
**mind** [2] - 5:18, 19:5
**Mine** [5] - 59:6, 59:12, 60:2, 60:14, 66:18
**mine** [40] - 8:4, 10:7, 14:16, 14:17, 15:6, 16:15, 21:5, 27:8, 27:14, 36:20, 37:18, 38:22, 38:23, 39:1, 39:4, 39:13, 39:18, 39:19, 41:23, 47:8, 50:8, 50:12, 52:17, 53:16, 57:8, 59:1, 60:19, 61:9, 61:10, 62:3, 62:22, 63:25, 64:2, 68:21, 69:16, 70:16, 78:25, 79:7
**mine's** [1] - 58:24
**Mine's** [3] - 59:14, 59:17, 59:20
**mined** [1] - 59:12
**mineral** [5] - 40:11, 40:18, 40:22, 61:25, 73:7
**mineralization** [1] - 73:8
**minerals** [2] - 40:8, 62:10
**MINERALS** [2] - 1:2, 2:1
**Minerals** [2] - 3:3, 73:5
**mingle** [1] - 10:22
**Mingo** [6] - 22:15, 22:16, 23:24, 23:25, 29:6
**Mining** [1] - 78:13
**mining** [17] - 16:2, 20:1, 22:16, 30:24, 34:24, 37:9, 38:1, 38:10, 38:21, 39:20, 39:22, 39:24, 55:11, 59:4, 61:25, 66:10, 78:22
**minutes** [8] - 4:11, 4:13, 4:15, 19:19, 19:22, 35:18, 35:20, 36:9
**misrepresents** [1] - 70:24
**misstatement** [1] - 53:1
**misunderstanding** [2] - 74:5, 78:22
**misunderstands** [1] - 84:5
**mitigation** [8] - 10:6, 36:13, 56:22, 63:3, 63:5, 63:7, 63:20, 63:23
**mode** [1] - 74:20
**model** [5] - 12:16, 12:19, 13:5, 46:22, 76:5
**modest** [1] - 64:13
**moment** [3] - 12:24, 18:12, 54:7
**money** [1] - 73:1
**month** [1] - 10:18
**monthly** [2] - 38:8, 46:19
**moreover** [3] - 31:5, 39:3, 71:13
**mortality** [2] - 48:15, 69:2
**most** [9] - 4:18, 8:23, 47:21, 57:14, 60:2, 61:10, 62:22, 66:18,

71:25
**MOTION** [1] - 1:21
**mountains** [1] - 22:17
**mouse** [2] - 68:8, 68:10
**move** [2] - 35:12, 38:19
**moved** [1] - 3:20
**moving** [1] - 64:7
**MR** [83] - 3:9, 3:10, 3:11, 3:14, 3:16, 3:17, 3:18, 3:22, 4:5, 4:7, 4:18, 4:21, 5:18, 5:22, 6:2, 6:5, 6:8, 7:22, 8:2, 10:24, 11:2, 12:1, 12:6, 12:22, 13:1, 13:4, 13:19, 15:13, 15:22, 15:24, 16:4, 16:7, 16:21, 17:11, 17:25, 18:2, 18:10, 18:12, 18:21, 19:9, 19:18, 19:21, 19:24, 20:22, 21:18, 21:24, 22:5, 23:4, 23:6, 24:6, 25:11, 25:14, 26:4, 26:16, 27:7, 27:12, 27:19, 28:10, 29:17, 29:24, 30:7, 30:21, 35:1, 35:18, 56:19, 63:16, 63:19, 63:23, 64:6, 66:5, 69:6, 69:13, 74:2, 75:2, 75:8, 76:16, 77:10, 77:15, 78:15, 79:12, 79:19, 80:18, 83:23
**MS** [7] - 3:13, 3:15, 36:2, 38:17, 50:18, 56:14, 56:16
**multibillion** [2] - 66:12, 67:20
**multibillion-dollar** [2] - 66:12, 67:20
**multimillion** [1] - 67:20
**multiple** [5] - 4:24, 13:24, 20:9, 20:22, 66:21
**must** [16] - 12:19, 31:23, 33:12, 41:18, 42:13, 45:11, 47:15, 47:21, 50:2, 51:23, 55:22, 58:23, 65:13, 71:25, 74:18, 76:10

## N

**Nalven** [1] - 36:5
**name** [1] - 56:20
**narrow** [1] - 31:13
**narrowly** [1] - 73:18
**Nation** [2] - 74:21, 75:4
**National** [4] - 13:1, 31:25, 50:6, 72:4
**national** [1] - 73:18
**Native** [3] - 18:19, 64:21, 66:6
**NATIVE** [1] - 1:9
**native** [1] - 41:17
**Natives** [3] - 3:10, 4:14, 30:22
**NATIVES** [1] - 2:12
**Natural** [1] - 2:18
**navigable** [2] - 54:12, 54:16
**near** [2] - 60:8, 84:20
**near-shored** [1] - 60:8
**nearby** [1] - 46:3
**nearly** [3] - 19:19, 75:14, 78:7
**necessary** [1] - 65:9
**need** [9] - 4:17, 8:23, 25:22, 27:2, 47:13, 52:18, 56:9, 63:17, 82:23
**needed** [1] - 30:25
**needs** [5] - 14:17, 25:22, 25:23, 60:9, 83:1
**NEPA** [6] - 12:8, 12:9, 71:20, 72:2, 72:4, 72:6
**never** [19] - 7:8, 8:7, 12:9, 13:6, 24:20, 28:19, 45:23, 45:24, 53:22, 53:23, 75:4, 75:8, 75:12, 75:16, 75:19, 83:10, 83:11, 83:18, 83:19
**new** [3] - 31:9, 39:6, 39:21
**next** [6] - 9:17, 59:7, 60:16, 60:20, 61:20, 78:21
**NFK** [6] - 44:2, 44:12, 44:21, 45:18, 45:19, 49:9
**Ninth** [17] - 12:18, 16:16, 16:23, 17:7, 17:8, 18:16, 19:6, 19:12, 31:12, 33:5, 43:4, 76:8, 78:12, 78:16, 78:17
**NISHIDA** [1] - 2:17
**NO** [2] - 1:5, 1:14
**NOAA** [1] - 10:24
**nobody** [3] - 9:11, 77:20, 79:21
**non** [2] - 38:6, 46:12
**non-salmon** [2] - 38:6, 46:12
**nonanadromous** [1] - 54:17
**nondelegation** [11] - 18:24, 19:15, 31:24, 32:18, 33:10, 33:11, 36:14, 56:23, 64:23, 84:6, 84:10
**none** [1] - 46:14
**nonetheless** [2] - 9:9, 35:1
**nonquantified** [1] - 57:25
**North** [2] - 7:4, 69:8
**NORTHERN** [2] - 1:2, 2:1
**Northern** [2] - 3:3, 73:5
**northwest** [1] - 10:21
**notably** [2] - 47:21, 61:10
**note** [6] - 42:21, 50:5, 50:11, 52:25, 55:4, 58:1
**nothing** [7] - 24:22, 32:7, 33:16, 40:9, 55:16, 56:10, 76:7
**notice** [2] - 65:16, 84:15
**notion** [2] - 64:16, 74:18
**novel** [1] - 64:12
**November** [1] - 63:21
**number** [6] - 6:5, 46:19, 49:18, 49:22, 61:3, 72:16
**numbers** [3] - 9:9, 16:19, 58:14
**Nushagak** [1] - 44:20
**nutrients** [1] - 46:16

## O

**objective** [1] - 69:25
**obligations** [1] - 34:17
**obscure** [2] - 68:7, 70:21
**obtained** [1] - 48:2
**obviously** [3] - 8:6, 8:14, 14:17
**occasion** [1] - 51:13
**occasions** [1] - 7:23
**occur** [4] - 11:19, 21:4, 47:14, 61:24
**ocean** [3] - 41:15, 45:22, 54:13
**OF** [5] - 1:1, 1:12, 1:21, 2:7, 2:16
**offer** [1] - 64:18
**offered** [1] - 63:11
**officer** [5] - 34:5, 34:7, 71:2, 71:5, 71:10
**OFFICIAL** [1] - 85:9
**Official** [2] - 1:25, 85:2
**offspring** [1] - 41:13
**Ohio** [1] - 2:6
**oil** [2] - 32:11, 32:12
**OMB** [1] - 57:22
**once** [3] - 45:3, 76:15
**one** [35] - 4:10, 8:17, 9:3, 9:8, 10:18, 13:24, 16:13, 17:2, 17:3, 17:5, 18:2, 23:10, 38:4, 38:17, 41:19, 42:20, 46:6, 49:16, 54:6, 56:25, 58:19, 60:14, 62:22, 69:7, 70:23, 72:3, 72:19, 74:23, 75:15, 76:22, 76:24, 77:11, 77:13, 78:18
**one-hundredth** [1] - 8:17
**onerous** [1] - 40:13
**ones** [4] - 9:16, 9:17, 49:24, 57:1
**open** [2] - 33:19, 52:16
**opening** [1] - 83:13
**opens** [1] - 32:15
**operate** [1] - 30:9
**operation** [4] - 21:5, 29:18, 52:7, 52:12
**opportunities** [2] - 39:21, 63:11
**opportunity** [2] - 58:19, 65:16
**oppose** [1] - 16:15
**opposite** [1] - 16:14
**Opsahl** [1] - 3:20
**OPSAHL** [2] - 2:10, 3:22
**oral** [1] - 3:25
**orchard** [1] - 49:2
**Order** [1] - 3:1
**order** [4] - 4:1, 29:11, 45:11, 83:1
**Organized** [1] - 78:18
**original** [3] - 10:4, 10:6, 85:3
**otherwise** [2] - 37:11, 65:7
**outcome** [2] - 16:14, 35:6
**outing** [1] - 9:3
**output** [1] - 59:20
**outright** [1] - 31:20
**outset** [2] - 5:13, 17:14
**outside** [2] - 10:17, 83:20
**overestimate** [1] - 51:5
**overestimates** [1] - 60:5
**overlap** [1] - 18:9
**overlays** [1] - 44:1
**own** [7] - 31:20, 47:12, 57:20, 59:13, 59:23, 60:1, 60:5
**owned** [3] - 20:2, 25:21, 37:10

## P

**p.m** [6] - 1:23, 3:1, 35:23, 84:22
**P.O** [1] - 2:19
**Pacific** [3] - 2:13, 17:8, 44:17
**page** [16] - 5:17, 6:5, 7:16, 20:19, 20:21, 20:22, 21:11, 24:14, 24:18, 25:4, 25:15, 26:4, 26:11, 71:8, 82:3, 85:4
**pages** [2] - 21:24, 21:25
**pagination** [1] - 6:6
**Panama** [4] - 31:10, 31:24, 32:9
**Pandora's** [1] - 33:19
**parenthetical** [3] - 41:10, 74:21, 75:5
**Parks** [1] - 13:2
**part** [5] - 24:7, 25:9, 57:16, 59:15, 67:23
**particular** [2] - 51:2, 61:21
**particularly** [3] - 7:24, 12:7, 44:17
**parties** [5] - 3:25, 4:2, 26:17, 27:22, 34:18
**PARTNERSHIP** [1] - 2:1
**Partnership's** [1] - 73:7
**parts** [3] - 28:13, 59:1, 82:5
**party** [3] - 55:7, 56:1, 56:6

**passing** [1] - 5:18
**past** [1] - 30:14
**patience** [1] - 17:16
**patrol** [1] - 34:5
**patterns** [1] - 70:15
**Patton** [2] - 2:2, 2:4
**pause** [1] - 9:5
**paving** [1] - 49:2
**Pebble** [36] - 6:11, 15:8, 19:7, 27:14, 27:16, 27:17, 38:11, 39:20, 39:24, 40:13, 44:1, 49:10, 54:18, 57:9, 59:6, 59:12, 59:14, 59:17, 59:20, 60:2, 60:14, 61:23, 62:4, 62:9, 66:11, 66:18, 67:4, 67:23, 69:13, 69:23, 70:2, 70:24, 72:25, 73:6, 73:12, 73:14
**PEBBLE** [1] - 2:1
**Pebble's** [3] - 60:6, 67:25, 68:21
**Peninsula** [2] - 30:22, 48:7
**PENINSULA** [1] - 2:12
**people** [2] - 15:9, 79:24
**per** [1] - 68:7
**percent** [14] - 8:17, 38:8, 39:2, 46:19, 48:8, 48:10, 59:25, 60:2, 60:6, 60:8, 60:10, 79:22, 79:23, 79:24
**percentage** [1] - 79:15
**perennial** [2] - 54:15, 54:19
**perfectly** [1] - 72:14
**period** [3] - 48:3, 48:7, 58:13
**permanent** [1] - 69:3
**permanently** [3] - 46:11, 46:12, 64:2
**permit** [23] - 8:5, 8:6, 14:17, 33:23, 34:1, 35:9, 36:18, 38:19, 50:9, 50:14, 50:16, 50:19, 51:25, 52:22, 53:19, 53:21, 54:4, 54:25, 56:9, 56:12, 70:25, 81:20
**permits** [1] - 28:16
**permitted** [1] - 14:11
**permitting** [6] - 7:1, 31:14, 31:15, 31:18, 35:2, 35:3
**perspective** [2] - 16:18, 58:22
**Peter** [3] - 3:17, 36:6, 66:5
**PETER** [1] - 2:21
**petitioned** [1] - 73:11
**petitions** [1] - 66:14
**ph** [3] - 36:4, 36:5
**phenotypic** [1] - 46:7
**phenotypically** [1] - 46:2
**phrase** [2] - 37:13, 41:1
**physical** [2] - 44:8, 46:7
**picking** [2] - 16:18, 49:1
**picture** [1] - 71:13
**piece** [1] - 4:10
**piercing** [1] - 73:20
**PIGOT** [1] - 2:16
**pinpoint** [1] - 28:22
**Pirzadeh** [3] - 31:12, 33:9, 33:15
**PJD** [4] - 25:2, 72:12, 80:13, 80:15
**PJD..** [1] - 80:8
**place** [3] - 65:6, 75:20, 79:2
**placement** [4] - 20:18, 52:4, 82:17, 82:24
**places** [1] - 6:14
**plain** [1] - 41:9
**plainly** [1] - 69:15
**Plaintiff** [1] - 1:13
**PLAINTIFF** [1] - 2:7
**plaintiff** [3] - 3:8, 4:4, 13:2
**Plaintiffs** [1] - 1:4
**plaintiffs** [9] - 34:22, 58:16, 60:16, 61:20, 64:14, 64:16, 64:18, 67:3, 71:19
**PLAINTIFFS** [2] - 2:1, 2:12
**plaintiffs'** [2] - 57:7, 64:8
**plan** [29] - 27:8, 27:14, 34:25, 36:20, 37:18, 38:22, 39:4, 39:15, 39:18, 39:19, 41:23, 45:22, 47:8, 50:8, 50:12, 53:16, 57:8, 61:9, 62:3, 63:7, 63:14, 63:15, 63:18, 63:19, 63:20, 63:21, 63:24, 68:21
**planning** [1] - 4:10
**plans** [3] - 4:14, 63:5, 74:8
**plant** [2] - 12:17, 75:23
**play** [1] - 35:4
**played** [1] - 35:4
**pleases** [1] - 32:7
**PLLC** [2] - 2:7, 2:23
**PLP** [47] - 3:9, 3:13, 3:14, 13:16, 18:18, 24:19, 25:19, 26:12, 35:5, 36:19, 36:24, 38:10, 38:20, 38:25, 39:3, 39:6, 39:12, 39:14, 39:22, 41:8, 41:22, 43:5, 43:15, 44:23, 44:24, 45:14, 46:4, 46:10, 46:22, 47:2, 47:7, 47:24, 48:12, 48:18, 48:22, 49:11, 50:8, 52:10, 52:16, 53:16, 53:21, 53:24, 55:10, 60:1, 60:20, 63:4, 79:5
**PLP's** [18] - 24:16, 24:18, 37:17, 37:21, 39:17, 42:4, 43:2, 43:17, 45:7, 47:13, 54:3, 54:24, 58:14, 58:20, 59:13, 59:18, 60:5, 64:1
**plugged** [1] - 58:16
**ply** [1] - 19:14
**point** [48] - 9:13, 14:14, 15:11, 16:11, 16:21, 18:8, 19:10, 21:21, 21:25, 24:6, 24:25, 25:4, 25:14, 25:18, 25:25, 26:2, 26:24, 27:20, 27:23, 28:13, 29:2, 31:22, 33:4, 33:11, 33:18, 37:25, 40:24, 42:3, 49:15, 51:16, 55:15, 58:22, 61:1, 64:4, 68:19, 70:1, 72:5, 72:15, 72:24, 73:3, 75:17, 77:18, 79:10, 82:3, 82:4, 82:6, 82:8, 83:8
**pointed** [9] - 6:22, 8:21, 9:22, 17:14, 61:14, 73:2, 76:6, 76:8, 80:2
**points** [8] - 19:16, 30:17, 31:1, 37:7, 67:3, 67:23, 79:13, 80:18
**policy** [9] - 31:2, 31:23, 33:2, 33:12, 33:14, 47:11, 65:9, 83:24, 84:4
**pond** [1] - 28:1
**population** [5] - 10:14, 45:18, 48:11, 61:15, 79:23
**populations** [10] - 7:6, 43:22, 44:3, 44:10, 44:13, 44:18, 44:20, 46:1, 47:4, 75:14
**portfolio** [11] - 9:1, 9:13, 9:25, 10:7, 10:9, 11:2, 43:23, 46:5, 47:8, 75:18
**portion** [1] - 49:19
**portions** [3] - 55:23, 80:23, 80:25
**portrayal** [1] - 14:25
**position** [8] - 7:19, 18:18, 18:19, 25:8, 51:7, 72:16, 74:25, 75:8
**positions** [2] - 50:7, 51:1
**possibility** [2] - 33:25, 35:8
**possibly** [1] - 45:9
**post** [1] - 14:10
**postdates** [1] - 55:5
**posted** [1] - 34:6
**potential** [1] - 66:10
**power** [13] - 12:17, 20:3, 28:16, 29:25, 31:3, 32:2, 32:4, 32:6, 32:11, 32:16, 33:1, 33:2, 34:4
**practical** [1] - 81:17
**precautionary** [2] - 11:13, 11:16
**precedent** [2] - 67:3, 71:18
**precise** [1] - 71:11
**precisely** [2] - 32:1, 32:5
**precluded** [1] - 68:13
**predator** [1] - 46:17
**predetermined** [1] - 16:14
**predicate** [3] - 32:9, 32:10, 32:13
**predicting** [1] - 74:15
**prediction** [1] - 47:16
**predictive** [3] - 47:20, 71:22, 74:14
**preferred** [1] - 46:22
**prefers** [1] - 11:22
**preliminary** [13] - 13:20, 14:4, 14:9, 15:25, 24:16, 24:25, 25:5, 59:13, 60:5, 72:9, 72:12, 80:5
**prepared** [2] - 14:22
**present** [2] - 36:4, 64:23
**presents** [2] - 47:25, 57:2
**preservation** [2] - 63:24, 64:1
**preserving** [1] - 16:9
**President** [3] - 32:2, 32:3, 32:13
**President's** [1] - 32:10
**presumptively** [1] - 65:1
**prevent** [3] - 60:24, 61:7, 62:21
**prevention** [1] - 61:6
**prevents** [1] - 60:24
**prices** [4] - 60:12, 60:15, 80:1
**primarily** [1] - 56:20
**primary** [1] - 19:25
**primed** [2] - 44:4, 44:14
**principle** [4] - 11:14, 11:16, 17:9, 65:10
**private** [1] - 34:18
**problem** [12] - 13:23, 18:24, 19:15, 21:9, 23:14, 29:16, 29:17, 31:5, 32:19, 64:23, 78:12, 82:12
**problematic** [1] - 22:3
**problems** [3] - 5:3, 13:24, 80:21
**Procedures** [3] - 37:6, 72:6, 73:21
**proceed** [1] - 4:4
**proceeding** [1] - 55:9
**Proceedings** [1] - 84:22
**proceedings** [1] - 65:5
**process** [14] - 8:7, 16:5, 35:2, 35:3, 51:6, 53:21, 56:5, 56:10, 57:17, 59:10, 66:16, 73:13, 73:20, 80:15
**processed** [1] - 33:23
**produces** [1] - 59:10
**productivity** [1] - 37:1
**program** [1] - 45:16
**prohibit** [9] - 20:4,

27:8, 27:21, 28:14, 28:24, 32:11, 34:24, 39:19, 39:23
**prohibited** [4] - 27:4, 27:5, 79:11
**prohibiting** [1] - 55:19
**prohibition** [13] - 27:8, 27:9, 27:15, 27:17, 31:21, 54:8, 62:8, 62:12, 69:8, 72:18, 72:21, 83:6
**prohibits** [1] - 78:22
**project** [7] - 14:13, 15:3, 30:24, 32:15, 35:11, 35:14, 59:4
**Project** [1] - 6:11
**projected** [1] - 60:15
**promised** [1] - 30:25
**promulgates** [1] - 57:17
**propagation** [1] - 41:18
**proper** [2] - 22:8, 49:21
**properly** [1] - 51:16
**properties** [1] - 82:22
**property** [2] - 24:20, 73:7
**proposal** [2] - 10:4, 10:6
**Proposals** [1] - 77:10
**proposed** [30] - 36:20, 36:24, 37:17, 37:21, 38:21, 39:15, 41:23, 42:4, 43:2, 43:15, 44:23, 44:24, 45:14, 46:11, 47:2, 47:7, 48:21, 49:5, 49:12, 50:7, 50:12, 51:23, 52:11, 52:16, 63:8, 63:14, 64:2, 66:18, 68:21
**proposes** [2] - 38:11
**proposition** [3] - 69:15, 69:16, 72:1
**propositions** [1] - 17:1
**prosecutorial** [2] - 34:3, 34:14
**prospects** [1] - 14:25
**protect** [8] - 11:17, 43:12, 45:9, 45:11, 47:12, 58:11, 74:18
**protected** [2] - 41:6, 41:18
**PROTECTION** [3] - 1:6, 1:16, 2:16
**Protection** [1] - 3:4
**protection** [1] - 66:17
**provide** [10] - 12:19, 46:15, 47:16, 52:5, 65:8, 67:2, 67:13, 67:19, 76:10, 78:7
**provided** [2] - 31:6, 84:3
**provides** [2] - 72:7, 72:16
**proving** [2] - 55:4, 55:7
**provision** [2] - 31:25, 68:7
**provisions** [1] - 84:12
**proximate** [1] - 44:9
**public** [5] - 65:17, 66:21, 70:3, 73:15
**publishes** [1] - 57:20
**pull** [2] - 30:8, 34:6
**pumping** [2] - 21:6, 21:7
**purpose** [1] - 62:2
**purposes** [1] - 48:5
**pursue** [1] - 35:5
**pursuing** [2] - 8:5, 34:1
**put** [8] - 4:23, 14:21, 22:18, 34:25, 65:25, 78:25, 79:1, 79:3
**putting** [1] - 30:1

## Q

**qualified** [1] - 62:15
**qualifies** [1] - 71:23
**quality** [1] - 67:21
**quantified** [1] - 62:15
**questions** [10] - 4:19, 30:19, 34:20, 56:14, 56:22, 56:23, 64:7, 64:8, 64:9, 64:19
**quibbles** [1] - 9:6
**quick** [1] - 80:18
**quintessentially** [1] - 34:18
**quo** [1] - 32:4
**quote** [5] - 20:17, 26:11, 71:20, 73:6, 80:6
**quotes** [1] - 7:18

## R

**Rain** [1] - 36:5
**raised** [3] - 18:19, 25:12, 26:13
**rare** [1] - 66:21
**rarely** [1] - 30:8
**rarest** [1] - 44:16
**rather** [6] - 16:22, 17:16, 41:21, 49:21, 60:13, 71:6
**rational** [5] - 12:13, 17:12, 47:16, 57:3, 65:21
**rationally** [2] - 70:15, 71:4
**RDR** [1] - 85:8
**RDR-CRR** [1] - 85:8
**reach** [2] - 53:10, 68:4
**reaches** [1] - 9:19
**read** [4] - 74:25, 77:12, 80:6, 82:14
**reading** [5] - 21:15, 37:15, 42:2, 68:6, 69:5
**reads** [1] - 81:2
**ready** [2] - 4:4, 35:25
**real** [1] - 61:17
**reality** [2] - 10:15, 10:16
**really** [18] - 7:13, 8:19, 9:1, 14:20, 15:8, 18:23, 28:11, 33:1, 33:9, 34:23, 38:23, 45:3, 45:15, 54:7, 55:8, 56:1, 81:4, 83:25
**Realtime** [1] - 1:25
**rear** [9] - 37:15, 41:3, 41:13, 44:25, 45:2, 45:8, 45:10, 45:24, 75:20
**reared** [1] - 75:20
**rearing** [5] - 41:5, 45:3, 45:4, 48:17, 48:20
**reason** [6] - 7:14, 9:8, 32:17, 50:2, 51:11, 83:13
**reasonable** [8] - 53:16, 54:3, 58:18, 59:9, 59:16, 59:19, 60:1, 63:1
**reasonably** [9] - 5:7, 5:10, 11:18, 12:14, 46:18, 47:17, 62:6, 70:17, 74:10
**reasoned** [6] - 37:4, 43:13, 57:10, 58:3, 65:24, 73:17
**reasoning** [2] - 17:19, 71:9
**reasons** [2] - 8:9, 20:13
**rebut** [1] - 67:3
**rebuttal** [5] - 4:12, 4:14, 19:22, 26:25, 30:18
**rebutted** [1] - 47:25
**recast** [1] - 57:7
**recent** [1] - 44:19
**recently** [1] - 42:12
**Recessed** [1] - 35:23
**recitation** [1] - 64:15
**recited** [1] - 5:5
**recommended** [1] - 50:9
**recommits** [1] - 6:20
**reconfigure** [1] - 39:12
**record** [53] - 3:2, 3:7, 5:17, 7:14, 9:9, 10:15, 10:17, 14:22, 15:21, 21:11, 35:22, 35:24, 37:4, 37:16, 42:3, 44:2, 46:25, 47:22, 48:1, 48:4, 50:2, 50:24, 54:22, 55:6, 57:2, 57:4, 57:10, 60:6, 61:8, 65:22, 65:23, 67:2, 67:12, 69:6, 69:11, 69:17, 69:24, 70:12, 71:4, 71:7, 71:11, 71:17, 71:18, 72:15, 72:19, 72:24, 75:24, 78:4, 79:3, 79:8, 80:2, 84:21, 85:4
**Recovery** [1] - 32:1
**recreational** [1] - 61:13
**recurring** [1] - 57:16
**reduce** [3] - 39:13, 39:15, 61:15
**reenforces** [1] - 29:3
**Reeves** [2] - 85:2, 85:8
**REEVES** [2] - 1:24, 85:8
**referenced** [1] - 30:9
**referencing** [2] - 28:15, 28:24
**referred** [5] - 43:23, 43:24, 46:4, 54:14, 78:3
**referring** [2] - 15:21, 76:19
**refine** [2] - 59:10, 59:11
**refined** [1] - 60:9
**refineries** [2] - 59:15, 60:7
**Refining** [2] - 31:10, 31:24
**refining** [1] - 79:14
**reframe** [1] - 15:13
**refuge** [1] - 46:17
**regard** [2] - 18:20, 47:5
**regarding** [4] - 4:1, 56:24, 78:21
**regardless** [1] - 59:4
**regime** [5] - 31:14, 31:15, 31:18, 31:20, 35:13
**Registered** [1] - 1:24
**regret** [1] - 12:22
**regular** [1] - 57:16
**regulate** [3] - 27:25, 40:2, 43:12
**regulated** [1] - 29:7
**regulation** [18] - 5:24, 7:18, 7:20, 16:1, 19:8, 19:13, 19:14, 19:15, 20:24, 25:1, 25:6, 46:16, 57:18, 57:19, 78:11, 81:2, 81:3, 81:4
**regulations** [12] - 14:3, 42:16, 47:15, 51:22, 52:1, 52:5, 64:1, 80:20, 80:21, 80:22, 81:14, 85:4
**regulator** [1] - 19:25
**regulators** [1] - 14:24
**regulatory** [1] - 72:10
**rehabilitate** [1] - 63:12
**reinterpreted** [1] - 5:6
**reject** [3] - 71:5, 76:7, 84:14
**rejected** [3] - 68:2, 68:5, 69:16
**relate** [1] - 22:4
**related** [2] - 24:6, 72:25
**relates** [1] - 72:13
**relating** [1] - 71:17
**relation** [1] - 68:24
**relationship** [1] - 68:11
**release** [1] - 52:14
**relevant** [11] - 10:19, 10:20, 43:17, 46:1, 49:7, 63:9, 67:10, 68:9, 70:1, 80:23, 80:25
**reliance** [1] - 67:25
**relied** [7] - 20:10, 20:15, 20:25, 23:11, 41:3, 45:1, 54:23

**relocations** [1] - 62:3
**rely** [8] - 21:17, 21:20, 24:25, 42:22, 42:24, 54:3, 80:12, 81:13
**relying** [6] - 11:11, 14:9, 22:8, 26:9, 26:11, 82:9
**remaining** [3] - 36:15, 49:23, 56:25
**remains** [1] - 59:19
**remarkable** [2] - 68:14, 76:16
**remind** [1] - 8:2
**removal** [2] - 63:9, 69:3
**remove** [1] - 52:18
**removing** [1] - 63:12
**render** [1] - 51:11
**repeatedly** [3] - 25:16, 25:22, 57:13
**replace** [1] - 31:20
**replacement** [1] - 63:8
**replacing** [1] - 63:12
**replete** [1] - 72:22
**reply** [3] - 40:11, 43:5, 45:7
**report** [3] - 58:16, 61:1, 73:5
**reported** [1] - 39:2
**REPORTER** [1] - 85:9
**Reporter** [4] - 1:24, 1:25, 1:25, 85:2
**represent** [4] - 38:22, 40:14, 40:15, 66:6
**representing** [1] - 74:8
**represents** [1] - 66:8
**reproduce** [1] - 41:12
**Republican** [1] - 66:22
**request** [1] - 26:3
**requested** [1] - 13:16
**require** [2] - 62:8, 80:21
**required** [5] - 12:4, 18:5, 25:9, 52:21, 71:11
**requirements** [3] - 43:3, 43:8, 43:11
**requires** [6] - 14:12, 51:18, 55:16, 55:18, 56:10, 58:2
**research** [1] - 44:11
**reserve** [6] - 4:11, 19:22, 30:18, 35:18, 37:11, 67:17
**residents** [1] - 73:15
**resilience** [2] - 37:1, 47:3
**resolve** [1] - 64:19
**resolved** [1] - 31:12
**resource** [3] - 15:8, 49:8, 52:2
**Resources** [1] - 2:18
**resources** [6] - 36:22, 43:17, 46:14, 53:12, 58:25, 65:16
**respect** [6] - 18:6, 42:13, 50:23, 53:2, 63:7, 63:23
**respects** [1] - 73:23
**respond** [2] - 34:21, 34:23
**response** [9] - 6:25, 8:22, 12:2, 13:16, 26:2, 54:22, 70:7, 70:11, 80:7
**responses** [1] - 81:11
**responsibility** [1] - 29:22
**rest** [3] - 10:14, 30:18, 60:10
**restoration** [1] - 63:8
**restore** [1] - 10:5
**restricted** [2] - 27:3, 27:5
**restricting** [1] - 32:12
**restriction** [15] - 27:9, 27:17, 40:16, 54:9, 61:21, 61:22, 62:2, 62:7, 62:11, 69:10, 72:18, 77:5, 77:6, 77:12, 83:6
**restrictive** [1] - 7:2
**restricts** [1] - 40:5
**result** [16] - 7:17, 13:8, 20:18, 42:18, 45:17, 46:13, 48:15, 50:13, 52:3, 59:3, 60:17, 62:4, 62:23, 69:2, 77:11, 82:16
**results** [1] - 28:8
**return** [10] - 41:16, 44:4, 44:14, 45:13, 45:23, 45:24, 46:9, 59:4, 59:21
**revenue** [2] - 14:18, 30:25
**review** [11] - 12:9, 26:15, 34:10, 35:14, 57:2, 65:23, 66:1, 71:2, 71:5, 71:10, 81:19
**reviewability** [1] - 84:12
**reviewable** [1] - 19:13
**reviewed** [2] - 4:1, 35:6
**reviewing** [3] - 47:20, 57:14, 71:24
**rewritten** [1] - 12:7
**rewrote** [1] - 12:8
**rich** [1] - 66:17
**Richter** [3] - 11:11, 76:10
**rights** [2] - 34:17, 37:11
**rigid** [1] - 10:9
**rigorous** [1] - 73:14
**risk** [2] - 11:17, 15:1
**risks** [1] - 73:12
**River** [3] - 44:20, 63:10, 78:13
**river** [1] - 9:17
**rivers** [1] - 72:21
**rivulets** [1] - 11:5
**road** [1] - 66:15
**roadless** [1] - 63:11
**robust** [2] - 14:22, 37:4
**rolled** [1] - 73:19
**RONALD** [1] - 2:10
**room** [1] - 3:22
**round** [1] - 19:6
**Roundtable** [2] - 16:24, 17:4
**royalties** [1] - 14:19
**rule** [3] - 11:13, 11:22, 19:1
**rules** [2] - 7:1, 32:7
**ruling** [3] - 13:17, 33:18, 34:10
**running** [1] - 19:18
**runoff** [1] - 52:8
**runs** [1] - 68:15

## S

**Sackett** [8] - 13:11, 39:5, 55:3, 55:5, 55:6, 67:24, 68:1, 68:2
**Sacramento** [1] - 2:15
**Safety** [1] - 72:4
**salmon** [72] - 6:22, 8:13, 9:2, 9:6, 9:10, 9:15, 9:23, 10:11, 10:12, 10:15, 36:23, 36:25, 37:2, 38:6, 38:9, 41:2, 41:4, 41:6, 41:13, 41:20, 42:6, 43:19, 43:22, 44:4, 44:13, 44:16, 44:17, 44:19, 44:22, 44:25, 45:2, 45:5, 45:10, 45:13, 45:18, 45:21, 45:22, 46:8, 46:10, 46:12, 46:17, 47:3, 48:12, 48:15, 48:17, 48:18, 48:19, 48:20, 48:24, 48:25, 52:15, 54:11, 54:12, 54:13, 61:12, 63:8, 66:11, 66:17, 67:13, 67:20, 68:11, 68:12, 68:15, 68:22, 69:15, 70:20, 75:19, 77:24, 78:3, 79:21
**salmon-rich** [1] - 66:17
**salmon-spawning** [1] - 48:17
**satisfy** [2] - 31:23, 65:9
**saw** [1] - 27:11
**scale** [20] - 44:22, 49:4, 49:7, 49:12, 49:21, 50:1, 51:2, 51:4, 51:8, 67:2, 69:24, 70:1, 70:13, 70:15, 70:21, 70:22, 71:3, 71:7, 78:3, 78:4
**scales** [2] - 10:22, 70:21
**School** [1] - 49:23
**schools** [4] - 49:16, 49:18, 49:22, 49:23
**science** [5] - 45:25, 67:14, 68:24, 73:14, 73:20
**science-based** [1] - 67:14
**scientific** [11] - 4:23, 12:5, 12:12, 37:3, 43:19, 46:20, 47:9, 47:20, 49:6, 61:14, 71:23
**scope** [2] - 22:12, 61:20
**searching** [1] - 12:12
**Seattle** [1] - 2:25
**SEC** [5] - 15:21, 73:2, 73:4, 73:6, 74:4
**second** [15] - 9:18, 14:7, 24:25, 29:1, 31:8, 33:4, 35:14, 37:12, 40:24, 49:3, 63:14, 68:19, 69:9, 81:6, 81:17
**Secondary** [1] - 24:9
**secondary** [28] - 20:10, 20:14, 20:15, 20:16, 21:18, 21:20, 22:8, 22:11, 22:23, 23:10, 24:10, 37:21, 51:17, 51:20, 51:21, 52:1, 52:5, 52:10, 53:1, 53:5, 53:6, 80:19, 81:1, 81:8, 82:9, 82:10, 82:13, 82:14
**section** [5] - 20:2, 21:23, 21:24, 22:10, 43:7
**Section** [34] - 5:23, 5:25, 6:3, 21:12, 21:13, 21:19, 22:3, 22:9, 22:10, 23:1, 23:3, 23:4, 23:7, 23:17, 26:22, 28:10, 29:24, 30:7, 51:17, 51:21, 51:24, 52:22, 53:19, 55:8, 56:11, 65:8, 68:18, 70:25, 81:8, 81:10, 81:12, 81:15, 81:21
**securities** [3] - 14:23, 15:1, 16:1
**see** [5] - 3:20, 4:8, 19:18, 27:19, 35:10
**seek** [1] - 56:4
**seeks** [2] - 55:11, 56:7
**seem** [1] - 12:5
**selected** [1] - 67:18
**selection** [1] - 50:1
**sell** [1] - 10:1
**sense** [2] - 35:2, 35:11
**sensitive** [1] - 60:12
**separate** [1] - 21:19
**serious** [2] - 15:1, 50:8
**services** [1] - 50:6
**Services'** [1] - 50:7
**set** [3] - 4:7, 5:4, 31:18
**sets** [1] - 77:2
**setting** [1] - 54:6
**Seven** [4] - 12:3, 12:6, 47:18, 71:19
**several** [2] - 16:25, 48:22
**SFK** [4] - 44:2, 44:12, 44:21, 49:9
**shaded** [1] - 15:2
**Shalala** [1] - 16:25
**share** [3] - 10:1, 59:20, 59:21
**SHARON** [1] - 1:22
**shored** [1] - 60:8
**short** [3] - 11:17,

68:16, 80:3
**short-term** [1] - 80:3
**show** [3] - 48:10, 57:10, 83:10
**showing** [1] - 44:6
**shows** [6] - 10:15, 69:24, 70:12, 71:14, 72:19, 72:20
**shutting** [1] - 49:15
**shy** [1] - 8:7
**side** [5] - 16:7, 16:12, 17:3, 17:4, 23:10
**sign** [1] - 76:24
**significance** [2] - 32:25, 61:3
**significant** [18] - 5:8, 6:16, 6:19, 7:7, 7:18, 8:19, 19:3, 31:5, 33:13, 42:18, 50:13, 51:3, 52:14, 57:17, 58:7, 62:19, 62:22, 71:23
**significantly** [1] - 48:20
**silly** [1] - 69:15
**similar** [7] - 27:15, 30:9, 40:20, 52:13, 62:7, 62:8, 62:11
**similarly** [1] - 44:13
**simply** [11] - 4:22, 7:12, 11:22, 13:14, 16:4, 19:13, 31:20, 64:18, 65:25, 76:11, 79:9
**single** [3] - 10:1, 24:20, 83:15
**singularly** [1] - 57:8
**sit** [2] - 3:23, 26:24
**site** [16] - 20:4, 20:12, 21:6, 27:1, 27:21, 27:22, 27:23, 28:2, 28:12, 29:1, 29:2, 29:4, 61:10, 63:25, 65:15, 83:18
**sites** [5] - 28:17, 38:2, 40:7, 55:22, 55:23
**situation** [1] - 76:22
**six** [2] - 44:7, 49:16
**six-tenths** [1] - 44:7
**size** [1] - 49:17
**small** [1] - 69:23
**smaller** [5] - 10:22, 27:4, 48:21, 60:17, 71:3
**smallest** [1] - 38:22
**societal** [2] - 58:23, 60:17
**society** [1] - 58:12
**sockeye** [7] - 44:4, 44:6, 44:9, 77:15, 77:16, 78:1, 78:2
**solely** [1] - 11:11
**solicited** [1] - 70:1
**solve** [1] - 19:15
**sometimes** [2] - 6:17, 25:2
**somewhat** [1] - 45:10
**somewhere** [3] - 79:1, 83:5, 83:6
**sonar** [1] - 48:9
**SONJA** [2] - 1:24, 85:8
**Sonja** [2] - 85:2, 85:8
**sorry** [4] - 11:8, 25:23, 50:18, 81:7
**sort** [5] - 4:2, 29:20, 35:14, 35:15, 46:7
**sought** [8] - 45:20, 48:13, 49:11, 53:17, 53:22, 53:23, 54:18, 60:23
**source** [1] - 72:17
**sources** [1] - 72:16
**South** [2] - 2:5, 2:24
**southeast** [1] - 10:21
**southeastern** [1] - 49:19
**span** [1] - 73:16
**spatially** [1] - 49:7
**spawn** [13] - 37:15, 41:2, 41:13, 41:17, 44:5, 44:15, 44:25, 45:2, 45:23, 45:24, 46:9, 68:12, 75:18
**spawned** [2] - 10:13, 75:21
**spawning** [21] - 6:22, 9:6, 9:10, 37:13, 41:1, 41:5, 41:10, 42:1, 43:13, 45:3, 46:17, 47:25, 48:17, 48:20, 67:7, 69:3, 75:1, 75:18, 77:16, 77:24, 78:2
**speaking** [7] - 4:12, 21:19, 31:2, 32:3, 33:2, 33:12, 83:24
**special** [1] - 76:20
**species** [6] - 9:20, 37:1, 41:18, 44:16, 61:12, 78:4
**specific** [7] - 26:3, 29:2, 29:7, 30:6, 47:3, 48:5, 55:17
**specifically** [4] - 12:8, 28:21, 30:3, 68:2
**specification** [7] - 20:4, 27:21, 28:14, 28:15, 28:24, 29:7, 55:19
**specified** [1] - 28:16
**specify** [2] - 38:2, 55:24
**speculating** [1] - 15:16
**speculation** [2] - 9:7, 38:24
**speculative** [6] - 14:20, 16:10, 47:5, 71:22, 73:2, 74:8
**speed** [2] - 34:7, 34:8
**spent** [1] - 78:24
**sport** [2] - 66:12, 67:21
**square** [1] - 27:10
**squarely** [1] - 74:21
**Squire** [2] - 2:2, 2:4
**stability** [2] - 47:3, 61:16
**stage** [2] - 16:5, 45:12
**stand** [3] - 17:1, 66:23, 73:1
**standard** [12] - 5:4, 6:21, 6:25, 18:6, 42:7, 57:2, 58:4, 58:5, 65:23, 71:12, 74:11, 74:12
**standardless** [1] - 32:22
**standards** [7] - 31:19, 33:24, 35:6, 35:15, 35:16, 65:9, 72:7
**Standards** [1] - 76:21
**start** [4] - 8:4, 20:14, 69:18, 80:19
**started** [3] - 17:14, 17:17, 66:14
**STATE** [2] - 1:12, 2:7
**state** [10] - 3:6, 7:1, 20:2, 20:20, 25:21, 32:12, 37:10, 37:11, 40:16, 70:2
**State** [24] - 3:11, 4:13, 19:21, 19:24, 20:1, 25:20, 25:21, 25:22, 26:13, 29:10, 29:12, 29:18, 41:5, 41:6, 43:18, 45:2, 45:15, 47:11, 47:21, 67:16, 72:3, 73:15
**State's** [8] - 25:15, 26:2, 29:23, 39:24, 40:8, 41:3, 44:19, 45:1
**state-owned** [3] - 20:2, 25:21, 37:10
**Statehood** [4] - 39:25, 40:9, 40:17, 40:22
**statement** [2] - 14:11, 50:24
**statements** [2] - 51:1, 54:21
**States** [79] - 2:17, 3:4, 13:9, 13:10, 13:13, 20:6, 20:11, 22:6, 22:14, 22:19, 23:16, 23:20, 23:21, 24:1, 24:12, 24:15, 24:20, 24:22, 24:24, 25:3, 25:10, 25:17, 25:24, 26:6, 26:8, 26:23, 27:24, 28:5, 28:7, 28:20, 28:22, 29:3, 30:16, 36:19, 36:25, 37:23, 38:2, 38:13, 39:5, 39:9, 39:13, 40:4, 40:6, 42:5, 47:2, 50:14, 53:15, 53:17, 53:19, 54:1, 54:4, 54:10, 54:20, 54:24, 55:2, 55:12, 55:13, 55:17, 55:24, 56:2, 56:3, 56:7, 58:25, 64:18, 65:14, 78:13, 79:20, 81:16, 81:22, 82:20, 82:22, 83:3, 83:5, 83:8, 83:11, 83:17, 85:2, 85:5
**states** [4] - 40:20, 40:23, 47:24, 61:2
**STATES** [5] - 1:1, 1:6, 1:15, 2:16, 2:16
**station** [1] - 48:9
**status** [2] - 32:4, 80:9
**statute** [32] - 6:14, 7:21, 7:24, 18:22, 19:7, 19:10, 22:10, 22:24, 26:21, 31:17, 37:15, 41:10, 42:2, 45:8, 51:19, 55:16, 55:18, 55:21, 57:10, 64:11, 74:12, 74:19, 75:1, 77:3, 81:4, 81:12, 82:13, 84:8, 84:9
**statute's** [1] - 43:8
**statutes** [1] - 76:20
**statutory** [15] - 20:9, 31:11, 33:14, 33:15, 37:13, 40:25, 42:23, 58:3, 58:5, 64:9, 64:12, 64:15, 82:18, 83:3, 83:20
**stay** [1] - 20:8
**stenographic** [1] - 85:3
**step** [1] - 65:20
**stepped** [1] - 83:20
**still** [7] - 9:13, 53:11, 56:24, 58:9, 62:24, 83:23, 84:13
**stocks** [2] - 9:25, 47:12
**stood** [3] - 6:11, 74:11, 77:22
**stop** [1] - 17:22
**stopwatch** [1] - 4:7
**stray** [1] - 10:15
**stream** [27] - 11:10, 38:6, 38:8, 39:15, 41:2, 43:19, 44:24, 45:13, 45:19, 45:21, 46:10, 46:12, 46:19, 46:23, 47:6, 48:13, 48:14, 53:9, 53:10, 54:11, 54:12, 54:14, 54:18, 69:3, 77:22, 77:24
**streamflow** [2] - 76:3
**streams** [44] - 8:17, 8:18, 9:10, 9:16, 11:4, 11:8, 11:9, 21:8, 22:18, 22:20, 23:20, 23:25, 24:4, 24:14, 24:21, 26:6, 29:7, 30:12, 38:9, 41:14, 41:17, 44:5, 44:14, 45:2, 45:24, 48:16, 48:25, 52:19, 54:13, 54:15, 54:20, 61:15, 67:13, 68:22, 68:25, 72:21, 77:17, 78:2, 79:6, 82:10, 82:25, 83:2, 83:10
**Street** [3] - 2:3, 2:5, 2:22
**striking** [1] - 31:13
**struck** [1] - 31:25
**students** [3] - 18:3, 49:18, 49:22
**studied** [4] - 11:21, 66:18, 68:24, 78:5
**studies** [4] - 44:6, 47:9, 48:9, 80:3
**study** [5] - 11:11, 15:18, 15:21, 43:16, 78:2
**stuff** [3] - 23:6, 78:9, 79:1
**subject** [5] - 56:3,

77:11, 77:13, 84:9, 84:10
**submit** [2] - 6:9, 39:6
**submitted** [3] - 53:17, 63:4, 73:5
**subsidies** [1] - 46:15
**subsistence** [3] - 61:12, 66:11, 67:19
**substance** [1] - 27:5
**substantive** [4] - 43:8, 43:11, 84:15, 84:16
**suffering** [1] - 30:23
**sufficient** [1] - 58:2
**suggest** [1] - 33:18
**suggested** [1] - 74:9
**suggesting** [1] - 74:23
**suggestion** [1] - 75:19
**suggests** [1] - 60:21
**suit** [1] - 17:6
**suitable** [1] - 32:21
**Suite** [6] - 2:3, 2:8, 2:11, 2:14, 2:22, 2:24
**suits** [2] - 16:13, 16:15
**summary** [4] - 5:20, 5:22, 6:1, 6:2
**Summit** [1] - 2:23
**superseded/ replaced** [1] - 63:15
**supply** [2] - 60:13, 80:1
**support** [9] - 44:3, 44:12, 58:3, 61:12, 66:13, 69:7, 71:3, 72:16, 73:3
**supported** [6] - 12:13, 37:4, 50:1, 58:5, 61:8, 65:24
**supporting** [1] - 26:6
**supports** [4] - 16:17, 37:16, 42:3, 47:1
**supposed** [4] - 12:4, 22:22, 23:14, 80:13
**Supreme** [13] - 12:2, 16:17, 16:23, 31:25, 39:5, 42:12, 42:21, 47:18, 57:13, 64:24, 65:10, 68:2, 75:6
**surface** [1] - 52:8
**surrounding** [2] - 52:18, 52:19
**survey** [6] - 48:3, 48:6, 69:22, 77:21, 77:23, 77:24
**surveys** [3] - 48:4, 48:10, 77:19
**sustaining** [1] - 43:21
**swift** [1] - 74:2

## T

**table** [3] - 3:22, 15:20, 66:7
**tailored** [1] - 73:18
**talks** [2] - 7:17, 72:11
**task** [1] - 29:23
**taxes** [1] - 14:19
**technical** [4] - 16:1, 46:25, 50:3, 74:5
**technology** [1] - 39:21
**temperature** [1] - 46:16
**temporal** [1] - 84:14
**ten** [3] - 4:14, 10:5, 36:9
**tenths** [1] - 44:7
**term** [15] - 13:17, 32:20, 32:21, 41:25, 42:9, 45:18, 51:20, 60:13, 68:3, 68:6, 74:5, 80:1, 80:3, 84:20
**terminology** [1] - 13:20
**terms** [1] - 18:9
**test** [1] - 65:10
**text** [3] - 28:13, 33:15
**textual** [4] - 33:16, 64:18, 67:14, 83:13
**THE** [86] - 1:1, 1:22, 3:8, 3:20, 3:24, 4:6, 4:16, 4:20, 5:16, 5:20, 5:25, 6:4, 6:7, 7:16, 8:1, 10:23, 11:1, 11:24, 12:2, 12:20, 12:24, 13:3, 13:15, 15:10, 15:18, 15:23, 16:3, 16:6, 16:16, 17:10, 17:23, 18:1, 18:8, 18:11, 18:18, 19:5, 19:16, 19:20, 19:23, 20:20, 21:11, 21:23, 22:2, 23:1, 23:5, 24:3, 25:8, 25:12, 26:1, 26:13, 27:2, 27:11, 27:18, 28:9, 29:16, 29:21, 30:5, 30:20, 34:21, 35:17, 35:20, 35:24, 38:16, 50:16, 56:13, 56:15, 56:18, 63:14, 63:17, 63:22, 64:4, 66:4, 69:5, 69:12, 73:25, 74:25, 75:7, 76:15, 77:9, 77:14, 78:14, 79:10, 79:18, 80:16, 83:21, 84:18
**theme** [1] - 56:25
**themselves** [2] - 4:2, 24:5
**theories** [1] - 9:7
**theorize** [1] - 47:6
**theory** [7] - 9:1, 9:14, 10:7, 10:9, 11:2, 43:23, 47:9
**thereabouts** [1] - 7:19
**therefore** [2] - 57:5, 62:6
**thinking** [2] - 78:24, 81:17
**thinks** [2] - 18:23, 79:21
**third** [7] - 9:22, 24:6, 31:13, 37:16, 42:3, 72:3, 82:2
**thirds** [1] - 79:21
**thorough** [2] - 69:25, 84:18
**thousand** [1] - 11:7
**thousands** [4] - 6:24, 11:8, 48:18, 78:3
**threatens** [2] - 37:1, 47:3
**three** [15] - 11:5, 21:21, 22:18, 23:25, 29:7, 30:12, 30:17, 31:1, 35:18, 44:1, 44:12, 53:1, 53:7, 56:24, 72:1
**three-fourths** [1] - 11:5
**threshold** [2] - 39:11, 64:8
**thresholds** [2] - 38:4, 38:13
**throughout** [3] - 66:16, 67:9, 69:17
**throw** [1] - 11:22
**thumb** [2] - 11:13, 11:23
**Thursday** [1] - 1:22
**tie** [1] - 19:5
**timer** [1] - 4:8
**tiny** [1] - 11:4
**title** [1] - 15:24
**today** [6] - 31:1, 36:4, 36:12, 66:9, 71:9, 84:19
**today's** [1] - 55:9
**tool** [1] - 64:9
**top** [1] - 52:12
**tops** [1] - 22:17
**total** [3] - 59:25, 60:2, 60:18
**totally** [2] - 82:18, 83:20
**touching** [1] - 60:20
**toward** [1] - 58:25
**towards** [2] - 39:10, 59:6
**track** [1] - 4:8
**traditional** [1] - 54:15
**traditionally** [1] - 54:11
**traits** [1] - 44:8
**TRANSCRIPT** [1] - 1:21
**transcript** [3] - 85:3, 85:3, 85:4
**transformative** [1] - 64:12
**translating** [1] - 59:24
**transport** [1] - 32:11
**Transportation** [1] - 72:4
**treated** [1] - 62:13
**treatment** [5] - 8:21, 17:2, 52:11, 52:12, 75:23
**trees** [1] - 49:2
**tribes** [2] - 66:13, 73:11
**tried** [1] - 71:19
**triggered** [2] - 38:14, 38:18
**TROUT** [1] - 1:19
**true** [7] - 15:8, 32:14, 33:10, 33:19, 49:25, 60:22, 85:3
**truly** [2] - 31:16, 80:4
**trump** [1] - 81:3
**try** [2] - 45:7, 74:2
**turn** [5] - 14:9, 37:8, 37:10, 56:16, 61:11
**turning** [8] - 37:25, 40:24, 42:3, 51:16, 57:12, 63:3, 68:19, 72:8
**Tuyn** [4] - 2:21, 3:17, 36:6, 66:6
**TUYN** [5] - 2:21, 3:17, 66:5, 69:6, 69:13
**twice** [2] - 9:12, 76:15
**two** [17] - 24:8, 26:17, 28:13, 37:23, 38:3, 40:4, 54:8, 60:17, 63:4, 69:10, 69:18, 72:2, 79:13, 79:21, 80:21, 81:11
**two-thirds** [1] - 79:21
**type** [4] - 22:22, 23:13, 28:11, 81:25
**types** [3] - 8:11, 12:5, 24:8

## U

**U.S** [20] - 33:20, 58:12, 58:23, 59:1, 59:9, 59:11, 59:19, 59:21, 59:25, 60:2, 60:8, 60:18, 72:8, 72:10, 72:17, 72:22, 79:22, 79:23
**ultimate** [1] - 53:2
**ultimately** [5] - 50:11, 50:14, 51:9, 62:9, 62:17
**unacceptability** [1] - 24:8
**unacceptable** [32] - 5:5, 6:16, 6:17, 6:23, 7:7, 7:12, 8:9, 14:12, 17:20, 20:6, 32:15, 32:20, 32:23, 33:7, 37:18, 41:23, 42:5, 42:8, 42:9, 42:17, 42:25, 43:2, 43:10, 51:19, 58:4, 58:9, 62:25, 65:15, 67:11, 68:20, 71:24, 75:10
**uncertain** [2] - 39:1, 74:9
**uncertainties** [3] - 57:24, 58:17, 62:16
**uncertainty** [1] - 11:14
**unconstitutional** [2] - 30:24, 31:8
**under** [22] - 14:3, 14:23, 17:24, 19:24, 22:9, 33:23, 34:7, 35:2, 35:3, 35:6, 39:5, 41:21, 42:16, 43:7, 51:12, 58:3, 62:25, 65:25, 70:16, 84:1, 84:8, 84:19
**undercount** [2] - 48:2, 48:14
**undercuts** [1] - 68:1
**underestimate** [2] - 8:19, 51:5
**underlying** [1] - 40:8
**underscore** [1] - 44:21
**underscores** [1] - 32:25
**understood** [4] -

13:15, 19:12, 64:4, 71:15
**undertaken** [1] - 66:19
**undiscussed** [1] - 78:9
**undisputedly** [1] - 48:17
**unequaled** [1] - 67:21
**unequivocal** [1] - 73:9
**unfettered** [4] - 33:6, 33:16, 33:24, 84:3
**unfounded** [2] - 9:14, 19:4
**unique** [3] - 15:8, 43:20, 47:12
**uniquely** [1] - 73:19
**UNITED** [5] - 1:1, 1:6, 1:15, 2:16, 2:16
**United** [80] - 2:17, 3:4, 13:9, 13:10, 13:13, 20:6, 20:11, 22:6, 22:13, 22:19, 23:15, 23:20, 23:21, 24:1, 24:12, 24:15, 24:19, 24:21, 24:24, 25:3, 25:10, 25:17, 25:24, 26:6, 26:8, 26:23, 27:24, 28:5, 28:7, 28:20, 28:22, 29:3, 30:16, 36:19, 36:25, 37:23, 38:2, 38:12, 39:5, 39:9, 39:13, 40:4, 40:6, 42:5, 47:2, 50:14, 53:15, 53:17, 53:18, 54:1, 54:4, 54:9, 54:20, 54:24, 55:2, 55:12, 55:13, 55:17, 55:23, 56:2, 56:3, 56:6, 58:24, 64:17, 65:14, 78:13, 78:21, 79:20, 81:16, 81:22, 82:20, 82:21, 83:2, 83:5, 83:8, 83:11, 83:17, 85:2, 85:5
**units** [2] - 10:19, 10:20
**unless** [1] - 30:18
**unlike** [2] - 34:5, 34:11
**UNLIMITED** [1] - 1:19
**unprecedented** [2] - 45:15
**unreasonable** [2] - 49:18, 51:11
**unreviewable** [3] - 19:7, 65:1, 84:8
**unsure** [1] - 56:1
**unused** [1] - 59:6
**unusual** [1] - 7:2
**unusually** [1] - 7:2
**up** [11] - 5:18, 7:23, 19:19, 27:2, 30:8, 59:24, 71:18, 72:14, 74:11, 78:10, 83:14
**upheld** [2] - 66:2, 68:18
**uphold** [3] - 57:6, 65:19, 73:22
**uplands** [1] - 67:17
**upper** [2] - 53:10, 71:16
**upset** [1] - 34:10
**upstream** [6] - 53:13, 61:6, 61:18, 74:19, 74:23, 75:9
**USACE's** [1] - 80:12
**USDA** [1] - 78:19
**useful** [2] - 4:18, 48:4
**uses** [1] - 47:11
**UTC** [3] - 44:2, 44:12, 49:9

**V**

**vacate** [3] - 7:14, 8:3, 20:13
**vague** [1] - 28:11
**valley** [1] - 9:17
**valuable** [1] - 69:1
**value** [7] - 15:5, 38:25, 58:24, 60:18, 60:21, 61:2
**Van** [4] - 2:21, 3:17, 36:6, 66:5
**VAN** [5] - 2:21, 3:17, 66:5, 69:6, 69:13
**variability** [1] - 61:16
**variety** [1] - 17:15
**various** [5] - 6:14, 8:21, 17:18, 18:25, 68:20
**vast** [3] - 9:22, 34:12, 79:23
**vehicle** [1] - 34:6
**version** [1] - 18:16
**versus** [6] - 3:4, 13:2, 16:25, 43:5, 78:13, 78:18
**vessel** [1] - 32:20
**vested** [1] - 34:13
**veto** [18] - 5:6, 5:11, 5:12, 6:19, 7:15, 8:24, 13:14, 14:17, 16:8, 17:22, 29:14, 30:1, 30:3, 30:24, 31:3, 32:16, 32:25, 35:10
**vetoes** [3] - 30:8, 30:13, 34:24
**vetoing** [1] - 8:7
**viable** [1] - 38:23
**view** [4] - 5:14, 18:21, 19:1, 79:10
**viewing** [1] - 51:4
**Village** [1] - 78:18
**violation** [2] - 17:23, 32:18
**Virginia** [2] - 2:9, 22:16
**visibility** [1] - 12:16
**vs** [2] - 1:5, 1:14
**vulnerable** [1] - 44:17

**W**

**waived** [1] - 25:20
**Wake** [2] - 3:10, 30:21
**wake** [1] - 4:14
**WAKE** [6] - 2:14, 3:10, 30:21, 35:1, 35:18, 83:23
**WALKER** [2] - 2:5, 3:14
**Walker** [1] - 3:14
**WALTER** [1] - 2:10
**wander** [1] - 75:20
**wandered** [1] - 75:21
**wants** [1] - 49:16
**Washington** [2] - 2:19, 2:25
**wastewater** [1] - 52:11
**watchful** [1] - 14:23
**Water** [22] - 6:15, 20:2, 36:17, 37:5, 39:9, 40:18, 40:19, 41:3, 41:19, 41:21, 42:8, 43:7, 43:11, 45:1, 51:21, 51:24, 53:19, 65:8, 68:4, 68:7, 72:6, 73:22
**water** [21] - 19:25, 21:6, 21:7, 39:15, 52:6, 52:11, 52:12, 52:14, 52:18, 52:19, 54:12, 54:16, 56:2, 56:6, 56:8, 75:23, 75:25, 76:1, 76:2
**Waterkeeper** [3] - 43:4, 43:5, 76:25
**waters** [104] - 13:9, 13:10, 13:13, 20:6, 20:11, 21:3, 22:5, 22:13, 22:19, 23:12, 23:15, 23:20, 23:21, 24:1, 24:11, 24:15, 24:19, 24:21, 24:24, 25:3, 25:6, 25:10, 25:16, 25:23, 26:3, 26:5, 26:6, 26:7, 26:8, 26:23, 27:24, 28:5, 28:7, 28:9, 28:10, 28:20, 28:22, 29:2, 30:15, 36:19, 36:23, 36:24, 37:14, 37:23, 38:2, 38:7, 38:12, 39:4, 39:8, 39:9, 39:13, 40:3, 40:5, 41:4, 41:7, 42:5, 44:6, 44:10, 45:10, 45:25, 46:13, 47:2, 48:16, 49:11, 50:13, 53:15, 53:17, 53:18, 53:22, 53:25, 54:1, 54:3, 54:9, 54:20, 54:24, 55:2, 55:12, 55:13, 55:17, 55:23, 61:5, 64:17, 65:14, 66:17, 67:5, 68:11, 68:12, 69:1, 70:16, 72:8, 72:17, 72:22, 75:23, 78:21, 81:16, 81:22, 82:20, 82:21, 83:2, 83:5, 83:8, 83:10, 83:17
**watershed** [8] - 8:18, 44:20, 45:19, 47:10, 49:4, 60:25, 63:10
**watersheds** [10] - 11:7, 44:1, 44:3, 44:12, 46:2, 47:10, 48:21, 49:10, 49:11
**ways** [5] - 4:24, 8:21, 17:18, 18:25, 20:9
**weak** [2] - 31:6, 32:24
**weigh** [1] - 62:19
**weighed** [1] - 58:8
**weight** [2] - 13:23, 13:24
**weir** [1] - 48:9
**wells** [2] - 21:5, 21:6
**West** [2] - 2:11, 22:16
**western** [1] - 40:20
**wet** [1] - 52:17
**wetland** [3] - 28:1, 42:18, 46:13
**wetlands** [21] - 13:7, 13:10, 13:13, 21:8, 23:21, 24:15, 24:21, 26:5, 30:11, 38:7, 39:3, 39:8, 47:7, 52:20, 54:7, 72:20, 82:10, 82:25, 83:2, 83:9
**whale** [1] - 31:16
**white** [1] - 31:16
**whole** [3] - 14:7, 49:3, 51:11
**wide** [1] - 57:22
**wild** [1] - 44:17
**Wildlife** [1] - 50:6
**Wilson** [1] - 2:8
**Wind** [1] - 78:13
**winter** [1] - 45:6
**wiped** [1] - 15:17
**withdrawal** [1] - 19:13
**withdrawing** [1] - 19:11
**withdrew** [1] - 29:6
**word** [11] - 5:11, 6:13, 7:2, 15:25, 16:1, 26:19, 45:8, 51:14, 64:15, 83:21
**word-for-word** [1] - 64:15
**words** [4] - 7:10, 7:11, 18:15, 64:3
**works** [5] - 9:24, 10:2, 10:3, 24:17, 56:5
**world** [6] - 30:24, 33:21, 34:2, 60:10, 61:17, 84:7
**worst** [1] - 79:6
**worth** [1] - 57:12
**wrestle** [1] - 18:4
**write** [1] - 19:1
**written** [1] - 65:17
**wrote** [2] - 74:19

**Y**

**year** [4] - 6:24, 48:7, 48:19, 73:5
**years** [8] - 9:10, 14:22, 36:22, 59:7, 66:14, 73:10, 73:14, 78:24

**Z**

**zero** [1] - 77:25